FILED
15-0092
8/4/2015 3:59:31 PM
tex-6352761
SUPREME COURT OF TEXAS
BLAKE A. HAWTHORNE, CLERK

# NO. 15-0092

_____

## IN THE SUPREME COURT OF TEXAS

_____

TEXAS MEDICAL BOARD AND SCOTT FRESHOUR, IN HIS OFFICIAL CAPACITY
AS GENERAL COUNSEL OF THE TEXAS MEDICAL BOARD,

*Petitioners,*

v.

TELADOC, INC.

*Respondent.*

_____

ON PETITION FOR REVIEW FROM THE COURT OF APPEALS
FOR THE THIRD JUDICIAL DISTRICT OF TEXAS
CASE NO. 03-13-00211-CV

_____

## TELADOC'S RESPONSE TO TMB'S PETITION FOR REVIEW

_____

JACKSON WALKER L.L.P.
Matt Dow
State Bar No. 06066500
Dudley D. McCalla
State Bar No. 13354000
100 Congress St., Suite 1100
Austin, Texas  78701
Tel: 512.236.2000
Fax: 512.236.2002
mdow@jw.com
dmccalla@jw.com

BAKER BOTTS, L.L.P.
Thomas R. Phillips
State Bar No. 00000102
98 San Jacinto Blvd., Suite 1500
Austin, Texas   78701
Tel: 512.322.2610
Fax: 512.322.3608
tom.phillips@bakerbotts.com

Benjamin A. Geslison
State Bar No. 24074269
One Shell Plaza
910 Louisiana St.
Houston, Texas  77002
Tel: 713.229.1241
Fax: 713.229.2841
ben.geslison@bakerbotts.com

ATTORNEYS FOR RESPONDENT TELADOC, INC.

# TABLE OF CONTENTS

FACTS.........................................................................................................1

ARGUMENT .................................................................................................1

I.    This Court's review is unwarranted because the Court of Appeals correctly held that the TMB letter articulated a new rule under the APA, which was invalid under Section 2001.035 of that Act........................2

    A.    The TMB letter satisfies the elements of Section 2001.003(6). ...........2

    B.    The petition for review fails to identify flaws in the appellate court's Section 2001.003(6) analysis. ..................................................5

II.    This Court's review is unwarranted because the court of appeals opinion will have none of the disruptive effects that TMB predicts..............9

    A.    The opinion below will not excessively burden agencies.....................9

    B.    The opinion below will neither "drastically expand" Texas court dockets nor arrogate power to the judiciary at agency expense. .......................................................................................12

    C.    Regulated entities will not be left without guidance...........................14

III.    This Court's review is unwarranted under Government Code Section 22.001(a). ......................................................................................15

CONCLUSION .............................................................................................16

CERTIFICATE OF COMPLIANCE .................................................................18

CERTIFICATE OF SERVICE.........................................................................18

INDEX TO APPENDIX..................................................................................19

**Page(s)**

CASES

*Bd. of Adjustment v. Levinson*,
244 S.W.2d 281 (Tex. Civ. App.—San Antonio 1951, no writ) ........................... 3

*Combs v. Entertainment Publications, Inc.*,
292 S.W.3d 712 (Tex. App.—Austin 2009, no pet.) .................................... 10, 13

*Dewhurst v. Hendee*,
253 S.W.3d 320 (Tex. App.—Austin 2008, pet. dism'd) .................................... 11

*El Paso Hosp. Dist. v. Tex. Health & Human Serv.*,
247 S.W.3d 709 (Tex. 2008) ............................................................ 8, 13, 14, 16

*Martinez v. Harris Cnty.*,
808 S.W.2d 257 (Tex. App.—Houston [1st Dist.] 1991, writ denied) .................. 3

*R.R. Comm'n. v. WBD Oil & Gas Co.*,
104 S.W.3d 69 (Tex. 2003) ..................................................................... 6

*Teladoc, Inc. v. Tex. Med. Bd.*,
453 S.W.3d 606 (Tex. App—Austin 2014, pet. filed) ............................... *passim*

*Teladoc v. Tex. Med. Bd.*,
No. 1:15-cv-00343-RP, slip op. (W.D. Tex. May 29, 2015) .............................. 11

*Tex. Dept. of Transp. v. Sunset Transp.*,
357 S.W.3d 691 (Tex. App.—Austin 2011, no pet.) ........................ 10, 13, 14, 16

*Tex. Logos, L.P. v. Tex. Dep't of Transp.*,
241 S.W.3d 105 (Tex. App.—Austin 2007, no pet.) .......................................... 11

*Tex. Mut. Ins. Co. v. Vista Cmty. Med. Ctr., L.L.P.*,
275 S.W.3d 538 (Tex. App.—Austin 2008, no pet.) .......................................... 13

*Tex. State Bd. of Pharmacy v. Witcher*,
447 S.W.3d 520 (Tex. App.—Austin 2014, pet filed) ................................. 12, 14

*Trinity Settlement Servs., LLC v. Tex. State Sec. Bd.*,
417 S.W.3d 494 (Tex. App.—Austin 2013, pet. denied) ...................................... 6

**STATUTES**

22 Tex. Admin. Code § 174.4 ...................................................................................4

22 Tex. Admin. Code § 174.8 ...................................................................................4

22 Tex. Admin. Code § 190.8(1)(L) .................................................................*passim*

Tex. Gov't. Code § 2001.003(6) .......................................................................*passim*

Tex. Gov't. Code § 2001.035 ...................................................................................9

Tex. Gov't. Code § 2001.038 ..............................................................4, 5, 13, 14, 16

**OTHER AUTHORITIES**

29 Tex. Reg. 3896 (Apr. 23, 2004) ..........................................................................4

29 Tex. Reg. 6088-89 (2004) ...................................................................................4

35 Tex. Reg. 3392 (Apr. 30, 2010) ..........................................................................4

35 Tex. Reg. 9085 (2010) .........................................................................................4

40 Tex. Reg. 1019 ..................................................................................................11

## FACTS

The "Background" section of the court of appeals opinion states the relevant facts sufficiently for purposes of this response. *See Teladoc, Inc. v. Tex. Med. Bd.*, 453 S.W.3d 606, 608-13 (Tex. App—Austin 2014, pet. filed). TMB's facts section contains some inaccuracies, including its having "used Rule 190.8 to discipline license holders who prescribed drugs over the telephone or internet without first conducting a face-to-face examination." Pet. at 4. In reality, the record shows that it was not merely the lack of face-to-face examinations that led to TMB historically disciplining physicians, but the complete failure to establish any professional relationship with patients before prescribing dangerous drugs and controlled substances—something that has never been true of Teladoc physicians. *See* CR 41. TMB also states that its June 2011 letter was in response to "a company misrepresenting [Rule 190.8(1)(L)'s] restrictions." Pet. 5. Teladoc maintains, and the appeals court agreed, that TMB—not Teladoc—has misrepresented Rule 190.8(1)(L)'s restrictions.

## ARGUMENT

TMB's petition for review never discusses the dispositive fact in the court of appeals' analysis—namely that TMB's June 2011 letter clearly departed from the plain text of the rule that TMB invoked against Teladoc: 22 Tex. Admin. Code § 190.8(1)(L). That omission presents a distorted picture not only of the Third

1

Court's analysis, but also of this case's importance to the State's jurisprudence. Because the letter was a clear departure from the plain text of a published rule, the Third Court's analysis was correct, the parade of horribles predicted by TMB will never occur, and review of this case would be a waste of this Court's resources.

I. **This Court's review is unwarranted because the Court of Appeals correctly held that the TMB letter articulated a new rule under the APA, which was invalid under Section 2001.035 of that Act.**

  A. **The TMB letter satisfies the elements of Section 2001.003(6).**

Under the APA, an agency statement is a "rule" if it is one "of general applicability that: (A) implements, interprets, or prescribes law or policy;" "(B) includes the amendment or repeal of a prior rule; and (C) does not include a statement regarding only the internal management or organization of a state agency and not affecting private rights or procedures." Tex. Gov't. Code § 2001.003(6). The court below had "little difficulty concluding that the substance and nature of" TMB's June 2011 letter "distinguishes it as a rule." 453 S.W.3d at 608. The pronouncements in TMB's letter were statements of general applicability that implemented, interpreted, or prescribed policy; they included an amendment to a prior rule—Section 190.8(1)(L)(i)(II) of Title 22 of the Texas Administrative Code—and they affected private rights rather than internal TMB management.

TMB does not dispute that the letter is an agency statement or that its pronouncements implement, interpret, or prescribe policy. *See* Pet. 20-22. It *does*

2

dispute that the letter's pronouncements are statements of general applicability that affect private rights. *See Id.* at 21. But it simply *ignores* that the letter amended a prior rule. Tex. Gov't. Code § 2001.003(6)(B). That was the principal contested element in the courts below, and the court of appeals found the letter's departure from Rule 190.8(1)(L)'s plain text to be the most compelling factor in determining that the letter constituted an invalid rule. 453 S.W.3d at 608, 620.

Rule 190.8(1)(L) outlines what a doctor must do to establish a proper professional relationship with a patient. That relationship is a prerequisite for the doctor prescribing dangerous drugs or controlled substances to a person. Among the rule's requirements is "establishing a diagnosis through the use of acceptable medical practices *such as* patient history, mental status examination, physical examination, and appropriate diagnostic and laboratory testing." 22 Tex. Admin. Code § 190.8(1)(L)(i)(II) (emphasis added). Despite the term "such as" being universally understood to denote a non-compulsory, *illustrative* list of examples,[1] TMB's letter threatened "disciplinary action against the participating doctors" in Texas unless they performed *all four* practices in that illustrative list, including (most importantly) a "face-to-face" physical examination. CR 17-18.

---

[1] *See, e.g., Teladoc*, 453 S.W.3d at 617; *Martinez v. Harris Cnty.*, 808 S.W.2d 257, 259 (Tex. App.—Houston [1st Dist.] 1991, writ denied) (holding that list of activities after "such as" was illustrative only and not exclusive); *Bd. of Adjustment v. Levinson*, 244 S.W.2d 281, 282-283 (Tex. Civ. App.—San Antonio 1951, no writ) ("The synonyms of 'such as,' are alike, similar, of the like kind; 'such' representing the object as already particularized in terms which are not mentioned, being a descriptive and relative word, referring to the specific articles mentioned.").

3

An analogous rule, Rule 174.8, contains a similar list of practices for the separate telemedicine context. 22 Tex. Admin. Code § 174.8. There, TMB used notice-and-comment rulemaking to change the "such as" qualifier to "including," thereby making all of the designated practices required in the telemedicine context.[2] TMB did not follow that practice for Rule 190.8(1)(L), however. Instead, TMB simply made pronouncements in its June 2011 letter to Teladoc, copying the Texas Medical Association. CR 17-19. The court of appeals correctly held that "TMB's pronouncements in its June 2011 letter are tantamount to amendments to the existing text of Rule 190.8(1)(L)(i)(II), effectively substituting 'including' for 'such as,' thereby conforming it to the 2010 telemedicine rules." 453 S.W.3d at 621.

As it did below, TMB frames this as a jurisdictional issue, arguing that "[t]he decision of the APA's drafters to limit Section 2001.038's immunity waiver to suits challenging the 'validity of a rule' was a deliberate one," which limits jurisdiction to only those statements determined to be a "rule" under the APA. Pet. 10-11, 19-21. Teladoc agrees. But as the court of appeals properly noted, because the pronouncements in the June 2011 letter *did* constitute a rule, "Teladoc both properly

---

[2]    Specifically, in 2010, when promulgating the current version of Rule 174.8 identifying "acceptable medical practices, *including* patient history, mental status examination, physical examination . . . and appropriate diagnostic and laboratory testing," TMB replaced the prior Rule 174.4, which had contained language parallel to Rule 190.8(1)(L)(i)(II), identifying "acceptable medical practices *such as* patient history, mental status examination, and appropriate diagnostic and laboratory testing." Compare 35 Tex. Reg. 3392 (Apr. 30, 2010) (proposing the "including" language adopted as 22 Tex. Admin Code § 174.8, *see* 35 Tex. Reg. 9085 (2010)), with 29 Tex. Reg. 3896 (Apr. 23, 2004) (detailing the previous "such as" language, adopted as 22 Tex. Admin Code § 174.4, *see* 29 Tex. Reg. 6088-89 (2004)).

4

invoked the district court's jurisdiction through section 2001.038 and established its entitlement to summary judgment on its declaratory claim under that statute, as it is undisputed that TMB did not promulgate the letter in accordance with the APA's notice-and-comment rulemaking requirements." 453 S.W.3d at 613-14.

## B. The petition for review fails to identify flaws in the appellate court's Section 2001.003(6) analysis.

TMB claims that the court of appeals made several errors in determining that the letter satisfied Section 2001.003(6)'s elements of a "rule." Specifically, TMB contends that the letter was not a statement of general applicability, Pet. ix, 10, 20-21, that it did not affect private rights, *id.* at 10, 21, and that the opinion applied with no limiting principle. *Id.* at 19, 23. Each contention is easily rejected.

First, while TMB argues repeatedly that the letter's responsive nature—addressed to Teladoc in response to Teladoc's advertising materials—somehow renders it a statement of limited, not general, applicability, Pet. 7, 10, 18, 20, it cites no authority for the underlying premise that a statement of general applicability cannot be made in direct response to a specific perceived problem. Indeed, using TMB's logic, an agency's statements would have general applicability only when the agency clairvoyantly foresees future problems and proactively elects to resolve them, not when it responds to an observed problem with a solution applicable to all.

TMB apparently is trying to invoke the distinct principle that agency statements made in the course of adjudicatory or similar proceedings, which are

5

limited to the rights and interests of the parties subject to those proceedings, are not statements of general applicability. *See, e.g.*, *R.R. Comm'n. v. WBD Oil & Gas Co.*, 104 S.W.3d 69, 79 (Tex. 2003); *Trinity Settlement Servs., LLC v. Tex. State Sec. Bd.*, 417 S.W.3d 494, 502 (Tex. App.—Austin 2013, pet. denied). The June 2011 letter was not, however, "an agency adjudicat[ion of] individual rights of parties through trial-type proceedings." *Trinity*, 417 S.W.3d at 502. Rather, it was a statement of warning applicable to all Texas physicians. The letter opened by expressing "concern on the part of the Board for its licensed *Texas physicians*," CR 17 (emphasis added), then proceeded to observe that TMB "does not believe that *physicians in Texas* can reply on your representations as to compliance with Texas board rules should they opt to participate in your program." *Id.* (emphasis added). The letter warned that if a model like Teladoc's is "followed by licensed *Texas physicians*, [it] will lead to disciplinary action against the participating doctors in the program." CR 19 (emphasis added). Such language is plainly not directed solely at Teladoc, but at every licensed physician in Texas.

Indeed, TMB admits (as it must) that it sent the letter not just to Teladoc, but also to the Texas Medical Association, "the chief statewide association representing the Texas medical profession, with over 48,000 physician and medical student members." 453 S.W.3d at 611. TMB argues that it "was merely doing its best to notify doctors who might be detrimentally relying on Teladoc's mischaracterization

of Rule 190.8(1)(L)(i)(II)." Pet. 21 n.5. But that explanation sounds a whole lot like what a statement of general applicability is intended to do—put everyone subject to agency oversight on notice.

TMB's next argument, that the letter did not affect private rights, is even less persuasive. It consists solely of conclusory statements, bereft of argument or authority, *id.* at 10, 21, and should be summarily rejected.

TMB then charges that the Third Court's opinion is "premised on semantics" and "merely promotes form over substance" because "[t]he court of appeals purportedly would not have asserted jurisdiction over this lawsuit had the Letter been phrased 'tentatively.'" Pet. 9, 10, 13, 15, 19, 23. To support this conclusion, TMB refers repeatedly to the Third Court's reassurance that TMB's perceived parade of horribles (discussed in Part II below) is unlikely because the APA "defines 'rule' in a way that will *exclude a considerable range* of unofficial, individually directed, tentative or other non-proscriptive agency or staff issuances concerning law or policy." 453 S.W.3d at 621-22 (emphasis added).

That simple clarification by the court of appeals—that the APA excludes a considerable range of statements from its definition of a rule, including tentative statements—is a far cry from TMB's misleading characterization, that the opinion below welcomes "a slate of new APA claims any time an agency makes a statement that isn't phrased in 'tentative' terms." Pet. 10. Of course a statement

7

phrased in tentative terms will avoid an APA challenge (because, for example, it would not affect private rights). But so will *any* agency statement that does not satisfy *all* of the Section 2001.003(6) elements. The inquiry is not simply whether a statement is tentative, but whether it is a generally applicable statement that implements policy, affects private rights, and amends a prior rule. Hence the "considerable range" of statements that the court below assured TMB it could make without fear of APA challenge.

TMB doubles down on this argument, claiming that it "is difficult to find a meaningful limiting principle to the court of appeals' holding." Pet. 19; *see also id.* at 23. But the "limiting principle" is the very principle that TMB assiduously ignores throughout its petition: when the other Section 2001.003(6) factors are present, and the disputed agency statement "departs from [a prior] rule's unambiguous text to an extent as to effectively rewrite it," the statement is a rule under the APA and must be passed with formal rulemaking. 453 S.W.3d at 618; *see also El Paso Hosp. Dist. v. Tex. Health & Human Serv.*, 247 S.W.3d 709, 714-15 (Tex. 2008) (finding that the commission's "interpretation" actually "amends another rule . . . thus meeting the second criteria of a rule").

It is that simple. The June 2011 letter is an agency statement of general applicability that implements, interprets, or prescribes policy, departs from the plain text of a prior rule it purports to interpret, and affects the private rights of all doctors

regulated by TMB. The court of appeals properly held that the letter was a rule under the APA that bypassed notice-and-comment rulemaking, and is thus invalid under Section 2001.035 of the APA. 453 S.W.3d at 620.

**II.    This Court's review is unwarranted because the court of appeals opinion will have none of the disruptive effects that TMB predicts.**

TMB urges review based on its repeated predictions of dire consequences that await Texas courts, administrative agencies, and all regulated entities if the appeals court's holding is allowed to stand. Pet. viii, 2, 9, 11-15. Specifically, TMB predicts that the "ruling will flood the courts with rule-validity challenges," will "incentivize agencies to do nothing to explain their actions beyond putting their own rules in block quotations," and will leave regulated entities "without an explanation, [such that] the entity would have to merely guess at the basis for the alleged violation." Pet. 9, 13-14. None of these alarming consequences will occur.

**A.    The opinion below will not excessively burden agencies.**

TMB contends that the "Third Court's approach hamstrings agencies by effectively requiring them to pursue lengthy, formal rulemaking procedures any time they need to alert regulated entities that those entities are violating a statute or administrative rule." Pet. viii, 9, 11-12. But that is not what the court below held. The court held that the letter was an improperly promulgated rule not because it "alert[ed] regulated entities" to the law, but because it *changed* it by departing from

9

Rule 190.8(1)(L)'s plain text.[3]  Had the letter merely "alerted" Teladoc to Rule 190.8(1)(L), it would not have been a rule under Section 2001.003(6); hence formal rulemaking would have been unnecessary.  *See, e.g.*, *Tex. Dept. of Transp. v. Sunset Transp.*, 357 S.W.3d 691, 703-04 (Tex. App.—Austin 2011, no pet.).  But it did not merely "alert."  It attempted to "effectively rewrite" Rule 190.8(1)(L)(i)(II) by "substituting 'including' for 'such as.'" 453 S.W.3d at 618, 620.

As noted above, TMB actually used notice-and-comment rulemaking in 2010 to change "such as" to "including" in the analogous context of telemedicine rules.  *See* Part I.A. *supra*.  This history "betrays not only TMB's understanding of the significant difference in meaning of 'including' versus 'such as,' but its awareness that a change between the two must properly be achieved through the APA's notice-and-comment rulemaking processes and not by the naked fiat it

---

[3]    TMB argues that it has "long interpreted [Rule 190.8(1)(L)(i)(II)] to require all four practices to establish a professional relationship," Pet. 4, and cites disciplinary actions from Dr. David L. Bryson and others as support.  Those disciplinary actions hardly establish that TMB has "long interpreted that text" to mean anything.  Dr. Bryson, for example, had his license revoked not merely for failing to perform a face-to-face examination, but for ignoring Rule 190.8(1)(L) altogether, prescribing Xanax, hydrocodone, valium, and other similar dangerous drugs and controlled substances to over 20,000 patients in a two-year period without performing *any* of the Rule 190.8(1)(L)(i)(II) practices, like diagnostic or laboratory testing, obtaining a medical history, physical examination, or consulting with primary care physicians.  *See* CR 41. Like TMB, the Comptroller in *Combs v. Entertainment Publications, Inc.*, obfuscated the novelty of its new position by making statements like "the Comptroller's office has consistently held," and "[t]his office has consistently held." 292 S.W.3d 712, 717-18 (Tex. App.—Austin 2009, no pet.). Rather than simply accepting those assertions at face value, the court of appeals in that case compared what the Comptroller had done before with what the letters at issue indicated it would do in the future, *id.*, and concluded that the letters constituted a "rule." *Id.* at 721-22.  What TMB has done before here is use formal rulemaking to change "such as" to "including" for Rule 174.8.  It cannot, therefore, say that it has always read "such as" to mean "including."

relies on here." 453 S.W.3d at 619-20.

Indeed, after the opinion below was issued, TMB actually undertook notice-and-comment rulemaking to change *the very language at issue* in Rule 190.8(1)(L) itself. On February 23, 2015, TMB proposed changes to Rule 190.8(1)(L), which would remove "such as" and replace it with "which includes documenting and performing," the existing list of four practices. 40 Tex. Reg. 1019. The proposed change also adds a clarification that the physical examination "must be performed by either a face-to-face visit or in person evaluation . . . ." *Id.* [4] TMB has thus—by its own actions—*accepted* that the change to Rule 190.8(1)(L) that it tried to make with the June 2011 letter is properly made through formal rulemaking. [5]

The opinion below neither incentivizes agencies to be opaque, Pet. 9, 13, nor limits them to TMB's "three options" of instituting proceedings without warning,

---

[4]    The new rule has not yet gone into effect. On May 29, 2015, the U.S. District Court for the Western District of Texas granted a preliminary injunction, temporarily halting the rule, based on its anticompetitive effects, which include increased prices, reduced patient choice and access, reduced innovation, and reduced availability of physician services. *See Teladoc v. Tex. Med. Bd.*, No. 1:15-cv-00343-RP, slip op. at 8-9 (W.D. Tex. May 29, 2015), attached as Appendix Tab A.

[5]    Moreover, it is difficult to see how TMB's having already undertaken formal rulemaking to amend Rule 190.8(1)(L) does not render this appeal moot, or in any event, unworthy of this Court's review. *See, e.g.*, *Tex. Logos, L.P. v. Tex. Dep't of Transp.*, 241 S.W.3d 105, 114 (Tex. App.—Austin 2007, no pet.) (noting the requirements of "(1) a justiciable controversy as to the rights and status of parties actually before the court for adjudication; and (2) that will be actually resolved by the declaration sought"); *Dewhurst v. Hendee*, 253 S.W.3d 320, 332–33 (Tex. App.—Austin 2008, pet. dism'd) (expiration of biennium rendered moot claims challenging legality of legislative appropriations for that biennium). After all, if Teladoc prevails on the merits of its federal antitrust suit, neither the June 2011 letter nor the formal rule that was subsequently passed will be effective, and this case will resolve nothing. If Teladoc loses in its federal action, then the new rule will presumably take effect (subject to any challenges that may be brought on substantive or procedural grounds) and this case will still resolve nothing.

11

engaging in notice-and-comment rulemaking, or simply doing nothing. *Id.* at 2. In truth, the opinion below encourages agency transparency by reiterating the requirement that informal agency guidance be consistent with the language of the rule it purports to interpret. *See, e.g.*, *Tex. State Bd. of Pharmacy v. Witcher*, 447 S.W.3d 520, 533, 536 (Tex. App.—Austin 2014, pet filed) (finding "a quintessential example" of impermissible ad hoc rulemaking where the existing rule listed many factors that "may be considered" for determining disciplinary action for pharmacists, but the Pharmacy Board elevated *one* "as an outcome-determinative factor").

**B.     The opinion below will neither "drastically expand" Texas court dockets nor arrogate power to the judiciary at agency expense.**

TMB further contends that the appeals court's "interpretation will drastically expand" the dockets of Texas courts, Pet viii, and "flood the courts with rule-validity challenges." *Id.* at 9. Continuing the hyperbole, TMB insists that the decision below has "elevat[ed] judicial power at the expense of specialized administrative agencies," *id.*, and has set courts up to "second-guess every interpretive utterance an agency makes," *id.* at 12. In reality, nothing of the sort has occurred or will occur.[6]

---

[6]     In fact, if the opinion below prompted *any* attempted arrogation of power, it was by TMB, not the courts. Two weeks after the opinion issued, TMB held an emergency meeting and adopted a purported "emergency" amendment to Rule 190.8, mandating a "face-to-face visit or in-person evaluation" before a physician can issue a drug prescription—a move that was in direct response to, and inconsistent with, the lower court's opinion. The professed "purpose of the emergency amendment is to protect the public health and welfare." Appendix Tab B (Memo from Scott Freshour, TMB General Counsel (Jan. 16, 2015)). The Travis County District Court enjoined the purported emergency rule after a February 6, 2015 temporary injunction hearing, holding that "[n]o imminent peril to public health, safety or welfare existed on January 16, 2015, or exists at the present time to justify adoption of the emergency rule and it is invalid." Appendix Tab C

12

As explained above, the court of appeals correctly determined that the letter was an improper rule because it satisfied all the elements of Section 2001.003(6). Had it not done so, it would not be a rule subject to challenge under Section 2001.038.

In other words, courts will see no increase in rule-validity challenges because the court of appeals merely followed its and this Court's recent precedent that when an agency statement of general applicability affects private rights, prescribes policy, and "amends another rule," its failure to go through formal rulemaking is subject to judicial review under Section 2001.038. *El Paso Hosp. Dist.*, 247 S.W.3d at 714-15; *Entm't Publ'ns*, 292 S.W.3d at 718-19. When, on the other hand, the agency has *not* departed from its earlier administrative policy, is otherwise *consistent* in its administrative guidance, or merely *restates* a published rule, there is no need (or, for that matter, jurisdiction) for judicial review.[7] Had TMB's June 2011 letter not purported to interpret Rule 190.8(1)(L) to require all four practices in the illustrative "such as" list, the letter would not have satisfied APA Section 2001.003(6)(B)'s definition of "rule." This action would never have been brought, and courts would have lacked jurisdiction under Section 2001.038 if the suit had been attempted.

---

(Temporary Injunction Order, *Teladoc v. Tex. Med. Bd., et al*, No. D-1-GN-15-00238). It was only after having this second attempted end-run quashed that TMB finally began formal rulemaking.

[7] *See, e.g. Tex. Dept. of Transp. v. Sunset Transp.*, 357 S.W.3d 691, 703-04 (Tex. App.—Austin 2011, no pet.) ("[A]n informal agency statement that does no more than restate its own formally promulgated rules would not in itself be a 'rule.'"); *Tex. Mut. Ins. Co. v. Vista Cmty. Med. Ctr., L.L.P.*, 275 S.W.3d 538, 556 (Tex. App.—Austin 2008, no pet.) ("The 2005 Staff Report did not affect private rights because it did not change or amend" a formally promulgated rule).

## C.     Regulated entities will not be left without guidance.

For the same reasons agencies will not be hamstrung by the lower court's opinion, regulated entities will not be starved for guidance, as TMB predicts. *See* Pet. 9, 13-14. The opinion below does not preclude informal agency guidance. It merely reiterates the rule, consistently applied by this Court and the Third Court of Appeals, that informal guidance may not consist of statements that reasonably appear to "amend[] or repeal . . . a prior rule." Tex. Gov't Code § 2001.003(6)(B); *see El Paso Hosp. Dist.*, 247 S.W.3d at 714-15; *Witcher*, 447 S.W.3d at 534; *Sunset Transp.*, 357 S.W.3d at 703.

TMB urges that "where a statute or formally promulgated rule permits reasonable, alternative constructions, the agency's guidance to the public is most valuable." Pet. 16. Teladoc agrees. But this is not such a case. TMB's letter did not, as TMB claims, merely make a "permissible resolution of an ambiguity." *Id.* It took an unambiguous phrase from a published rule that had a single, reasonable construction—"such as," and substituted for it a word with an inconsistent meaning—"including." Making mandatory every item in a list of illustrative examples is not a "reasonable, alternative construction" of Rule 190.8(1)(L)'s "such as" qualifier any more than making dispositive a single factor in a list of many alternative factors that "may be considered" in determining disciplinary sanctions for pharmacists was reasonable in *Witcher*. *See* 447 S.W.3d 533.

14

**III. This Court's review is unwarranted under Government Code Section 22.001(a).**

Review is also unwarranted here because this case meets none of the six jurisdictional criteria identified in Government Code Section 22.001(a). The justices below were unanimous in their opinion; the opinion was consistent with prior case law from this Court and the courts of appeals; the case does not involve the validity of a statute or state revenue; the Railroad Commission is not a party; and, while the subject matter of this case is important to Teladoc, to its affiliated physicians, and to the millions whose insurers give them access to Teladoc services, there is no legal error in the opinion below of such importance to Texas jurisprudence to warrant this Court's review.

TMB presents a purported inconsistency in the case law, which supposedly requires this Court to "step in to provide clear guidance to agencies and the public." Pet. 16-17. How, TMB muses, can the statements in *Witcher* and *TABC v. Amusement & Music Operators of Texas* be "rules," while those in *Brinkley v. Texas Lottery Commission* and *Beacon National Insurance Co. v. Montemayor* are not? *Id.* TMB then invokes Professor Beal's "miry bog" epithet to charge that the Third Court is hopelessly confused and needs this Court's guidance.

While the court below conceded that this is a "notoriously muddled corner of the law," 453 S.W.3d at 616, it also correctly observed that the dispositive factor in this case "is perhaps one of the few that can be discerned with 'relative certainty.'"

15

*Id.* (quoting *Sunset Transp.*, 357 S.W.3d at 703). Whether the statements in *Witcher*, *Brinkley*, *TABC*, and *Beacon* were rules or not turned on the facts of those cases and judicial interpretation of various Section 2001.003(6) factors where lingering confusion may persist. But one thing is abundantly clear: "an agency's 'interpretations' or 'applications' of existing formally promulgated rules will themselves be held to be 'rules' where they have the effect of amending the existing rules, or of creating new rules, and the other requirements of the APA's 'rule' definition are met." 453 S.W.3d at 616 (citing *El Paso Hosp. Dist.*, 247 S.W.3d at 714-15 (holding agency statement to be a "rule" despite the agency's insistence that it "is not a rule itself, but rather its interpretation of the [existing] rule")). Because the June 2011 letter departed so plainly from the text of the rule it purported to interpret, the court of appeals found this to be an easy case and had "little difficulty concluding that [it was] a rule under the APA." 453 S.W.3d at 608.

As such, even if this Court were otherwise inclined to wade into what may or may not be a "miry bog" of Section 2001.038 jurisprudence, this case is not the appropriate vehicle to provide further guidance because it was decided on clear and settled principles that are neither "miry" nor "muddled."

## CONCLUSION

For all of these reasons, Teladoc respectfully requests that the Court deny TMB's petition for review.

16

Respectfully submitted,

BAKER BOTTS L.L.P.

By: */s/ Benjamin A. Geslison*

    Thomas R. Phillips
    State Bar No. 00000102
    98 San Jacinto Blvd, Ste 1500
    Austin, Texas 78701
    T: 512-322-2565
    F: 512-322-8363
    tom.phillips@bakerbotts.com

    Benjamin A. Geslison
    State Bar No. 24074269
    One Shell Plaza
    910 Louisiana Street
    Houston, Texas 77002-4995
    T: 713.229.1234
    F: 713.229.2841
    ben.geslison@bakerbotts.com

    JACKSON WALKER L.L.P.

    Matt Dow
    State Bar No. 06066500
    Dudley McCalla
    State Bar No. 13354000
    100 Congress Ave, Suite 1100
    Austin, TX 78701
    mdow@jw.com
    dmccalla@jw.com

    *Attorneys for Respondent Teladoc, Inc.*

**CERTIFICATE OF COMPLIANCE**

As required by Texas Rule of Appellate Procedure 9.4(i)(3), I certify that, according to the word count of the computer program used to prepare this document, the document contains 4,475 words.

This brief complies with the typeface requirements of Tex. R. App. P. 9.4(e) because this brief was prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font for text and 12-point font for footnotes.

*/s/ Benjamin A. Geslison*
Benjamin A. Geslison

**CERTIFICATE OF SERVICE**

I certify that a that a true and correct copy of this response brief was served on the following counsel of record for Petitioners, electronically and/or by certified mail, return receipt requested on August 4, 2015:

Douglas D. Geyser
Assistant Solicitor General
Ted A. Ross
Assistant Attorney General

Office of the Attorney General
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548

*/s/ Benjamin A. Geslison*
Benjamin A. Geslison

# INDEX TO APPENDIX

**Tab A**    *Teladoc v. Texas Medical Board*, No. 1:15-cv-00343-RP (W.D. Tex. May 29, 2015) order granting preliminary injunction.

**Tab B**    Memorandum from Scott Freshour, TMB General Counsel, announcing the emergency amendment to rule 190.8 (Jan. 16, 2015).

**Tab C**    Temporary Injunction Order, *Teladoc v. Tex. Med. Bd., et al*, No. D-1-GN-15-00238 (Feb. 6, 2015).

# TAB A

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| TELADOC, INC., ET AL., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| V. | § | 1-15-CV-343  RP |
| | § | |
| TEXAS MEDICAL BOARD, ET AL., | § | |
| | § | |
| Defendants. | § | |

## ORDER

Before the Court are Plaintiffs' Application for a Temporary Restraining Order and Preliminary Injunction Before June 3, 2015 and Brief in Support, filed April 29, 2015 (Clerk's Dkt. #10), the responsive pleadings thereto, as well as Amicus briefs filed both in support of, and opposition to, Plaintiffs' application. The Court conducted a hearing on the application on May 22, 2015. Having considered the application, response, record in the case, and the applicable law, the Court is of the opinion that Plaintiff's application for a preliminary injunction should be granted. *See* FED. R. CIV. P. 65(b).

## I. BACKGROUND

Plaintiffs Teladoc, Inc. and Teladoc Physicians, P.A. (jointly "Teladoc"), Kyon Hood, M.D., and Emmette Clark, M.D. bring this action against defendants the Texas Medical Board ("TMB"), and fourteen members of the TMB in their official and individual capacities[1] challenging recent regulatory changes adopted by the TMB.

The TMB is a state agency "statutorily empowered to regulate the practice of medicine in Texas." 22 TEX. ADMIN. CODE § 161.1. Teladoc describes itself as providing "telehealth services," utilizing telecommunication technologies to provide health care services outside the traditional

---

[1] The members of the TMB have not yet made an appearance in their individual capacities. Only the TMB and its members in their official capacities filed a response to the application for a preliminary injunction. The Court refers herein to both the TMB and its members in their official capacities as the TMB.

models wherein medical professionals provides services in an in-person office or hospital setting. According to Plaintiffs, "[t]elehealth providers are generally available 24 hours per day, 365 days per year, for a fraction of the cost of a visit to a physician's office, urgent care center, or hospital emergency room." (Compl. ¶ 3).

Teladoc's services are typically available to individuals whose employer has contracted with Teladoc for a per-member subscription fee. Individuals register with Teladoc either by telephone or online, creating a personal account, including information such as a medical history, physician, contact information, and medical records. Registrants may also upload photographs and medical records to Teladoc's system for inclusion with their medical history. (*Id.* ¶¶ 43-44).

Registrants seeking a physician consultation can log into Teladoc's web portal or call a toll-free number to place a request for consultation. Teladoc employs board certified physicians who are provided specialized training in treatment and diagnosis via telephone. Once a Teladoc physician accepts the request for consultation, the physician reviews the requesting registrant's information and medical records through the website, then calls the registrant by telephone and consults with him or her. Based on the medical records and history, reported symptoms, and other information the physician elicits during the consultation, the physician dispenses medical advice, including referring the registrant to a physician's office, dentist, or emergency room. When deemed appropriate, the physician can prescribe certain medications.[2] Following the consultation, the Teladoc physician enters notes and findings into the registrant's record, which is available to the registrant and, if the registrant chooses, is forwarded to his or her primary-care physician. (*Id.* ¶¶ 45, 68-71, 76-84).

This action relates to the TMB's adoption on April 10, 2015 of revisions to Chapter 190 of the Texas Administrative Code title which governs the TMB. Chapter 190 sets forth disciplinary

---

[2] According to Teladoc, its physicians do not prescribe "DEA-controlled substances (including narcotics) or what are referred to as lifestyle drugs (i.e., Viagra, or diet pills)." (Compl. ¶ 81).

guidelines for the practice of medicine in Texas.  22 TEX. ADMIN. CODE § 190.1.  Plaintiffs specifically complain of the revisions to section 190.8(1)(L) ("New Rule 190.8) which sets forth practices the TMB deems to be violations of the Texas Medical Practices Act.

As originally adopted by the TMB in 2003, section 190.8(1)(L) ("Old Rule 190.8) prohibits prescription of any "dangerous drug or controlled substance" without first establishing a "proper professional relationship" which requires, in pertinent part, "establishing a diagnosis through the use of acceptable medical practices such as patient history, mental status examination, physical examination, and appropriate diagnostic and laboratory testing."  22 TEX. ADMIN. CODE § 190.8(1)(L).  New Rule 190.8 prohibits prescription of any "dangerous drug or controlled substance" without first establishing a "defined physician-patient relationship" which "must include," in pertinent part, "documenting and performing" a "physical examination that must be performed by either a face-to-face visit or in-person evaluation" elsewhere defined as requiring the provider and patient to be in the same physical location or at an established medical site.  (Def. Resp. Ex. 15).

In 2004 the TMB adopted regulations specifically governing "telemedicine." 22 TEX. ADMIN. CODE §§ 174.1, et seq.  Effective October 2010, the TMB amended its telemedicine regulations, restricting the definition of "telemedicine" to consultations using "advanced telecommunications technology that allows the distant site provider to see and hear the patient in real time."  22 TEX. ADMIN. CODE § 174.2.  The amended regulations also made clear that, to establish a "proper physician-patient relationship," telemedicine providers were required to conduct a physical examination of a patient.  Id. § 174.8.

In June 2011, the TMB issued a letter to Teladoc, stating the language of Old Rule 190.8 required a "face-to-face" examination prior to prescription of a dangerous drug or controlled substance.  The letter makes clear the TMB considered Teladoc and its physicians to be engaging in a prohibited practice by issuing prescriptions following telephone-only consultation.  (Plf. Appl. Ex. 1 ("Navikas Decl.") Ex. A).

Teladoc sought legal recourse by bringing suit against the TMB in Texas state court. The court of appeals held the "TMB's pronouncements in its June 2011 letter are tantamount to amendments to the existing text," finding the TMB had effectively substituted "including" for the actual "such as" phrase. *Teladoc, Inc. v. Texas Med. Bd.*, 453 S.W.3d 606, 620 (Tex. App.–Austin 2014, pet. filed). Thus, the court found the " TMB's pronouncements hardly 'track' [Old] Rule 190.8 . . . rather, they depart from and effectively change that text," rendering the June 2011 letter a procedurally invalid amendment to Old Rule 190.8. *Id.*

In response, the TMB issued an "emergency" rule on January 16, 2015, amending Old Rule 190.8. The emergency amendment mandated a "face-to-face visit or in-person evaluation" before a physician can issue a prescription. (Compl. ¶ 111). Teladoc sought and obtained a temporary injunction of the emergency rule in Texas state court. (Navikas Decl. Ex. U). The TMB then engaged in a formal rulemaking, resulting in an April 10, 2015 vote by the TMB to adopt New Rule 190.8. (Navikas Decl. Ex. B).

Plaintiffs filed this action on April 29, 2015, asserting Defendants have committed a violation of antitrust law, as well as the Commerce Clause of the Constitution in adopting New Rule 190.8. Plaintiffs now seek a preliminary injunction preventing enforcement of New Rule 190.8, which is to go into effect on June 3, 2015. The parties have filed responsive pleadings. The Court conducted a hearing on May 22, 2015 and the matter is now ripe for review.

## II. STANDARD OF REVIEW

A preliminary injunction is an extraordinary remedy and the decision to grant a preliminary injunction is to be treated as the exception rather than the rule. *Valley v. Rapides Parish Sch. Bd.,* 118 F.3d 1047, 1050 (5th Cir. 1997). The party seeking a preliminary injunction may be granted relief *only* if the moving party establishes: (1) a substantial likelihood of success on the merits; (2) a substantial threat that failure to grant the injunction will result in irreparable injury; (3) that the

threatened injury out-weighs any damage that the injunction may cause the opposing party; and (4) that the injunction will not disserve the public interest. *See Hoover v. Morales,* 146 F.3d 304, 307 (5th Cir.1998); *Wenner v. Texas Lottery Comm'n,* 123 F.3d 321, 325 (5th Cir. 1997); *Cherokee Pump & Equip. Inc. v. Aurora Pump,* 38 F.3d 246, 249 (5th Cir. 1994). The party seeking a preliminary injunction must clearly carry the burden of persuasion on all four requirements to merit relief. *Mississippi Power & Light Co.,* 760 F.2d 618, 621 (5th Cir. 1985).

## III. ANALYSIS

### A. Likelihood of Success

Plaintiffs contend they are likely to succeed on the merits both of their antitrust claim as well as their claim under the Commerce Clause. To show a substantial likelihood of success, "the plaintiff must present a prima facie case, but need not prove that he is entitled to summary judgment." *Daniels Health Sciences, L.L.C. v. Vascular Health Sciences, L.L.C.,* 710 F.3d 579, 582 (5th Cir. 2013). *See also Janvey v. Alguire,* 647 F.3d 585, 596 (5th Cir. 2011) (same, citing CHARLES ALAN WRIGHT, ARTHUR R. MILLER, MARY KAY KANE, 11A FEDERAL PRACTICE & PROCEDURE § 2948.3 (2d ed. 1995) ("All courts agree that plaintiff must present a prima facie case but need not show that he is certain to win.")).

#### 1. Antitrust

This case presents an atypical situation under antitrust laws. States are generally permitted to regulate their economies in ways they see fit, including "impos[ing] restrictions on occupations, confer[ring] exclusive or shared rights to dominate a market, or otherwise limit[ing] competition to achieve public objectives." *N. Carolina State Bd. of Dental Examiners v. F.T.C.,* 135 S. Ct. 1101, 1109 (2015). Thus, in most situations "federal antitrust laws are subject to supersession by state regulatory programs." *F.T.C. v. Ticor Title Ins. Co.,* 504 U.S. 621, 632 (1992). As a result, the Supreme Court has "interpreted the antitrust laws to confer immunity on anticompetitive conduct

by the States when acting in their sovereign capacity." *Id.* at 1110 (citing *Parker v. Brown*, 317 U.S. 307, 350–51 (1942). Specifically, state regulation is granted *Parker* immune from antitrust law where the challenged restraint is "clearly articulated and affirmatively expressed as state policy" and is "actively supervised by the State itself." *California Retail Liquor Dealers Ass'n v. Midcal Alum., Inc.*, 445 U.S. 97, 105 (1980).

Significantly, in this case, the TMB declined to assert any immunity defenses, including *Parker* immunity, solely as to Plaintiffs' application for a preliminary injunction. The normal deference afforded to a state under antitrust law is, therefore, not an issue in reviewing Plaintiff's application for a preliminary injunction. The Court's opinion is properly read through that narrow, and unusual, lens.

### a. Governing Law

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade . . . is declared to be illegal." 15 U.S.C. § 1. Thus, to establish a violation of Section 1 of the Sherman Act, "plaintiffs must show that the defendants (1) engaged in a conspiracy (2) that produced some anti-competitive effect (3) in the relevant market." *Abraham & Veneklasen Joint Venture v. Am. Quarter Horse Ass'n*, 776 F.3d 321, 327 (5th Cir. 2015). More particularly, Section 1 prohibits concerted action which unreasonably restrained trade in the relevant market. *American Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 190 (2010) ("Section 1 applies only to concerted action that restrains trade"); *Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 375 (5th Cir. 2014) (plaintiffs must allege facts showing defendants "unreasonably restrained trade" in market); *Consol. Metal Prods., Inc. v. Am. Petroleum Inst.*, 846 F.2d 284, 289 (5th Cir.1988) (only "unreasonable restraint[s]" violate Section 1). For the purpose of Plaintiffs' request for immediate injunctive relief, the TMB does not contest the existence of a conspiracy. Rather, it maintains Plaintiffs cannot demonstrate the

requisite anti-competitive effect.

To seek relief for anti-competitive conduct, a plaintiff must show both an injury to the plaintiff as well as an "antitrust injury." *Jebaco, Inc. v. Harrah's Operating Co.*, 587 F.3d 314, 318-19 (5th Cir. 2009) (quoting *Doctor's Hosp., Inc. v. Se. Med. Alliance*, 123 F.3d 301, 305 (5th Cir. 1997)). Antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 489 (1977). Put another way, a plaintiff "must show that the defendants' activities caused an injury to competition." *Doctor's Hosp.*, 123 F.3d at 307. *See also Felder's Collision Parts, Inc. v. All Star Adver. Agency, Inc.*, 777 F.3d 756, 757 (5th Cir. 2015) ("It would not be an antitrust opinion without the line that the antitrust laws were designed for the protection of competition, not competitors") (internal quotation omitted).

Assessing whether an injury to competition has occurred utilizes a sliding scale of analysis. *N. Carolina State Bd. of Dental Examiners v. F.T.C.*, 717 F.3d 359, 373 (4th Cir. 2013), *aff'd*, 135 S. Ct. 1101 (2015). At one end of the scale are practices considered anti-competitive per se. *N. Tex. Specialty Physicians v. F.T.C.*, 528 F.3d 346, 362 (5th Cir. 2008). At the other end of the scale, restraints are analyzed under the "rule of reason." which "requires the factfinder to decide whether under all the circumstances of the case the restrictive practice imposes an unreasonable restraint on competition." *Id.* (quoting *Arizona v. Maricopa County Med. Soc.*, 457 U.S. 332, 343 (1982)). Courts apply a middle ground called "quick look" analysis only "when the great likelihood of anticompetitive effects can easily be ascertained," and "after assessing and rejecting [the] logic of proffered procompetitive justifications." *Id.* (quoting *Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770-71 (1999)).

### b. Discussion

The parties in this case disagree which analysis the Court should apply. Plaintiffs maintain

the quick–look analysis is warranted, while the TMB argues the rule of reason should be applied. This dispute need not be addressed as the Court concludes Plaintiffs' challenge succeeds under both analyses.

Plaintiffs maintain the effect of New Rule 190.8 will be increased prices, reduced choice, reduced access, reduced innovation, and a reduced overall supply of physician services. As the TMB itself concedes, the types of harm identified by Plaintiffs are clearly "the kind of injuries that the antitrust laws were enacted to prevent." (Def. Resp. at 4 (quoting *Nilavar v. Mercy Health Sys.-W. Ohio*, 494 F. Supp. 2d 604, 617 (S.D. Ohio 2005)). However, the TMB argues Plaintiffs have presented only speculation, not concrete data, which shows the identified injuries are actually likely to occur should New Rule 190.8 go into effect.

The Court disagrees. Plaintiffs' evidence shows the average costs of visits to a physician or emergency room are $145 and $1957, respectively, and the cost for a Teladoc consultation is typically $40. (Plf. Appl. Ex. 8 ("Miller Decl.") ¶ 69). Plaintiffs also cite to research finding companies using Teladoc's services achieved reduced monthly employee healthcare costs. (Miller Decl. ¶ 70). Additionally, Plaintiffs present evidence that patients choose telehealth for a number of reasons, including reduced travel and waiting time. (Plf. App. Ex. 3 ("DePhillips Decl.") ¶ 52; Ex. 5 ("Hood Decl.") ¶ 14. Ex. 7 ("Smythe Decl.) ¶ 28). One physician stated that, without Teladoc, some of his patients would have gone without treatment. (Hood Decl. ¶ 14). Another suggested access to telehealth would reduce delay in obtaining treatment. (Smythe Decl. ¶ 24).

Plaintiffs have also cited evidence that Teladoc increases opportunities for physicians to provide health care. One physician testified telehealth allowed him to continue to practice medicine on a flexible schedule in his semiretirement. (Plf. Appl. Ex. 6 ("Clark Decl.") ¶¶ 15-16). Another testified, without telehealth, he would treat fewer patients. (Hood Decl. ¶ 8). This evidence is significant in light of the evidence presented by Plaintiffs that Texas suffers from a shortage of doctors, particularly in rural areas, and that approximately 50% of Teladoc's client patients do not

have a regular physician. (Hood. Decl. ¶ 11; Smythe Decl. ¶ 26; DePhillips Decl. ¶ 18). Elimination of physicians providing healthcare would thus negatively impact not just the competitor physicians, but consumers, a classic antitrust injury.

The Court finally notes the TMB's own evidence supports Plaintiffs' contention that Teladoc provides benefits to the market. As one physician stated, "one cannot help but realize the care [Teladoc is] attempting to deliver decreases the costs for insurance companies and large employers that are self insured." (Def Resp. Ex. 5 ("Curran Aff.") at 3). In addition, a study conducted in California concluded "Teladoc appears to be expanding access to patients who are not connected to other providers." (Def. Resp. Ex. 22 ("RAND study") at 1). Accordingly, the Court concludes Plaintiffs have presented sufficient evidence, at this preliminary stage, to meet their burden to show an anti-competitive effect by New Rule 190.8. *See Palmyra Park Hosp., Inc. v. Phoebe Putney Mem'l Hosp.*, 604 F.3d 1291, 1305 (11th Cir. 2010) ("higher premiums and decreased choices [are] two evils within the ambit of the antitrust laws.").

The Court thus turns to the second part of the analysis, balancing the anti-competitive effect of the challenged regulation with the pro-competitive justification offered in support. *See PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 417 (5th Cir. 2010) (under rule of reason court balances "anticompetitive evils" of challenged regulation "against any procompetitive benefits or justifications"); *Specialty Physicians*, 528 F.3d at 362 (to justify quick-look analysis, the burden remains on challenger to demonstrate proffered procompetitive effect does not result in net procompetitive effect). The sole justification the TMB offers is that New Rule 190.8 will lead to improved quality of medical care. *See McWane, Inc. v. F.T.C.*, 783 F.3d 814, 841 (11th Cir. 2015) (noting cognizable procompetitive justifications include improving product quality or service). *See also Marucci Sports*, 751 F.3d at 377 (addressing failure to improve quality as anticompetitive evil).

As an threshold matter, the Court notes all physicians licensed by Texas, including Teladoc physicians, are bound to the same standard of care and ethical rules. *See* 22 TEX. ADMIN. CODE § 190.8(1)(A) ("Failure to practice in an acceptable professional manner consistent with public health and welfare within the meaning of the [Medical Practices] Act includes, but is not limited to . . . failure to treat a patient according to the generally accepted standard of care."). As Plaintiffs point out, Teladoc physicians refer patients who cannot be diagnosed reasonably and safely via the telephone to an in-person physician. (DePhillips Decl. ¶ 25). As the TMB itself makes clear, it has the authority to , and regularly does, investigate complaints against physicians who do not meet the standards of care for practicing in Texas. In light of the existing restrictions on poor quality care, the Court finds TMB's assertion of additional improvement in the quality of care by the adoption of New Rule 190.8 suspect.

In support of this contention the TMB first cites to affidavit testimony presented by medical practitioners detailing deficiencies in telephone-only diagnosis. (Def. Resp. Ex. 3 ("Malone Aff") (noting complaint of left shoulder pain without acute injury cannot be diagnosed without face to face encounter with patient); Ex. 4 ("Douglass Aff.") (relating example of mistreatment by Teladoc physician of ear pain with antibiotic ear drops, where correct diagnosis of sinus infection was only made following physical exam); Curran Aff. at 3 (relating two examples where physical examination aided in diagnosis); Ex. 12 ("Yount Aff") (noting two examples of "poor care" provided via telephone contact). As Plaintiffs point out, this testimony is essentially anecdotal, reflecting the opinion of the affiants, but not necessarily statistically reliable evidentiary studies. *See Wells v. SmithKline Beecham Corp.*, 601 F.3d 375, 380-81 (5th Cir. 2010) (finding testimony based on "anecdotal evidence" did not meet threshold for admission of expert testimony under *Daubert* standard). Moreover, to the degree anecdotal evidence is informative, Plaintiffs have submitted countervailing testimony from patients extolling the value of Teladoc's services. (DePhillips Decl. ¶¶ 33-36 (detailing examples of positive results of Teladoc services); Ex. 10 ("Stowell Decl.") Ex. B

10

(describing incident in which Teladoc physician identified early stages of heart attack and directed patient to immediately go to emergency room, stating "I would definitely not have done this if I did not call Teladoc because I did not understand the severity of the situation.").

It is also worth noting Plaintiffs have submitted expert testimony summarizing pertinent research, and concluding "there is empirical evidence suggesting widespread improper antibiotic prescribing by physicians following in-person physical examination." (Plf. Reply Ex. 2 ("Mehrotra Decl.") ¶ 45).

The TMB also suggests notes made by a regular treating physician, in contrast with a Teladoc consulting physician, become "part of the patient's permanent medical record, which will follow her to future locations and can be accessed by future treating personnel." (Def. Resp. at 11). As the TMB acknowledges, however, Teladoc permits patients to send their Teladoc record to their primary care physician, although apparently only roughly one-third agree to do so. (*Id.*). Moreover, in reality, patients do not have a singular "permanent medical record." Rather, patients have records scattered across a variety of providers. (Mehrotra Decl. ¶¶ 52-53).

Plaintiffs further contend the TMB's contention of increased quality of care is rebutted by the continued acceptance of "on call" coverage by one physician for another's patients. The TMB maintains the service provided by Teladoc is not comparable, relying on affidavit testimony in which physicians describe on call coverage as based on a shared practice, in which physicians have a common knowledge of skills and values, as well as access to the patient's medical record. (Curran Aff. at 2; Def. Resp. Ex. 9 ("Arambula Aff.")). As noted above, Plaintiffs have presented evidence rebutting the notion that a patient has a singular record. The Court additionally notes that, while the TMB's evidence suggests an on call physician has access to patient records, it does not establish the on call physician checks those records before treating a patient. Indeed, one physician has testified that, as an on call physician, he had no access to electronic medical records, and would rely on the patient's account of symptoms and medical history. (Clark Decl. ¶ 5).

Further, affidavit testimony provided by Plaintiffs indicates there may not be empirical evidence supporting the distinction between Teladoc's service and that of an on call physician. (Mehrotra Decl. ¶ 51). Additionally, affidavit testimony from a Texas physician notes that physician assistants in Texas may enter into agreements with supervising doctors delegating prescription writing authority. Under such an agreement, the physician assistant may issue a prescription without examining the patient, by listening to the patient's descriptions of his or her symptoms over the phone. (Smythe Decl. ¶ 25).

Finally, and troublingly, the TMB cites a study performed in California, assessing use of Teladoc by a large public employer. In its proffered justification for adopting New Rule 190.8, the TMB stated that "[t]he study found:

> Teladoc's model could actually further fragment healthcare;
>
> Teladoc's physicians are unable to use visual cues to aid in diagnosis;
>
> The limitations of telephone only consult could lead to misdiagnosis and higher rates of follow-up care - findings that have already been demonstrated with e-visits and telephone consultations;
>
> The adult users of Teladoc, in the study, were younger and healthier and lived in more affluent communities; and
>
> The population of patients attracted to Teladoc - a more affluent and likely more technologically savvy group - might have fewer access needs than people living in area's [sic] characterized by shortage of primary care or socio-economic disadvantage. And further research is needed to understand whether Teladoc might be improving access for patients with lower income and those in rural areas, and if not, can it be positioned to do so in the future.

(Def. Resp. Ex. 11 ("Freshour Aff.") Ex. (c) at 12).

Plaintiffs, in turn, have provided the affidavit of one of the two researchers who conducted the study, Ateev Mehrotra ("Mehrotra"). According to Mehrotra, the TMB has mischaracterized his research by "present[ing] to the Court a number of conclusions that are purportedly drawn from my 2014 study that are not accurate descriptions of my findings" but rather "hypotheses laid out in the introduction of the study." (Mehrotra Decl. ¶ 24).

Mehrotra specifically takes exception to the statement that his study "found" that Teladoc consultations "could lead to misdiagnosis and higher need for follow-up visits." (*Id.* ¶ 25). Instead, he states the "data showed that, across the three leading conditions treated by Teladoc, 13% of visits to physicians' offices and 20% of visits to the emergency room led to follow-up care, whereas only 6% of Teladoc calls led to follow-up care," results which "do not support the hypothesis that Teladoc has higher rates of misdiagnosis or mismanagement." (*Id.* ¶ 26).

In fact, the first page of the study, which is attached to the TMB's response to Plaintiffs' application, summarized the study as showing "Patients who uses Teladoc were less likely to have a follow-up visit to any setting, compared to those patients who visited a physician's office or emergency department." (RAND Study at 1). Plaintiffs also cite a second research study examining the impact of Teladoc on employees fo Home Depot. In pertinent part, the researchers concluded "Teladoc users had significantly lower rates of follow-up office visits, ER visits, and hospitalizations at both 7 and 30 days." (Plf. Appl. Ex. 2 ("Gorevic Decl.") Ex. A at 15). In sum, Plaintiffs have presented significant evidence which undermines the TMB's contention that the quality of medical care will be improved by New Rule 190.8.

The TMB suggests Plaintiffs' countervailing evidence is an insufficient basis for enjoining New Rule 190.8. The TMB points to the Supreme Court's statement that "certain practices by members of a learned profession might survive scrutiny under the Rule of Reason even though they would be viewed as a violation of the Sherman Act in another context." *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 686 (1978). *See also Goldfarb v. Va. State Bar*, 421 U.S. 773, 788 n.17 (1975). While the decision does indeed include that quotation, in *Professional Engineers* the Supreme Court explicitly rejected the notion that improved public safety was a sufficient justification for a society of professionals to adopt an anti-competitive policy. *Prof'l Eng'rs*, 435 U.S. at 695 (attempt to justify anti-competitive policy "on the basis of the potential threat that competition poses to the public safety and the ethics of its profession is nothing less than a frontal

assault on the basic policy of the Sherman Act"). The Supreme Court has continued to reject such justifications. *See F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 463 (1986) (rejecting argument "that an unrestrained market in which consumers are given access to the information they believe to be relevant to their choices will lead them to make unwise and even dangerous choices" as justification for anti-competitive policy).[3]

The Court thus concludes Plaintiffs have presented evidence and argument which makes a prima facie showing they are likely to succeed on the merits of their claim under the Sherman Act.

### 2. Dormant Commerce Clause

Plaintiffs maintain New Rule 190.8 violates the Commerce Clause because it discriminates against physicians who are licensed in Texas, but are physically located out of state. The Supreme Court has made clear "[t]ime and again," that state laws violate the Commerce Clause if they mandate "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Granholm v. Heald*, 544 U.S. 460, 472 (2005) (quoting *Oregon Waste Sys., Inc. v. Dep't of Envt'l Quality*, 511 U.S. 93, 99 (1994)). The TMB maintains Plaintiffs cannot establish more than "an indirect burden on interstate commerce" which does not violate the Commerce Clause. *Dickerson v. Bailey*, 336 F.3d 388, 396 (5th Cir. 2003).

As the Court has concluded Plaintiffs have shown a likelihood of success on their antitrust claim, Plaintiffs have satisfied the first element of the test for grant of a preliminary injunction. The Court thus declines to address this claim.

---

[3] The TMB also suggests the proper standard for reviewing its justification is whether its "conclusions are so baseless that no reasonable medical practitioner could have reached those conclusions after reviewing the same set of facts." *Willman v. Heartland Hosp. E.,* 34 F.3d 605, 611 (8th Cir. 1994). At issue in *Willman*, however, was whether specific corrective action against a physician violated antitrust laws if the physician's peer reviewers had legitimate medical reasons to believe that the physician provided substandard care. TMB's reliance on *Willman* in this case is simply not appropriate.

**B. Substantial Threat of Irreparable Injury**

As to the second element, Plaintiffs contend they face irreparable injury. First, the plaintiff physicians maintain they would no longer be able to engage in providing medical care under the Teladoc model. Although the parties do not directly address this issue, as noted above, both Plaintiff Hood and Clark have submitted declarations in support of the application for preliminary injunction. Hood, as a Virginia resident, testifies he would be unable to provide care to Texas residents were New Rule 190.8 to go into effect and would lose substantial income. (Hood Decl. ¶¶ 27-29). Clark testifies he is nearing retirement and anticipates earning income through Teladoc to support himself. According to Clark, absent that income, he will have to delay his retirement. (Clark. Decl. ¶¶ 15-18).

Monetary losses are generally not considered to satisfy the irreparable injury required to obtain a preliminary injunction. *See Bluefield Water Ass'n, Inc. v. City of Starkville*, 577 F.3d 250, 253 (5th Cir. 2009) (there is no irreparable injury where any harm is financial, and monetary compensation will make plaintiff whole if plaintiff prevails). *See also Heil Trailer Int'l Co. v. Kula*, 542 F. App'x 329, 335 (5th Cir. 2013) (irreparable injury is one that cannot be undone by monetary damages). However, Clark suggests money damages alone are insufficient to compensate him for delaying his requirement. (Clark. Decl. ¶ 18). Similarly, Hood would be forced to choose between continuing to practice in Virginia or moving to Texas. Finally, implementation of New Rule 190.8 would eliminate the possibility that Clark and Hood could continue to provide healthcare via telephone consultation, effectively rendering their current business practices impossible. As discussed more fully below, destruction of a business model may constitute irreparable injury.

As to the remaining plaintiffs, succinctly put, Teladoc maintains it would no longer be in business in Texas, or otherwise. Unquestionably, New Rule 190.8 would prevent Teladoc from providing its telephone-only service to patients in Texas. In 2014 23% of Teladoc's revenue was

generated by Texas consultations or service payments.  (Gorevic Decl. ¶ 5). Teladoc contends deprivation of its ability to do business in Texas would destroy its business model, causing "harm for which there is no adequate remedy at law." *Daniels*, 710 F.3d at 585.  At least two circuit courts have recognized destruction of a business model may constitute irreparable injury. *See Stuller, Inc. v. Steak N Shake Enters., Inc.*, 695 F.3d 676, 680 (7th Cir. 2012) (evidence that change in pricing policy would be significant change to business model, negatively affecting revenue, and that reestablishing previous business model without loss of goodwill and reputation would be difficult, met threshold for irreparable injury); *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 18-19 (1st Cir. 1996) (evidence defendant's product was integral component of plaintiff's business model, customers relied on availability of product, and product line served as "a beacon to attract potential customers," sufficed to show potential loss of consumer goodwill and threat of irreparable injury).

The TMB contends Plaintiffs' claims that they will no longer be able to provide healthcare services in Texas is overblown for two reasons.  First, they maintain Plaintiffs have not shown they cannot continue to do business in Texas by utilizing the provisions in the TMB's regulations permitting telemedicine through the use of video equipment.

The Court notes, however, those regulations require "the use of advanced telecommunications technology that allows the distant site provider to *see and hear* the patient in *real time*." 22 TEX. ADMIN. CODE § 174.2(10) (emphasis added).  Under the regulations, a patient presents at an "established medical site," which must be staffed with a licensed health care provider, and then communicates with the distant health care professional via real time video. *Id.* § 174.2(2) & (7).  The site must have "sufficient technology and medical equipment to allow for adequate physical evaluation, as appropriate for the patient's presenting complaint." *Id.* 174.2(2). The current regulations provide that a "patient's private home is not considered an established medical site." *Id.*  However, the regulations have recently been amended to permit a patient's

home to be considered an established medical site if the home has "sufficient communication and remote medical diagnostic technology to allow the physician to carry out an adequate physical examination appropriate for the patient's presenting condition while seeing and hearing the patient in real time." (Def. Resp. Ex. 13). In short, these regulations do not permit Teladoc to simply substitute video technology for its current telephone consultation model.

Moreover, the president of Teladoc testifies since 2011 Teladoc has explored operating by way of establishing remote medical sites in Texas, but has concluded the associated costs would prevent it from competing and would prevent it from serving a diffusely located patient population. (Plf. Reply Ex. 2 ("Gorevic Supp. Decl.") ¶ 15). Teladoc also considered partnering with physicians and employers in Texas to provides services at their offices, as well as sending physicians to specific sites at specific times, but rejected both options for the same reasons of cost and diffusely located patients. (Gorevic Supp. Decl. ¶¶ 16-17).

Second, Defendants point out Teladoc has clients in states other than Texas. However, as noted above, Plaintiffs have presented evidence that nearly one-quarter of their business is generated in Texas. Plaintiffs have also presented evidence that its subscribers include multi-state employers who demand healthcare services be available in all states. (Gorevic Decl. ¶ 18; Murphy Decl. App. C).

Additionally, Plaintiffs correctly point out an irreparable injury includes one for which monetary damages would be "especially difficult to calculate." *Heil Trailer*, 542 F. App'x at 335. According to Teladoc's statistics, it has experienced rapid growth, quadrupling its revenues between 2012 and 2014. (Gorevic Supp. Decl. Ex. C-I). Teladoc's evidence further suggests the telehealth industry as a whole is at an early stage, making future growth especially difficult to estimate. (Gorevic Decl. ¶ 20; Murphy Decl. ¶ 44).

Teladoc further maintains it is at an especially vulnerable point in its growth. Teladoc characterizes itself as a young business, dependent on ongoing funding from new sources to

maintain and grow its business.  (Gorevic Decl. ¶ 22).  Further, Teladoc is planning an initial public offering of common stock.  Teladoc's president states Teladoc's investment bankers have advised that the stock offering will not go forward if New Rule 190.8 is put into effect.  (Gorevic Decl. ¶ 14; Gorevic Supp. Decl. ¶¶ 8-9).  Teladoc additionally points out some of its physicians, the quality of which are key to patient satisfaction and Teladoc's continued viability, are declining to continue to provide services through Teladoc.  (DePhillips Decl. Ex. C; Murphy Decl. App. at 22-24).

Finally, Plaintiffs argue they face irreparable injury because, even if monetary compensation was sufficient, it is unlikely they will be able to recover monetary damages from the defendants. According to Teladoc, Plaintiffs' trebled antitrust damages would run into at least the tens of millions of dollars and likely outstrip the individual defendants' ability to pay.  (Murphy Decl. ¶¶ 31-36).  The Fifth Circuit recently noted the district court did not abuse its discretion in considering there was a "substantial probability that [plaintiff] would be unable to collect a judgment against [defendant]" in finding the plaintiff faced irreparable harm. *Aspen Tech., Inc. v. M3 Tech., Inc.*, 569 F. App'x 259, 273 (5th Cir. 2014).  *See also Specialty Healthcare Mgmt., Inc. v. St. Mary Parish Hosp.*, 220 F.3d 650, 658 (5th Cir. 2000) (noting there is some authority for proposition that inability to actually collect on money judgment may suffice to make injury irreparable).  The possibility that the TMB will assert immunity from monetary damages as a state agency also weighs in favor of finding Plaintiffs face irreparable harm.  *See Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1157 (10th Cir. 2011) (imposition of money damages that cannot later be recovered for reasons such as sovereign immunity constitutes irreparable injury); *Harris v. Cantu*, __ F. Supp. 3d __, 2015 WL 338938, at *11 (S.D. Tex. Jan. 26, 2015) (where defendants entitled to Eleventh Amendment immunity from money damages, plaintiff "has suffered and—if no injunction is issued—will continue to suffer irreparable injury for which money damages are inadequate").

The Court thus finds Plaintiffs have shown they face a substantial threat of irreparable injury.

C.      **Balancing of Respective Interests**

The final two prongs of the preliminary injunction inquiry require weighing of the respective interests of the parties and the public.  Specifically, that the threatened injury out-weighs any damage that the injunction may cause the opposing party and  that the injunction will not disserve the public interest.  In this case, the inquiry essentially collapses because the interests asserted by the TMB are in the form of protecting the public from injury.

The TMB contends Plaintiffs have failed to meet their burden to show the harm they would suffer if New Rule 190.8 were permitted to take effect does not outweigh the threat to public safety the rule poses.  The TMB characterizes Plaintiffs' evidence of harm as merely "speculative."  As discussed above, however, Plaintiffs have presented specific evidence detailing the financial harm they will suffer, likely including destruction of Teladoc's business model and ability to do business in Texas, in addition to other non-monetary harms.  Plaintiffs have also presented evidence casting into doubt their ability to receive monetary damages, even if such damages were sufficient to compensate them for the injury suffered.

As to the threat to public safety and health, the TMB has presented only anecdotal evidence of possible public harm.  As reviewed above, Plaintiffs have presented countervailing anecdotal evidence, as well as evidence suggesting the basis for TMB's conclusions concerning Teladoc are poorly founded.  In addition, Plaintiffs have presented evidence that consumers will face higher prices for medical care, as well as reduced access.

Finally, Plaintiffs point out a Texas state court considered this very issue in February in considering whether to enjoin enforcement of the emergency rule adopted by the TMB in January 2015.  That court concluded "No imminent peril to public health, safety or welfare existed on January 16, 2015, or exists at the present time to justify adoption of the emergency rule." (Navikas Decl. Ex. U ¶ 2).  At the injunction hearing, Plaintiffs suggested this ruling should be viewed as

collaterally estopping the TMB from asserting otherwise in this action.  While the Court declines to adopt Plaintiffs' view, the ruling additionally weighs against the TMB"s arguments.

In light of the evidence presented by Plaintiffs, the Court concludes the balance of respective interests of the parties and the public weigh in favor of granting Plaintiffs' application for a preliminary injunction.

## IV.  CONCLUSION

Plaintiffs' Application for a Temporary Restraining Order and Preliminary Injunction Before June 3, 2015 (Clerk's Dkt. #10) is hereby **GRANTED.**

Accordingly, it is hereby **ORDERED** that New Rule 190.8 is enjoined from taking effect and Defendants are enjoined from taking any action to implement, enact and enforce New Rule 190.8 from taking effect pending final resolution of the claims brought by Plaintiffs in their Complaint.

**SIGNED** on May 29, 2015.

ROBERT L. PITMAN
UNITED STATES DISTRICT JUDGE

# TAB B



TO:        Telemedicine Stakeholders
           Interested Parties

FROM:      Scott Freshour, General Counsel

DATE:      January 16, 2015

SUBJECT:   Texas Medical Board's Notification of an Emergency Rule

---

Dear Telemedicine Stakeholders and Interested Parties:

Today the Texas Medical Board (Board) adopted an amendment on an emergency basis to Rule 190.8(1)(L), relating to Violation Guidelines. The purpose of the emergency amendment is to protect the public health and welfare by clarifying that a face-to-face visit or in-person evaluation is required before a practitioner can issue a prescription for drugs. Attached is a copy of Rule 190.8(1)(L), as amended. This emergency rule is effective immediately. The same version of the rule will proceed through the regular rulemaking process.

Please know that in adopting this emergency rule, the Board was cognizant of the input from the Telemedicine Stakeholders concerning Rule 174 related to the issue of an "established medical site" and the provision of mental health services. In response to this input, Board Staff has drafted potential amendments to Rule 174, which are also included as an attachment for your review.

The two rules, 190.8(1)(L) and 174, will be presented at the February 12 and 13, 2015 Board meeting for consideration for publication and comment according to the regular rulemaking process. Board Staff has endeavored to make the two rules compatible to ensure patient safety while allowing greater access to mental health services via telemedicine.

The Board looks forward to your input on these issues.


C:     Mari Robinson, Executive Director

# TAB C

Cause No. D-1-GN-15-000238

| | | |
|---|---|---|
| TELADOC, INC., | § | IN THE DISTRICT COURT |
| Plaintiff, | § | |
| v. | § | 53rd JUDICIAL DISTRICT |
| | § | |
| TEXAS MEDICAL BOARD and SCOTT | § | |
| FRESHOUR, in his Official Capacity as | § | |
| General Counsel of the Texas Medical | § | |
| Board, | § | |
| Defendants. | § | TRAVIS COUNTY, TEXAS |

## TEMPORARY INJUNCTION ORDER

On the 2nd day of February, 2015, came on to be considered Plaintiff's Verified Original Petition for Declaratory Judgment and Application for Injunctive Relief in which Plaintiff Teladoc, Inc. ("Teladoc") seeks, among other things, a temporary injunction against Defendants, Texas Medical Board ("TMB") and Scott Freshour, in his Official Capacity as General Counsel of the TMB. After having considered the Petition, the request for injunctive relief, the evidence presented and argument of counsel, the Court finds that:

1. Teladoc has a probable right to recovery with respect to its claims against the Defendants for issuing an Order adopting an emergency rule on January 16, 2015, amending Rule 190.8(1)(L) of 22 TEXAS ADMINISTRATIVE CODE, Chapter 190.

2. No imminent peril to public health, safety or welfare existed on January 16, 2015, or exists at the present time to justify adoption of the emergency rule and it is invalid.

3. It is probable that Teladoc will suffer an imminent irreparable injury if this Temporary Injunction is not granted because of the Defendants' prior and continuing conduct in threatening disciplinary actions against Teladoc and the physicians participating in its program, as set out in the TMB letter of June 16, 2011, which has been declared an invalid rule by the Court of Appeals for the Third District of Texas, Austin, Texas, by opinion of December 31,

**TEMPORARY INJUNCTION ORDER**                                                      **PAGE 1**

2014. Such action by Defendants will have immediate, severe and adverse impact on Teladoc's ability to do business in Texas. Teladoc has no adequate remedy at law.

4. Maintenance of the status quo in this case will be preserved by restricting the TMB from enforcing or endeavoring to enforce against Teladoc or its participating physicians Rule 190.8(1)(L) as it existed prior to and after the invalid Order of January 16, 2015, as construed by Defendant Texas Medical Board in its letter of June 16, 2011.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that Teladoc's Application for Temporary Injunction be and is hereby GRANTED;

ACCORDINGLY, the Texas Medical Board and Scott Freshour, in his Official Capacity as General Counsel of the Texas Medical Board, and their agents, servants, employees and attorneys or other representatives, are HEREBY ORDERED to desist and refrain from implementing, communicating, enforcing or attempting to enforce the amendments to Rule 190.8(1)(L) as stated in the memorandum from the Texas Medical Board's General Counsel, Scott Freshour, dated January 16, 2015, and Texas Medical Board Order Adopting Emergency Rule dated January 16, 2015. Notwithstanding the foregoing, Defendants are not enjoined from investigating complaints received under the Texas Medical Practice Act as to any physicians.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that this Temporary Injunction shall become effective upon execution and the filing of a bond in the amount of $500.00 filed with the Clerk of this Court by Teladoc and the Court finds that Teladoc previously satisfied this requirement with the tendering of a cash bond in the amount of $500.00, which is still on file with the Clerk.

2

The Clerk of the above-entitled Court shall forthwith issue a Writ of Injunction in conformity with the law and the terms of this Order.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that this cause be set for final trial on the merits on September 21, 2015, at 9:00 a.m. @

IT IS FURTHER ORDERED that this order expires no later than the date of entry of a final judgment in this case.

Signed and issued this 6 day of February, 2015, at 10.00 o'clock a.m.

The Honorable Orlinda Naranjo,
Judge Presiding

12075362v.1

3

FILED
15-0092
4/2/2015 2:46:44 PM
tex-4748789
SUPREME COURT OF TEXAS
BLAKE A. HAWTHORNE, CLERK

No. 15-0092

# In the
# Supreme Court of Texas

---

TEXAS MEDICAL BOARD AND SCOTT FRESHOUR, IN HIS
OFFICIAL CAPACITY AS GENERAL COUNSEL OF THE TEXAS MEDICAL BOARD,
*Petitioners,*

v.

TELADOC, INC.,
*Respondent.*

---

On Petition for Review from the
Third Court of Appeals
Case No. 03-13-00211-CV

---

## PETITION FOR REVIEW

---

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney
General

OFFICE OF THE ATTORNEY
GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-1700
Fax: (512) 474-2697

SCOTT A. KELLER
Solicitor General

DOUGLAS D. GEYSER
Assistant Solicitor General
State Bar No. 24059817
*douglas.geyser@texasattorneygeneral.gov*

TED A. ROSS
Assistant Attorney General

COUNSEL FOR PETITIONERS

**Petitioners**
Texas Medical Board and Scott Freshour, in his official capacity as General Counsel of the Texas Medical Board

**Lead Appellate Counsel**
Douglas D. Geyser
State Bar No. 24059817
Assistant Solicitor General
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-2540
Fax: (512) 474-2697
*douglas.geyser@texasattorneygeneral.gov*

**Additional Appellate and Trial Counsel**
Ted A. Ross
State Bar No. 24008890
Assistant Attorney General
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548
Austin, Texas 78711-2548
Tel.: (512) 475-4191
Fax: (512) 474-1062
*ted.ross@texasattorneygeneral.gov*

**Respondent**
Teladoc, Inc.

**Appellate Counsel and Trial Counsel Below**
Matt Dow
Carla Cox
Dudley D. McCalla
JACKSON WALKER L.L.P.
100 Congress Ave., Suite 1100
Austin, Texas 78701
Tel.: (512) 236-2230
Fax: (512) 391-2113
*mdow@jw.com*

Thomas R. Phillips
BAKER BOTTS L.L.P.
98 San Jacinto Blvd., Ste 1500
Austin, Texas 78701
Tel.: (512) 322-2565
Fax: (512) 322-8363
*tom.phillips@bakerbotts.com*

Benjamin A. Geslison
BAKER BOTTS L.L.P.
One Shell Plaza
910 Louisiana St.
Houston, TX 77002
Tel.: (713) 229-1241
Fax: (713) 229-2841
*ben.geslison@bakerbotts.com*

i

## TABLE OF CONTENTS

Identity of Parties and Counsel ................................................................i

Index of Authorities.........................................................................iv

Statement of the Case ...................................................................vii

Statement of Jurisdiction...............................................................viii

Issues Presented..............................................................................ix

Statement of Facts ............................................................................3

Reasons to Grant the Petition...........................................................9

Summary of the Argument ..............................................................10

Argument..........................................................................................10

    I.    The Court Of Appeals' Impermissibly Broad Interpretation Of The Term "Rule" Creates An Untenable Situation For The Judiciary And State Agencies............................................................................11

        A.    The Definition Of "Rule" Is Important To Texas Courts, Administrative Agencies, And The Public......11

        B.    The Third Court Of Appeals' Decisions On This Issue Conflict With Each Other.................................16

    II.    The Third Court Of Appeals Erroneously Interpreted The Term "Rule" To Include The Board's Letter.................17

        A.    Sections 2001.038 And 2001.003(6) Must Be Strictly Construed To Preserve The State's Sovereign Immunity...................................................18

B.     The Third Court Of Appeals' Interpretation Of "Rule" Misinterprets The Limited Judicial Review Afforded By The APA. ................................................. 19

Prayer ....................................................................................... 24

Certificate of Service ............................................................... 25

Certificate of Compliance ........................................................ 25

Appendix

## INDEX OF AUTHORITIES

### Cases

*Am. Tort Reform Ass'n v. Occupational Safety & Health Admin.*,
738 F.3d 387 (D.C. Cir. 2013)......................................................23

*Beacon Nat'l Ins. Co. v. Montemayor*,
86 S.W.3d 260 (Tex. App.—Austin 2002, no pet.) ........................17

*Block v. Cmty. Nutrition Inst.*,
467 U.S. 340 (1984) .....................................................................22

*Brinkley v. Tex. Lottery Comm'n*,
986 S.W.2d 764 (Tex. App.—Austin 1999,
no pet.) ..................................................................... 14, 15, 16, 18

*City of LaPorte v. Barfield*,
898 S.W.2d 288 (Tex. 1995)..........................................................18

*Combs v. Entm't Publ'ns*,
292 S.W.3d 712 (Tex. App.—Austin 2009, no pet.) ......................21

*Gen. Servs. Comm'n v. Little-Tex Insulation Co.*,
39 S.W.3d 591 (Tex. 2001).................................................... 19, 22

*Gulf Coast Coal. of Cities v. Pub. Util. Comm'n*,
161 S.W.3d 706 (Tex. App.—Austin 2005, no pet.) ......................13

*Prairie View A & M Univ. v. Chatha*,
381 S.W.3d 500 (Tex. 2012)..........................................................18

*Prof'ls & Patients for Customized Care v. Shalala*,
56 F.3d 592 (5th Cir. 1995) .................................................. 22, 23

*TABC v. Amusement & Music Operators of Tex., Inc.*,
997 S.W.2d 651 (Tex. App.—Austin 1999, pet. dism'd
w.o.j.)............................................................................................17

*TDCJ v. Miller*,
51 S.W.3d 583 (Tex. 2001)........................................................ 19, 20

*Teladoc, Inc. v. Tex. Med. Bd.*,
2014 WL 7464833 (Tex. App.—Austin Dec. 31,
2014, pet. filed) ....................................................................... *passim*

*Tex. Educ. Agency v. Leeper*,
893 S.W.2d 432 (Tex. 1994)...................................................... 17, 21

*Tex. State Bd. of Pharmacy v. Witcher*,
447 S.W.3d 520, 529 (Tex. App.—Austin 2014, pet.
filed) ............................................................................... 12, 17, 19

*Wichita Falls State Hosp. v. Taylor*,
106 S.W.3d 692 (Tex. 2003)........................................................ 18

**Statutes**

22 TEX. ADMIN. CODE § 190.8(1)(L) ......................................................... 4

22 TEX. ADMIN. CODE § 190.8(1)(L)(i)(II) ............................................... ix, 4

5 U.S.C. § 551(4) ................................................................................... 23

5 U.S.C. § 553(b)(A) ............................................................................. 23

5 U.S.C. § 553(d)(2) ............................................................................. 23

5 U.S.C. § 704 ...................................................................................... 23

TEX. GOV'T CODE § 22.001(a)(3) ........................................................... viii

TEX. GOV'T CODE § 22.001(a)(6) ........................................................... viii

TEX. GOV'T CODE § 311.034 ............................................................. 11, 18

TEX. GOV'T CODE § 2001.003(6) ................................................ viii, ix, 11, 20

TEX. GOV'T CODE § 2001.003(6)(A) .......................................................... 21

TEX. GOV'T CODE § 2001.003(6)(C) .......................................................21

TEX. GOV'T CODE § 2001.038(a) .............................................viii, ix, 11, 20

TEX. GOV'T CODE § 2001.038(f) ...........................................................viii

TEX. OCC. CODE § 152.001(a) ...............................................................3

TEX. OCC. CODE § 153.001(3)(4) ..........................................................3

TEX. OCC. CODE § 154.051 ...................................................................3

TEX. OCC. CODE § 164.001(a) ...............................................................3

TEX. OCC. CODE § 164.003 ...................................................................3

TEX. OCC. CODE § 164.007 ...................................................................3

TEX. OCC. CODE § 164.009 ...................................................................3

TEX. OCC. CODE § 164.051(a)(6) ...........................................................3

## Other Authorities

Ron Beal, *Substantive and Interpretive Rules: The Judiciary
    Continues to Struggle to Define Them and to Determine
    Their Legal Validity and Effect*, 12 TEX. TECH ADMIN.
    L.J. 55 (2010) ...............................................................................16

*Nature of the Case*:  This is a declaratory-judgment claim that a letter from the general counsel of the Texas Medical Board on the Board's behalf constitutes an unpublished "rule" under the Texas Administrative Procedure Act. CR.170-82.[1]

*Trial Court*:  The 353rd District Court of Travis County, the Honorable Amy Clark Meachum presiding

*Trial Court Disposition*:  The trial court granted the State's motion for summary judgment based on lack of subject-matter jurisdiction and denied Teladoc's. CR.386-87 (App. A). The court also entered an order purporting to suspend enforcement of the judgment. CR.389-90.

*Parties in Court of Appeals*:  *Appellant*: Teladoc, Inc.
*Appellee*: Texas Medical Board and Nancy Leshikar, in her official capacity as General Counsel of the Texas Medical Board[2]

*Court of Appeals*:  Third Court of Appeals

*Court of Appeals' Disposition*:  The court of appeals reversed and rendered summary judgment declaring that the letter constituted an invalid unpublished rule. *Teladoc, Inc. v. Tex. Med. Bd.*, 2014 WL 7464833 (Tex. App.—Austin Dec. 31, 2014, pet. filed) (Pemberton, J., joined by Jones, C.J., and Field, J.) (App. B, C).

---

[1] Citations of the Clerk's Record are formatted "CR.[page]". Citations of the appendix to this petition are formatted "App. [tab]".

[2] Scott Freshour has since succeeded Leshikar as the Board's general counsel.

## STATEMENT OF JURISDICTION

This Court has jurisdiction under sections 22.001(a)(3) and (a)(6) of the Government Code. The primary issue involves the APA's definition of the term "rule," which limits a court's jurisdiction to hear an APA declaratory-judgment claim. *See* TEX. GOV'T CODE §§ 2001.003(6) (defining "rule"), 2001.038(a) (waiving the State's immunity for declaratory-judgment claim regarding "the validity or applicability of a rule"). That issue is of vital importance to: the courts, whose dockets the Third Court's interpretation will drastically expand; every executive agency with rulemaking authority; and regulated entities that value administrative guidance. The Third Court's approach hamstrings agencies by effectively requiring them to pursue lengthy, formal rulemaking procedures any time they need to alert regulated entities that those entities are violating a statute or administrative rule. The Court should also grant the petition because the Third Court is the appellate court intended by statute to hear these appeals, *see* TEX. GOV'T CODE § 2001.038(f), yet its opinions are hopelessly muddled, drawing meaningless distinctions that provide no useful guidance to agencies or the public.

## ISSUES PRESENTED

The APA waives the State's sovereign immunity for a claim challenging the "validity or applicability of a rule." TEX. GOV'T CODE § 2001.038(a) (App. F). Here, in response to Teladoc's representations that its business practices satisfied section 190.8(1)(L)(i)(II) of the Board's rules, *see* 22 TEX. ADMIN. CODE § 190.8(1)(L)(i)(II) (regarding the medical practices necessary to establish a proper professional relationship) (App. G), the Board sent Teladoc a letter (the "Letter" (App. D)) warning that its telephonic drug-prescription practices in fact violated Rule 190.8. CR.197. Teladoc filed suit claiming that the Letter is an invalid "rule" under the APA because it added an in-person consultation requirement to Rule 190.8 without undergoing the formal rulemaking process.

Did the trial court lack subject-matter jurisdiction over Teladoc's lawsuit because the Letter is not a "rule" under APA section 2001.003, *see* TEX. GOV'T CODE § 2001.003(6) (App. E), because either:

(1) the context and intent of the Letter show that it was not a "statement of general applicability" or attempt to bind the public; or

(2) the Letter merely reiterates the requirements of Rule 190.8(1)(L)(i)(II)? (UNBRIEFED)

No. 15-0092

# In the
# Supreme Court of Texas

---

TEXAS MEDICAL BOARD AND SCOTT FRESHOUR, IN HIS
OFFICIAL CAPACITY AS GENERAL COUNSEL OF THE TEXAS MEDICAL BOARD,
*Petitioners*,

v.

TELADOC, INC.,
*Respondent.*

---

On Petition for Review from the
Third Court of Appeals
Case No. 03-13-00211-CV

---

**PETITION FOR REVIEW**

---

TO THE HONORABLE SUPREME COURT OF TEXAS:

The Third Court of Appeals has enlarged the APA's waiver for rule-validity claims to allow suit nearly any time an administrative agency makes a statement that does anything other than quote a statute or formally promulgated rule. That interpretation of the APA is misguided in principle and unworkable in practice—for courts, agencies, and regulated entities alike. Under the court of appeals' expansive view of section 2001.038, interpretations in press releases, letters, contested-

case proceedings, depositions, information sheets, and website frequently asked questions, among others, bring executive activity under the control of the judiciary.

In addition to swelling the judiciary's docket, the court of appeals' interpretation puts agencies in an unmanageable position. Confronted with a private party's public misstatements regarding the meaning of an administrative rule, a state agency has just three options: wait for a regulated entity actually to engage in the unlawful conduct and then institute adjudicatory proceedings without warning; initiate the lengthy formal rulemaking process; or do nothing and hope no one believes the misstatements. If the agency attempts to correct the misstatement through anything other than a letter sent exclusively to the offending party, the Third Court's decree is that the agency has exposed itself to a lawsuit.

The Court should grant the petition for review to remedy this untenable situation.

The court of appeals correctly stated the nature of the case.

***Regulatory background.*** The Board is an executive agency empowered "to regulate the practice of medicine" through rulemaking and adjudications. TEX. OCC. CODE § 152.001(a). The Legislature granted it the broad authority to "adopt rules and bylaws as necessary to . . . regulate the practice of medicine[] and enforce this subtitle." *Id.* § 153.001(3)(4). The Board's specific duties include disciplining license holders "on determining a violation of this subtitle or a board rule." *Id.* § 164.001(a). The initiation of disciplinary proceedings typically results from complaints by members of the public. *See id.* § 154.051. Disciplinary hearings are conducted via formal or informal contested-case procedures and are subject to judicial review. *Id.* §§ 164.003, 164.007, 164.009.

One ground for a disciplinary action is the "fail[ure] to practice medicine in an acceptable professional manner consistent with public health and welfare." *Id.* § 164.051(a)(6). Under its statutory delegation of authority, the Board formally promulgated a rule—unchallenged by Teladoc here—to elaborate on this ground: "Failure to practice in an acceptable professional manner consistent with public health and welfare

within the meaning of the Act includes, but is not limited to . . . prescription of any dangerous drug or controlled substance without first establishing a proper professional relationship with the patient." 22 TEX. ADMIN. CODE § 190.8(1)(L). The rule further defines this category with the language that is the subject of the instant dispute: "A proper relationship, at a minimum requires . . . establishing a diagnosis through the use of acceptable medical practices such as patient history, mental status examination, physical examination, *and* appropriate diagnostic and laboratory testing. An online or telephonic evaluation by questionnaire is inadequate . . . ." *Id.* § 190.8(1)(L)(i)(II) (emphasis added). Any license holder who violates section 190.8(1)(L)(i)(II) may be disciplined by the Board.

The Board has long interpreted that text to require all four practices to establish a professional relationship. Over the years—beginning well before the Board sent the Letter to Teladoc—the Board has used Rule 190.8 to discipline license holders who prescribed drugs over the telephone or internet without first conducting a face-to-face examination. *See* CR.40-46 (relevant adjudicatory proceedings).

***Teladoc's business and the instant dispute.*** Teladoc calls itself a "telehealth provider." CR.171. It offers medical advice solely via telephone, not through in-person or even video consultations. *See* CR.212-14. Its physicians thus never see their patients. *See, e.g.*, CR.174 ("Teladoc's participating physicians do not conduct face-to-face consultations or physical examinations . . . .").

Nevertheless, Teladoc advertised to the public—including Texas physicians that might participate with Teladoc—that Teladoc's business model complied with the Board's rules. *See* CR.197-98. Faced with a company misrepresenting the rules' restrictions, the Board's general counsel Nancy Leshikar responded by sending Teladoc a letter expressing concern that Teladoc's physicians may be violating Rule 190.8(1)(L)(i)(II): "Tel[a]doc's advertising material has multiple statements indicating that its process can be conducted over the telephone without any prior establishment of a physician/patient relationship via a 'face-to-face' examination." CR.197. For instance, the Letter noted that Teladoc represented that its physicians treat patients "via remote telephone consultations." *Id.* Leshikar concluded: "[A]ny representation that [Teladoc] make[s] regarding Tel[a]doc's program

5

being in conformance with the Board's rules will be directly and firmly refuted by the Board." CR.198. Because the Board didn't know the identity of Teladoc's doctors, *cf.* CR.72-73 (discussing Board's discovery request for identity of Teladoc doctors), the Board sent a copy of the Letter to the vice president and general counsel of the Texas Medical Association, a medical society representing Texas physicians and medical students.

Teladoc filed its original petition shortly thereafter, claiming that the Letter was an invalid, unpublished "rule" under the APA. CR.5, 15. Teladoc deposed Leshikar and the Board's Executive Director, Mari Robinson. Leshikar testified that the four practices listed in Rule 190.8(1)(L)(i)(II) are the "minimum" level of acceptable medical practices to establish a diagnosis. CR.237. Likewise, Robinson stated that the rule "require[s] a patient history, mental status exam, physical examination, and appropriate laboratory testing." CR.231. Based on this testimony about what the Board's rules require, Teladoc amended its petition to include claims that these deposition statements also constitute invalid, unpublished "rules." CR.175-76, 179, 180-81.

The parties filed cross-motions for summary judgment, and the trial court held that the Letter is not a "rule" and issued judgment for the State. *See* CR.386-87. The court also entered a supersedeas order, purporting to rely on Texas Rule of Appellate Procedure 24.2(a)(5) to suspend enforcement of the judgment. CR.389.

The Third Court of Appeals reversed and rendered judgment "declaring that [the Board's] pronouncements regarding Rule 190.8(1)(L)(i)(II)" in the Letter are an invalid "rule." *Teladoc*, 2014 WL 7464833, at *13. The court held that the Letter is a "state agency statement" that "implements, interprets, or prescribes law or policy" by "implement[ing] a broader policy judgment by the Board . . . that the creation of a new physician-patient relationship should generally entail an in-person physical examination." *Id.* at *6. The Letter thus also "impact[ed] private rights and not merely internal agency management or organization." *Id.* Despite the fact that the Letter was a direct response to Teladoc's misrepresentations, the court further held that the Letter constituted a "statement of general applicability" because it was also sent to the general counsel of the Texas Medical Association, thereby "plac[ing] the regulated public—Texas physicians—on notice." *Id.* at *7.

The court also found that even resolving an ambiguity in Rule 190.8 "would have a legal effect on private parties beyond . . . the text of Rule 190.8[] alone." *Id.* at 10.

## REASONS TO GRANT THE PETITION

- The line between "rule" and policy statement limits courts' ability to interfere with the executive's constitutional discretion. The decision here epitomizes the Third Court's elevation of judicial power at the expense of specialized administrative agencies.[3] This is all the more problematic given that, in evaluating the jurisdictional issue, the court refused to afford the Board deference regarding the interpretation of its own formally promulgated rule. The Board's sensible attempt to refute Teladoc's misstatement should not have opened the courthouse doors.

- The court of appeals purportedly would not have asserted jurisdiction over this lawsuit had the Letter been phrased "tentatively." But a legal rule premised on semantics merely promotes form over substance.

- The court of appeals' ruling will flood the courts with rule-validity challenges: any agency statement, regardless of context or intent, might waive the State's immunity so long as the statement isn't "unofficial, individually directed, [or] tentative," descriptors that set only vague and hollow limits on the court's interpretation. *Teladoc*, 2014 WL 7464833, at *11.

- The court's decision will also incentivize agencies to do nothing to explain their actions beyond putting their own rules in block quotations. The APA is not designed, however, to prevent administrative bodies from communicating with the public. A rational interpretation of the statute should encourage agencies to be more, not less, transparent.

---

[3] These issues are also before the Court in a separate petition for review. *See* Petition for Review, No. 14-1022, *Tex. State Bd. of Pharmacy v. Witcher* (response to petition requested Feb. 27, 2015).

## SUMMARY OF THE ARGUMENT

The court of appeals' decision throws open the courthouse doors to a broad range of APA challenges based on mere semantics, regardless of the intent or context of the agency's statement. The upshot is a slate of new APA claims any time an agency makes a statement that isn't phrased in "tentative" terms. Afraid that they might not meet this "tentative" standard, agencies will be less apt to issue *any* guidance, thereby depriving regulated entities of valuable information and harming the public.

Those are not the consequences of reasonable interpretations of the term "rule" and section 2001.038's immunity waiver. To the contrary, that waiver must be strictly construed to preserve executive agencies' immunity. Because the Board's Letter merely responded to Teladoc's own misstatements in an effort to allow Texas physicians to reform their conduct to avoid disciplinary proceedings under Rule 190.8, the Letter is not a statement of general applicability that itself affected private rights.

## ARGUMENT

The decision of the APA's drafters to limit section 2001.038's immunity waiver to suits challenging the "validity or applicability of a

10

rule" was a deliberate one. The Legislature could have empowered courts to adjudicate declaratory claims regarding any interpretive agency statement. But it instead restricted this jurisdiction to considering the validity of "statement[s] of general applicability" that "affect[] private rights or procedures." TEX. GOV'T CODE § 2001.003(6); *see id.* § 2001.038(a). The Third Court's interpretation removes any meaningful jurisdictional limit on that text and conflicts with Government Code section 2001.034's requirement of strict construction of immunity waivers. And the result of that flawed legal analysis is predictably problematic for courts, agencies, and regulated entities hoping for more, not less, transparency from the government.

## I. THE COURT OF APPEALS' IMPERMISSIBLY BROAD INTERPRETATION OF THE TERM "RULE" CREATES AN UNTENABLE SITUATION FOR THE JUDICIARY AND STATE AGENCIES.

### A. The Definition Of "Rule" Is Important To Texas Courts, Administrative Agencies, And The Public.

The Third Court's interpretation of "rule" has pernicious consequences for the judiciary, the executive, and the public, as well as the relationships between the three.

As to the judiciary, the APA's limited waiver protects the courts' scarce resources. In a state as large as Texas, administrative agencies

11

issue an untold number of pronouncements every month, as part of informal and formal requests, memoranda, and proceedings. Not every decision can (or should) be made through the APA's formal processes. If a private party can challenge any statement that is phrased in definitive language—even if there is no grant of judicial review—section 2001.038 lawsuits may overwhelm the courts. *Cf. Tex. State Bd. of Pharmacy v. Witcher*, 447 S.W.3d 520, 529 (Tex. App.—Austin 2014, pet. filed) (allowing challenge to statement contained in contested-case ruling).

That limited waiver also preserves the appropriate functioning of both government departments. Properly construed, the APA allows agencies—which are subject to political pressure through the executive— to engage in policymaking without undue intrusion from the courts. The judiciary steps in only to determine the "validity or applicability" of agency action that concretely affects private parties. By contrast, courts do not stand ready to second-guess every interpretive utterance an agency makes, for that would impermissibly interject the courts into the details of executive functions. The Third Court's decision here upsets that careful balance struck by the APA.

And as to that agency policymaking function itself, the court of appeals' interpretation incentivizes agencies to provide less information to regulated entities or, at best, to provide information in a vague or ambiguous manner, lest it cross the line from "tentative" to definite. If the Letter here constitutes a "rule," consider the alternatives left to an agency, like the Board, that wishes to alert a regulated entity that it is violating a statute or regulation. First, the agency could, without warning, simply initiate administrative proceedings. The agency's interpretation of the regulation would be entitled to deference on judicial review. *See, e.g.*, *Gulf Coast Coal. of Cities v. Pub. Util. Comm'n*, 161 S.W.3d 706, 712 (Tex. App.—Austin 2005, no pet.). This is plainly a poor option. Among other problems, it would increase costs for both the agency and the regulated entity, and would likely create needless friction between the parties.

Second, the agency could send correspondence stating that the entity is violating a rule but without providing any additional explanation because, under the court of appeals' reading of the APA, any "non-tentative" explanation would subject the agency to an APA rule-validity challenge. But without an explanation, the entity would have to

13

merely guess at the basis for the alleged violation. This option thus adds little value for a regulated entity that is not knowingly and willfully violating the Texas Administrative Code.

That leaves the two impractical options the court of appeals favors. One way for the agency to retain its independence from judicial interference is to initiate rulemaking proceedings under the APA each time it wants to notify a regulated entity of a possible violation. But that option is unworkable, inefficient, and overly restrictive, as the Third Court previously recognized:

> Agencies would be reduced to impotence, however, if bound to express their views as to "law," "policy," and procedural "requirements" through contested-case decisions or formal rules exclusively; and they could not under such a theory exercise powers explicitly delegated to them by the legislature. . . . If every expression by the agency as to "law," "policy," and procedural "requirements" requires the promulgation of a formal rule, the agency could no longer exercise its "informed discretion" to choose adjudication as a means of making law and policy, rather than rulemaking, a choice we have repeatedly said an agency has when it possesses both adjudicatory and rulemaking powers.

*Brinkley v. Tex. Lottery Comm'n*, 986 S.W.2d 764, 769 (Tex. App.—Austin 1999, no pet.); *see also id.* at 770 (noting "the straight-jacket of rulemaking").

The other course is to avail itself of what the Third Court evidently (but erroneously) believed was a meaningful constraint on its decision: issue statements that are "unofficial, individually directed, tentative or other[wise] non-proscriptive." *Teladoc*, 2014 WL 7464833, at *11. It's difficult to see the sense of this approach. In the first place, the Letter itself *was* "unofficial" and "individually directed." More importantly, there is no rational reason for the result here to differ had the Letter said that Texas physicians' reliance on Teladoc's misstatements about Rule 190.8 "*may* lead to disciplinary action," instead of writing that such reliance "*will* lead to disciplinary action." CR.198 (emphasis added). The law—especially an immunity waiver—should not turn on such semantics and formulaic niceties.

In sum, the only sensible option is precisely what the Board did here (and precisely what the Third Court approved in other cases, *see infra* Part I.B), namely, alert Teladoc and others who may have relied on Teladoc's misstatements that the Board disagrees with Teladoc's views.

The APA should be interpreted to encourage an agency to warn regulated entities, not to penalize it for doing so. *See Brinkley*, 986 S.W.2d at 770 ("The definition in section 2001.003(6) is sufficiently flexible to

allow agencies to perform their functions without unnecessary procedural obstacles."). This situation is exacerbated by the court's treatment of interpretive deference owed to agencies. The court held that even a permissible resolution of an ambiguity offends section 2001.038. *Teladoc*, 2014 WL 7464833, at \*10. But where a statute or formally promulgated rule permits reasonable, alternative constructions, the agency's guidance to the public is most valuable. This important matter warrants the Court's involvement.

## B. The Third Court Of Appeals' Decisions On This Issue Conflict With Each Other.

Adding uncertainty to a bad situation, the Third Court's decisions interpreting the term "rule" reach conflicting results without any principled explanation for the differing outcomes.[4]

For instance, the court has held not to be "rules":

- Lottery Commission letters purporting "to make licensees aware of the agency's position and to afford an opportunity to licensees for voluntary compliance," *Brinkley*, 986 S.W.2d at 771 n.10 (emphases removed); *see id.* (noting that agency explained "that the 'Eight-liner' is a gambling device . . . and is therefore illegal," and promised to

---

[4] *Cf.* Ron Beal, *Substantive and Interpretive Rules: The Judiciary Continues to Struggle to Define Them and to Determine Their Legal Validity and Effect*, 12 TEX. TECH ADMIN. L.J. 55, 64 (2010) (calling two Third Court decisions "directly inconsistent" with each other and describing that court's jurisprudence as a "miry bog").

"initiate an appropriate administrative disciplinary action" for illegal operations); and

- A letter sent to the plaintiff in which the agency allegedly "reversed [the agency's] position" interpreting a form promulgated by the agency and promised to "institute an administrative enforcement action," *Beacon Nat'l Ins. Co. v. Montemayor*, 86 S.W.3d 260, 264-65 (Tex. App.—Austin 2002, no pet.).

By contrast, the court has held to be rules, in addition to the Letter here:

- TABC memoranda setting out the "elements that make a[n] [eight-liner gambling] machine illegal," *TABC v. Amusement & Music Operators of Tex., Inc.*, 997 S.W.2d 651, 654 (Tex. App.—Austin 1999, pet. dism'd w.o.j.); and

- An explanation of longstanding agency policy stated in a contested-case order, *Witcher*, 447 S.W.3d at 529.

This Court should step in to provide clear guidance to agencies and the public regarding what kinds of agency statements must proceed through formal rulemaking.

## II.   THE THIRD COURT OF APPEALS ERRONEOUSLY INTERPRETED THE TERM "RULE" TO INCLUDE THE BOARD'S LETTER.

"Not every statement by an administrative agency is a rule for which the APA prescribes procedures for adoption and for judicial review." *Tex. Educ. Agency v. Leeper*, 893 S.W.2d 432, 443 (Tex. 1994). Indeed, as the Third Court previously explained, "[a]gencies would be

17

reduced to impotence . . . if bound to express their views as to 'law,' 'policy,' and procedural 'requirements' through contested-case decisions or formal rules exclusively." *Brinkley*, 986 S.W.2d at 769. That sensible interpretation also is required by the Code Construction Act's mandate that immunity waivers be strictly construed. This Court should therefore reject the Third Court's flawed, overbroad interpretation of "rule."

## A. Sections 2001.038 And 2001.003(6) Must Be Strictly Construed To Preserve The State's Sovereign Immunity.

Waivers of immunity must be strictly construed. *See, e.g.*, *Prairie View A & M Univ. v. Chatha*, 381 S.W.3d 500, 513 (Tex. 2012); TEX. GOV'T CODE § 311.034. That principle "applies to both the existence and the extent of the waiver." *City of LaPorte v. Barfield*, 898 S.W.2d 288, 297 (Tex. 1995), *superseded by statute on other grounds.* Accordingly, ambiguities must be resolved in favor of retaining immunity. *Wichita Falls State Hosp. v. Taylor*, 106 S.W.3d 692, 697 (Tex. 2003).

The decision here does just the opposite. Any agency statement—regardless of context or intent—might subject the State to a lawsuit. Here it was a letter responding to Teladoc's misstatement. But this isn't the Third Court's only recent overreach. In *Witcher*, for example, another

18

case pending in this Court, the court of appeals held that a contested-case decision's explanation of the agency's longstanding position could be challenged under section 2001.038. *See* 447 S.W.3d at 529.

It is difficult to find a meaningful limiting principle to the court of appeals' holdings. As noted above, the court purported to carve out "unofficial, individually directed, tentative or other[wise] non-proscriptive" statements. *Teladoc*, 2014 WL 7464833, at *11. But how the Board was supposed to squeeze through that opening remains unclear. Simply couching communications with words like "might" is hardly a principled rule of law.

**B.    The Third Court Of Appeals' Interpretation Of "Rule" Misinterprets The Limited Judicial Review Afforded By The APA.**

The background presumption of Texas law is that, apart from constitutional claims, there is no basis for judicial review of executive action. *See, e.g.*, *Gen. Servs. Comm'n v. Little-Tex Insulation Co.*, 39 S.W.3d 591, 599 (Tex. 2001). The APA thus allows suits "only in certain, narrowly defined circumstances." *TDCJ v. Miller*, 51 S.W.3d 583, 587 (Tex. 2001) (interpreting Tort Claims Act). The Court therefore "must look to the terms of the [statute] to determine the scope of its waiver" in

19

light of "the particular facts of the case." *Id.* (citation and internal quotation marks omitted).

Section 2001.038 limits jurisdiction to claims contesting the "validity or applicability" of a "rule." TEX. GOV'T CODE § 2001.038(a). In turn, a "rule"

> (A) means a state agency statement of general applicability that:
>
>> (i) implements, interprets, or prescribes law or policy; or
>>
>> (ii) describes the procedure or practice requirements of a state agency;
>
> (B) includes the amendment or repeal of a prior rule; and
>
> (C) does not include a statement regarding only the internal management or organization of a state agency and not affecting private rights or procedures.

*Id.* § 2001.003(6). The Third Court's interpretation of "rule," taken in context of the APA as a whole and essential principles of sovereign immunity, is flawed in several respects.

***First***, the Letter does not fit a reasonable construction of the plain text. The Board responded to Teladoc's misstatements so that Teladoc's doctors have the opportunity to reform their conduct. And the Board directed the Letter at a single entity and merely warned that the entity

was violating an administrative regulation.[5] This is not a "statement of general applicability" that "affect[s] private rights." *Id.* § 2001.003(6)(A), (C).

The context of the statement and the agency's intent should matter. *See Combs v. Entm't Publ'ns*, 292 S.W.3d 712, 722 (Tex. App.—Austin 2009, no pet.) (stating that courts must "consider the intent of the agency . . . and the context in which the agency statement was made" (citing *Leeper*, 893 S.W.2d at 443)). The Letter described policy, but did not create it. It is absurd to think that if the Board initiated a disciplinary proceeding against a Teladoc physician, it would cite the Letter as a basis for its action. Rather, the Board would rely on—and enforce—the statute and formally promulgated rules, as indeed it has done for years. *Cf.* CR.40-46.[6]

---

[5] The Board acknowledges that it also sent a copy of the Letter to the TMA, but that doesn't change the nature and intent of the Letter; rather, the Board doesn't have a list of names of Teladoc's doctors but believed that some Teladoc doctors are affiliated with the TMA. The Board was merely doing its best to notify doctors who might be detrimentally relying on Teladoc's mischaracterization of Rule 190.8(1)(L)(i)(II).

[6] Although the "interpretation" of Rule 190.8(1)(L)(i)(II), as stated in the Letter, would apply to all entities and doctors identically situated to Teladoc and its doctors, any time an agency sends a letter to a regulated entity, there may be some other entity engaging in the same practice. A "statement of general applicability" cannot sweep in every pronouncement that could apply to a class larger than one. And nothing in the Letter would bind the Board to apply the Letter's so-called

21

The Third Court's approach also cannot be squared with the purpose of a rule-validity challenge. That type of claim prevents an agency from achieving the same result as formal rulemaking without actually engaging the rulemaking process. But any such characterization of the Letter is unavailing. The Board has been enforcing the Letter's "interpretation" of Rule 190.8 for years; the Letter needed to make that understanding explicit now only because Teladoc itself made statements to the contrary.

The federal APA provides a stark but useful contrast. Whereas Texas law requires strict construction of immunity waivers and doesn't contain a background right to judicial review of executive action, *see, e.g.*, *Little-Tex*, 39 S.W.3d at 599, federal administrative law *presumes* the availability of review of administrative action. *See, e.g.*, *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 348-49 (1984); *see Prof'ls & Patients for Customized Care v. Shalala*, 56 F.3d 592, 595 (5th Cir. 1995) ("The APA's notice and comment exemptions must be narrowly construed." (citation and internal quotation marks omitted)). Federal courts thus review a

---

"interpretation," as opposed to the Rule itself, to other entities (or even to Teladoc) in future disciplinary proceedings.

distinctly broader class of cases, including those involving interpretive rules. *See, e.g.*, *Prof'ls & Patients*, 56 F.3d at 595-96; *see also* 5 U.S.C. §§ 551(4), 553(b)(A), 553(d)(2), 704; *Am. Tort Reform Ass'n v. Occupational Safety & Health Admin.*, 738 F.3d 387, 395-96 (D.C. Cir. 2013). The drafters of Texas's APA, however, deliberately selected a narrower immunity waiver, a choice that is consistent with general Texas administrative-law principles.

*Second*, the court of appeals' construction has no limiting principle. Indeed, it comes close to allowing jurisdiction merely to consider *interpretations* of agency statements, even though section 2001.038 contemplates challenges only to the "validity or applicability" of the purported rule.

*Third*, the perverse results of the court's interpretation reflect its interpretive defects. As discussed *supra* Part I.A, the court of appeals' view hamstrings agencies, encouraging them to offer less information and explanation (or none at all) or to couch every statement in vague or tentative language. Neither the public nor the executive is served by such an incentive. A reasonable interpretation of the APA should promote communications like the Letter, not penalize them.

## PRAYER

The Court should grant the petition for review, reverse the court of appeals' judgment, and render judgment dismissing the case for want of jurisdiction.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney
General

SCOTT A. KELLER
Solicitor General

 /s/ Douglas D. Geyser 
DOUGLAS D. GEYSER
Assistant Solicitor General
State Bar No. 24059817

TED A. ROSS
Assistant Attorney General

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tel.: (512) 936-2540
Fax: (512) 474-2697
*douglas.geyser@texasattorneygeneral.gov*

COUNSEL FOR PETITIONERS

**CERTIFICATE OF SERVICE**

On April 2, 2015, the foregoing Petition for Review was served via

File & ServeXpress on:

| | |
|---|---|
| Matt Dow | Thomas R. Phillips |
| Carla Cox | BAKER BOTTS L.L.P. |
| Dudley D. McCalla | 98 San Jacinto Blvd., Ste 1500 |
| JACKSON WALKER L.L.P. | Austin, Texas 78701 |
| 100 Congress Ave., Suite 1100 | Tel.: (512) 322-2565 |
| Austin, Texas 78701 | Fax: (512) 322-8363 |
| Tel.: (512) 236-2230 | *tom.phillips@bakerbotts.com* |
| Fax: (512) 391-2113 | |
| *mdow@jw.com* | Benjamin A. Geslison |
| | BAKER BOTTS L.L.P. |
| | One Shell Plaza |
| | 910 Louisiana St. |
| | Houston, TX 77002 |
| | Tel.: (713) 229-1241 |
| | Fax: (713) 229-2841 |
| | *ben.geslison@bakerbotts.com* |

*Counsel for Respondent*

 /s/  Douglas D. Geyser
Douglas D. Geyser

**CERTIFICATE OF COMPLIANCE**

In compliance with Texas Rule of Appellate Procedure 9.4(i)(2), this

brief contains 4,277 words, excluding the portions of the brief exempted

by Rule 9.4(i)(1).

 /s/  Douglas D. Geyser
Douglas D. Geyser

25

86 S.W.3d 260
Court of Appeals of Texas,
Austin.

BEACON NATIONAL INSURANCE COMPANY; First Preferred
Insurance Company; and Petrolia Insurance Company, Appellants,

v.

Jose MONTEMAYOR, in his Official Capacity as Commissioner of Insurance;
the Texas Department of Insurance; John Cornyn, in his Official Capacity
as Attorney General; and the Office of the Attorney General, Appellees.

No. 03–01–00499–CV.  |  July 26, 2002.

Homeowners' insurer brought action against the Commissioner of Insurance, Department of Insurance, and Attorney General for a declaratory judgment that the insurer had no duty to pay for cost to repair or replace portions of multi-layer roof damaged by excluded peril. The 261st Judicial District Court, Travis County, William E. Bender, J., granted Department's plea to jurisdiction and dismissed the case. Insurer appealed. The Court of Appeals, Marilyn Aboussie, C.J., held that: (1) trial court lacked subject matter jurisdiction; (2) the Department's actions were not subject to judicial review; (3) the insurer was required to exhaust administrative remedies; and (4) the doctrine of primary jurisdiction justified deference to the Department.

Affirmed.

West Headnotes (27)

**[1]**  **Pleading**  👉 Plea to the Jurisdiction

A plea to the jurisdiction challenges the district court's authority to determine the subject matter of the cause of action.

Cases that cite this headnote

**[2]**  **Appeal and Error**  👉 Cases Triable in Appellate Court

Subject matter jurisdiction raises a question of law reviewed de novo.

Cases that cite this headnote

**[3]**  **Courts**  👉 Presumptions and Burden of Proof as to Jurisdiction

The plaintiff bears the burden of pleading facts that show the district court has subject matter jurisdiction.

1 Cases that cite this headnote

**[4]**  **Pleading**  👉 Plea to the Jurisdiction

On a plea to jurisdiction, plaintiff's good faith factual allegations are reviewed to determine whether the district court has jurisdiction.

Cases that cite this headnote

**[5]  Courts**  Presumptions and Burden of Proof as to Jurisdiction

Unless the face of the petition affirmatively demonstrates a lack of jurisdiction, the district court must liberally construe the allegations in the petition in favor of the plaintiff and in favor of jurisdiction.

2 Cases that cite this headnote

**[6]  Courts**  Allegations, pleadings, and affidavits

The plaintiff's pleadings should be alleged sufficiently to give a reasonable person fair notice of the basis for jurisdiction.

Cases that cite this headnote

**[7]  States**  What are suits against state or state officers

State agencies have immunity from suit under the doctrine of sovereign immunity.

Cases that cite this headnote

**[8]  States**  Declaratory judgment

Uniform Declaratory Judgments Act (UDJA) waives the state's sovereign immunity when a party seeks a court's construction of a statute or rule. V.T.C.A., Civil Practice & Remedies Code § 37.003.

4 Cases that cite this headnote

**[9]  Declaratory Judgment**  Insurance

Trial court lacked subject matter jurisdiction in an insurer's suit against the Commissioner of Insurance for a declaratory judgment that the standard homeowners' policy did not require the insurer to pay for cost to repair or replace portions of multi-layer roof damaged by excluded peril; the Department of Insurance had authority to regulate the policies and claims practices and had taken no adverse action against the insurer, and the insurer did not seek resolution of a dispute between contracting parties. V.A.T.S. Insurance Code, arts. 5.35(a-j), 21.21, § 5, 21.21–2, §§ 4, 8; V.A.T.S. Insurance Code, §§ 31.002(1), 37.001.

3 Cases that cite this headnote

**[10]  Declaratory Judgment**  Jurisdiction not enlarged

A declaratory judgment action is merely a procedural device for deciding matters already within a court's subject matter jurisdiction.

2 Cases that cite this headnote

**[11]  Declaratory Judgment**  Nature and scope of remedy
**Declaratory Judgment**  Jurisdiction not enlarged

The Uniform Declaratory Judgments Act (UDJA) does not itself confer jurisdiction or substantive rights and cannot change the basic character of a lawsuit. V.T.C.A., Civil Practice & Remedies Code § 37.003.

4 Cases that cite this headnote

**[12]**     **Administrative Law and Procedure** 🔑 Judicial Review of Administrative Decisions

      **Constitutional Law** 🔑 Judicial encroachment on executive acts taken under statutory authority

An administrative body is entitled to exercise its statutory duties and functions without interference from the courts, unless it exceeds that statutory authority.

1 Cases that cite this headnote

**[13]**     **Declaratory Judgment** 🔑 Officers and official acts in general

A party may employ a declaratory judgment action to intervene in administrative proceedings only when an agency is exercising authority beyond its statutorily conferred powers.

4 Cases that cite this headnote

**[14]**     **Action** 🔑 Moot, hypothetical or abstract questions

      **Action** 🔑 Persons entitled to sue

Subject matter jurisdiction requires that the plaintiff bringing the suit have standing to do so, that there be a live controversy between the parties, and that the case be justiciable or ripe for decision.

Cases that cite this headnote

**[15]**     **Declaratory Judgment** 🔑 Contracts

Insureds were necessary parties in an insurer's suit against the Commissioner of Insurance for a declaratory judgment that the standard homeowners' policy did not require the insurer to pay for cost to repair or replace portions of multi-layer roof damaged by excluded peril; the insureds had a cognizable interest in the action since they were or would be denied coverage for roof tear-off expenses. V.T.C.A., Civil Practice & Remedies Code § 37.006(a).

1 Cases that cite this headnote

**[16]**     **Declaratory Judgment** 🔑 Insurance

Insurance Department's correspondence with homeowners' insurer and proposed consent decree about its obligation to pay for the cost to tear off shingles were not a "rule" within the meaning of an Administrative Procedure Act (APA) statute allowing a person to bring a declaratory judgment action to determine the validity or applicability of a rule. V.T.C.A., Government Code § 2001.038.

6 Cases that cite this headnote

**[17]**     **Administrative Law and Procedure** 🔑 Judicial Review of Administrative Decisions

There is no right to judicial review of an administrative order unless a statute provides a right or unless the order adversely affects a vested property right or otherwise violates a constitutional right.

Cases that cite this headnote

**[18]**     **Insurance** 🔑 Judicial remedies and review

Insurance Department's actions in connection with prescription, promulgation, adoption, approval, amendment, or repeal of standard manual rules or policies and endorsement forms for fire and other allied insurance lines were not subject to judicial review. V.A.T.S. Insurance Code, arts. 5.39, 5.96(k).

Cases that cite this headnote

**[19]** **Insurance** Judicial remedies and review

Insurance Department's informal disposition actions regarding homeowners' insurer's obligation to pay for cost to repair or replace portions of multi-layer roof damaged by excluded peril were not subject to judicial review before the Department took any action against the insurer. V.A.T.S. Insurance Code, § 82.055(a).

Cases that cite this headnote

**[20]** **Declaratory Judgment** Statutory remedy

Failure to exhaust administrative remedies precludes declaratory relief before the agency issues a final administrative decision. V.T.C.A., Government Code § 2001.171.

2 Cases that cite this headnote

**[21]** **Constitutional Law** Particular Issues and Applications

Homeowners' insurer's action anticipating that the Insurance Department would initiate enforcement proceedings if the insurer did not agree to the terms of a proposed consent decree essentially sought an advisory opinion which the court was powerless to render. Vernon's Ann.Texas Const. Art. 2, § 1.

1 Cases that cite this headnote

**[22]** **Insurance** Judicial remedies and review

The exception to the administrative finality requirement for matters involving purely legal issues did not apply to suit by homeowners' insurer against the Insurance Department to challenge its position that the insurer was required to pay for cost to repair or replace portions of multi-layer roof damaged by excluded peril; the substance of the insurer's complaints involved factual issues, and the insurer was thus required to exhaust administrative remedies.

Cases that cite this headnote

**[23]** **Administrative Law and Procedure** Primary jurisdiction

The "primary jurisdiction doctrine" applies when a court and an agency have concurrent original jurisdiction over a dispute and guides a court in determining whether it should route the threshold decision about certain issues that are within the special competence of an administrative agency to that agency.

1 Cases that cite this headnote

**[24]** **Administrative Law and Procedure** Primary jurisdiction

A court must decide whether it should defer to the agency's expertise and responsibility to develop regulatory policy under primary jurisdiction doctrine.

1 Cases that cite this headnote

**[25]    Appeal and Error**  &#x1F511;  Cases Triable in Appellate Court

Appellate courts review questions of primary jurisdiction on a de novo basis with no deference to the district court's decision.

Cases that cite this headnote

**[26]    Administrative Law and Procedure**  &#x1F511;  Primary jurisdiction

Courts defer to an agency under primary jurisdiction doctrine when uniform decision making is essential to carry out the purposes of the regulatory scheme.

Cases that cite this headnote

**[27]    Insurance**  &#x1F511;  Judicial remedies and review

The doctrine of primary jurisdiction justified deference to the Insurance Department regarding its dispute with homeowners' insurer over obligation to pay for cost to repair or replace portions of multi-layer roof damaged by excluded peril; the issues implicated other questions concerning such matters as structural engineering, residential construction, and premium rating, and principles of uniformity dictated a decision by the Department.

3 Cases that cite this headnote

**Attorneys and Law Firms**

**\*263** Bruce McCandless III, Larry Parks, Christopher A. McClellan, Long, Burner, Parks, McClellan & DeLargy, P.C., Austin, for appellants.

Sarah C. Wells, Asst. Atty. Gen., Austin, for appellees.

Before Chief Justice ABOUSSIE, Justices B.A. SMITH and PURYEAR.

**Opinion**

MARILYN ABOUSSIE, Chief Justice.

Appellants Beacon National Insurance Company, First Preferred Insurance Company, and Petrolia Insurance Company (collectively "Beacon") appeal the district court's order granting the Texas Department of Insurance's ("TDI") plea to the jurisdiction and dismissing the cause.[1] Beacon contends the district court erred because (1) Beacon is entitled to pursue declaratory relief to construe a contract; (2) its action presents a justiciable controversy **\*264** with TDI and is not barred by sovereign immunity; (3) Beacon is not required to exhaust its administrative remedies before seeking this declaratory relief on a purely legal question; and (4) primary jurisdiction does not bar Beacon's request for declaratory relief. We will affirm the judgment of the district court.

## BACKGROUND

This controversy stems from Beacon's treatment of its insureds' claims for roof repairs. When replacing a roof, some homeowners elect to lay new shingles over the damaged layer of shingles rather than pay the cost of having the old layer removed. Repeating this practice over time can result in the loss of a "nailable surface," *i.e.,* a surface to which a new roof may

adequately be affixed. Subsequent roof repairs eventually require removing the underlying layers in order to obtain a nailable surface.

The crux of this controversy concerns the Texas Standard Homeowers Insurance Policy—Form B ("Form B"), a standard insurance policy form promulgated by TDI, the terms of which are incorporated into the insurance policy contracts between Beacon and its policy holders. Form B provides, "If a Peril Insured Against causes the loss, we will pay the reasonable cost you incur for necessary repairs." Form B requires an insurer to pay its insured "the cost to repair or replace that part of the building structure(s) damaged, with material of like kind and quality and for the same use and occupancy on the same premises; or the amount actually and necessarily spent to repair or replace the damaged building structure(s)." [2] Form B excludes from coverage "loss caused by wear and tear, deterioration or loss caused by any quality in property that causes it to damage or destroy itself."

Beacon acknowledges that Form B requires it to pay for roof damage caused by covered perils, such as hail. However, Beacon contends that Form B does not require it to pay for repairs or replacement of roofing layers damaged by excluded perils, such as wear and tear. Thus, as Beacon concludes in a memo to its agents dated January 27, 2000, "on those claims requiring replacement of damaged roofs, our company will only figure to tear off one layer of roofing and replace it with like kind and quality."

Beacon asserts that TDI expressly approved Beacon's interpretation of Form B in a letter to Beacon dated February 15, 2000. [3] However, Beacon complains that TDI reversed its position in a letter to Beacon dated October 5, 2000, informing Beacon that regardless of whether underlying roof layers were damaged by excluded perils, Beacon was responsible for providing **\*265** a nailable surface for a new roof covering:

> One such situation [not addressed in the February 15, 2000 letter] exists if during the removal of the damaged roof covering it is discovered the underlayment (shingles or decking) is an unsuitable nailing surface for the new roof covering.... To attach the new roof covering, there must be a nailable surface; therefore, it may be necessary to either (i) replace wood shingles/ shakes with new wood shingles/shakes, or (ii) remove the wood shingles/shakes and redeck the affected area before installing the new roof covering.

> A generous reading of these letters suggests that TDI agreed with Beacon's assertion that it was not responsible for replacing underlying layers of roofing *when those underlying layers were damaged by excluded perils.* However, that statement, and TDI's acquiescence to it, does not address situations where the cause of damage to the underlying layers of roofing is unknown, or where there are so many underlying damaged layers (some caused by excluded perils, some by covered perils) that a nailable surface cannot be obtained without removing the underlying layers.

Beacon claims that TDI "announced its intention" to: (1) fine Beacon a total of $12,000; (2) require Beacon to review its policy files to locate specific claims in which Beacon refused to pay for tear off necessary to obtain a "nailable surface"; and (3) require Beacon to pay past roof repair claims in accordance with the October 5, 2000 letter. Beacon expresses concern that TDI will institute an administrative enforcement action against it. On May 23, 2001, Beacon filed suit against TDI, seeking declaratory relief that

> (1) [i]n light of both the "like kind and quality" language in the settlement portion of Form B and the specific exclusions listed in the policy, [Beacon is] not obligated to repair or replace portions of a multi-layer roof that are damaged as a result of an excluded peril; (2) TDI may not periodically interpret an insurance contract in a manner that is contrary to the plain terms of the contract and that in doing so it is exceeding its statutory authority; (3) TDI cannot retroactively impose a new interpretation of a policy form in order to punish an insurer who took actions consistent with the agency's previous interpretation; and (4) Beacon's treatment of roof repair claims consistent with the terms of Form B and the agency's interpretation of such form cannot constitute "bad faith" claims settlement practices as a matter of law....

Beacon founded its request for declaratory relief on the Uniform Declaratory Judgments Act ("the UDJA"). *See* Tex. Civ. Prac. & Rem.Code Ann. § 37.003 (West 1997). It characterizes its suit as an effort to obtain a court declaration of purely legal

questions regarding its contract rights and obligations under Form B with respect to claims settlement with its policy holders. *See* Tex. Civ. Prac. & Rem.Code Ann. § 37.004 (West 1997). In response, TDI filed a plea to the jurisdiction based on, among other things, sovereign immunity, Beacon's failure to exhaust its administrative remedies, and the primary jurisdiction of TDI over the issues presented. The district court granted TDI's plea to the jurisdiction without specifying the grounds, and Beacon appeals.

## STANDARD OF REVIEW

 **[1]** **[2]** **[3]** **[4]** A plea to the jurisdiction challenges the district court's authority to determine the subject matter of the cause of action. *Bland Indep. Sch. Dist. v. Blue,* 34 S.W.3d 547, 554 (Tex.2000). Subject matter jurisdiction raises a question of law, which we review de novo. *See Mayhew v. Town* **\*266** *of Sunnyvale,* 964 S.W.2d 922, 928 (Tex.1998). The plaintiff bears the burden of pleading facts that show the district court has subject matter jurisdiction. *Texas Ass'n of Bus. v. Texas Air Control Bd.,* 852 S.W.2d 440, 446 (Tex.1993). We examine a plaintiff's good faith factual allegations to determine whether the district court has jurisdiction. *See Bland Indep. Sch. Dist.,* 34 S.W.3d at 554.

 **[5]** **[6]** Unless the face of the petition affirmatively demonstrates a lack of jurisdiction, the district court must liberally construe the allegations in the petition in favor of the plaintiff and in favor of jurisdiction. *Texas Ass'n of Bus.,* 852 S.W.2d at 446; *Peek v. Equipment Serv. Co.,* 779 S.W.2d 802, 804 (Tex.1989). Nevertheless, the plaintiff's pleadings should be alleged sufficiently to give a reasonable person fair notice of the basis for jurisdiction.

## DISCUSSION

*Initial Determination*

Beacon's pleadings do not clearly allege whether it is seeking an initial determination of legal issues or appealing an action taken by TDI. Although Beacon couches its complaints in terms of seeking construction of contractual language, the facts and allegations reflect that Beacon's main complaint concerns TDI's recent statement as to the coverage afforded by Form B and Beacon's perceived threat of enforcement action being taken by TDI. Beacon states that its declaratory judgment action sought to clarify its rights under Form B and to complain of TDI's improper construction of the form. Beacon asserts that TDI exceeds its statutory authority because its construction is wrong. Beacon contends that TDI changed its position about what the terms of Form B required, "announced its intention" to fine Beacon, tendered Beacon a proposed consent order, and suggests that unless Beacon agrees TDI might institute an enforcement action. Beacon asserts in its brief that it "seeks relief from TDI's proposed enforcement action."

 **[7]** **[8]** **[9]** State agencies have immunity from suit under the doctrine of sovereign immunity. *Federal Sign v. Texas S. Univ.,* 951 S.W.2d 401, 405 (Tex.1997). The UDJA waives this immunity when a party seeks a court's construction of a statute or rule. *City of LaPorte v. Barfield,* 898 S.W.2d 288, 297 (Tex.1995). Beacon's action does not seek construction of a statute or rule; it seeks a court ruling as to its obligations under Form B, which is part of its insurance contracts with its policy holders to which TDI is not a party. We hold that the district court properly sustained TDI's plea to the jurisdiction.

Beacon argues that because courts are empowered to construe insurance policies through declaratory judgment actions and the UDJA waives the State's sovereign immunity against such a suit,[4] the courts are therefore empowered to remedy Beacon's complaints about TDI's current position as to the terms of coverage provided in Form B. We disagree.

 **[10]** **[11]** A declaratory judgment action under the UDJA is available if (1) a justiciable controversy exists and (2) the controversy can be resolved by court declaration. *Bonham State Bank v. Beadle,* 907 S.W.2d 465, 467 (Tex.1995). However, the UDJA does not establish subject matter jurisdiction. A declaratory judgment action is merely a procedural device for deciding matters already within a court's subject matter jurisdiction. *State v. Morales,* 869 S.W.2d 941, 947 (Tex.1994); *Texas Ass'n of Bus.,* 852 S.W.2d at 444. The UDJA does **\*267** not itself confer jurisdiction or substantive rights, and it cannot change the

basic character of a lawsuit. *Vance v. Doe,* 969 S.W.2d 537, 540 (Tex.App.-Dallas 1998, no pet.); *Kadish v. Pennington Assocs.,* 948 S.W.2d 301, 304 (Tex.App.-Houston [1st Dist.] 1995, no writ). Beacon must allege an independent basis for jurisdiction to maintain this proceeding.

 **[12]** **[13]** The power of courts to issue declaratory judgments under the UDJA in the face of administrative proceedings is limited. For example, we have held that when a statute provides an avenue for attacking an agency order, a declaratory judgment action will not lie to provide redundant remedies. *Young Chevrolet, Inc. v. Texas Motor Vehicle Bd.,* 974 S.W.2d 906, 911 (Tex.App.-Austin 1998, pet. denied). An administrative body is entitled to exercise its statutory duties and functions without interference from the courts, unless it exceeds that statutory authority. *Westheimer Indep. Sch. Dist. v. Brockette,* 567 S.W.2d 780, 785 (Tex.1978). A party may employ a declaratory judgment action to intervene in administrative proceedings only when an agency is exercising authority beyond its statutorily conferred powers. *Nuchia v. Woodruff,* 956 S.W.2d 612, 615–16 (Tex.App.-Houston [14th Dist.] 1997, pet. denied).

Although Beacon's petition alleges that TDI has exceeded its statutory authority, the basis alleged for that complaint is not sufficient to confer jurisdiction. Beacon asserts that while TDI has authority to promulgate Form B, it does not have authority to construe its provisions. *But see* Tex. Ins.Code Ann. art. 5.35 (West Supp.2002). Beacon contends that TDI misconstrues the terms of coverage provided in Form B and, therefore, TDI has exercised authority beyond that conferred on it by the legislature. Whether TDI's interpretation is correct or incorrect cannot be the factor that confers jurisdiction. TDI is expressly authorized by the Insurance Code to regulate insurance policies and insurer claims practices. [5] It therefore has the authority to decide such matters in the first instance.

 **[14]** Furthermore, Beacon has not demonstrated the requirements necessary to seek contract construction. [6] It does not seek resolution of a dispute between contracting parties. Beacon is not a party to any contract with TDI. Beacon does not seek a declaration of contracting parties' rights under any specific contract. [7] It is axiomatic that a contractual dispute must rest upon a contract, or at least an allegation of a contract. Here, there is none. Rather, Beacon's claims concern abstract insurance contracts and hypothetical sets of facts. Beacon's preemptive claims for contractual construction reflect an effort to avoid regulatory enforcement. *See, e.g.,* **\*268** *Texas Med. Ass'n v. Aetna Life Ins. Co.,* 80 F.3d 153, 159 (5th Cir.1996) (under Texas law plaintiffs lacked standing under Insurance Code to bring claims, and allegations seeking contract construction could not provide jurisdiction).

Beacon's premature attempt to arrest the administrative process before the agency has taken adverse action against it distinguishes this case from the facts of a recent decision in which we held that a party had properly presented a request for declaratory relief. *See City of Waco v. Texas Natural Res. Conservation Comm'n,* 83 S.W.3d 169 (Austin 2002, no pet. h.). In that case, the City sought a declaration of the effect of a federal regulation incorporated into state law, a pure question of law. *Id.,* op. at 177. Resolution of the City's claims did not require the determination of facts in the context of an individual permit. *Id.,* op. at 176– 177. We held that the City's claim properly implicated the purpose of the UDJA. *Id.,* op. at 178. Beacon's claims require determination of several factual matters which have not been sufficiently developed. Additionally, while Beacon has only pointed to TDI's "intentions," the City was able to point to actions that the TNRCC had taken, *i.e.,* granting permits that allowed for the additional discharge of wastewater into an impaired segment of water. Moreover, this action by the TNRCC indicated that the TNRCC had been given the opportunity to exercise primary jurisdiction in the matter; in contrast, TDI's expressed intentions do not manifest that agency's exercise of a matter within its statutorily conferred province.

 **[15]** In addition, Beacon's suit lacks necessary parties. Section 37.006(a) of the UDJA requires all with an interest who would be affected by a declaration be made parties to any declaratory judgment action. *See* Tex. Civ. Prac. & Rem.Code Ann. § 37.006(a) (West 1997). Beacon's insureds who have been or will be denied coverage for roof tear-off expenses have a cognizable interest in this declaratory judgment action. Beacon has not joined or even identified any such insureds. Section 37.006(a) prohibits the application of any declaration to anyone not a party to the declaratory judgment action. *See id.* If a declaration in this case could not have a preclusive effect, then the suit cannot terminate a controversy or resolve uncertainties. Section

37.008 allows a court to refuse to hear a declaratory judgment action if it would not end the controversy or uncertainty. *Id.* § 37.008 (West 1997). The district court properly refused to hear this claim.

**Judicial Review of TDI Actions**

 **[16]**  Section 2001.038 of the Administrative Procedure Act ("APA") allows a person to bring a declaratory judgment action to determine the "validity or applicability of a rule ... if it is alleged that the rule or its threatened application interferes with or impairs, or threatens to interfere with or impair, a legal right or privilege of the plaintiff." Tex. Gov't Code Ann. § 2001.038 (West 2000). This provision cannot provide jurisdiction because Beacon does not allege any basis for a declaratory judgment under section 2001.038. Beacon does not challenge the "validity or applicability" of an agency rule, finding, or order. Beacon complains only about a series of letters between Beacon and TDI and a proposed consent decree submitted to Beacon by TDI. Neither the correspondence nor the proposed consent decree equate to a specific agency rule, set of requirements, or specific policy concerning roof tear-offs or the terms of coverage under Form B.

Section 2001.038 requires that the agency action being challenged be a "rule" as **\*269**  defined in the APA. Nothing in Beacon's complaints qualifies as an attack on an agency "rule" as the statute defines that term. *See id.* § 2001.003(6). Here, the correspondence from TDI about which Beacon complains is directed at Beacon only; TDI's comments are not statements of general applicability.

TDI's general policy regarding roof tear-offs is apparently set forth in agency bulletins or advisory letters which are not included in this record. Beacon has not sought a declaratory judgment concerning the "validity and application" of these bulletins or letters. Beacon's complaints are directed at TDI's correspondence with Beacon, not generally applicable policies. Even if we assume that Beacon complains or could complain about the policies contained in TDI's bulletins or advisory letters, these bulletins or advisory letters do not rise to the status of "rules" within the meaning of section 2001.003(6). *Brinkley v. Texas Lottery Comm'n,* 986 S.W.2d 764, 769 (Tex.App.-Austin 1999, no pet.). This Court has previously held:

> Not every statement by an administrative agency is a rule for which the APA prescribes procedures for adoption and for judicial review. *Texas Educ. Agency v. Leeper,* 893 S.W.2d 432, 443 (Tex.1994). This observation refers to the fact that administrative agencies routinely issue letters, guidelines, and reports, and occasionally file briefs in court proceedings, any of which might contain statements that intrinsically implement, interpret, or prescribe law, policy, or procedure or practice requirements. Are all such statements therefore "rules" within the meaning of APA section 2001.003(6) and 2001.038? They are not for several reasons.

> \* \* \* \*

> The legislature intends that administrative agencies exercise effectively the powers delegated to them.... Agencies would be reduced to impotence, however, if bound to express their views as to "law," "policy," and procedural "requirements" through contested-case decisions or formal rules exclusively; and they could not under such a theory exercise powers explicitly delegated to them by the legislature.

*Id.* at 769–71.

Beacon did not allege that any "rule" within the meaning of section 2001.003(6) is invalid or inapplicable. It did not allege the threatened deprivation of a specific property right or privilege. Therefore, section 2001.038 provides no basis for the district court's jurisdiction over Beacon's declaratory judgment action.

**Judicial Review Under the Insurance Code**

Beacon complains about TDI's actions or anticipated actions in three general areas: (1) regulation of insurance policy forms, *see* Tex. Ins.Code Ann. arts. 5.39, 5.96 (West 1981); (2) regulation of insurer unfair and deceptive acts or practices, *see* Tex. Ins.Code Ann. art. 21.21 (West 1981 & Supp.2002); and (3) regulation of insurer claims settlement practices, *see* Tex. Ins.Code

Ann. art. 21.21–2 (West 1981 & Supp.2002). [8] The statutory framework for judicial review of TDI's actions differs among these code provisions. [9] The code **\*270** explicitly excludes matters arising under articles 5.39 and 5.96 (regarding the promulgation and approval of policy forms by TDI) from the definition of a "contested case" under the APA. These provisions contain their own specialized procedures which do not provide for judicial review of TDI's acts. [10] On the other hand, TDI's regulation under articles 21.21 and 21.21–2 are subject to the contested case provisions of the APA and substantial evidence review. [11]

 **[17]**   **[18]**   The portions of the Insurance Code providing for TDI's regulation of the pertinent types of insurance policies do not expressly allow for judicial review. The Texas Supreme Court recently reiterated the basic rule that "there is no right to judicial review of an administrative order unless a statute provides a right or unless the order adversely affects a vested property right or otherwise violates a constitutional right." *Continental Cas. Co. v. Functional Restoration Assocs.,* 19 S.W.3d 393, 397 (Tex.2000); *see also General Servs. Comm'n v. Little–Tex Insulation Co.,* 39 S.W.3d 591, 599 (Tex.2001); *Stone v. Texas Liquor Control Bd.,* 417 S.W.2d 385, 385–86 (Tex.1967). The legislature did not provide for judicial review from decisions made under article 5.39 in connection with prescription, promulgation, adoption, approval, amendment, or repeal of standard manual rules or policies and endorsement forms for fire and other allied insurance lines. To the extent that Beacon complains of TDI's actions related to its duties under article 5.96, there is no jurisdictional basis for judicial review of those actions, and article 5.96(k) expressly exempts the article from application of the APA.

Neither article 21.21 nor article 21.21–2 provides any basis for jurisdiction over Beacon's claims. The private cause of action created in article 21.21, section 16 was fashioned by the legislature to be used against insurers. Nothing in article 21.21, section 16 provides an insurer a right of action against TDI. Similarly, article 21.21, section 16 applies only to persons in privity of contract with an insurer or an intended beneficiary of a policy. *Shelton Ins. Agency v. St. Paul Mercury Ins. Co.,* 848 S.W.2d 739, 744 (Tex.App.-Corpus Christi 1993, writ denied); *CNA Ins. Co. v. Scheffey,* 828 S.W.2d 785, 791 (Tex.App.-Texarkana 1992, writ denied); *Chaffin v. Transamerica Ins. Co.,* 731 S.W.2d 728, 731 (Tex.App.-Houston [14th Dist.] 1987, writ ref'd n.r.e.). Moreover, article 21.21–2 is not available to Beacon because only TDI may act under it to investigate insurers and impose sanctions. *See Allstate Ins. Co. v. Watson,* 876 S.W.2d 145, 148–49 (Tex.1994).

 **[19]**   **[20]**   Furthermore, there is no judicial review of TDI's actions because TDI has not taken any action against Beacon. We have nothing to review. TDI has only engaged in informal disposition procedures prescribed by the Insurance Code. *See* Tex. Ins.Code Ann. § 82.055(a) (West 2002). As judicial review under articles 21.21 and 21.21–2 is subject to the APA, anyone aggrieved by TDI's actions must first exhaust all administrative remedies before proceeding to court. *Texas Educ. Agency v. Cypress–Fairbanks Indep. Sch. Dist.,* 830 S.W.2d 88, 90 (Tex.1992). Section 2001.171 of the APA only allows judicial review to a person "who has exhausted **\*271** all administrative remedies available within a state agency" and who is dissatisfied with a "final order in a contested case." Tex. Gov't Code Ann. § 2001.171 (West 2000). Failure to exhaust administrative remedies precludes granting declaratory relief before the agency issues a final administrative decision. *Cypress–Fairbanks Indep. Sch. Dist.,* 830 S.W.2d at 90. Here, there is no order, final or otherwise.

 **[21]**   Clearly, TDI was acting pursuant to the authority granted to it under section 82.055(a) when it submitted the proposed consent decree about which Beacon complaints. Beacon argues that it anticipates that TDI will initiate enforcement proceedings if Beacon does not agree to the terms set out in the proposed consent decree. TDI has not initiated any enforcement proceedings. Beacon's lawsuit presents an attempt to circumvent TDI's ability to act under chapters 82 and 84 of the Insurance Code. *See* Tex. Ins.Code Ann. §§ 82.051, .052, .054, .055 (West 2002). Beacon essentially seeks an advisory opinion which the courts are powerless to render. *See Texas Ass'n of Bus.,* 852 S.W.2d at 444 (citing Tex. Const. art. II, § 1, prohibiting advisory opinions).

 **[22]**   The exception to the finality requirement for matters involving purely legal issues does not apply to this case as Beacon urges. The substance of Beacon's complaints involves factual issues, not purely legal questions, and requires technical expertise that should not be determined in a factual vacuum. Each insured's roof claim is factually unique and may arise under innumerable factual scenarios. Whether and under what circumstances an adequate roof can be installed without removing underlying layers is a fact-based question. Beacon seeks a blanket answer based only on policy language and not individualized facts. *See,*

*e.g., Mercedes Indep. Sch. Dist. v. Munoz,* 941 S.W.2d 215, 218 (Tex.App.-Corpus Christi 1996, writ denied) (existence of fact questions disqualified claim from pure legal question exception). Beacon is not excused from the exhaustion of remedies requirements of the APA.

**Primary Jurisdiction**

[23]  [24]  [25]  [26]  The doctrine of primary jurisdiction applies when a court and an agency have concurrent original jurisdiction over a dispute. *Cash Am. Int'l, Inc. v. Bennett,* 35 S.W.3d 12, 18 (Tex.2000). It guides a court in determining whether it should route the threshold decision about certain issues that are "within the special competence of an administrative agency" to that agency. *Id.* A court must decide whether it should defer to the agency's expertise and responsibility to develop regulatory policy. *Id.* The doctrine rests on valid policies: "(1) an agency is typically staffed with experts trained in handling the complex problems in the agency's purview; and (2) great benefit is derived from an agency's uniformly interpreting its laws, rules, and regulations, whereas courts and juries may reach different results under similar fact situations." *Subaru of Am., Inc. v. David McDavid Nissan, Inc.,* 84 S.W.3d 212, 221 (Tex.2002); *see also Gregg v. Delhi–Taylor Oil Corp.,* 162 Tex. 26, 344 S.W.2d 411, 413 (1961). This deference ensures that the agency decides, at least initially, [12] matters that require the "special knowledge, experience and services of the administrative tribunal to determine technical and intricate matters of fact." *Cash Am. Int'l, Inc.,* 35 S.W.3d at 18. Courts **\*272** also defer to an agency when uniform decision making is essential to carry out the purposes of the regulatory scheme. *Id.; Kavanaugh v. Underwriters Life Ins. Co.,* 231 S.W.2d 753, 755 (Tex.Civ.App.-Waco 1950, writ ref'd); *see also* Tex. Ins.Code Ann. § 36.001(b) (West 2002).

[27]  Both of the fundamental principles underlying the doctrine of primary jurisdiction lead to the conclusion that the courts should defer to TDI, subject to appropriate judicial review, on the issues presented in this case. While courts alone are authorized to construe written contracts and adjudicate rights thereunder, this case involves many more complex issues than simple contract interpretation. TDI's enforcement of insurer claims handling practices is necessarily informed by court interpretations of policy language. However, the issues raised by Beacon's complaints implicate other questions concerning such matters as structural engineering, residential construction, and premium rating. TDI can better address, at least initially, these fact-based questions and apply its regulatory expertise and historical perspective to these issues.

Moreover, principles of uniformity dictate that TDI address these issues. In matters of insurance and interpretation of insurance policies, the supreme court has recognized the importance of uniformity, especially when policy provisions are identical across the country. *National Union Fire Ins. Co. v. CBI Indus.,* 907 S.W.2d 517, 522 (Tex.1995). Form B is a standardized form used in the insurance industry nationwide. Resolution of the issues raised by Beacon potentially impact all insurers writing homeowner coverage in Texas. The issues should first be addressed in a broader administrative proceeding, not in two party litigation. The regulatory scheme and authority of TDI will be undermined if insurers are allowed to avoid enforcement proceedings through preemptive declaratory judgment actions.

## CONCLUSION

For the reasons set forth above, we overrule Beacon's issues on appeal. We affirm the judgment of the district court granting TDI's plea to the jurisdiction and dismissing Beacon's action.

**All Citations**

86 S.W.3d 260

Footnotes

1    Beacon conceded at oral argument that it has no justiciable claims against John Cornyn as Attorney General or the Office of Attorney General.

2    Form B also provides, under a section labeled "Extensions of Coverage," the following: "We will pay your expense for the removal from the *residence premises* of: (a) debris of covered property if a Peril Insured Against causes the loss."

3    This February 15 letter is apparently a response to an earlier letter from Beacon which is not in the record. The February 15 letter enclosed a copy of an "April 24, 1995 letter by [TDI] which clarified this Department's position regarding claims on dwellings having multiple layers of roof coverings." It then states that "[i]t appears that [Beacon's January 27, 2000 letter to adjusters] regarding roof claim loss settlement is within the provisions as contained in the policy contract." This is the portion of TDI's letter relied on by Beacon to support its claim that TDI at one time approved of its settlement practices regarding roof claims. The February 15 letter goes on to state, "However, there may be situations, i.e. [sic] wind and/or hail damages both layers, that the company would be expected to pay for complete removal of the top and underlying roofing material."

4    *See* Tex. Civ. Prac. & Rem.Code Ann. § 37.004 (West 1997).

5    Tex. Ins.Code Ann. art. 5.35(a)-(j) (West Supp.2002); Tex. Ins.Code Ann. art. 21.21, § 5, 21.21–2, §§ 4, 8 (West 1981); Tex. Ins.Code Ann. §§ 31.002(1), 37.001 (West 2002) (investing TDI with authority to "regulate the business of insurance in this state").

6    Subject matter jurisdiction requires that the plaintiff bringing the suit have standing to do so, that there be a live controversy between the parties, and that the case be justiciable or ripe for decision. *Texas Ass'n of Bus. v. Texas Air Control Bd.,* 852 S.W.2d 440, 443–46 (Tex.1993); *Texas Dep't of Banking v. Mount Olivet Cemetery Ass'n,* 27 S.W.3d 276, 282 (Tex.App.-Austin 2000, pet. denied) (suits to construe statutes).

7    All of the insurance policy construction cases cited by Beacon in its brief involve situations concerning an insurance policy between an insurer and an insured. *See Travelers Indem. Co. v. McKillip,* 469 S.W.2d 160 (Tex.1971); *Carlton v. Trinity Universal Ins. Co.,* 32 S.W.3d 454 (Tex.App.-Houston [14th Dist.] 2000, pet. denied); *Wallis v. United Servs. Auto Ass'n,* 2 S.W.3d 300 (Tex.App.-San Antonio 1999, pet. denied).

8    The proposed consent decree submitted by TDI includes provisions for Beacon's violations of policyholder complaint record keeping. An insurer's failure to keep required records of the complaints it receives about its claims practices is governed by article 21.21–2, section 2(6). Tex. Ins.Code Ann., art. 21.21–2, § 2(b) (West Supp.2002). These failures are defined as "unfair claims settlement practices."

9    The Insurance Code is not a model of clarity. Adding to the confusion is the fact that the Code is being recodified in intervals and portions of the recodification contain substantive revisions. Currently, some parts of the Code have been recodified and some have not.

10    Tex. Ins.Code Ann. arts. 5.39(a), 5.96(a), (b), (f), (j), (k) (West Supp.2002).

11    Tex. Ins.Code Ann. §§ 31.002, .001, .101, .201–03 (West 2002).

12    Appellate courts review questions of primary jurisdiction on a de novo basis with no deference to the district court's decision. *Subaru of Am., Inc. v. David McDavid Nissan, Inc.,* 84 S.W.3d 212, 222 (Tex.2002).

---

**End of Document**                                                                          © 2015 Thomson Reuters. No claim to original U.S. Government Works.

**244 S.W.2d 281**
**Court of Civil Appeals of Texas**, San Antonio.

BOARD OF ADJUSTMENT OF CITY OF SAN ANTONIO et al.
v.
LEVINSON.

**No. 12304. | Nov. 7, 1951. | Rehearing Denied Dec. 5, 1951.**

Minnie (Stein) Levinson brought suit against the Board of Adjustment of the City of San Antonio, Texas and others to enjoin operation of a one chair beauty shop in a home in a D-Apartment District. The 73rd District Court, of Bexar County, Delos Finch, J., entered a judgment in favor of the plaintiff, and the defendants appealed. The Court of Civil Appeals, Pope, A. J., held that zoning ordinance prohibited operation of beauty shop, and that powers granted Adjustment Board to make a variance did not permit it to re-classify land uses.

Judgment affirmed.

W. O. Murray, C. J., dissented.

West Headnotes (5)

[1]     **Zoning and Planning**
        🔑Home occupations

        In light of the ejusdem generis rule of construction, words "such as the office of a physician, surgeon, dentist, musician, or artist" limited and contracted the broader term "home occupation" as used in zoning ordinance of city permitting in a D-Apartment District uses customarily incident to enumerated uses when situated in the same dwelling, including "home occupation""such as the office of a physician, surgeon, dentist, musician, or artist", and the words "such as" required that the home occupations be like or similar to the classifications or kinds named.

        6 Cases that cite this headnote

[2]     **Zoning and Planning**
        🔑Right to variance or exception, and discretion

        Discretion of a city zoning board of adjustment

to vary zoning ordinance is not power to legislate.

Cases that cite this headnote

**[3]**     **Zoning and Planning**
  Limitations on and sparing exercise of power

The power to vary conditions of municipal zoning ordinances should be sparingly exercised.

Cases that cite this headnote

**[4]**     **Zoning and Planning**
  Home occupations

City ordinance authorizing in a D-Apartment District uses customarily incident to enumerated uses when situated in the same dwelling, including home occupation "such as" the office of a physician, surgeon, dentist, musician, or artist, did not authorize operation of a one chair beauty shop in the D-Apartment District.

2 Cases that cite this headnote

**[5]**     **Zoning and Planning**
  Business, commercial, and industrial uses in general

Where city zoning ordinance provided that in D-Apartment District there might be such home occupations as office of a physician, surgeon, dentist, musician, or artist, and provided that Board of Adjustment had authority to hear and decide special exceptions to terms of ordinance where literal enforcement of ordinance will result in unnecessary hardships, and that City Commissioners may from time to time amend, supplement or change by ordinance the boundaries of the districts or the regulations established, Board of Adjustment could not grant a variance so as to permit operation of a

one chair beauty shop in home in D-Apartment District, and it was necessary that any relief come by way of an amendment by City Commissioners.

9 Cases that cite this headnote

**Attorneys and Law Firms**

**\*281** Kampmann & Burney, Jack R. Davis, and C. J. Matthews, San Antonio, for appellants.

Adrian A. Spears, San Antonio, for appellee.

**Opinion**

POPE, Justice.

The Board of Adjustment of the City of San Antonio, Carmen Eggleton and her husband have appealed from a judgment of the District Court of Bexar County, that held an order of the San Antonio Board of Adjudgment to be in excess of its delegated powers and void. The Board's order granted Carmen Eggleton and her husband permission to operate a beauty shop in a D-Apartment District as zoned by the City of San Antonio.

Appellants Carmen Eggleton and her husband live in San Antonio in a D-Apartment District as defined by the Zoning Ordinance, and are adjoining neighbors of appellee, Minnie Levinson. The Eggleton property is located about two hundred feet from North St. Mary's Street, where various **\*282** kinds of retail stores are situated. Mrs. Eggleton maintains her aged and blind father in her home, and Mrs. Levinson maintains her disabled sister in her home. On March 16, 1949, after proper notice and hearing, the Board of Adjustment granted Mrs. Eggleton permission to operate a one-chair beauty shop in her seven-room residence, provided she displayed no signs or advertising on the outside of the home. Mrs. Eggleton commenced the operation of her beauty shop and has continued that operation up to the present time. On September 27, 1950, Minnie Levinson sought and obtained a rehearing and challenged the Board's jurisdiction to make its former order. This application for rehearing was made more than a year and a half after the original decision by the Board. The ordinance required appeals from Board orders to be perfected within ten days. On October 12, 1950, the Board denied the rehearing and appellee within ten days filed suit in the District Court, still attacking the jurisdiction of the Board to enter its order and praying for an injunction against the operation of the beauty shop. The court after trial entered its judgment that the Board did not have the authority and jurisdiction to enter its original order in 1949, and enjoined appellants from further operating the beauty shop. The judgment was superseded.

Appellee concedes that she did not appeal from the Board's original order within the time provided by the ordinance, and that unless the order is void, she cannot attack the order.

Land uses not granted by the ordinance were expressly prohibited. The uses for a D-Apartment District as stated in the ordinance are: 'Uses customarily incident to any of the above uses when situated in the same dwelling, including home occupation such as the office of a physician, surgeon, dentist, musician, or artist * * *.' Another section permits also in such a district: 'Uses customarily incident to any of the above uses * * * when not involving the conduct of a business other than incidental to the residential use of such lot * * *.' Beyond those uses permitted by the ordinance, the Board of Adjustment was authorized:

'To hear and decide special exceptions to the terms of this ordinance upon which the Board is required to pass herein.

'To authorize upon appeals in specific cases such variance from the terms of this ordinance as will not be contrary to the public interest where, owing to special conditions a literal enforcement of the provisions of this ordinance will result in unnecessary hardships, and so that the spirit of the ordinance shall be observed and substantial justice done.'

The judgment of the district court amounts to a judgment (1) that the beauty shop as an incident to the residence is not permitted in a D-Apartment District under the wroding of the ordinance, and (2) that the granting of the right to maintain the beauty shop was not a mere 'variance,' but was a re-zoning which is a form of legislation and in excess of the Board's delegated powers and void.

[1] If the ordinance in permitting 'home occupation, such as the office of a physician, surgeon, dentist, musician, or artist,' means that a beautician may operate her shop in her home, any action by the Board of Adjustment becomes immaterial, for the right exists without benefit of an exception to or variance from the ordinance. The trial court has held that the beauty shop is not 'such as' the vocations named in the ordinance. Erwin v. Steele, Tex.Civ.App., 228 S.W.2d 882, discusses the rule of ejusdem generis as an aid in interpreting the words 'such as' when used in a will. Examination of that case shows that the general words were repeated both before and after the specific items designated in the sentence being construed, and in that respect differs from the instant case. However, we think, in the light of the ejusdem generis rule of construction, the words 'such as the office of a physician, surgeon, dentist, musician, or artist' limit and contract the broader term 'home occupation.' Erwin v. Steele, Tex.Civ.App., 228 S.W.2d 882. The named occupations may be treated as examples or illustrations, but even so, the words 'such as' require **\*283** that the home occupations be like or similar to the classifications or kinds named. Charles Behlen Sons' Co. v. Ricketts, 30 Ohio App. 167, 164 N.E. 436. The words 'such as' were defined in the Erwin case (Tex.Civ.App., 228 S.W.2d 885) as: '(A) similitude, classifying articles of the kinds named, which are like or similar to those used in the will. 'Such' is defined by Webster as 'having the particular quality or character specified; certain; representing the object as already particularized in terms which are not mentioned'; as of like kind, similar, equivalent to, 'of that kind.' Travers v. Wallace, 93 Md. 507, 49 A. 415. The synonyms of 'such as,' are alike, similar, of the like kind; 'such' representing the object as already particularized in terms which are not mentioned, being a descriptive and relative word, referring to the specific articles mentioned. Strawberry Hill Land Corporation v. Starbuck, 124 Va. 71, 97 S.E. 362.'

In Piaget-Del Corporation v. Kulik, 133 N.J.L. 485, 45 A.2d 125, 126, the court was called upon to construe a zoning ordinance which prohibited within business districts certain 'trades, industries or uses,' among others, 'Merry-Go-Rounds, Ferris Wheels or similar amusement.' It was there held that a skating rink was not included in the ban and that the words 'or similar amusement' could not be construed to include them. The ordinance in the instant case permits uses 'including home occupations such as the office of a physician, surgeon, dentist, musician, or artist.' 'Such as', from the definition in the Erwin case, means 'similar', and the ordinance thus permits a use of a home for 'the office of a physician, surgeon, dentist, musician, or artist', and/or similar home occupations, to paraphrase the Kulik case. The Kulik case reasons that if any amusements, though not stated, were included within the ban of that ordinance, the ordinance would not receive its ordinary and natural meaning, for 'Evidently, there was no intention, by this provision, to reach all amusement devices and places of entertainment.' By the same reasoning, unless we are to say that the San Antonio ordinance permits all home occupations, we must construe the ordinance as permitting only those named uses and similar uses, a beauty parlor not being one of them.

Hence, it becomes apparent that in the instant case, while other 'home occupations' may be similar to the named vocations and permitted; many others are prohibited, both professional and unprofessional.

The purposes for passing the comprehensive zoning regulations and the establishment of the districts were those usually stated in the exercise of a city's police powers. But the ordinance not only established land uses, it also had as one of its purposes, the preservation of what it established. The ordinance permits relief from the rigors of the ordinance, but the methods of obtaining changes are stated in the ordinance. Those changes are effected by way of an (1) exception or variance at the hands of the Board of Adjustment under stated circumstances, or (2) amendment at the hands of the City Commission. Whether the ordinance as written permits the beauty shop in a D-Apartment District must be decided in view of a purpose to preserve the designated uses of the property. Every expansion of the permitted uses is an encroachment upon what is prohibited and to that degree does not preserve the district.

The Board of Adjustment was delegated the power to grant a variance so long as it 'will not be contrary to the public interest where, owing to special conditions a literal enforcement of the provisions of this ordinance will result in unnecessary hardships, and so that the spirit of this ordinance shall be observed and substantial justice done.' In the exercise of that power to enlarge upon permitted land uses, the Board possesses some discretion, which unless abused will prevail. We are not here

concerned with discretion, but power of the Board. Appellee concedes that the Board did not abuse its discretion, if this is such a case as called for its exercise. Appellee urges that the Board exercised an undelegated power in permitting a use which is prohibited. The Board admittedly is granted some discretion to alleviate land use hardships, while at the other extreme **\*284** we know that the Board is powerless to go so far as to legislate. Somewhere between these opposites, the Board's delegated administrative powers cease and the municipality's legislative powers commence. That point of separation of powers means the difference between a valid and a void order.

[2] Discretion to vary is not power to legislate. While the language which grants discretion cannot be expressed in decimal points, we do have some guides that indicate the areas which the Board of Adjustment may not transgress. In the absence of a clear delegation of powers, a Board's effects to change the nature of permitted land uses have been held void. Under ordinances expressly prohibiting certain uses, as in this case, courts have on many occasions held void a Board's attempt to grant a variance permitting such use. Lee v. Board of Adjustment, 226 N.C. 107, 37 S.W.2d 128, 168 A.L.R. 1. In the absence of action by the proper legislative body of the city, an ordinance permitting a foundry in a first manufacturing district could not be expanded to permit a foundry in a second manufacturing district, City of Amarillo v. Stapf, 129 Tex. 81, 101 S.W.2d 229; nor a filling station in a residence district, Harrington v. Board of Adjustment, Tex.Civ.App., 124 S.W.2d 401; Bray v. Beyer, 292 Ky. 162, 166 S.W.2d 290, 292. A free parking lot adjoining a threatre was not permitted in the adjacent first residential district, Texas Consolidated Theatres v. Pitillo, Tex.Civ.App., 204 S.W.2d 396, nor a retail store in a dwelling district, Luse v. City of Dallas, Tex.Civ.App., 131 S.W.2d 1079, and where, unlike in the instant case, all professions were expressly forbidden in a certain district, appellant was denied the right to use his home as a dentist's office, Connor v. City of University Park, Tex.Civ.App., 142 S.W.2d 706, although the question of the Board's power to vary the ordinance was not raised in that case. Accord, City of Harlingen v. Feener, Tex.Civ.App., 153 S.W.2d 671. Walton v. Tracy Loan & Trust Company, by the Supreme Court of Utah, 97 Utah 249, 92 P.2d 724, 727, states the reasons that land may not be re-classified for uses by action of the Board: 'Any variance in use is to the extent of such land in effect a rezoning or the placing of such land in a different zone than that in which the Commission by ordinance had placed it for the purpose of promoting the health, safety, morals and general welfare of the community. Such interpretation would permit the Board, an administrative agent merely, to set aside and in effect annual an ordinance, a legislative act of the Commission, and to do all the Commission itself might do. It requires no citation of authority to establish that the Commission could not delegate to the Board or any other administrative officer its legislative powers or functions. The Board may make such rules and regulations as are reasonably necessary or expedient to enable it to carry out administratively its functions and duties, but not the duties and powers of the Commission. Its function is to carry out the will of the Commission and not to void or set aside that judgment or will.'

This Court recently held in the case of Hall v. Board of Adjustment of City of McAllen, 239 S.W.2d 647, that the failure to appeal from a Board's decision within the time allowed by the ordinance was grounds for dismissal of the suit for certiorari to review the action of the Board in allowing a skating rink in an area not permitted by the ordinance. Neither the opinion nor the transcript of statement of facts in that case, which we have again examined, brought forward the city ordinance which would show the measure of the powers delegated to the Board by the City of McAllen. Whether the Board exceeded its delegated powers was not the point in that case. Driskell v. Board of Adjustment, Tex.Civ.App., 195 S.W.2d 594, unlike the problem in the instant case, involved an ordinance specifically authorizing the Board to grant a variance as regards the same kind of use there sought. The Board there possessed the power and also the ordinance was clear in its intended scope. City of San Angelo v. Boehme Bakery, 144 Tex. 281, 190 S.W.2d 67, held that the Board possessed the power to extend uses that were non-conforming at the time the ordinance there in question was passed. That **\*285** ordinance also expressly granted such power to the Board, unlike in the instant case where, instead of a grant of powers, there is a prohibition of the exercise of such powers. This distinction is recognized in the Court of Civil Appeals opinion, Boehme Bakery v. City of San Angelo, 185 S.W.2d 601. The Supreme Court approved this distinction between delegated and undelegated powers. City of University Park v. Hoblitzelle, Tex.Civ.App., 150 S.W.2d 169, 171, states: 'the Board of Adjustments of the City of University Park, exercising the powers granted by the ordinances of said City, denied by the application, \* \* \*.' That case no authority for a problem where there is no grant of power to the Board. City of West University Place v. Ellis, Tex.Civ.App., 118 S.W.2d 907, affirmed 134 Tex. 222, 134 S.W.2d 1038, in no way concerned the delegation of powers. That case held that even the proper legislative body of the city could not arbitrarily classify a business lot as a single family dwelling.

[3] Board of Adjustment v. Stovall, Tex.Civ.App., 218 S.W.2d 286, concerned an ordinance which gave more specific authority to the Board than is found in the San Antonio ordinance, but it was there held that the attempted variation was legislation rather than a variance even under the more definite delegation of powers. The power to vary conditions of zoning ordinances should be sparingly exercised. Weaver v. Ham, Tex., 232 S.W.2d 704, 708.

Section 70 of the San Antonio zoning ordinance infers that the City Commissioners expected to exercise the power of changing district boundaries. It provides: 'Sec. 70. The City Commissioners may from time to time amend, supplement or change by ordinance the boundaries of the districts or the regulations herein established.'

[4] [5] We conclude that the ordinance prohibits a beauty shop in the D-Apartment District, and that under the delegated powers granted the Board to make a variance in instances of hardship, it cannot reclassify land uses. That must come by way of an amendment by the City Commissioners who retained the power to legislate.

The judgment is affirmed.

W. O. MURRAY, Chief Justice.

I do not concur in the above opinion. It will be kept in mind that this is not an appeal from an order of the Board of Adjustment but an independent proceeding to have its order declared void for want of jurisdiction.

Under the zoning law the Board did have jurisdiction to consider whether or not the operating of a one-chair beauty shop, such as appellant desired to operate, was a home occupation such as the office of a physician, surgeon, dentist, musician, or artist, and whether there was to be granted a variance or exception to this zoning ordinance.

The construction placed upon the language of the ordinance by the majority is a very strict one and, in effect, holds that the doctrine of ejusdem generis should be applied, and therefore the only offices that can be operated in a D-Apartment District are those named in the ordinance. It occurs to me that the language of the ordinance, in general terms, having granted the right to conduct home occupations in D-Apartment districts, the language following, naming specifically five of these home industries, should not be given such strict construction as to exclude such home occupations as dress-making, a lawyer's office, an engineer's office, etc. Just why would the City authorize a doctor, a dentist, a surgeon, a musician or an artist to maintain an office in his home in such a zone and at the same time intend that under no circumstances could a dress-maker, a lawyer, or an engineer maintain an office in his home? I cannot believe that such was the intention. In construing an ordinance the legislative intent is the thing to be determined.

It further occurs to me that in constructing the particular language here used in the ordinance an application of the doctrine of ejusdem generis will defeat rather than uphold the legislative intent. The doctrine of 'ejusdem generis' and 'expression unius est exclusio alterius' are not rules of substantive **\*286** law, but are only rules of construction, and are not to be applied where the legislative intent is plain and unambiguous. City of Lexington v. Edgerton, 289 Ky. 815, 159 S.W.2d 1015, 151 A.L.R. 1207; City of Caruthersville v. Faris, 237 Mo.App. 605, 146 S.W.2d 80.

For the reasons above stated, I respectfully enter my dissent.

**All Citations**

244 S.W.2d 281

---

986 S.W.2d 764
Court of Appeals of Texas,
Austin.

Shannon BRINKLEY, d/b/a Krane–Ko Vending, Appellant,

v.

TEXAS LOTTERY COMMISSION, Appellee.

No. 03–97–00252–CV    |    Feb. 4, 1999.

Owner of electronic machines similar to slot machines filed action seeking, in part, declaratory judgment that his machines were not gambling devices. The District Court, Travis County, 250th Judicial District, John K. Dietz, J.P., dismissed his causes of action for want of jurisdiction. Owner appealed. The Court of Appeals, John Powers, J. (Retired), held that: (1) cause of action seeking declaratory judgment that machines were not gambling devices sought improper advisory opinion; (2) trial court lacked jurisdiction to grant requested injunctive relief in absence of allegations of probable injury; (3) Commission's advisory letters were not "rules" within meaning of provision of Administrative Procedure Act (APA) authorizing declaratory judgments to determine validity of rules; and (4) Commission was not subject to suit under § 1983 or federal civil rights conspiracy statute.

Affirmed.

West Headnotes (14)

**[1]    Constitutional Law** 👈 Advisory Opinions

Separation-of-powers doctrine prohibits courts from issuing advisory opinions.

1 Cases that cite this headnote

**[2]    Constitutional Law** 👈 Advisory Opinions

Distinctive feature of an advisory opinion is that it decides an abstract question of law without binding the parties.

4 Cases that cite this headnote

**[3]    Constitutional Law** 👈 Advisory Opinions

Opinion is advisory when the judgment sought would not constitute specific relief to a litigant or affect legal relations.

7 Cases that cite this headnote

**[4]    Declaratory Judgment** 👈 Future or contingent questions

Court will not declare rights on facts which have not arisen or adjudicate matters which are contingent, uncertain, or rest in the future.

1 Cases that cite this headnote

**[5]    Declaratory Judgment** 👈 State officers and boards

Cause of action brought by owner of electronic machines against Lottery Commission seeking declaratory judgment that his machines were not gambling devices, in response to advisory letters on subject sent by Commission to bingo-parlors, sought improper advisory opinion where only parties to suit were owner and Commission, and where owner was not licensee subject to Commission's regulation but was speculating that declaratory judgment might induce his former lessor or other licensees to allow him to operate his machines in their parlors.

3 Cases that cite this headnote

**[6]** **Declaratory Judgment** Advisory opinions

Uniform Declaratory Judgments Act is a procedural device for deciding cases already within a court's jurisdiction; the statute does not enlarge a court's jurisdiction so as to authorize the rendition of advisory opinions. V.T.C.A., Civil Practice & Remedies Code §§ 37.001–37.011.

3 Cases that cite this headnote

**[7]** **Injunction** Clear, likely, threatened, anticipated, or intended injury

Injunctions may not issue unless it is shown that the respondent will engage in or is engaging in the activity to be enjoined.

Cases that cite this headnote

**[8]** **Injunction** Gambling and gaming

Trial court lacked jurisdiction to grant request by owner of electronic machines for injunction to prevent Lottery Commission and all others from interfering with his operation in bingo parlors licensed by Commission, absent allegations of fact showing probable injury; owner alleged that Commission sent advisory letters on whether machines were gambling devises to about 2,500 licensees, but not that Commission, unless restrained, would enforce against him any sanction within its power to enforce.

3 Cases that cite this headnote

**[9]** **Declaratory Judgment** State officers and boards

Advisory letters from Lottery Commission about whether electronic machines were illegal gambling devices did not constitute "rules" within meaning of provision of Administrative Procedure Act (APA) authorizing declaratory judgments to determine validity of rules. V.T.C.A., Government Code §§ 2001.003(6), 2001.038.

8 Cases that cite this headnote

**[10]** **Administrative Law and Procedure** Rules, Regulations, and Other Policymaking

Not every statement or expression by an administrative agency as to "law," "policy," and procedural "requirements" is a rule for which the Administrative Procedure Act (APA) prescribes procedures for adoption and for judicial review; in absence of statute providing that statements have legal effect on private persons or some attempt by agency to so enforce its statement, the agency's pronouncements remain merely informal views, effective only upon and within the agency's internal management and organization. V.T.C.A., Government Code § 2001.003(6).

13 Cases that cite this headnote

**[11]** **Civil Rights** States and territories and their agencies and instrumentalities, in general

**Civil Rights** 🗝 Parties

States and the governmental entities that are considered "arms of the State" are not "persons" subject to suit under § 1983, and thus, when a litigant seeks relief from the acts of a state agency under § 1983, he must sue an individual in authority at an agency as opposed to the agency itself. 42 U.S.C.A. § 1983.

2 Cases that cite this headnote

**[12]** **States** 🗝 Necessity of Consent

Doctrine of sovereign immunity, unless waived, protects the State of Texas, its agencies, and its officials, against lawsuits for damages, absent legislative consent to sue the state.

2 Cases that cite this headnote

**[13]** **Civil Rights** 🗝 Liability of Municipalities and Other Governmental Bodies

**Conspiracy** 🗝 Persons Liable

Lottery Commission was arm of the state and thus was not "person" subject to suit for damages and injunctive relief under § 1983 or federal civil rights conspiracy statute. 42 U.S.C.A. §§ 1983, 1985.

1 Cases that cite this headnote

**[14]** **Appeal and Error** 🗝 Review of correct decision based on erroneous reasoning in general

Correct lower court judgment must be upheld on any applicable legal theory, even if the lower court gives an incorrect reason for its judgment.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*766** Ira E. Tobolowsky, Tobolowsky & Burk, P.C., Dallas, for Appellant.

John Cornyn, Atty. Gen., Matthew L. Rienstra, Asst. Atty. Gen., Admistrative Law Division, Austin, for Appellee.

Before Chief Justice ABOUSSIE, Justices B.A. SMITH and POWERS. [*]

**Opinion**

JOHN POWERS, Justice (Retired).

Shannon Brinkley sued the Texas Lottery Commission to obtain a declaratory judgment that certain machines, denominated "eight-liners," are not "gambling devices" as defined by the Texas Penal Code. *See* Tex. Penal Code Ann. § 47.01(B)(4) (West Supp.1998). He applied for an injunction against enforcement of any criminal or administrative penalties for operating "eight-liners," and in a civil-rights action prayed for compensatory damages. The trial court dismissed his causes of action for want of jurisdiction. Brinkley appeals. We will affirm the judgment.

## THE CONTROVERSY

The Bingo Enabling Act, administered and enforced by the Texas Lottery Commission, provides as follows:

> A game of chance other than bingo ... may not be conducted or allowed during an occasion when bingo is played.... This subsection does not prohibit the exhibition and play of an amusement machine that is not a gambling device as defined by Section 47.01, Penal Code.

Tex.Rev.Civ. Stat. Ann. art. 179d, § 11(k) (West Supp.1998). Section 47.01 of the Penal Code defines "gambling device." [1]

The Commission licenses and regulates some 2,500 bingo-parlors. Many licensees allow the operation of "eight-liners" in their parlors. Eight-liners are electronic machines (similar to "slot machines") that dispense gift certificates redeemable for prizes. The machines do not all operate in the same manner; their operation and payout can be configured in a variety of ways.

**\*767** The Commission received numerous complaints and inquiries from licensees who were uncertain about whether the particular machines in their parlors were set up to operate legally. In response, the Commission sent to its licensees letters setting forth criteria by which the licensees might ascertain the legal status of machines in their parlors. The letters included a warning that illegally operated machines exposed licensees to administrative and criminal penalties. [2] The Commission noted in the letters that application of the stated criteria would not necessarily determine the legality of the machines and "the agency cannot guarantee that the use of the eight-liners is necessarily legal." The letters concluded: "we hope this helps answer questions you may have in regard to this issue."

Brinkley does not hold a Commission license to operate a bingo parlor. He owns several eight-liners that he formerly operated in a space he leases within a licensed bingo parlor. When Brinkley's lessor received the Commission's letters, he refused to allow Brinkley to continue the operation of his eight-liners in the bingo parlor.

Brinkley pleaded against the Commission the following causes of action:

(1) An action under the Uniform Declaratory Judgments Act for a judicial determination that eight-liners are not gambling devices under section 47.01(4)(B) of the Texas Penal Code, and that the Commission's interpretation of section 47.01 is unconstitutional;

(2) an action for declaratory judgment under section 2001.038 of the Texas Government Code that the Commission's letters constitute "rules," as defined by section 2001.003(6) of the Administrative Procedure Act, and that the "rules" are invalid because they were not formulated or adopted in compliance with the rulemaking provisions of Texas Government Code sections 2001.021–.037; [3]

(3) an application for injunction restraining the Commission and "all others" from interfering with the operation of Brinkley's eight-liners in bingo parlors, whether by raids, harassment, criminal prosecution, forfeiture and seizure of Brinkley's eight-liners, or any other way; and

(4) actions for injunctive relief and compensatory damages, under 42 United States Code sections 1983 and 1985, for violation of Brinkley's civil rights under color of state law. [4]

The Commission filed pleas to the jurisdiction, contending the trial court lacked subject-matter jurisdiction because (1) the actions were barred by the doctrine of sovereign immunity; (2) Brinkley lacked standing to assert the actions alleged; (3) the trial court lacked jurisdiction to determine legal relationships under a penal statute; and (4) there existed no justiciable controversy. The trial court denied the plea of sovereign immunity but sustained the pleas on the other grounds claimed and dismissed the actions. Brinkley contends the trial court possessed jurisdiction on the grounds discussed below.

## UNIFORM DECLARATORY JUDGMENTS ACT

**[1]** **[2]** **[3]** **[4]** The separation-of-powers doctrine prohibits courts from issuing advisory opinions. *Texas Ass'n of Bus. v. Texas Air Control Bd.,* 852 S.W.2d 440, 444 (Tex.1993); *Firemen's Ins. Co. v. Burch,* 442 S.W.2d 331, 333 (Tex.1969); *Morrow v. Corbin,* 122 Tex. 553, 62 S.W.2d 641, 647 (1933). The distinctive feature of an advisory opinion is that it decides an abstract question of law without binding the parties. *Alabama State Fed'n of Labor v. McAdory,* 325 U.S. 450, 461, 65 S.Ct. 1384, 89 L.Ed. 1725 (1945); *Texas Ass'n of Bus.,* 852 S.W.2d at 444; *Firemen's Ins. Co.,* 442 S.W.2d at 333; *California Prods. Inc. v. Puretex Lemon Juice, Inc.,* 160 Tex. 586, 334 S.W.2d 780, 783 (1960). An opinion is advisory when the judgment sought would not constitute specific relief to a litigant or affect legal relations. *Reuter v.* **\*768** *Cordes–Hendreks Coiffures,* 422 S.W.2d 193, 196 (Tex.Civ.App.—Houston [14th Dist.] 1967, no writ). "The court will not declare rights on facts which have not arisen or adjudicate matters which are contingent, uncertain, or rest in the future." 26 C.J.S. *Declaratory Judgments,* § 28 (1956).

**[5]** **[6]** Brinkley alleged that he sustained "irreparable injury to vested property rights with no adequate remedy at law" because his lessor, "as a result" of the Commission's letters, demanded that Brinkley remove his machines. Elsewhere in his petition, Brinkley's allegations are susceptible of a construction that the letters prevent his operating his machines in other bingo parlors. We believe Brinkley's cause of action under the UDJA requires an advisory opinion. Brinkley and the Commission are the only parties to the lawsuit and Brinkley is not a licensee subject to the Commission's regulation. [5] Brinkley necessarily speculates that a declaratory judgment, holding that eight-liners are not gambling devices, may induce his lessor or other bingo-parlor licensees to allow him to operate his machines, however configured, in their parlors. This is a contingency, an uncertainty, a hypothesis upon which a court may not decide the legal issues raised in Brinkley's petition. *See Coalson v. City Council of Victoria,* 610 S.W.2d 744, 747 (Tex.1980) (suit to declare invalid city charter-amendment initiative requires advisory opinion because voters might disapprove proposed amendment); *Central Sur. & Ins. Corp. v. Anderson,* 445 S.W.2d 514, 515 (Tex.1969) (suit for declaratory judgment that insurer liable to pay judgment, in advance of judgment against tort defendant, requires advisory opinion); *see generally Texas Ass'n of Bus.,* 852 S.W.2d at 444. [6]

## INJUNCTIVE RELIEF

**[7]** **[8]** The trial court also lacked jurisdiction to grant the injunctive relief requested. [7] Injunctions may not issue unless it is shown that the respondent will engage in or is engaging in the activity to be enjoined. *See State v. Morales,* 869 S.W.2d 941, 946–47 (Tex.1994). Brinkley seeks to enjoin the Commission and "all others" from interfering with the operation of his eight-liners in bingo parlors in any way, including the prohibition of raids, harassment, criminal prosecution, and forfeiture and seizure of his machines. Brinkley alleged only that the Commission sent the advisory letters to about 2,500 licensees. He has not alleged that the Commission threatens to impose upon him (he is not a licensee) administrative penalties nor that law enforcement authorities (not parties here) threaten to prosecute him under the criminal law. He has not alleged that the Commission, unless restrained, will enforce against him any sanction within its power to enforce. We decline to hold as a matter of law that the Commission's sending of the advisory letters to a large number of its licensees constituted a showing of "probable injury" to Brinkley. *See id.* at 946–47; *Transport Co. v. Robertson Transports, Inc.,* 152 Tex. 551, 261 S.W.2d 549, 552 (1953) (requiring showing of "probable injury" if respondent not restrained). Absent allegations of fact showing a probable injury, a court is *without jurisdiction* to grant the injunctive relief requested. *See Morales,* 869 S.W.2d at 942, 946–47; *see also* **\*769** *Texas Employment Comm'n v. Martinez,* 545 S.W.2d 876, 877–78 (Tex.Civ.App.—El Paso 1976, no writ).

## ADMINISTRATIVE PROCEDURE ACT—DECLARATORY JUDGMENT

Section 2001.038 of the Administrative Procedure Act (APA) creates a cause of action for declaratory judgment to determine the validity or applicability of an agency rule when it "is alleged that the rule or its threatened application interferes with or impairs,

or threatens to interfere with or impair, a legal right or privilege of the plaintiff." Tex. Gov't Code Ann. § 2001.038 (West 1998). For purposes of section 2001.038 and all other sections in Chapter 2001 of the Texas Government Code, the word "rule"

(A) means a state agency statement of general applicability that:

(i) implements, interprets, or prescribes *law* or *policy;* or

(ii) describes the procedure or practice *requirements* of a state agency;

(B) includes the amendment or repeal of a prior rule; and

(C) does *not* include a statement regarding only the internal management or organization of a state agency and *not affecting private rights or procedures.*

Tex. Gov't Code Ann. § 2001.003(6) (West 1998) (emphasis added).

 **[9]**    Brinkley contends the trial court had jurisdiction of his cause of action for declaratory judgment, under section 2001.038 of the APA, because the Commission letters amounted to a "rule" as defined in section 2001.003(6). We disagree.

 **[10]**    "Not every statement by an administrative agency is a rule for which the APA prescribes procedures for adoption and for judicial review." *Texas Educ. Agency v. Leeper,* 893 S.W.2d 432, 443 (Tex.1994). This observation refers to the fact that administrative agencies routinely issue letters, guidelines, and reports, and occasionally file briefs in court proceedings, any of which might contain statements that intrinsically implement, interpret, or prescribe law, policy, or procedure or practice requirements. Are all such statements therefore "rules" within the meaning of APA section 2001.003(6) and 2001.038? They are not for several reasons.

It does not appear that the legislature has delegated to the Commission a power to bind others by ukase—a naked proclamation contained, for example, in a letter, a set of guidelines, or a report, or by a statement in a brief filed in a court proceeding. It appears instead that the Commission may bind others generally only by a *rule* promulgated through the notice-and-comment procedures of APA sections 2001.022–.037, or bind particular litigants by the Commission's *order* adjudicating a contested case conducted under the procedures set forth in APA sections 2001.051–.147. The same is true in general of most constitutive statutes and enabling acts delegating power to administrative agencies.

The legislature intends that administrative agencies exercise effectively the powers delegated to them. *See Sexton v. Mount Olivet Cemetery Ass'n,* 720 S.W.2d 129, 137 (Tex.App.—Austin 1986, writ ref'd n.r.e.). Agencies would be reduced to impotence, however, if bound to express their views as to "law," "policy," and procedural "requirements" through contested-case decisions or formal rules exclusively; and they could not under such a theory exercise powers explicitly delegated to them by the legislature. How, under such a theory, could an agency practically express its views to an informal conference or advisory committee, or state its reasons for denying a petition to adopt a rule, or file a brief in a court or agency proceeding? *See Tex. Gov't Code Ann. §§ 2001.021*, .031, .058 (West 1998).

The foregoing are only examples derived from the APA itself. If every expression by the agency as to "law," "policy," and procedural "requirements" requires the promulgation of a formal rule, the agency could no longer exercise its "informed discretion" to choose adjudication as a means of making law and policy, rather than rulemaking, a choice we have repeatedly said an agency has when it possesses both adjudicatory and rulemaking powers. *See, e.g., Madden v. Texas Bd. of Chiropractic Exmr's,* 663 S.W.2d 622, 626 (Tex.App.—Austin 1984, writ ref'd n.r.e.); **\*770** *State Bd. of Ins. v. Deffebach,* 631 S.W.2d 794, 799 (Tex.App.—Austin 1982, writ ref'd n.r.e.). If the agencies were so restricted, they would be deprived, as a practical matter, of the power to adjudicate; an agency could make valid "law" or "policy" only through the straight-jacket of rulemaking, even though the agency might be quite unable to do so for any number of reasons as noted in *El Paso v. Public Util. Comm'n,* 883 S.W.2d 179, 188–89 (Tex.1994).[8]

The very text of the APA rejects the theory that every agency pronouncement regarding "law," "policy," and procedural "requirements" requires the promulgation of a formal rule. That theory would destroy, for example, the distinction between "rules" and "policies" found in section 2001.058(b), (c), and (e); the word "policies" is rendered meaningless because under that theory "policies" could *only* exist in the form of "rules."

We need not belabor the point. The definition in section 2001.003(6) is sufficiently flexible to allow agencies to perform their functions without unnecessary procedural obstacles; the definition expressly excludes from the definition of a "rule" any agency statements regarding only the internal management or organization of an agency that *do not affect* private rights or procedures. *See* Tex. Gov't Code Ann. § 2001.003(6)(C) (West 1998). This statutory exclusion encompasses any agency statement regarding "law," "policy," or procedural "requirements" made outside the rulemaking and contested-case context; such statements have no legal effect on private persons absent a statute that so provides or some attempt by the agency to enforce its statement against a private person, as in *Madden* where the agency attempted to enforce, in the course of adjudicating a contested case, its policy of what constituted a "bona fide reputable chiropractic" school. *See Madden,* 663 S.W.2d at 626–27. At that point, an affected person may challenge, if he wishes, the validity or applicability of the agency statement on whatever grounds may be applicable. Until then, the agency's pronouncements regarding "law," "policy," and procedural "requirements" remain merely informal views, effective only upon and within the agency's internal management and organization.[9] *See Leeper,* 893 S.W.2d at 443 (state board of education resolution stating guidelines for school districts pending statutory revision); *United Parcel Serv., Inc. v. Oregon Transp. Comm'n,* 27 Or.App. 147, 555 P.2d 778, 780 (1976) (commission statement consenting to city's designation of truck route); *Reynolds Sch. Dist. v. Oregon Sch. Employees,* 58 Or.App. 609, 650 P.2d 119, 123 (1982) (agency statement made in adjudication of previous contested case); *United States v. Fitch Oil Co.,* 676 F.2d 673, 678 (Temp.Emer.Ct.App.U.S.1982) (statement of Secretary of Energy); *Durnin v. Allentown Fed. Sav. and Loan Ass'n,* 218 F.Supp. 716, 721 (E.D.Pa.1963) (letter from supervisory agent of Federal Home Loan Bank Board); 1 Davis and Pierce, *Administrative* **\*771** *Law Treatise* § 3.5 at 120 (3d ed.1994).[10]

Accordingly, we hold the Commission's letters were not rules within the meaning of APA section 2001.038, authorizing suits for declaratory judgment in district court.

## CIVIL–RIGHTS ACTIONS

Brinkley also requested injunctive relief and damages under 42 United States Code sections 1983 and 1985. Section 1983 provides as follows:

> Every *person* who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C.A. § 1983 (1994) (emphasis added). Section 1985 prohibits a "conspiracy" by two or more "persons" to deprive another of constitutional rights under color of state law. *See* 42 U.S.C.A. § 1985 (1994).

 **[11]** Section 1983 applies only to "persons" as that term is used in the statute. *See Will v. Michigan Dep't of State Police,* 491 U.S. 58, 63–70, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). States are not "persons" as that term is used in section 1983. *Id.* at 71, 109 S.Ct. 2304. Governmental entities that are considered "arms of the State" are also not persons under section 1983. *Id.* at 70, 109 S.Ct. 2304. When a litigant seeks relief from the acts of a state agency under section 1983, he must therefore sue an individual in authority at an agency as opposed to the agency itself. *See Ntreh v. University of Tex. at Dallas,* 936 S.W.2d 649, 652 (Tex.App.—Dallas 1996), *aff'd as modified,* 947 S.W.2d 202 (Tex.1997).

**\*772** **[12]** **[13]** **[14]** The doctrine of sovereign immunity, unless waived, protects the State of Texas, its agencies and its officials, against lawsuits for damages, absent legislative consent to sue the State. *See Federal Sign v. Texas S. Univ.,* 951 S.W.2d 401, 405 (Tex.1997); *Griffin v. Hawn,* 161 Tex. 422, 341 S.W.2d 151, 152–53 (1960); *Hosner v. DeYoung,* 1 Tex. 764, 769 (1847). The Texas Lottery Commission is an "arm of the State" and not a person under section 1983. If the Commission is not a person for purposes of section 1983, it is not a person for purposes of section 1985. *See State v. Biggar,* 848 S.W.2d 291, 295 (Tex.App.—Austin 1993), *aff'd,* 873 S.W.2d 11 (Tex.1994). Because sections 1983 and 1985 are inapplicable to the Commission, the sole defendant in Brinkley's action, and he has not obtained legislative consent to sue the State, we hold the trial court did not err in dismissing for want of subject-matter jurisdiction Brinkley's claims under sections 1983 and 1985. [11] *See Ntreh,* 936 S.W.2d at 652.

Having concluded that the trial court was without jurisdiction to render judgment on Brinkley's claims for compensatory damages and for declaratory and injunctive relief, we affirm the judgment below.

**All Citations**

986 S.W.2d 764

Footnotes

| | |
|---|---|
| \* | Before John Powers, Senior Justice (retired), Third Court of Appeals, sitting by assignment. *See* Tex. Gov't Code Ann. § 74.003(b) (West 1998). |
| 1 | "Gambling device" means any electronic, electromechanical, or mechanical contrivance not excluded under Paragraph (B) that for a consideration affords the player an opportunity to obtain anything of value, the award of which is determined solely or partially by chance, even though accompanied by some skill, whether or not the prize is automatically paid by the contrivance. The term:<br>\* \* \*<br>(B) does not include any electronic, electromechanical, or mechanical contrivance designed, made, and adapted solely for bona fide amusement purposes if the contrivance rewards the player exclusively with noncash merchandise prizes, toys, or novelties, or a representation of value redeemable for those items, that have a wholesale value available from a single play of the game or device of not more than 10 times the amount charged to play the game or device once or $5, whichever is less.<br>Texas Penal Code Ann. § 47.01(4)(B) (West Supp.1998). |
| 2 | The Commission may impose administrative penalties for violations of the Bingo Enabling Act. Law-enforcement authorities enforce the Texas Penal Code. |
| 3 | *See* Tex. Gov't Code Ann. §§ 2001.021–.037 (West 1998). |
| 4 | *See* 42 U.S.C. §§ 1983, 1985 (1994). |
| 5 | The Commission regulates amusement machines pursuant to article 179d of the Texas Revised Civil Statutes (Bingo Enabling Act) which is concerned only with those amusement machines located in bingo halls. *See* Tex.Rev.Civ. Stat. art. 179d (West 1998). Outside of bingo halls, law enforcement personnel are charged with the enforcement of Texas Penal Code section 47.01 which prohibits the use of "gambling devices." Tex. Penal Code § 47.01 (West 1994 & Supp.1998). |
| 6 | The Uniform Declaratory Judgments Act, found in the Texas Civil Practice & Remedies Code, is a procedural device for deciding cases already within a court's jurisdiction; the statute does not enlarge a court's jurisdiction so as to authorize the rendition of advisory opinions. *See* Tex. Civ. Prac. & Rem.Code Ann. §§ 37.001–.011 (West 1997); *Texas Ass'n of Bus. v. Texas Air Control Bd.,* 852 S.W.2d 440, 444 (Tex.1993). |
| 7 | Brinkley requested injunctive relief pursuant to section 65.011 of the Texas Civil Practice & Remedies Code and section 16.29 of the Texas Business & Commerce Code (Injury to Business Reputation or Trade Name or Mark); Tex. Civ. Prac. & Rem.Code Ann. § 65.011 (West 1997); Tex. Bus. & Com.Code Ann. § 16.29 (West Supp.1998). |
| 8 | The legislature may, by statute, require an agency to make formal rules with regard to particular matters. *See Railroad Comm'n v. Shell Oil Co.,* 146 Tex. 286, 206 S.W.2d 235, 241 (1947). The agency would be bound, of course, to enact rules in compliance with the legislative mandate. It may also be that a constitutional provision requires, in particular circumstances, that the agency promulgate a formal rule before attempting to bind private persons by the agency's view of "law," "policy," or procedural "requirements." *See,* |

*e.g., Madden v. Texas Bd. of Chiropractic Exmr's,* 663 S.W.2d 622, 626–27 (Tex.App.—Austin 1984, writ ref'd n.r.e.). Such matters are not involved in the present controversy.

The letters sent by the Commission in this instance were, on their face, simply advisory guidelines; they did not purport to express a final opinion on the legality of eight-liners of any particular kind. We have previously noted the valuable role such advisory opinions serve in administration. *See Texas Comm'n of Licensing and Regulation v. Model Search America, Inc.,* 953 S.W.2d 289 (Tex.App.—Austin 1997, no writ). As we stated in that opinion,

> [T]o permit suits for declaratory judgments upon mere informal, advisory, administrative opinions might well discourage the practice of giving such opinions, with a net loss of far greater proportions than any possible gain.

> *Id.* at 293 quoting, *Helco Prods. Co. v. McNutt,* 137 F.2d 681, 684 (D.C.Cir.1943). Considering the number of bingo-parlor licensees and the variety of ways in which eight-liners can be configured, the practical value of the letters is obvious. Nothing in the letters purports to foreclose an individual licensee from seeking, if he wishes, a formal opinion from the Commission regarding particular eight-liners. While private parties may voluntarily comply with such guidelines, they are not legally bound to do so.

The first Commission letter stated:

> TO ALL BINGO LICENSEES:

> The Texas Lottery Commission has received complaints regarding the use of gambling devices at locations where bingo is being conducted. The specific complaints concern the operation of devices popularly known as "Eight Liners."

> The Texas Lottery Commission considers these devices to be gambling devices as defined by Section 47.01(4) of the Texas Penal Code, *as a result of the method of operation and payoff of these devices.*

> Please be aware that Section (11)(k) of the Bingo Enabling Act, Texas Revised Civil Statutes Article 179d, provides the following: "A game of chance other than bingo may not be conducted or allowed during an occasion when bingo is played. This subsection does not prohibit the exhibition and play of an amusement machine that is not a gambling device as defined by Section 47.01, Penal Code."

> Therefore, effective September 1, 1996, the Commission will refer *any incident of use* by a licensee of the aforementioned device(s) *in an illegal manner* which is detected after September 1, 1996 to the appropriate law enforcement agency for criminal prosecution and will initiate an appropriate administrative disciplinary action.

> This notice is intended to *make licensees aware* of the agency's position and to *afford an opportunity* to licensees for voluntary compliance.

(Emphasis added). The letter was signed by the Commissioner's Security Director.

The follow-up letter stated:

> [T]he agency received complaints regarding the use of "Eight liners" at locations where Bingo is being conducted.

> Based on a follow-up of those complaints, the agency considers these "eight-liners" *at those locations* to be gambling devices, *as a result of the method of operation and payoff* of *those* machines.

> The purpose of the August 15, 1996 letter was to notify licensees of the agency's position and to afford licensees an opportunity for voluntary compliance.

> We have received numerous calls since the August 15, 1996 letter was sent. To help you determine whether an "Eight-liner" located in your Bingo location is not an amusement machine ... the agency's position is that the "Eight-liner" is a gambling device ... and is therefore illegal. Even if the answer to every question is "no," the agency cannot guarantee that the use of the "Eight-liner" is necessarily legal.

> We hope this helps answer questions you may have in regards to this issue. Please contact [the Security Director] should you have any further questions.

(Emphasis added.)

We must uphold a correct lower court judgment on any applicable legal theory, even if the court gives an incorrect reason for its judgment. *Guaranty County Mut. Ins. Co. v. Reyna,* 709 S.W.2d 647, 648 (Tex.1986).

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

292 S.W.3d 712
Court of Appeals of Texas,
Austin.

Susan COMBS, Comptroller of Public Accounts of the State of Texas, Appellant
v.
ENTERTAINMENT PUBLICATIONS, INC., Appellee.

No. 03–08–00474–CV. | June 12, 2009. | Rehearing Overruled Aug. 27, 2009.

**Synopsis**

**Background:** Fundraising products seller brought an action against the Comptroller of Public Accounts, for declaratory and injunctive relief, to prevent the Comptroller from implementing a new rule which would require seller to collect and remit tax on the sales of products sold through school fundraising activities. The 419th Judicial District Court, Travis County, Gus J. Strauss, Jr., J., denied the Comptroller's plea to the jurisdiction, and granted a temporary injunction in favor of seller, enjoining the Comptroller from implementing and enforcing the new tax rule. The Comptroller made an interlocutory appeal.

**Holdings:** The Court of Appeals, J. Woodfin Jones, C.J., held that:

[1] Comptroller's letters to association of fundraising suppliers constituted a "rule" under the Administrative Procedures Act (APA):

[2] declaratory relief regarding validity of sales tax rule was not prohibited by Tax Code;

[3] rule regarding application of sales tax to fundraising suppliers was invalid when promulgated by letter;

[4] statute on injunction in taxpayer's suit did not bar enjoining of Comptroller's enforcing of new rule; and

[5] temporary injunction was warranted to preserve status quo pending final disposition of merits of seller's action.

Affirmed.

Diane M. Henson, J., filed a concurring opinion.

West Headnotes (17)

[1]     **Courts**
        ☞ Determination of questions of jurisdiction in general

        Whether a court has subject-matter jurisdiction is a question of law.

        3 Cases that cite this headnote

[2]     **Pleading**
🔑Scope of inquiry and matters considered in general

A plea to the jurisdiction often may be determined solely from the pleadings and sometimes must be.

Cases that cite this headnote

[3]     **Appeal and Error**
🔑Cases Triable in Appellate Court

A plea to the jurisdiction determination is reviewed de novo.

1 Cases that cite this headnote

[4]     **Pleading**
🔑Scope of inquiry and matters considered in general
**Pleading**
🔑Questions of law and fact

When a plea to the jurisdiction challenges the existence of jurisdictional facts, a court should consider relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues raised, and where the jurisdictional issue or facts do not implicate the merits of the case, and the facts are disputed, the court, not the jury, must make the necessary fact findings to resolve the jurisdictional issue; if the facts relevant to jurisdiction are undisputed, the court should make the jurisdictional determination as a matter of law based solely on those undisputed facts.

14 Cases that cite this headnote

**[5]**     **Courts**
🔑Determination of questions of jurisdiction in general

Because a court should not proceed with a case over which it has no jurisdiction, it should make the jurisdictional determination as soon as practicable, but has discretion to defer the decision until the case has been more fully developed.

Cases that cite this headnote

**[6]**     **Appeal and Error**
🔑Appeal from orders relating to injunctions

In an appeal from an order granting or denying a request for a temporary injunction, appellate review is confined to the validity of the order that grants or denies the injunctive relief.

Cases that cite this headnote

**[7]**     **Injunction**
🔑Discretionary Nature of Remedy

Whether to grant or deny a temporary injunction is within the trial court's sound discretion.

Cases that cite this headnote

**[8]**     **Declaratory Judgment**
🔑Officers and official acts in general
**Declaratory Judgment**
🔑Jurisdiction of particular state courts

The Administrative Procedures Act (APA) declaratory judgment vehicle, provided by the statute which allows a person to challenge the validity or applicability of an agency rule pursuant to a declaratory judgment action if it is alleged that the rule or its threatened application interferes with or impairs a legal right or privilege of the plaintiff, is a legislative grant of

subject matter jurisdiction. V.T.C.A., Government Code § 2001.038.

3 Cases that cite this headnote

[9] **Declaratory Judgment**
⚷Sales and use taxes

Comptroller of Public Accounts' letters to an association of fundraising suppliers constituted a "rule" under the Administrative Procedures Act (APA) which was subject to challenge by declaratory judgment action, and were not merely advisory opinions, inasmuch as they were statements implementing, interpreting, or prescribing law or policy; letters communicated Comptroller's intention to apply sales tax law in all cases to all brochure fundraising firms, thereby interpreting tax code to mean such firms were always taxable "sellers" of goods they sold to schools for resale to public, by deeming all school groups mere agents of the fundraising firms. V.T.C.A., Government Code §§ 2001.003(6), 2001.038; V.T.C.A., Tax Code § 151.024.

2 Cases that cite this headnote

[10] **Administrative Law and Procedure**
⚷Nature and Scope

Not every statement by an administrative agency is a "rule" for which the Administrative Procedures Act (APA) prescribes procedures for adoption, and in order to constitute a rule, statements may not pertain only to the internal management of the agency without affecting private rights or procedures, but must, instead, be "generally applicable" because affecting the interest of the public at large such that they cannot be given the effect of law without public input by way of rulemaking procedures. V.T.C.A., Government Code § 2001.003(6).

4 Cases that cite this headnote

[11]    **Administrative Law and Procedure**
    Nature and Scope

The definition of a "rule" for which the Administrative Procedures Act (APA) prescribes procedures for adoption does not reference statements made in contested case determining individual rights, even if the number of individuals is large and they can be described as falling within a defined class. V.T.C.A., Government Code § 2001.003(6).

2 Cases that cite this headnote

[12]    **Declaratory Judgment**
    Levy, assessment, collection, and enforcement

In enacting Tax Code statute which purports to prevent a court from issuing a declaratory judgment regarding the "applicability, assessment, collection, or constitutionality of a tax or fee or the amount of the tax or fee due, " the legislature did not intend to bar all declaratory actions involving the assessment and collection of taxes, as the next sentences read: "The court may grant such relief as may be reasonably required by the circumstances. A grant of declaratory relief against the state or a state agency shall not entitle the winning party to recover attorney's fees." V.T.C.A., Tax Code § 112.108.

1 Cases that cite this headnote

[13]    **Declaratory Judgment**
    Sales and use taxes

Taxpayer's action for declaratory relief, regarding validity of a sales tax rule promulgated by the Comptroller of Public Accounts in a letter, which was in violation of the Administrative Procedures Act (APA), was not prohibited by Tax Code statute which purported to prevent a court from issuing a

declaratory judgment regarding the "applicability, assessment, collection, or constitutionality of a tax or fee or the amount of the tax or fee due"; action did not seek declaratory relief regarding the tax itself, and in fact the declaratory judgment action on validity of a rule was authorized by the APA itself.

3 Cases that cite this headnote

[14]     **Taxation**
         Administrative agencies and regulation

Tax rule regarding application of sales tax to fundraising suppliers was invalid, when announced by letter from the Comptroller of Public Accounts to a fundraising suppliers association; Comptroller did not comply with the Administrative Procedures Act's (APA) procedural requirements for promulgating agency rules before issuing the letters. V.T.C.A., Government Code §§ 2001.021–2001.041.

Cases that cite this headnote

[15]     **Injunction**
         Injunctions against government officials in general
         **Taxation**
         Remedies for wrongful enforcement

Statute on requirements for an injunction in a taxpayer's suit did not bar temporarily enjoining of Comptroller of Public Accounts from implementing and enforcing a new rule described by the Comptroller's letters unless and until the Comptroller properly enacted the rule in compliance with Administrative Procedures Act (APA) procedures; what taxpayer sought, and the court granted, was not a "tax injunction." V.T.C.A., Tax Code § 112.101.

Cases that cite this headnote

**[16]**     **Injunction**
   🔑Preservation of status quo
   **Injunction**
   🔑Discretionary Nature of Remedy

The purpose of a temporary injunction is to preserve the status quo of the subject matter of a suit pending final disposition of the case on its merits and, because of this limited purpose, the trial court has broad discretion to determine whether to issue such an injunction.

Cases that cite this headnote

**[17]**     **Injunction**
   🔑Injunctions against government officials in general
   **Injunction**
   🔑Public revenue; bonds and taxation
   **Taxation**
   🔑Remedies for wrongful enforcement

Temporary injunction was warranted to preserve status quo pending final disposition of merits of fundraising products seller's action against Comptroller of Public Accounts, to prevent implementing of new rule that required such sellers to collect tax on sales of products through school fundraising activities; there was evidence that, absent the injunction, seller would likely suffer imminent and irreparable injury because rule would disrupt business and cause financial liability, which substantially outweighed any harm Comptroller would suffer by having to adopt a rule that complied with the procedural requirements of the Administrative Procedures Act (APA).

Cases that cite this headnote

**Attorneys and Law Firms**

**\*714** William E. Storie, Assistant Attorney General, Austin, TX, for Appellant.

Carl R. Galant, McGinnis, Lochridge & Kilgore, LLP, Austin, TX, for Appellee.

Before Chief Justice JONES, Justices PURYEAR and HENSON.

**\*715** *OPINION*

[J. WOODFIN JONES](), Chief Justice.

Appellee Entertainment Publications, Inc. ("Entertainment") sued Susan Combs, Comptroller of Public Accounts of the State of Texas (the "Comptroller"), for declaratory and injunctive relief to prevent the Comptroller from implementing a new rule that would require Entertainment to collect and remit tax on the sales of products sold through school fundraising activities. The trial court denied the Comptroller's plea to the jurisdiction and granted a temporary injunction in favor of Entertainment, enjoining the Comptroller from implementing and enforcing a new rule governing the tax treatment of fundraising sales. In this interlocutory appeal, the Comptroller complains of the denial of her plea to the jurisdiction, *see* [Tex. Civ. Prac. & Rem.Code Ann. § 51.014(a)(8)]() (West 2008), and the grant of the temporary injunction, *see id.* [§ 51.014(a)(4)](). The Comptroller argues that the policy statement Entertainment complains of is not a "rule" that may be challenged under the Administrative Procedures Act ("APA"), *see* [Tex. Gov't Code Ann. §§ 2001.021]()–.041 (West 2008); that the court lacked jurisdiction to grant declaratory relief under the Uniform Declaratory Judgments Act ("UDJA"), *see* [Tex. Civ. Prac. & Rem.Code Ann. §§ 37.001]()–.011 (West 2008); and that injunctive relief is improper. We will affirm the orders of the district court.

## FACTUAL AND PROCEDURAL BACKGROUND

Entertainment is a brochure-fundraising firm that contracts with schools and related organizations, some tax-exempt, to sell merchandise and food products in order to raise funds for student groups. The fundraising products are sold by the school groups to third-party consumers using Entertainment's brochures and order forms at retail prices suggested by Entertainment in its catalogs. According to Entertainment, its initial sales to the school groups are separate transactions from the ultimate sales of items by the school groups to the end consumers. In Entertainment's view, this "two-sale transaction" system dictates that the school groups themselves are the actual "sellers" of goods for the following reasons:

> The school [group] purchases sales inventory from a vendor [such as Entertainment] for a certain price (first transaction) and then resells the taxable items at its own profit or loss for a price the organization determines (second transaction).
>
> The school [group] assumes the responsibility and risk.
>
> The school [group] does not receive a commission on sales, nor does it share or split the proceeds with the vendor in any way.

Thus, Entertainment argues that the school groups, not Entertainment, are the "sellers" and therefore are responsible for collecting and remitting any sales tax due on the items sold to the end consumers. *See* [Tex. Tax Code Ann. § 151.052(a)-(b)]() (West 2008) (requiring that "seller" of taxable item collect sales tax). Furthermore, when the school groups claim an intention to resell the fundraising products, Entertainment maintains that, based on the "sale for resale" exemption in [section 151.302 of the tax code](), it is not responsible for collecting sales tax on its initial sales to the school groups. *See* [id. § 151.302(a)]() (providing that "sale for resale" of taxable item is exempted from sales tax); *see also id.* § 151.006(a)(1) (defining "sale for resale" of tangible personal property). Accordingly, Entertainment asserts that it accepts resale or exemption certificates in lieu of charging sales tax to schools that claim an intention to resell the **\*716** fundraising products. Only when schools do not provide a resale or exemption certificate does Entertainment charge sales tax, based on the "wholesale" price that schools pay Entertainment for the products.

In marketing itself to school groups, Entertainment relies on a further exemption in the tax code, which provides that a tax-exempt organization such as a school may hold two one-day, tax-free sales per year, at which the sale of an item priced $5,000 or less is exempted from sales tax. *See id.* § 151.310; [34 Tex. Admin. Code § 3.322(h)(2) (2008)](). Such sales are

permissible, however, only if the school—not Entertainment—is regarded as the actual "seller" of the fundraising products. According to Entertainment, its business model "allows schools to utilize the tax advantages of the two-sale scenario" because the schools can resell the fundraising products without having to calculate the sales tax due on the items or collect sales tax from the end consumers.

The alternative to viewing these types of transactions as two distinct sales is to characterize them as a single sale, wherein the fundraising firm is the seller and the school or school group acts as the seller's agent. In these circumstances, the fundraising firm bears the responsibility of collecting and remitting sales tax on the products, which may not be sold tax-free during one of the school's tax-free sales days.

Entertainment asserts that it developed its understanding that the transactions at issue were two distinct sales from what it refers to as the Comptroller's "long-standing rule" stated in a 2007 letter ruling identified as Accession No. 200704926L. The so-called Factual Criteria Rule, as described in that letter,[1] provided the following guidelines for determining whether the fundraising firm or the school organization was the "seller" for purposes of collecting sales tax:

[1] The inquiry to which Accession No. 200704926L responded was submitted by an unidentified vendor seeking clarification of the same issues involved in this appeal. The vendor specifically asked about sales to parent-teacher organizations, and thus the Comptroller's response refers only to "PTAs." (All of the Comptroller's accessions are available through http:// cpastar2.cpa.state.tx.us.)

The PTA is the seller when it purchases sales inventory from a vendor for a certain price (first transaction) and then resells the taxable items at its own profit or loss for a price the PTA determines (second transaction). The PTA assumes all responsibility and risk.

The PTA is the seller when it does not share/split the proceeds with the vendor/distributor.

....

The PTA is not the seller when it takes orders for the vendor and receives a commission from the vendor, such as a share or split of the proceeds. This is true regardless of who is setting the sales price.

....

Whether the payment, such as a check, is made to the PTA or the vendor may not be an indicator of the seller. For example, a check could be made to the PTA, but if the PTA is receiving a commission from a vendor, the PTA is not the seller.[2]

[2] These guidelines are similar to and consistent with the Comptroller's statements in other documents referenced in Accession No. 200704926L. *See, e.g.,* Accession No. 200204940L (Apr. 5, 2002) (noting that in situation when exempt organization is merely acting as sales representative, seller is responsible for collecting and remitting sales tax); Accession No. 9808714L (Aug. 4, 1998) (stating that distributor does not need to collect sales tax if exempt organization is purchasing taxable items for its own use or to sell); Accession No. 8609H0755E02 (Sept. 17, 1986) (applying rule that if school assumes responsibility for activity and/or sales, school is responsible for ensuring tax is paid).

**\*717** According to the testimony of the Comptroller's representative, this letter accurately stated, at that time, the Comptroller's policy as to brochure fundraising.

On March 18, 2008, the Comptroller sent a letter to the Executive Director of the Association of Fundraising Distributors and Suppliers (the "March 2008 letter"), stating the following:

> The Comptroller's office has consistently held that sales will not qualify as one of a non-profit organization's tax-free sales days when a school group raises funds by acting as sales representatives or agent for a for-profit retailer. In these cases, the retailer is the seller of the goods.

The March 2008 letter, which was signed by the Comptroller, Susan Combs, went on to explain that her office had conducted a review of fundraising firms and found that a number of them had not been following the applicable statutes and guidelines her office had promulgated. The letter stated, "Our office has reviewed the situation and determined that fundraising firms should not be allowed to mischaracterize their relationships with the schools." Specifically, the Comptroller expressed concern that fundraising firms had been modifying their contracts with schools to "include language concerning sellers' responsibilities and recharacterizing commission payments as markup." As a result, "non-profit school groups would be forced to analyze and review each contract with its vendors to determine who is responsible for collecting and remitting sales tax and whether it must expend one of its tax-free sales days for the sales under that contract."

The March 2008 letter further stated that section 151.024 of the tax code had been "applied to direct marketing firms operating in Texas for several years." Section 151.024, entitled "Persons Who May Be Regarded As Retailers," provides:

> If the comptroller determines that it is necessary for the efficient administration of this chapter to regard a salesman, representative, peddler, or canvasser as the agent of a dealer, distributor, supervisor, or employer under whom he operates or from whom he obtains the tangible personal property that he sells, whether or not the sale is made in his own behalf or for the dealer, distributor, supervisor, or employer, the comptroller may so regard the salesman, representative, peddler, or canvasser, and may regard the dealer, distributor, supervisor, or employer as a retailer or seller for purposes of this chapter.

Tax Code § 151.024. The March 2008 letter concluded, "For the efficient administration of the tax and to create certainty for the non-profits that tax would be collected and paid by the fundraising firm and not the school organization, we believe we need to utilize this section of the statute."

According to the Comptroller's witness, the effect of "utilizing" section 151.024 was to do away with the fundraising firm's ability "to contractually change the responsibilities of the buyer and the seller. We—the Comptroller just determined that the [fundraising firm] would be the seller regardless of these factors [listed in Accession No. 200704926L]." On cross-examination, the Comptroller's representative further testified:

> Q. But under what we call the old rule, you went through these factors and you could make a determination **\*718** whether the school was the seller or the school was the agent.
>
> A. That is correct.
>
> Q. Okay. And then, in March, the Comptroller invoked 151.024 and said, "We're not going to do this analysis anymore. If you're a brochure fundraising firm, the school is your agent."
>
> A. That is correct.
>
> ....
>
> Q. Okay. And I think you just told me but—this [March 2008 letter] is the document that you would say instituted the—what we call the new rule, but it does away with the seller versus the agent for seller analysis. Right?
>
> A. That is correct.

....

Q. Well—okay. But if you look at the whole transaction, the fact of the matter is, since March 18th, 2008, you no longer look at any part of the transaction if you're a brochure fundraiser; isn't that correct?

A. That's correct. We're going to say that they are subject to tax and that the vendor needs to collect the tax.

Less than a month later, on April 14, 2008, the Comptroller's office submitted a follow-up letter (the "April 2008 letter") to the Executive Director of the Texas PTA and counsel for Entertainment, stating:

This office has consistently held that school fundraising firms taking orders through brochures and sales forms were considered the actual sellers of the fundraising items and responsible for the sales tax on the full sales price. The PTAs or other nonprofit associations act as representatives for the fundraising firms in taking the orders and earning a commission and are not responsible for the sales tax on these sales.

....

To resolve these issues, for clarity, and the efficient administration of the tax, the Comptroller will regard the PTAs or other nonprofit entities as the sales agent for the fundraising firm and will apply § 151.024 of the Texas Tax Code.

The April 2008 letter was signed by the "Assistant Director of Tax Administration" of the Comptroller's office and referenced a meeting that had taken place that morning between officers of the Texas PTA and "the Comptroller and staff." In this appeal, the Comptroller does not contend that the signer of the letter was acting with anything less than her full authority.

Shortly thereafter, Entertainment filed suit seeking declaratory and injunctive relief against enforcement of the Comptroller's "New Rule." Specifically, Entertainment sought a declaration under the APA that the rule embodied in the March and April 2008 letters was invalid and a further declaration under the UDJA that the Comptroller exceeded her statutory authority under section 151.024 of the tax code in adopting the rule and applying section 151.024 to Entertainment. The Comptroller filed a plea to the jurisdiction, asserting that the trial court lacked subject-matter jurisdiction over Entertainment's claims. With respect to Entertainment's rule challenge, the Comptroller argued that the policy in question is not a "rule" that can be challenged under the APA; alternatively, the Comptroller asserted that even if the policy is a rule, the APA does not permit a challenge to rules that affect the assessment or collection of a tax. In addition, the Comptroller's plea urged that Entertainment's request for declaratory relief under the UDJA is barred by sovereign immunity because she was acting within her discretionary authority in applying section 151.024 of the tax code to Entertainment. The **\*719** Comptroller further asserted that because the tax code provides the exclusive remedy for taxpayers who wish to enjoin assessment, collection, or enforcement of a tax, the trial court also lacked jurisdiction over Entertainment's request for injunctive relief; additionally, the Comptroller argued that Entertainment's UDJA claim was not yet ripe.

After a hearing, the trial court denied the Comptroller's plea to the jurisdiction and granted Entertainment's application for a temporary injunction. The order denying the plea specified that the trial court had jurisdiction "over the declaratory judgment cause of action under Section 2001.038 of the APA in its entirety," finding that the Comptroller had adopted a new rule with respect to fundraising firms but had failed to comply with the procedural requirements to adopt a new administrative rule. In its order granting the temporary injunction, the trial court directed the Comptroller to "desist and refrain from implementing and enforcing the New Rule described by the Comptroller's letters dated March 18, 2008 and April 14, 2008 unless and until the Comptroller properly enacts the New Rule according to the procedural requirements of the APA" or until the Court renders its final judgment.

On appeal, the Comptroller argues that (1) the trial court lacked subject-matter jurisdiction under the APA; (2) Entertainment cannot establish subject-matter jurisdiction under the UDJA; (3) injunctive relief is barred by the tax code; and (4) injunctive relief is improper under general principles of equity.

## STANDARDS OF REVIEW

[1] Whether a court has subject-matter jurisdiction is a question of law. *Texas Dep't of Parks & Wildlife v. Miranda,* 133 S.W.3d 217, 226 (Tex.2004).

[2] [3] [4] A plea to the jurisdiction often may be determined solely from the pleadings and sometimes must be. *See Bland Indep. Sch. Dist. v. Blue,* 34 S.W.3d 547, 554–55 (Tex.2000). Such a determination is reviewed de novo. *Miranda,* 133 S.W.3d at 226. When a plea to the jurisdiction challenges the existence of jurisdictional facts, however, a court should consider relevant evidence submitted by the parties when necessary to resolve the jurisdictional issues raised. *Id.*

[5] Where the jurisdictional issue or facts do *not* implicate the merits of the case, and the facts are disputed, the court—not the jury—must make the necessary fact findings to resolve the jurisdictional issue. *See id.* (" 'Whether a district court has subject matter jurisdiction is a question for the court, not a jury, to decide, even if the determination requires making factual findings, unless the jurisdictional issue is inextricably bound to the merits of the case.' ") (quoting *Cameron v. Children's Hosp. Med. Ctr.,* 131 F.3d 1167, 1170 (6th Cir.1997)). If, however, the facts relevant to jurisdiction are undisputed, the court should make the jurisdictional determination as a matter of law based solely on those undisputed facts. *Id.* at 228. Because a court should not proceed with a case over which it has no jurisdiction, it should make the jurisdictional determination as soon as practicable, but has discretion to defer the decision until the case has been more fully developed. *Id.* at 227.[3]

3    Here, the trial court's order denying the plea to the jurisdiction did not indicate that the court was deferring its jurisdictional determination until the case was more fully developed. Nor did Entertainment urge a deferral of the issue in its response to the Comptroller's plea to the jurisdiction. Accordingly, because the trial court did not purport to exercise its discretion in this regard, we will not attempt to apply an abuse-of-discretion standard in reviewing the trial court's denial of the plea. In any event, as discussed below, the relevant facts before the trial court were undisputed and conclusive, so fuller development of the case would have served no purpose.

**\*720** [6] [7] In an appeal from an order granting or denying a request for a temporary injunction, appellate review is confined to the validity of the order that grants or denies the injunctive relief. *See Walling v. Metcalfe,* 863 S.W.2d 56, 58 (Tex.1993). Whether to grant or deny a temporary injunction is within the trial court's sound discretion. *Butnaru v. Ford Motor Co.,* 84 S.W.3d 198, 204 (Tex.2002). A reviewing court must not substitute its judgment for that of the trial court unless the trial court's action was so arbitrary that it exceeded the bounds of reasonable discretion. *Id.* A trial court abuses its discretion when it acts without reference to any guiding rules or principles, not when it simply exercises that discretion in a manner different from how a reviewing appellate court might. *Low v. Henry,* 221 S.W.3d 609, 620 (Tex.2007). As a reviewing court, we must view the evidence in the light most favorable to the trial court's order and indulge every reasonable inference in its favor. *Brammer v. KB Home Lone Star, L.P.,* 114 S.W.3d 101, 105–06 (Tex.App.-Austin 2003, no pet.).

**DISCUSSION**

*Subject–Matter Jurisdiction*

[8] In issues one and two, the Comptroller asserts that the trial court erred in denying her plea to the jurisdiction because the trial court lacked subject-matter jurisdiction over Entertainment's suit. The trial court's order denied the Comptroller's plea to the jurisdiction on the specific basis that it had jurisdiction over Entertainment's "cause of action for declaratory judgment under Section 2001.038 of the Texas Government Code, Administrative Procedures Act." The APA allows a person to challenge the validity or applicability of an agency rule pursuant to a declaratory judgment action if it is alleged that the rule or its threatened application interferes with or impairs a legal right or privilege of the plaintiff. APA § 2001.038(a). As this Court has consistently held, the APA declaratory-judgment vehicle of section 2001.038 is a legislative grant of subject-matter

jurisdiction. *See, e.g., Keeter v. Texas Dep't of Agric.,* 844 S.W.2d 901, 902 (Tex.App.-Austin 1992, writ denied); *Lopez v. Public Util. Comm'n,* 816 S.W.2d 776, 782 (Tex.App.-Austin 1991, writ denied); *Rutherford Oil Corp. v. General Land Office,* 776 S.W.2d 232, 235 (Tex.App.-Austin 1989), *aff'd sub nom. State v. Flag–Redfern Oil Co.,* 852 S.W.2d 480 (Tex.1993).

[9] In the present case, the parties submitted evidence relevant to the jurisdictional issue, but that evidence does not implicate the merits of Entertainment's case: the jurisdictional inquiry concerns whether the Comptroller's March and April 2008 letters constitute a rule under the APA and, if so, whether that rule or its threatened application interferes with or impairs Entertainment's legal rights or privileges, whereas the merits concern whether the rule was validly adopted. The relevant jurisdictional facts were undisputed; accordingly, we review the trial court's decision de novo.

The Comptroller contends that the statements contained in the March and April 2008 letters do not constitute a "rule" that can be challenged under the APA. Rather, the Comptroller argues that these statements are merely advisory opinions, not binding instructions, concerning **\*721** her future use of section 151.024 of the tax code in the enforcement of sales tax. We disagree.

The APA defines "rule" as follows:

"Rule":

(A) means a state agency statement of general applicability that:

(i) implements, interprets, or prescribes law or policy; or

(ii) describes the procedure or practice requirements of a state agency;

(B) includes the amendment or repeal of a prior rule; and

(C) does not include a statement regarding only the internal management or organization of a state agency and not affecting private rights or procedures.

APA § 2001.003(6). There is no question in this case that the March and April 2008 letters are statements implementing, interpreting, or prescribing law or policy. As the Comptroller's witness testified, these letters communicated the Comptroller's intention to apply section 151.024 in all cases involving brochure fundraising firms, thereby interpreting the tax code to mean that such firms are, for purposes of collecting and remitting sales tax, always the "sellers" of the taxable items.

[10] As the Comptroller correctly points out, however, "[n]ot every statement by an administrative agency is a rule for which the APA prescribes procedures for adoption...." *Brinkley v. Texas Lottery Comm'n,* 986 S.W.2d 764, 769 (Tex.App.-Austin 1999, no pet.) (quoting *Texas Educ. Agency v. Leeper,* 893 S.W.2d 432, 443 (Tex.1994)). In order to constitute a rule, the statements must be generally applicable and may not pertain only to the internal management of the agency without affecting private rights or procedures.

[11] "The term 'general applicability' under the APA references 'statements that affect the interest of the public at large such that they cannot be given the effect of law without public input.' " *El Paso Hosp. Dist. v. Texas Health & Human Servs. Comm'n,* 247 S.W.3d 709, 714 (Tex.2008) (quoting *Railroad Comm'n v. WBD Oil & Gas Co.,* 104 S.W.3d 69, 79 (Tex.2003)). "The definition does not reference statements made in determining individual rights, even if the number of individuals is large and they can be described as falling within a defined class." *WBD Oil,* 104 S.W.3d at 79.[4]

---

4     The supreme court's analysis in *WBD Oil,* overruling this Court's decision that the Railroad Commission's field rules were "rules" under the APA, *see WBD Oil & Gas Co. v. Railroad Comm'n,* 35 S.W.3d 34 (Tex. App.-Austin 1999), *rev'd,* 104 S.W.3d 69 (Tex.2003), turns on the fact that the field rules had been promulgated through trial-type proceedings rather than

through the APA's rulemaking provisions. 104 S.W.3d at 79. Thus, the court's comments regarding "statements made in the determination of individual rights" must be read in light of its holding that the field rules in question had been adopted in a contested case that adjudicated the individual rights of the parties and could not, therefore, be challenged as generally applicable "rules" in a declaratory-judgment action under section 2001.038. *See id.*

We conclude that the Comptroller's statements in the March and April 2008 letters that the Comptroller will uniformly regard brochure-fundraising firms as the sellers and nonprofit entities as the sellers' agents, without regard to the individual factors considered under the Comptroller's previous guidelines, are "generally applicable" statements for purposes of the APA. These interpretations apply not only to Entertainment and the tax-exempt groups with which it conducts business, but to all brochure-fundraising firms engaging in **\*722** business across the state.[5] *Compare Texas Alcoholic Beverage Comm'n v. Amusement & Music Operators of Tex., Inc.,* 997 S.W.2d 651, 660 (Tex.App.-Austin 1999, pet. dism'd w.o.j.) (holding that statements contained in agency memoranda were rules because they imposed binding instructions affecting private rights of all similarly situated persons), *with Beacon Nat'l Ins. Co. v. Montemayor,* 86 S.W.3d 260, 269 (Tex.App.-Austin 2002, no pet.) (declining to view agency correspondence as stating rule when policy was directed only at plaintiff and did not implicate rights of any party other than plaintiff).

[5] The Comptroller's representative confirmed that the rule would be uniformly applicable during his testimony on cross-examination:

Q. And does this new—does Exhibit No. 8 [the March and April 2008 letters]—is it in your mind—does this apply to all brochure fundraising firms who operate in Texas?

A. Yes, under this model.

Q. What model is that?

A. Well, the model with the taking of the sales orders and with the brochures and—if that's what you're talking about when you say brochure fundraising firms.

Q. It is.

Moreover, construing the statements in the March and April 2008 letters as "rules" is consistent with the supreme court's instruction that we consider the intent of the agency, the prescriptive nature of the guidelines, and the context in which the agency statement was made. *See Leeper,* 893 S.W.2d at 443 (holding that statements evincing intent to urge action by legislature did not constitute rule under APA and noting that guidelines "were only recommended, not prescriptive"). In this case, the March and April 2008 letters informed interested parties of the Comptroller's intention to regard all school groups as agents of the fundraising firms and the firms themselves as the sellers for purposes of applying the sales-tax provisions of the tax code. The statements in the letters are also prescriptive, unambiguously expressing an intent to apply this interpretation of section 151.024 in all future cases involving brochure-fundraising firms, regardless of whether the particular circumstances of each transaction might have resulted in different tax treatment under the "seller versus agent-for-seller" analysis the Comptroller had previously applied.

The statements in the March and April 2008 letters are also consistent with subsection (c) of the APA's definition of "rule": while the interpretation would bind agency employees to apply the rule in analyzing the tax responsibilities of parties to these sales, it is not directed "only" to "the internal management or organization of a state agency." *See* APA § 2001.003(6)(c). Rather, it is aimed at placing the regulated public on notice of the Comptroller's prospective, blanket application of section 151.024 of the tax code.

[12] [13] Finally, we decline to adopt the Comptroller's position that a declaratory-judgment action can never be available to challenge a Comptroller rule. As support for her position, the Comptroller cites this Court's decision in *First State Bank v. Sharp,* 863 S.W.2d 81 (Tex.App.-Austin 1993, no writ). But the primary holding of *First State Bank* was rejected by the supreme court in *R Communications v. Sharp,* 875 S.W.2d 314, 318 (Tex.1994) (reversing court of appeals opinion relied on by *First State Bank* court and declaring unconstitutional section 112.108 of tax code "insofar as it would preclude a taxpayer from obtaining judicial review of its tax liability by means of a declaratory action"). Whether *First State Bank* is still good law for some purposes is an issue we need not decide, as the current version of section 112.108 does not bar Entertainment's suit **\*723** under the *R Communications* decision. Section 112.108 purports to prevent a court from issuing a declaratory judgment regarding the "applicability, assessment, collection, or constitutionality of a tax or fee ... or the amount of the tax or fee due." Tax Code § 112.108. The legislature did not intend section 112.108 to bar all declaratory actions involving the assessment and collection of taxes, as the next sentences read: "The court may grant such relief as may be reasonably required by the circumstances. *A grant of declaratory relief against the state* or a state agency shall not entitle the winning party to recover attorney's fees." *Id.* (emphasis added). Entertainment did not seek declaratory relief regarding the tax itself, but regarding the *validity of the rule* promulgated by the Comptroller in violation of the APA, for which the legislature has expressly permitted suit by a declaratory-judgment action. *See* APA § 2001.038.

In light of the preceding, we hold that the Comptroller's statements in the March and April 2008 letters that she would henceforth regard a school group or other nonprofit entity doing business with a brochure-fundraising firm as the sales agent for the fundraising firm and apply section 151.024 of the tax code constitute a "rule" under the APA. Therefore, we conclude the trial court correctly determined that section 2001.038 conferred subject-matter jurisdiction over Entertainment's claim and properly denied the Comptroller's plea to the jurisdiction on this basis.[6] We overrule the Comptroller's first and second issues.[7]

[6]     Professor Ron Beal has defined an "interpretive rule" as an agency statement made under the following conditions:

> (1) it is issued by an agency board, commissioner, executive director or other officer vested with the power to act on behalf of the agency;
>
> (2) it is issued with the intent of the agency to notify persons or entities that are similarly situated or within a class described in general terms;
>
> (3) it is issued to notify those persons or entities of the agency's interpretation of a statutory provision that has been crystallized following reflective examination in the course of the agency's interpretive process; and
>
> (4) such interpretation was not labeled as tentative or otherwise qualified by arrangement for consideration at a later date.

    Ron Beal, *A Miry Bog Part II: UDJA and APA Declaratory Judgment Actions and Agency Statements Made Outside a Contested Case Hearing Regarding the Meaning of the Law,* 59 Baylor L. Rev. 267, 270 (2007); *see also* Ron Beal, *The APA and Rulemaking: Lack of Uniformity Within a Uniform System,* 56 Baylor L. Rev. 1, 29–46 (2004). Although we need not place the label "interpretive rule" on the Comptroller's March and April 2008 letters, we note that they satisfy all the elements of Professor Beal's four-part test.

[7]     On appeal, the Comptroller reurges each of the

jurisdictional arguments raised in her plea to the jurisdiction regarding the declaratory relief sought by Entertainment, including several challenges regarding whether the trial court had jurisdiction under the UDJA; because we conclude that the trial court had jurisdiction under the APA, however, we need not address the additional grounds. *See* Tex.R.App. P. 47.1.

[14] When an agency promulgates a rule without complying with the statutory rule-making procedures, the rule is invalid. *See* APA § 2001.035(a); *El Paso Hosp. Dist.,* 247 S.W.3d at 715. It is undisputed in this case that the Comptroller did not comply with the APA's procedural requirements for promulgating agency rules before issuing the March and April 2008 letters; accordingly, the rule announced by those letters is invalid. A court, on finding an agency rule invalid, may remand the rule to the agency to allow "reasonable time for the agency to **\*724** either revise or readopt the rule through the established procedures." APA § 2001.040; *El Paso Hosp. Dist.,* 247 S.W.3d at 715. We will therefore affirm the trial court's order denying the Comptroller's plea to the jurisdiction and abating consideration of the substantive matters raised in Entertainment's petition "pending the Comptroller's determination as to whether she will seek to properly enact the administrative rule under the APA, and what the terms of that administrative rule would be."[8]

8    Our holding does not prevent the Comptroller from making an individualized determination, on a case-by-case basis, that a tax-exempt organization should be regarded as a fundraising firm's agent, after having determined that it is "necessary for the efficient administration" of chapter 151 of the tax code to do so. *See* Tax Code § 151.024.

*Temporary Injunction*

In issues three and four, the Comptroller argues that injunctive relief is barred by the tax code and contrary to general principles of equity. The Comptroller maintains that Entertainment was required to comply with the statutory requirements for pursuing a tax injunction, as stated in section 112.101 of the tax code. *See* Tax Code § 112.101. We disagree.

[15] The Comptroller's arguments misunderstand the nature of the injunctive relief granted by the trial court. Entertainment did not seek, and the trial court did not grant, a "tax injunction." By its order, the trial court enjoined the Comptroller "from implementing and enforcing the New Rule described by the Comptroller's letters dated March 18, 2008 and April 14, 2008 unless and until the Comptroller properly enacts the New Rule" in compliance with APA procedures. This situation is analogous to that presented by *Texas Alcoholic Beverage Commission v. Macha,* 780 S.W.2d 939 (Tex.App.-Amarillo 1989, writ denied), in which the taxpayer claimed that the Commission's suspension of his liquor permits for failure to remit taxes allegedly due violated his right to due process. After the trial court enjoined the suspension, the Commission argued on appeal that the injunction was improper because the taxpayer failed to prepay the taxes allegedly due or post a bond as required by section 112.101. *Id.* at 941. Affirming the order granting the injunction, the court of appeals held that, since the trial court's order "does not prohibit the collection of a state tax, license, registration or filing fee, section 112.101 does not control." *Id.* Similarly, here Entertainment has not sought to prohibit the assessment or collection of a tax or fee. Indeed, no tax had yet been assessed that the trial court could have enjoined.

[16] [17] The purpose of a temporary injunction is to preserve the status quo of the subject matter of a suit pending final disposition of the case on its merits. *See Davis v. Huey,* 571 S.W.2d 859, 862 (Tex.1978). Because of this limited purpose, the trial court has broad discretion to determine whether to issue a temporary injunction. *Amusement & Music Operators,* 997 S.W.2d at 654. In this case, the trial court found that Entertainment had presented evidence that, if its application was not granted, it would likely suffer "imminent and irreparable injury" because implementation of the "New Rule" would disrupt its business and subject it to financial liability. The trial court further found that the threat of immediate and irreparable injury to Entertainment substantially outweighed the harm, if any, that the Comptroller would suffer as a result of having to reassess

its administrative rule and adopt a rule that complied with the procedural requirements of the APA. Based on the record before us, we conclude **\*725** that the trial court did not abuse its discretion. We overrule the Comptroller's third and fourth issues.

## CONCLUSION

Having overruled the Comptroller's issues on appeal, we affirm the orders of the trial court denying the Comptroller's plea to the jurisdiction and granting a temporary injunction in favor of Entertainment.

Concurring Opinion by Justice HENSON.

DIANE M. HENSON, Justice, concurring.

I concur in the judgment and reasoning of the majority opinion, with the exception of the discussion of the four-part test for defining an "interpretive rule," found in footnote six. In light of our determination that the Comptroller's statements in the March and April 2008 letters constitute a rule under section 2001.003(6) of the APA, we need not address the issue of whether they might also be considered interpretive rules under the four-part test suggested by Professor Beal, or the impact, if any, of an "interpretive rule" designation under the test. Because this test has never been adopted by this Court or the Texas Supreme Court and is not necessary for disposition of the appeal, I decline to join footnote six of the majority opinion.

**All Citations**

292 S.W.3d 712

---

   © 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

253 S.W.3d 320
Court of Appeals of Texas,
Austin.

David DEWHURST, Tom Craddick, Susan Combs, State of Texas, and the Texas Legislative Budget Board,
Appellants,
v.
Edd HENDEE, Individually and as Executive Director of C.L.O.U.T., Appellees.

No. 03–07–00462–CV. | April 2, 2008. | Rehearing Overruled April 23, 2008.

**Synopsis**
**Background:** Citizens' group and its executive director brought action against the State, State officials, and members of the Legislative Budget Board (LBB), seeking declarations that school financing bill violated constitution and statute and alleging that it caused State to exceed aggregate biennial cap on the rate of growth of appropriations. The District Court, Travis County, 345th Judicial District, William E. Bender, J., granted plea to the jurisdiction filed by all defendants except Comptroller. Plaintiffs appealed. The Court of Appeals, 228 S.W.3d 354, affirmed in part, reversed in part, and remanded. On remand the District Court, Travis County, 261st Judicial District, Joseph H. Hart, J., granted in part and denied in part defendants' plea to the jurisdiction. Defendants appealed.

**Holdings:** The Court of Appeals, Bob Pemberton, J., held that:

[1] citizens' group had no standing to seek relief for fiscal biennium that had expired;

[2] group's challenges to appropriations during expired fiscal biennium were moot;

[3] legislature's use of state personal income (SPI) to calculate the estimated rate of growth in the state's economy did not violate the constitution; and

[4] legislature's failure to reconcile estimated growth with actual growth did not violate the constitution.

Reversed and rendered.

West Headnotes (15)

[1]     **States**
        Rights and Remedies of Taxpayers

        Citizens' group had no standing as taxpayers to seek declaratory and injunctive relief to prevent State's expenditures of appropriations for fiscal biennium that had expired.

        Cases that cite this headnote

[2]     **States**
        ⚷Rights and Remedies of Taxpayers

        Taxpayers have standing only to challenge
        prospective state expenditures, but do not have
        standing to complain of public funds that have
        already been spent.

        1 Cases that cite this headnote

[3]     **Municipal Corporations**
        ⚷Incurring Indebtedness or Expenditure

        When a taxpayer brings an action to restrain the
        illegal expenditure of tax money, he sues for
        himself, and it is held that his interest in the
        subject-matter is sufficient to support the action;
        but when the money has already been spent, an
        action for its recovery is for the taxing entity,
        and the cause of action belongs to it alone.

        Cases that cite this headnote

[4]     **Municipal Corporations**
        ⚷Nature and Scope in General

        In general, taxpayers do not have a right to bring
        suit to contest government decision-making
        because governments cannot operate if every
        citizen who concludes that a public official has
        abused his discretion is granted the right to
        come into court and bring such official's public
        acts under review.

        Cases that cite this headnote

[5]     **States**
        ⚷Rights and Remedies of Taxpayers

        Citizens'      group's      challenges      to      State

appropriations during fiscal biennium, including the claim that appropriations during the biennium exceeded statutory spending cap, were rendered moot when the biennium expired. Vernon's Ann.Texas Const. Art. 8, § 22; V.T.C.A., Government Code § 316.002(a)(3).

1 Cases that cite this headnote

[6]     **Action**
        ☞Moot, Hypothetical or Abstract Questions

To invoke the capable of repetition, yet evading review exception to the mootness doctrine, a plaintiff must prove that: (1) the challenged action was too short in duration to be litigated fully before the action ceased or expired; and (2) a reasonable expectation exists that the same complaining party will be subjected to the same action again.

Cases that cite this headnote

[7]     **States**
        ☞Limitation of Amount of Indebtedness or Expenditure

A legislative enactment pursuant to the constitutional provision imposing a biennial cap on the rate of growth of appropriations is "arbitrary" when it is taken without reference to guiding rules or principles. Vernon's Ann.Texas Const. Art. 8, § 22.

Cases that cite this headnote

[8]     **Appeal and Error**
        ☞Cases Triable in Appellate Court

Whether a legislative enactment is arbitrary is a question of law that the Court of Appeals reviews de novo.

Cases that cite this headnote

**[9]**   **Constitutional Law**
🔑Arbitrariness

Although the determination of whether a legislative enactment is arbitrary may rest in part upon determinations of disputed factual matters, such findings have a limited role in deciding ultimately the constitutional issues.

Cases that cite this headnote

**[10]**   **Constitutional Law**
🔑Interpretation of Constitution in General

For the constitutional provision requiring the Legislature to establish a public school system, as with other provisions, the final authority to determine adherence to the Constitution resides with the Judiciary. Vernon's Ann.Texas Const. Art. 7, § 1.

Cases that cite this headnote

**[11]**   **Constitutional Law**
🔑Reasonableness or Rationality
**Constitutional Law**
🔑Arbitrariness

A mere difference of opinion between judges and legislators, where reasonable minds could differ, is not a sufficient basis for striking down legislation as arbitrary or unreasonable.

Cases that cite this headnote

**[12]**   **Constitutional Law**
🔑Meaning of Language in General
**Constitutional Law**

Plain, Ordinary, or Common Meaning

When construing the Texas Constitution, the courts rely heavily on its literal text and must give effect to its plain language.

1 Cases that cite this headnote

**[13]** **Constitutional Law**
Intent in General

The courts strive to give constitutional provisions the effect their makers and adopters intended; to that end, the courts may also consider such things as the legislative history and purpose of the constitutional provision, the historical context in which it was written, prior judicial decisions, and the interpretations of analogous constitutional provisions by other jurisdictions.

2 Cases that cite this headnote

**[14]** **States**
Limitation of Amount of Indebtedness or Expenditure
**States**
Rights and Remedies of Taxpayers

Legislature did not violate the state constitution by using state personal income (SPI) to calculate the estimated rate of growth in the state's economy, for purposes of constitutional provision imposing a biennial cap on the rate of growth of appropriations, and thus citizens' group did not allege a constitutional violation in their action challenging the use of SPI to set the spending cap, as required for the citizens' group to have standing based on a taxpayer's right to sue in equity to enjoin the illegal expenditure of public funds. Vernon's Ann.Texas Const. Art. 8, § 22.

Cases that cite this headnote

[15] **States**
👈Limitation of Amount of Indebtedness or Expenditure
**States**
👈Rights and Remedies of Taxpayers

Legislature did not violate the state constitution when it failed to provide a "feedback" mechanism, to reconcile estimated growth with actual growth when measuring state economy's growth rate, for purposes of constitutional provision imposing a biennial cap on the rate of growth of appropriations, and thus citizens' group did not allege a constitutional violation in their action challenging the mechanism for measuring economic growth, as required for the citizens' group to have standing based on a taxpayer's right to sue in equity to enjoin the illegal expenditure of public funds. Vernon's Ann.Texas Const. Art. 8, § 22.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*322** Danica L. Milios, Asst. Sol. Gen. for Litigation, Austin, for Appellants.

Gary M. Polland, Polland & Associates, Houston, for Appellees.

Before Justices PATTERSON, PURYEAR and PEMBERTON.

*OPINION*

BOB PEMBERTON, Justice.

This is an interlocutory appeal from an order of the district court granting in part and denying in part a plea to the jurisdiction asserted by appellants following our partial remand in *Hendee v. Dewhurst,* 228 S.W.3d 354 (Tex.App.-Austin 2007, pet. denied) ("*Hendee I* "). In *Hendee I,* we affirmed in part and reversed in part a judgment of the district court granting a prior plea to the jurisdiction and dismissing the plaintiffs' suit for want of subject-matter jurisdiction. Following our remand, appellants filed another plea to the jurisdiction, raising new grounds regarding the causes of action that had survived the first proceeding. The district court, with a different visiting judge presiding, granted the plea with respect to the same causes of action whose dismissal we affirmed in *Hendee I,* but otherwise denied it. Concluding that appellants have conclusively negated the district court's subject-matter jurisdiction over all of the causes of action challenged in the second plea to the jurisdiction, we will reverse the portion of the district court's order denying the plea and render judgment dismissing all of these causes of action for want of subject-matter jurisdiction.

# BACKGROUND

## The lawsuit

The nature of the underlying action and its constitutional and statutory backdrop are detailed in *Hendee I.* To summarize, in June 2006, Edd Hendee, individually and as executive director of the group Citizens Lowering Our Unfair Taxes PAC (C.L.O.U.T.) (collectively, Plaintiffs), filed suit against the Lieutenant Governor, the Speaker of the House of Representatives, **\*323** the Comptroller, and the members of the Legislative Budget Board (LBB),[1] all in their official capacities (collectively, the State Defendants[2]). Relying on principles of taxpayer standing—the exception to general standing limitations that permits "a taxpayer ... to sue in equity to enjoin the illegal expenditure of public funds, even without showing a distinct injury"[3]—Plaintiffs sought declaratory relief challenging the legality of prospective state expenditures authorized under H.B. 1 or other appropriations by the 79th Legislature[4] on the basis that the underlying appropriations violated the Texas Constitution and statute.[5] The cornerstone of Plaintiffs' suit was article VIII, section 22(a) of the Texas Constitution:

[1] The LBB is a permanent joint committee of the Texas Legislature comprised of the lieutenant governor, speaker of the house of representatives, the chairman of the senate finance committee, the chairman of the house appropriations committee, the chairman of the house ways and means committee, three members of the senate appointed by the lieutenant governor, and two additional house members appointed by the speaker. Tex. Gov't Code Ann. § 322.001(a) (West 2005). The lieutenant governor and speaker of the house are joint chairs of the LBB. *Id.* § 322.001(b). The LBB develops budget and policy recommendations for legislative appropriations, including a draft General Appropriations Act each session, *id.* § 322.008(c) (West 2005), and fiscal impact statements regarding other proposed legislation. *Id.* § 314.001 (West 2005).

[2] Plaintiffs also named "the State of Texas" as a defendant, which is the effect of their naming the other defendants in their official capacities. *See Perry v. Del Rio,* 53 S.W.3d 818, 822–23 (Tex.App.-Austin 2001), *pet. dism'd,* 66 S.W.3d 239 (Tex.2001).

[3] *Hendee v. Dewhurst,* 228 S.W.3d 354, 373–74 (Tex.App.-Austin 2007, pet. denied); *see id.* at 378–82 (analyzing the Texas Supreme Court's jurisprudence on the subject).

[4] As we explained in *Hendee I,* H.B. 1 responded to the Texas Supreme Court's decision in the *Neeley v. West Orange–Cove* case. *Neeley v. West Orange–Cove Consolidated Indep. Sch. Dist.,* 176 S.W.3d 746 (Tex.2005). The supreme court held that Texas's public school finance system constituted an unconstitutional state property tax and gave the legislature until June 1, 2006, to enact corrective legislation. *Id.* at 800. During

the 79th Legislature's third called session of April and May 2006, it succeeded in enacting H.B. 1, which the Governor signed into law on May 31 of that year. H.B. 1 attempted to shift some of the burden of funding Texas's public schools from local property taxpayers to the state and, to that end, made additional appropriations for the biennium ending on August 31, 2007.

[5]     Although Plaintiffs did not then seek to enjoin the expenditures, there has been no dispute that their declaratory claims challenging the expenditures' legality would logically be governed by the same taxpayer-standing principles. *See Hendee I,* 228 S.W.3d at 379 n. 31.

In no biennium shall the rate of growth of appropriations from state tax revenues not dedicated by this constitution exceed the estimated rate of growth of the state's economy. The legislature shall provide by general law procedures to implement this subsection.

Tex. Const. art. VIII, § 22(a). An "appropriation" refers to a legislative enactment authorizing state funds to be expended for particular purposes. The constitution elsewhere requires that "[n]o money shall be drawn from the Treasury but in pursuance of specific appropriation made by law; nor shall any appropriation of money be made for a longer term than two years." *See* Tex. Const. art. VIII, § 6. "State tax revenues not dedicated by this constitution" refers to one source of funds that the legislature could appropriate; others include non-tax revenues and tax revenues whose use is dedicated by the constitution. *Hendee I,* 228 S.W.3d at 359–60. The "biennium" runs from September 1 of each odd-numbered year through August 31 of **\*324** the succeeding odd-numbered year. *See id.* at 360 n. 3.

Plaintiffs alleged that appropriations from non-dedicated state tax revenues for the biennium beginning September 1, 2005 and ending August 31, 2007 (the "06–07 biennium"[6]) violated article VIII, section 22 both because the specific amount of those appropriations exceeded the constitutional limit and because the legislature's "procedures to implement this subsection" systematically cause noncompliance with that limit. The legislature has implemented article VIII, section 22 primarily through chapter 316 of the government code. Chapter 316 requires that, in advance of each biennial regular legislative session, the LBB must calculate the "spending cap," or "the amount of state tax revenues not dedicated by the constitution that could be appropriated within the limits established by the estimated rate of growth of the state's economy." Tex. Gov't Code Ann. § 316.002(a)(3) (West 2005). The LBB is to establish this figure by determining (1) "the estimated rate of growth of the state's economy from the current biennium to the next biennium," and (2) "the level of appropriations for the current biennium from state tax revenue not dedicated by the constitution," and then (3) applying the former to the latter. *Id.* § 316.002(a). The requirement that the LBB calculate the spending cap before each regular legislative session, as well as the cap itself, are enforced through a range of procedures and checks in the legislative process. *See id.* §§ 316.002(d), (e), .006–.008 (West 2005); *Hendee I,* 228 S.W.3d at 361–63.

[6]     We will similarly use "08–09 biennium" to describe the now-current biennium that began on September 1, 2007 and will end on August 31, 2009; "04–05 biennium" to describe the September 1, 2003–through–August 31, 2005 biennium that preceded the 06–07 biennium; etc.

Subject to an exception that has undisputedly never been invoked, the LBB "shall determine the estimated rate of growth of the state's economy" based on "estimated Texas total personal income" or "state personal income" (SPI), "dividing the estimated Texas total personal income for the next biennium by the estimated total Texas personal income for the current biennium." *Id.* § 316.002(b); *see id.* § 316.002(c) (permitting adoption of "a more comprehensive definition of the rate of growth" by "the committee established by Section 316.005"). "Using standard statistical methods, the board shall make the

estimate by projecting through the biennium the estimated Texas total personal income reported by the United States Department of Commerce or its successor in function." *Id.*

The other component of the spending cap, to which the growth rate is applied—the "level of appropriations for the current biennium from state tax revenues not dedicated by the constitution"—is also partly an estimate, as we explained in *Hendee I,* for reasons related to the nature of appropriations. *See Hendee I,* 228 S.W.3d at 361–62. Even without additional legislative action, the amount of an appropriation, as well as its funding source—e.g., whether the money comes from non-dedicated state tax revenues (subject to the spending cap) or dedicated tax revenues or federal funds (not subject to the cap)—may change during a biennium, such as when changes in economic conditions not originally forecasted impact the amount or composition of funding sources subject to an appropriation. *Id.* Because the "level of appropriations for the current biennium from state tax revenues not dedicated by the constitution" is calculated during the current biennium, it is comprised of both **\*325** actual appropriations of non-dedicated tax revenues (appropriated non-dedicated tax revenues that have already been spent, and whose amount is thus finally ascertainable) and estimated appropriations of non-dedicated tax revenues (the amount of such funds that the LBB anticipates will be spent pursuant to appropriations during the remainder of the biennium). *Id.* Reflecting the potential for unforeseen changes in the amount or funding source of appropriations later in the biennium, the LBB determines "the level of appropriations for the current biennium from state tax revenues not dedicated by the constitution" and the corresponding spending cap for the next biennium "subject to adjustments resulting from revenue forecast revisions or subsequent appropriations certified by the Comptroller." *Id.* This characteristic of appropriations, furthermore, impacts determination of the amount of additional appropriations from non-dedicated state tax revenues that can be made in the current biennium without exceeding the current biennium's spending cap.

Before approving its determination of the SPI-based "estimated rate of growth of the state's economy," the "level of appropriations for the current biennium from state tax revenues not dedicated by the constitution," and the resulting spending cap for the next biennium, the LBB must publish in the *Texas Register* "the proposed items of information and the methodology used" in making these calculations and, by December 1 of each even-numbered year, hold a public hearing regarding those matters. Tex. Gov't Code Ann. §§ 316.003–.004 (West 2005). Once it approves the three items, the LBB "shall submit the information to a committee composed of the governor, lieutenant governor, speaker of the house of representatives, and comptroller," which has ten days to "meet and finally adopt the items, either as submitted by the board or as amended by the committee." *Id.* § 316.005 (West 2005). However, if the committee fails to act by the deadline, the items are "treated as if the committee had adopted them as submitted." *Id.*

In the case of the 06–07 biennium, it is undisputed that in November 2004, the LBB adopted by resolution—deemed approved by the section 316.005 committee—an 11.34% "estimated rate of growth of the state's economy [i.e., of SPI] from the current [04–05] biennium to the next [06–07] biennium" and a "level of appropriations for the current [04–05] biennium from state tax revenues not dedicated by the constitution" of $46.8 billion. Applying the growth rate to its calculation of current-biennium appropriations, the LBB in its resolution adopted a 06–07 spending cap of $52.145 billion.

Plaintiffs pled numerous declaratory claims predicated on essentially four liability theories.[7] First, Plaintiffs alleged that the legislature and LBB's use of SPI to calculate "the estimated rate of growth of the state's economy" and the spending cap violates article VIII, section 22. They urged that, as a matter of constitutional interpretation, the "estimated rate of growth *of the state's economy* " requires a broader measure of economic growth than SPI, which they criticized as a mere "component" of "the state's economy." Plaintiffs pled that SPI "has been historically proven to wildly overstate the growth in **\*326** the state's economy, permitting excessive increases in spending contrary to the intent of the constitutional and statutory spending restraint provision at issue in this case." Plaintiffs further pled that other alternative measures would more accurately calculate "growth in the state's economy," placing particular emphasis on "Gross State Product ("GSP") ... a barometer of 'growth of the state's economy' more consistent with sound economic practice and the intent of the constitutional and statutory provisions at issue."[8] They cited, and attached as evidence to their petition, comptroller projections and a study by former Hartland Bank chairman David Hartman that they contend demonstrate that GSP generally increases at a lower rate than SPI and that SPI consequently "overstates" state economic growth. Plaintiffs further argued that the legislative history of the proposed constitutional provisions that became article VIII, section 22 demonstrates affirmative intent to reject SPI as a measure of economic growth.[9]

---

[7]     As we observed in *Hendee I,* several of Plaintiffs declaratory claims went beyond seeking determinations

that expenditures and their underlying appropriations were illegal, and purported to request that the district court improperly specify particular means by which the State Defendants would be required to implement article VIII, section 22. *Hendee I,* 228 S.W.3d at 372 n. 23.

[8]     Plaintiffs also urged that a measure based on population growth plus inflation would be more consistent with article VIII, section 22 than SPI.

[9]     In their briefing in this proceeding, Plaintiffs summarize these theories as:
> Theory Six—The use of SPI is unconstitutional, as it does not measure the "rate of growth of the state's economy."
> Theory Seven—The use of SPI is unconstitutional, because the legislature explicitly rejected the use of SPI in the course of amending the legislation that became Article VIII, Section 22.

Second, Plaintiffs alleged that the LBB's calculation of the SPI-based "estimated rate of growth in the state's economy" between the current and next biennium has "always" proven inaccurate when compared to the actual SPI growth rates for the same period. Plaintiffs complained that the legislature has not provided a "feedback mechanism" for making a "controlling reduction (or increase) in the growth numbers when the projections are in error" during either the subject biennium or after it ends, causing the spending cap (and appropriations) to grow at a rate exceeding the actual rate of SPI growth.[10] It is undisputed that once the LBB adopts the SPI-based "estimated rate of growth of the state's economy" between the current and next biennium prior to the regular legislative session preceding the start of the next biennium, it does not adjust or revise that figure (or make corresponding adjustments to the spending cap) to account for intervening changes in economic conditions. Nor does chapter 316 require or provide a mechanism for making such adjustments. In contrast, it is undisputed that the LBB's staff will periodically revise the board's calculations of current-biennium appropriations from non-dedicated state tax revenues (with corresponding adjustments to the next biennium's spending cap) as the current biennium progresses and eventually ends. For example, in December 2005, after the 04–05 biennium ended and appropriations became final, the LBB staff calculated the actual level of 04–05 appropriations from non-dedicated state tax revenue to have been approximately **\*327** $49.9 billion, a figure somewhat higher than the LBB's original estimate of $46.8 billion. Applying the fixed 11.34% economic growth rate to this final 04–05 appropriations amount, staff determined a final 06–07 spending cap that exceeded the LBB's original figure of $52.145 billion—approximately $55.6 billion.

[10]    Plaintiffs summarize these theories as:
> Theory Four—The State's use of SPI in combination with other factors is arbitrary and capricious because, while the state modifies the other factors as the biennium passes to account for actual historical data within the biennium, the state does not make such adjustments to SPI. Thus, when economic data indicate that the projected SPI is inaccurate (which, as noted above, it always has been), the projection is never adjusted for error.
> Theory Five—State's use of SPI is arbitrary and capricious because, after the end of the biennium, the errors in SPI are never corrected for, unlike

changes in other factors.

The effect of the unadjusted "excessive" appropriations resulting from deviations between estimated and actual SPI growth, Plaintiffs added, compounds each biennium, as past appropriations will necessarily be reflected in the current-biennium appropriations figure that is the baseline for the spending-cap calculation. As a result, Plaintiffs pled, Texas state government spending between 1980–81 and 2000–01 increased at a rate 42.2% greater than the actual rate of growth in SPI over the same period. The failure to correct for these past incremental deviations of actual versus estimated SPI growth and their compounding effect over time on each biennium's spending cap, Plaintiffs urged, violates article VIII, section 22.[11]

[11]    In other words, Plaintiffs advocated that article VIII, section 22 required *prospective* adjustments in the spending cap that account for past deviations between estimated and actual SPI growth. This is distinguishable from challenging "specific appropriations and expenditures made during prior biennia." *Hendee I,* 228 S.W.3d at 364 n. 12.

    Plaintiffs similarly pled a theory that article VIII, section 22 is violated by the failure to adjust each biennium's spending cap to account for past divergences between SPI and GSP or population-growth-plus-inflation. Because this theory rests upon Plaintiffs' contention that the use of SPI to estimate the economic growth rate violates article VIII, section 22, we do not separately address it.

Third, Plaintiffs pled that the specific amount of appropriations from non-dedicated state tax revenues during the 06–07 biennium exceeded the spending cap. Plaintiffs cited calculations by LBB staff that total 06–07 appropriations from non-dedicated state tax revenues in December 2006 were $53.0 billion. This, Plaintiffs alleged, demonstrated that the legislature exceeded the spending cap—which, they contend, was $52.145 billion, the LBB's original 06–07 figure. Plaintiffs contended that the LBB staff's calculation of the final 06–07 spending cap—$55.6 billion—was invalid because it was not formally approved by the LBB itself. Alternatively, even assuming the validity of the $55.6 billion "unapproved staff generated limit," Plaintiffs alleged that H.B. 1 appropriated an additional $3.9 million in non-dedicated state tax revenues—which, when added to the $53.0 billion already appropriated for 06–07, yielded $56.9 billion, $1.3 billion over the staff's own calculation of the cap.[12]

[12]    Plaintiffs term this theory "Theory One—The State overspent its own calculated limits."

Fourth, Plaintiffs alleged that chapter 316 and the practices of making adjustments to the LBB's initial spending cap calculations violate the separation of powers by improperly delegating legislative power to the LBB, its staff, or the section 316.005 committee. Tex. Const. Ann. art. II, § 1. Relatedly, Plaintiffs urged that these violations render void any "adjustments" to the spending cap or current-biennium appropriation levels by LBB staff.[13]

[13]    Plaintiffs summarize these theories as follows:
        Theory Two—The State's SPI number was set at $52.145 and cannot be adjusted by LBB staff without express authorization of the ten-member Board of the LBB....
        Theory Three—The State's SPI number was set at $52.145 billion and cannot be adjusted by the LBB

staff. Only the ten-member Board of the LBB can change the SPI number.

....

Theory Eight—The Government Code Section 316.005 [committee comprised of the governor, lieutenant governor, speaker of the house of representatives, and comptroller that approves the LBB's initial calculation of the spending cap] facially violates the mandate in Article 2, Sec. 1 for separation of powers.

Theory Nine—The LBB has no constitutional authority to set the limit by itself.... [T]he LBB may propose a limit just as another committee may propose a bill, but the LBB's proposal must be ratified by the Legislature just like any other committee proposal. The failure of the Legislature to ever ratify the LBB's proposed limits is persuasive evidence of an unconstitutional delegation of authority.

Theory Ten—The LBB, as a committee, may not set the Article VIII, Section 22 limits, but can only recommend them to the Legislature, which must approve these limits "by general law" in accordance with the plain language of Article VIII, Section 22.

**\*328** *Hendee I*

All defendants except the Comptroller[14] joined in a plea to the jurisdiction challenging only the sufficiency of Plaintiffs' pleadings. They argued that Plaintiffs' causes of action presented non-justiciable political questions and that Plaintiffs lacked standing as taxpayers to assert their causes of action, and that their causes of action were barred by sovereign immunity, because they had not and could not allege that H.B. 1's appropriation was actually unconstitutional or unlawful. The district court granted the plea without specifying its grounds. Plaintiffs appealed.

[14]    At the time, Carole Keeton Strayhorn.

In *Hendee I,* relying on the Texas Supreme Court's analysis in *Neeley v. West Orange–Cove Consolidated Indep. Sch. Dist.,* 176 S.W.3d 746, 776–83 (Tex.2005), we concluded that Plaintiffs' causes of action did not present non-justiciable political questions and, relatedly, that article VIII, section 22 was self-executing to the extent of prohibiting legislative action inconsistent with its requirements. *Hendee I,* 228 S.W.3d at 369–73. We also determined that Plaintiffs would have standing as state taxpayers to seek declaratory or injunctive relief challenging prospective state expenditures made pursuant to appropriations alleged to have violated article VIII, section 22(a) or chapter 316 of the government code. *Id.* at 378–82. We also emphasized, however, that the defendants could negate subject-matter jurisdiction over these causes of action by either demonstrating that Plaintiffs' pleadings did not allege facts constituting violations of article VIII, section 22 or chapter 316 or negating the existence of any such facts through conclusive jurisdictional evidence. *Id.* at 366–69 (citing *Texas Dep't of Parks & Wildlife v. Miranda,* 133 S.W.3d 217, 227–28 (Tex.2004); *Director of Dept. of Agric. & Environ. v. Printing Indus. Ass'n,* 600 S.W.2d 264, 265–70 (Tex.1980); *McLane Co. v. Strayhorn,* 148 S.W.3d 644, 649 (Tex.App.-Austin 2004, pet. denied)).[15] **\*329** We held that the district court did not err in dismissing Plaintiffs' "improper delegation" causes of action because the face of their pleadings demonstrated fatal and incurable jurisdictional defects—namely, that the challenged procedures were not delegations of legislative power at all. *Id.* at 378.[16] On the other hand, observing that the defendants had not challenged in the trial court whether Plaintiffs had alleged article VIII, section 22 violations, nor had the parties developed that issue on appeal, we concluded that the district court would have abused its discretion in dismissing on that basis. *Id.* at 369, 374–75 (discussing *Miranda,* 133 S.W.3d at 227, and *Davis v. Burnam,* 137 S.W.3d 325, 335 & n. 16

(Tex.App.-Austin 2004, no pet.)). Similarly, we rejected an appellate-level attempt by the defendants to broaden their jurisdictional challenge to attack the jurisdictional facts Plaintiffs pled in support of their cause of action that H.B. 1 "caused total appropriations [of non-dedicated state tax revenues for 06–07] to exceed even the unapproved staff-generated limit by $1.3 billion dollars." On appeal, the defendants had presented evidence for the first time that (1) before H.B. 1 was enacted, the Comptroller had certified additional constitutionally-dedicated tax revenue that caused the LBB staff's estimates of 06–07 appropriations from non-dedicated tax revenues to drop (correspondingly increasing the "room" under the spending cap); and (2) H.B. 1's appropriations from non-dedicated tax revenues, according to LBB staff calculations, fell within the spending cap. Nonetheless, we concluded that the principles of *Miranda* precluded us from considering this challenge when it overlapped with the merits of Plaintiffs' claims and was raised for the first time on appeal. *Hendee I,* 228 S.W.3d at 375–78.[17]

[15] We explained:

> It is ... well-established that where a trial court's jurisdiction depends upon whether a state official's acts are within her constitutional or statutory authority, such as when a plaintiff alleges *ultra vires* action to avoid sovereign immunity, the trial court may sometimes be able to decide the jurisdictional issue as a matter of law based on the pleadings by construing the constitutional and statutory provisions defining the actor's authority and ascertaining whether the acts alleged would exceed that authority. *See, e.g., McLane Co. v. Strayhorn,* 148 S.W.3d 644, 649 (Tex.App.-Austin 2004, pet. denied)* (acknowledging that in determining whether declaratory judgment suit may be maintained against a state official, it was first necessary, in light of sovereign immunity principles, to construe statutes defining official's powers to "decide whether the [official] validly exercised her discretion or acted outside of her legal authority"); *cf. Director of Dept. of Agric. & Environ. v. Printing Indus. Ass'n,* 600 S.W.2d 264, 265–70 (Tex.1980)* (construing constitution to determine whether plaintiff alleged *ultra vires* action by state officials; state had raised issue via special exceptions). And *Miranda* would further allow jurisdictional challenges, via its summary judgment-like process, to the existence of the alleged acts that are asserted to have been beyond the actor's constitutional or statutory authority.

> *Hendee I,* 228 S.W.3d at 368–69.

[16] We also held, sua sponte, that Plaintiffs had failed to allege C.L.O.U.T.'s associational standing, but that the defect was curable and Plaintiffs thus were entitled to the opportunity to amend. *See id.* at 382.

[17] We explained the principles underlying these holdings:

> To succeed, a defendant challenging a jurisdictional fact via a plea to the jurisdiction must satisfy the same initial burden as in a "traditional" summary judgment—conclusively negating the existence of the fact—and judgment is proper in such instance only if the plaintiff cannot present controverting evidence raising a

genuine issue of material fact. *Miranda,* 133 S.W.3d at 227–28. More generally, a trial court must exercise sound discretion in deciding whether a jurisdictional determination implicating the merits "should be made at a preliminary hearing or await a fuller development of the case, mindful that this determination must be made as soon as practicable." *Id.* at 227; *see Bland,* 34 S.W.3d at 554. It follows that a trial court's decision to determine a jurisdictional issue implicating the merits at a particular preliminary stage of case development may be so arbitrary or unreasonable, given the state of the record, that it constitutes an abuse of discretion. *Cf. Davis v. Burnam,* 137 S.W.3d 325, 334–35 (Tex.App.-Austin 2004, no pet.) (vacating trial court's denial of jurisdictional plea turning on statutory construction to determine whether alleged acts were *ultra vires;* defendant had inadequate notice to brief and argue the issue).

*Hendee I,* 228 S.W.3d at 369.

Following our decision in *Hendee I,*[18] the defendants filed a petition for review in the supreme court, which was denied on July 10, 2007. With the August 31, 2007 **\*330** end of the 06–07 biennium looming, Plaintiffs requested, and we granted, expedited issuance of our mandate.

[18]   We issued our initial opinion and judgment in April 2007. The defendants filed a motion for rehearing, in response to which we substituted an opinion and judgment dated June 11, 2007.

**Proceedings below**

On July 31, 2007, Plaintiffs amended their petition to seek temporary and permanent injunctive relief, in addition to their original requests for declaratory relief.[19] All of the State Defendants[20] joined in a renewed plea to the jurisdiction, this time with attached evidence "to provide the record desired by the court of appeals." The State Defendants asserted: (1) *Hendee I* had already held that the district court lacked subject-matter jurisdiction over Plaintiffs' "improper delegation" causes of action; (2) Plaintiffs had failed to allege conduct constituting violations of article VIII, section 22(a); (3) their attached jurisdictional evidence conclusively established that 06–07 appropriations did not exceed the spending cap[21]; and (4) Plaintiffs' taxpayer standing was destroyed, and their claims rendered moot, because the funds appropriated under 06–07 appropriations had already been spent (or would be, by the end of August).

[19]   They also amended their allegations of C.L.O.U.T.'s associational standing.

[20]   In the interim, Susan Combs had replaced Carole Keeton Strayhorn as Comptroller.

[21]   This evidence included, along with the documents the

> defendants had attempted to present on appeal in *Hendee I,* affidavit testimony of John O'Brien, the Director of the LBB. O'Brien testified that the Comptroller's April 2006 update to the revenue estimates included an additional $1.8 million in natural gas tax revenue over the previous estimate. He explained that because natural gas revenues "are partially dedicated by the Constitution," total appropriations from non-dedicated state tax revenue as of April 2006 dropped to $52.04 billion, $3.56 billion under the spending limit. O'Brien continued that during the third special session of 2006, the legislature appropriated a total of $3.866 billion, $3.476 billion of which was funded by non-dedicated state tax revenues. Adding these new appropriations from non-dedicated state tax revenues to the $52.04 already appropriated would equal $55.516 billion, a figure below the 06–07 final spending cap of $55.6 billion.
>
>> O'Brien further testified that during its 80th regular session between January through May 2007, the legislature reduced 2007 appropriations and that further revisions to the comptroller's revenue estimates increased the amount of dedicated tax revenue, "thus freeing up revenue not subject to the spending limit." The effect of these developments, O'Brien opined, was to reduce total 06–07 appropriations from non-dedicated state tax revenues, as of July 2007, to $55.3 billion, or $286 million below the 06–07 final spending cap.

On August 14, the district court granted the plea with regard to Plaintiffs' "improper delegation" claims but otherwise denied it. The State Defendants immediately filed a notice of appeal from the district court's order.[22] Apparently in response to the Plaintiffs' attempts to proceed with a hearing on their request for temporary injunctive relief, the State Defendants also filed a "Notice of Automatic Stay" in the district court stating that they were entitled to the automatic stay of trial court proceedings pending their appeal provided in section 51.014(b) of the civil practice and remedies code.[23] Plaintiffs filed an "Emergency Objection to State Defendants' Notice of Automatic Stay and Request for Reinstatement of Hearing Date on Plaintiffs' Request for Temporary Injunctive Relief." On August 21, the district court denied this relief, finding that the automatic-stay provisions of section 51.014(b) applied. On August 23, Plaintiffs sought mandamus relief from this order, which we granted to the extent of holding **\*331** that section 51.014(b)'s automatic-stay provisions did not apply during the pendency of the State Defendants' pending interlocutory appeal.[24] The State Defendants sought mandamus from this order with the supreme court, which denied such relief on August 30.[25] At the end of the following day, August 31, 2007, the 06–07 biennium ended.

[22] *See* Tex. Civ. Prac. & Rem.Code Ann. § 51.014(a)(8).

[23] *See id.* at § 51.014(b).

[24] *In re Hendee,* No. 03–07–00490–CV (Tex.App.-Austin Aug. 27, 2007) (mem.op.).

[25] *In re Dewhurst,* No. 07–0683 (Tex. Aug. 30, 2007).

> The parties represent that the district court subsequently denied Plaintiffs' request for temporary injunctive relief.

During the pendency of this appeal, Plaintiffs have filed a second amended petition in which they add declaratory and injunctive claims seeking to prevent forthcoming expenditures under 08–09 appropriations that they allege are unconstitutional and illegal. Plaintiffs base these claims, as before, on the theories that the underlying 08–09 appropriations violate article VIII, section 22 because of the legislature's continued use of SPI to calculate the spending cap and the lack of a "feedback" mechanism as it bears on that cap's calculation.[26] Plaintiffs also add a new cause of action alleging that the specific amount of 08–09 appropriations from non-dedicated state tax revenues exceeds the 08–09 spending cap.

[26] They similarly complain of the continued "improper delegation" of powers to the LBB, its staff, and the section 316.005 committee, albeit acknowledging that *Hendee I* affirmed the dismissal of those causes of action.

## DISCUSSION

The State Defendants bring four issues on appeal, contending that Plaintiffs have failed to invoke the district court's subject-matter jurisdiction because (1) the alleged facts made the basis for Plaintiffs' theories challenging the use of SPI and the lack of a "feedback mechanism" in calculating the spending cap do not constitute violations of article VIII, section 22(a); (2) the State Defendants' uncontroverted jurisdictional evidence conclusively demonstrates that 06–07 from non-dedicated state tax revenues did not exceed the 06–07 spending cap; (3) Plaintiffs lack standing as taxpayers because the 06–07 biennium has ended and, by definition, all expenditures under the challenged 06–07 appropriations have already been spent; and (4) similarly, Plaintiffs' causes of action challenging 06–07 appropriations or expenditures are moot.[27]

[27] The State Defendants do not separately challenge C.L.O.U.T.'s associational standing, relying on the above grounds to defeat the standing of its members to sue in their own behalf. *See Texas Ass'n of Bus. v. Tex. Air Control Bd.,* 852 S.W.2d 440, 447 (Tex.1993).

The applicable standard of review is detailed in *Hendee I.* 228 S.W.3d at 366–69.

### Standing and mootness

[1] [2] [3] [4] We agree with the State Defendants that the expiration of the 06–07 fiscal biennium is fatal to Plaintiffs' standing as taxpayers to seek declaratory and injunctive relief to prevent expenditures under 06–07 appropriations. Those appropriations, by definition, expired after August 31, 2007. *See Hendee I,* 228 S.W.3d at 359–60 & n. 3. Stated another way, the allegedly illegal expenditures that conferred standing on Plaintiffs to challenge 06–07 appropriations have already been spent.[28] And, as we observed in *Hendee I,*

[28] At oral argument, counsel for Plaintiffs asserted that their standing to challenge 06–07 appropriations might have been preserved because some appropriated funds "lapse" at the end of a biennium without being spent

and go back into general revenue. Although any such funds would now be subject to appropriation in the current (08–09) biennium, counsel maintained that such funds could, at least in theory, not yet be spent. For this reason, counsel posited, Plaintiffs would retain standing even into the 08–09 biennium to challenge the legality of the 06–07 appropriations under which those funds could have been expended during that biennium, but ultimately were not. Eventually, Plaintiffs' counsel candidly conceded that this argument was "not the strongest part of our case." We are not persuaded that the existence of any lapsed appropriated 06–07 funds could, in light of the well-established principles of taxpayer standing discussed above, somehow preserve Plaintiffs' standing to seek declaratory and injunctive relief to challenge the now-expired 06–07 appropriations.

**\*332** it is well-established that taxpayers have standing only to challenge *prospective* state expenditures, but do not have standing to complain of public funds that have already been spent. As the supreme court has explained:

> When a taxpayer brings an action to restrain the illegal expenditure ... of tax money he sues for himself, and it is held that his interest in the subject-matter is sufficient to support the action; but when the money had already been spent, an action for its recovery is for the [taxing entity]. The cause of action belongs to it alone.
> *Hoffman v. Davis,* 128 Tex. 503, 100 S.W.2d 94, 95 (1937); *see Bland* [*I.S.D. v. Blue* ], 34 S.W.3d [547,] 556–58 [ (Tex.2000) ].

*Hendee I,* 228 S.W.3d at 381. These limitations reflect that "[i]n general, taxpayers do not have a right to bring suit to contest government decision-making because ... governments cannot operate if every citizen who concludes that a public official has abused his discretion is granted the right to come into court and bring such official's public acts under review." *Bland,* 34 S.W.3d at 555 (quoting *Osborne v. Keith,* 142 Tex. 262, 177 S.W.2d 198, 200 (1944)). Taxpayer-standing principles strike a balance between "the protection afforded taxpayers" by permitting such suits compared to "the interference such suits pose to government activities." *Id.* at 557. Applying these principles, the Texas Supreme Court has held that taxpayers lack standing to challenge even prospective expenditures when "the government entity has received all that it bargained for and must simply pay for it," because "[t]he potential for disruption of government operations is too great to allow a taxpayer with no special injury distinct from the general public from paying for goods and services it has already received and placed in permanent use." *Id.* at 381–82. Where the challenged expenditures have already been made, taxpayers even more clearly lack standing to seek injunctive and declaratory relief to prevent those expenditures. *Hendee I,* 228 S.W.3d at 364 ("To the extent Plaintiffs are complaining about specific appropriations and expenditures made during prior biennia, as opposed to forthcoming expenditures ... they would lack standing."); *see Hoffman,* 100 S.W.2d at 95. Consequently, we must reverse the district court's order with regard to Plaintiffs' declaratory and injunctive claims against expenditures under now-expired 06–07 appropriations and render judgment dismissing those claims for want of subject-matter jurisdiction. *See Texas A&M University System v. Koseoglu,* 233 S.W.3d 835, 839–40 (Tex.2007).[29]

[29] We note that the 06–07 biennium had not yet expired at the time the district court ruled on the State Defendants' plea to the jurisdiction.

[5] [6] Similarly, each cause of action that Plaintiffs have asserted to challenge 06–07 appropriations has been rendered moot by the 06–07 biennium's expiration. This includes Plaintiffs' theory that the specific amount of 06–07 appropriations exceeded **\*333** the spending cap applicable to that biennium. Plaintiffs attempt to salvage this theory by invoking the "capable of repetition, yet evading review" exception to the mootness doctrine. To invoke this exception, a plaintiff must prove that: (1) the challenged action was too short in duration to be litigated fully before the action ceased or expired; and (2) a reasonable expectation exists that the same complaining party will be subjected to the same action again. *Williams v. Lara,*

52 S.W.3d 171, 184 (Tex.2001); *Blum v. Lanier,* 997 S.W.2d 259, 264 (Tex.1999); *see also In re Allied Chem. Corp.,* 227 S.W.3d 652, 655 (Tex.2007). Even if this mootness exception were otherwise availing here, it remains that the 06–07 biennium has ended, all 06–07 appropriations have expired, and there cannot possibly be further allegedly illegal expenditures under those appropriations that would give Plaintiffs standing to challenge those appropriations. *See Hoffman,* 100 S.W.2d at 95.[30]

[30] Because Plaintiffs have not alleged a justiciable controversy regarding compliance with the 06–07 spending cap that would continue beyond the 06–07 biennium's end, any opinion we would offer on that subject or the implications of the State Defendants' jurisdictional evidence would be advisory and beyond our jurisdiction. *See Valley Baptist Med. Ctr. v. Gonzalez,* 33 S.W.3d 821, 822 (Tex.2000) ("Under article II, section 1 of the Texas Constitution, courts have no jurisdiction to issue advisory opinions."). We note, however, that Plaintiffs have relied on their "improper delegation" theories in urging us to ignore the State Defendants' jurisdictional evidence regarding the LBB staff's calculations of the final 06–07 spending cap and of the level of appropriations from non-dedicated state tax revenues as the 06–07 biennium progressed. Because Plaintiffs have not appealed from the district court's dismissal of their improper delegation theories below, any challenge to that ruling is not properly before us. *See Campbell v. State,* 85 S.W.3d 176, 184 (Tex.2002). To the extent Plaintiffs nevertheless are asking us to revisit our holding in *Hendee I* that their improper delegation claims failed to state violations of article II, section 1, we decline that invitation. *See Briscoe v. Goodmark Corp.,* 102 S.W.3d 714, 716 (Tex.2003) (discussing the law-of-the-case doctrine); *cf. Tex. Parks & Wildlife Dep't v. Dearing,* 240 S.W.3d 330, 351 (Tex.App.-Austin 2007, pet. filed) (finding that "clearly erroneous" exception to law-of-the-case doctrine applied). However Plaintiffs might attempt to characterize the actions of the LBB, its staff, or the section 316.005 committee in regard to the spending cap, it remains that "the ultimate legislative power—whether a bill containing an appropriation is passed, amended, or rejected—is vested not in the LBB or its staff, but with each respective chamber and its individual members, who can utilize several procedural mechanisms to resist passage of bills containing appropriations they believe would violate the spending cap." *Hendee I,* 228 S.W.3d at 378 (also observing that "the only 'delegation' of legislative power that Plaintiffs attack is merely an assignment of duties within the legislative branch."). Further, because this holding is decisive of all of Plaintiffs' improper-delegation theories, we need not address the State Defendants' contention that Plaintiffs waived their complaint regarding the committee established under section 316.005. *See id.* at 365 n. 13.

On the other hand, Plaintiffs' second amended petition, as noted, seeks declaratory and injunctive relief to prevent forthcoming expenditures under 08–09 appropriations based on their live theories that the continued use of SPI to calculate "the estimated rate of growth of the state's economy" and the spending cap and the absence of a "feedback mechanism"

violate article VIII, section 22. *See City of Austin v. L.S. Ranch, Ltd.,* 970 S.W.2d 750, 755 (Tex.App.-Austin 1998, no pet.) (petition was amended during pendency of interlocutory appeal from denial of plea to jurisdiction to allege justiciable controversy and moot subject matter of appeal). Plaintiffs also allege a new theory that the specific amount of the legislature's 08–09 appropriations from non-dedicated state tax revenue have exceeded the 08–09 spending cap.

**\*334** Because the State Defendants have not challenged subject-matter jurisdiction over the latter theory in this proceeding, that question is not yet before us. However, the State Defendants have squarely challenged whether the legislature's use of SPI and the absence of a "feedback mechanism" actually constitute violations of article VIII, section 22. *See Hendee I,* 228 S.W.3d at 374 (whether conduct constituting a constitutional violation has been alleged controls both sovereign immunity and Plaintiffs' standing). Because these grounds would negate subject-matter jurisdiction over Plaintiffs' live claims based on those theories, we consider them here. *Id.* at 368–69.

### Use of SPI

[7] [8] [9] The parties agree that to prevail on their causes of action regarding the legislature's use of SPI to determine "the estimated rate of growth of the state's economy," Plaintiffs must plead and prove that such use is arbitrary in light of the requirements of article VIII, section 22. Arbitrariness is the standard that the supreme court has applied to claims challenging the Texas public school finance system under article VII, section 1, of the Texas Constitution. *See Neeley,* 176 S.W.3d at 783–85. An action is arbitrary when it is taken without reference to guiding rules or principles. *Id.* at 784 (citing *General Tire, Inc. v. Kepple,* 970 S.W.2d 520, 526 (Tex.1998)). Whether a legislative enactment is arbitrary is a question of law that we review de novo. *Neeley,* 176 S.W.3d at 785. Although this determination may rest in part upon determinations of disputed factual matters, such findings "have a limited role" in deciding ultimately the constitutional issues. *Id.*

[10] [11] Both article VII, section 1 and article VIII, section 22 mandate that the legislature enact legislation to effectuate somewhat broadly-defined goals, yet do not specify precisely how the legislature is to perform that task. *Compare* Tex. Const. Ann. art. VII, § 1 ("A general diffusion of knowledge being essential to the preservation of the liberty and rights of the people, it shall be the duty of the Legislature of the State to establish and make suitable provision for the support and maintenance of an efficient system of free public schools") *with id.* art. VIII, § 22(a) ("In no biennium shall the rate of growth of appropriations from state tax revenues not dedicated by this constitution exceed the estimated rate of growth of the state's economy. The legislature shall provide by general law procedures to implement this subsection."). In this way, each provision "gives the legislature the 'sole right to decide how to meet the standards set by the people,' " yet it remains under our constitution that "the Judiciary has the final authority to determine whether they have been met." *Hendee I,* 228 S.W.3d at 373 (quoting *Neeley,* 176 S.W.3d at 777 & n. 169 (quoting *West Orange–Cove Consol. Indep. Sch. Dist. v. Alanis,* 107 S.W.3d 558, 563–64 (Tex.2003))); *see also id.* at 372 (legislature's authority is "not committed unconditionally to the legislature's discretion, but is instead accompanied by standards") (quoting *Neeley,* 176 S.W.3d at 776–77 (quoting *Edgewood Indep. School Dist. v. Kirby,* 777 S.W.2d 391, 394 (Tex.1989))).[31] The arbitrariness standard ensures that the judiciary defers to the legislature on matters constitutionally **\*335** committed to that branch's discretion while also performing its role as final arbiter of whether the legislature's acts comply with constitutional requirements. As the supreme court has explained in regard to article VII, section 1:

---

[31]     *See also Mitchell County v. City Nat'l Bank,* 91 Tex. 361, 43 S.W. 880, 882–83 (1898) (constitutional provisions were self-executing to the extent of prohibiting conflicting laws but not to the extent of requiring particular laws be enacted to effectuate it because the provisions "prescribe no rules by which any act could be done in the enforcement of their requirements").

---

If the Legislature's choices are informed by guiding rules and principles properly related to public education—that is, if the choices are not arbitrary—then the system does not violate the constitutional provision.

For article VII, section 1, as with other provisions, "[t]he final authority to determine adherence to the Constitution resides with the Judiciary." As we have said, " 'a mere difference of opinion [between judges and legislators], where reasonable minds could differ, is not a sufficient basis for striking down legislation as arbitrary or unreasonable.' " At the same time, "[l]egislative action ... is not without bounds." In assessing challenges to the public school system under article VII, section 1, courts must not on the one hand substitute their policy choices for the Legislature's, however undesirable the latter may appear, but must on the other hand examine the Legislature's choices carefully to determine whether those choices meet the requirements of the Constitution. By steering this course, the Judiciary can assure that the people's guarantees under the Constitution are protected without straying into the prerogatives of the Legislature.

*Neeley,* 176 S.W.3d at 785 (footnotes and citations omitted). Similarly, when evaluating whether Plaintiffs have alleged conduct constituting violations of article VIII, section 22(a), it is not enough for Plaintiffs to allege merely that the legislature might have chosen a better method for calculating the spending cap or to demonstrate a "difference of opinion ... where reasonable minds could differ." *See id.* Our proper role is instead to determine whether the legislature's choice of a method is *arbitrary*—without guiding rules and principles properly related to the directives of article VIII, section 22. *See id.*[32]

[32] As we have previously suggested, the same standard would apply to a complaint that the specific spending cap for a biennium has been exceeded—whether the legislature acted arbitrarily in regard to its compliance with that limit. *See Hendee I,* 228 S.W.3d at 378 n. 29. This standard leaves room for "difference of opinion" regarding the technical calculations and economic forecasting bearing on the spending cap and its components and legislative ascertainment of whether current-biennium appropriations from non-dedicated state tax revenues are within the cap. *See id.* (observing, with regard to Plaintiffs' claim alleging violation of the 06–07 spending cap as calculated by the LBB staff, "Plaintiffs would not have a basis to 'go behind' and dispute estimates validly made by the Comptroller or LBB."). On the other hand, this standard does not require or allow *carte blanche* judicial deference to bare conclusions by the State's witnesses regarding what these figures are or whether the spending cap has been complied with.

Given these limitations on judicial intervention, Plaintiffs' theory ultimately must rest upon a construction of article VIII, section 22 that forecloses any discretion of the legislature to choose the rate of growth of SPI to measure "the estimated rate of growth in the state's economy." Plaintiffs urge that the "estimated rate of growth of the state's economy" in article VIII, section 22(a) means growth of the *entire* economy—and personal income is inadequate because it is merely one *component* of the state's economy. To further support their analysis of the provision's text, Plaintiffs also rely on a view of article VIII, section 22's legislative history. As introduced in the house of representatives, the proposed Tax Relief Amendment that included what became article VIII, section 22 would have **\*336** limited the growth of all legislative appropriations from state tax revenue to a fixed annual increase of 7 ½ percent. H.J. of Tex., 65th Leg., 2d C.S. 9 (1978). That provision was deleted entirely in the committee substitute, *see id.* at 92, but the following provision was later added through a house floor amendment:

That Article VIII of the Texas Constitution be amended by adding Section 21 to read as follows:

Sec. 21 (a) Except as otherwise provided by this Section, legislative appropriations from State tax revenue for a fiscal biennium may not exceed the total of those appropriations for the preceding biennium by more than would result from a percentage equaling the percentage of growth of total personal income of the State during the previous biennium, as reported by the Comptroller of Public Accounts.

(b) The limitation in subsection (a) hereof shall not apply to appropriations and tax increases necessary to provide for

reimbursement to school districts to replace revenues lost by partial or total abolition of ad valorem property taxes.

(c) If the legislature by adoption of a resolution approved by a record vote of three-fifths of the members of each house, finds that an emergency exists and identifies the nature of the emergency, the legislature may provide for appropriations in excess of the amount authorized by Subsection (a) of this section. The excess authorized under this subsection may not exceed the amount specified in the resolution.

(d) In no case shall appropriations exceed revenues as provided in Article III, Section 49a.

*Id.* at 142–43. This version of the provision that became article VIII, section 22 remained in the Taxpayer Relief Amendment passed by the house, *id.,* but was deleted in the senate committee substitute and omitted from the version approved by that chamber. *Id.* at 309. The conference committee agreed on the language that now appears in article VIII, section 22, and that was the version submitted to and ratified by the voters. Citing the fact that the legislature considered but eventually rejected a version of subsection (a) that would have explicitly tied the spending limit to growth in personal income, Plaintiffs urge us to infer legislative intent to reject growth in personal income as a measure of the "estimated rate of growth in the state's economy."

[12] [13] When construing the Texas Constitution, we "rely heavily on its literal text and must give effect to its plain language." *Stringer v. Cendant Mortgage Corp.,* 23 S.W.3d 353, 355 (Tex.2000); *see Republican Party of Tex. v. Dietz,* 940 S.W.2d 86, 89 (Tex.1997); *Edgewood Indep. Sch. Dist. v. Kirby,* 777 S.W.2d 391, 394 (Tex.1989). We strive to give constitutional provisions the effect their makers and adopters intended. *Stringer,* 23 S.W.3d at 355. To that end, we may also consider such things as the legislative history and purpose of the constitutional provision, the historical context in which it was written, prior judicial decisions, and the interpretations of analogous constitutional provisions by other jurisdictions. *Id.; Dietz,* 940 S.W.2d at 89.

[14] Contrary to Plaintiffs' assertions, the text of article VIII, section 22(a) does not foreclose the legislature's use of SPI to calculate the "estimated rate of growth of the state's economy." The meaning of the terms "the state's economy" and "the estimated rate of growth of the state's economy" is not self-apparent, but entails consideration of myriad technical and policy variables. *Cf. Neeley v. West Orange–Cove Consol. Indep. Sch. Dist.,* 176 S.W.3d 746, 783 (Tex.2005) (noting that "the standards **\*337** of article VII, section 1—adequacy, efficiency, and suitability—do not dictate a particular structure that a system of free public schools must have"). Nor does article VIII, section 22 provide definitions for these terms.[33] Instead, the provision expressly contemplates that the legislature will address these matters in the first instance when devising "procedures to implement this subsection." Tex. Const. Ann. art. VIII, § 22(a). We cannot conclude that the legislature's determination to select SPI as the basis for calculating the growth factor was without guiding rules and principles relative to article VIII, section 22(a)'s purposes.

33      Nor do Plaintiffs point to any other constitutional provisions or case law that might bear upon judicial construction of these terms.

The State Defendants have advanced several reasonable rationales supporting the legislature's choice to use SPI. They urge that personal income is an appropriate measure of state spending relative to economic growth—the concern of article VIII, section 22—because it measures the ability of individuals and businesses to pay for government services.[34] The State Defendants also observe that twenty out of thirty states with spending limits use personal income to measure economic growth. They further posit that using SPI also has the economic policy benefit of incentivizing stakeholders in government spending to support policies that increase personal income. Plaintiffs vehemently disagree with these economic and policy judgments, offering their own rationales as to why GSP or other alternatives would provide a more accurate or fiscally prudent barometer of economic growth than SPI. Although these arguments may demonstrate that reasonable minds can disagree with the legislature's choices, we cannot conclude that the use of SPI is so lacking in guiding rules and principles related to article VIII, section 22's directives as to be arbitrary and unconstitutional.

34      These rationales are detailed in O'Brien's affidavit testimony.

We are unpersuaded by the implications Plaintiffs draw from article VIII, section 22's legislative history. That the legislature considered but ultimately decided not to include express language in the constitutional proposal that would have tied the spending cap to personal income is merely one indicator of the intent of that provision. *See Stringer,* 23 S.W.3d at 355 (observing that the intent of both the drafters *and* the people who ratified it is relevant). More importantly, this legislative record is at least equally consistent with the contemporary practice of constitutionalizing only the general principles of the limitation, delegating to the legislature the task of determining the specific method of calculating the estimated economic growth rate and spending cap, and thereby avoiding adding even more statute-like provisions to the byzantine array already contained in our 130–year–old Texas Constitution.

If anything, the origins of section VIII, section 22 support the legislature's choice to use SPI to measure the estimated rate of growth in the state's economy. As we noted in *Hendee I,* article VIII, section 22 was born of a tax reform effort in the late 1970s. *See* John Greene & Larry Toomey, *The Tax Reform Act of 1979,* 42 Tex. B.J. 1007, 1007 (1979) (contemporaneously observing, with reference to the notable California taxpayer-relief measures of the 1970s, that "Proposition 13 sentiment has invaded the Texas Legislature."). The provision that became article VIII, section 22 was one of several components of a "Tax Relief Amendment" to the constitution **\*338** proposed by the 65th legislature during a special session called for that purpose by Governor Dolph Briscoe. H.J.R. 1, 65th Leg., 2d C.S. These origins suggests less a concern with the general growth in government compared to the economy that Plaintiffs decry, but with the relative burdens that the funding demands of government impose on taxpayers. The legislature would not have acted arbitrarily and without guiding rules and principles by seeking to advance this objective by tying growth in state spending to growth in the income of the taxpayers who fund the government.

For these reasons, we hold that Plaintiffs' theory that the legislature's use of SPI to calculate "the estimated rate of growth in the state's economy" and the spending cap does not allege conduct constituting a violation of article VIII, section 22.

### Adjustment mechanism

[15] We also cannot conclude that the legislature's failure to provide a "feedback" mechanism to reconcile estimated SPI growth with actual SPI growth during the biennium violates article VIII, section 22. Article VIII, section 22(a) requires only that the rate of growth in appropriations cannot exceed "*the estimated* rate of growth in the state's economy." "*The* estimated rate of growth" implies a single calculation, while "*estimated* rate of growth" belies Plaintiffs' notion that the figure must precisely track whatever the actual rate of SPI growth during the biennium ultimately proves to be. Nor did the legislature act arbitrarily in requiring the LBB and section 316.005 committee to develop and approve this estimate before the legislature's regular session. This timing enables the LBB to make an initial calculation of the next biennium's spending cap before the legislature begins the session in which it generally will enact appropriations for that biennium.

Plaintiffs emphasize that, in contrast to the legislature and LBB's reliance on a fixed estimated economic growth rate, the LBB staff periodically updates the board's calculations of current-biennium appropriations and makes corresponding adjustments to the next biennium's spending cap, including a final calculation of the spending cap once the current biennium ends. Plaintiffs urge that this distinction establishes the arbitrariness of using a fixed economic growth estimate. To the contrary, this distinction is consistent with the text of article VIII, section 22. Although the provision refers to "the *estimated* rate of growth of the state's economy," the framers did not similarly qualify "the rate of growth of appropriations from state tax revenues not dedicated by this constitution." Consequently, article VIII, section 22(a) would appear to require that the rate of growth of *actual* appropriations from non-dedicated state tax revenues not exceed "the estimated rate of growth of the state's economy" for that period. The LBB staff's periodic recalculations of the amount of current-biennium appropriations from non-dedicated state tax revenues (and corresponding adjustments to the next biennium's spending cap) would appear necessary to ensure that the rate of growth in actual appropriations remains within the estimated rate of growth of the state's economy. There is no corresponding constitutional basis for requiring similar adjustments to the economic growth rate. The legislature's failure to provide for such adjustments is not arbitrary.

Similarly, we cannot conclude that the absence of mechanisms for accounting for long-term deviations between estimated and actual SPI growth constitutes a violation of article VIII, section 22. The provision, again, refers to "the *estimated* rate of

growth in the state's economy" for the biennium and does not require that appropriations **\*339** growth precisely track whatever ultimately proves to have been the actual rate of SPI growth once the period ends. To the extent that Plaintiffs are challenging the legislature's use of a biennium-by-biennium method of calculating the spending cap—calculating economic and appropriations growth from a base year of the current biennium[35] instead of using a baseline like 1980–81 or earlier years that would tend to correct incremental biennial deviations—we likewise conclude that Plaintiffs have not alleged a theory whereby that approach would violate article VIII, section 22. Article VIII, section 22(a) provides that, "*[i]n no biennium* shall the rate of growth of appropriations from state tax revenues not dedicated by this constitution exceed the estimated rate of growth of the state's economy." This type of provision allows either a biennium-by-biennium approach or a comparison of relative economic and spending growth between the provision's inception and the next biennium. *Cf.* Op. Tenn. Atty Gen. 85–153, at 5 (1985) (observing that Tennessee's similar constitutional limitation could be implemented either by taking its year of inception as the base year or by looking only to the preceding year).[36] Consequently, we cannot conclude that the legislature acted without guiding rules and principles in opting for its biennium-by-biennium approach.

[35]     *See* Tex. Gov't Code Ann. § 316.002(a) (requiring the LBB to establish "the estimated rate of growth of the state's economy *from the current biennium to the next biennium,*" "the level of appropriations *for the current biennium* from state tax revenues not dedicated by the constitution," and "the amount of state tax revenues not dedicated by the constitution that could be appropriated *for the next biennium* within the limit established by the estimated rate of growth of the state's economy").

[36]     Tenn. Const. Ann. art. II, § 24 ("In no year shall the rate of growth of appropriations ... exceed the estimated rate of growth of the state's economy ..."). This provision apparently was the model for article VIII, section 22. *See* Janice C. May, *The Texas State Constitution: A Reference Guide* 310 (1996).

In sum, although reasonable minds may differ regarding the policy choices the legislature has made in its implementation of article VIII, section 22, we cannot conclude that the choices of which Plaintiffs have complained violate constitutional boundaries. Plaintiffs' complaints regarding those policy choices, in other words, must be adjudged not by the judiciary but by the legislature and, ultimately, the people.

## CONCLUSION

For the foregoing reasons, we reverse the district court's order in part, and render judgment dismissing all of Plaintiffs' causes of action for want of jurisdiction, with the exception of their claims, added in their second amended petition, based on the yet-unchallenged theory that the specific amount of 08–09 appropriations from non-dedicated state tax revenues have exceeded the 08–09 spending cap.

**All Citations**

253 S.W.3d 320

---

**End of Document**         © 2015 Thomson Reuters. No claim to original U.S. Government Works.

**El Paso Hosp. Dist. v. Texas Health and Human Services Com'n, 247 S.W.3d 709 (2008)**

Med & Med GD (CCH) P 302,333, 51 Tex. Sup. Ct. J. 534

247 S.W.3d 709
Supreme Court of Texas.

EL PASO HOSPITAL DISTRICT d/b/a R.E. Thomason General Hospital District, et al., Petitioner,
v.
TEXAS HEALTH AND HUMAN SERVICES COMMISSION and Don Gilbert, Commissioner, Respondents.

No. 05–0372. | Argued Nov. 15, 2006. | Decided Feb. 22, 2008.

**Synopsis**
**Background:** Hospitals sued Health and Human Services Commission (HHSC) seeking declaration that HHSC's cutoff date for submitting paid claims data to determine Medicaid reimbursement rates was invalid rule under the Administrative Procedures Act (APA) and that HHSC failed to follow its own rules in reviewing the hospitals' claim. The 201st Judicial District Court, Travis County, Peter M. Lowry, J., found in favor of HHSC. Hospitals appealed. The Austin Court of Appeals, Bea Ann Smith, J., 161 S.W.3d 587, affirmed. Hospitals petitioned for review.

**Holdings:** On rehearing, the Supreme Court, David M. Medina, J., held that:

[1] HHSC's cutoff date was a "rule" under the APA, and thus, because HHSC did not follow the proper rule-making procedures, rule was invalid, and

[2] hospitals were entitled to a formal review with State Office of Administrative Hearings, with respect to individual claims data excluded by the invalidated cutoff rule.

Judgment of Court of Appeals reversed and remanded.

West Headnotes (6)

[1] **Health**
⚷ Medicaid and similar programs in general

Medicaid is a health insurance program, jointly operated and funded by the federal and state governments, for the medical care of low-income and other eligible persons. Medicaid Act, §§ 1901–1930, 42 U.S.C.A. §§ 1396–1396u.

1 Cases that cite this headnote

[2] **Health**

**El Paso Hosp. Dist. v. Texas Health and Human Services Com'n, 247 S.W.3d 709 (2008)**

Med & Med GD (CCH) P 302,333, 51 Tex. Sup. Ct. J. 534

Providers, Proceedings Regarding

Health and Human Services Commission's (HHSC's) cutoff date for submitting paid claims data to determine reimbursement rates for inpatient Medicaid services was a "rule" under the Administrative Procedures Act, and thus, because HHSC did not follow the proper rule-making procedures, rule was invalid; cutoff was a statement of general applicability because it applied to all hospitals, effect of cutoff was to modify the base-year rule by controlling the data HHSC would use from that year, and cutoff affected hospitals' private rights because it was a key formula component. V.T.C.A., Government Code § 2001.003(6)(A–C); 1 TAC § 355.8063(b)(5).

4 Cases that cite this headnote

[3]     **Administrative Law and Procedure**
        Nature and Scope

The term "general applicability" under the Administrative Procedures Act's definition of "rule" references statements that affect the interest of the public at large such that they can not be given the effect of law without public input. V.T.C.A., Government Code § 2001.003(6)(A).

5 Cases that cite this headnote

[4]     **Administrative Law and Procedure**
        Duty to make

A presumption favors adopting rules of general applicability through the formal rule making procedures the Administrative Procedures Act sets out, including providing notice, publication, and public comment on the proposed rule. V.T.C.A., Government Code §§ 2001.023–2001.030.

1 Cases that cite this headnote

El Paso Hosp. Dist. v. Texas Health and Human Services Com'n, 247 S.W.3d 709 (2008)

Med & Med GD (CCH) P 302,333, 51 Tex. Sup. Ct. J. 534

**[5]**    **Administrative Law and Procedure**
           ➤Validity

When an agency promulgates a rule without complying with the proper rule-making procedures, the rule is invalid. V.T.C.A., Government Code § 2001.035(a).

6 Cases that cite this headnote

**[6]**    **Health**
           ➤Providers, Proceedings Regarding

Hospitals were entitled to a formal review with State Office of Administrative Hearings, with respect to individual claims data excluded by an invalidated rule in which Health and Human Services Commission (HHSC) set cutoff date for submitting paid claims data to determine reimbursement rates for inpatient Medicaid services; because the cutoff rule was invalid, hospitals' administrative appeals did not question HHSC's payment methodology, but rather the omission of individual claims. 1 TAC § 355.8063(k)(1)(A), (k)(2).

3 Cases that cite this headnote

**Attorneys and Law Firms**

**\*711** Marie R. Yeates, Houston, Spikes Kangerga, Julie Plantes Woody, Vinson & Elkins L.L.P., James E. Gjerset, Lance James Ramsey, Shauna L. Lorenz, Gjerset & Lorenz, Austin, TX, for Petitioner.

Robert L. Seibert, Office of Attorney General, Greg Abbott, Attorney General of Texas, Barry Ross McBee, Office of Atty. Gen., Edward D. Burbach, Office of Atty. Gen., Barbara Bryant Deane, Assistant Atty. Gen., Rafael Edward Cruz, Office of Atty. Gen., Rance L. Craft, Kristofer S. Monson, Assistant Solicitor Gen., Kent C. SullivanFirst Asst. Atty. Gen., and David S. Morales, Office of Atty. Gen., Austin, TX, for Respondents.

Ron Beal, pro se.

**Opinion**

Justice MEDINA delivered the opinion of the Court.

El Paso Hosp. Dist. v. Texas Health and Human Services Com'n, 247 S.W.3d 709 (2008)

Med & Med GD (CCH) P 302,333, 51 Tex. Sup. Ct. J. 534

We grant El Paso Hospital District's motion for rehearing, withdraw our opinion and judgment dated August 31, 2007, and substitute the following in its place.

In this appeal from the denial of a declaratory judgment, we are asked whether the Texas Health and Human Services Commission's (HHSC) data-collection method for calculating prospective Medicaid inpatient service rates is an agency rule as defined by the Administrative Procedures Act (APA). TEX. GOV'T CODE § 2001.003(6). If it is, we are asked to declare the rule invalid because HHSC neglected to adopt it as the APA requires. We are further asked to determine whether HHSC failed to follow the procedure prescribed by other rules that govern an interested party's administrative appeal of HHSC's proposed rates. The trial court denied all relief, and the court of appeals affirmed its judgment. 161 S.W.3d 587.

We conclude that HHSC's data collection method is an invalid rule and remand that part of the case for further proceedings. We further conclude that the Hospitals are entitled to have their excluded data entry claims reviewed. Accordingly, we reverse the court of appeals' judgment.

## I

Fourteen Texas hospitals sued HHSC asking that HHSC's cutoff date for submitting paid claims data to determine reimbursement rates for inpatient Medicaid services be declared invalid. The Hospitals claim the cutoff date is improper either because it is an invalid rule under the APA, or because it conflicts with relevant provisions of the Human Resources Code and HHSC's administrative rules. Additionally, the Hospitals assert that HHSC failed to follow its administrative appeals rules in reviewing the Hospitals' claims. A general understanding of the Medicaid program and the process HHSC uses to reimburse for Medicaid services is necessary before addressing these complaints.

[1] Medicaid is a health insurance program, jointly operated and funded by the federal and state governments, for the medical care of low-income and other eligible persons. *See generally* Pub.L. No. 89–97, 79 Stat. 286 (1965) (codified as amended at 42 U.S.C. §§ 1396–1396u); *see also Wilder v. Va. Hosp. Ass'n,* 496 U.S. 498, 502, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990) (citing 42 U.S.C. § 1396). While federal law establishes Medicaid's basic parameters, each state decides eligible groups, types and range of services, payment levels for services, and administrative services. *See* 42 C.F.R. § 430.0. Specifically, each state prepares a written plan describing the nature and scope of its Medicaid **\*712** program. *Id.* § 430.10. Once the plan is approved by the Secretary of Health and Human Services, the state is responsible for operating the program to conform with the federal guidelines. 42 U.S.C. § 1396. In Texas, HHSC is the agency charged with this responsibility. *See* TEX. HUM. RES.CODEE §§ 32.028(a)-(d), 32.0281(a).

Under the approved plan, HHSC is responsible for reimbursing hospitals that provide services to Medicaid patients. *See* 42 U.S.C. § 1396a(a)(13). The reimbursement methodology in Texas is a prospective payment system. TEX. HUM. RES.CODEE § 32.028(d). Under this system, HHSC sets the rates paid to hospitals for each service in advance, which allows hospitals to know the rate at which they will be reimbursed for specific services. *See Wilder,* 496 U.S. at 506, 110 S.Ct. 2510. The prospective payment system encourages hospitals to control costs for inpatient Medicaid services so they can earn a profit under the pre-determined rates. *Id.* at 506–07.

To implement this system, HHSC has adopted specific rules to determine the prospective payment rates. Although the rate-calculation rules are detailed and complex, they generally involve three components: (1) the data that forms the basis for the rate calculation, (2) the formula that converts the data into reimbursement rates, and (3) the process HHSC uses to collect the data and calculate rates.

The first component, the data used for the rate calculation, is comprised of both cost and claims data. *See* 1 TEX. ADMIN. CODEE § 355.8063(c). Cost data are derived from the hospitals' cost reports that allocate a portion of their total costs to the Medicaid program based on how many days Medicaid patients stay in the hospital, charges associated with such patients, and other factors. *See id.* § 355.8063(*l* ). Claims data are derived from hospital claims requesting payment for services rendered to Medicaid patients under existing reimbursement rates. *Id.* § 355.8063(b)(5).

The second component, the rate-calculation formula, converts the cost and claims data into reimbursement rates that

El Paso Hosp. Dist. v. Texas Health and Human Services Com'n, 247 S.W.3d 709 (2008)

Med & Med GD (CCH) P 302,333, 51 Tex. Sup. Ct. J. 534

approximate a hospital's cost for treating a Medicaid patient. The formula achieves this goal by taking a group of hospitals with similar Medicaid cost experiences, deriving those hospitals' approximate costs to treat an average Medicaid case, then adjusting that cost to reflect the relative expense of a particular service. *Id.* § 355.8063(e). The result is the new rate to be paid to that hospital group for that service. *See id.* Specifically, the rate for a service is determined by multiplying (1) the relative weight of the patient's diagnosis-related group by (2) the standard dollar amount for the hospital's payment division. *Id.* Although several steps are involved in calculating the diagnosis-related groups and standard dollar amounts, the foundation for the calculations, and what is important for purposes of this appeal, is the "base year" that we will later discuss in more detail. *Id.* § 355.8063(b)(5).

The third component for determining prospective rates for Medicaid services is HHSC's process for collecting the data. This process requires that the prospective reimbursement rates be recalculated at least every three years to account for inflation and medical advances that affect the cost of medical services. *See id.* HHSC's current policy is to recalculate the rates on a three-year cycle. *See id.* The first year is the base year, and only claims data from Medicaid patients admitted in this base year may be included in the rate calculation. *See id.* § 355.8063(n). The next year, HHSC collects the data and converts it into prospective reimbursement rates. *See id.* These rates then go into effect in **\*713** the third year and remain effective for three years during which this process is repeated. *See id.* During the third year, HHSC makes changes only if a hospital successfully appeals a mathematical or data entry error. *Id.* § 355.8063(k)(1). For example, the base year at issue here was the state fiscal year from September 1, 1999, to August, 31, 2000. The process for collecting data and generating rates occurred between September 1, 2000, and August 31, 2001. These rates were in effect from September 1, 2001, through August 31, 2004.

This appeal focuses on HHSC's interpretation of what constitutes a "base year." HHSC's rules define the "base year" as "[a] 12–consecutive–month period of claims data selected by the [department] or its designee." *Id.* § 355.8063(b)(5). HHSC requires that the "12–consecutive–month period" run concurrently with the State's fiscal year from September 1 to August 31. *See id.* § 355.8063(n). HHSC gathers all claims data for Medicaid patients admitted during that fiscal year but uses only the claims that Medicaid actually pays to assure that the data is from Medicaid-eligible claimants. Most importantly to this appeal, HHSC imposes a "cutoff" date, selecting claims data only from base-year claims that are paid within the fiscal year plus a six-month grace period (the "February 28 cutoff"). Put simply, when determining what claims go into the rate calculation, HHSC considers only the claims of Medicaid patients admitted during the base year that are actually paid within six months of the base-year's end. Claims for all patients admitted during the base year, but not paid by February 28, are not included in determining the prospective reimbursement rates. Between February 28 and August 31, HHSC recalculates the standard dollar amount and diagnosis-related group relative weights, informs hospitals of the proposed new rates, hears appeals, and finalizes the new rates before they go into effect on September 1 of that year.

The problem with this process, according to the Hospitals, is that HHSC does not use twelve consecutive months of claims data in computing rates as its rules require. Instead, the Hospitals argue that HHSC's six-month cutoff arbitrarily excludes relevant Medicaid claims simply because they are not paid quickly enough. The Hospitals submit that under HHSC's interpretation of the rule, only 95–97 percent of base-year claims are used to calculate the rates, while the rules actually require a "true cost average."

Dissatisfied with this process, the Hospitals sought administrative review of the reimbursement rates from fiscal year 2000, asking HHSC to include claims data excluded by the February 28 cutoff. HHSC denied the Hospitals' request and refused to refer the case to the State Office of Administrative Hearings for a formal hearing. The Hospitals then sued HHSC for declaratory and injunctive relief to enjoin it from applying the February 28th cutoff. The Administrative Procedures Act authorizes declaratory relief when determining the validity or applicability of a rule, if the plaintiff alleges "that the rule or its threatened application interferes with or impairs, or threatens to interfere with or impair, a legal right or privilege of the plaintiff." TEX. GOV'T CODE § 2001.038(a).

The trial court granted the Hospitals' request for a temporary injunction, but, at a subsequent trial on the merits, a visiting judge ruled against the Hospitals on all claims. The court of appeals affirmed, 161 S.W.3d 587, and this appeal followed.

## II

El Paso Hosp. Dist. v. Texas Health and Human Services Com'n, 247 S.W.3d 709 (2008)

Med & Med GD (CCH) P 302,333, 51 Tex. Sup. Ct. J. 534

The Hospitals present two arguments on appeal. First, they ask that we declare **\*714** the February 28 cutoff invalid either because it constitutes an improperly promulgated rule or because it conflicts with the applicable provisions of the Texas Human Resources Code and the Texas Administrative Code. *See generally* TEX. HUM. RES.CODEE § 32.028(d); 1 TEX. ADMIN. CODEE § 355.8063. Second, the Hospitals argue that HHSC failed to refer their administrative appeal relating to the rate issue for formal hearing, as required by HHSC's rules and the Texas Human Resources Code. They ask that we either direct HHSC to refer their appeal or remand the case for further proceedings.

### A

[2] HHSC is charged with establishing methods for administering and adopting necessary rules for the proper and efficient operation of medical assistance programs. TEX. HUM. RES.CODEE § 32.021(c). Specifically, HHSC has statutory authority to adopt "reasonable rules and standards governing the determination of rates paid for inpatient hospital services on a prospective payment basis." *Id.* § 32.028(d). HHSC also has authority to adopt rules relating to the payment rates that describe the process used to determine the rates. *Id.* § 32.0281(b). HHSC further must describe the prospective payment system used to reimburse hospitals that provide inpatient Medicaid services. *See* 1 TEX. ADMIN. CODEE § 355.8063(a).

HHSC argues that it complied with these statutes, and that the February 28 cutoff is not a rule itself, but rather its interpretation of the base-year rule. The Hospitals disagree, arguing the February 28 cutoff falls squarely within the APA's definition of a rule. We agree with the Hospitals. Under the APA, a rule: (1) is an agency statement of general applicability that either "implements, interprets, or prescribes law or policy" or describes [HHSC's] "procedure or practice requirements;" (2) "includes the amendment or repeal of a prior rule;" and (3) "does not include a statement regarding only the internal management or organization of a state agency and not affecting private rights or procedures." TEX. GOV'T CODE § 2001.003(6)(A)-(C).

[3] First, the February 28 cutoff is a statement of general applicability that implements law or describes procedure. *See id.* § 2001.003(6)(A)(i)-(ii). The term "general applicability" under the APA references "statements that affect the interest of the public at large such that they cannot be given the effect of law without public input." *R.R. Comm'n of Tex. v. WBD Oil & Gas Co.,* 104 S.W.3d 69, 79 (Tex.2003). The prospective payment system and its calculations affect all hospitals receiving reimbursement for inpatient Medicaid services. Thus, no question exists that the February 28 cutoff is a statement of general applicability because it applies to all hospitals.

The cutoff further implements policy and describes HHSC's data collection procedure. HHSC is required to describe the process used to determine payment rates through its formally promulgated rules, and HHSC's rule provides that it will use a base year, "[a] 12–consecutive–month period of claims data," to calculate the Hospitals' rates. 1 TEX. ADMIN. CODEE § 355.8063(b)(5). The effect of HHSC's February 28 cutoff, however, is to modify the base-year rule by controlling the data HHSC will use from that year. The February 28 cutoff thus amends another rule, the base year's 12–consecutive–month period of claims data, thus meeting the second criteria of a rule. *See* TEX. GOV'T CODE § 2001.003(6)(B).

Finally, the February 28 cutoff is not a statement regarding the agency's internal management or organization but rather affects **\*715** the Hospitals' private rights. Hospitals are entitled to have their prospective reimbursement rates determined according to the formula set out in HHSC's rules. The February 28 cutoff is a key component of that formula, directly affecting the Hospitals' right to reimbursement, but was not adopted through proper rule-making procedures. *Id.* § 2001.003(6)(C).

The enabling statute here requires that HHSC adopt "reasonable rules and standards governing the determination of rates paid for inpatient hospital services on a prospective payment basis." TEX. HUM. RES.CODEE § 32.028(d). Specifically, HHSC must "assure that the payment rates are reasonable and adequate to meet the costs incurred by the hospital in rendering services to Medicaid recipients." *Id.* § 32.028(d)(1). The February 28 cutoff is a significant component for calculating prospective reimbursement rates, and the Hospitals complain that its effect is to skew those rates to their disadvantage. Whether or not this is true, it is a matter that the agency should explore as a part of its rule-making process.

[4] A presumption favors adopting rules of general applicability through the formal rule-making procedures the APA sets out.

El Paso Hosp. Dist. v. Texas Health and Human Services Com'n, 247 S.W.3d 709 (2008)

Med & Med GD (CCH) P 302,333, 51 Tex. Sup. Ct. J. 534

*Rodriguez v. Serv. Lloyds Ins. Co.,* 997 S.W.2d 248, 255 (Tex.1999). These procedures include providing notice, publication, and public comment on the proposed rule. *Id.* (citing TEX. GOV'T CODE §§ 2001.023–.030). The process assures notice to the public and affected persons and an opportunity to be heard on matters that affect them. *Id.*

[5] When an agency promulgates a rule without complying with the proper rule-making procedures, the rule is invalid. *See* TEX. GOV'T CODE § 2001.035(a). Although we do not decide whether the February 28 cutoff is appropriate to the determination of whether hospitals receive reasonable and adequate reimbursement for inpatient Medicaid services, we do hold that HHSC should have incorporated the cutoff into the language of the "base-year rule." *See, e.g.,* 1 TEX. ADMIN. CODEE § 355.8065(b)(24) (including cutoff in rule pertaining to additional reimbursement for disproportionate share hospitals). Because we conclude that the February 28th cutoff is a rule that HHSC did not properly promulgate, we reverse the court of appeals' judgment and render judgment declaring the rule invalid and enjoining its enforcement. *See* TEX. GOV'T CODE § 2001.035.

## B

[6] The Hospitals also complain that HHSC improperly applied its administrative appeals rules. The Hospitals contend that HHSC was required to refer their appeal for a formal hearing with the State Office of Administrative Hearings.

According to the Texas Administrative Code, a hospital may appeal a claim if the hospital believes HHSC "made a mechanical, mathematical, or data entry error in computing the hospital's base year claims data," and "may request a review of the disputed calculation by the HHSC...." 1 TEX. ADMIN. CODEE § 355.8063(k)(1)(A). HHSC considers this review an "informal review." *See id.* If a hospital is dissatisfied with the results of the informal review, the hospital may then request a formal hearing before the State Office of Administrative Hearings. *See id.*

However, the appeals rule also specifically states that "[a] hospital may not appeal the prospective payment methodology used by the HHSC ... including: (A) the payment division methodologies; (B) the [diagnosis-related groups] established; (C) the methodology for classifying hospital discharges within the [diagnosis-related **\*716** groups]; (D) the relative weights assigned to the [diagnosis-related groups]; and (E) the amount of payment as being inadequate to cover costs." *Id.* § 355.8063(k)(2). Thus, the appeals rules specifically prohibit any appeals contesting HHSC's prospective payment methodology.

The court of appeals concluded that HHSC was not required to grant a formal review "[b]ecause the mathematical or data entry errors alluded to by the Hospitals did not pertain to individual claims but, rather, to how the claims selection process in the aggregate could lead to mathematical or data entry errors." 161 S.W.3d at 594. Because the February 28 cutoff is invalid, however, the Hospitals' administrative appeals do not question HHSC's payment methodology but rather the omission of individual claims. Applying the base-year rule without the February 28 cutoff, the only issue is whether HHSC has included all the claims arising during the twelve-month base-year period. *See* TEX. ADMIN. CODEE §§ 355.8063(b)(5), (n). This inquiry involves a reviewable "data entry" claim. *See id.* § 355.8063(k)(1). Thus, we conclude that the Hospitals were entitled to a review of individual claims data excluded by the February 28 cutoff.

* * *

We reverse the court of appeals' judgment and remand the case to the trial court for further proceedings.

## All Citations

247 S.W.3d 709, Med & Med GD (CCH) P 302,333, 51 Tex. Sup. Ct. J. 534

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

**808 S.W.2d 257**
**Court of Appeals of Texas,**
**Houston (1st Dist.).**

**Ruben MARTINEZ, Appellant,**
v.
**HARRIS COUNTY, Appellee.**

**No. 01–90–00723–CV. | April 18, 1991. | Rehearing Denied May 9, 1991.**

Victim of injury incurred while swinging sued county maintaining swing-set. The 269th District Court, Harris County, David West, J., entered summary judgment for county and appeal was taken. The Court of Appeals, O'Connor, J., held that: (1) swinging was recreational activity, covered by statute limiting liability of landowners for injuries occurring out of such activity; (2) statute did not violate the state or federal equal protection rights of accident victim; and (3) statute did not violate open courts provision of State Constitution.

Affirmed.

West Headnotes (4)

---

**[1]** **Negligence**
🔑Property, conditions, activities and persons covered

Swinging was "recreation," within contemplation of statute limiting landowners liability for torts arising out of recreational activity conducted on premises, even though swinging was not a specifically enumerated recreational activity; statute provided that "activities such as" enumerated ones constituted recreation. V.T.C.A., Civil Practice & Remedies Code § 75.001(2).

4 Cases that cite this headnote

---

**[2]** **Negligence**
🔑Property, conditions, activities and persons covered

Statute limiting liability of owners for injuries incurred while engaged in recreational activities on premises applied to injuries on swing-set, even though activities specifically designated

under statute as recreational did not involve owner's alteration of land, as did swing-set; statutory definition of "premises" included structures. V.T.C.A., Civil Practice & Remedies Code § 75.001(2, 3).

3 Cases that cite this headnote

[3]  **Constitutional Law**
🔑Personal Injuries
**Negligence**
🔑Constitutional, statutory and regulatory provisions

Statute providing for limitation of liability to landowners arising out of injuries incurred while engaging in recreational activities did not violate equal protection rights of victims of recreational injuries, as opposed to those sustaining other types of injuries on same premises; statute bore rational relationship to legitimate state interest of encouraging landowners to allow public to enjoy outdoor recreation on landowners' facilities. V.T.C.A., Civil Practice & Remedies Code § 75.001(2); U.S.C.A. Const.Amend. 14; Vernon's Ann.Texas Const. Art. 1, § 3.

4 Cases that cite this headnote

[4]  **Constitutional Law**
🔑Conditions, Limitations, and Other Restrictions on Access and Remedies
**Counties**
🔑Condition and use of public buildings, places, and property

Statute limiting liability of landowners for injuries arising from recreational use of land, as applied to county as landowner, did not violate recreational accident victim's constitutional right to open court for redress of personal injury; constitutional provision applied only to abridgement of common-law rights of action, and right to sue county was statutory. V.T.C.A., Civil Practice & Remedies Code § 75.001(2); Vernon's Ann.Texas Const. Art. 1, § 13.

4 Cases that cite this headnote

**Attorneys and Law Firms**

**\*258** Donald Burger, Houston, for appellant.

Frank M. Sanders, Asst. County Atty., for appellee.
Before O'CONNOR and COHEN, JJ., and GERALD T. BISSETT,[1] Assigned Justice.

[1]     The Honorable Gerald T. Bissett, Retired Justice, Court of Appeals, Thirteenth District of Texas at Corpus Christi, sitting by assignment.

## OPINION

O'CONNOR, Justice.

The question presented here is: Does the recreational use statute apply to governmental entities? We hold it does and we affirm the summary judgment in favor of Harris County.

Ruben Martinez sued Harris County for personal injuries, alleging the County negligently installed a swing in one of its parks. In April of 1989, as Martinez was swinging on a swing-set at Sylvan Beach Park, he was hurt when the swing became unhooked from the chain. Martinez alleged the County did not properly squeeze shut the "S" hook that attaches the swing to the chain.

The trial court, relying on the recreational use statute in chapter 75 of the Texas Civil Practice and Remedies Code, which limits the landowner's liability, granted Harris County's motion for summary judgement. Chapter 75 provides:

If an owner, lessee, or occupant of real property gives permission to another to enter the premises for recreation, the owner, lessee, or occupant, by giving the permission, does not:

(1) assure that the premises are safe for that purpose;

(2) owe to the person to whom permission is granted a greater degree of care than is owed to a trespasser on the premises; or

(3) assume responsibility or incur liability for any injury to any individual or property caused by any act of the person to whom permission is granted.

TEX.CIV.PRAC. & REM. CODE ANN.. § 75.002(c) (Vernon Supp.1991).

**\*259** In a summary judgment case, the movant for summary judgment has the burden of showing that it is entitled to judgment as a matter of law. *Nixon v. Mr. Property Management,* 690 S.W.2d 546, 548 (Tex.1985).

**1. Swinging is not a recreational activity**

[1] In point of error one, Martinez claims the trial court erred in granting Harris County's motion for summary judgment because swinging is not a "recreational activity" as that term is defined by chapter 75. Thus, Martinez argues, the County cannot take advantage of the recreational use statute. The statute defines "recreation" as

> an activity such as hunting, fishing, swimming, boating, camping, picnicking, hiking, pleasure driving, nature study, and waterskiing and other water sports.

TEX.CIV.PRAC. & REM.CODE ANN. § 75.001(3) (Vernon Supp.1991). Martinez contends the list in § 75.001(2) is exclusive, and therefore, the County, as the landowner, may be sued for injuries arising from any activities not included in the list.

The statute provides that "activities *such as* " those listed are considered "recreation" for purposes of chapter 75. Under the *ejusdem generis* rule, which means "of the same kind," we are to construe the general words in the statute as applying to things of the same kind or class as those specifically enumerated. *Harris County v. Eaton,* 573 S.W.2d 177, 179 (Tex.1978). *Ejusdem generis* is a canon of construction that provides when general words follow the enumeration of things of a specific meaning, the general words will be construed as applying only to things of the same general class as those enumerated. 2A C. SANDS, SUTHERLAND'S STATUTES AND STATUTORY CONSTRUCTION § 47.17 (4th ed. 1973). The examples included in the statute are not exclusive and do not exhaust the class. *See Eaton,* 573 S.W.2d at 179.

Chapter 75 was enacted to encourage landowners to allow the public to enjoy outdoor activities on the land by limiting their liability for injuries arising from these activities. *Tarrant County Water Control & Improvement Dist. v. Crossland,* 781 S.W.2d 427, 437 (Tex.App.—Fort Worth 1989, no writ). In light of the general wording of the Texas statute and the purpose of the statute, swinging is a recreational activity contemplated under chapter 75.

When a similar challenge was made to an Iowa recreational use statute that limited the liability of landowners who open their property to the public for recreational activities, the United States court of appeals held that the statute was valid against a plaintiff who sued for injuries sustained on a swing-set. *Hegg v. United States,* 817 F.2d 1328, 1330 (8th Cir.1987). The Iowa statute defined "recreational purpose" as

> the following or any combination thereof: Hunting, horseback riding, fishing, swimming, boating, camping, picnicking, hiking, pleasure driving, motorcycling, nature study, water skiing, snowmobiling, other summer and winter sports, and viewing or enjoying sites while going to and from or actually engaged therein.

IOWA CODE ANN. § 111C.2(3) (West 1984). The appellate court upheld the district court's ruling that the list in the statute was intended to be illustrative only, not exclusive, and that "in view of the general purposes of the statute and the popular and reasonable understanding of the meaning of the term 'recreational purpose,' swinging fell within that definition." *Hegg,* 817 F.2d at 1330.

We overrule point of error one.

**2. Swinging exclusion is not contemplated by statute**

[2] In point of error two, Martinez claims the trial court erred in granting the summary judgment, because swinging on a swing is not the kind of recreational activity contemplated by the legislature. He argues that chapter 75 carves a narrow exception to normal landowner liability law.

Martinez attempts to distinguish swinging on a swing from those activities listed in § 75.001(3), in that the listed activities are ones that a visitor can do without any aid or assistance from the landowner. He points out that all the listed recreational activities do not require the landowner to **\*260** provide equipment or to change the condition of the property. He argues that the legislative intent of the statute was not to penalize a landowner who allows the listed activities when the land's primary purpose is for some other use. Martinez contends that by changing the nature of the land by erecting playground equipment,

Harris County, as the landowner of Sylvan Beach Park, falls outside the protection of the statute. The County, he claims, should not be allowed to change the land so that people are lured onto it for recreation, and then be immune from the negligent operation of its recreational equipment.

The statute specifically defines "premises" as including "buildings, structures, machinery, and equipment attached or located on the land, road, water, watercourse, or private way." TEX.CIV.PRAC. & REM.CODE ANN. § 75.001(2) (Vernon Supp.1991). Playground equipment falls within the definition of "premises."

Further, as stated above, the purpose of the statute is to encourage landowners to open their property to the public for enjoyment of recreational activities. A reasonable meaning of "recreation" would include the activity of swinging on a swing-set provided for public use.

We overrule point of error two.

### 3. Constitutional violations

[3] In point of error three, Martinez contends that chapter 75 violates the equal protection clauses of the Texas Constitution and the United States Constitution. The Texas Constitution provides: "All free men ... have equal rights, and no man, or set of men, is entitled to exclusive separate public emoluments, or privileges, but in consideration of public services." TEX. CONST. art. I, § 3. The United States Constitution provides: "No State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. Martinez argues the Texas Civil Practice and Remedies Code § 75.001(3) creates different classes of plaintiffs that are treated differently under the law, namely, that people engaging in recreational activities have no remedy for landowner negligence.

In support of this point of error, Martinez relies on *Whitworth v. Bynum,* 699 S.W.2d 194 (Tex.1985). In *Whitworth,* the Texas Supreme Court analyzed the constitutionality of the Texas automobile guest statute. *Id.* at 195. That statute denied a passenger, who was a relative of the host driver, the right to sue the driver for injuries, death, or loss, in case of an accident resulting from the driver's negligence. TEX.REV.CIV.STAT.ANN. art. 6701b (Vernon 1977). The Texas Supreme Court held the statute unconstitutional, finding the classification drawn by the statute was not "rationally related to a legitimate State interest." *Whitworth,* 699 S.W.2d at 197. Plaintiff argues that as in *Whitworth,* there is no rational basis between a legitimate State interest and the classifications drawn in the statute. Here, he claims there are two classifications: people engaged in the recreational activities enumerated in chapter 75, and those engaged in other activities on a landowner's property.

When we review the constitutionality of a statute, we presume that it is valid. *Spring Branch Indep. School Dist. v. Stamos,* 695 S.W.2d 556, 558 (Tex.1985). Equal protection questions involve inquiry into three subjects: the character of the classification; the individual interests affected by classification; and the governmental interest asserted in support of the classification. *Houston Chronicle Publishing Co. v. City of Houston,* 620 S.W.2d 833, 838 (Tex.App.—Houston [14th Dist.] 1981, no writ). If interests other than fundamental rights are affected, the classification must be rationally related to a legitimate state interest. *Sullivan v. University Interscholastic League,* 616 S.W.2d 170, 172 (Tex.1981) (challenge under the United States constitutional equal protection provision); *Houston Chronicle Publishing Co.,* 620 S.W.2d at 838 (challenge under the Texas constitutional equal protection provision). Martinez is not alleging a violation of a fundamental right; therefore, we apply the rational basis test here.

Chapter 75 was enacted for the "salutary purpose of encouraging landowners to allow the public to enjoy outdoor recreation **\*261** on the landowner's property by limiting the liability of the landowner for personal injury which often results from vigorous outdoor activities." *Tarrant County Water Control & Improvement Dist.,* 781 S.W.2d at 437. The statute provides landowners with a limitation on their liability in exchange for opening their land to the public for recreational activities.

In other states, statutes like chapter 75, enacted for similar purposes, have been upheld against federal and state equal protection challenges. *Harlan v. Frazier,* 635 F.Supp. 718, 724 (W.D.La.1986), *aff'd,* 811 F.2d 601 (5th Cir.1987) (Louisiana statute); *Sublett v. United States,* 688 S.W.2d 328, 329 (Ky.1985) (Kentucky statute); *Reed v. United States,* 604 F.Supp. 1253, 1265 (N.D.Ind.1984) (Indiana statute); *Simpson v. United States,* 652 F.2d 831, 833–34 (9th Cir.1981) (California statute); *Moss v. Department of Natural Resources,* 62 Ohio St.2d 138, 404 N.E.2d 742, 745 (1980) (Ohio statute).

Chapter 75 bears a rational relationship to a legitimate state interest. The classification, therefore, is reasonable and the statute withstands the equal protection challenge.

We overrule point of error three.

### 4. Violation of the open courts provision

[4] In point of error four, Martinez contends chapter 75 violates the open courts provision of the Texas Constitution. The constitution provides: "All courts shall be open, and every person for an injury done him, in his lands, goods, person or reputation, shall have remedy by due course of law." TEX. CONST. art. I, § 13.

In *Sax v. Votteler,* 648 S.W.2d 661, 665 (Tex.1983), the Texas Supreme Court restated the test for analyzing violations of the open courts-due process provision: A statute that unreasonably abridges a justiciable right to obtain redress for injuries caused by the wrongful acts of another amounts to a denial of due process under article I, section 13, and is therefore, void. The court held that a statute is constitutional if "the legislative basis for the statute outweighs the denial of the constitutionally-guaranteed right of redress." *Id.* at 665–66.

In our analysis, we must first consider the purpose of the statute. *Sax,* 648 S.W.2d at 666. The purpose of chapter 75 is to limit liability of landowners when the landowner allows the public to use the property for recreational purposes. *Tarrant County Water Control and Improvement Dist.,* 781 S.W.2d at 437.

Second, in order for the open courts analysis to apply, there must be some abrogation of a litigant's right to bring a cause of action, either common law or statutory. *Sax,* 648 S.W.2d at 666. Martinez must show that he had a cause of action that is restricted by the recreational use statute, and that the restriction is unreasonable or arbitrary when balanced against the purpose and basis of the statute. *Sax,* 648 S.W.2d at 666.

Martinez did not have a common-law cause of action for a suit against Harris County; he only had a right to sue the County under the Texas Tort Claims Act. Under the common-law doctrine of sovereign immunity, the State and its political subdivisions, which includes counties, may not be held liable for torts absent a statutory provision creating such liability. *State v. Terrell,* 588 S.W.2d 784, 785 (Tex.1979); *Wheat v. Texas Dept. of Corrections,* 715 S.W.2d 362, 363 (Tex.App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.); TEX.CIV.PRAC. & REM.CODE ANN. § 101.001 et seq. (Vernon 1986 & Supp.1991). The Texas Tort Claims Act provides the exception to the doctrine of sovereign immunity for counties. *Id.* Thus, Martinez's remedy is not rooted in the common law, but is statutorily created. Because he cannot establish he had a cognizable cause of action that was restricted by chapter 75, he has failed to show a violation of the open courts provision of the constitution.

Other jurisdictions have held that statutes similar to chapter 75 did not violate the open courts provisions of those states. *Harlan,* 635 F.Supp. at 725; *Genco v. Connecticut Light & Power Co.,* 7 Conn.App. 164, 508 A.2d 58, 63 (1986); **\*262** *Sublett,* 688 S.W.2d 328, 329 (Ky.1985); *Abdin v. Fischer,* 374 So.2d 1379, 1380 (Fla.1979).

We overrule point of error four.

### All Citations

808 S.W.2d 257

104 S.W.3d 69
Supreme Court of Texas.

RAILROAD COMMISSION OF TEXAS and Greg Abbott in His Official Capacity as Attorney General for the State of Texas, Petitioners,
v.
WBD OIL & GAS CO. and WBD Oil & Gas Co., Inc., Respondents.

No. 01–0177. | Argued Jan. 9, 2002. | Decided Feb. 13, 2003. | Rehearing Denied June 5, 2003.

Oil and gas company filed declaratory judgment action challenging the validity of field rules promulgated by the Railroad Commission for oil and gas fields in state's panhandle. The 250th Judicial District Court, Travis County, Margaret A. Cooper, J., dismissed for want of jurisdiction, and company appealed. The Austin Court of Appeals, 35 S.W.3d 34, reversed and remanded. Commission and two intervening operators petitioned for review. The Supreme Court, Hecht, J., held that: (1) field rules could not be judicially reviewed as "rules" through a declaratory judgment action under the Administrative Procedure Act (APA), but instead could only be reviewed following the more limited procedures available for review of contested case decisions, and (2) company received adequate notice from the Commission that its production rights were to be adjudicated in proceedings to change field rules.

Judgment of Court of Appeals reversed and remanded.

West Headnotes (2)

[1]     **Declaratory Judgment**
        🔑Statutory remedy

        Field rules promulgated by the Railroad Commission, using contested case procedures, could not be judicially reviewed as "rules" through a declaratory judgment action under the Administrative Procedure Act (APA), but instead could only be reviewed following the more limited procedures available under the APA for review of contested case decisions; field rules were not rules of general applicability, but were an adjudication of the individual interests principally affected. V.T.C.A., Government Code §§ 2001.003(1, 6), 2001.038, 2001.171–2001.202.

        15 Cases that cite this headnote

[2]     **Mines and Minerals**
        🔑Powers and Proceedings of Commissions and

Officers in General

Oil and gas company received adequate notice from the Railroad Commission that its production rights in certain oil and gas fields were to be adjudicated in proceedings to change field rules for the fields, such that company was required to follow judicial review procedures for contested case decisions when challenging the field rules, although participation in the proceeding was only invited, not compelled, and company was never formally named as a party, where notice was very clear in warning that company's rights would be affected, company was aware that it could intervene, and notice set out changes the Commission was considering making and warned that other changes could also be made. V.T.C.A., Government Code §§ 2001.171–2001.202.

5 Cases that cite this headnote

**Attorneys and Law Firms**

**\*69** Jamie Nielson, Austin, Ronald C. Schultz, Dubai, Howard G. Baldwin, First Assistant Attorney General, Jeffrey S. Boyd, Office of the Attorney General, Austin, for petitioners.

Philip F. Patman, Ana Maria Marsland–Griffith, Patman & Osborn, Austin, Rick A. Mayer, The Woodlands, for Anadarko Petroleum Corp.

Don Walker, Asst. Atty. Gen., for the Railroad Commission.

James Douglas Ray, Charles E. Hampton, Michael P. Marcin, Gammage, Hampton, Marcin & Ray, Travis Phillips, The Law Offices of Travis R. Phillips, Austin, **\*70** Robert A. Gammage, Hill Gilstrap, PC, Arlington, for respondents.

**Opinion**

Justice HECHT delivered the opinion of the Court, in which Chief Justice PHILLIPS, Justice ENOCH, Justice OWEN, Justice O'NEILL, Justice JEFFERSON, Justice SCHNEIDER, and Justice SMITH joined.

To regulate oil and gas production, the Railroad Commission of Texas has adopted general rules applicable throughout the State,[1] but because these general rules cannot adequately address the widely varying conditions found in the thousands of oil and gas reservoirs in Texas, the Commission may issue orders with detailed regulations for a specific field, which the Commission calls field rules. In determining field rules, the Commission has historically followed the procedures used for adjudication rather than for rulemaking. Under the Administrative Procedure Act,[2] judicial review of adjudicated decisions is more limited in timing and scope than judicial review of rules. The question before us is whether field rules are subject to review as rules. The trial court thought not, but a divided court of appeals disagreed.[3] We agree with the trial court and consequently reverse and remand the case to the court of appeals for further proceedings.

1   *See* 16 TEX. ADMIN. CODE ch. 3 (2002).

2   TEX. GOV'T CODE §§ 2001.001–.902.

3   35 S.W.3d 34 (Tex.App.-Austin 1999).

# I

The discovery gas well in the Panhandle Field—the Canadian River Gas Company Masterson No. 1 well in Potter County—was completed in 1918 to little delight because there was then, and for many years afterward, no significant market for gas. On the other hand, the 1921 completion of the discovery oil well in the field—the Gulf Production Company S.B. Burnett No. 2 well in Carson County—set off massive drilling and production throughout the area. It was customary at the time for oil wells to be completed and the casing perforated both in lower oil horizons and higher gas horizons so that gas and oil were produced together. The so-called "wet" or casinghead gas from the well was processed to remove whatever liquid condensate or "natural gasoline" could be extracted under pressure, and the remaining "dry" gas—some 90% of the volume—was vented or flared. The gas lost by this lamentable practice could reach, by one 1934 estimate, 1 billion cubic feet per day. In 1935, the Legislature prohibited such wasteful operations.[4] About the same time, the Commission began issuing a series of orders adopting field rules to regulate the production of oil and gas in the Panhandle Field, and specifically, to prohibit perforating oil well casing in higher gas strata so as to produce gas and oil together.

4   Act of April 30, 1935, 44th Leg., R.S., ch. 120, § 1, 1935 Tex. Gen. Laws 318, 318–319 ("Declaration of policy: In recognition of past, present, and imminent evils occurring in the production and use of natural gas, as a result of waste in the production and use thereof in the absence of correlative opportunities of owners of gas in a common reservoir to produce and use the same, this law in enacted for the protection of public and private interests against such evils by prohibiting waste and compelling ratable production.").

By 1986, the Panhandle Field had been divided into thirteen separately designated fields (several simply on county lines) together containing 10,796 producing oil wells and 3,510 producing gas wells. From information the Commission had obtained and from operators' requests for clarification of the field rules, the Commission **\*71** had grown concerned about persisting "high-perforation" practices[5] as well as the adequacy of the field rules in other respects. Accordingly, in January 1986 the Commission initiated Docket No. 10–87,017 by notifying all operators in the Panhandle Fields, as well as all other interested persons and the public, that it would hold a hearing to consider consolidating the fields and changing the field rules. The Commission's notice set out possible changes in the rules but warned that it would adopt "such rules, regulations, and orders as in its judgment the evidence presented may justify and such rules, regulations and orders may differ from those specifically proposed or mentioned in this notice." Operators were "urged to present data and opinions" and admonished to conduct any necessary discovery diligently. The notice scheduled a prehearing conference for the purpose of organizing the participants and determining when and how the trial-type hearing would be conducted. The hearing began in January 1987, and in March 1989 the Commission issued its final order, adopting findings and conclusions and changing the field rules. In part, the new rules changed completion requirements, well spacing, and allowable production. Several parties sought review of the order in district court, but that case was dismissed in January 1990.[6]

[5]     *See also Amarillo Oil Co. v. Energy–Agri Prods., Inc.,
794 S.W.2d 20, 27 n. 6 (Tex.1990)* (observing that
"[o]il operators have been shooting perforations in the
well casings into the gas formations, higher up the
hole").

[6]     *Texaco, Inc. v. Railroad Comm'n,* No. 465,642
(Consolidated) (53rd Dist. Ct., Travis County, Tex.,
Jan. 26, 1990).

The notice, hearing, order, and appeal were in all respects typical of the adjudicative—what the APA calls "contested case"—procedures the Commission has long followed in determining field rules.[7] Such proceedings can be initiated by an operator or by the Commission.[8] Notice is given, usually by mail, to all operators in the field and other persons whose rights could be affected. Persons with a "justiciable or administratively cognizable interest" may intervene.[9] The hearing is conducted like a trial, with witnesses giving sworn testimony subject to cross-examination and a verbatim record kept.[10] According to the Commission, the evidence regarding the nature of a particular reservoir and the production from it is often very technical and complex. The hearing results in an order detailing regulations applicable to the specific area, which may differ from statewide regulations. Parties can seek judicial review as with any contested case decision. Persons affected by field rules may seek exceptions from the Commission based on individual circumstances, and of course when situations in a field change, the Commission may revisit the field rules as it did here.

[7]     *See* Joe Greenhill & Robert C. McGinnis, *Practice and
Procedure in Oil and Gas Hearings in Texas,* 18 SW.
L.J. 406, 407–408 (1964).

[8]     3 ERNEST E. SMITH & JACQUELINE LANG
WEAVER, TEXAS LAW OF OIL AND GAS § 15.3,
at 214 (1997).

[9]     *See* 16 TEX. ADMIN. CODE § 1.64(a) (2002).

[10]    SMITH, *supra* note 8, § 15.3, at 214.

WBD Oil & Gas Co. and WBD Oil & Gas Co., Inc. (together, "WBD") have forty marginal oil wells and one gas well in the Panhandle Fields and therefore received the Commission's notice of Docket No. 10–87,017, but decided not to participate in the hearing. WBD also received a copy of the Commission's final order but did not attempt to join in the appeal to the district court. In June 1995, however, WBD sued the Commission, challenging the validity **\*72** and applicability of the 1989 field rules. WBD complained that the Commission should not be permitted to change completion requirements for existing wells. In essence, WBD asserted that the Commission had, in WBD's words, "deprived them of property without due process, and unconstitutionally interfered with vested rights through an impermissible retroactive application of agency rules or orders that were adopted in a contested case proceeding in which WBD was not a party." WBD alleged violations of several provisions of the state and federal constitutions. As grounds for the trial court's jurisdiction, WBD asserted section 2001.038 of the APA,[11] the Uniform Declaratory Judgments Act,[12] section 85.241 of the Texas Natural Resources Code, section 1983 of title 42 of the United States Code, the Texas Constitution, and the United States Constitution. The Commission filed a plea to the jurisdiction, arguing that WBD was improperly attempting to circumvent the APA's requirements for obtaining judicial review of a Commission order. Several operators intervened in support of the Commission's position.[13] The trial court

sustained the Commission's plea and dismissed the case.

[11]     TEX. GOV'T CODE § 2001.038.

[12]     TEX. CIV. PRAC. & REM.CODE §§ 37.001–.011.

[13]     Anadarko Petroleum Corp.; MidCon Gas Services Corp.; Natural Gas Pipeline Company of America; Midgard Energy Company; and Conoco Inc.

A divided court of appeals reversed,[14] holding that the trial court had jurisdiction under section 2001.038(a) of the APA, which states:

[14]     35 S.W.3d 34.

> The validity or applicability of a rule ... may be determined in an action for declaratory judgment if it is alleged that the rule or its threatened application interferes with or impairs, or threatens to interfere with or impair, a legal right or privilege of the plaintiff.[15]

[15]     TEX. GOVT.CODE § 2001.038(a).

The APA defines "rule" as "a state agency statement of general applicability that ... implements, interprets, or prescribes law or policy...."[16] A field rule, the court concluded, fits this definition: it is clearly a state agency statement that prescribes law or policy, and it is generally applicable, though not statewide, because it applies to an open class of persons rather than specific individuals, is prospective, and affects individual rights only in subsequent enforcement proceedings.[17] The court rejected the argument that because field rules are determined using contested case procedures, they are contested case decisions that may be appealed under APA sections 2001.171–.202 and not rules that may be challenged in a declaratory judgment action under section 2001.038.[18] The court reasoned that the nature of neither the Commission proceeding nor its decision is dictated by the procedures followed, regardless of whether those procedures are mandated by law or are within the Commission's discretion[19]—in other words, a rule is a rule, whether it is the product of an informational notice-and-comment rulemaking hearing or an adversarial trial-type contested case hearing. Besides, the court explained, field rules are not adjudications because their determination is inherently legislative rather **\*73** than adjudicative,[20] and therefore the proceeding to determine them is not a contested case, defined by the APA to be "a proceeding ... in which the legal rights, duties, or privileges of a party are to be determined by a state agency after an opportunity for adjudicative hearing."[21] Thus, the court concluded, the trial court had jurisdiction of WBD's claims under section 2001.038. Those claims, the court stated, were a direct attack on the field rules rather than an impermissible collateral attack[22] and were not within the Commission's primary jurisdiction.[23] "We can think of no reason," the court said, "why the legislature would have wanted rules adopted [with contested case] procedures to be immune from challenge under APA § 2001.038."[24] Having reached this conclusion, the court did not consider WBD's other jurisdictional arguments.

[16]     *Id.* § 2001.003(6).

[17]     35 S.W.3d at 40–43.

18      *Id.* at 43–46.

19      *Id.*

20      *Id.* at 43–45.

21      TEX. GOV'T CODE § 2001.003(1).

22      35 S.W.3d at 46.

23      *Id.* at 46–47.

24      *Id.* at 45.


In dissent, Justice Powers argued that the court's "abstract and lexical"[25] construction of the APA's definition of "rule" was so broad as to include every generally applicable statement of policy an agency might make, however informally, subjecting all such statements not only to unlimited attack in judicial proceedings but also to all of the APA's procedural requirements for rulemaking, resulting in "absurd and paralyzing consequences".[26] The court's analysis, he noted, could not be limited to the adoption of field rules or even to all Railroad Commission proceedings; as a construction of the APA, it applied with equal force to all agency proceedings. Beyond these pragmatic difficulties, Justice Powers argued, the court's holding ignored the APA's fundamental, functional, procedural dichotomy between rulemaking and contested case decision-making and the judicial review appropriate for each. " 'A rule,' " he contended, quoting Professor Davis's commentary on administrative law, " '*is the product of rulemaking,* and rulemaking is the part of the administrative process that resembles a legislature's enactment of a statute.' "[27] In Justice Powers' view, the nature of the proceeding determines whether a decision is a rule. The APA's definition of "rule" in general terms, Justice Powers argued, is meant to discourage agencies from attempting to circumvent the Act's notice-and-comment procedures when they should apply, not to mandate their application universally.[28] The contested case procedures the Commission used to determine field rules, Justice Powers observed, not only provided interested persons with adequate process but guaranteed due process when rulemaking procedures would not.[29] Accordingly, he concluded, the appropriate judicial review of field rules was by appeal as with other contested case decisions, not by declaratory judgment action allowed for rules challenges.

25      *Id.* at 49 (Powers, J., dissenting).

26      *Id.* at 52.

27      *Id.* at 51 (quoting KENNETH CULP DAVIS, ADMINISTRATIVE LAW § 5.01, at 123 (1972))

(emphasis added in opinion).

28      *Id.* at 50–51.

29      *Id.* at 52.

On rehearing, Justice Kidd added a brief concurring opinion attempting to "harmonize" the court's opinion and Justice Powers' dissent. In Justice Kidd's view, "[t]he Railroad Commission, in propounding field rules, employs a hybrid procedure which **\*74** blends both legislative rulemaking and contested-case procedures into one docket."[30] In this circumstance, which he regarded as entirely unique, field rules could be challenged under section 2001.038.[31]

30      *Id.* at 48 (Kidd, J., concurring).

31      *Id.*

The Commission and two intervenors in the trial court[32] petitioned for review. They and several amici curiae[33] argue that the court of appeals' decision opens long-settled field rules to new attacks and poses a serious threat to the process the Commission has used for decades to determine field rules. In addition, the Public Utilities Commission as amicus curiae has expressed concern that the court of appeals' construction of the APA will adversely affect it and other agencies. We granted the petitions for review to address these issues.[34]

32      Conoco, Inc. and Anadarko Petroleum Corp.

33      Coghlan, Crowson, Fitzpatrick, Westbrook & Worthington; Goldston Oil Corp.; Phillips Petroleum Co.; Pioneer Natural Resources USA, Inc.; Scott, Douglass & McConnico; Texas Oil & Gas Association.

34      44 Tex. Sup.Ct. J. 1170 (Sept. 20, 2001).

## II

[1] We are not concerned here with whether the Commission's long-standing practice of determining field rules using contested case procedures rather than rulemaking procedures is an appropriate exercise of the discretion that we have said it possesses generally to choose between the two.[35] The court of appeals indicated,[36] and WBD concedes, that the use of contested case procedures is proper and maybe even necessary to fully protect the rights of everyone affected. The issue we have to decide is whether field rules, having been determined under contested case procedures, may nevertheless be judicially reviewed as rules under section 2001.038 of the APA rather than as contested case decisions. The issue is not, of course,

merely one of nomenclature; denominating reservoir-specific regulations "field *rules* ", as opposed to "field regulations" or "field orders", does not make them "rules" within the meaning of the APA. Use of the term "field rules" predates the APA's first predecessor in 1975[37] by decades. Nor do we think that the issue can be resolved by focusing on a single provision of the APA—its definition of "rule"—to the distortion of the Act as a whole. Accordingly, we begin with an overview of the APA's provisions to set the context in which individual provisions must be construed.

[35]    *See Railroad Comm'n v. Lone Star Gas,* 844 S.W.2d 679, 689 (Tex.1992) (observing that the Commission may exercise "informed discretion" in deciding to promulgate rules rather than determine issues in contested cases).

[36]    35 S.W.3d at 45.

[37]    Act of April 8, 1975, 64th Leg., R.S., ch. 61, 1975 Tex. Gen. Laws 136.

The APA provides two modes of judicial review—one for contested case decisions and the other for rules—that are significantly different. Judicial review of contested case decisions is far more limited. To obtain such review, an aggrieved person must move for rehearing (except in certain cases),[38] must have exhausted all other administrative remedies available,[39] **\*75** and must file a petition with the court within thirty days of the decision.[40] A person seeking judicial review of a rule need not do any of these things. The only time limitation on judicial review of a rule is that a proceeding to contest compliance with certain procedural requirements must be initiated within two years of the rule's effective date.[41] Otherwise, judicial review of a rule may be sought at any time. The scope of review of a contested case decision varies from statute to statute;[42] sometimes a court must try the issue de novo,[43] but far more often it is limited to determining whether the agency decision was supported by substantial evidence.[44] The APA does not restrict the scope of judicial review of rules but says only:

[38]    TEX. GOV'T CODE § 2001.145(a) ("A timely motion for rehearing is a prerequisite to an appeal in a contested case except that a motion for rehearing of a decision or order that is final under Section 2001.144(a)(3) [involving imminent peril to the public health, safety, or welfare] or (4) [by agreement of the parties] is not a prerequisite for appeal.").

[39]    *Id.* § 2001.171 ("A person who has exhausted all administrative remedies available within a state agency and who is aggrieved by a final decision in a contested case is entitled to judicial review under this chapter.").

[40]    *Id.* § 2001.176(a) ("A person initiates judicial review in a contested case by filing a petition not later than the 30th day after the date on which the decision that is the subject of complaint is final and appealable.").

[41]    *Id.* § 2001.035(b) ("A person must initiate a proceeding

to contest a rule on the ground of noncompliance with the procedural requirements of [specified sections] not later than the second anniversary of the effective date of the rule.").

42      *Id.* § 2001.172 ("The scope of judicial review of a state agency decision in a contested case is as provided by the law under which review is sought.").

43      *Id.* § 2001.173(a) ("If the manner of review authorized by law for the decision in a contested case that is the subject of complaint is by trial de novo, the reviewing court shall try each issue of fact and law in the manner that applies to other civil suits in this state as though there had not been an intervening agency action or decision but may not admit in evidence the fact of prior state agency action or the nature of that action except to the limited extent necessary to show compliance with statutory provisions that vest jurisdiction in the court.").

44      *Id.* § 2001.174 ("If the law authorizes review of a decision in a contested case under the substantial evidence rule or if the law does not define the scope of judicial review, a court may not substitute its judgment for the judgment of the state agency on the weight of the evidence on questions committed to agency discretion but: (1) may affirm the agency decision in whole or in part; and (2) shall reverse or remand the case for further proceedings if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (A) in violation of a constitutional or statutory provision; (B) in excess of the agency's statutory authority; (C) made through unlawful procedure; (D) affected by other error of law; (E) not reasonably supported by substantial evidence considering the reliable and probative evidence in the record as a whole; or (F) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.").

The validity or applicability of a rule ... may be determined in an action for declaratory judgment if it is alleged that the rule or its threatened application interferes with or impairs, or threatens to interfere with or impair, a legal right or privilege of the plaintiff.[45]

45      *Id.* § 2001.038(a).

No standard of review is prescribed. The statute adds that plaintiff need not have challenged the rule before the agency.[46] Judicial review of rules is thus largely unlimited in time and scope.

[46]     *Id.* § 2001.038(d) ("A court may render a declaratory judgment without regard to whether the plaintiff requested the state agency to rule on the validity or applicability of the rule in question.").

The differences in these two modes of judicial review do not derive from distinctions between decisions *qua* decisions and rules *qua* rules unrelated to the procedures that produce them. Both decisions and rules have the force of law, and while it may often be true that a contested case decision affects only the relatively few parties actually involved in the case while a **\*76** rule may have a much broader effect, that is not necessarily so. Some cases, like this one, affect a large number of persons, more than some rules. Moreover, to the extent that a contested case decision has precedential value for similar cases, its effect may be similar to a rule's. The proper mode of judicial review is simply not based on the number of persons affected.

But different methods of judicial review can be justified by the profound procedural differences between contested case proceedings and rulemaking proceedings. In rulemaking proceedings:
   • notice of a proposed rule must be published in the Texas Register;[47]

[47]     *Id.* § 2001.023(b) ("A state agency shall file notice of the proposed rule with the secretary of state for publication in the Texas Register in the manner prescribed by Chapter 2002.").

   • the agency must "give all interested persons a reasonable opportunity to submit data, views, or arguments, orally or in writing";[48]

[48]     *Id.* § 2001.029(a).

   • interested persons are not entitled to compel evidence or take discovery;
      • the agency need not conduct a hearing unless requested by at least twenty-five persons, an association with at least twenty-five members, or the government;[49]

[49]     *Id.* § 2001.029(b) ("A state agency shall grant an opportunity for a public hearing before it adopts a substantive rule if a public hearing is requested by: (1) at least 25 persons; (2) a governmental subdivision or agency; or (3) an association having at least 25 members.").

   • no rules of evidence apply;

      • persons supplying information need not testify under oath;

      • interested persons are not entitled to cross-examination;
      • the agency may consult informally with interested persons and appoint a committee of experts to provide advice;[50]

[50]     *Id.* § 2001.031(a)-(b)("(a) A state agency may use an informal conference or consultation to obtain the opinions and advice of interested persons about contemplated rulemaking. (b) A state agency may appoint committees of experts or interested persons or

representatives of the public to advise the agency about contemplated rulemaking.").

• a proposed rule must be reviewed by a committee in each House of the Legislature;[51]

[51]     *Id.* § 2001.032 ("Each house of the legislature by rule shall establish a process under which the presiding officer of each house refers each proposed state agency rule to the appropriate standing committee for review before the rule is adopted....").

• the agency, if requested, must give "a concise statement of the principal reasons for and against" the adoption of the rule;[52] and

[52]     *Id.* § 2001.030 ("On adoption of a rule, a state agency, if requested to do so by an interested person either before adoption or not later than the 30th day after the date of adoption, shall issue a concise statement of the principal reasons for and against its adoption. The agency shall include in the statement its reasons for overruling the considerations urged against adoption.").

• there is no record of the proceedings.
By contrast, in a contested case:
  • notice must be given to each party;[53]

[53]     *Id.* § 2001.051 ("In a contested case, each party is entitled to an opportunity: (1) for hearing after reasonable notice of not less than 10 days; and (2) to respond and to present evidence and argument on each issue involved in the case.").

• only parties are entitled to present evidence and argument;[54]

[54]     *Id.*

**\*77** • the agency and parties may subpoena evidence and take discovery;[55]

[55]     *Id.* §§ 2001.089–.103.

• each party is entitled to an opportunity for hearing;[56]

[56]     *Id.* § 2001.051.

• the rules of evidence apply generally;[57]

[57]     *Id.* § 2001.081 ("The rules of evidence as applied in a nonjury civil case in a district court of this state shall apply to a contested case except that evidence

inadmissible under those rules may be admitted if the evidence is: (1) necessary to ascertain facts not reasonably susceptible of proof under those rules; (2) not precluded by statute; and (3) of a type on which a reasonably prudent person commonly relies in the conduct of the person's affairs.").

• witnesses are sworn;[58]

[58] *Id.* § 2001.088 ("A state agency may swear witnesses and take their testimony under oath in connection with a contested case held under this chapter.").

• parties are entitled to cross-examination;[59]

[59] *Id.* § 2001.087 ("In a contested case, a party may conduct cross-examination required for a full and true disclosure of the facts.").

• the agency may generally not engage in ex parte consultations;[60]

[60] *Id.* § 2001.061("(a) Unless required for the disposition of an ex parte matter authorized by law, a member or employee of a state agency assigned to render a decision or to make findings of fact and conclusions of law in a contested case may not directly or indirectly communicate in connection with an issue of fact or law with a state agency, person, party, or a representative of those entities, except on notice and opportunity for each party to participate. (b) A state agency member may communicate ex parte with another member of the agency unless prohibited by other law. (c) Under Section 2001.090, a member or employee of a state agency assigned to render a decision or to make findings of fact and conclusions of law in a contested case may communicate ex parte with an agency employee who has not participated in a hearing in the case for the purpose of using the special skills or knowledge of the agency and its staff in evaluating the evidence.")

• a proposed decision is not reviewable by the Legislature;

• the agency must make findings of fact and conclusions of law, whether requested or not;[61] and

[61] *Id.* § 2001.141("(a) A decision or order that may become final under Section 2001.144 that is adverse to a party in a contested case must be in writing or stated in the record. (b) A decision that may become final under Section 2001.144 must include findings of fact and conclusions of law, separately stated. (c) Findings of fact may be based only on the evidence and on matters that are officially noticed. (d) Findings of fact, if set forth in statutory language, must be accompanied

by a concise and explicit statement of the underlying facts supporting the findings. (e) If a party submits under a state agency rule proposed findings of fact, the decision shall include a ruling on each proposed finding.").

• a record must be made of the proceedings.[62]

[62]  *Id.* § 2001.060 ("The record in a contested case includes: (1) each pleading, motion, and intermediate ruling; (2) evidence received or considered; (3) a statement of matters officially noticed; (4) questions and offers of proof, objections, and rulings on them; (5) proposed findings and exceptions; (6) each decision, opinion, or report by the officer presiding at the hearing; and (7) all staff memoranda or data submitted to or considered by the hearing officer or members of the agency who are involved in making the decision.").

Plainly, rulemaking procedures maximize "public participation in the rulemaking process," a stated purpose of the APA,[63] while contested case procedures limit participation to those directly affected by the dispute. It makes perfect sense to allow less restricted judicial review of rules. It **\*78** may well be that the effect of a rule cannot be fully appreciated except as time passes. To require review to be initiated within thirty days, or any comparably short time period, would impair the utility of rules by forcing on them a permanence they do not deserve. For contested cases, the situation is exactly opposite. Once an agency has resolved the disputes among persons directly involved in a contested case, they have every reason to expect that any further challenge will follow immediately and after that the decision will stand. To offer litigants no assurance of finality in the circumstances presented is to make the dispute-resolution process meaningless to them.

[63]  *Id.* § 2001.001(2).

The court of appeals suggested that determining field rules is a hybrid process,[64] but this cannot be true. Contested case procedures and rulemaking procedures are mutually exclusive: a rule cannot be adopted without public input, and a contested case cannot be decided with it. A person is entitled to provide rulemakers with data or opinions without being placed under oath; a person cannot testify in a contested case except under oath. Parties to a contested case are entitled to a decision based on the evidence in the record; there is no record in a rulemaking proceeding. An agency proceeding to determine field rules that bind persons who receive notice but do not actually appear and participate is no less adjudicative than is a class action in court. In both instances, all those whose rights will be affected must be given notice. In a rulemaking proceeding, blanket notice must be given to the public at large. Contested case procedures and rulemaking procedures simply cannot be mixed in one hybrid proceeding.

[64]  35 S.W.3d at 43; *id.* at 48 (Kidd, J., concurring).

WBD argues, and the court of appeals held, that the Commission's hearing on the Panhandle Field rules was not a contested case as defined by the APA. We disagree. The APA defines a contested case as "a proceeding ... in which the legal rights, duties, or privileges of a party are to be determined by a state agency after an opportunity for adjudicative hearing."[65] WBD argues, as the court of appeals did,[66] that the Panhandle Field rules hearing was not adjudicative because individual rights were not determined, but this argument contradicts WBD's basic complaint in this case, which is that its own rights have been altered by the decision in a proceeding in which it did not participate. Contested case procedures were used, including giving notice to all operators, so that production rights in the field could be determined. Like a judgment in a class action, the Commission's decision adjudicated the rights of those who chose to participate in the proceeding and all others similarly

situated—that is, other operators in the Panhandle Fields. The court of appeals reasoned that the Panhandle Field rules were not "concretely operative" against any individual until the initiation of enforcement proceedings,[67] but under that view only the rights of violators would ever be determined. Certainly, the law is more "concretely operative" when one is standing in the dock, but one need not be indicted to notice the law's constraints. Operators who chose to comply with the field rules also had their rights determined in the proceeding.

[65]    TEX. GOV'T CODE § 2001.003(1).

[66]    35 S.W.3d at 45.

[67]    *Id.* at 43.

The mainstay of the court of appeals' analysis and WBD's argument is that field **\*79** rules come within the APA's definition of a rule, which is "a state agency statement of general applicability that ... implements, interprets, or prescribes law or policy...."[68] While this definition may be read abstractly to encompass field rules, in the context of the APA as a whole it is clear that field rules are not rules of "general applicability" which must not be made without public comment but are an adjudication of the individual interests principally affected. One need only compare field rules detailing spacing and proration requirements in a specific reservoir and its own peculiar geologic formations with the Commission's statewide rules which govern the entire oil and gas industry for the public good to see this difference. We noted this difference in *Railroad Commission v. Torch Operating Co.,* comparing temporary field rules to statewide rules:

[68]    TEX. GOV'T CODE § 2001.003(6).

Temporary field rules are not adopted under the rulemaking provisions of the Administrative Procedure Act. Instead, they are promulgated through the adjudication provisions of the Act because these rules concern a specific field and a specific group of operators and do not affect the statewide oil and gas industry as a whole.[69]

[69]    912 S.W.2d 790, 791 n. 1 (Tex.1995) (citing 3 ERNEST E. SMITH & JACQUELINE LANG WEAVER, TEXAS LAW OF OIL AND GAS § 15.3, at 214–215 (1995)).

By "general applicability", the APA definition references statements that affect the interest of the public at large such that they cannot be given the effect of law without public input. The definition does not reference statements made in determining individual rights, even if the number of individuals is large and they can be described as falling within a defined class.

Thus, as we read the APA, judicial review of orders adopting field rules should be the same as in other contested case decisions. As a practical matter, such review affords the participants in the proceeding ample opportunity to challenge the Commission's decision but also provides for the reasonable finality necessary for conducting operations in the field. To allow field rules to be challenged in a declaratory judgment action that can be filed at any time would deny them the certainty essential to their effectiveness. The court of appeals wrote: "We can think of no reason why the legislature would have wanted rules adopted [with contested case] procedures to be immune from challenge under APA § 2001.038."[70] The reason to require that orders adopting field rules be reviewed like other contested case decisions is to afford the certainty such decisions require as long as circumstances are unchanged.

[70]    35 S.W.3d at 45.

Accordingly, we conclude that Commission field rules adopted in a contested case like those involved here cannot be challenged in a declaratory judgment action under section 2001.038 of the APA.

## III

[2] WBD argues that even if section 2001.038 would not otherwise apply, it should nevertheless be permitted to sue under that statute because the notice it received was inadequate for a contested case proceeding. According to the notice, participation in the proceeding was only invited, not compelled, and WBD was never formally named as a party. But the notice was very clear in warning that WBD's rights would be affected. WBD was aware that it could intervene in the proceeding and chose not to do so. Not only did the Commission's notice urge participation, **\*80** it set out changes the Commission was considering making in the field rules and warned that other, different changes might also be made. We think the notice was sufficient for WBD to know that its production rights in the Panhandle Fields were to be adjudicated.

As we have noted above, WBD asserts a number of other bases for jurisdiction of its claims in the district court, which the court of appeals did not find it necessary to address. Although the parties have devoted a portion of their briefing in this Court to WBD's other jurisdictional arguments, we believe they should first be addressed by the court of appeals.

\* \* \* \* \* \*

For these reasons, the judgment of the court of appeals is reversed and the case is remanded to that court for further proceedings.

Justice WAINWRIGHT did not participate in the decision.

**All Citations**

104 S.W.3d 69, 159 Oil & Gas Rep. 122, 46 Tex. Sup. Ct. J. 442

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

453 S.W.3d 606
Court of Appeals of Texas,
Austin.

Teladoc, Inc., Appellant
v.
Texas Medical Board and Nancy Leshikar, in her Official Capacity as General Counsel of the Texas Medical
Board, Appellees

NO. 03–13–00211–CV | Filed: December 31, 2014

**Synopsis**
**Background:** Operator of network of physicians providing medical services by telephone brought action against state medical board, alleging that letter sent to operator by board, which warned that doctors providing such services would be exposed to disciplinary action, was a "rule" within the meaning of the Administrative Procedure Act (APA) and, therefore, invalid for failure to follow the notice and comment procedure. The District Court, Travis County, 353rd Judicial District, Amy Clark Meachum, J., awarded summary judgment to board, finding that the letter was not a rule. Operator appealed.

**Holdings:** The Court of Appeals, Bob Pemberton, J., held that:

[1] letter was an agency statement of general applicability, and

[2] letter effectively amended existing board rule and, thus, was itself a "rule."

Reversed and rendered.

West Headnotes (9)

[1]     **Appeal and Error**
        👉Particular orders or rulings reviewable in general
        **Appeal and Error**
        👉Rendering Final Judgment

        Where both sides move for summary judgment and the trial court grants one motion and denies the other, Court of Appeals reviews the summary judgment evidence presented by both sides, determines all questions presented, and renders the judgment that the district court should have rendered.

        Cases that cite this headnote

[2] **Appeal and Error**
🔑Cases Triable in Appellate Court

Construction of both statutes and administrative rules presents questions of law that Court of Appeals reviews de novo under traditional principles of statutory construction.

Cases that cite this headnote

[3] **Health**
🔑Regulatory boards, officers, and examiners
**Health**
🔑Nature and existence of relation

Letter from state medical board to operator of network of physicians providing medical services by telephone, warning that providing such services without a prior face-to-face examination would violate board rule governing creation of a "proper professional relationship," was an agency statement of general applicability, for purposes of determining whether letter was itself a "rule" within meaning of Administrative Procedure Act (APA), despite contention that letter was directed only at operator; letter included a threat of disciplinary action against any physicians who violated board's interpretation of rule, and letter was copied to statewide professional organization of physicians. Tex. Gov't Code Ann. § 2001.003(6); 28 Tex. Admin. Code § 190.8(1)(L).

1 Cases that cite this headnote

[4] **Administrative Law and Procedure**
🔑Nature and Scope

An informal agency statement that does no more than merely restate its own formally promulgated rules would not in itself be a "rule" within the meaning of the Administrative

Procedure Act (APA). Tex. Gov't Code Ann. § 2001.003(6).

Cases that cite this headnote

[5] **Administrative Law and Procedure**
⚷Nature and Scope

An agency's interpretations or applications of existing formally promulgated rules will themselves be held to be "rules" within the meaning of the Administrative Procedure Act (APA) where they have the effect of amending the existing rules, or of creating new rules, and the other requirements of the APA's "rule" definition are met. Tex. Gov't Code Ann. § 2001.003(6).

Cases that cite this headnote

[6] **Administrative Law and Procedure**
⚷Nature and Scope

The bare fact that an agency statement might be said to interpret or effectuate only standards already prescribed in existing statutes or rules, as opposed to creating new standards, cannot categorically mean that the statement lacks the sort of legal effect on private persons that distinguishes a "rule" within the meaning of the Administrative Procedure Act (APA), as the same would be true of any "agency statement of general applicability that" interprets law, and the legislature has explicitly included such statements within the APA's definition of "rule." Tex. Gov't Code Ann. § 2001.003(6).

1 Cases that cite this headnote

[7] **Health**
⚷Regulatory boards, officers, and examiners
**Health**
⚷Nature and existence of relation

Letter from state medical board to operator of network of physicians providing medical services by telephone, which interpreted board rule governing creation of a proper professional relationship as requiring a face-to-face examination, effectively amended board rule so as to conform to separate rule governing telemedicine and, thus, was itself a "rule" subject to notice and comment requirements of Administrative Procedure Act (APA); letter interpreted phrase "such as" before list of acceptable medical practices as requiring employment of all such practices, and interpreted rule's statement that "telephonic evaluation by questionnaire is inadequate" as applying to all telephonic evaluations. Tex. Gov't Code Ann. §§ 2001.003(6), 2001.0225 et seq.; 28 Tex. Admin. Code §§ 174.8, 190.8(1)(L).

Cases that cite this headnote

[8]  **Administrative Law and Procedure**
  ☞Power to Make

An agency's discretion to make law or policy through adjudication is not unlimited.

Cases that cite this headnote

[9]  **Administrative Law and Procedure**
  ☞Nature and Scope

Not every statement by an administrative agency is a rule for which the Administrative Procedure Act (APA) prescribes procedures for adoption and for judicial review, and the Act defines "rule" in a way that will exclude a considerable range of unofficial, individually directed, tentative or other non-proscriptive agency or staff issuances concerning law or policy.

Cases that cite this headnote

**\*607 FROM THE DISTRICT COURT OF TRAVIS COUNTY, 353RD JUDICIAL DISTRICT, NO. D–1–GN–11–002115, HONORABLE AMY CLARK MEACHUM, JUDGE PRESIDING**

**Attorneys and Law Firms**

Douglas D. Geyser, Office of the Attorney General, Solicitor General's Office, Austin, TX, for appellee.

Benjamin Geslison, Baker Botts, L.L.P., Houston, TX, Dudley D. McCalla, Matt Dow, Carla J. Cox, Jackson Walker, L.L.P., Thomas R. Phillips, Baker Botts, L.L.P., Austin, TX, for appellant.
Before Chief Justice Jones, Justices Pemberton and Field

*OPINION*

Bob Pemberton, Justice

We again confront the recurrent question of whether an "informal" written agency pronouncement regarding law or policy constitutes a "rule" as the Administrative Procedure Act (APA)[1] defines that **\*608** term.[2] In this case, a professional regulatory agency sent a letter to the primary statewide association representing the regulated population warning that certain practices violated agency rules and would lead to disciplinary action. The agency's pronouncement went beyond a mere restatement of its existing formally promulgated rules or underlying statutes. We have little difficulty concluding that the substance and nature of this pronouncement distinguishes it as a "rule" under the APA.

---

[1] The APA is codified in chapter 2001 of the Texas Government Code. *See* Tex. Gov't Code §§ 2001.001–.902.

[2] *See id.* § 2001.003(6).

---

**BACKGROUND**

As its name suggests, Teladoc, Inc., the appellant, is in the business of providing health-care consumers access to a network of physicians who dispense medical services by telephone. The basic features of Teladoc's business model are undisputed. Through a website, an individual consumer creates a personal account, provides access to personal information and medical records, and can request consultation with a physician when the need arises. In that event, a responding physician will access and review the patient's information and medical records through the website, then call the patient by telephone and consult with him or her. Based on the medical records and history, the patient's reported symptoms, and other information the physician elicits during the consultation, the physician dispenses medical advice and, when deemed appropriate, can prescribe certain medications.[3] A nurse reviews any resulting prescriptions for allergies or potential drug interactions before submission to the patient's pharmacy. The consulting physician enters notes and findings into the patient's electronic health record, which is immediately made available to the patient and the patient's primary-care physician.

---

[3] Teladoc has emphasized that its physicians do not prescribe drugs that have a demonstrated risk of abuse, such as narcotics, or non-therapeutic drugs like Viagra.

---

Teladoc has operated in Texas since 2005, and its clientele currently includes several large public and private health plans and managed-care organizations.[4] But in June 2011, the Texas Medical Board (TMB or the Board)—the administrative agency that licenses and regulates physicians in this state, including those participating in Teladoc's network[5]—wrote Teladoc a letter taking issue with "several recent representations by Teladoc regarding its internet program" that, in TMB's view, indicated that physicians would be "jeopardizing their respective licenses should they choose to participate" in Teladoc's network.

[4]     Teladoc indicates, and the Texas Medical Board does not dispute, that its customers currently include "the entire commercially-insured population of Aetna in the State of Texas, as well as several large group employers ... and over three hundred smaller employers through non-Aetna plans[,] ... 800,000 members of the Texas State Medicaid managed care population, ... approximately 25,000 individuals within the Medicare population, ... and a number of children in foster care for the Texas Health and Human Services Commission."

[5]     *See* Tex. Occ. Code § 152.001 (creating TMB); *see generally id.* §§ 151.001–168.202 (Medical Practice Act). There is no contention that Teladoc itself is practicing medicine or is otherwise directly subject to TMB's regulatory authority.

The letter attacked "Teladoc[ ] advertising materials" for indicating that the physicians in its network can provide medical services "over the telephone without any prior establishment of a physician/patient relationship via a 'face-to-face' examination," asserting that this practice violated **\*609** "Board Rule 190.8(1)(L)." That rule, codified in Title 28 of the Texas Administrative Code at section 190.8(1)(L), is included among a non-exclusive list of physician acts and omissions that TMB has deemed to constitute the "fail[ure] to practice medicine in an acceptable professional manner consistent with public health and welfare" under the Medical Practice Act.[6] The referenced paragraph (L) specifically prohibits physicians from prescribing "any dangerous drug or controlled substance without first establishing a proper professional relationship with the patient."[7] Since November 2003, and at all times relevant to this case, subparagraph (i) of paragraph (L) has prescribed the requirements for creating a "proper professional relationship" as follows:

(i) A proper relationship, at a minimum requires:

(I) establishing that the person requesting the medication is in fact who the person claims to be;

(II) establishing a diagnosis through the use of acceptable medical practices such as patient history, mental status examination, physical examination, and appropriate diagnostic and laboratory testing. An online or telephonic evaluation by questionnaire is inadequate;

(III) discussing with the patient the diagnosis and the evidence for it, the risks and benefits of various treatment options; and
(IV) ensuring the availability of the licensee or coverage of the patient for appropriate follow-up care.[8]

According to TMB, the requirements set forth in (II)—"Rule 190.8(1)(L)(i)(II)"—meant that the "acceptable medical practices" entailed in "establishing a diagnosis" (and, in turn, initiating a "proper" physician-patient relationship) must always include a " 'face-to-face' physical examination." As TMB would later elaborate, this construction rested upon two related premises: (1) the "physical examination" contemplated in Rule 190.8(1)(L)(i)(II) entails a "face-to-face" examination; and, more critically, (2) the rule's reference to "acceptable medical practices *such as* patient history, mental status

examination, physical examination, and appropriate diagnostic and laboratory testing" means that physicians must perform *all four* enumerated procedures or their equivalent. In TMB's view, the "face-to-face" physical examination component of these requirements precluded a physician from making an initial diagnosis by telephone.

[6]      22 Tex. Admin. Code § 190.8(1) (TMB, Violation Guidelines); *see* Tex. Occ.Code §§ 153.001 (TMB's rulemaking authority), 164.051(a)(6) ("The board may refuse to admit a person to its examination or refuse to issue a license to practice medicine and may take disciplinary action against a person if the person ... fails to practice medicine in an acceptable professional manner consistent with public health and welfare.").

[7]      22 Tex. Admin. Code § 190.8(1)(L).

[8]      28 Tex. Reg. 10496, 10497 (2003) (codified at 22 Tex. Admin. Code § 190.8(1)(L)(i)).

TMB's letter similarly criticized Teladoc for purportedly advertising that the telephone consultations it provides are not within the scope of revised rules governing "telemedicine" that the agency promulgated in 2010. Telemedicine, simply described, refers to medical services provided over the Internet or other "advanced communication technology" enabling an off-site physician to see and hear the patient in real time.[9] TMB's 2010 telemedicine **\*610** rules, codified in chapter 174 of title 22 of the Texas Administrative Code,[10] incorporate an explicit concept of "face-to-face visit," defined as "[a]n evaluation performed on a patient where the provider and patient are both at the same physical location" unless the patient is located at a medical facility qualifying as an "established medical site."[11] When a patient is located at an "established medical site," the rules permit a "distant site provider" to use "telemedicine medical services ... for all patient visits, including initial evaluations to establish a proper physician-patient relationship between a distant site provider and a patient."[12] However, when a patient is located somewhere other than an "established medical site," a distant site provider may not provide telemedicine medical services without first "see[ing] the patient one time in a face-to-face visit" or receiving a referral from another physician who has performed an in-person evaluation of the patient.[13] The telemedicine rules additionally include a provision, Rule 174.8, that addresses the initial creation of the physician-patient relationship in a manner similar to Rule 190.8(1)(L)(i):

> (a) Evaluation of the Patient. Distant site providers who utilize telemedicine medical services must ensure that a proper physician-patient relationship is established which at a minimum includes:
>
> (1) establishing that the person requesting the treatment is in fact whom he/she claims to be;
>
> (2) establishing a diagnosis through the use of acceptable medical practices, including patient history, mental status examination, physical examination (unless not warranted by the patient's mental condition), and appropriate diagnostic and laboratory testing to establish diagnoses, as well as identify underlying conditions or contra-indications, or both, to treatment recommended or provided;
>
> (3) discussing with the patient the diagnosis and the evidence for it, the risks and benefits of various treatment options; and
> (4) ensuring the availability of the distant site provider or coverage of the patient for appropriate follow-up care.[14]

**\*611** Subparagraph (2) generally corresponds to Rule 190.8(1)(L)(i)(II), but with an obvious textual difference—whereas Rule 190.8(1)(L)(i)(II) requires "establishing a diagnosis through the use of acceptable medical practices *such as* patient history, mental status examination, physical examination, and appropriate diagnostic and laboratory testing,"[15] Rule 174.8(a)(2) requires "establishing a diagnosis through the use of acceptable medical practices, *including* patient history,

mental status examination, physical examination ... and appropriate diagnostic and laboratory testing."[16]

[9]     *See* 22 Tex. Admin. Code § 174.2(10) (TMB, Definitions) (defining "Telemedicine Medical Services" as "[t]he practice of medical care delivery, initiated by a distant site provider, who is physically located at a site other than the site where the patient is located, for the purposes of evaluation, diagnosis, consultation, or treatment which requires the use of advanced telecommunications technology that allows the distant site provider to see and hear the patient in real time"); *see also* Tex. Gov't Code § 531.001(8) (defining same phrase as "a health care service initiated by a physician or provided by a health professional, diagnosis or consultation by a physician, treatment, or the transfer of medical data that requires the use of advanced telecommunications technology").

[10]    *See* 22 Tex. Admin. Code §§ 174.1–.12 (TMB Telemedicine rules).

[11]    *See id.* § 174.2(3) (defining "face-to-face visit"); *see also id.* § 174.2(2) (defining "established medical site").

[12]    *Id.* § 174.6 (TMB, Telemedicine Medical Services Provided at an Established Medical Site).

[13]    *See id.* § 174.7(a) (TMB, Telemedicine Medical Services Provided at Sites other than an Established Medical Site). The same rule additionally requires that any such patients obtain an annual "in-person" evaluation by a physician and that existing patients receive face-to-face visits within 72 hours after receiving telemedicine medical services related to new symptoms. *See id.* § 174.7(c), (e).

[14]    *Id.* § 174.8(a) (TMB, Evaluation and Treatment of the Patient).

[15]    *Id.* § 190.8(1)(L)(i)(II) (emphasis added).

[16]    *Id.* § 174.8(a)(2) (emphasis added).

While acknowledging that "phone consults were deleted from the [2010 telemedicine] rule as adopted," TMB in its letter insisted—notwithstanding the textual differences between the enactments—that this exclusion had reflected its position "both initially and throughout the [rulemaking] process" that the more general Rule 190.8(1)(L)(i)(II) had already required " 'face-to-face' consults [as] the only appropriate manner in which to establish a physician/patient relationship." The telemedicine rules had departed from this policy, TMB claimed, only to the extent of "allow[ing] for situations in which th[e] required 'face-to-face' examination could be accomplished through the use of the [I]nternet." TMB also emphasized that Teladoc had commented in opposition to the telemedicine rules when proposed,[17] characterizing the company as having "maintain[ed] throughout the rulemaking process that 'face-to-face' examinations were not necessary to establish a physician/patient relationship," and portraying the agency's response as a repudiation of that position not only with respect to the telemedicine rules, but also Rule 190.8(1)(L)(i)(II).[18]

[17]    Teladoc or affiliates evidently offer medical services over the Internet in other states.

[18]    The letter represents, for example, that "as Teladoc described its practices before the Board members sitting on the rulemaking committee, Teladoc was told that it was then violating Board rules and if it continued in that vein it would continue to be in violation of Board rules."

Based on TMB's view of Rule 190.8(1)(L)(i)(II) and the rule's relationship with the 2010 telemedicine rules, TMB accused Teladoc of "unconscionable" "misrepresentation" in advertising or representing that "its process can be conducted over the telephone without any prior establishment of a physician/patient relationship via a 'face-to-face' examination." TMB added that "[t]hese statements ... if followed by licenced Texas physicians, will lead to disciplinary action against the participating doctors in the program." The agency also threatened that "any representation that you [Teladoc] make regarding Teladoc's program being in compliance with Board rules will be directly and firmly refuted by the Board" and that "[t]he Board will take all legal steps as are necessary should it see continued advertisements containing the material referenced above."

Of final note, the letter advised that "[b]y copy hereof, the Board is sending this correspondence to the Texas Medical Association," and a copy was indeed transmitted by overnight delivery to TMA's Vice President and General Counsel. TMA, as TMB acknowledges, is the chief statewide association representing the Texas medical profession, with over 48,000 physician and medical student members.[19]

[19]    As if to emphasize this fact, our oral-argument docket on the day we heard Teladoc's appeal also included, by happenstance, one of the many scope-of-practice lawsuits TMA has initiated over the years on behalf of the Texas medical profession.

**\*612** In response to this letter and its implications for Teladoc's ability to do business in Texas, the company sued TMB under section 2001.038 of the APA, which authorizes declaratory-judgment claims against a state agency to challenge the "validity" or "applicability" of a "rule."[20] Teladoc contended that TMB's letter—or, more precisely, the agency's pronouncements therein concerning the construction and effect of Rule 190.8(1)(L)(i)(II)—was in itself a "rule" under the APA.[21] Because TMB unquestionably did not comply with the APA's notice-and-comment rulemaking requirements before promulgating this new "rule," Teladoc prayed that the "rule" be declared void under APA section 2001.035.[22] In the alternative, Teladoc prayed that the district court remand the "rule" to TMB, pursuant to APA section 2001.040, to afford the agency the opportunity to readopt or revise through proper APA procedures.[23]

[20]    *See* Tex. Gov't Code § 2001.038(a) ("The validity or

applicability of a rule ... may be determined in an action for declaratory judgment if it is alleged that the rule or its threatened application interferes with or impairs, or threatens to interfere with or impair a legal right or privilege of the plaintiff."), (c) ("The state agency must be a party to the action."); *see also Texas Dep't of Transp. v. Sunset Transp., Inc.,* 357 S.W.3d 691, 700 (Tex.App.–Austin 2011, no pet.) (explaining that section 2001.038 waives sovereign immunity to the extent of the relief it authorizes) (citing *Texas Logos, L.P. v. Texas Dep't of Transp.,* 241 S.W.3d 105, 123 (Tex.App.–Austin 2007, no pet.)).

[21]     *See* Tex. Gov't Code § 2001.003(6) (defining "rule").

[22]     *See id.* §§ 2001.0225–.034 (rulemaking procedures), .035 ("A rule is voidable unless a state agency adopts it in substantial compliance with Sections 2001.0225 through 2001.034.").

[23]     *See id.* § 2001.040 ("If a court finds that an agency has not substantially complied with one or more of the procedural requirements of Sections 2001.0225 through 2001.034, the court may remand the rule, or a portion of the rule, to the agency and, if it does so remand, shall provide a reasonable time for the agency to either revise or readopt through established procedure.").

In addition to the declaratory relief it sought, Teladoc also asserted claims for temporary and permanent injunctive relief to restrain the "rule's" enforcement. The district court granted a temporary restraining order, which was ultimately extended through judgment by agreement. On appeal, however, Teladoc does not appear to complain of the district court's dismissal of its claims for injunctive relief.

Teladoc also named as a defendant the TMB officer who had written the June 2011 letter on the agency's behalf—general counsel Nancy Leshikar, in her official capacity. At least with respect to Teladoc's claim for declaratory relief under APA section 2001.038, this amounts to a duplicative but harmless pleading of the same claim for relief against the same defendant, TMB. *See Texas Dep't of State Health Servs. v. Balquinta,* 429 S.W.3d 726, 750 (Tex.App.–Austin 2014, pet. filed) (suggesting that where sovereign immunity has been waived by APA section 2001.038 so as to permit suit against an agency, it is of no substantive consequence that claimant also named agency official as a defendant to that claim) (citing *Texas A & M Univ. Sys. v. Koseoglu,* 233 S.W.3d 835, 844 (Tex.2007); *cf. Texas State Bd. of Pharmacy v. Witcher,* 447 S.W.3d 520, 545 (Tex.App.–Austin 2014, pet. filed) (reasoning that where agency's immunity from suit

was waived by section 2001.171 of the APA, immunity was likewise waived as to agency officers sued in their official capacities) (citing *Koseoglu, 233 S.W.3d at 844*). For convenience, however, we refer to the relevant defendant solely as TMB.

Teladoc subsequently sought summary judgment on its claims. TMB countered with a cross-motion for summary judgment challenging whether its June 2011 letter had constituted a "rule" under the APA and, in turn, whether Teladoc's claims had invoked the district court's jurisdiction via **\*613** section 2001.038.[24] Concluding that "the June 16, 2011 letter ... is not an unpublished 'rule' within the meaning of the [APA]," the district court rendered judgment denying Teladoc's motion and granting TMB's cross-motion, in effect sustaining the agency's jurisdictional challenge. This appeal ensued.

[24]     *See Slay v. Texas Comm'n on Envtl. Quality,* 351 S.W.3d 532, 544–45 (Tex.App.–Austin 2011, pet. denied) ("From the face of the statute, a challenged agency action that constitutes a 'rule' is among the facts (more precisely, a mixed question of law and fact) that must exist in order for a claimant to successfully invoke, via section 2001.038, a trial court's subject-matter jurisdiction over the claim for relief authorized by the statute. If there is no 'rule' as defined by the APA being challenged, in other words, the claimant cannot obtain the declaratory relief the statute authorizes against the State, its agencies, or its agents, because sovereign immunity would bar the cause of action.") (citing *Combs v. City of Webster,* 311 S.W.3d 85, 100–01 (Tex.App.–Austin 2009, pet. denied)).

## ANALYSIS

Teladoc brings two issues on appeal. In the first, Teladoc argues that TMB's June 2011 letter constitutes a "rule" under the APA as a matter of law, such that the district court erred in denying Teladoc's summary-judgment motion and granting TMB's. Teladoc further prays that we render judgment against TMB declaring the "rule" invalid or, alternatively, remanding it to TMB under APA section 2001.040. In its second issue, urged in the alternative, Teladoc contends that even if it is not entitled to summary judgment, TMB has likewise failed to meet its summary-judgment burden, such that we should reverse the district court's judgment and remand for further proceedings.

### Standard of review

[1]We review the district court's summary-judgment rulings de novo.[25] Summary judgment is proper when there are no disputed issues of material fact and the movant is entitled to judgment as a matter of law.[26] Where, as here, both sides move for summary judgment and the trial court grants one motion and denies the other, we review the summary-judgment evidence presented by both sides, determine all questions presented, and render the judgment that the district court should have rendered.[27]

[25]     *Valence Operating Co. v. Dorsett,* 164 S.W.3d 656, 661 (Tex.2005).

[26]    Tex.R. Civ. P. 166a(c); *Shell Oil Co. v. Khan,* 138 S.W.3d 288, 291 (Tex.2004).

[27]    *Texas Workers' Comp. Comm'n v. Patient Advocates of Tex.,* 136 S.W.3d 643, 648 (Tex.2004); *FM Props. Operating Co. v. City of Austin,* 22 S.W.3d 868, 872 (Tex.2000).

In this case, the pivotal summary-judgment issue turns on application of statutes and rules to undisputed facts—whether TMB's June 2011 letter, whose contents are in the record and undisputed, qualifies as a "rule" as the APA has defined that term.[28] If the letter is not a "rule," Teladoc failed to invoke the district court's jurisdiction through APA section 2001.038.[29] If, on the other hand, the letter is a "rule," Teladoc both properly invoked the district court's jurisdiction through section 2001.038 and established its entitlement to summary judgment on its declaratory claim under that statute, as **\*614** it is undisputed that TMB did not promulgate the letter in accordance with the APA's notice-and-comment rulemaking requirements.[30]

[28]    Teladoc also emphasizes summary-judgment evidence of what it characterizes as TMB's prior explicit or tacit agreement that initial physician-patient consultations by telephone satisfy Rule 190.8(1)(L)(i)(II). Because we conclude the contents of the letter itself conclusively establish that it is a "rule," we need not address this additional evidence or its possible implications.

[29]    *See, e.g., Slay,* 351 S.W.3d at 544–45, 548.

[30]    *See, e.g., El Paso Hosp. Dist. v. Texas Health & Human Servs. Comm'n,* 247 S.W.3d 709, 715 (Tex.2008); *Combs v. Entertainment Publ'ns, Inc.,* 292 S.W.3d 712, 723–24 (Tex.App.–Austin 2009, no pet.).

[2]Construction of both statutes and administrative rules presents questions of law that we review de novo under traditional principles of statutory construction.[31] Our primary objective is to ascertain and give effect to the drafters' intent.[32] We determine that intent from the plain meaning of the words chosen when it is possible to do so, using any definitions provided.[33] We consider the statutes or rules as a whole rather than their isolated provisions.[34] We presume that the enactment's language was chosen with care, with each word included (or omitted) purposefully.[35]

[31]    *See TGS–NOPEC Geophysical Co. v. Combs,* 340 S.W.3d 432, 438 (Tex.2011) (holding that administrative rules are interpreted under principles of statutory construction); *City of Rockwall v. Hughes,* 246 S.W.3d 621, 625 (Tex.2008) ("Statutory construction is a legal question we review de novo.").

[32]    *See TGS–NOPEC,* 340 S.W.3d at 439 (citing Tex. Gov't Code § 312.005; *Texas Dep't of Protective &*

*Regulatory Servs. v. Mega Child Care, Inc.,* 145 S.W.3d 170, 176 (Tex.2004)).

[33]  *See id.* (citing Tex. Gov't Code § 311.011(b)).

[34]  *See id.* (citing *Texas Dep't of Transp. v. City of Sunset Valley,* 146 S.W.3d 637, 642 (Tex.2004)).

[35]  *See id.* (citing *In re M.N.,* 262 S.W.3d 799, 802 (Tex.2008)).

**A rule?**

The APA defines a "rule" as follows:

"Rule":

(A) means a state agency statement of general applicability that:

(i) implements, interprets, or prescribes law or policy; or

(ii) describes the procedure or practice requirements of a state agency;

(B) includes the amendment or repeal of a prior rule; and
(C) does not include a statement regarding only the internal management or organization of a state agency and not affecting private rights or procedures.[36]

Teladoc asserts that TMB's letter satisfies each element of this definition. TMB does not dispute that its letter is a "state agency statement," as required by (A), and it plainly is—it purports to speak for the Board, conveying its official position, and there is no contention that the writer, the agency's general counsel, was acting with anything less than the Board's full authority.[37] Similarly, the statement obviously "implements, interprets, or prescribes law or policy," reflecting the Board's construction and application of Rule 190.8(1)(L)(i)(II) and the underlying statutory concept of practicing medicine "in an acceptable professional manner consistent with public health and welfare."[38] The **\*615** statement likewise implements a broader policy judgment by the Board, reflected explicitly in the 2010 telemedicine rules, that the creation of a new physician-patient relationship should generally entail an in-person physical examination.[39] The statement would also impact private rights and not merely internal agency management or organization, thereby negating the exception in (C)—TMB unambiguously and definitively asserts that a physician's provision of prescriptions or other medical services "over the telephone without any prior establishment of a physician/patient relationship via a 'face-to-face' examination" violates Rule 190.8(1)(L)(i)(II) and will prompt legal action that includes "disciplinary action against the participating doctors."[40]

[36]  Tex. Gov't Code § 2001.003(6).

[37]  *See Entertainment Publ'ns,* 292 S.W.3d at 718, 721–22 (letter signed by the "Assistant Director of Tax Administration" of the Comptroller's office conveying Comptroller's construction of tax laws was a "rule"

under the APA; noting that "the Comptroller does not contend that the signer of the letter was acting with anything less than her full authority").

[38]    *See id.* at 721 ("There is no question" that letters conveying Comptroller's construction of tax laws are "statements implementing, interpret[ing], or prescribing law or policy," as they "interpret[ed] the tax code to mean that [brochure-fundraising] firms are, for purposes of collecting and remitting sales tax, always the 'sellers' of the taxable items.").

[39]    *See El Paso Hosp. Dist.,* 247 S.W.3d at 714 (HHSC's "February 28 cutoff" used in calculating Medicaid reimbursement rates "implements law" and "implements policy"); *Witcher,* 447 S.W.3d 520, 2014 WL 5654255, at *7 ("The Board's disciplinary order ... leave[ ]s little doubt" that Board's de facto "reciprocal-sanctions" requirement "is a statement implementing, interpreting, or prescribing the agency's policy....").

[40]    *See Witcher,* 447 S.W.3d 520, 2014 WL 5654255, at *7 (noting that Board's order was essentially statement that it was "duty bound" to impose disciplinary action based on interpretation); *Entertainment Publ'ns, Inc.,* 292 S.W.3d at 722 (emphasizing that legal interpretation in Comptroller's letters would bind agency employees and "unambiguously express[ed] an intent to apply this interpretation ... in all future cases" involving similar facts); *see also Witcher,* 447 S.W.3d 520, 2014 WL 5654255, at *10 (distinguishing Board of Pharmacy's reciprocal-sanctions "rule" from the non-binding evaluative sanctions guidelines addressed in *Slay,* 351 S.W.3d at 537–42, 546–48).

[3]TMB joins issue, however, as to whether the letter represents an agency statement of "general applicability." Agency statements of "general applicability" refer to those "that affect the interest of the public at large such that they cannot be given the effect of law without public comment," as contrasted with statements "made in determining individual rights."[41] Its letter does not meet this requirement, TMB insists, because it was "directed only at Teladoc." That narrow characterization is conclusively refuted by the contents of the letter itself. While the letter certainly seeks in part to influence or impede Teladoc's Texas operations, it also pronounces a rule construction that impacts all physicians practicing in this state—accompanied by a threat of "disciplinary action" against any physicians who would dare to deviate from the Board's view.[42] The letter is also pointedly copied to TMA, the chief statewide professional organization representing Texas physicians and medical students. In short, the letter and the manner of its dissemination are plainly calculated to place the regulated public—Texas physicians—on notice of the agency's legal pronouncement and the accompanying threat of adverse consequences if they fail to comply.[43]

[41]    *See Entertainment Publ'ns, Inc.,* 292 S.W.3d at 721 (quoting *El Paso Hosp. Dist.,* 247 S.W.3d at 714; *Railroad Comm'n v. WBD Oil & Gas Co.,* 104 S.W.3d

69, 79 (Tex.2003)).

42      *See id.* at 721–22 (Comptroller's letters regarding tax treatment of brochure-fundraising firms "apply not only to Entertainment and the tax-exempt groups with which it conducts business, but to all brochure-fundraising firms engaging in business across the state.").

43      *See id.* at 722 ("[W]hile the interpretation [of Tax Code in letters] would bind agency employees to apply the rule in analyzing the tax responsibilities to parties to these sales, it is not directed 'only' to the 'internal management or organization of a state agency.' Rather, it is aimed at placing the regulated public on notice of the Comptroller's prospective, blanket application of [the] tax code.") (internal citation omitted); *see also id.* (concluding that the manifested "intent of the agency, the prescriptive nature of the [letters], and the context in which the agency statement was made" distinguished them as a "rule") (quoting *Texas Educ. Agency v. Leeper,* 893 S.W.2d 432, 443 (Tex.1994)).

Similarly misplaced is TMB's reliance on *Beacon National Insurance Co. v. Montemayor,* which rejected an attempted APA section 2001.038 challenge to an asserted "rule" consisting "only [of] a series of letters between Beacon and TDI and a proposed consent decree submitted to Beacon by TDI." 86 S.W.3d 260, 268–69 (Tex.App.–Austin 2002, no pet.). The *Beacon* Court emphasized that "the correspondence from TDI about which Beacon complains is directed at Beacon only" and did not "equate to a specific agency rule, set of requirements, or specific policy." *Id.* 268–69. None of that is true of TMB's letter here.

[4] [5] [6] **\*616** A potentially more complicated question on which the parties diverge is whether the pronouncements in the letter should be considered to have any legal effect or significance independent of what is already contained in Rule 190.8(1)(L)(i)(II). Subpart (B) of the APA's definition states that a "rule" "includes the amendment or repeal of a prior rule."[44] While "includes" denotes that a "rule" may include agency statements beyond those that amend or repeal an existing rule, "this indicia of a 'rule,' " as we have previously observed, "is nonetheless illustrative of the types of agency actions that would [be considered to] have legal effect on private persons, as contemplated by [ (C) ]."[45] Consequently, as we explained in *Sunset Transportation,* "an informal agency statement that does no more than merely restate its own formally promulgated rules would not in itself be a 'rule,' " adding that this proposition is perhaps one of the few that can be discerned with "relative certainty" in this notoriously muddled corner of the law.[46] But in the aftermath of the Texas Supreme Court's *El Paso Hospital* decision, it is equally clear that an agency's "interpretations" or "applications" of existing formally promulgated rules will themselves be held to be "rules" where they have the effect of amending the existing rules, or of creating new rules, and the other requirements of the APA's "rule" definition are met.[47] Similarly, the bare fact that an agency statement might be said to "interpret" or effectuate only standards already prescribed in existing statutes or rules, as opposed to creating new standards, cannot categorically mean that the statement lacks the sort of legal effect on private persons that distinguishes a "rule," as the same would be true of any "agency statement of general applicability that ... interprets ... law," and the Legislature has explicitly included such statements within the Texas APA's definition of "rule."[48]

44    Tex. Gov't Code § 2001.003(6)(B).

45    *Sunset Transp.,* 357 S.W.3d at 704.

46    *Id.* at 703; *accord Texas Dep't of Pub. Safety v. Salazar,* 304 S.W.3d 896, 904 (Tex.App.–Austin 2009, no pet.) (DPS internal memorandum prescribing that drivers' licenses will include statement of bearer's immigration status "merely reiterates" rule already imposing that requirement).

47    *See El Paso Hosp. Dist.,* 247 S.W.3d at 714–15 (holding agency statement to be a "rule" despite agency's insistence that it "is not a rule itself, but rather its interpretation of the [existing] rule"). *Accord Witcher,* 447 S.W.3d 520, 2014 WL 5654255, at *9–10.

48    *See* Tex. Gov't Code § 2001.003(6)(A); *see also Entertainment Publ'ns,* 292 S.W.3d at 723 n. 6 (acknowledging that the Court's analysis reached the same conclusion as would applying Professor Ron Beal's analysis to identify an "interpretive rule") (citing Ron Beal, *A Miry Bog Part II: UDJA and APA Declaratory Judgment Actions and Agency Statements Made Outside a Contested Case Hearing Regarding the Meaning of the Law,* 59 Baylor L.Rev. 267, 270 (2007); Ron Beal, *The APA and Rulemaking: Lack of Uniformity Within a Uniform System,* 56 Baylor L.Rev. 1, 29–46 (2004)). As Professor Beal further notes, the Texas APA differs from its federal counterpart in making "rules" that "interpret" law or policy—the so-called "interpretive rules"—subject to notice-and-comment rulemaking requirements. Ronald L. Beal, *Texas Administrative Practice & Procedure,* § 2.3.4 (2014) (citing 5 U.S.C. § 553(b)(3)(a)).

**\*617** The "agency statement" held to be a "rule" in *El Paso Hospital* was HHSC's "interpretation" of its formally promulgated rules governing calculation of Medicaid reimbursement rates to divine a temporal cut-off for the data set that was not found in the text of the existing rules.[49] A more recent example of an agency rule "interpretation" held to itself constitute a "rule" is found in this Court's *Witcher* decision, in which the Board of Pharmacy had applied a multi-factor sanctions rule in a manner that effectively made only one of the factors singularly dispositive.[50] At the opposite end of the spectrum is the situation we addressed in *Sunset Transportation,* where the asserted "rule"—an informational "notice" issued by the Texas Department of Transportation concerning regulatory changes impacting certain interstate motor carriers[51]—was substantively identical to the agency's formally promulgated rules.[52] We further observed that "distinguishing a mere restatement of a formally promulgated rule from a statement that is itself a 'rule,'" was "straightforward" on the record presented there, but "might prove more elusive in other circumstances."[53]

49    *See El Paso Hosp. Dist.,* 247 S.W.3d at 714–15.

50    *See Witcher,* 447 S.W.3d 520, 2014 WL 5654255, at *10.

51    *See Sunset Transp.,* 357 S.W.3d at 700–01.

52    *See id.* at 704. The portions of the notice at issue consisted of (1) a statement that "[a]ll motor carriers must maintain active insurance filing with TxDOT at all times;" and (2) a statement that motor carriers whose state registrations have been revoked "are required to re-register and submit applicable fees." The first challenged statement, we observed, "tracks TxDOT's rules" requiring motor carriers to "file and maintain proof of automobile liability insurance for all vehicles required to be registered." *Id.* (quoting 43 Tex. Admin. Code § 218.16(e)(1)(A)). The second challenged statement, we concluded, "tracks TxDOT's rules providing that '[i]f a motor carrier that has registered [under the statute requiring it] does not maintain continuous motor carrier registration under [the statute], the motor carrier must file an application under [the statute] to operate on public streets and highways in this state." *Id.* (citing 43 Tex. Admin. Code § 218.14(c) and related rule governing registration requirements and fees, § 218.13).

53    *Id.*

[7]The parties urge diametrically opposing views as to where TMB's letter lies along this continuum. Teladoc argues that the "construction" of Rule 190.8(1)(L)(i)(II) pronounced in TMB's letter amounts to an amendment of that formally promulgated rule, similar to the temporal cut-off in *El Paso Hospital.* It reasons that Rule 190.8(1)(L)(i)(II)'s requirement of "... acceptable medical practices *such as* patient history, mental status examination, physical examination, and appropriate diagnostic and laboratory testing" denotes a non-exclusive list of illustrative examples of "acceptable medical practices," emphasizing dictionary definitions to that effect.54 **\*618** Consequently, Teladoc urges, Rule 190.8(1)(L)(i)(II) contemplates that a "physical examination" (whether "face-to-face" or through some other means) is merely one type of "acceptable medical procedure" through which a physician might permissibly make an initial diagnosis in a given case consistent with the standard of care. In pronouncing that a physical examination—and, indeed, each of the other examples of "acceptable medical procedures" mentioned in Rule 190.8(1)(L)(i)(II) or their equivalent—are *all required* in *every* case, TMB's letter, in Teladoc's view, departs from that rule's unambiguous text to an extent as to effectively rewrite it.

54    *See, e.g., The American Heritage Dictionary of the English Language* 1740 (5th ed.2011) (defining "such" as "[o]f this kind" and "[o]f a kind specified or implied," and describing the idiom "such as" to mean "[f]or example"); *see also Martinez v. Harris Cnty.,* 808 S.W.2d 257, 259 (Tex.App.–Houston [1st Dist.] 1991, writ denied) (holding that list of activities after

"such as" was illustrative only and not exclusive); *Board of Adjustment v. Levinson,* 244 S.W.2d 281, 282–283 (Tex.Civ.App.–San Antonio 1951, no writ) ("The synonyms of 'such as,' are alike, similar, of the like kind; 'such' representing the object as already particularized in terms which are not mentioned, being a descriptive and relative word, referring to the specific articles mentioned.").

In contrast, TMB insists that its letter merely "restates" Rule 190.8(1)(L)(i)(II), emphasizing two textual features of that enactment. First, pointing to the conjunction "and" within the rule's enumeration of "... acceptable medical practices such as patient history, mental status examination, physical examination, *and* appropriate diagnostic and laboratory testing," TMB urges that "such as ..." must refer to all four of the cited procedures *collectively* as the exemplar of "acceptable medical practices." Second, TMB insists that the concluding sentence in Rule 190.8(1)(L)(i)(II)—"An online or telephonic evaluation by questionnaire is inadequate"—unequivocally bars physicians from relying only on a telephone consultation when establishing a physician-patient relationship. Teladoc counters that in the context of Rule 190.8(1)(L)(i)(II)'s use of "and" following "such as," "and" is merely the equivalent of "or," as suggested by Webster's use of the following example to illustrate the definition of "such as"—"course fish *such as* carp, catfish, and the like."[55] Were TMB's view of the rule correct, Teladoc suggests, it would imply that "course fish such as ..." in the Webster's illustration must refer to a conflation of "carp, catfish, and the like" that is unknown to nature, a nonsensical construction. As for Rule 190.8(1)(L)(i)(II)'s last sentence, Teladoc accuses TMB of rewriting the rule again by ignoring the modifier "... online or telephonic evaluation *by questionnaire* ..." "By questionnaire," Teladoc observes, denotes the use of a script or finite list of questions that are asked without regard to the person being questioned.[56] Evaluation or consultation without the use of a questionnaire—such as the sorts of open-ended questions that a doctor in search of a diagnosis might ask, whether in person or over the phone—are not prohibited, Teladoc urges.

[55] *Webster's Third New Int'l Dictionary* 2283 (2002) (defining "such").

[56] *See, e.g., American Heritage* at 1444 (defining "questionnaire" as "[a] form containing a set of questions, especially one addressed to a statistically significant number of subjects as a way of gathering information for a survey").

TMB also insists that Rule 190.8(1)(L)(i)(II) must be read "in context" with its 2010 telemedicine rules. By this, TMB means that the two enactments must be construed to impose parallel requirements of a "face-to-face" physical examination as part of a physician's initial evaluation of a new patient. Were it otherwise, TMB reasons, physicians could "evade" the face-to-face physical examination requirements imposed by the telemedicine rules "simply by picking up the telephone and calling the patient."[57] Teladoc replies that if the 2010 telemedicine **\*619** rules have any bearing on the meaning of the 2003–enacted Rule 190.8(1)(L)(i)(II), it is only to illustrate stark textual differences between the two rules, most notably the contrast between Rule 174.8's reference to "... acceptable medical practices, *including* patient history, mental status examination, physical examination ... and appropriate diagnostic and laboratory testing"[58] as compared to Rule 190.8(1)(L)(i)(II)'s "... acceptable medical practices *such as* patient history, mental status examination, physical examination, and appropriate diagnostic and laboratory testing."[59] "Including," Teladoc urges, is a term of enlargement that encompasses all that follows,[60] in contrast to the list of examples denoted by "such as." Such textual distinctions, as Teladoc emphasizes, must be given effect when construing Rule 190.8(1)(L)(i)(II).[61]

[57] To similar effect, citing its responses to a comment from Teladoc regarding the proposed 2010

telemedicine rules, TMB emphasizes an excerpt in which it described Rule 174.8 as "consistent with and mirror [ing] the language of 22 TAC § 190.8(1)(L)." 35 Tex. Reg. 9085, 9090 (2010) (comment to adopted rule 22 Tex. Admin. Code § 174.8). This statement responded to a comment concerning a requirement within Rule 174.8 regarding follow-up care and, in context, would appear to refer solely to that feature of the two enactments, not the broader correlation TMB insinuates. *See id.* Regardless, TMB's characterization of the relationship between the telemedicine rules and the preexisting Rule 190.8(1)(L)(i)(II) would be no more authoritative regarding the latter provision's meaning than the similar ex-post assertions contained in its June 2011 letter. *Cf. Entertainment Publ'ns,* 292 S.W.3d at 717–18 (noting Comptroller's Office's attempt to portray new tax code interpretation as one it "has consistently held").

[58]  22 Tex. Admin. Code § 174.8(a)(2) (emphasis added).

[59]  *Id.* § 190.8(1)(L)(i)(II) (emphasis added).

[60]  *See* Tex. Gov't Code § 311.005(13) (" 'Includes' and 'including' are terms of enlargement and not of limitation or exclusive enumeration, and use of the terms does not create a presumption that components not expressed are excluded.").

[61]  *See Railroad Comm'n v. Texas Citizens for a Safe Future & Clean Water,* 336 S.W.3d 619, 628 (Tex.2011) ("When the legislature uses a word or phrase in one portion of a statute but excludes it from another, the term should not be implied where it has been excluded."); *see also TGS–NOPEC,* 340 S.W.3d at 439 (we presume that the enactment's language was chosen with care, with each word included (or omitted) purposefully).

At bottom, Teladoc argues, TMB's letter amounts to a procedurally invalid amendment to conform Rule 190.8(1)(L)(i)(II) to Rule 174.8 merely by declaring that the two textually contrasting provisions actually mean the same thing. In that regard, Teladoc also emphasizes that when promulgating the current version of Rule 174.8 referring to "... acceptable medical practices, *including* patient history, mental status examination, physical examination ... and appropriate diagnostic and laboratory testing" in 2010, TMB actually replaced a prior version that had contained language parallel to Rule 190.8(1)(L)(i)(II) and referring to "... acceptable medical practices *such as* patient history, mental status examination, and appropriate diagnostic and laboratory testing."[62] This history, Teladoc contends, betrays not only TMB's understanding of the significant difference in the meaning of "including" versus "such as," but its awareness that a change between the two must properly be achieved through the APA's notice-and- **\*620** comment rulemaking processes and not by the naked fiat it relies on here.

[62]     *See* 35 Tex. Reg. 9085 (2010) (codified at 22 Tex. Admin. Code § 174.8) (proposed Apr. 30, 2010); 29 Tex. Reg. 6088, 6089 (codified at 22 Tex. Admin. Code § 174.4 (Use of the Internet in Medical Practice) (proposed Apr. 23, 2004), *repealed* 35 Tex. Reg. 9085 (2010) (emphasis added). An earlier version of the same rule, promulgated in 2003, had also contained the same "such as" language. *See* 28 Tex. Reg. 3325 (2003) (codified at 22 Tex. Admin. Code § 174.17 (Use of the Internet in Medical Practice), *repealed* 29 Tex. Reg. 6088 (2004).

We agree with Teladoc that TMB's pronouncements in its June 2011 letter are tantamount to amendments to the existing text of Rule 190.8(1)(L)(i)(II), effectively substituting "including" for "such as," thereby conforming it to the 2010 telemedicine rules. Similarly, to the extent the pronouncement also rests upon Rule 190.8(1)(L)(i)(II)'s last sentence, TMB's letter effectively deleted the modifying phrase "by questionnaire." TMB's pronouncements hardly "track" Rule 190.8(1)(L)(i)(II) in the manner of the TxDOT notice in *Sunset Transportation*—rather, they depart from and effectively change that text.[63]

[63]     *Cf. Sunset Transp., Inc.,* 357 S.W.3d at 704; *Salazar,* 304 S.W.3d at 904.

In contending otherwise, TMB ultimately insists that even if Rule 190.8(1)(L)(i)(II) fails to unambiguously support its "interpretation," the letter is at least consistent with a reasonable interpretation to which that ambiguous rule would be susceptible and would be accorded deference under the principles that govern judicial review of agency rule constructions.[64] But even if we assume TMB's pronouncement could somehow be reconciled with Rule 190.8(1)(L)(i)(II)'s text, as the agency insists, the letter would still have the effect of amending the rule so as to adopt one of the alternative reasonable constructions to which the current text would be susceptible while rejecting another. To that extent, at least, the pronouncement would have a legal effect on private parties beyond that achieved through the text of Rule 190.8(1)(L)(i)(II) alone. To hold that the pronouncement has no such effect because it "interprets" or "applies" Rule 190.8(1)(L)(i)(II) to resolve an ambiguity would be, as previously suggested, logically inconsistent with the Legislature's explicit recognition that a "rule" under the APA includes an "agency statement of general applicability that ... interprets ... law."[65]

[64]     *See, e.g., TGS–NOPEC,* 340 S.W.3d at 438.

[65]     *See* Tex. Gov't Code § 2001.003(6)(A). To the extent *Texas Mutual Insurance Co. v. Vista Community Medical Center Hospital,* 275 S.W.3d 538 (Tex.App.–Austin 2008, pet. denied), could be construed as holding to the contrary, we conclude it is not controlling. *Vista* concerned disputes arising under a formal rule promulgated by the Division of Workers' Compensation that had imposed a "stop-loss" limitation on reimbursement payments made to hospitals. After administrative law judges (ALJs) at the State Office of Administrative Hearings (SOAH) reached divergent conclusions regarding the proper construction of the stop-loss rule in deciding medical-reimbursement disputes, the director of SOAH's medical-review division prepared a one-page memorandum advocating what the director viewed as the proper construction of the rule, which SOAH ALJs followed for a period

thereafter. *See id.* at 545–46. In relevant part, this Court held that the memorandum was not itself a "rule" void for failure to comply with APA rulemaking requirements. *See id.* at 555–56. The Court reasoned in part that the memorandum was not a "state agency statement" because it had never been adopted or approved by the relevant agency, the Division. *See id.* at 555. The Court went on, however, to conclude that the memorandum was merely a statement regarding SOAH's "internal management" that "did not affect private rights" because "it [was] designed to correct [ALJ's] inconsistent application or the Stop–Loss Exception" and "it did not change or amend [the stop-loss rule]; it simply mandated internal consistency when applying the rule." *Id.* at 556. *Vista* 's assertion that this memorandum was purely "internal" and had no impact on private rights is arguably inconsistent with both *El Paso Hospital* and this Court's more recent jurisprudence like *Entertainment Publications* and *Witcher,* inasmuch as the rule construction advocated in the memorandum was to be applied, and was applied, by SOAH ALJs in deciding medical fee disputes, plainly impacting private rights. *Cf. El Paso Hosp. Dist.,* 247 S.W.3d at 714–15 (agency's cut-off date affected hospitals' private rights); *Witcher,* 447 S.W.3d 520, 2014 WL 5654255, at *7 (emphasizing general applicability of the agency interpretation and its impact on the private rights); *EntertainmentPubl'ns,* 292 S.W.3d at 721 (noting that applying interpretation to all brochure-fundraising firms affected private rights). Similarly, as for the suggestion that the memorandum did not impact private rights because it represented one of two competing constructions of the stop-loss rule, *Vista* cites no supporting authority beyond attempting to contrast the memorandum with the cut-off "rule" in *El Paso Hospital,* which it characterized as "contradict[ing]" the underlying formal rules. *See Vista,* 275 S.W.3d at 556. But leaving aside the merits of these assertions by the *Vista* Court, *see Sunset Transp.,* 357 S.W.3d at 704 (citing *Vista* as example where the distinction between "a mere restatement of a formally promulgated rule" and "a statement that is itself a 'rule' " was "elusive"), they can be classified as dicta given the Court's preceding holding that the memorandum was not a "state agency statement" at all. *See id.* at 555.

[8] [9] **\*621** Finally, TMB urges that "sound public policy" warrants a narrow construction of the APA's "rule" definition that would exclude the pronouncements in its letter. "If this type of letter constitutes a 'rule,' " TMB insists, the "alternatives left to an agency ... that wishes to alert a regulated entity that it [in the agency's opinion] is violating a statute or regulation" would be confined to the following "poor option[s]": (1) "without warning, simply initiate administrative proceedings"; (2) "send correspondence stating that the entity is violating a rule but without providing any additional explanation," leaving the entity to "merely guess at the basis for the alleged violation"; or (3) "initiate rulemaking proceedings each time it wants to notify a regulated entity of a possible violation." The latter option is especially odious in TMB's view, quoting the following familiar excerpt from this Court's 1999 *Brinkley* opinion, seemingly cited by this state's administrative agencies with greater frequency and fervor than even the Texas Constitution:

Agencies would be reduced to impotence ... if bound to express their views as to 'law,' 'policy,' and

> procedural 'requirements' through contested-case hearings or formal rules exclusively; and they could not under such a theory exercise powers explicitly delegated to them by the [L]egislature.... If every expression by the agency as to 'law,' 'policy,' and procedural 'requirements' requires the promulgation of a formal rule, the agency could no longer exercise its 'informed discretion' to choose adjudication as a means of making law and policy rather than rulemaking, a choice we have repeatedly said an agency has when it possesses both adjudicatory and rulemaking powers.[66]

An agency's discretion to "mak[e] 'law' or 'policy' " through adjudication is not unlimited, of course, as this Court has most recently held in *Witcher,*[67] but the more critical observation here is that our construction of the APA's "rule" definition does not imply the stark alternatives *Brinkley* and TMB suggest. As the Texas Supreme Court observed in *Leeper,* "Not every statement by an administrative agency is a rule for which the APA prescribes procedures for adoption and for judicial review,"[68] and the Act defines "rule" in a way that will exclude a considerable range of unofficial, individually directed, tentative or other non-proscriptive agency or staff issuances concerning law **\*622** or policy.[69] But where, as here, an agency's legal or policy pronouncements seek to control the conduct of a free people through the assertion or threatened assertion of State power, agency "impotence" is hardly the relevant concern under our Constitution and laws. Rather, it is the risk that agencies—whose legitimate authority and very existence must derive from law and not merely perceived "expediency"[70]—will stray from their legal limitations (perhaps with the best of individual intentions, but exceeding them nevertheless) through what federal courts have aptly termed a "tyranny of small decisions" that substantively assert Executive or Legislative power over the citizenry through forms calculated to avoid the meaningful checks and balances the Framers intended the Judiciary to provide.[71] In very recently rejecting agency claims to an absolute right to supersede adverse trial court judgments pending appeal, the Texas Supreme Court cited similar concerns:

> The State's position—boundless entitlement to supersede adverse non-money judgments—would vest unchecked power in the executive branch, at considerable expense to the judicial branch, not to mention the wider public we both serve. The Texas Constitution divides governing power among three branches, and power seized by one branch necessarily means power ceded by another. Our State Constitution, like Madison's Federal handiwork, is infused with Newtonian genius: three rival branches locked in synchronous orbit by competing interests—ambition checking ambition. These are abstract principles, but they have real-world ripple effects on the lives of everyday Texans. This case is Exhibit A. TRAP 24.2(a)(3) gives the trial court discretion, quite sensibly, to prevent the State from re-revoking Montalvo's certification—the ultimate professional sanction—while it spends years appealing the court's reversal of the State's first revocation, something the trial court found "arbitrary and capricious." The State—as yet unsupported by a victory on the merits in any court—wants to strip Montalvo of his livelihood while the appellate process grinds on.... That's a striking assertion of unbridled executive power—to enforce administrative orders that a trial court has reversed—and TRAP 24.2(a)(3) recognizes the judiciary's authority to say no.[72]

With similar perceptiveness, the Legislature, through the APA, has enabled affected **\*623** citizens to invoke judicial jurisdiction, through section 2001.038, to test the "validity" or "applicability" of agency pronouncements that rise to the level of "rules"—including those that "interpret" law or policy—and required that the further checks of transparency, public participation, and reasoned justification must precede such assertions of agency authority. We must give effect to these important safeguards, as the Legislature has intended.

---

[66]   *Brinkley v. Texas Lottery Comm'n,* 986 S.W.2d 764, 769 (Tex.App.–Austin 1999, no pet.).

[67]   *See Witcher,* 447 S.W.3d 520, 2014 WL 5654255, at \*12–13 (discussing principles that limit ad hoc rulemaking).

[68]   *Leeper,* 893 S.W.2d at 443.

69    *See* Tex. Gov't Code § 2001.003(6); *Combs,* 311 at 100–01, (noting that appellees could not point to any specific "statement" by the comptroller); *see also* Ronald L. Beal, *Texas Administrative Practice & Procedure* § 2.3.4 (2014) (illustrating examples of agency statements that would fall short of "rules").

70    *See, e.g., Public Util. Comm'n v. City Pub. Servs. Bd.,* 53 S.W.3d 310, 316 (Tex.2001) ("[W]hen the Legislature expressly confers a power on an agency, it also impliedly intends that the agency have whatever powers are reasonably necessary to fulfill its functions or duties. An agency may not, however, exercise what is effectively a new power, or a power contradictory to the statute, on the theory that such a power is expedient for administrative purposes.").

71    *See Iowa League of Cities v. Environmental Prot. Agency,* 711 F.3d 844, 873 (8th Cir.2013) (quoting *Professionals & Patients for Customized Care v. Shalala,* 56 F.3d 592, 596 (5th Cir.1995)).

72    *In re State Bd. for Educator Certification,* No. 13–0537, ——S.W.3d ——, 2014 WL 7204523, 2014 Tex. LEXIS 1208, at *17–18 (Tex. Dec. 19, 2014); *see* Tex. Const. art. II, § 1 ("The powers of the Government of the State of Texas shall be divided into three distinct departments, each of which shall be confided to a separate body of magistracy, to wit: Those which are Legislative to one; those which are Executive to another, and those which are Judicial to another; and no person, or collection of persons, being of one of these departments, shall exercise any power properly attached to either of the others, except in the instances herein expressly permitted."); *see also City of Dallas v. Stewart,* 361 S.W.3d 562, 577 (Tex.2012) (citing approvingly to scholarship suggesting that administrative agencies, in assuming adjudicatory, rulemaking, and administrative functions in a manner not obviously contemplated by the tripartite constitutional structure, suffer from a "chronic 'legitimacy crisis' " (citing Richard H. Fallon, Jr., *Legitimacy and the Constitution,* 118 Harv. L.Rev. 1787, 1842–43 (2005)).
       To the extent TMB argues that its letter resembles those that *Brinkley* held to be "simply advisory guidelines" that "have no legal effect on private persons," *see Brinkley,* 986 S.W.2d at 770–71 & nn. 9 & 10, we observe that *Brinkley* 's analysis was premised on the view that agency pronouncements of law have no material effect on private rights unless issued in the form of formal rules or contested-case orders. *Id.* at 769. That premise has been eroded, to

say the least, by this Court's precedents that have been informed by the Texas Supreme Court's intervening *El Paso Hospital* decision. In short, if *Brinkley* would imply a different result here, we need go no farther than to conclude it is distinguishable.

We hold that TMB's pronouncements regarding Rule 190.8(1)(L)(i)(II) contained in its June 2011 letter are a "rule" as a matter of law. Accordingly, we sustain Teladoc's first issue and need not reach its second issue, which it argues in the alternative.[73]

[73]     *See* Tex.R.App. P. 47.1.

## CONCLUSION

Having sustained Teladoc's first issue on appeal, we reverse the district court's judgment and render summary judgment declaring that TMB's pronouncements regarding Rule 190.8(1)(L)(i)(II) contained in its June 2011 letter are a "rule" under the APA and, therefore, invalid under section 2001.035 of that Act.

**All Citations**

453 S.W.3d 606, Med & Med GD (CCH) P 305,173

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

997 S.W.2d 651
Court of Appeals of Texas,
Austin.

TEXAS ALCOHOLIC BEVERAGE COMMISSION, Appellant,

v.

AMUSEMENT AND MUSIC OPERATORS OF TEXAS, INC., Appellee.

No. 03–98–00579–CV.  |  May 6, 1999.  |  Opinion on Rehearing July 29, 1999.

Association of amusement and music operators brought action for declaratory judgment against Texas Alcoholic Beverage Commission and its administrator, and Department of Public Safety and its director, challenging constitutionality of memoranda defining illegal "gambling devices" to include certain coin-operated electronic machines. The District Court, Travis County, John K. Dietz, J., issued temporary injunction against enforcement of memoranda by agencies. Commission appealed. The Court of Appeals, Bea Ann Smith, J., held that: (1) Commission received adequate notice and opportunity to be heard regarding issuance of temporary injunction; (2) association had standing to sue on behalf of its members; (3) trial court had jurisdiction over claim that Commission invalidly promulgated rules under APA; and (4) association demonstrated probable injury and probable right of recovery required to support injunction.

Affirmed; rehearing granted.

West Headnotes (13)

**[1]    Injunction    👈 Preservation of status quo**

The limited purpose of a temporary injunction is to preserve the status quo of the subject matter of a suit pending final disposition of the case on its merits.

1 Cases that cite this headnote

**[2]    Injunction    👈 Discretionary Nature of Remedy**

The trial court has broad discretion to determine whether to issue a temporary injunction.

Cases that cite this headnote

**[3]    Appeal and Error    👈 Injunction**

Appellate court may reverse the trial court's order granting a temporary injunction only for a clear abuse of discretion.

3 Cases that cite this headnote

**[4]    Injunction    👈 Other particular cases**

**Injunction    👈 Right or necessity**

Texas Alcoholic Beverage Commission received adequate notice and opportunity to be heard, at hearing on temporary injunction sought by association of amusement and music operators, on issue of whether Commission's memoranda were invalid rules under Administrative Procedure Act (APA), though association's first petition did not plead issue; association's counsel elicited testimony at hearing from Commission's witnesses concerning compliance with APA,

and prior to issuance of injunction Commission filed reply to association's amended petition that specifically pleaded that memoranda were invalid rules. Vernon's Ann.Texas Rules Civ.Proc., Rule 681; V.T.C.A., Government Code § 2001.001 et seq.

Cases that cite this headnote

**[5]    Corporations and Business Organizations**   Persons entitled to sue;  standing

Association of amusement and music operators had standing to bring suit on behalf of its members to enjoin Alcoholic Beverage Commission from implementing memoranda adopting definition of "gambling devices" that included certain coin-operated electronic machines, on ground that memoranda were invalidly promulgated rules under Administrative Procedure Act (APA); request for injunctive relief did not require participation from individual members. V.T.C.A., Government Code § 2001.001 et seq.

Cases that cite this headnote

**[6]    Associations**   Actions by or Against Associations

An association may sue on behalf of its members when (1) its members could otherwise sue on their own; (2) the interests the association seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief sought requires the participation of individual members in the lawsuit.

Cases that cite this headnote

**[7]    Declaratory Judgment**   State officers and boards

Claims by association of amusement and music operators for declaratory and injunctive relief, regarding whether Alcoholic Beverage Commission memoranda that expanded definition of "gambling devices" were invalidly promulgated rules under Administrative Procedure Act (APA), were ripe without proof of individual prosecution. V.T.C.A., Government Code § 2001.001 et seq.

1 Cases that cite this headnote

**[8]    Injunction**   Authority of court;  jurisdiction and venue

Request by association of amusement and music operators for temporary injunction against enforcement of Alcoholic Beverage Commission memoranda that expanded definition of "gambling device," based on Attorney General's opinion that Penal Code definition was unconstitutionally restrictive, was not request to enjoin enforcement of criminal law matter, which would be outside trial court's jurisdiction, where relief was sought on ground that memoranda were invalidly promulgated rules under Administrative Procedure Act (APA). V.T.C.A., Penal Code § 47.01(4)(B); V.T.C.A., Government Code § 2001.003.

3 Cases that cite this headnote

**[9]    Courts**   Previous Decisions as Controlling or as Precedents

An Attorney General's opinion, while persuasive, is not the law, and is not immune from the trial court's jurisdiction or appellate review.

3 Cases that cite this headnote

**[10]    Injunction**   Gambling and gaming

Association of amusement and music operators sufficiently demonstrated probable injury and probable right of recovery to support temporary injunction restraining Alcoholic Beverage Commission from implementing memoranda expanding definition of "gambling devices" to include certain coin-operated electronic machines, in action claiming implementation constituted improper rulemaking under Administrative Procedure Act (APA). V.T.C.A., Penal Code § 47.01(4)(B); V.T.C.A., Government Code § 2001.003.

3 Cases that cite this headnote

[11]  **Gaming and Lotteries**  Verdict and findings

Trial court did not abuse its discretion in finding that Alcoholic Beverage Commission memorandum had effect of instructing law enforcement agents to ignore Penal Code provision defining "gambling devices," in connection with request by association of amusement and music operators for temporary injunction against implementation of memorandum, where memorandum instructed agents that exception to gambling device statute was inapplicable and referred to Attorney General opinion advising that exception was unconstitutional and should be excluded from reading of statute. V.T.C.A., Penal Code § 47.01(4)(A, B).

1 Cases that cite this headnote

[12]  **Injunction**  Gambling and gaming

Trial court had power to issue injunctive order against Alcoholic Beverage Commission under Administrative Procedure Act. V.T.C.A., Government Code § 2001.001 et seq.

Cases that cite this headnote

[13]  **Injunction**  Defendants or respondents

Ordinarily, a plaintiff must sue an individual in authority to enjoin the activities of a state agency.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*652** John Cornyn, Atty. Gen., W. Reed Lockhoof, Asst. Atty. Gen., Law Enforcement Defense Div., Austin, for appellant.

Jennifer S. Riggs, Hill, Gilstrap, Adams & Graham, Austin, for appellee.

Barry Bishop, Clark, Thomas & Winters, Austin, for Veterans of Foreign Wars, Dept. of Texas.

**\*653** Before Justices JONES, B.A. SMITH and YEAKEL.

BEA ANN SMITH, Justice.

This case comes before us on an interlocutory appeal from a temporary injunction. The Amusement and Music Operators of Texas, Inc. ("AMOT") filed a declaratory judgment action against the Texas Alcoholic Beverage Commission (the "Commission"); Doyne Bailey, the Administrator of the Commission; the Department of Public Safety; and Dudley Thomas, the Director of the Department of Public Safety. AMOT challenged the constitutionality of a Commission memorandum and interoffice communication interpreting the definition of "gambling devices" in section 47.01 of the Texas Penal Code as applied to certain machines called "eight-liners." The trial court issued a temporary injunction enjoining those agencies from relying

on the memorandum and the first two paragraphs of the interoffice communication. In seven issues, the Commission appeals the temporary injunction issued. We will affirm the trial court's order.

## BACKGROUND

AMOT is an association of amusement and music operators. The members of AMOT engage in the business of owning and/or operating coin-operated machines, including amusement machines known as "eight-liners." Eight-liners are electronic machines, similar to slot machines, that dispense gift certificates redeemable for prizes.

Before 1993, the Texas Penal Code made the possession and operation of all gambling devices illegal. However, in 1993, the legislature amended the Penal Code's definition of "gambling devices" to exclude

> electronic, electromechanical, or mechanical contrivance designed, made, and adapted solely for bona fide amusement purposes if the contrivance rewards the player exclusively with noncash merchandise prizes, toys, or novelties, or a representation of value redeemable for those items, that have a wholesale value available from a single play of the game or device of not more than 10 times the amount charged to play the game or device once or $5, whichever is less. [1]

Tex. Penal Code Ann. § 47.01(4)(B) (West Supp.1999). AMOT members relied on the plain language of this statute and on discussions with county prosecutors and police officers before entering the business of owning and operating eight-liners.

In 1998, the attorney general's office issued an opinion ruling that the amended definition of gambling devices violated the Texas Constitution because it purports to authorize the operation of certain lotteries not contemplated by the constitution. *See* Att'y Gen. Op. DM–466 (Jan. 23, 1998). The Texas Constitution requires the legislature to pass laws prohibiting all lotteries or gift enterprises other than those specifically authorized by the constitution. *See* Tex. Const. art. III, § 47(a). Because the Texas Constitution allows for no exemptions to the lottery ban other than those enumerated, [2] the attorney general concluded that the exemption in section 47.01(4)(B) is unconstitutional. The attorney general stated in his opinion that "if the contrivances described as 'eight-liners' fit the Penal Code's definition of 'gambling device,' freed of the unconstitutional 1995 exception in paragraph (B), their possession is proscribed." Att'y Gen. Op. DM–466.

In reliance on this opinion, the Commission drafted and distributed two memoranda to its law enforcement agents. The first memorandum, dated February 9, 1998 **\*654** and written by Doyne Bailey ("February 9, 1998 memo"), explained that the attorney general had determined that the statute should be read to delete Paragraph (B), and listed the three elements that make a machine illegal according to the attorney general's opinion: (1) the machine awards a prize, even if it is a prize of very small value or a redeemable coupon for anything of value; (2) the prize is awarded by chance; and (3) the player gives consideration for the opportunity to win a prize. The second memorandum, an interoffice communication written by James S. Smelser ("Smelser memo"), also listed the three elements as the basis for probable cause against gambling devices, and stated: "If in your investigation you have probable cause to believe that games violate the elements in § 47.01(4)(A) then the defense under § 47.01(4)(B) is not applicable."

AMOT filed suit to enjoin the Commission and the Department of Public Safety from relying on these memoranda in enforcing the provisions of the Texas Penal Code governing the operation of gambling devices. The Veterans of Foreign Wars, Department of Texas, intervened in support of the injunctive suit. AMOT alleged that the enforcement of the internal memoranda violated their rights to due process under the law, and challenged the authority of the two agencies to suspend section 47.01(4)(B) of the Texas Penal Code pursuant to an opinion of the attorney general. The defendants filed a plea to the jurisdiction. At a hearing on the temporary injunction held July 14, 1998, the trial court indicated that it was granting the plea to the jurisdiction on the grounds that AMOT lacked associational standing to pursue its constitutional claims. On October 5, 1998, however, the

trial court ruled that AMOT did have standing to pursue its claims under the Administrative Procedure Act [3] ("APA"), and found that the two memoranda constituted invalid rules because they were not passed in accordance with the APA's rulemaking requirements. The court therefore ordered that the defendants were temporarily enjoined from relying on the February 9, 1998 memo and the first and second paragraphs of the Smelser memo.

On appeal, the Commission argues that (1) the temporary injunction is void because it was denied notice and a hearing on the issues addressed in the order; (2) the trial court lacked subject matter jurisdiction; (3) the trial court erred in finding that the memoranda constitute rules under the APA; (4) the trial court lacked subject matter jurisdiction to enjoin the enforcement of a criminal law matter; (5) the trial court erred in construing section 47.01(4)(B) of the Texas Penal Code as an exemption; (6) the trial court erred in concluding that the Smelser memo directed agents to ignore section 47.01(4)(B); and (7) the trial court's order is void because it seeks to enjoin a state agency.

## DISCUSSION

**[1] [2] [3]** The purpose of a temporary injunction is to preserve the status quo of the subject matter of a suit pending final disposition of the case on its merits. *See Davis v. Huey,* 571 S.W.2d 859, 862 (Tex.1978). Because of this limited purpose, the trial court has broad discretion to determine whether to issue a temporary injunction. *See LeFaucheur v. Williams,* 807 S.W.2d 20, 22 (Tex.App.—Austin 1991, no writ). We therefore may reverse the trial court's order granting a temporary injunction only for a clear abuse of discretion. *See Walling v. Metcalfe,* 863 S.W.2d 56, 57–58 (Tex.1993); *Iranian Muslim Org. v. City of San Antonio,* 615 S.W.2d 202, 208 (Tex.1981).

### Notice

**[4]** In its first issue on appeal, the Commission contends that it was denied notice and a hearing on the substance of the temporary injunction in violation of Rule 681 of the Texas Rules of Civil Procedure. The Commission concedes that a hearing was held on the temporary injunction, **\*655** but argues that no "live" pleading filed by AMOT prior to the day of the hearing discussed whether the February 9, 1998 memo or the Smelser memo were "rules" within the meaning of the APA. AMOT's supplemental petition, on file at the time of the hearing, briefed the applicability of the APA to the two memoranda. However, the Commission argues that the trial court explicitly stated that it had not looked at the supplemental petition at the time of the hearing. The Commission therefore believes that it did not have adequate notice and opportunity to be heard on the issue that became the basis for the trial court's issuance of the temporary injunction.

Rule 681 states that no temporary injunction shall be issued without notice to the adverse party. Tex.R. Civ. P. 681. In *City of Austin v. Texas Public Employees Ass'n,* 528 S.W.2d 637, 640 (Tex.Civ.App.—Austin 1975, no writ), this Court held that the requirement of notice impliedly requires an adequate opportunity to be heard. After reviewing the record, we find that the Commission had adequate opportunity to be heard on the question of whether the internal memoranda constituted invalid rules under the APA. During the hearing on the temporary injunction, counsel for AMOT elicited testimony from the Commission's witnesses regarding the procedures followed in promulgating the internal memoranda and whether they complied with APA requirements. The Commission was therefore on notice that the applicability of the APA was an issue before the court, and had the opportunity to present evidence as to whether it had complied with the APA, or in the alternative, why it was not required to do so.

Moreover, AMOT's amended petition, filed after the hearing, specifically pleaded that the directives issued in the memoranda were invalid rules. The Commission responded to these allegations in a subsequently filed pleading, arguing that the internal memoranda were not rules and therefore were not subject to APA requirements. Obviously, the Commission understood that the applicability of the APA was at issue because it briefed the matter in its reply to the amended petition. All of these pleadings were on file before the trial court when it issued the temporary injunction. We fail to see how the Commission was deprived of its opportunity to be heard under Rule 681. We therefore overrule the Commission's first issue on appeal.

*Subject Matter Jurisdiction*

 **[5]**   **[6]**   In its second and fourth issues on appeal, the Commission argues that the trial court lacked subject matter jurisdiction to issue the temporary injunction. First, the Commission contends that AMOT lacks associational standing to bring suit on behalf of its members because AMOT cannot meet the third prong of the "*Hunt* test" for associational standing adopted by the Texas Supreme Court in *Texas Ass'n of Business v. Air Control Board,* 852 S.W.2d 440, 447–48 (Tex.1993). According to the *Hunt* test, an association may sue on behalf of its members when (1) its members could otherwise sue on their own; (2) the interests the association seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief sought requires the participation of individual members in the lawsuit. *See id.* at 447 (adopting test from *Hunt v. Washington State Apple Advertising Commission,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977)).

At the July 14 hearing, the trial court stated that AMOT could not meet the third part of the *Hunt* test. The court based this determination on the fact that AMOT sued for a declaration that seizure of its eight-liner machines by agents of the Commission would be unconstitutional, and for an injunction prohibiting such seizure. Either form of relief, the court ruled, would require proof of the individual circumstances by the aggrieved establishment that had an eight-liner seized. In the temporary injunction order, the trial court granted the Commission's plea to the jurisdiction only with respect to the search and   **\*656**   seizure and due process claims [4] raised in AMOT's first amended petition. The court denied the plea to the jurisdiction with respect to the remainder of the AMOT's claims.

AMOT's inability to meet the *Hunt* test with respect to its constitutional claims did not preclude it from suing on behalf of its members for other relief. AMOT could still sue to enjoin the Commission from relying on invalidly promulgated rules because that action does not require the participation of individual members. [5] The trial court therefore did not err in restricting its grant of the defendants' plea to the jurisdiction and ruling that it had subject matter jurisdiction to hear the remainder of AMOT's claims.

 **[7]**   The Commission also argues that the trial court did not have subject matter jurisdiction because AMOT's claims were not ripe. As discussed above, the trial court's order preserved only the declaratory and injunctive relief sought by the association to prevent the Commission from enforcing an illegal rule. The claims pursued by AMOT do not require proof of individual prosecution against its members. The contention is simply that the Commission adopted what is effectively a rule without complying with the rulemaking procedures mandated by the APA. If AMOT has standing to contest the validity of this rule, which we have determined that it does, then the claim is ripe. We therefore overrule the Commission's second issue on appeal.

 **[8]**   In its fourth issue, the Commission argues that the trial court lacked subject matter jurisdiction to enjoin the enforcement of a criminal law matter. However, there was no criminal law matter before the trial court. The issue was whether the memoranda constituted an invalid rule of an administrative agency. The fact that the rule interpreted a provision of the Penal Code is ancillary to the administrative question before the trial court.

 **[9]**   The Commission suggests that the only challenge to the memoranda available to members of AMOT is arrest and trial, at which point the aggrieved establishments could challenge the constitutionality of the rule. The cases cited by the Commission are inapposite to its position. They stand either for the proposition that a civil appellate court cannot review an injunction of an enforcement of a criminal statute, *see, e.g., Dearing v. Wright,* 653 S.W.2d 288, 289 (Tex.1983), or for the proposition that a trial court cannot entertain an equitable action determining the illegality of a statute absent a showing of irreparable injury to vested property rights, *see, e.g., State v. Morales,* 869 S.W.2d 941, 945 (Tex.1994); *Coalson v. City Council of Victoria,* 610 S.W.2d 744, 747 (Tex.1980); *Texas Liquor Control Bd. v. Canyon Creek Land Corp.,* 456 S.W.2d 891, 894 (Tex.1970). What AMOT challenges, however, is the enforcement of an *agency rule*. The Commission's position that section 47.01(4)(B) of the Penal Code is unconstitutional and can be ignored is based only on an attorney general's opinion, not on a decision by a court of law. An attorney general's opinion, while persuasive, is not the law, *see Holmes v. Morales,* 924 S.W.2d 920, 924 (Tex.1996), and is not immune from the trial court's jurisdiction or our review. [6] We overrule this fourth issue on appeal.

**\*657** *Determination that the Interoffice Memoranda are "Rules" Under the APA*

[10] The Commission contends that the trial court erred in holding that the February 9, 1998 memo and the Smelser memo are rules under the APA. The Commission's argument is twofold. First, it argues that the APA is not applicable to the Penal Code because the Code of Criminal Procedure is the only procedural act with authority to instruct how criminal statutes are to be enforced. The Commission observes that no provision of the Code of Criminal Procedure instructs law enforcement to consult the APA when determining proper procedure to follow in enforcing the Penal Code. Furthermore, article 1.27 of the Code of Criminal Procedure states that where the Code fails to provide a procedural rule, common law shall be applied and govern. Therefore, the Commission asserts, the trial court violated the Code of Criminal Procedure when it adjudged the Commission's actions in drafting memos related to the enforcement of the Penal Code under the strictures of the APA.

Put another way, the Commission's argument is essentially this: even if the memoranda would otherwise constitute rules under the APA, the Commission does not have to comply with the APA because the APA does not govern the Penal Code. We find no provision in the APA that excludes its applicability to state agencies adopting rules that interpret the Penal Code. Nor are we persuaded by the Commission's inability to identify a directive in the Code of Criminal Procedure to consult the APA for enforcement matters. We can hypothesize at least one possible explanation for the Code's failure to contain such an instruction —namely, that the legislature failed to anticipate that a state agency might adopt and implement a rule rewriting a provision of the Penal Code unless authorized by statutory amendment or judicial opinion.

In the event that the APA does apply, the Commission argues that neither the February 9, 1998 memo nor the Smelser memo satisfy the APA's definition of a rule. Section 2001.003 of the APA states that a rule

   (A) means a state agency statement of general applicability that:

      (i) implements, interprets, or prescribes law or policy; or

      (ii) describes the procedure or practice requirements of a state agency;

   (B) includes the amendment or repeal of a prior rule; and

   (C) does not include a statement regarding only the internal management or organization of a state agency and not affecting private rights or procedures.

Tex. Gov't Code Ann. § 2001.003(6) (West 1999).

The Commission offers two arguments why the February 9, 1998 memo and the Smelser memo do not constitute rules under the APA. First, it argues that the memoranda do not reflect a policy choice of the Commission, but rather, invoke a reasonable reading of the Penal Code in conjunction with the Texas Constitution and the common law of the state. Moreover, the Smelser memo instructs Commission agents how to develop probable cause, and therefore, it more accurately constitutes a statement regarding internal management of the agency. Second, the Commission contends that the memoranda are not binding on the parties.

In order to grant a temporary injunction, the trial court was required to find that the plaintiffs established a probable injury and a probable right to recovery. *See, e.g., Omniphone, Inc. v. Southwestern Bell Tel. Co.,* 742 S.W.2d 523, 525 (Tex.App.— Austin 1987, no writ). Appellate review is limited to determining whether the trial court abused its discretion in granting the injunction. *See Davis v. Huey,* 571 S.W.2d 859, 862 (Tex.1978). The merits of the underlying lawsuit are not presented for review. *See id.* at 861; *Omniphone,* 742 S.W.2d at 525. In this **\*658** case, the trial court found that both memoranda set out binding practice requirements; that the requirements substantially changed previous enforcement policy by directing the agents to ignore the exemption to the definition of gambling device set out in the Penal Code; and that the memoranda directed agents to issue warning tickets and initiate enforcement actions against all eight-liners. The court therefore determined that the memos

met the definition of rules under the APA, and enjoined the Commission from taking any enforcement action in reliance on the memos and from otherwise ignoring the statutory exemption set out in section 47.01(4)(B) of the Penal Code.

While the findings of the trial court read much like an order of declaratory judgment, we are restrained from reviewing more than the temporary injunction that is before us on interlocutory appeal. We therefore may not examine the merits of the declaratory judgment action brought by AMOT. After reviewing the record, we determine that AMOT has sufficiently demonstrated a probable injury and a probable right to recovery for the purposes of this temporary injunction. The testimony of the Commission's witnesses establishes that agents of the Commission not only intend to enforce, but have enforced administrative sanctions on owners and operators of eight-liner machines. AMOT has thus established facts showing probable injury. *Cf. Brinkley v. Texas Lottery Comm'n,* 986 S.W.2d 764, 768–69 (Tex.App.—Austin 1999, no pet. h.) (no probable injury where appellant failed to allege threatened administrative penalties or prosecution). We also agree that these facts are sufficient to establish a probable right to recovery. The record reflects that the Commission has adopted guidelines for enforcing the Penal Code that appear contrary to the plain wording of the statute. Those guidelines appear in the two memoranda at issue. The record also establishes that the enforcement of these guidelines affects every owner and operator of eight-liner machines in Texas. Without reviewing the merits of the claims, we find sufficient evidence to support AMOT's claim to a probable right to recovery at trial. [7] We therefore overrule the Commission's third issue on appeal.

### Construction of the Statute and the Smelser Memo

 **[11]**    In its fifth and sixth issues on appeal, the Commission argues that the trial court erred in construing Penal Code section 47.01(4)(B) as an exemption from prosecution and in reading the language of the Smelser memo to instruct agents to ignore that section. The construction of section 47.01(4)(B) is an issue that goes to the merits of the underlying lawsuit, because it informs the question of whether the memoranda were statements of policy and whether they were binding. Because we have determined that AMOT has established a probable injury and a probable right to recovery, we leave this issue to be  ***659** determined by the trial court on the merits.

The construction of the Smelser memo is supported by the plain language of the memo, which instructs law enforcement that if their investigation results in a finding of probable cause that a machine violates section 47.01(4)(A), "then the defense under § 47.01(4)(B) is not applicable." The Smelser memo also instructs enforcement personnel to refer to the February 9, 1998 memo, which specifically advises personnel how the statute should be read according to the view of the chief law enforcement agent of the state, the attorney general. That reading voids section 47.01(4)(B) as unconstitutional and advises that it be excluded from a reading of the statute. Under these circumstances, we believe that the trial court did not abuse its discretion in finding that the Smelser memo instructed agents to ignore the language of the Penal Code. We overrule the Commission's fifth and sixth issues on appeal.

### Injunction of a State Agency

 **[12]**    **[13]**    The Commission's final point on appeal is that the trial court's order is void for attempting to enjoin a state agency. Ordinarily, a plaintiff must sue an individual in authority to enjoin the activities of a state agency. *See Nabejas v. Texas Dep't of Public Safety,* 972 S.W.2d 875, 876 (Tex.App.—Corpus Christi 1998, no pet.) (citing *Dillard v. Austin Indep. Sch. Dist.,* 806 S.W.2d 589, 592 (Tex.App.—Austin 1991, writ denied)). However, as discussed above, the trial court's jurisdiction over this matter was founded on the APA. It was therefore empowered to issue an injunctive order. *See* Tex. Civ. Prac. & Rem.Code Ann. § 65.011 (West 1997). We overrule the Commission's seventh issue on appeal.

## CONCLUSION

Having found that the trial court had subject matter jurisdiction over this action, and that it did not abuse its discretion in determining that the internal memoranda constituted guidelines purporting to bind agency enforcement of the Penal Code, we affirm the trial court's order granting a temporary injunction.

### ON MOTION FOR REHEARING

In a very articulate motion for rehearing, the Commission complains that our holding in this case is at odds with this court's decision in *Brinkley v. Texas Lottery Comm'n,* 986 S.W.2d 764 (Tex.App.—Austin 1999, no pet.). We write to point out the distinctions, if they were not clear earlier, between the memoranda issued here by the Alcoholic Beverage Commission and the letters sent by the Lottery Commission in *Brinkley.*

While both agency statements address the legality of eight-liners, there the similarity ends. In *Brinkley,* the Lottery Commission, which regulates bingo parlors and any eight-liners placed in those halls, warned its licensees that eight-liners could be legal or illegal, depending on how they were configured and operated. The Lottery Commission sent out two letters to some 2500 licensees describing some of the criteria that might be used by the licensee to evaluate the legality of the eight-liners in their bingo halls. The first letter stated: "This notice is intended to make licensees aware of the agency's position and to afford an opportunity to licensees for voluntary compliance." The second included a warning that the guidelines were advisory and could not be guaranteed to determine legality. We held that these letters were advisory and non-binding on the licensee:

> The letters sent by the Commission in this instance were, on their face, simply advisory guidelines; they did not purport to express a final opinion on the legality of eight-liners of any particular kind. We have previously noted the valuable role such advisory opinions serve in administration.... Considering the number of bingo-parlor licensees and the variety of ways in which eight-liners can be configured, the practical value of the letters is obvious. Nothing in the letters purports to foreclose an **\*660** individual licensee from seeking, if he wishes, a formal opinion from the Commission regarding particular eight-liners. While private parties may voluntarily comply with such guidelines, they are not legally bound to do so.

*Brinkley,* 986 S.W.2d at 770 n. 9.

By contrast, the memoranda issued by the Alcoholic Beverage Commission in this case impose binding instructions on law enforcement agents that affect the private rights of all owners of eight-liners. They are agency statements that implement, interpret or prescribe law or policy; they amend or repeal a prior enforcement policy of the Commission; and they do not constitute statements regarding only the internal management or organization of the Commission without affecting private rights. Clearly, they are statements of general, not particular, applicability. In *WBD Oil & Gas Co. v. Railroad Commission of Texas,* No. 03–97–00002–CV, —— S.W.2d ——, 1999 WL 46637 (Tex.App.—Austin Feb. 4, 1999, reh'g filed), we determined that field rules of the Railroad Commission that satisfied this literal statutory definition could confer jurisdiction for a declaratory judgment action challenging the rules' validity under APA section 2001.038. *See* slip op. at 659. We follow that holding here.

### All Citations

997 S.W.2d 651

### Footnotes

1    This language appears in the 1995 amendment. However, the substance of this amendment was adopted in 1993. *See* Att'y Gen. Op. DM–466 (Jan. 23, 1998).

2    The Texas Constitution permits the legislature to authorize bingo games conducted by a church or other nonprofit organization, charitable raffles, and a state lottery. *See* Tex. Const. art. III, §§ 47(b), (d), (e).

3    *See* Tex. Gov't Code Ann. ch. 2001 (West 1999).

4    AMOT complained that, in violation of due process, the Commission issued administrative sanctions to members of AMOT for operating eight-liners without providing for notice and a hearing on the alleged violations.

5    In its brief, the Commission asserts that the remaining claims and relief sought by AMOT *do* require the participation of individual members in the lawsuit. However, the Commission has waived this argument by failing to provide any authority or support for what is merely a conclusory statement. *See* Tex.R.App. P. 38.1(h).

6    For these reasons, we also reject the Commission's contention that AMOT has come into court with unclean hands because it is operating "illegal" eight-liner machines.

7    We recognize that the Texarkana Court of Appeals recently addressed a similar issue involving eight-liners in *Weaver v. Head,* 984 S.W.2d 744 (Tex.App.—Texarkana 1999, no pet.). In that case Head, an eight-liner operator, sought a declaratory judgment that Penal Code section 47.01(4)(B) is valid and constitutional, and a ruling that the attorney general has no authority to suspend the statute's operation. The trial court enjoined Weaver, the sheriff of Gregg County, from relying on Attorney General Opinion DM–466 to disregard section 47.01(4)(B) as unconstitutional. The trial court found that Weaver's use of DM–466 would violate the separation of powers provision of the Texas Constitution and that Head had vested property rights that would be violated by prosecution based on the attorney general's opinion. *See id.* at 745.

The court of appeals reversed. It held that the trial court's injunction was improper because it did not address the constitutionality of section 47.01(4)(B) and was not in answer to any of the relief sought by Head. *See id.* at 747. The present case is distinguishable. Here, AMOT did not request a determination of section 47.01(4)(B)'s constitutionality. Instead, AMOT sought and was granted injunctive relief on the ground that the Commission's implementation of DM–466 constituted improper rulemaking in violation of the APA, a theory that was not raised in *Weaver.* We therefore find *Weaver* unpersuasive under the circumstances of the present case.

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

357 S.W.3d 691
Court of Appeals of Texas,
Austin.

The TEXAS DEPARTMENT OF TRANSPORTATION, and Amadeo Saenz, Jr., in his Official Capacity as
Director of Texas Department of Transportation, Appellants,
v.
SUNSET TRANSPORTATION, INC.; MEL Transport, Inc. d/b/a Magnum Transportation; and Sunset Prosper,
Inc., Appellees.

No. 03–10–00023–CV. | Aug. 19, 2011. | Rehearing Overruled Jan. 13, 2012.

**Synopsis**
**Background:** Motor carriers brought action against Texas Department of Transportation (TxDOT) under the Uniform Declaratory Judgments Act (UDJA) and the Administrative Procedure Act (APA), challenging the imposition of certain registration requirements and fees. TxDOT filed plea to the jurisdiction. The 126th Judicial District Court, Travis County, John K. Dietz, J., denied plea. TxDOT appealed.

**Holdings:** The Court of Appeals, Bob Pemberton, J., held that:

[1] Revised Notice challenged by motor carriers was not a "rule" for purposes of invoking district court's subject-matter jurisdiction through APA;

[2] motor carriers were to have opportunity to amend their pleadings to cure the jurisdictional defect;

[3] redundant UDJA claims would be subject to dismissal; and

[4] UDJA claims were sufficient to invoke district court's subject-matter jurisdiction under the ultra vires exception to sovereign immunity.

Affirmed.

West Headnotes (15)

[1]     **Pleading**
        🔑Plea to the Jurisdiction

        A plea to the jurisdiction challenges a trial court's authority to decide the subject matter of a specific cause or action.

        Cases that cite this headnote

[2]   **Courts**
       Allegations, pleadings, and affidavits

Analysis of whether the authority exists for a trial court to decide the subject matter of a specific cause or action begins with the plaintiff's live pleadings.

Cases that cite this headnote

[3]   **Courts**
       Allegations, pleadings, and affidavits

Plaintiff has the initial burden of alleging facts that affirmatively demonstrate the trial court's jurisdiction to hear the cause.

1 Cases that cite this headnote

[4]   **Courts**
       Allegations, pleadings, and affidavits

Mere unsupported legal conclusions do not suffice to demonstrate the trial court's jurisdiction to hear a cause.

Cases that cite this headnote

[5]   **Appeal and Error**
       Matters or Evidence Considered in Determining Question

In considering appeal from denial of plea to the jurisdiction, appellate court must consider evidence the parties presented below that is relevant to the jurisdictional issues, including evidence that a party has presented to negate the existence of facts alleged in the plaintiff's pleading.

Cases that cite this headnote

**[6]**

**Appeal and Error**
🔑 Cases Triable in Appellate Court
**Appeal and Error**
🔑 Pleading

In considering appeal from denial of plea to the jurisdiction, appellate court's ultimate inquiry is whether the plaintiff's pled and un-negated facts, taken as true, and liberally construed with an eye to the pleader's intent, would affirmatively demonstrate a claim or claims within the trial court's subject-matter jurisdiction; this is a question of law reviewed de novo.

1 Cases that cite this headnote

**[7]**

**States**
🔑 What are suits against state or state officers

Merely asserting legal conclusions or labeling a defendant's actions as "ultra vires," "illegal," or "unconstitutional" does not suffice to plead a claim under "ultra vires" exception to sovereign immunity; what matters is whether the facts alleged constitute actions beyond the governmental actor's statutory authority, properly construed.

3 Cases that cite this headnote

**[8]**

**Administrative Law and Procedure**
🔑 Nature and Scope

An informal agency statement that does no more than restate its own formally promulgated rules is not in itself a "rule" under the Administrative Procedure Act (APA). V.T.C.A., Government Code § 2001.003(6).

2 Cases that cite this headnote

[9]    **Administrative Law and Procedure**
    Nature and Scope

A "rule," under the Administrative Procedure Act (APA), encompasses state agency statements formally promulgated in compliance with the APA's notice-and-comment rulemaking procedures, but it extends beyond these. V.T.C.A., Government Code § 2001.003(6).

2 Cases that cite this headnote

[10]    **Administrative Law and Procedure**
    Nature and Scope

A "rule" under the Administrative Procedure Act (APA) must have some legal effect on private persons, and not merely impact the internal management or organization of a state agency. V.T.C.A., Government Code § 2001.003(6).

2 Cases that cite this headnote

[11]    **Automobiles**
    Judicial supervision

Texas Department of Transportation (TxDOT) Revised Notice stating that motor carriers whose state registrations have been revoked "are required to re-register and submit applicable fees," and that "All motor carriers must maintain active insurance filing with TxDOT at all times," was a mere restatement of TxDOT's formally promulgated rules and was not itself a "rule" under the Administrative Procedure Act (APA), and thus motor carrier's challenge to validity or applicability of Revised Notice failed to invoke district court's subject-matter jurisdiction through APA. V.T.C.A., Government Code §§ 2001.003(6), 2001.038.

4 Cases that cite this headnote

[12]    **Pleading**
        🔑 Amendments following sustaining of pleas

If a claimant's pleadings omit sufficient facts to affirmatively demonstrate the trial court's jurisdiction but do not affirmatively demonstrate incurable defects in jurisdiction, the issue on plea to the jurisdiction is one of pleading sufficiency, and the plaintiffs should be afforded the opportunity to amend.

1 Cases that cite this headnote

[13]    **Pleading**
        🔑 Amendments following sustaining of pleas

Where motor carriers' challenge to validity or application of Revised Notice failed to invoke district court's subject-matter jurisdiction through Administrative Procedure Act (APA) because the Revised Notice was a mere restatement of TxDOT's formally promulgated rules, and was not itself a "rule," motor carriers were to have opportunity to amend their pleadings to cure the jurisdictional defect following grant of TxDOT's plea to the jurisdiction; claims necessarily implicated the applicability or substantive validity of the underlying formally promulgated TxDOT rules. V.T.C.A., Government Code §§ 2001.003(6), 2001.038.

Cases that cite this headnote

[14]    **Declaratory Judgment**
        🔑 Statutory remedy
        **Declaratory Judgment**
        🔑 Grounds for involuntary dismissal in general

Motor carriers' Uniform Declaratory Judgments Act (UDJA) claims, challenging imposition of certain registration requirements and fees by Texas Department of Transportation (TxDOT), would be subject to dismissal to the extent UDJA remedies would be redundant to remedies

available to motor carriers on their claims brought under Administrative Procedure Act (APA). V.T.C.A., Civil Practice & Remedies Code § 37.001 et seq.; V.T.C.A., Government Code § 2001.038.

Cases that cite this headnote

[15] **States**
⚷What are suits against state or state officers

Claim brought under Uniform Declaratory Judgments Act (UDJA), alleging that Texas Department of Transportation (TxDOT) was requiring motor carriers that had already validly registered with it and whose registrations had not been revoked to re-register, pay related fees, and also submit annual filings of proof of financial responsibility, alleged conduct that would run afoul of Unified Carrier Registration Act (UCR Act) and the state transportation code, and thus such allegations would invoke the district court's subject-matter jurisdiction under the ultra vires exception to sovereign immunity. 49 U.S.C.A. § 14504a(a); V.T.C.A., Civil Practice & Remedies Code § 37.001 et seq.; V.T.C.A., Transportation Code § 643.002.

2 Cases that cite this headnote

**Attorneys and Law Firms**

**\*694** Amy Kovar, Assistant Attorney General, Austin, TX, for Appellants.

Kent J. Lisenby, Chuck Axmacher, The Lisenby Law Firm, P.C., Fort Worth, TX, for Appellees.

Before Justices PURYEAR, PEMBERTON and ROSE.

*OPINION*

BOB PEMBERTON, Justice.

The Texas Department of Transportation (TxDOT) and its executive director, in his official capacity, appeal a district court

order denying, in its entirety, their plea to the jurisdiction over claims asserted by appellees Sunset Transportation, Inc.; MEL Transport, Inc. d/b/a Magnum Transportation, Inc.; and Sunset Prosper, Inc.[1] In a single issue, appellants assert that appellees' claims—which were asserted under the Uniform Declaratory Judgments Act (UDJA) and section 2001.038 of the Administrative Procedure Act (APA)—are each barred by sovereign immunity. We agree that appellees did not plead facts sufficient to invoke the district court's jurisdiction under APA section 2001.038. However, we conclude that appellees are entitled to the opportunity to replead those claims. In light of this holding, moreover, we further conclude that the district court reached the correct result in denying appellants' plea as to appellees' UDJA claims at this juncture. For these reasons, we affirm the district court's order.

[1]     *See* Tex. Civ. Prac. & Rem.Code Ann. § 51.014(a)(8) (West 2008).

## STANDARD OF REVIEW

[1] [2] [3] [4] [5] [6] A plea to the jurisdiction challenges a trial court's authority to decide the subject matter of a specific cause or action. *See Texas Dep't of Parks & Wildlife v. Miranda,* 133 S.W.3d 217, 225–26 (Tex.2004). Analysis of whether this authority exists begins with the plaintiff's live pleadings. *Id.* at 226. The plaintiff has the initial burden of alleging facts that affirmatively demonstrate the trial court's jurisdiction to hear the cause. *Id.* (citing *Texas Ass'n of Bus. v. Texas Air Control Bd.,* 852 S.W.2d 440, 446 (Tex.1993)). Mere unsupported legal conclusions do not suffice. *See Creedmoor–Maha Water Supply Corp. v. Texas Comm'n on Envtl. Quality,* 307 S.W.3d 505, 515–16 & n. 7 & 8 (Tex.App.-Austin 2010, no pet.). We must also consider evidence the parties presented below that is relevant to the jurisdictional issues, *Bland Indep. Sch. Dist. v. Blue,* 34 S.W.3d 547, 555 (Tex.2000), including evidence that a party has presented to negate the existence of facts alleged in the plaintiff's pleading. *See Miranda,* 133 S.W.3d at 227; *see also Combs v. Entertainment Publ'ns, Inc.,* 292 S.W.3d 712, 719 (Tex.App.-Austin 2009, no pet.) (summarizing different standards governing evidentiary challenges to the existence of pled jurisdictional facts where such facts implicate both jurisdiction and the merits versus where they implicate only jurisdiction). Our ultimate inquiry is whether the plaintiff's pled and un-negated facts, taken as true, and liberally construed with an eye to the pleader's intent, would affirmatively demonstrate a claim or claims within the trial court's subject-matter jurisdiction. *See Miranda,* 133 S.W.3d at 226; *Creedmoor–Maha Water Supply Corp.,* 307 S.W.3d at 513, 516 n. 8. This is a question of law that we review de novo. *See Miranda,* 133 S.W.3d at 226; *Creedmoor–Maha Water Supply Corp.,* 307 S.W.3d at 513, 516 n. 8.

## REGULATORY CONTEXT

It is undisputed that each appellee is a motor carrier that engages in both interstate **\*695** commerce and intrastate commerce within Texas. These facts implicate interrelated state and federal regulatory regimes that provide the context for appellees' claims and, ultimately, the jurisdictional issues on appeal. It is thus helpful to begin with a brief review of these laws before beginning our analysis of the pleadings and jurisdictional evidence.

In 2005, the United States Congress enacted a law known as the Unified Carrier Registration Act of 2005 (the UCR Act) creating a "Unified Carrier Registration" (UCR) system through which a motor carrier operating in interstate or international commerce submits a single registration fee and pays, through a designated "base state," a "UCR fee" in an amount determined based on the size of its vehicle fleet. *See* 49 U.S.C.A. §§ 14504a(a)(2) (West 2007), (f) (West 2007 & Supp. 2011). The system is implemented through an interstate agreement under which individual states so desiring can opt to participate in collecting UCR fees and in sharing fee revenues. *See id.* §§ 14504a(a)(2), (e), (f)(4), (g)-(h) (West 2007). Of chief relevance to this case, however, are provisions of the UCR Act that prohibit states—regardless of whether they have opted into fee-collection and sharing under the UCR system—from imposing certain additional regulatory burdens on the interstate motor carriers that would register under the UCR system. Congress determined that it was an "unreasonable burden upon interstate commerce" for a state or its agencies "to enact, impose, or enforce any requirement or standards with respect

to, or levy any fee or charge on," interstate motor carriers in connection with registering their interstate operations with the state, the filing of information concerning their federally required financial responsibility, or the filing with the state of the name of their federally required agent for service of process. *See id.* § 14504a(c)(1)(A)-(C) (West 2007 & Supp. 2011). States were further prohibited from requiring any interstate motor carrier that also had intrastate operations to pay any tax or fee from which a purely intrastate carrier would be exempt. *See id.* § 14504a(c)(2) (West Supp. 2011).

Finally, and most importantly for this case, Congress prohibited states from "enact[ing], impos[ing], or enforc[ing] any requirement or standards with respect to, or levy and fee or charge on" motor carriers that conduct both interstate and intrastate business "in connection with ... the annual renewal of the intrastate authority, or the insurance filings ... or other intrastate filing requirement necessary to operate within the State," if certain conditions are met. *See id.* § 14504a(c)(1)(D) (West 2007). For this prohibition to apply, the motor carrier (1) must have satisfied certain federal registration requirements and (2) be "in compliance with the laws and regulations of the State authorizing the carrier to operate in the State in accordance with [49 U.S.C.] section 14501(c)(2)(A)." *See id.* Section 14501(c)(2)(A), in turn, provides that general federal preemption of state regulations "related to a price, route, or service of any [interstate] motor carrier ... with respect to the transportation of property" does not:

> restrict the safety regulatory authority of a State with respect to motor vehicles, the authority of a State to impose highway route controls or limitations based on the size or weight of the motor vehicle or the hazardous nature of the cargo, or the authority of the State to regulate motor carriers with regard to minimum amounts of financial responsibility related to insurance requirements and self-insurance authorization.

**\*696** *Id.* § 14501(c)(2)(A) (West 2007). Additionally, section 14504a(c)(1)(D) exempts from preemption renewals of a motor carrier's intrastate operating authority to transport waste or household goods, conduct certain bus services, or provide non-consensual towing. *See id.* § 14504a(c)(1).

The UCR Act took effect in January 2007, and Texas opted into the UCR system through legislation effective on September 1 of that year. *See generally* Tex. Transp. Code Ann. §§ 645.001–.004 (West 2011) (delegating authority to, among other things, participate, "to the fullest extent practicable ... in a federal motor carrier registration program under the unified carrier registration system...."). At the same time, the Legislature amended the transportation code in an evident attempt to conform Texas law to the UCR Act's preemption provisions.

At all relevant times, chapter 643 of the transportation code has generally prohibited a motor carrier from operating a commercial motor vehicle on a road or highway of this state unless the carrier registers with the State (specifically, at the dispute's inception, TxDOT's motor vehicle division[2]) and obtains a registration certificate and, for each vehicle, a "cab card." *See* Tex. Transp. Code Ann. §§ 643.051, .054, .059 (West 2011). Such registrations must also be renewed periodically, generally on an annual basis. *See id.* § 643.058, .061 (West 2011). Additionally, motor carriers required to register under chapter 643 must, with respect to each vehicle requiring registration, maintain liability insurance or financial responsibility in an amount specified by the agency, which must not exceed the amounts required under federal law. *See id.* §§ 643.101(a), (b), .102 (West 2011). Proof of such insurance or financial responsibility must be filed at the time of initial registration, "at the time of a subsequent registration if the motor carrier was required to be continuously registered ... and the carrier failed to maintain continuous registration," when the carrier changes insurers, and when the carrier changes ownership. *Id.* § 643.103(a) (West 2011); *see also id.* §§ 643.053(2) (West 2011) (application for initial registration must be accompanied by proof of insurance or financial responsibility as required by section 643.103), .058(c)(3) (motor carrier renewing registration must "provid[e] ... evidence of continuing insurance or financial responsibility" in required amount). Fees may be assessed in connection with initial registration, renewal of registration, and insurance filings. *See id.* §§ 643.053(1), (3), .057, .058(c)(2), .061(b), .103(c). All of these general requirements have been implemented through rules, codified at relevant times in title 43, chapter 18 of the Texas Administrative Code. *See generally* 43 Tex. Admin. Code §§ 18.2–.76 (2010) (Tex. Dep't of Transp., Motor Carriers), *amended by* 34 Tex. Reg. 8286 (2009), *adopted* 35 Tex. Reg. 664 (2010) (codified as amended at 43 Tex. Admin. Code §§ 218.1–.77 (Tex. Dep't of Motor Vehicles, Motor Carriers)).

---

[2]      *See infra* note 5.

In response to the UCR Act, the Legislature amended section 643.002 of the transportation code to provide simply that "[t]his chapter does not apply" to "motor carrier operations exempt from registration by the Unified Carrier Registration Act of 2005 (49 U.S.C. Section 14504a)." *See id.* § 643.002(1) (West 2011). A few months later, TxDOT likewise promulgated proposed rule amendments to implement the UCR system and conform to the Act's preemption provisions. *See* 32 Tex. Reg. 9923–34 (2007) (to be codified at **\*697** 43 Tex. Admin. Code §§ 18.1–.76) (proposed Dec. 28, 2007). The amendments as proposed ultimately took effect on April 17, 2009. *See* 32 Tex. Reg. 9923–34 (2007), *adopted* 33 Tex. Reg. 2978–81 (2008) (codified at 43 Tex. Admin. Code §§ 18.1–.76). New or amended provisions that are material to this appeal included a requirement that interstate carriers operating in Texas "register and comply with provisions of the [UCR] System as required by 49 U.S.C. 14504(a) [sic]," 43 Tex. Admin. Code § 18.18(b), an exclusion of "motor vehicle[s] exempt from registration by the Unified Carrier Registration Act of 2005" from the "commercial motor vehicle[s]" required to be registered with TxDOT, *see id.* §§ 18.2(6)(B)(viii), .11(a), and a new subsection titled "Interstate motor carrier operating in intrastate commerce" that was added to the rule governing expiration and renewals of state motor carrier registrations:

> (1) An interstate motor carrier registered under § 18.18 of this chapter [i.e., UCR] is not required to renew a certificate of registration issued under § 18.11 of this chapter [the general requirement that motor carriers register with TxDOT] except when the motor carrier is operating commercial motor vehicles as a
>
> > (A) charter bus carrier;
> >
> > (B) for-hire household goods carrier; or
> >
> > (C) recyclable materials or waste carrier.
>
> (2) If a motor carrier that registered under § 18.18 of this chapter [UCR] does not maintain continuous motor carrier registration under § 18.11 of this chapter, the motor carrier must file an application under § 18.13 of this chapter [the general requirements and procedures for original registration as a motor carrier with TxDOT, including fees and proof of insurance requirements] to operate on public streets and highways in this state.

*Id.* § 18.14(c); *see id.* §§ 18.11, 18.13, 18.15–.16.[3] The rule amendments did not alter preexisting requirements that motor carriers "file and maintain proof of automobile liability insurance for all vehicles required to be registered ... at all times." *Id.* § 18.16(e)(1)(A); *see also id.* § 18.16(e)(2) (requiring proof-of-insurance filing at time of original registration application, on or before cancellation date of insurance coverage, whenever the motor carrier changes insurers, whenever the motor carrier changes its name, whenever the motor carrier changes the classification of the cargo being transported, and when "replacing another active insurance filing").

[3]   TxDOT also added a statement to the preamble of its registration rules recognizing that transportation code chapter 643 prohibits motor carriers from operating commercial motor vehicles on a Texas road or highway "unless the carrier registers with the department *or is exempt from registration under Transportation Code § 643.002*." 32 Tex. Reg. 9923, 9927 (codified at 43 Tex. Admin. Code § 18.10) (emphasis added).

## THE RECORD

The record in this case consists of appellees' live pleading at the time of the hearing on appellants' plea to the jurisdiction[4] and evidence presented by appellees both during the hearing and as exhibits to their response in opposition to appellants' plea. This evidence includes documentary evidence and both affidavit and live testimony from Erick Smith, an officer with a company that handles appellees' regulatory filings. Appellants challenged only the sufficiency **\*698** of appellees' pleadings; they did not attempt to negate the existence of any pled facts with evidence nor presented evidence to controvert that presented by appellees. Consequently, we must take as true appellees' factual allegations and evidence. *See Miranda,* 133

S.W.3d at 226; *Creedmoor–Maha Water Supply Corp.,* 307 S.W.3d at 513, 516 n. 8.

[4]     Their third amended original petition.

Appellees' pleadings and evidence reflect that each entity is a Texas corporation, with a principal place of business in this state, and the record further indicates that the corporations are affiliated or related. Each company, moreover, is a motor carrier that operates in Texas in both interstate and intrastate commerce, and none has operated intrastate within the categories of intrastate operations that are excluded from the UCR Act's preemption of state registration renewal requirements, *see* 49 U.S.C.A. § 14504a(c)(1).

Before the UCR Act took effect in 2008, according to Smith, appellees had registered with TxDOT as motor carriers. After UCR went into effect, appellees' pleadings and evidence indicate, appellees had each registered under the UCR system. The documentary evidence reflects, and appellees acknowledge, that TxDOT revoked the state registration of Sunset Transportation during the summer of 2008. However, it is not this revocation that is the immediate focus of appellees' claims for relief.

In their pleadings, appellees complain that TxDOT is requiring "UCR registered interstate motor carriers who also operate[ ] in intrastate commerce ... to maintain active insurance filings with TXDOT at all times, to re-register with TXDOT and to pay applicable fees to the State, all in contradiction to the UCR Act and the Texas Transportation Code."[5] In appellees' **\*699** view, section 643.002 of the transportation code and the UCR create an exemption for and/or preempt these state registration, insurance, and fee requirements with respect to interstate motor carriers within UCR's scope. Appellees allege that their business operations are being impeded by being required to "re-register" with TxDOT, maintain active insurance filings, and pay related fees as a condition of operating intrastate in Texas, and that TxDOT has been "threatening administrative penalties and fines" and "harass[ing] the plaintiffs with bogus records requests" in connection with "registration violations" that are premised on TxDOT's erroneous view of those requirements. Appellees seek the following declarations:

[5]     After appellees filed suit but before the hearing on appellants' plea to the jurisdiction, the state functions implicated by appellees' allegations were transferred from TxDOT to the newly created Texas Department of Motor Vehicles (DMV). *See* Act of May 23, 2009, 81st Leg., R.S., ch. 933, §§ 1.01–11.01, 2009 Tex. Gen. Laws 2485–522; *see also* 34 Tex. Reg. 8286 (2009), *adopted* 35 Tex. Reg. 664 (2010) (codified at 43 Tex. Admin. Code §§ 218.1–.77) (DMV rules that generally track the TxDOT motor carrier registration rules discussed herein). The Legislature provided that, effective November 1, 2009, "all powers, duties, obligations, and rights of action of the Motor Vehicle Division ... of the Texas Department of Transportation are transferred to the Texas Department of Motor Vehicles" and that "the Texas Department of Motor Vehicles shall continue in any proceeding involving the Motor Vehicle Division, the Vehicle Titles and Registration Division, or the portion of the Motor Carrier Division ... that was brought before the effective date of this act in accordance with the law in effect on the date the proceeding was brought, and the former law is continued in effect for that purpose." Act of May 23, 2009, 81st Leg., R.S., ch. 933, §§ 6.01(a), (d), 2009 Tex. Gen. Laws 2519–20.

        Although the DMV and its executive director would appear, as a formal matter, to have succeeded to the interests of TxDOT and its executive director in this litigation, the Attorney General continued to

> prosecute the plea to the jurisdiction in the names of TxDOT and its executive director, the district court's order refers only to these defendants, and the Attorney General has pursued this appeal solely in their names. In an apparent abundance of caution, appellees joined the DMV as an additional defendant, alleging that the new agency has continued to interpret and enforce the state registration and filing requirements in the same manner TxDOT had. Neither side contends that the distinction between the predecessors and successors has any substantive implications for this appeal. For this reason, and because the events giving rise to the underlying dispute involved actions by TxDOT, we have, for clarity, continued to identify the relevant state actors as TxDOT and its executive director, as the parties have, and similarly cite to the versions of relevant rules that referenced TxDOT rather than the DMV.

• "that the [TxDOT] policy of requiring UCR registered interstate motor carriers who may also operate in intrastate Texas commerce to maintain active insurance filings with [TxDOT] at all times and/or re-register and submit applicable fees to re-activ[ate] a revoked [TxDOT] motor carrier certificate of registration, is invalid because it seeks to amend the law as made and provided by the Legislature through an administrative process," is "an excessive exercise of the power vested in [TxDOT]," and "goes beyond the statutory authority to regulate interstate carriers and insurers."

• "that [TxDOT] [is] acting beyond [its] statutory authority in requiring insurance filings, registrations, and fees, for interstate carriers registered under the UCR who may operate in intrastate commerce."

• that "[TxDOT] [is] preempted by federal law from requiring interstate carriers registered under the UCR from making insurance filings or renewing intrastate authority."

Appellees additionally seek temporary and permanent injunctive relief restraining appellants "from requiring insurance filings from interstate motor carriers registered under the UCR, from conducting investigations of intrastate movements of interstate motor carriers registered under the UCR, and from issuing violation reports or assessing fines to interstate motor carriers properly registered under the UCR concerning intrastate movement."

Appellees purport to assert their claims under the limited waiver of sovereign immunity provided in the Uniform Declaratory Judgments Act, Tex. Civ. Prac. & Rem.Code Ann. §§ 37.001–.009 (West 2009); *see Texas Lottery Comm'n v. First State Bank of DeQueen,* 325 S.W.3d 628, 633–34 (Tex.2010) (recognizing that section 37.006(b) of the UDJA waives the State's sovereign immunity to the extent of permitting suits for declarations as to the construction or validity of a state statute), but ultimately must rely upon the "ultra vires" exception to sovereign immunity. *See City of El Paso v. Heinrich,* 284 S.W.3d 366, 369–77 (Tex.2009) (explaining that sovereign or governmental immunity does not bar suits against governmental officers in their official capacity for prospective relief to restrain acts outside their discretionary legal authority); *Creedmoor–Maha Water Supply Corp.,* 307 S.W.3d at 514–16 (recognizing "that an otherwise proper UDJA claim seeking to construe or invalidate a statute is nonetheless barred by sovereign immunity if the remedy would have the effect of establishing a right to relief against the State that implicates sovereign immunity and for which immunity has not been waived," including an ostensible "ultra vires" claim that actually seeks to control state action). In this regard, appellees allege that TxDOT's executive director "has acted ultra vires of the applicable laws regarding registration and insurance filings[,] for which no immunity exists." **\*700** Appellees also request attorney's fees as the UDJA permits. *See* Tex. Civ. Prac. & Rem.Code Ann. § 37.009.

Appellees additionally invoke section 2001.038 of the APA. APA section 2001.038 waives sovereign immunity to the extent of creating a cause of action for declaratory relief regarding the "validity" or "applicability" of a "rule" if "it is alleged that the rule or its threatened application interferes with or impairs, or threatens to interfere with or impair, a legal right or

privilege of the plaintiff." Tex. Gov't Code Ann. § 2001.038(a) (West 2008); *see Texas Logos, L.P. v. Texas Dep't of Transp.,* 241 S.W.3d 105, 123 (Tex.App.-Austin 2007, no pet.) ("section 2001.038 is a grant of original jurisdiction and, moreover, waives sovereign immunity"). As for the TxDOT "rule" that is under challenge, appellees allege that "in June 2008 TxDOT revised its policy or rules concerning UCR registered interstate motor carriers who also operated in interstate commerce to require those carriers to maintain active insurance filings with TXDOT at all times, to re-register with TXDOT and to pay applicable fees to the State." This allegation refers to a TxDOT document, purportedly published on the agency's website and in evidence, titled, "**Important Notice for UCR Registered Interstate Motor Carriers Also Operating in Intrastate Texas Commerce,**" and indicating "**REVISED—JUNE 25, 2008**" and "**EFFECTIVE IMMEDIATELY.**"

This document (hereinafter, the "2008 Revised Notice") states that its "purpose is ... to provide instructions to Interstate Motor Carriers who are currently registered under the Unified Carrier Registration (UCR) Agreement and that also operate in Intrastate Texas Commerce to convert existing TxDOT Registration to a non-expiring certificate," and that it applied to "Interstate Motor Carriers also operating in Interstate Texas Commerce" that had a current U.S. Department of Transportation number, are currently registered under UCR, and whose intrastate operations did not consist of household goods, charter bus, or waste transportation. (Those categories of carriers, the document indicated, "must continue to renew TxDOT registration.") The 2008 Revised Notice then provided instructions for "converting," via a website or hard copy and mail, an existing TxDOT motor carrier certificate of registration to a "UCR/Intrastate certificate" that "will not expire" as long as the motor carrier remains registered with UCR and its intrastate operations do not include household goods, charter bus, or waste transportation. Upon conversion, the document further advised, TxDOT would provide a "new certificate and insurance cab card" indicating UCR registration. The 2008 Revised Notice additionally indicated that "No fees are required for activating an expired TxDOT Certificate and the existing TxDOT Number will be retained." However, at the bottom of the page was printed, in bold:

> **All motor carriers must maintain active insurance filing with TxDOT at all times.**

> **Motor Carriers are required to re-register and submit applicable fees to re-activate a revoked TxDOT Motor Carrier Certificate of Registration.**

Appellees contrast the 2008 Revised Notice with an earlier TxDOT document, similar in form, dated September 10, 2007, and titled, "**Important Notice for Motor Carriers**" (hereinafter the "2007 Notice"). The 2007 Notice stated that its "purpose ... is to inform motor carriers of the latest requirements associated with the **\*701** Unified Carrier Registration Act of 2005" and provided a chart explaining registration and filing requirements applicable to various categories of motor carrier operations. The chart, in relevant part, instructed that: (1) motor carriers that operated interstate were required to register with UCR and to comply with the Federal Motor Carrier Safety Administration (FMCSA) requirements, (2) motor carriers that operated exclusively intrastate were required to register with TxDOT, (3) interstate carriers that also operated intrastate as charter bus carriers, non-consent tow-truck carriers, for-hire household goods carriers, or waste carriers were required to register with both UCR and TxDOT and comply with the FMCSA requirements, and (4) other interstate carriers that also operated intrastate (e.g., appellees) were required to do the following:

> • Comply with FMCSA requirements (http://www.fmcsa.dot.gov/); AND

> • Register with UCR (http://www.ucr.in.gov/).

> **IMPORTANT NOTE:** All first time registrants in this category must also register with TxDOT as a motor carrier.

Appellees interpret the 2007 Notice as advising them that, having previously registered with TxDOT in years past, they were no longer required to comply with any state registration or insurance requirements or pay related fees, but needed merely to register under UCR and comply with FMCSA requirements. They assert that this interpretation was "consistent with the statutory language of the UCR and Chapter 643 of the Texas Transportation Code." Additionally, Smith testified that as late as the summer of 2008, but sometime before the 2008 Revised Notice, TxDOT had conducted an investigation of Sunset Transportation's registration and that the individual investigator had concluded that the company was properly registered.[6] By subsequently changing "its policy and rules" to require "active insurance filings ... at all times" and re-registration and fees when state registration certificates are revoked, as reflected in the 2008 Revised Notice, appellees complain that TxDOT acted contrary to section 643.002 of the transportation code and the UCR Act.[7]

[6]     Smith also claimed that the TxDOT investigator furnished the company with a copy of the 2007 Notice at the time.

[7]     Appellees also suggest that TxDOT was targeting them specifically when it issued the 2008 Revised Notice, and there does appear to be some correlation between the dates of the investigation and when the notice issued.

**ANALYSIS**

In their plea to the jurisdiction, appellants asserted that sovereign immunity barred appellees' suit, that APA section 2001.038 did not waive such immunity because appellees had failed to identify any "rule" that they were challenging, that appellees had not alleged facts that would invoke the district court's jurisdiction via the "ultra-vires" exception to sovereign immunity, and that appellees' UDJA claims would be a redundant remedy and mere vehicle for recovering attorney's fees if it turned out that appellees had invoked the court's jurisdiction through their APA claim. The district court's order denying the plea did not elaborate on its reasoning, nor were findings of fact and conclusions of law requested or made. On appeal, appellants bring forward essentially the same grounds for dismissal on which they relied below.

[7] To determine whether appellees have asserted a valid ultra vires claim that invokes the district court's subject-matter **\*702** jurisdiction, we would construe the provisions of the transportation code and UCR Act that define the scope of TxDOT's legal authority, apply them to the facts that appellees have alleged, and ascertain whether those facts constitute acts beyond TxDOT's legal authority. *See Heinrich,* 284 S.W.3d at 372–73 (ultra vires suit "must not complain of a government officer's exercise of discretion, but rather must allege, and ultimately prove, that the officer acted without legal authority or failed to perform a purely ministerial act"); *Creedmoor–Maha Water Supply Corp.,* 307 S.W.3d at 516 n. 8 (quoting *Hendee v. Dewhurst,* 228 S.W.3d 354, 368–69 (Tex.App.-Austin 2007, pet. denied) (when analyzing whether plaintiff has alleged ultra vires acts, we construe the relevant statutory or constitutional provisions that define the governmental actor's discretionary authority, apply the provisions to the pled and un-negated facts, and determine whether those facts fall within or outside that authority). Appellees emphasize that they explicitly pled that TxDOT or its executive director acted "ultra vires" or contrary to their legal authority. However, merely asserting legal conclusions or labeling a defendant's actions as "ultra vires," "illegal," or "unconstitutional" does not suffice to plead an ultra vires claim—what matters is whether the *facts* alleged constitute actions beyond the governmental actor's statutory authority, properly construed. *Creedmoor–Maha Water Supply Corp.,* 307 S.W.3d at 515–16 & nn. 7–8. To this extent, the jurisdictional inquiry with respect to appellees' purported ultra vires claims would substantially overlap with the claims' merits. *Id.* at 516 n. 8.

In contrast to appellees' UDJA claims, which are ultimately predicated upon the ultra vires exception, appellees' claims under APA section 2001.038 invoke the district court's subject-matter jurisdiction if appellees have challenged the "validity" or "applicability" of a "rule" under the APA and they allege that "the rule or its threatened application interferes with or impairs, or threatens to interfere with or impair, a legal right or privilege of the plaintiff." Tex. Gov't Code Ann. § 2001.038(a); *see Texas Logos, L.P.,* 241 S.W.3d at 123. Determining whether appellees have done so, unlike with our analysis of appellees' ultra vires claims, does not require us to delve into the merits of the claims, *see Texas Dep't of Pub. Safety v. Salazar,* 304 S.W.3d 896, 903 (Tex.App.-Austin 2009, no pet.)—nor would such an inquiry be proper. *See Bland Indep. Sch. Dist.,* 34 S.W.3d 547; *Hendee,* 228 S.W.3d at 366. Consequently, we should begin with section 2001.038's narrower jurisdictional inquiry.

Appellees have alleged that the 2008 Revised Notice is invalid because it violates the limitations on TxDOT's regulatory powers imposed by transportation code section 643.002 and the UCR Act. These factual allegations suffice to invoke the district court's subject-matter jurisdiction *if* the 2008 Revised Notice is a "rule" within the meaning of the APA. *See, e.g.,*

*Combs v. City of Webster,* 311 S.W.3d 85, 100–01 (Tex.App.-Austin 2009, pet. denied) (recognizing that "[t]o the extent that no rule as defined by the APA is at issue, section 2001.038 does not provide any basis for the district court's jurisdiction over appellees' declaratory judgment action"). Appellants argue that the 2008 Revised Notice is not a "rule" because it merely restates requirements already prescribed in TxDOT's formally promulgated rules.

[8] [9] A "rule" under the APA:

> (A) means a state agency statement of general applicability that:
>
>> (i) implements, interprets, or prescribes law or policy; or
>>
>> ***703** (ii) describes the procedure or practice requirements of a state agency;
>
> (B) includes the amendment or repeal of a prior rule; and
>
> (C) does not include a statement regarding only the internal management or organization of a state agency and not affecting private rights or procedures.

Tex. Gov't Code Ann. § 2001.003(6) (West 2008). This definition obviously encompasses state agency statements formally promulgated in compliance with the APA's notice-and-comment rulemaking procedures, *see id.* §§ 2001.021–.036 (West 2008), but it extends beyond these. *See, e.g., El Paso Hosp. Dist. v. Texas Health & Human Servs. Comm'n,* 247 S.W.3d 709, 714–15 (Tex.2008) (holding that agency rate-calculation procedure, ostensibly an "interpretation" of its formally promulgated rules, was itself a "rule" that was invalid because adopted without complying with APA's notice-and-comment procedures). Under certain circumstances, this Court has held that agency pronouncements that advise third parties regarding applicable legal requirements, as did the 2008 Revised Notice, may be "interpretations" of law that constitute "rules" under the APA. *See Entertainment Publ'ns, Inc.,* 292 S.W.3d at 720–22; *Texas Alcoholic Beverage Comm'n v. Amusement & Music Operators of Tex.,* 997 S.W.2d 651, 657–58 (Tex.App.-Austin 1999, pet. dism'd w.o.j.); *see also First Fed. Sav. & Loan Ass'n v. Vandygriff,* 639 S.W.2d 492, 498–99 (Tex.App.-Austin 1982, writ dism'd w.o.j.). Precisely when those circumstances exist has sometimes been difficult to discern under the relevant case law.[8] One thing that can be said with relative certainty, however, is that an informal agency statement that does no more than restate its own formally promulgated rules would not in itself be a "rule."

---

8     *See, e.g.,* Ron Beal, *Substantive and Interpretive Rules: The Judiciary Continues to Struggle to Define Them and to Determine Their Legal Validity and Effect,* 12 Tex. Tech. Admin. L.J. 55, 59–66 (2010).

---

[10] That a "rule" must be more than a restatement of a formally promulgated rule is implicit in the APA's requirement that a "rule" have some legal effect on private persons and not merely impact the "internal management or organization of a state agency." Tex. Gov't Code Ann. § 2001.003(6)(C). Recognizing this, we have consistently held that an agency statement interpreting law must bind the agency or otherwise represent its authoritative position in matters that impact personal rights. *See Salazar,* 304 S.W.3d at 905 ("[a]gency statements that 'have no effect on private persons' are not considered rules") (quoting *Brinkley v. Texas Lottery Comm'n,* 986 S.W.2d 764, 770 (Tex.App.-Austin 1999, no pet.)); *Entertainment Publ'ns, Inc.,* 292 S.W.3d at 722 (emphasizing that legal interpretation in Comptroller's letters would bind agency employees and "unambiguously express[ed] an intent to apply this interpretation ... in all future cases" involving similar facts); *Amusement & Music Operators of Tex.,* 997 S.W.2d at 658 (agency memoranda to its law enforcement agents held to constitute "rules" on that record where there was evidence that agents "not only intend to enforce, but have enforced administrative sanctions" in accordance with memoranda); *see Brinkley,* 986 S.W.2d at 770 (observing that agency advisory opinion regarding applicable law would have no legal effect "absent a statute that so provides or some attempt by the agency to enforce its statement against a private person"). An agency statement that merely restated a formally promulgated ***704** rule would not meet this test because it would be the underlying rule, not the agency's restatement of it, that had legal effect. This Court has previously concluded as much. *See Texas Mut. Ins. Co. v. Vista Cmty. Med. Ctr., L.L.P.,* 275 S.W.3d 538, 556 (Tex.App.-Austin 2008, no pet.) ("The 2005 Staff Report did not affect private rights because it did not change or amend" a formally promulgated rule).

This conclusion is also consistent with the second element of the APA's "rule" definition, which provides that a "rule" "includes the amendment or repeal of a prior rule." Tex. Gov't Code Ann. § 2001.003(6)(B). Although "includes" is a term of enlargement rather than exclusion or limitation,[9] such that not all "rules" amend or repeal other rules, this indicia of a "rule" is nonetheless illustrative of the types of agency actions that would have legal effect on private persons, as contemplated by the third element. Agency statements that merely restated rules would have no such effect, and would not themselves be "rules."

[9]      Tex. Gov't Code Ann. § 311.005(13) (West 2005) (" '[i]ncludes' and 'including' are terms of enlargement and not of limitation or exclusive enumeration, and use of the terms does not create a presumption that components not expressed are excluded").

[11] Although distinguishing a mere restatement of a formally promulgated rule from a statement that is itself a "rule" might prove more elusive in other circumstances, *see Vista Cmty. Med. Ctr., L.L.P.,* 275 S.W.3d at 555–56, its application is straightforward in this case. Appellees complain of the portion of the 2008 Revised Notice stating that motor carriers whose state registrations have been revoked "**are required to re-register and submit applicable fees.**" This statement tracks TxDOT's rule providing that "[i]f a motor carrier that registered under § 18.18 of this chapter [UCR] does not maintain continuous motor carrier registration under § 18.11 of this chapter, the motor carrier must file an application under § 18.13 of this chapter to operate on public streets and highways in this state." 43 Tex. Admin. Code § 18.14(c); *see id.* § 18.13 (registration requirements, including applicable fees and proof of financial responsibility); *see also id.* §§ 218.14(c)(2), .13. Appellees also complain about the notice's statement that "**All motor carriers must maintain active insurance filing with TxDOT at all times.**" This statement, likewise, tracks TxDOT's rules. *See* 43 Tex. Admin. Code § 18.16(e)(1)(A) (motor carriers must "file and maintain proof of automobile liability insurance for all vehicles required to be registered ... at all times"); *see also id.* § 218.16(e)(1)(A). We agree with appellants that the 2008 Revised Notice merely restates TxDOT's formally promulgated rules and, thus, is not itself a "rule" under the APA. Because appellees have alleged only this "rule" as the basis for their claims under APA section 2001.038, they have failed to invoke the district court's subject-matter jurisdiction through that statute. *See City of Webster,* 311 S.W.3d at 100–01.

[12] [13] On the other hand, the foregoing analysis also reveals that appellees' claims necessarily implicate the substantive validity of the underlying formally promulgated TxDOT rules, or, alternatively, the applicability of the underlying rules in light of the rules' exclusion of "motor vehicle[s] exempt from registration by the Unified Carrier Registration Act of 2005" from the "commercial motor vehicle[s]" required to be registered with TxDOT. The Texas Supreme Court has instructed us that if a claimant's pleadings omit sufficient facts to affirmatively demonstrate **\*705** the trial court's jurisdiction but do not affirmatively demonstrate incurable defects in jurisdiction, the issue is one of "pleading sufficiency, and the plaintiffs should be afforded the opportunity to amend." *Miranda,* 133 S.W.3d at 226–27. This is such a case. The substance of appellees' claims seek declarations regarding the validity or applicability of TxDOT's formally promulgated rules. APA section 2001.038 confers subject-matter jurisdiction on the district court to determine such claims. To cure the existing jurisdictional defect, appellees need only add allegations to the effect that the "rule" or "rules" they are challenging are TxDOT's formally promulgated rules instead of the 2008 Revised Notice. Accordingly, we will, at this juncture, affirm the district court's order denying appellants' plea to the jurisdiction as to appellees' section 2001.038 claims without prejudice to appellants re-urging their plea once appellees have had a reasonable opportunity to amend their pleadings to cure the jurisdictional defect.[10]

[10]      To the extent appellees' complaints regarding the 2007 Notice are intended to sound in estoppel, appellees will likewise have the opportunity to replead any facts they can assert in good faith to meet the high burden for such a claim. *See City of White Settlement v. Super Wash, Inc.,* 198 S.W.3d 770, 774–75 (Tex.2006).

[14] Assuming that appellees replead under section 2001.038, we agree with appellants that appellees' UDJA claims would be

redundant remedies to the extent they complain about TxDOT's imposition of requirements related to insurance or re-registration for motor carriers whose prior registration has been revoked. In that event, appellees' UDJA claims regarding those requirements would be subject to dismissal. *See Texas Mun. Power Agency v. Public Util. Comm'n,* 253 S.W.3d 184, 200 (Tex.2007) (declaratory-judgment action will not be entertained if another pending action between the same parties may adjudicate the same issue); *Strayhorn v. Raytheon E–Sys., Inc.,* 101 S.W.3d 558, 572 (Tex.App.-Austin 2003, pet. denied); *Young Chevrolet, Inc. v. Texas Motor Vehicle Bd.,* 974 S.W.2d 906, 911 (Tex.App.-Austin 1998, pet. denied); *Ben Robinson Co. v. Texas Workers' Comp. Comm'n,* 934 S.W.2d 149, 153 (Tex.App.-Austin 1996, writ denied). But this repleading has not occurred yet, and we conclude that the district court reached the correct result in declining to dismiss appellees' UDJA claims at this juncture, pending appellees' opportunity to replead their section 2001.038 claims. Although appellants urge us to proceed with an analysis of whether appellees have alleged ultra vires acts, at the present time it is unnecessary and would be premature for us to reach these questions, which would effectively decide the merits of appellees' putative section 2001.038 claims. *See Salazar,* 304 S.W.3d at 903; *see also Bland Indep. Sch. Dist.,* 34 S.W.3d 547; *Hendee,* 228 S.W.3d at 366.

[15] However, appellees' UDJA claims are also predicated upon alleged TxDOT actions beyond those that are the subject of their section 2001.038 claims. Liberally construing appellees' factual allegations, as we must do, *see Miranda,* 133 S.W.3d at 226, they claim that TxDOT is requiring motor carriers that have already validly registered with it and whose registrations have not been revoked to re-register, pay related fees, and also submit annual filings of proof of financial responsibility. Such conduct would run afoul of the UCR Act and, thus, transportation code section 643.002.[11] Consequently, these allegations **\*706** would invoke the district court's subject-matter jurisdiction under the ultra vires exception to sovereign immunity. *See Heinrich,* 284 S.W.3d at 372–73. The district court did not err in denying appellees' plea as to these claims.

---

11   *See* 49 U.S.C.A. § 14504a(a)(9), (d) (West 2007). The entity that administers the UCR system, a joint state-industry body known as the UCR Plan Board of Directors, has published "informal guidance" explaining the relationship between section § 14504a(c)(1) and section 14501(c)(2)(A) as follows:

   • A state shall not "[r]equire an interstate motor carrier ... of property, to *renew* or charge a fee to renew its intrastate authority or insurance filings or any other filings required of an intrastate carrier," except with regard to carriers that transport waste or household goods, certain bus operations, and non-consensual towing. Unified Carrier Registration Plan Board of Directors, *The Unified Carrier Registration Act of 2005 Informal Guidance for Interested Parties, available at* http://www.wutc.wa. gov/webimage.nsf/0/421868d1f06cf30888257361 005ffbe4/$FILE/ATT70RBR/UCR% 20Questions %20and%20Answer%20Document%201–30–08.p df (emphasis in original).
   • A state may, however, "[r]equire an interstate carrier to complete the application requirements, including the fees and proof of insurance coverage, for an *initial* application for interstate operating authority." *Id.* (emphasis in original).
   • The UCR Act "has taken ... away from the States" enforcement of financial responsibility laws with regard to filing proof of financial responsibility." "However, a State may enforce its laws requiring liability coverage for any vehicle operating on the State's public ways. In other words, if an interstate motor carrier is found to be operating on a State's highways without liability insurance coverage, the State may take an action

against that motor carrier." *Id.* at 11.

• A state may not require "an annual insurance or surety bond filing by an interstate motor carrier that is operating under an intrastate authority from the State." That is, "[a] State may require the insurance of surety bond filing as part of the initial issuance of the intrastate authority, but under § 14504a, not annually thereafter. A State may require the insurance company or surety company providing such coverage to notify the State whenever the coverage is cancelled or not renewed. Additionally, nothing in the UCR Act prohibits a State from verifying the coverage as part of its internal review process of intrastate motor carriers." *Id.*

## CONCLUSION

For the reasons we have explained, we affirm the district court's order denying appellants' plea to the jurisdiction.

**All Citations**

357 S.W.3d 691

---

    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

241 S.W.3d 105
Court of Appeals of Texas,
Austin.

**TEXAS LOGOS, L.P.**, Appellant

v.

**TEXAS DEPARTMENT OF TRANSPORTATION**, and Michael W. Behrens, Individually, and in his capacity as
Executive Director of the **Texas Department of Transportation**, Appellees.

No. 03–07–00002–CV. | Aug. 30, 2007.

**Synopsis**
**Background:** Sign vendor brought action against Texas Department of Transportation (TxDOT) and its executive director, both in his official and individual capacities, arising from its loss of contract for state's logo sign program to a competing vendor, seeking declarations under Uniform Declaratory Judgments Act (UDJA) that TxDOT exceeded its statutory authority by violating or waiving various rules and statutes governing its procurement of logo sign contract, and that TxDOT's administrative protest rules were invalid. TxDOT and director in his official capacity filed plea to the jurisdiction. The District Court, Travis County, Margaret A. Cooper, J., granted plea and dismissed vendor's claims against TxDOT and director in his official capacity. Vendor appealed.

**Holdings:** The Court of Appeals, Bob Pemberton, J., held that:

[1] vendor's claims seeking declarations under UDJA that TxDOT violated statutes governing its procurement of contract, and that contract was void were barred by sovereign immunity;

[2] sovereign immunity barred vendor's claim under UDJA for a declaration voiding TxDOT's denial of vendor's protest to contract; and

[3] trial court lacked subject matter jurisdiction over vendor's claim under Administrative Procedures Act (APA) seeking declaration of invalidity of TxDOT's protest rules.

Affirmed.

West Headnotes (25)

[1]     **Appeal and Error**
        🔑Pleading

        Court of Appeals, in reviewing trial court's grant of Texas Department of Transportation's (TxDOT) plea to the jurisdiction, in action brought by sign vendor against TxDOT after vendor lost contract for state's logo sign program, would assume truth of factual allegations contained in vendor's pleadings,

where TxDOT did not challenge the jurisdictional facts alleged by vendor and did not introduce controverting jurisdictional evidence, but disputed only whether vendor's pleadings were sufficient to affirmatively establish trial court's subject matter jurisdiction.

Cases that cite this headnote

[2] **Appeal and Error**
Pleadings and rulings thereon

Court of Appeals, in reviewing trial court's grant of Texas Department of Transportation's (TxDOT) plea to the jurisdiction, in action brought by sign vendor against TxDOT after vendor lost contract for state's logo sign program, would consider jurisdictional evidence vendor attached to its petition, as well as evidence vendor introduced in response to TxDOT's plea to the jurisdiction.

Cases that cite this headnote

[3] **Pleading**
Plea to the Jurisdiction

Subject matter jurisdiction of a trial court may be challenged through a plea to the jurisdiction.

1 Cases that cite this headnote

[4] **Pleading**
Plea to the Jurisdiction
**States**
Liability and Consent of State to Be Sued in General

The immunity from suit encompassed by a state's sovereign immunity deprives a trial court of subject-matter jurisdiction, and thus may be raised through a plea to the jurisdiction.

1 Cases that cite this headnote

**[5]** **Courts**
⚷Determination of questions of jurisdiction in general

Determination of whether a trial court has subject matter jurisdiction begins with the pleadings.

Cases that cite this headnote

**[6]** **Courts**
⚷Allegations, pleadings, and affidavits

Pleader has the initial burden of alleging facts that affirmatively demonstrate the trial court's jurisdiction to hear the cause.

1 Cases that cite this headnote

**[7]** **Appeal and Error**
⚷Striking out or dismissal

When reviewing trial court's dismissal of cause for lack of jurisdiction, appellate court construes the pleadings liberally and look to the pleader's intent.

Cases that cite this headnote

**[8]** **Pleading**
⚷Amendments following sustaining of pleas

If the pleadings do not contain sufficient facts to affirmatively demonstrate the trial court's jurisdiction but do not affirmatively demonstrate incurable defects in jurisdiction, the issue is one of pleading sufficiency and plaintiffs should be

afforded the opportunity to amend.

Cases that cite this headnote

[9]     **Pleading**
        Amendments following sustaining of pleas

If the pleadings affirmatively negate the existence of jurisdiction, then a plea to the jurisdiction may be granted without allowing plaintiffs an opportunity to amend.

1 Cases that cite this headnote

[10]    **Pleading**
        Scope of inquiry and matters considered in general

When a plea to the jurisdiction challenges the existence of facts alleged by the pleader to establish the trial court's subject matter jurisdiction, the trial court must consider relevant evidence submitted by the parties.

Cases that cite this headnote

[11]    **Declaratory Judgment**
        Jurisdiction not enlarged

The Uniform Declaratory Judgment Act (UDJA) does not create or augment a trial court's subject-matter jurisdiction; it merely provides a remedy where subject matter jurisdiction already exists. V.T.C.A., Civil Practice & Remedies Code § 37.003(a).

2 Cases that cite this headnote

[12]    **Declaratory Judgment**
        Jurisdiction not enlarged

**Declaratory Judgment**

Jurisdiction of particular state courts

While the Uniform Declaratory Judgment Act (UDJA) cannot confer subject matter jurisdiction in the absence of a cause of action within the court's jurisdiction, a suit under the UDJA is not confined to cases in which the parties have a cause of action apart from the UDJA itself; that is, a UDJA action will lie within the subject matter jurisdiction of the district courts when there is (1) a justiciable controversy as to the rights and status of parties actually before the court for adjudication, and (2) that will be actually resolved by the declaration sought. V.T.C.A., Civil Practice & Remedies Code § 37.001 et seq.

1 Cases that cite this headnote

[13] **States**

Declaratory judgment

A justiciable controversy regarding whether a state agency or officer has acted beyond statutory authority, which provides a jurisdictional basis for an action pursuant to the Uniform Declaratory Judgment Act (UDJA) seeking construction of that statutory authority, does not implicate sovereign immunity. V.T.C.A., Civil Practice & Remedies Code § 37.001 et seq.

1 Cases that cite this headnote

[14] **Declaratory Judgment**

State officers and boards

**States**

Declaratory judgment

Uniform Declaratory Judgment Act (UDJA) does not authorize, by sovereign immunity waiver or otherwise, a claim that seeks to control state action. V.T.C.A., Civil Practice & Remedies Code § 37.001 et seq.

1 Cases that cite this headnote

[15]    **Declaratory Judgment**
        Subjects of relief in general

Mere fact that sign vendor lacked vested property rights in contract award by Texas Department of Transportation (TxDOT) to a competing vendor that could give rise to an inherent right of judicial review did not deprive vendor of standing to prosecute a proper claim under Uniform Declaratory Judgments Act (UDJA) challenging TxDOT's statutory authority in regard to the contract procurement.

Cases that cite this headnote

[16]    **States**
        Declaratory judgment

Sign vendor's claims against Texas Department of Transportation (TxDOT) seeking declarations under Uniform Declaratory Judgments Act (UDJA) that TxDOT violated statutes governing its procurement of logo sign contract and that logo sign contract TxDOT awarded to competing vendor was void, were barred by sovereign immunity, as claims ultimately sought to invalidate contract, a remedy that would control state action, and vendor alleged only past statutory violations, for which the only plausible remedy was invalidation of contract. V.T.C.A., Civil Practice & Remedies Code § 37.001 et seq.; V.T.C.A., Transportation Code §§ 391.091(a), 391.0935(f), 391.099(d).

4 Cases that cite this headnote

[17]    **Declaratory Judgment**
        Statutory remedy

A claim pursuant to the Uniform Declaratory Judgment Act (UDJA) is sui generis and, all other things being equal, the district court's subject matter jurisdiction over it exists independently of any administrative remedies. V.T.C.A., Civil Practice & Remedies Code §

37.001 et seq.

Cases that cite this headnote

[18]  **States**

&#128273;Liability and Consent of State to Be Sued in General

In addition to barring suits for money damages, sovereign immunity protects the state against suits to control state action.

3 Cases that cite this headnote

[19]  **States**

&#128273;What are suits against state or state officers

A suit seeks to "control state action," and thus is barred pursuant to sovereign immunity, when the judgment would effectively direct or control a government official in the exercise of his discretionary statutory authority.

4 Cases that cite this headnote

[20]  **States**

&#128273;Declaratory judgment

A declaratory judgment suit ostensibly to declare statutory authority may be barred by sovereign immunity if it is predicated upon factual allegations that fall entirely within a state official's discretionary statutory powers; in such cases, courts may be able to decide jurisdictional challenges as a matter of law based on the pleadings by construing the relevant statutes and ascertaining whether the acts pled fall within or outside discretionary powers. V.T.C.A., Civil Practice & Remedies Code § 37.001 et seq.

2 Cases that cite this headnote

[21]    **States**
👈Declaratory judgment

A claim against officers of a state, including one under the Uniform Declaratory Judgment Act (UDJA), seeking to establish a contract's validity, to enforce performance under a contract, or to impose contractual liabilities is a suit against the state. V.T.C.A., Civil Practice & Remedies Code § 37.001 et seq.

2 Cases that cite this headnote

[22]    **Municipal Corporations**
👈Nature and grounds of liability
**States**
👈Liability and Consent of State to Be Sued in General

The contemporary rationale or justification for sovereign or governmental immunity is to protect state resources from the costs of paying judgments and defending against them so they can instead be used in accordance with the policy and budgetary directives of the legislature or local governments.

1 Cases that cite this headnote

[23]    **Public Contracts**
👈Judicial Remedies and Review
**States**
👈Determination and disposition
**States**
👈Declaratory judgment

Texas Department of Transportation (TxDOT) did not exceed its statutory authority in refusing to determine sign vendor's protest of TxDOT's award of logo sign contract to a competing vendor through an Administrative Procedure Act (APA) contested case proceeding, and thus sovereign immunity barred vendor's claim under Uniform Declaratory Judgments Act (UDJA) for a declaration voiding TxDOT's denial of the protest; vendor did not allege acts by TxDOT that exceeded its statutory authority, and absent express statutory authority, the APA did not

independently provide a right to a contested case hearing. V.T.C.A., Civil Practice & Remedies Code § 37.001 et seq.; V.T.C.A., Government Code § 2001.001 et seq.

7 Cases that cite this headnote

[24] **Declaratory Judgment**
Streets and highways
**States**
Declaratory judgment

Sign vendor's claim against Texas Department of Transportation (TxDOT) under the Administrative Procedures Act (APA), seeking declaration of the invalidity of TxDOT's protest rules, did not present a justiciable controversy, as required for court to exercise subject matter jurisdiction over the claim; justiciable controversy that sign vendor purportedly pled concerned its rights relative to TxDOT's award of logo sign contract to competing vendor and its protest of that award, sovereign immunity barred vendor's claims under Uniform Declaratory Judgments Act (UDJA) to invalidate contract and protest order, and relief provided under APA did not extend to invalidating either TxDOT's protest order or its ultimate contract award, but only rules by which protest was conducted. V.T.C.A., Government Code § 2001.038(a).

3 Cases that cite this headnote

[25] **Declaratory Judgment**
Jurisdiction of particular state courts
**States**
Declaratory judgment

Unlike the Uniform Declaratory Judgments Act (UDJA), provision of Administrative Procedures Act (APA) creating cause of action for declaratory judgment regarding validity or applicability of rule if it is alleged that rule or its threatened application interferes with or impairs, or threatens to interfere with or impair, a legal right or privilege of plaintiff, is a grant of original jurisdiction and, moreover, waives

sovereign immunity. V.T.C.A., Civil Practice & Remedies Code § 37.001 et seq.; V.T.C.A., Government Code § 2001.038.

10 Cases that cite this headnote

**Attorneys and Law Firms**

**\*108** Stephen G. Gleboff, Christopher Alan Brown, Hughes & Luce, L.L.P., Dallas, John B. Lay, Attorney General, Austin, for appellant.

Betsy J. Johnson, Office of Attorney General, Susan Desmarais Bonnen, Assistant Atty. Gen., Austin, for appellee.

Before Chief Justice LAW, Justices PURYEAR and PEMBERTON.

*OPINION*

BOB PEMBERTON, Justice.

Since the inception of the Texas Department of Transportation's logo sign program **\*109** in the early 1990s, Texas Logos, L.P., had held the contract to erect, maintain, and market fee-for-display opportunities on these now-familiar blue signs, located near Texas highway exits, that contain business logos of participating restaurants, gas stations, and lodging facilities. In December 2005, the department issued a request for proposals (RFP) seeking offers from vendors to operate the "Information Logo Sign and Tourist–Oriented Directional Sign Program"—which would include "specific information logo signs," "major shopping area guide signs," and new "tourist-oriented directional signs" with information about wineries and other agribusiness or tourist-oriented businesses—following the December 2006 expiration of Texas Logos's contract. Texas Logos, Media Choice/Quorum Media Group, L.L.C. (Media Choice), and other competing vendors submitted proposals for award of the contract (the "logo sign contract"). The department ultimately awarded the logo sign contract to Media Choice.

After unsuccessfully pursuing the administrative protest remedies the department provided under its rules and requesting, and being denied, a contested-case proceeding on its protest under the Administrative Procedures Act, Texas Logos sued the department and its executive director, in his official capacity (collectively, TxDOT) and individually. Texas Logos alleges chiefly that TxDOT "exceeded its statutory authority" by violating or waiving the requirements of various statutes and rules governing its procurement of the logo sign contract, resulting in a procurement that was "riddled with fraud, conflicts of interest, and extra-statutory actions by TxDOT at virtually every turn." It sought declarations under the Uniform Declaratory Judgments Act (UDJA)[1] that TxDOT had violated procurement statutes and that the logo sign contract was void. Texas Logos also sought declarations under the UDJA that TxDOT was statutorily required to adjudicate its protest through a contested-case proceeding and that its refusal to do so rendered void the agency's order denying its protest. Finally, Texas Logos requested declarations under section 2001.038 of the Administrative Procedures Act[2] that TxDOT's administrative protest rules were, for this reason and others, invalid.

[1]     Tex. Civ. Prac. & Rem.Code Ann. §§ 37.001–.011 (West 1997 & Supp.2006).

[2]     Tex. Gov't Code Ann. § 2001.038 (West 2000).

TxDOT (i.e., the department and Behrens in his official capacity) filed a plea to the jurisdiction, asserting that Texas Logos's claims against it were barred by sovereign immunity. The district court granted the plea and dismissed Texas Logos's claims against TxDOT; the claims against Behrens individually remained pending in the district court. Texas Logos appeals from this order.[3] For the reasons explained below, we affirm the district court's order.

[3] *See* Tex. Civ. Prac. & Rem.Code Ann. § 51.014(a)(8) (West Supp.2006). In its notice of appeal, Texas Logos erroneously included Behrens in his individual capacity as one of the appellees. Thus, although our caption indicates otherwise, Behrens individually is not a party to this appeal.

## STANDARD AND SCOPE OF REVIEW

[1] [2] [3] [4] The subject matter jurisdiction of a trial court may be challenged through a plea to the jurisdiction. *See Texas Dep't of Parks & Wildlife v. Miranda,* 133 S.W.3d 217, 225–26 (Tex.2004); *Bland Indep. Sch. Dist. v. Blue,* 34 S.W.3d 547, 554 (Tex.2000); **\*110** *Hendee v. Dewhurst,* 228 S.W.3d 354, 368 (Tex.App.-Austin, 2007, pet. denied). The immunity from suit encompassed by sovereign immunity derives a trial court of subject-matter jurisdiction, *Reata Constr. Corp. v. City of Dallas,* 197 S.W.3d 371, 374 (Tex.2006) (citing *Miranda,* 133 S.W.3d at 224), and thus may be raised through a plea to the jurisdiction. Our discussion of "sovereign immunity" in this opinion refers to immunity from suit.

[5] [6] [7] The determination of whether a trial court has subject matter jurisdiction begins with the pleadings. *See Miranda,* 133 S.W.3d at 226. The pleader has the initial burden of alleging facts that affirmatively demonstrate the trial court's jurisdiction to hear the cause. *Id.* (citing *Texas Ass'n of Bus. v. Texas Air Control Bd.,* 852 S.W.2d 440, 446 (Tex.1993)). Whether the pleader has met this burden is a question of law that we review de novo. *Id.* We construe the pleadings liberally and look to the pleader's intent. *Id.*

[8] [9] If the pleadings do not contain sufficient facts to affirmatively demonstrate the trial court's jurisdiction but do not affirmatively demonstrate incurable defects in jurisdiction, the issue is one of pleading sufficiency and the plaintiffs should be afforded the opportunity to amend. *Id.* at 226–27. If the pleadings affirmatively negate the existence of jurisdiction, then a plea to the jurisdiction may be granted without allowing the plaintiffs an opportunity to amend. *Id.* at 227.

[10] When a plea to the jurisdiction challenges the existence of facts alleged by the pleader to establish the trial court's subject matter jurisdiction, the trial court must consider relevant evidence submitted by the parties. *Id.* at 227 (citing *Bland,* 34 S.W.3d at 555); *Hendee,* 228 S.W.3d at 365. Here, TxDOT has not challenged the jurisdictional facts alleged by Texas Logos, nor did it introduce controverting jurisdictional evidence.[4] It disputes only whether Texas Logos's pleadings are sufficient to affirmatively establish the district court's subject matter jurisdiction. Consequently, we assume the truth of the factual allegations contained in Texas Logos's pleadings. *Miranda,* 133 S.W.3d at 226.7

[4] The only evidence TxDOT introduced was a copy of a letter from Texas Logos's counsel to establish that Texas Logos, not TxDOT, had requested the hearing on TxDOT's plea.

Additionally, because Texas Logos attached jurisdictional evidence to its petition and introduced additional evidence in response to TxDOT's plea to the jurisdiction, we may consider it in resolving the jurisdictional challenges TxDOT has raised. *Bland,* 34 S.W.3d at 555 ("[A] court deciding a plea to the jurisdiction is not required to look solely to the pleadings but may

consider evidence and must do so when necessary to resolve the jurisdictional issues raised.").

## PLEADINGS AND JURISDICTIONAL EVIDENCE

**Challenges to logo sign contract**

On appeal, Texas Logos principally contends that it properly invoked the district court's subject-matter jurisdiction through its UDJA claims alleging that TxDOT exceeded its statutory authority when procuring the logo sign contract and seeking to declare the contract void. To summarize, Texas Logos alleges that TxDOT violated or exceeded its statutory authority by improperly skewing its procurement procedures to favor Media Choice, enabling Media Choice to submit fraudulent, misleading, and inaccurate information upon which TxDOT ostensibly based its award decision. Central to these allegations is Texas Logos's legal premise that **\*111** TxDOT's procurement of the logo sign contract was governed by the State Purchasing and General Services Act (the "Purchasing Act"). *See generally* Tex. Gov't Code Ann. §§ 2151.001–2177.103 (West 2000 & Supp.2006). Among other requirements, the Purchasing Act generally requires competitive bidding[5] and that state agencies purchase goods and services "that provide the best value for the state," for which "the purchase price and whether the goods or services meet specifications are the most important considerations." *Id.* § 2155.074(a)-(b) (West Supp.2006).

> [5] *See* Tex. Gov't Code Ann. § 2155.063 ("Except as otherwise provided by this subtitle, a purchase of or contract for goods or services shall, whenever possible, be accomplished through competitive bidding.").

Overall, Texas Logos alleges that TxDOT's conduct violated these competitive-bidding requirements by failing in its "obligation to place all bidders on the same 'plane of equality.'" *See Texas Highway Comm'n v. Texas Ass'n of Steel Imps., Inc.,* 372 S.W.2d 525, 527 (Tex.1963) (regarding competitive-bidding principles). Texas Logos alleges specifically that TxDOT violated or exceeded its statutory authority by ignoring several deficiencies in Media Choice's proposal.

Texas Logos pleads that Media Choice "omitted important pricing information" elicited by TxDOT's RFP. It asserts that Media Choice "omitted" from a required schedule "an entire row" of pricing information concerning installation charges for major shopping area guide signs, and thereby "failed to provide the required pricing for the minimum and maximum proposed fees for MSAGS Freeway Installation."[6] By nonetheless accepting Media Choice's "incomplete" proposal and awarding the logo sign contract on that basis, Texas Logos contends that TxDOT violated and waived its duties under the Purchasing Act to evaluate "the purchase price and whether the goods meet specifications" as "the most important considerations" in determining the "best value for the state." *See* Tex. Gov't Code Ann. § 2155.074. Texas Logos further pleads that TxDOT's consideration of Media Choice's "incomplete" proposal violated its rules "requir[ing] submission and consideration of the proposed fees to be charged to program participants and the percentage of those fees to be remitted to [TxDOT]." This allegation appears to allude to 43 Tex. Admin. Code § 25.403(b) (2007), which provides, in relevant part, that TxDOT "will determine the best value to the state by evaluating the contractor's ... (8) proposed percentage to be paid to the department from fees collected from program participants; [and] (9) proposed amount for the fees that will be charged to participants in the program."

> [6] Texas Logos also complains that Media Choice "did not follow the RFP's instructions" to fill in the blanks in the copy of the schedule provided, but "retyped the schedule *including* the bold, all caps statement setting forth the consequence for the failure to fully complete the schedule."

Texas Logos also pleads that it "performed an analysis" of the prospective fees that Media Choice would earn and retain

compared to those Texas Logos would earn and retain under the companies' respective proposals. It concluded that "Media Choice would generate $17,011,398 more in gross revenue ... than by using the fees proposed by Texas Logos" during the five-year contract term, but "Media Choice would return $2,568,629 *less* to the State than Texas Logos during that time period while retaining in Media Choice's coffers $19,580,027 *more* than Texas Logos." Texas Logos similarly alleges that its returns to the state were higher **\*112** throughout the contract term and that it provided a higher guaranteed minimum annual return during the first year. It adds that "[i]n some cases, the Media Choice proposal specified rates to Texas businesses that are 650% higher than those proposed by Texas Logos, yet TxDOT ignored this disparity." Texas Logos pleads that in light of these calculations, TxDOT's award of the logo sign contract to Media Choice "waived consideration of certain required best value" factors under the Purchasing Act, TxDOT's statutes, and TxDOT's rules relating to the proposed amount of fees that would be charged to businesses participating in the program. *See* Tex. Gov't Code Ann. § 2155.074; Tex. Transp. Code Ann. § 2391.091(c) (West 2007); 43 Tex. Admin. Code § 25.403(b)(8)-(9).

Texas Logos further alleges that Media Choice's proposal would have paid TxDOT a ten-percent share of only *rental* fees it collected from participating facilities and shopping areas, and excluded a second component of total fees, *installation* fees. As Texas Logos emphasizes, the legislature has required that contracts for each type of logo sign provide for (1) the assessment of fees to be paid the contractor by eligible participants, and (2) remittance of at least ten percent of these fees to TxDOT. Tex. Transp. Code Ann. §§ 391.091(b) (specific information logo signs), .0935(g) (major shopping area guide signs), .099(e) (tourist-oriented directional sign program) (West 2007). Texas Logos pleads that "[t]he law governing this Program, as well as the mandatory provisions of TxDOT's rules and the RFP, required Media Choice to remit at least 10% of *all* fees collected to the State."

Texas Logos also complains that TxDOT permitted Media Choice to submit unaudited financial statements with its proposal. In this way and others, Texas Logos urges that Media Choice failed to comply with the requirements of TxDOT's RFP. Texas Logos pleads that TxDOT's own rules governing its procurement of the logo sign contract required it to disqualify proposals that did not meet the RFP's terms. *See* 43 Tex. Admin. Code § 25.403(c)(1) ("The department will not consider a proposal that ... fails to comply with any requirement contained in the request for proposals issued under this section....").[7]

---

[7] Texas Logos also cites 1 Tex. Admin. Code § 113.6(a)(7) (2007), which states that "A bid containing a material failure to comply with the advertised specifications shall be rejected." Section 113.6(a)(7) governs procurements under the Purchasing Act. *See* 43 Tex. Admin. Code § 9.3(b)(1), (10)-(11) (2007).

---

Texas Logos pled and produced evidence attempting to tie TxDOT's claimed favoritism to an alleged quid pro quo between Media Choice and a TxDOT employee who participated in the evaluation of the logo sign contract proposals. According to Texas Logos, the employee solicited employment opportunities during the procurement process and "was rewarded with, a consulting job with a subcontractor to Media Choice after TxDOT awarded the Contract to Media Choice."[8] Texas Logos also alleged additional conduct by Media Choice in the nature of fraudulent inducement. It pled that the unaudited financial statements that Media Choice submitted to TxDOT were "materially false" and "falsely overstated Media Choice's net worth by approximately one million dollars." Texas Logos also accuses Media Choice of providing "materially misleading information about which employees would perform the **\*113** Logo Sign Contract" and misleading information regarding the entity that would be performing the logo sign contract.[9]

---

[8] Texas Logos also alleged that "[t]he same TxDOT employee had previously assisted in securing the approval of proprietary technology belonging to the Media Choice subcontractor while employed by TxDOT."

[9] These and similar allegations are the subject of a related action that Texas Logos filed in the district

---

court of Williamson County against Media Choice and related entities; the Media Choice subcontractor that allegedly "rewarded" the TxDOT employee; the now former TxDOT employee, Gregory Brinkmeyer, individually; and Brinkmeyer's consulting company. After the district court dismissed this suit for want of subject-matter jurisdiction, Texas Logos appealed to this Court, and this proceeding remains pending before us. *Texas Logos, L.P. v. Brinkmeyer,* No. 03–07–00032–CV, (Tex.App.-Austin, notice of appeal filed Jan. 22, 2007).

**Challenges to protest ruling and denial of contested-case proceeding**

Texas Logos also seeks declarations under the UDJA that it was entitled to a contested-case proceeding to determine its protest, that TxDOT exceeded its statutory authority in refusing that request, and that "TxDOT's protest order is, therefore, void." Texas Logos relies on section 2155.076 of the government code, another provision of the Purchasing Act. Section 2155.076 requires that:

> each state agency by rule shall develop and adopt protest procedures for resolving vendor protests relating to purchasing issues. An agency's rules must be consistent with the [building and procurement] commission's rules. The rules must include standards for maintaining documentation about the purchasing process to be used in the event of a protest.

Tex. Gov't Code Ann. § 2155.076(a) (West 2000). Texas Logos pleads that because section 2155.076 "contemplates an adjudication of vendor's rights under the statutes and rules governing particular procurements, such protests must be conducted as contested case, consistent with the procedures in the ... APA."

**Challenges to TxDOT protest rules**

Texas Logos's claims under section 2001.038 of the APA seek declarations that TxDOT's rules governing procurement protests—43 Tex. Admin. Code § 9.3—are invalid. It pleads that "TxDOT's protest procedures ... fail to not only apply the contested case procedures found in the APA, but are instead a sham process designed to cloak TxDOT's actions from any meaningful scrutiny and, thus, do not ... effectuate the intent of [section 2155.076]; and ... contain no standards for maintaining documents to be used in the event of a protest." Texas Logos elaborates that by requiring protests to be filed within ten days after a contract award—a deadline corresponding to TxDOT's response deadline for any Public Information Act request—the TxDOT rules effectively preclude discovery. It adds that the rules lack provisions for examination of witnesses, subpoenas to obtain evidence, the appointment of a neutral hearing officer, the presentation of or objection to evidence, or "a meaningful hearing of the protest."

## ANALYSIS

Texas Logos brings two issues on appeal, asserting that the district court had subject-matter jurisdiction over Texas Logos's causes of action for declarations under the UDJA (i.e., its challenges to both the logo sign contract and the protest denial order) and section 2001.038 of the APA (its challenges to TxDOT's protest rules).

**UDJA**

Texas Logos asserts that its UDJA claims properly invoked the district court's subject-matter jurisdiction because they are

predicated on allegations that TxDOT acted beyond its statutory authority and **\*114** seek declarations construing that authority. The UDJA provides that a claimant "whose rights, status, or other legal relations are affected by a statute ... may have determined any question of construction or validity arising under [it] and obtain a declaration of rights, status, or other legal relations thereunder." Tex. Civ. Prac. & Rem.Code Ann. § 37.004(a) (West 1997). The legislature intended the UDJA to be remedial, to settle and afford relief from uncertainty and insecurity with respect to rights, and to be liberally construed. *Id.* § 37.002 (West 1997); *Bonham State Bank v. Beadle,* 907 S.W.2d 465, 467 (Tex.1995).

[11] [12] The UDJA does not create or augment a trial court's subject-matter jurisdiction—it merely provides a remedy where subject-matter jurisdiction already exists. *See* Tex. Civ. Prac. & Rem.Code Ann. § 37.003(a) (West 1997) ("A court of record *within its jurisdiction* has power to declare rights, status, and other legal relations ....") (emphasis added); *Chenault v. Phillips,* 914 S.W.2d 140, 141 (Tex.1996); *Texas Ass'n of Bus.,* 852 S.W.2d at 444. But while the UDJA cannot confer subject-matter jurisdiction in the absence of a cause of action within the court's jurisdiction, "[a] suit under the UDJA is not confined to cases in which the parties have a cause of action apart from the Act itself." *Texas Dep't of Pub. Safety v. Moore,* 985 S.W.2d 149, 153 (Tex.App.-Austin 1998, no pet.).[10] That is, a UDJA action will lie within the subject-matter jurisdiction of the district courts when there is (1) a justiciable controversy as to the rights and status of parties actually before the court for adjudication; and (2) that will be actually resolved by the declaration sought. *Brooks v. Northglen Ass'n,* 141 S.W.3d 158, 163–64 (Tex.2004); *Beadle,* 907 S.W.2d at 467.

[10]    *See also Bexar Metro. Water Dist. v. City of Bulverde,* 156 S.W.3d 79, 90 (Tex.App.-Austin 2004, pet. denied); *Juliff Gardens, L.L.C. v. Texas Comm'n on Envtl. Quality,* 131 S.W.3d 271, 276–77 (Tex.App.-Austin 2004, no pet.); *City of Waco v. Texas Natural Res. Conservation Comm'n,* 83 S.W.3d 169, 175 (Tex.App.-Austin 2002, pet. denied).

[13] [14] As this Court has repeatedly recognized, a justiciable controversy regarding whether a state agency or officer has acted beyond statutory authority provides a jurisdictional basis for a UDJA action seeking construction of that statutory authority.[11] This type of UDJA action, furthermore, does not implicate sovereign immunity. *Texas Ass'n. of Steel Imps., Inc.,* 372 S.W.2d at 530–31; *Cobb v. Harrington,* 144 Tex. 360, 190 S.W.2d 709, 712 (1945); *see also Texas Natural Res. Conservation Comm'n v. IT–Davy,* 74 S.W.3d 849, 855 (Tex.2002) ("Private parties may seek declaratory relief against state officials who allegedly act without legal or statutory authority."); *cf. Director of Dep't of Agric. & Env't v. Printing Indus. Ass'n,* 600 S.W.2d 264, 265–66 (Tex.1980) (if the complained-of acts of a state official are illegal or outside his statutory authority, "an entity or person whose rights have been violated ... may bring suit to remedy the violation or prevent its occurrence, and such suit is not a suit against the State **\*115** requiring legislative or statutory authorization.").[12]

[11]    *See, e.g., Texas Dep't of Ins., Div. of Workers' Comp. v. Lumbermens Mut. Cas. Co.,* 212 S.W.3d 870, 874–75 (Tex.App.-Austin 2006, pet. denied) (claim that agency's issuance of advisories inconsistent with statutory requirements was outside of agency's statutory authority); *Sweeney v. Jefferson,* 212 S.W.3d 556, 564–65 (Tex.App.-Austin 2006, no pet.) (whether defendants removed plaques without historical commission approval and without statutory authority); *Texas Mun. Power Agency v. Public Util. Comm'n,* 100 S.W.3d 510, 516 (Tex.App.-Austin 2003, pet. denied) (a UDJA action "to interpret the scope of an agency's statutory authority ... is sufficient to invoke the trial court's jurisdiction").

[12]    Relying on language in certain decisions of this Court, Texas Logos suggests that the UDJA also "*waives*

sovereign immunity when a party seeks interpretation or construction of an agency's statutory authority." (Emphasis added.) *See, e.g., Lumbermens,* 212 S.W.3d at 875 ("[A] UDJA action 'to interpret the scope of an agency's statutory authority ... is sufficient to invoke the trial court's jurisdiction and to waive sovereign immunity.' " (quoting *Texas Mun. Power Agency,* 100 S.W.3d at 516)). TxDOT disputes whether the UDJA waives sovereign immunity for such claims because (1) as noted, the UDJA cannot independently confer subject-matter jurisdiction on the trial court, *see Texas Ass'n of Bus.,* 852 S.W.2d at 444 (interpretation of UDJA as independently conferring subject-matter jurisdiction would render it violative of article II, section 1 of the Texas Constitution); and (2) the UDJA does not provide a waiver by "clear and unambiguous language" either explicitly or implicitly. *See* Tex. Gov't Code Ann. § 311.005 (West 2005), § 311.034 (West Supp.2006); Tex. Civ. Prac. & Rem.Code §§ 37.001, 37.006(a) (West 1997); *but see Texas Educ. Agency v. Leeper,* 893 S.W.2d 432, 446 (Tex.1994) (because UDJA contemplated that state government entities would be joined in suits to construe their statutory authority, it necessarily waived sovereign immunity against award of attorney's fees under the act).

> We need not address whether or to what extent the UDJA waives sovereign immunity here because the type of claims Texas Logos purports to assert—declaratory claims to construe the statutory authority of a state officer or agency alleged to be exceeding that authority—does not implicate sovereign immunity. *See Cobb v. Harrington,* 144 Tex. 360, 190 S.W.2d 709, 712 (1945). Nor would the asserted waiver on which Texas Logos relies impact our ultimate disposition. As Texas Logos acknowledges, the UDJA does not authorize (by sovereign immunity waiver or otherwise) a claim that seeks to control state action. *See Texas Natural Res. Conservation Comm'n v. IT–Davy,* 74 S.W.3d 849, 855–56 (Tex.2002).

### Challenges to logo sign contract

[15] [16] In the *Steel Importers* case, as Texas Logos emphasizes, the Texas Supreme Court affirmed a declaratory judgment invalidating agency actions it held to have violated a competitive-bidding statute, and further held that the suit did not implicate sovereign immunity. The Texas Highway Commission (a TxDOT predecessor) had issued a minute order requiring that its highway construction contracts require the use of only American-manufactured materials. *Texas Ass'n of Steel Imps., Inc.,* 372 S.W.2d at 526. A trade association representing steel importers sought declaratory judgment that the order was "invalid, illegal, void, and of no lawful effect" because it violated the applicable purchasing statute, which required competitive bidding. *Id.* at 526, 530. The supreme court agreed that the minute order violated the competitive bidding requirement of the statute:

> "Competitive bidding" require[s] due advertisement, giving opportunity to bid, and contemplates a bidding on the same undertaking upon each of the same material items covered by the contract; upon the same thing. It requires that all bidders be placed upon the same plane of equality and that they each bid upon the same terms and conditions involved in all the items and parts of the contract, and that the

proposal specify as to all bids the same, or substantially similar specifications. Its purpose is to stimulate competition, prevent favoritism and secure the best work and materials at the lowest practicable price, for the best interests and benefit of the taxpayers and property owners. There can be no competitive bidding in a legal sense where the terms of the letting of the contract prevent or restrict competition, favor a contractor or materialman, or increase the cost of the work or of the materials or other items going into the project.

**\*116** *Id.* at 527 (quoting *Sterrett v. Bell,* 240 S.W.2d 516, 520 (Tex.Civ.App.-Dallas 1951, no writ)). The supreme court added that:

[o]nce the view be adopted ... that the Minute Order is void because it is contrary to the competitive bidding statute, there can be no basis for saying that the disputed order was authorized by law. It was wholly nugatory and hence the present proceeding cannot be classed as a suit against the state.

*Id.* at 530 (citing *Cobb,* 190 S.W.2d at 709, *State v. Epperson,* 121 Tex. 80, 42 S.W.2d 228 (Tex.1931), *State v. Lain,* 162 Tex. 549, 349 S.W.2d 579 (1961), *and United States v. Lee,* 106 U.S. 197 (1882)). Further, the court reasoned, "[a]s this is not a suit against the State," the plaintiffs—whom, the court observed, were "resident citizen property taxpayers of the State of Texas or the representatives of such property taxpayers," "[a]ll of [whom] are actively engaged in or interested in the sale and use of imported manufactured products," and some of whom "are owners of imported foreign manufactured products suitable for highway construction purposes"—"clearly have the right and litigable interest to have the challenged Minute Order declared null and void." *Id.* at 530–31.

Texas Logos equates its UDJA claims with the claim in *Steel Importers.* It argues that TxDOT, like the highway commission, was required to conduct the logo sign contract procurement "through a competitive process and had an obligation to place all bidders on the same 'plane of equality.' " *See id.* at 527. Instead, Texas Logos alleges, TxDOT waived competitive requirements and unfairly favored Media Choice over other bidders. It urges that TxDOT had no statutory authority to conduct the procurement in that manner. This absence of statutory authority, Texas Logos asserts, renders TxDOT's contract award—like the minute order in *Steel Importers*—"void ." Although acknowledging that it has located "no authority ... [that] specifically holds that *ultra vires* conduct by an agency permits a Texas court to declare void an unlawfully entered contract," Texas Logos suggests that "if all variety of agency action can be declared void by a court, there is no principled reason [why] a contract should be any different."

TxDOT responds that a contract—or at least the logo sign contract—*is* different. First, it asserts that the district court lacked subject-matter jurisdiction to invalidate the contract award (or its protest decision) because the legislature has not provided for judicial review of these agency actions. *See, e.g., Texas Dep't of Protective & Regulatory Servs. v. Mega Child Care, Inc.,* 145 S.W.3d 170, 172 (Tex.2004) ("In Texas, a person may obtain judicial review of an administrative action only if a statute provides a right to judicial review, or the action adversely affects a vested property right or otherwise violates a constitutional right."). TxDOT asserts—and Texas Logos acknowledges—that the legislature has not explicitly provided a judicial review mechanism under the Purchasing Act or the transportation code and the company possessed no vested property right in the award of the logo sign contract that could support a claim to an inherent right of judicial review.

[17] TxDOT's argument is misplaced. A UDJA claim is *sui generis* and, all other things being equal, the district court's subject-matter jurisdiction over it exists independently of any administrative remedies. *Texas Liquor Control Bd. v. Canyon Creek Land Corp.,* 456 S.W.2d 891, 895 (Tex.1970); *Cobb,* 190 S.W.2d at 713. Although the subject matter of a UDJA claim—including one ostensibly concerning an agency's statutory authority—may sometimes be subsumed within the agency's **\*117** exclusive jurisdiction, *see Texas Ct. Reps. Certification Bd. v. Esquire Deposition Servs.,* No. 03–06–00002–CV, 240 S.W.3d 79, 89 (Tex.App.-Austin, 2007, no pet. h.); *cf. Texas Mun. Power Agency v. Public Util. Comm'n,* 100 S.W.3d 510, 520 (Tex.App.-Austin 2003, pet. denied) (UDJA claim to construe agency's statutory authority was broader than subject matter of contested-case proceeding), TxDOT does not claim that the legislature had granted it exclusive jurisdiction or otherwise displaced the district court's subject-matter jurisdiction to determine a valid UDJA claim to construe the agency's statutory authority in regard to the logo sign contract. Likewise, the mere fact that Texas Logos lacked vested property rights in the contract award that could give rise to an inherent right of judicial review would not deprive it of standing to prosecute a proper UDJA claim challenging TxDOT's statutory authority in regard to the contract procurement. *See Texas Ass'n of Steel Imps., Inc.,* 372 S.W.2d at 530–31;

*Inc.,* 99 S.W.3d 376, 380 (Tex.App.-Austin 2003, pet. denied) (instant-ticket game vendor had standing to seek declaratory and injunctive relief challenging lottery commission's statutory authority to adopt policy requiring consideration of prospective vendor's economic impact on the state when awarding certain contracts).[13]

[13]   We find similarly unpersuasive TxDOT's attempts to characterize Texas Logos's UDJA claims challenging the logo sign contract as sounding in tort, and barred by sovereign immunity, merely because Texas Logos pleads that TxDOT's alleged extra-statutory favoritism toward Media Choice—the basis for its declaratory claims against TxDOT—enabled or included alleged tortious and fraudulent acts by Media Choice and Brinkmeyer individually.

TxDOT also asserts that the legislature has given it "sole discretion" or "virtually unlimited discretion" in awarding the logo sign contract. It points to section 391.091 of the transportation code, which provides:

(a) The department shall contract with an individual, firm, group, or association in this state to erect and maintain specific information logo signs and major shopping area guide signs at appropriate locations along an eligible highway.

(b) The department may enter into a contract under this section *by the method that the department determines is the most practical or most advantageous for the state, including* competitive bids, competitive sealed proposals, and open market contracts.

(b)[14] A contract under this section shall provide for:

[14]   There are two subsection b's in section 391.091.

(1) the assessment of fees to be paid to a contractor by a commercial establishment eligible for display on the specific information logo sign; and

(2) remittance to the department of at least 10 percent of the fees collected by the contractor.

(c) The department shall make a written award of a contract to the offeror whose proposal offers *the best value for the state*. In determining the best value for the state, the department *may* consider:

(1) revenue provided to the department by the contractor;

(2) fees to be charged eligible businesses or agricultural interests for inclusion on the signs;

(3) the quality of services offered;

(4) the contractor's financial resources and ability to perform; and

**\*118** (5) *any other factor the department considers relevant.*

(d) *To the extent of any conflict, this section prevails over any other law relating to the method of the purchasing of goods and services by the department.*

(e) *Subtitle D, Title 10, Government Code, and Chapter 223 do not apply to purchases of goods and services under this section.*

Tex. Transp. Code Ann. § 391.091 (emphasis added). TxDOT observes that section 391.091 authorizes it to procure the

contract "by the method that the department determines is the most practicable or most advantageous for the state," *id.* § 391.091(b), gives it discretion in determining the "best value for the state," *id.* § 391.091(c), and trumps other procurement statutes and law—including the Purchasing Act (subtitle D, title 10 of the government code), a cornerstone of Texas Logos's claims.

[18] [19] [20] TxDOT contends that Texas Logos has alleged only conduct within the scope of these discretionary powers and, therefore, seeks to "control state action." In addition to barring suits for "money damages," sovereign immunity protects the state against suits to "control state action." *IT–Davy,* 74 S.W.3d at 855–56; *Printing Indus. Ass'n,* 600 S.W.2d at 265–66. A suit seeks to control state action when the judgment would effectively direct or control a government official in the exercise of his or her discretionary statutory authority. *Printing Indus. Ass'n,* 600 S.W.2d at 265–66; *Griffin v. Hawn,* 161 Tex. 422, 341 S.W.2d 151, 152–53 (1960); *Short v. W.T. Carter & Bro.,* 133 Tex. 202, 126 S.W.2d 953, 962 (1939); *see also IT–Davy,* 74 S.W.3d at 855–56 (characterizing the imposition of contract liability as "controlling state action"). A declaratory-judgment suit ostensibly to declare statutory authority may be barred by sovereign immunity if it is predicted upon factual allegations that fall entirely within a state official's discretionary statutory powers. *McLane Co. v. Strayhorn,* 148 S.W.3d 644, 649 (Tex.App.-Austin 2004, pet. denied). In such cases, courts may be able to decide jurisdictional challenges as a matter of law based on the pleadings by construing the relevant statutes and ascertaining whether the acts pled fall within or outside discretionary powers. *See Printing Indus. Ass'n,* 600 S.W.2d at 265–70; *Griffin,* 341 S.W.2d at 153–54; *Hendee,* 228 S.W.3d at 368; *McLane Co.,* 148 S.W.3d at 649.[15]

[15] *See also Potter Co. Atty's Office v. Stars & Stripes Sweepstakes, L.L.C.,* 121 S.W.3d 460, 470–71 (Tex.App.-Amarillo 2003, no pet.) (holding that suit to compel release of seized eight-liners was barred by governmental immunity where machines had been lawfully seized under search warrant; suit thus "seeks to control the actions of officials acting within their authority and cannot therefore be maintained without legislative consent"); *Commissioner, Tex. Dep't of Human Servs. v. Trinity Coalition, Inc.,* 759 S.W.2d 762, 764 (Tex.App.-El Paso 1988, writ dism'd w.o.j.) (contractor's suit to enjoin agency from entering into contract with competitor and refusing it bidding rights based on unresolved audit issues was barred by sovereign immunity; "[h]ere, T.D.H.S. acted within its own delineated procedure in regulating the terms, bidding, and acceptance of contracts for day care services").

Texas Logos counters that, notwithstanding section 391.091 of the transportation code, TxDOT's procurement of the logo sign contract was governed by the Purchasing Act. It observes that section 391.091 is specifically addressed to contracts only for "specific information logo signs and major shopping area guide signs." Tex. Transp. Code Ann. § 391.091(a). The third type of sign made subject to the logo sign contract—the tourist-oriented directional sign program—is **119** explicitly addressed only in section 391.099. That provision requires TxDOT to "enter into one or more contracts" with a third-party vendor to erect and maintain tourist-oriented directional signs along eligible highways. Id. § 391.099(b), (d) (West 2007). Like contracts for the other types of signs, contracts for the tourist-oriented directional sign program must provide for the charging of fees and remittance of at least ten percent to TxDOT. *See id.* § 391.099(e); *cf. id.* §§ 391.091(b), .0935(g). However, section 391.099 does not address the standards governing the procurement of tourist-oriented directional sign program contracts—and, unlike section 391.091, does not specifically exclude such contracts from the Purchasing Act or other procurement statutes.

Based on its construction of these statutes, Texas Logos maintains that contract procurement for the tourist-oriented directional sign program is governed by the Purchasing Act and that, moreover, TxDOT placed the entire logo sign contract under the Act by opting to procure a single combined contract for the "Information Logo and Tourist–Oriented Directional Sign Program."[16] Texas Logos adds that, in any event, these and similar arguments by TxDOT[17] properly go to the merits of its UDJA claims rather than the district court's subject-matter jurisdiction over them. It suggests that "[t]he fact that TxDOT and Texas Logos are debating whether the Purchasing Act applies to the Logo Sign procurement should be proof enough that

there is a controversy regarding the construction and applicability of a statute that is subject to declaratory relief" and within the district court's subject-matter jurisdiction.

16      It adds that, contrary to TxDOT's current position, the agency stated in its RFP that the procurement of the combined contract would be governed by the Purchasing Act. Strictly speaking, TxDOT's statements in the RFP would not estop it from later disputing the Purchasing Act's applicability. *See State v. Durham,* 860 S.W.2d 63, 67 (Tex.1993). However, Texas Logos suggests that TxDOT's position in the RFP nonetheless may belie the merits of its current arguments.

17      In addition to its arguments based on section 391.091 and those disputing the applicability of the Purchasing Act, TxDOT parses through Texas Logos's pleading allegations and disputes whether "the actions allegedly taken by TxDOT are actually contrary to any of the specific statutes cited by Texas Logos." Similarly, relying on its construction of these statutes, TxDOT argues that Texas Logos alleges only that the agency "made the wrong decision" within its statutory authority, not that it exceeded its authority. *See Beacon Nat'l Ins. Co. v. Montemayor,* 86 S.W.3d 260, 270 (Tex.App.-Austin 2002, no pet.).

TxDOT counters that even if Texas Logos had, in this or other ways, pled proper UDJA claims concerning its statutory authority, the claims would nonetheless be barred by sovereign immunity because they ultimately seek to invalidate the logo sign contract, a remedy that would "control state action." It adds that because sovereign immunity precludes invalidation of the logo sign contract, the district court likewise lacks jurisdiction under the UDJA over any component issues—e.g., those concerning the applicability of the Purchasing Act—because a declaration regarding those issues would not resolve the ultimate dispute. *See Beadle,* 907 S.W.2d at 467 (citing *Texas Ass'n of Bus.,* 852 S.W.2d at 446). We must agree with TxDOT.

[21] It is well-established that a claim—including one under the UDJA—"seeking to establish a contract's validity, to enforce performance under a contract, or to impose contractual liabilities are suits against the State." *IT–Davy,* 74 S.W.3d at 855–56 (characterizing such claims as a **\*120** form of "controlling state action"); *see W.D. Haden Co. v. Dodgen,* 158 Tex. 74, 308 S.W.2d 838, 840 (1958) ("A suit against officers of a state, to require them to perform acts which constitute a performance of a contract by the state, is in effect a suit against the state itself. A suit against officers of a state, the purpose or effect of which is to establish the validity of a contract of the state, or to enforce through them the performance of a contract of the state, or to require acts to be performed by them which would impose contractual liabilities upon the state, is a suit against the state.") (quoting *Herring v. Houston Nat'l Exch. Bank,* 113 Tex. 264, 253 S.W. 813, 814 (Tex.1923)). The Texas Supreme Court has historically regarded these immunity principles as also barring suits to cancel or nullify a contract made for the benefit of the state. *See W.D. Haden Co.,* 308 S.W.2d at 841 (" 'There is a clear distinction between a suit against an officer for a wrong committed by him in the name of the state, and suits brought against an officer to prevent the exercise by the state through such officer of some act of sovereignty, or suits against an officer or agent of the state to enforce specific performance of a contract made for the state, or to enjoin the breach of such contract, or to recover damages for such breach, or *to cancel or nullify a contract made for the benefit of the state.*' ") (emphasis added) (quoting *Imperial Sugar Co. v. Cabell,* 179 S.W. 83, 89 (Tex.Civ.App.-Galveston 1915, no writ).

[22] Suits to nullify a contract made for the benefit of the state would likewise implicate sovereign immunity principles as currently articulated by the Texas Supreme Court. The contemporary rationale or justification for sovereign or governmental immunity is to protect state resources from the costs of paying judgments and defending against them so they can instead be

used in accordance with the policy and budgetary directives of the legislature or local governments. *See Reata Constr. Corp.,* 197 S.W.3d at 375 (citing *IT–Davy,* 74 S.W.3d at 854) ("A lack of immunity may hamper governmental functions by requiring tax resources to be used for defending lawsuits and paying judgments rather than using those resources for their intended purposes."); *Tooke v. City of Mexia,* 197 S.W.3d 325, 331–32 (Tex.2006) (sovereign immunity "remains firmly established, and as it has come to be applied to the various governmental entities in this State, an important purpose is pragmatic: to shield the public from the costs and consequences of improvident actions of their governments"). Contracts are a well-established means through which the state or local governments effectuate their policy directives regarding governmental functions. *See, e.g., Ben Bolt–Palito Blanco Consol. Indep. Sch. Dist. v. Texas Political Subdivisions Prop./Cas. Joint Self–Ins. Fund,* 212 S.W.3d 320, 322, 325–26 (Tex.2006); *Tooke,* 197 S.W.3d at 329; *Big Spring v. Board of Control,* 404 S.W.2d 810, 817 (Tex.1966); *Osborne v. Keith,* 142 Tex. 262, 177 S.W.2d 198, 201 (Tex.1944). Furthermore, contracts may provide financial benefits for governmental entities, and thus, will have implications for budgetary and appropriations processes. Such is the case with the logo sign contract, which, as TxDOT observes, guarantees it several million in minimum payments during the contract term. By interfering with these policy and budgetary decisions regarding the use of state resources, a suit to invalidate the logo sign contract implicates sovereign immunity.

We disagree with Texas Logos that the statutory violations it alleges would, if proven, render the logo sign contract *void;* i.e., a nullity. TxDOT possessed express **\*121** statutory authority to contract with regard to all three types of signs addressed in the logo sign contract. *See* Tex. Transp. Code Ann. §§ 391.091(a) ("The department shall contract with an individual, firm, group, or association in this state to erect and maintain specific information logo signs and major shopping area guide signs at appropriate locations along an eligible highway."), .0935(f) ("The commission may contract with an individual, firm, group, or association in this state to erect and maintain major shopping area guide signs at appropriate locations along an eligible urban highway."), .099(d) ("The commission shall enter into one or more contracts with an individual, firm, group, or association in this state to erect and maintain tourist-oriented directional signs at locations along eligible highways."). Furthermore, the Purchasing Act—assuming it applies, as Texas Logos argues—does not reflect legislative intent to render void an otherwise-authorized contract executed in violation of its requirements. Instead, the legislature provided a range of other remedies and responses to violations, including agency protest procedures, *see* Tex. Gov't Code Ann. § 2155.076, dismissal of agency employees, *id.* § 2155.003 (West 2000) (conflict-of-interest prohibitions), legal action by the agency against defaulting contractors, *id.* § 2155.070(c) (West 2000), and removing vendors from participating in state contracts, *id.* §§ 2155.070(d), 2155.077 (West 2000). *See also id.* § 2155.004(d) (West Supp.2006) (prohibition against agencies accepting bids or awarding contracts including financial participation of certain agency personnel "does not create a cause of action to contest a bid or award of a state contract"). This statutory scheme contemplates that while contracts executed in violation of the Act's requirements might be subject to invalidation by the agency or other statutory remedies, they would not be rendered a legal nullity on that basis. *Cf. Friends of Canyon Lake, Inc. v. Guadalupe–Blanco River Auth.,* 96 S.W.3d 519, 528 (Tex.App.-Austin 2002, pet. denied) (allegations that applicant had failed to give required notice and "failed to provide statutorily required information to the TNRCC" as part of water right permit application process did not state claim that TNRCC had acted wholly beyond its statutory permitting jurisdiction). Finally, Texas Logos's allegations of fraud or misrepresentation by Media Choice or self-dealing by an employee are the types of allegations that render a contract voidable, not void. *See Dallas Farm Machinery Co. v. Reaves,* 158 Tex. 1, 12, 307 S.W.2d 233 (Tex.1957); *Osborne,* 177 S.W.2d at 201.

We agree with TxDOT that the sovereign-immunity implications of its existing contract with Media Choice distinguish this case from *Steel Importers* and the other cases involving challenges to agency statutory authority on which Texas Logos relies. Texas Logos's cases each involved declarations or injunctions that operated prospectively to compel state officials and agencies to comply with their statutory authority. Although these remedies had the effect of invalidating certain agency directives or policies, they did not establish a right to money damages or invalidate an existing contract. Texas Logos's claims, by contrast, explicitly attack an existing contract with the state.

An otherwise-proper declaratory claim alleging statutory violations may nonetheless have the effect of establishing a right to a remedy that is barred by sovereign immunity. For example, a declaratory claim that would be proper if asserted to compel the state to act within its statutory powers prospectively may nonetheless be barred by sovereign immunity to the extent it alleges past statutory violations that **\*122** implicate a right to money damages. This distinction is illustrated by recent Texas decisions concerning declaratory claims of statutory rights to payments. In *City of Houston v. Williams,* a group of retired firefighters sought a declaratory judgment that the city had violated chapter 143 of the local government code by improperly calculating lump-sum payments of accrued vacation and sick leave paid upon termination and in improperly deducting alleged overpayments of overtime. 216 S.W.3d 827, 828 (Tex.2007) (per curiam); *see* Tex. Loc. Gov't Code Ann. §§

142.0017, 143.115–.116 (West 1999). The city filed a plea to the jurisdiction asserting governmental immunity, which the district court denied and the court of appeals affirmed. In relevant part, the court of appeals held that the city had no immunity from the retirees' declaratory judgment claim because it sought construction of the pertinent statutory rights and the trial court had purported to reserve determination of damages for a later date. The supreme court reversed, holding that the firefighters' declaratory judgment claim actually sought money damages and, therefore, implicated the city's governmental immunity. *Williams,* 216 S.W.3d at 828–29 (citing *IT–Davy,* 74 S.W.3d at 856).

The supreme court reasoned that "[t]he only injury the retired firefighters allege has already occurred, leaving them with only one plausible remedy—an award of money damages." *Id.* at 829. It further explained that whether the plaintiffs sought a declaration regarding a "legitimate question of statutory interpretation" was irrelevant, because, "in every suit against a governmental entity for money damages, a court must first determine the parties' contract or statutory rights; if the sole purpose of such a declaration is to obtain a money judgment, immunity is not waived." *Id.* As for the trial court's reservation of a damages determination, the court observed that "governmental immunity does not spring into existence when a damages award is finally made; it shields governments from the costs of any litigation leading up to that goal." *Id.*

*Williams* thus recognized a dichotomy between declaratory and injunctive claims regarding *past* violations of statutory rights to payment under chapter 143 (which implicate governmental immunity because the "only plausible remedy" is money damages) and those seeking only to compel a municipality to comply with the statutes in the future (which, even while implicating rights to future payments, do not implicate immunity). *See Bell v. City of Grand Prairie,* 221 S.W.3d 317, 324–26 (Tex.App.-Dallas 2007, no pet.).[18]

[18] *Accord City of Seagoville v. Lytle,* 227 S.W.3d 401, 410–12 (Tex.App.-Dallas 2007, no pet. h.) (employing similar analysis in holding that declaratory-judgment, mandamus, and injunctive relief claims alleging termination in violation of local government code sections 614.022 and 614.023 were barred by governmental immunity to the extent they sought back pay or back benefits, but not to the extent they sought prospective reinstatement only); *City of Dallas v. Albert,* 214 S.W.3d 631, 633, 637 (Tex.App.-Dallas 2006, pet. filed) (similar analysis in suit alleging failure to pay police officers and firefighters in accordance with voter-approved pay referendum; suit barred by governmental immunity to the extent it sought back pay and benefits); *City of Dallas v. Martin,* 214 S.W.3d 638, 640, 644 (Tex.App.-Dallas 2007, pet. filed) (same).

A similar principle governs here. Even if sovereign immunity would not otherwise have barred Texas Logos's declaratory claims if it had alleged ongoing statutory violations in the logo sign procurement and sought to make TxDOT comply with these statutes, Texas Logos alleges only *past* statutory violations, the "only plausible remedy" for which is the invalidation of **\*123** the contract.[19] Such a remedy, we have seen, implicates sovereign immunity and bars Texas Logos's UDJA claims challenging the logo sign contract and procurement. *See Williams,* 216 S.W.3d at 828–29; *see also Tooke,* 197 S.W.3d at 331–32 (sovereign or governmental immunity functions "to shield the public from the costs and consequences of improvident actions of their governments").

[19] Texas Logos confirmed during oral argument that it complains only of TxDOT's alleged past statutory violations, not of any ongoing or future violations.

### *Challenges to procurement order & denial of contested case hearing*

[23] We likewise conclude that sovereign immunity bars Texas Logos's UDJA claims alleging that TxDOT acted beyond its statutory authority in refusing to determine its protest through a contested-case proceeding and seeking a declaration voiding TxDOT's denial of the protest. Under the precedent of this Court, Texas Logos does not allege acts by TxDOT that exceed its statutory authority. *See Printing Indus. Ass'n,* 600 S.W.2d at 265–70; *Hendee,* 228 S.W.3d at 368; *McLane Co.,* 148 S.W.3d at 649. Specifically, this Court has long held that, absent express statutory authority, the APA does not independently provide a right to a contested case hearing.[20] Texas Logos has not asserted a basis for our distinguishing or departing from these decisions. Barring any, we overrule Texas Logos's first issue.

20        *See, e.g., Eldercare Props., Inc. v. Texas Dep't of Human Servs.,* 63 S.W.3d 551, 557 (Tex.App.-Austin 2001, pet. denied), *overruled on other grounds by Mega Child Care, Inc.,* 145 S.W.3d at 173; *Best & Co. v. State Bd. of Plumbing Exam'rs,* 927 S.W.2d 306, 309–310 (Tex.App.-Austin1996, writ denied); *H. Tebbs, Inc. v. Silver Eagle Distributors, Inc.,* 797 S.W.2d 80, 85 (Tex.App.-Austin 1990, no writ); *see also Shrieve v. Texas Parks & Wildlife Dep't,* 2005 WL 1034086, at *3, 2005 Tex.App. LEXIS 3406, at *13 (Tex.App.-Austin May 5, 2005, no pet.) (mem.op.).

### Section 2001.038

[24] [25] In its second issue, Texas Logos asserts that the district court had subject-matter jurisdiction over its cause of action for a declaration under section 2001.038 of the APA that TxDOT's protest rules are invalid. Section 2001.038 creates a cause of action for declaratory judgment regarding "[t]he validity or applicability of a rule ... if it is alleged that the rule or its threatened application interferes with or impairs, or threatens to interfere with or impair, a legal right or privilege of the plaintiff." Tex. Gov't Code Ann. § 2001.038(a). Unlike the UDJA, section 2001.038 is a grant of original jurisdiction and, moreover, waives sovereign immunity. *Id.* § 2001.038(a), (c); *Texas Dep't of Human Servs. v. ARA Living Ctrs. of Tex.,* 833 S.W.2d 689, 693 (Tex.App.-Austin 1992, writ denied); *Southwestern Bell Tel. Co. v. Public Util. Comm'n,* 735 S.W.2d 663, 669 (Tex.App.-Austin 1987, no writ).

However, section 2001.038, like other causes of action, requires the existence of a justiciable controversy to establish the district court's subject-matter jurisdiction. The justiciable controversy that Texas Logos pled concerned its rights relative to TxDOT's award of the logo sign contract to Media Choice and its protest of that award. We have held that sovereign immunity bars Texas Logos's UDJA claims to invalidate the contract and protest order. The relief provided under section 2001.038 does not extend to invalidating either TxDOT's protest order or its ultimate contract award, but only the rules by which the protest was conducted. At this juncture, Texas Logos's section 2001.038 challenge to the validity of those rules would amount to a mere abstract, advisory **\*124** opinion. *Cf. Friends of Canyon Lake,* 96 S.W.3d at 529 (district court lacked subject-matter jurisdiction over section 2001.038 rule challenge where underlying controversy had been extinguished by plaintiff's failure to exhaust administrative remedies). We overrule Texas Logos's second issue.

### CONCLUSION

Having overruled Texas Logos's issues, we affirm the district court's judgment dismissing Texas Logos's suit for want of subject-matter jurisdiction. As our disposition is controlled by principles of sovereign immunity, we are not passing on the merits of Texas Logos's allegations concerning the logo sign procurement. Although sometimes criticized as arbitrary or unfair in the manner by which it shields alleged "improvident actions" by government from judicial redress, sovereign immunity is nonetheless the established law of Texas that we are bound to apply.

But we observe that, as a corollary to sovereign immunity principles, the judiciary defers to the legislature to decide when, if, or to what extent to waive such immunity, as these decisions entail sensitive policy judgments concerning the use of public resources and governmental functions that are the proper domain of that branch.[21] The legislature may, as it sees fit, waive immunity by statute or express permission. *Tooke,* 197 S.W.3d at 332–33; *IT–Davy,* 74 S.W.3d at 853–54. Further, while Texas Logos correctly notes that "the courts of this State ... have [some] jurisdiction to reign in agencies that overstep their statutory authority" through mechanisms like the UDJA, we note that the legislature and executive possess much more expansive powers in this regard, when they deem such actions appropriate.[22]

[21]     *See City of Galveston v. State,* 217 S.W.3d 466, 469 (Tex.2007) ( "This heavy presumption in favor of immunity arises not just from separation-of-powers principles but from practical concerns. In a world with increasingly complex webs of government units, the Legislature is better suited to make the distinctions, exceptions, and limitations that different situations require. The extent to which any particular city, county, port, municipal utility district, school district, or university should pay damages involves policy issues the Legislature is better able to balance."); *Reata Constr. Corp.,* 197 S.W.3d at 375 ("We have generally deferred to the Legislature to waive immunity because the Legislature is better suited to address the conflicting policy issues involved.") (citing *IT–Davy,* 74 S.W.3d at 854 ("We have consistently deferred to the Legislature to waive sovereign immunity from suit, because this allows the Legislature to protect its policymaking function.")).

[22]     We intend no comment regarding Texas Logos's pending appeal of its *Brinkmeyer* suit.

**All Citations**

241 S.W.3d 105

---

**End of Document**     © 2015 Thomson Reuters. No claim to original U.S. Government Works.

275 S.W.3d 538
Court of Appeals of Texas,
Austin.

TEXAS MUTUAL INSURANCE COMPANY, Liberty Mutual Insurance Company, Zenith Insurance Company and Zurich American Insurance Company, Appellants,
v.
VISTA COMMUNITY MEDICAL CENTER, LLP, d/b/a Vista Medical Center Hospital; Christus Health Gulf Coast; and The Texas Department of Insurance, Division of Workers' Compensation, Appellees.

No. 03–07–00682–CV. | Nov. 13, 2008. | Rehearing Overruled Jan. 13, 2009.

**Synopsis**
**Background:** Hospital filed action appealing decision of medical dispute resolution officer (MDRO), in which it challenged interpretation of rule promulgated by the Department of Insurance, Division of Workers' Compensation (Division) regarding stop-loss exception to standard per diem methodology for inpatient hospital services to workers' compensation claimants. Workers' compensation insurer filed a counterclaim against hospital and a cross-claim against Division challenging the validity of the rule. Another hospital and other workers' compensation insurers intervened. Following a bench trial, the District Court of Travis County, 353rd Judicial District, Margaret A. Cooper, J., entered judgment for hospitals. Division and insurers appealed.

**Holdings:** The Court of Appeals, Jan P. Patterson, J., held that:

[1] stop-loss exemption rule required hospitals to demonstrate that the admission involved unusually costly and unusually extensive services, in addition to demonstrating that charges exceeded $40,000;

[2] failure of Division to review stop-loss rule exemption every two years and to provide fee reimbursement guidelines that followed Medicare methodologies did not invalidate rule;

[3] terms "unusually costly" and "unusually extensive" in stop-loss rule were not so vague and uncertain that their use in determining whether the exception applied would be arbitrary;

[4] Division staff report interpreting stop-loss rule was not a rule that had to be adopted in conformance with Administrative Procedures Act (APA) procedures; and

[5] stop-loss rule did not allow workers' compensation carriers to audit a health care provider's charges for implantables, orthotics, and prosthetics to cost plus 10% when determining whether the $40,000 stop-loss threshold had been met.

Affirmed in part, and reversed in and rendered part.

West Headnotes (28)

**[1]** **Declaratory Judgment**
　Scope and extent of review in general

A trial court's declaratory judgment is reviewed de novo.

Cases that cite this headnote

**[2]** **Administrative Law and Procedure**
🔑Determination of validity; presumptions

When considering a challenge to the validity of an administrative rule, courts begin with the presumption that the rule is valid, and the party challenging the rule has the burden of demonstrating its invalidity.

Cases that cite this headnote

**[3]** **Administrative Law and Procedure**
🔑Construction

Courts construe administrative rules, which have the same force and effect as statutes, in the same manner as statutes.

2 Cases that cite this headnote

**[4]** **Workers' Compensation**
🔑Construction and operation

In construing a rule issued by the Department of Insurance, Division of Workers' Compensation (Division), a court's primary objective is to give effect to the Division's intent.

Cases that cite this headnote

**[5]** **Workers' Compensation**
🔑Construction and operation

Courts defer to the an interpretation by the Department of Insurance, Division of Workers'

Compensation (Division) of its own rules so long as that interpretation is reasonable and consistent with the plain language of the rule. V.T.C.A., Government Code § 311.023(6).

Cases that cite this headnote

**[6]** **Administrative Law and Procedure**
 Administrative construction

In an appeal of an agency interpretation of its own rule, court review is limited to determining whether the administrative interpretation is plainly erroneous or inconsistent with the rule.

Cases that cite this headnote

**[7]** **Administrative Law and Procedure**
 Administrative construction

If an agency fails to follow the clear, unambiguous language of its own regulation, a court must reverse its action as arbitrary and capricious.

1 Cases that cite this headnote

**[8]** **Administrative Law and Procedure**
 Construction

When construing an administrative rule, courts must read the rule as a whole, giving meaning and purpose to every part.

1 Cases that cite this headnote

**[9]** **Administrative Law and Procedure**
 Construction

Courts should not construe an administrative

rule in a way that would lead to an absurd or unreasonable result if another more reasonable construction or interpretation exists.

Cases that cite this headnote

[10]     **Administrative Law and Procedure**
         Construction

When construing an administrative rule, courts give effect to all words in the rule and, if possible, do not treat any words as mere surplusage.

1 Cases that cite this headnote

[11]     **Administrative Law and Procedure**
         Construction

Courts avoid construing administrative rules in a way that would render portions of the rule inoperable or meaningless.

Cases that cite this headnote

[12]     **Workers' Compensation**
         Cost containment programs;  managed care

Stop-loss exception rule adopted by Department of Insurance, Division of Workers' Compensation (Division), providing stop-loss exception to standard per diem methodology for inpatient hospital services to workers' compensation claimants, required hospitals to demonstrate more than that charges exceeded $40,000, and in addition required hospitals to demonstrate that the admission involved unusually costly and unusually extensive services; rule stated exception was established to ensure compensation for unusually costly and unusually extensive services during a hospital admission, that $40,000 was the minimum threshold and that the exception was to be allowed on a case-by-case basis, and an

interpretation allowing exception to apply merely because charges exceeded $40,000 would be contrary to mandate in Labor Code that Division achieve effective medical cost control. V.T.C.A., Labor Code § 413.011; 28 TAC § 134.401(c)(6) (Repealed).

2 Cases that cite this headnote

**[13]** **Administrative Law and Procedure**
⚷Validity

The measure of the validity of an agency rule is whether it is constitutional and whether it conforms to the procedural and substantive statutes applicable to its adoption.

Cases that cite this headnote

**[14]** **Workers' Compensation**
⚷Rules and Orders

Failure of Department of Insurance, Division of Workers' Compensation (Division) to review and revise stop-loss rule exception to standard per diem methodology for inpatient hospital services to workers' compensation claimants every two years and provide fee guidelines that followed Medicare reimbursement methodologies, as required by provisions in Labor Code, did not invalidate the rule, though Labor Code provisions used the word "shall," as the legislature did not provide for any consequences for Division's noncompliance with the directives. V.T.C.A., Labor Code §§ 413.011, 413.012; 28 TAC § 134.401(c)(6) (Repealed).

Cases that cite this headnote

**[15]** **Statutes**
⚷Mandatory or directory statutes

To determine whether the legislature intended a

provision to be mandatory or directory, courts consider the plain meaning of the words used, as well as the entire act, its nature and object, and the consequences that would follow from each construction.

2 Cases that cite this headnote

**[16]** **Statutes**
⚷Purpose

When a statute is silent about consequences of noncompliance, courts look to the statute's purpose in determining the proper consequence of noncompliance.

2 Cases that cite this headnote

**[17]** **Time**
⚷Statutory provisions

If a statute requires that an act be performed within a certain time without any words restraining the act's performance after that time, the timing provision is usually directory.

2 Cases that cite this headnote

**[18]** **Workers' Compensation**
⚷Liberal or strict construction in general

Courts liberally construe workers' compensation legislation to carry out its evident purpose of compensating injured workers and their dependents.

Cases that cite this headnote

**[19]** **Workers' Compensation**
⚷Cost containment programs; managed care

Fee guidelines for health care providers providing treatment to workers' compensation claimants are just that, guidelines, and merely assist carriers and, upon review, the Department of Insurance, Division of Workers' Compensation (Division) in determining whether medical charges are fair and reasonable or satisfy the applicable standard.

Cases that cite this headnote

[20]     **Workers' Compensation**
         Cost containment programs; managed care

There is no private right to an updated fee guideline or a guideline that uses a particular reimbursement methodology, for purposes of health care provider fees to care for workers' compensation claimants, so long as the reimbursement provided in the guideline is fair and reasonable.

Cases that cite this headnote

[21]     **Workers' Compensation**
         Cost containment programs; managed care

Terms "unusually costly" and "unusually extensive," in rule adopted by Department of Insurance, Division of Workers' Compensation (Division) establishing stop-loss exception to standard per diem methodology for inpatient hospital services to workers' compensation claimants, were not so vague and uncertain that their use in determining whether the exception applied would be arbitrary; terms only recognized that what was "unusually costly" and "unusually expensive" in a particular fee dispute was a fact-intensive inquiry best left to the Division's determination on a case-by-case basis. 28 TAC § 134.401(c)(6) (Repealed).

2 Cases that cite this headnote

[22] **Administrative Law and Procedure**
⚷Validity
**Constitutional Law**
⚷Rules and Regulations in General
**Constitutional Law**
⚷Statutes in general

There is no constitutional requirement that a statute or rule must define all of the terms used.

Cases that cite this headnote

[23] **Administrative Law and Procedure**
⚷Validity

Recognizing the myriad of factual situations that may arise and allowing administrative agencies sufficient flexibility when drafting their rules, courts require no more than a reasonable degree of certainty defining what is required or prohibited.

Cases that cite this headnote

[24] **Constitutional Law**
⚷Rules and regulations

Courts will invalidate an economic regulation only if it commands compliance in terms so vague and indefinite as really to be no rule or standard at all or if it is substantially incomprehensible.

Cases that cite this headnote

[25] **Workers' Compensation**
⚷Rules and Orders

Staff report issued by Department of Insurance, Division of Workers' Compensation (Division), regarding interpretation of Division rule establishing stop-loss exception to standard per diem methodology for inpatient hospital services

to workers' compensation claimants, was not a rule within the meaning of the Administrative Procedures Act (APA) that had to be adopted in compliance with the APA; report was a one-page document prepared to address inconsistent applications of the stop-loss rule by Division's medical dispute resolution officers (MDROs), and only proposed a correction to the internal inconsistency based on the language of the rule. V.T.C.A., Government Code §§ 2001.003(6), 2001.0225 to 2001.034; 28 TAC § 134.401(c)(6) (Repealed).

1 Cases that cite this headnote

[26] **Administrative Law and Procedure**
Nature and Scope

Not every administrative pronouncement is a rule within the meaning of the Administrative Procedures Act (APA); administrative agencies routinely issue letters, guidelines, and reports, and occasionally file briefs in court proceedings, any of which might contain statements that intrinsically implement, interpret, or prescribe law, policy, or procedure or practice requirements, and if such statements were rules, an agency could not carry out its legislative functions. V.T.C.A., Government Code §§ 2001.003(6), 2001.0225 to 2001.034.

2 Cases that cite this headnote

[27] **Workers' Compensation**
Construction and operation

The Department of Insurance, Division of Workers' Compensation (Division) has authority to interpret its own rules.

Cases that cite this headnote

[28] **Workers' Compensation**
Cost containment programs; managed care

Rule adopted by Department of Insurance, Division of Workers' Compensation (Division), establishing stop-loss exception to standard per diem methodology for inpatient hospital services to workers' compensation claimants, did not allow workers' compensation carriers to audit a health care provider's charges for implantables, orthotics, and prosthetics to cost plus 10% when determining whether the $40,000 stop-loss threshold had been met. 28 TAC § 134.401(c)(6) (Repealed).

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*542** Thomas B. Hudson Jr., Robin A. Melvin, Christopher H. Trickey, P. M. Schenkkan, Graves, Dougherty, Hearon & Moody, P.C., Steven M. Tipton, Flahive, Ogden & Latson, P.C., Nicholas Canaday, III, Office of the Atty. Gen., Dudley D. McCalla, Heath, Davis & McCalla, P.C., Mary Barrow Nichols, Mary Barrow Nichols, Gen. Counsel, Austin, for Appellants.

David F. Bragg, Law Office of David F. Bragg, P.C., Eric G. Carter, The Carter Law Firm, Austin, for Appellees.

Before Justices PATTERSON, WALDROP and HENSON.

*OPINION*

JAN P. PATTERSON, Justice.

This appeal concerns a challenge to the validity of a rule promulgated by the Texas Department of Insurance, Division of Workers' Compensation,[1] regarding hospital fee reimbursement for inpatient services to injured workers' compensation patients. *See* 22 Tex. Reg. 6264–308 (July 4, 1997) (originally codified at 28 Tex. Admin. Code § 134.401), *repealed,* 33 Tex. Reg. 5319 (July 4, 2008). Appellee Vista Community Medical Center, LLP, d/b/a Vista Medical Center Hospital filed suit against the Division and appellant Texas Mutual Insurance Company in a medical fee reimbursement dispute seeking a declaratory judgment that the "Stop–Loss Exception" in Rule 134.401[2] was invalid. Another hospital, appellee Christus Health Gulf Coast, and several insurance carriers, including appellants Liberty Mutual Insurance Company, Zenith Insurance Company, and Zurich American Insurance Company, intervened and sought competing declarations regarding the validity of Rule **\*543** 134.401. The trial court severed the parties' claims for declaratory relief and, after a bench trial, issued a final judgment granting declaratory relief in favor of the hospitals and rejecting the Division's interpretation of the Stop–Loss Exception. Because we conclude there was error in the trial court's judgment, we affirm the trial court's judgment in part, and reverse and render in part.

[1] The rule at issue was originally promulgated by the Texas Workers' Compensation Commission in 1997, but the legislature abolished the TWCC in 2005 and transferred its duties and rules to the Division of Workers' Compensation within the Texas Department

of Insurance. *See* Act of May 29, 2005, 79th Leg., R.S., ch. 265, §§ 8.001(b), .004(a), 2005 Tex. Gen. Laws 468, 607–11. In light of this change, we refer to the agency throughout this opinion as either the "Commission" or the "Division."

2    Rule 134.401 was adopted in 1997, *see* 22 Tex. Reg. 6264 (July 4, 1997), and formerly codified at 28 Tex. Admin. Code § 134.401 (2007), but has since been repealed. *See* 33 Tex. Reg. 5319 (July 4, 2008) (repealing Rule 134.401). Because the 1997 rule remains in effect for admissions occurring prior to its repeal effective March 1, 2008, we refer to the rule as "Rule 134.401" or the "1997 guideline."

### FACTUAL AND PROCEDURAL BACKGROUND

In 1989, the Texas Legislature enacted a new Workers' Compensation Act that restructured workers' compensation law in Texas. *See* Tex. Lab.Code Ann. §§ 401.001–506.002 (West 2006 & Supp.2008).[3] The Act charged the Division with the difficult task of developing medical fee reimbursement guidelines that would ensure quality medical care for injured workers and achieve effective medical cost control. *Id.* § 413.011; *see also Patient Advocates v. Texas Workers' Comp. Comm'n,* 80 S.W.3d 66, 71 (Tex.App.-Austin 2002), *aff'd in part, rev'd in part,* 136 S.W.3d 643 (Tex.2004). To satisfy its legislative mandate to balance these competing legislative policy goals, the Division adopted the 1992 hospital reimbursement guideline, which was invalidated by this Court in 1995 for lack of a reasoned justification. *See Texas Hosp. Ass'n v. Texas Workers' Comp. Comm'n,* 911 S.W.2d 884, 885–86, 888 (Tex.App.-Austin 1995, writ denied) (declaring "Rule 400" void because it failed to include reasoned justification as required by section 2001.033 of the APA). In the wake of this Court's decision, the Division adopted the 1997 guideline, including the Stop–Loss Exception, at issue in this appeal. *See* 22 Tex. Reg. 6264.

3    The Workers' Compensation Act was initially located in articles 8303–1.01 through 8308–11.10 of the Texas Revised Civil Statutes, but was codified in the labor code in 1993. *See* Act of May 12, 1993, 73rd Leg., R.S., ch. 269, 2003 Tex. Gen. Laws 987.

#### *The 1997 Guideline*

With certain exceptions, the 1997 guideline provides that hospitals are to be reimbursed for inpatient admissions under a standard per diem methodology based on the category of admission. *See generally* Rule 134.401(c)(1)-(2). The 1997 guideline also specifies two exceptions to the standard per diem reimbursement methodology. *Id.* 134.401(c)(2)(C). These two exceptions apply on a case-by-case basis and include the "Trauma–Burn–HIV," or "TBHIV," exception, and the Stop–Loss Exception. *See id.* 134.401(c)(5) & (6). Only the Stop–Loss Exception is at issue in this appeal.

With regard to the Stop–Loss Exception, Rule 134.401(c)(6) provides:

Stop-loss is an independent reimbursement methodology established to ensure fair and reasonable compensation to the hospital for unusually costly services rendered during treatment to an injured worker. This methodology shall be used in place of and not in addition to the per diem based reimbursement system. The diagnosis codes specified in paragraph (5) of this subsection are exempt from the stop-loss methodology and the entire admission shall be reimbursed at a fair and

reasonable rate.

(A) Explanation

(i) To be eligible for stop-loss payment the total audited charges for a hospital admission must exceed $40,000, the minimum stop-loss threshold.

(ii) This stop-loss threshold is established to insure compensation for unusually extensive services required during an admission.

**\*544** (iii) If audited charges exceed the stop-loss threshold, reimbursement for the entire admission shall be paid using a Stop–Loss Reimbursement Factor (SLRF) of 75%.

(iv) The Stop–Loss Reimbursement Factor is multiplied by the total audited charges to determine the Workers' Compensation Reimbursement Amount (WCRA) for the admission.

(v) Audited charges are those charges which remain after a bill review by the insurance carrier has been performed. Those charges which may be deducted are personal items (e.g., telephone, television). If an on-site audit is performed, charges for services which are not documented as rendered during the admission may be deducted. The formula to obtain audited charges is as follows: Total Charges–Deducted Charges = Audited Charges.

(B) Formula. Audited Charges x SLRF = WCRA.

(C) Example. Total Charges: $108,000; Deducted Charges: $8,001; Audited Charges: $99,999. $99,999 x 75% = $74,999.25 (WCRA).

Rule 134.401(c)(6). In addition, Rule 134.401 also defines the terms "Stop–Loss Payment," "Stop–Loss Reimbursement Factor," and "Stop–Loss Threshold." *Id.* § 134.401(b)(1)(F)-(H). Stop–Loss Payment is "[a]n independent method of payment for an unusually costly or lengthy stay." *Id.* § 134.401(b)(1)(F). Stop–Loss Reimbursement Factor is "[a] factor established by the Commission to be used as a multiplier to establish a reimbursement amount when the total hospital charges have exceeded specific stop-loss thresholds." *Id.* § 134.401(b)(1)(G). Stop–Loss Threshold is "[the] Threshold of total charges established by the Commission, beyond which reimbursement is calculated by multiplying the applicable Stop–Loss Reimbursement Factor by the total charges identifying that particular threshold." *Id.* § 134.401(b)(1)(H).

Rule 134.401 also sets forth certain general information as follows: All hospitals must bill their "usual and customary charges." *Id.* § 134.401(b)(2)(A). Hospital reimbursement for acute care hospital inpatient services rendered shall be the lesser of pre-negotiated rates between the hospital and insurance carrier, the hospital's usual and customary charges, or reimbursement as set out in subsection (c) of Rule 134.401 for the particular admission. *Id.* § 134.401(b)(2)(A)(i)-(iii). Additional Reimbursements as outlined in subsection (c)(4) will be determined on a case-by-case basis within the guidelines established for the specific services rendered. *Id.* § 134.401(b)(2)(B). Finally, all hospital charges are subject to audit as described in the Commission's rules. *Id.* § 134.401(b)(2)(C).

*Medical Fee Disputes*

In 2001, with health care costs rising, the Division began to see a corresponding rise in the number of medical fee disputes between hospitals and insurance carriers. Under the labor code, a health care provider dissatisfied with a carrier's payment can file an administrative dispute with the Division. *See* Tex. Lab.Code Ann. § 413.031(a) (West Supp.2008). A Division employee known as a medical dispute resolution officer, or MDRO, reviews the complaint and documentation filed by the provider and the carrier and determines the appropriate reimbursement due the provider under the labor code and the Division's rules. *See id.* § 413.031(c); 28 Tex. Admin. Code § 133.307 (2007). If either party is dissatisfied with the MDRO's decision, **\*545** that party can request a hearing before an Administrative Law Judge at the State Office of Administrative Hearings (SOAH). *See* Tex. Lab.Code Ann. § 413.031(k).[4] Under the labor code, the ALJ issues the final administrative order. *See id.* §§ 402.073(b) (West Supp.2008), 413.031(k). But a party may seek judicial review of the ALJ's order in a Travis County District Court under the substantial evidence rule. *See id.* § 413.031(k–1).

[4]     There was a window of time between 2005 and 2007 when a party was not entitled to request a hearing at SOAH. In 2005, the Legislature amended section 413.031(k) to eliminate the option of requesting a hearing at SOAH in a medical fee dispute. *See* Act of May 29, 2005, 79th Leg., R.S., ch. 265, § 3.245, 2005 Tex. Gen. Laws 469, 554 (amending section 413.031(k) of the labor code). But, in 2007, the Legislature re-wrote section 413.031(k) again and restored the option of requesting a SOAH hearing before seeking judicial review in a medical fee dispute. *See* Act of May 23, 2007, 80th Leg., R.S., ch. 1007, § 1, 2007 Tex. Gen. Laws 3525, 3525 (codified at Tex. Lab.Code Ann. § 413.031(k) (West Supp.2008)).

Many of these administrative fee disputes concerned the applicability of the Stop–Loss Exception. The hospitals argued that the Stop–Loss Exception applied whenever the audited charges for a particular admission exceeded $40,000. The hospitals thus urged that whenever the audited charges for a particular admission exceeded $40,000, reimbursement should be paid at 75% of the total audited charges using the Stop–Loss Reimbursement Factor in Rule 134.401. *See* Rule 134.401(c)(6)(A)(iii). The insurance carriers disagreed and argued that reimbursing a hospital admission at 75% of the total audited charges anytime those charges exceeded $40,000 would produce a windfall for the hospitals and defeat the statutory objective of achieving effective medical cost control. Accordingly, the carriers urged that, in addition to total audited charges exceeding $40,000, a hospital must prove that an admission involved "unusually costly" and "unusually extensive" services, before the Stop–Loss Exception applied. Essentially, the carriers argued that the hospitals must satisfy a two-pronged test before reimbursement under the Stop–Loss Exception applied.

When resolving these initial administrative disputes, the Division's MDROs issued conflicting opinions regarding the applicability of the Stop–Loss Exception. Some MDROs applied the Stop–Loss Exception whenever total audited charges exceeded $40,000, and some MDROs applied the Stop–Loss Exception on a case-by-case basis only to those cases involving unusually costly and unusually extensive services where total audited charges exceeded $40,000. For those cases appealed to SOAH, the first SOAH decisions issued in 2001 applied the Stop–Loss Exception on a case-by-case basis only to those cases involving unusually costly and unusually extensive services in which total audited charges exceeded $40,000. Thereafter, SOAH ALJs issued conflicting decisions on when to apply the Stop–Loss Exception. Like the Division's MDROs, some ALJs applied the Stop–Loss Exception whenever total audited charges exceeded $40,000, and other ALJs applied the Stop–Loss Exception on a case-by-case basis only in those cases involving unusually costly or unusually extensive services where total audited charges exceeded $40,000.

### The 2005 Staff Report & Resulting Appeals

When Allen McDonald became Director of the Medical Review Division in 2004, he identified an internal split among Division employees over the proper interpretation and application of the Stop–Loss Exception. In the fall of 2004, McDonald ordered **\*546** a halt in the issuance of MDRO decisions in Stop–Loss Exception disputes until he could investigate further. At the January 2005 public meeting, the Division's Chairman inquired about the inconsistent agency positions regarding the Stop–Loss Exception. McDonald promised to report back at the next meeting. At the February 2005 public meeting, McDonald presented the 2005 Staff Report, a one-page document in which McDonald explained the proper interpretation and application of the Stop–Loss Exception. The 2005 Staff Report explained that in order to qualify for Stop–Loss Payment, an admission must have audited charges exceeding $40,000 and the admission must involve unusually costly and unusually extensive services. The agency Commissioners acknowledged McDonald for his presentation but took no official action regarding the 2005 Staff Report.

Between February 2005 and June 2006, Division MDROs applied the two-part interpretation of the Stop–Loss Exception in the 2005 Staff Report in almost 1,500 disputes. Many of these disputes, including the dispute that led to this case, were appealed directly to the district court.[5]

[5]     These appeals were taken during the window of time when parties were not entitled to a hearing at SOAH. *See* note 4 *supra.* The parties have informed the Court that these appeals are inactive pending resolution of this appeal.

### The 2007 En Banc Panel Decision

After the Staff Report was issued in 2005, SOAH began consolidating the Stop–Loss Exception disputes into one docket for consideration of threshold legal issues. This docket was assigned to an en banc panel of nine SOAH ALJs in 2006. In January 2007, after briefing on a limited record, the en banc panel rejected the Division's interpretation and application of the Stop–Loss Exception as explained in the 2005 Staff Report and held, 7–2, that the Stop–Loss Exception applied in any case in which total audited charges exceeded $40,000. The en banc panel held that this dollar amount threshold was the only prerequisite for payment under the stop-loss method. In addition, the en banc panel held that a hospital's implant charges, regardless of mark-up, must be used when deciding whether the $40,000 threshold has been met. The en banc panel rejected the carriers' arguments that implant charges should be reduced to cost plus 10% as required in Rule 134.401 when determining whether audited charges exceeded $40,000.

Since the issuance of the en banc panel decision, SOAH ALJ's have ordered numerous reimbursements at 75% of audited charges. Most carriers have paid under protest and perfected appeals to the district court in these cases.[6]

[6]     The parties agree that these appeals are likewise inactive pending resolution of this appeal.

### The Trial Court's Judgment

The instant appeal originated in 2006 when Vista appealed one of the many decisions rendered by the Division's MDROs pursuant to the 2005 Staff Report. In addition to the suit for judicial review allowed under the labor code, Vista sought a declaration under section 2001.038 of the Administrative Procedure Act, *see* Tex. Gov't Code Ann. § 2001.038 (West 2000), regarding the proper interpretation of the Stop–Loss Exception, as well as a declaration that the 2005 Staff Report was an invalidly adopted rule.

As one of the defendants in Vista's lawsuit, Texas Mutual filed an answer and counterclaim against Vista, as well as a cross-claim against the Division challenging **\*547** the validity of Rule 134.401 and the Stop–Loss Exception. Texas Mutual sought competing declarations that the 1997 guideline, properly interpreted: (1) required that charges for implants be audited to cost plus 10% before determining whether an admission met the $40,000 minimum stop-loss threshold; and (2) required a hospital to prove that the services provided in an admission were unusually costly and unusually extensive before that admission was entitled to Stop–Loss Payment under Rule 134.401. Alternatively, Texas Mutual sought a declaration that the Stop–Loss Exception was invalid because it violated statutory standards and was an unconstitutional delegation of the Division's legislative authority to private parties.

Several carriers and another hospital intervened and sought declaratory relief regarding the application and validity of the Stop–Loss Exception. The trial court severed the parties' claims for declaratory relief from Vista's administrative appeal. After a bench trial, the trial court entered final judgment with the following declarations:

1. The Court declares that the stop-loss reimbursement methodology of the Acute Care Inpatient Hospital Fee Guideline found at 28 Texas Administrative Code § 134.401(c)(6) requires only that a provider prove that its total audited charges exceed $40,000 in order for the stop-loss reimbursement methodology to apply; there is no additional requirement that a provider prove that the admission was unusually costly, or unusually extensive[,] in order for the stop-loss

reimbursement methodology to apply.

2. The Court declares that the Staff Report that was admitted into evidence as Vista Exhibit 9 and Joint Exhibit 4 is an administrative rule as defined in Tex. Gov't Code § 2001.003(6) and is invalid and voidable because it was not adopted in substantial compliance with Tex. Gov't Code § 2001.0225 through Tex. Gov't Code § 2001.034.

3. Instead of remanding the rule to the Division under Tex. Gov't Code § 2001.040 to allow a reasonable time for the Division to either revise or readopt the rule through established procedures, the Court finds good cause to immediately invalidate the Staff Report because the Court holds that absent the addition of objective criteria, the phrases "unusually costly" and "unusually extensive" as used by the Division are so vague and uncertain that their use in determining whether the stop-loss reimbursement methodology applies would be arbitrary.

4. The Court declares that when determining whether payment is due under 28 Tex. Admin. Code 134.401(c)(6), a carrier is authorized to audit all hospital charges in accordance with applicable Division retrospective rules, and is not limited to auditing for the deductions as described in 28 Tex. Admin. Code § 134.401(c)(6)(A)(v).

5. The Court declares that under 28 Tex. Admin. Code § 134.401(c)(6), a carrier is not authorized to reduce the provider's usual and customary charges for implantables, orthotics and prosthetics to cost plus 10% in determining whether the stop-loss reimbursement methodology applies for reimbursement purposes.

The trial court's judgment denied all further relief not specifically granted and ordered that each party was to bear its own costs, attorney's fees, and other expenses. **\*548** The trial court denied Texas Mutual's motion for new trial, and the insurance carriers, including Texas Mutual, Liberty Mutual, Zenith, and Zurich American, appealed to this Court. The Division did not appeal.

**DISCUSSION**

This appeal involves the proper interpretation and application of Rule 134.401. The carriers urge reversal of the trial court's judgment arguing that the trial court's declarations erroneously interpret Rule 134.401. The hospitals counter that the trial court's judgment was proper and this Court should affirm. The Division does not appeal the trial court's judgment but urges this Court to reject the carriers' challenges to the validity of Rule 134.401. For the reasons discussed below, we determine the trial court erred in its interpretation of Rule 134.401.

***Standard of Review***
[1] We review the trial court's declaratory judgment *de novo. See City of San Antonio v. City of Boerne,* 111 S.W.3d 22, 25–26 (Tex.2003).

[2] [3] [4] [5] [6] [7] This appeal concerns a challenge to the validity of an administrative rule under section 2001.038 of the government code. *See* Tex. Gov't Code Ann. § 2001.038. When considering a challenge to the validity of an administrative rule, we begin with the presumption that the rule is valid, and the party challenging the rule has the burden of demonstrating its invalidity. *See Office of Pub. Util. Counsel v. Public Util. Comm'n,* 104 S.W.3d 225, 232 (Tex.App.-Austin 2003, no pet.); *McCarty v. Texas Parks & Wildlife Dep't,* 919 S.W.2d 853, 854 (Tex.App.-Austin 1996, no writ) (citing cases). We construe administrative rules, which have the same force and effect as statutes, in the same manner as statutes. *Rodriguez v. Service Lloyds Ins. Co.,* 997 S.W.2d 248, 254 (Tex.1999); *Lewis v. Jacksonville Bldg. & Loan Ass'n,* 540 S.W.2d 307, 310 (Tex.1976). In construing a Division rule, our primary objective is to give effect to the Division's intent. *Rodriguez,* 997 S.W.2d at 254. We defer to the Division's interpretation of its own rules so long as that interpretation is reasonable and consistent with the plain language of the rule. *Public Util. Comm'n v. Gulf States Utils. Co.,* 809 S.W.2d 201, 207 (Tex.1991); *see also* Tex. Gov't Code Ann. § 311.023(6) (West 2005). Our review is limited to determining whether the administrative interpretation is plainly erroneous or inconsistent with the rule. *Gulf States Utils.,* 809 S.W.2d at 207 (citing *United States v. Larionoff,* 431 U.S. 864, 872, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1977)). However, if an agency fails to follow the clear, unambiguous language of its own regulation, we must reverse its action as arbitrary and capricious. *Id.* (citing *Sam Houston*

*Elec. Coop., Inc. v. Public Util. Comm'n,* 733 S.W.2d 905, 913 (Tex.App.-Austin 1987, writ denied)).

*Carrier Claims*

On appeal, the insurance carriers raise several challenges to the trial court's judgment. In general, the carriers argue that the trial court erred in its construction of Rule 134.401 and in its declaration that Rule 134.401 was a valid rule.[7] The carriers argue that Rule 134.401 is valid if properly interpreted. The carriers assert that the proper interpretation of Rule 134.401 requires proof that audited charges exceed $40,000, as well as proof that an admission involved unusually costly and unusually extensive services, before an admission can be paid under the Stop– **\*549** Loss Exception. The carriers also argue that the trial court erred in its declaration that the terms "unusually costly" and "unusually extensive" are so vague as to be arbitrary and that the trial court should not have found the 2005 Staff Report to be an invalid rule. Finally, the carriers argue that the trial court erred in its declaration that the charges for implantables, orthotics, and prosthetics could not be audited to cost plus 10% when determining whether audited charges exceed $40,000.

[7]     Certain carriers argue that Rule 134.401 has been invalid since its inception or that it has become invalid for the various reasons we discuss.

Alternatively, the carriers assert that Rule 134.401 as interpreted by the trial court is invalid because it fails to satisfy the statutory requirements of labor code section 413.011. In particular, the carriers argue that Rule 134.401 as interpreted by the trial court violates labor code section 413.011 because:

• it does not result in fair and reasonable reimbursement;

• it is not based on Medicare reimbursement policies and methodologies;

• it has not been reviewed and revised every two years;

• it no longer achieves effective medical cost control;

• it constitutes an unconstitutional private delegation of agency authority;

• it allows for reimbursement for medical services in excess of those amounts charged for similar treatment to individuals with an equivalent standard of living; and

• it is inconsistent with the labor code definition of "medical benefit."

**1. Interpretation of the Stop–Loss Exception**

We begin our analysis of the carriers' claims with a review of the trial court's interpretation of Rule 134.401. The carriers challenge the trial court's interpretation of the Stop–Loss Exception, or section 134.401(c)(6) of the rule. The plain language of the rule provides that the stop-loss method is an independent reimbursement methodology established to ensure fair and reasonable compensation to the hospital for unusually costly services rendered during treatment to an injured worker. *See* Rule 134.401(c)(6). The rule also provides that the stop-loss threshold was established to ensure compensation for unusually extensive services during a hospital admission and that an admission is eligible for stop-loss payment if the total audited charges exceed $40,000. *Id.* § 134.401(c)(6)(A)(i)-(ii).

[8] [9] [10] [11]   We construe administrative rules, which have the same force as statutes, in the same manner as statutes. *Rodriguez,* 997 S.W.2d at 254. As when construing a statute, we must read the rule as a whole, giving meaning and purpose to every part. *See Sharp v. House of Lloyd, Inc.,* 815 S.W.2d 245, 249 (Tex.1991); *Ex Parte Pruitt,* 551 S.W.2d 706, 709 (Tex.1977). We should not construe a rule in a way that would lead to an absurd or unreasonable result if another more reasonable construction or interpretation exists. *See National Plan Adm'rs, Inc. v. National Health Ins. Co.,* 235 S.W.3d 695,

701 (Tex.2007); *C & H Nationwide v. Thompson,* 903 S.W.2d 315, 322 n. 5 (Tex.1994). We give effect to all words in the rule and, if possible, do not treat any words as mere surplusage. *See Spradlin v. Jim Walter Homes, Inc.,* 34 S.W.3d 578, 580 (Tex.2000). Accordingly, we avoid construing rules in a way that would render portions of the rule inoperable or meaningless. *See id.*

[12] The trial court's declaration that a hospital need only demonstrate that total audited charges exceed $40,000 to be entitled to payment under the Stop–Loss Exception is contrary to the plain language of the rule. The rule states that the Stop– **\*550** Loss Exception was established to ensure compensation for unusually costly and unusually extensive services during a hospital admission. *See* Rule 134.401(c)(6). The rule also states that the stop-loss threshold was established to ensure compensation for unusually extensive services during a hospital admission. *Id.* § 134.401(c)(6)(A)(ii). The trial court's declaration eliminates the Division's ability under the rule to ensure that the Stop–Loss Exception provides compensation for unusually costly and unusually extensive services.

The trial court's declaration is inconsistent with other provisions in the rule. For example, the rule defines "Stop–Loss Payment" as an independent method of payment for an unusually costly or lengthy stay. *Id.* § 134.401(b)(1)(F). But the trial court's declaration precludes consideration of whether a hospital admission was unusually costly or lengthy. In addition, the rule states that $40,000 is the "*minimum* stop-loss threshold." *Id.* § 134.401(c)(6)(A)(i) (emphasis added). By its terms, this language suggests that there must be something more than a dollar amount to be considered when determining whether to apply the Stop–Loss Exception. The basic structure of the rule is consistent with this concept: The rule provides that reimbursement will be made under the standard per diem method unless an exception applies. *Id.* § 134.401(c)(2). The rule further states that independent reimbursement under the Stop–Loss Exception will be "allowed on a case-by-case basis." *Id.* § 134.401(c)(2)(C). This language suggests that the Stop–Loss Exception was meant to apply on a case-by-case basis in relatively few cases. Without consideration of whether an admission involves unusually costly or unusually extensive services, there can be no determination on a case-by-case basis, and the Stop–Loss Exception would mechanically apply in all cases where total audited charges exceeded $40,000. Reading the language of the rule as a whole, this cannot be what the Division intended.

The trial court's declaration is also contrary to the legislative mandate in the labor code because it precludes the Division from achieving effective medical cost control. Under the trial court's interpretation, the Division cannot limit the application of the Stop–Loss Exception to those cases involving unusually costly and unusually extensive services in which total audited charges exceed $40,000. When the Division adopted the 1997 guideline, it provided for a standard per diem reimbursement methodology with two exceptions. With the rise in health care costs as demonstrated by the record evidence in this case, the trial court's interpretation leads to the absurd and unreasonable result that reimbursement under the Stop–Loss *Exception* has replaced the standard per diem method as the general method of hospital reimbursement. Stated differently, the exception has now become the rule. We do not believe that this is what the Division intended when it adopted the 1997 guideline.

For these reasons, we conclude that the trial court's interpretation is contrary to the plain language of the rule, renders portions of the rule meaningless, and leads to results inconsistent with the intent of the statutory structure. A more reasonable interpretation of the rule is that to be eligible for reimbursement under the Stop–Loss Exception, a hospital must demonstrate that total audited charges exceed $40,000 and that an admission involved unusually costly and unusually extensive services. This interpretation is consistent with the plain language of the rule, which states that the stop-loss method was established to ensure fair and reasonable **\*551** compensation to the hospital for unusually costly and unusually extensive services. *Id.* § 134.401(c)(6), (c)(6)(A)(ii). It is likewise consistent with the interpretation urged by the Division in the 2005 Staff Report, which we address more fully below. And it is consistent with the basic structure of the rule, which calls for reimbursement under the standard per diem method except as allowed on a case-by-case basis under the Stop–Loss Exception. Accordingly, we sustain the carriers' challenge, reverse the trial court's declaration, and render judgment that the Stop–Loss Exception requires a hospital to demonstrate that total audited charges exceed $40,000 and that the admission involved unusually costly and unusually extensive services to receive reimbursement under the stop-loss method.

We emphasize that, in light of the legislative mandate in section 413.011 of the labor code requiring the Division to adopt fee guidelines designed to achieve both quality medical care and effective medical cost control, this is a more reasonable interpretation of the Stop–Loss Exception in Rule 134.401. Furthermore, because we adopt the construction of the rule urged by the carriers on appeal, we need not reach the carriers' alternative claims that the rule, as construed by the trial court, is an invalid delegation of the Division's legislative authority. Nor do we reach the carriers' claims that the rule, as interpreted by the trial court, is invalid because it fails to provide fair and reasonable reimbursement, fails to achieve effective medical cost

control, or allows for reimbursement for medical services in excess of those amounts charged for similar treatment to individuals with an equivalent standard of living as required in section 413.011 of the labor code, or that the trial court's interpretation is inconsistent with the definition of "medical benefit" in labor code section 401.011(31).

[13] [14] To the extent certain carriers maintain that Rule 134.401 was invalid at its inception, or became invalid at some later date, because the rule is not based on Medicare reimbursement policies and methodologies and has not been reviewed and revised every two years, we find those claims to be without merit. While we agree with the carriers that section 413.011 of the labor code currently requires the Division to adopt medical fee guidelines that follow Medicare reimbursement policies and methodologies, *see* Tex. Lab.Code Ann. § 413.011(a), this requirement was not part of the statute when the Division adopted Rule 134.401 in 1997 and was not added until 2001. *See*Act of May 25, 2001, 77th Leg., R.S., ch. 1456, § 6.02, 2001 Tex. Gen. Laws 5167, 5185 (amending section 413.011(a) to require the Division to "adopt the most current reimbursement methodologies ... used by the federal Health Care Financing Administration").[8] Because this requirement was not part of the statute in 1997, the rule was not invalid at its inception for failing to meet this requirement. Nor do we believe that the rule became invalid at the moment this requirement was added to the statute in 2001.[9]

[8]    This language was changed in 2005 from "Health Care Financing Administration" to "Centers for Medicare and Medicaid Services." Act of May 29, 2005, 79th Leg., R.S., ch. 265, § 3.233, 2005 Tex. Gen. Laws 469, 548.

[9]    "The measure of the validity of an agency rule is whether it is constitutional and whether it conforms to the procedural and substantive statutes applicable to its adoption." *Texas Dep't of Banking v. Restland Funeral Home, Inc.,* 847 S.W.2d 680, 683 (Tex.App.-Austin 1993, no writ).

Similarly, we agree that section 413.012 states that the medical fee guidelines **\*552** "shall be reviewed and revised" every two years to reflect fair and reasonable rates and to reflect reasonable and necessary ranges of medical treatment. *See* Tex. Lab.Code Ann. § 413.012 (West 2006). But it does not follow that the Division's failure to review and revise the 1997 guideline every two years since it was adopted invalidates the rule.

[15] [16] [17] [18] Although we generally construe the term "shall" as imposing a duty or obligation, *see* Tex. Gov't Code Ann. § 311.016 (West 2005), Texas courts have, in certain circumstances, construed "shall" to be directory. *See, e.g., Albertson's Inc. v. Sinclair,* 984 S.W.2d 958, 961 (Tex.1999). To determine whether the legislature intended a provision to be mandatory or directory, we consider the plain meaning of the words used, as well as the entire act, its nature and object, and the consequences that would follow from each construction. *See Schepps v. Presbyterian Hosp. of Dallas,* 652 S.W.2d 934, 936 (Tex.1983) (citing *Chisholm v. Bewley Mills,* 155 Tex. 400, 287 S.W.2d 943, 945 (1956)). The supreme court has held that "provisions which are not of the essence of the thing to be done," but are directed instead towards the prompt and orderly conduct of business, are not generally considered mandatory. *Id.* When a statute is silent about consequences of noncompliance, we look to the statute's purpose in determining the proper consequence of noncompliance. *Id.* at 938. "If a provision requires that an act be performed within a certain time without any words restraining the act's performance after that time, the timing provision is usually directory." *Helena Chem. Co. v. Wilkins,* 47 S.W.3d 486, 495 (Tex.2001). Further, we liberally construe workers' compensation legislation to carry out its evident purpose of compensating injured workers and their dependents. *See Lujan v. Houston Gen. Ins. Co.,* 756 S.W.2d 295, 297 (Tex.1988); *Ward v. Charter Oak Fire Ins. Co.,* 579 S.W.2d 909, 910 (Tex.1979).

The legislature has provided no consequences for the Division's unfortunate noncompliance with the statutory directives in section 413.011 or 413.012 of the labor code. If the legislature had intended consequences for the failure to adopt Medicare reimbursement methodologies or the failure to review and revise the fee guidelines, it could have spelled out those consequences in the statute. With regard to the legislature's requirement that the Division adopt new *treatment* guidelines for

injured workers, the legislature expressly provided that "[t]he treatment guidelines adopted under Chapter 413, in effect immediately before September 1, 2001, are abolished on January 1, 2002." *See* Act of May 25, 2001, 77th Leg., R.S., ch. 1456, § 6.09(b), 2001 Tex. Gen. Laws 5167, 5188. It speaks volumes that the legislature provided no consequences for the failure to adopt Medicare reimbursement methodologies or the failure to review and revise the fee guidelines every two years.

[19] [20] The carriers do not complain that the reimbursement rates under the 1997 guideline, as properly interpreted, are unreasonable. Nor have the carriers demonstrated harm from the application of the reimbursement rates in the 1997 guideline. Fee guidelines are just that—*guidelines.* They "merely assist carriers and, upon review, the [Division] in determining whether medical charges are 'fair and reasonable' or satisfy the applicable standard." *Methodist Hosp. v. Texas Workers' Comp. Comm'n,* 874 S.W.2d 144, 149–50 (Tex.App.-Austin 1994, writ dism'd w.o.j.). This Court has previously held that there is no private right to a fee guideline established by rule. *See* **\*553** *Texas Workers' Comp. Comm'n v. East Side Surgical Ctr.,* 142 S.W.3d 541, 549 (Tex.App.-Austin 2004, no pet.) ("East Side is only entitled to 'fair and reasonable' reimbursement-not to have the fee guidelines established by rule."). Accordingly, there can be no private right to an updated fee guideline or a guideline that uses a particular reimbursement methodology, so long as the reimbursement provided in the guideline is fair and reasonable. *See id.*

For these reasons, we conclude that the labor code's requirement to adopt fee guidelines that follow Medicare reimbursement methodologies and to review and revise these guidelines every two years are directory, not mandatory.[10] We further conclude that the Division's failure to comply with these statutory directives does not invalidate the 1997 guideline, or Rule 134.401.

[10]     We reject the carriers' argument that this Court's opinion in *Texas Medical Association v. Texas Workers Compensation Commission,* 137 S.W.3d 342 (Tex.App.-Austin 2004, no pet.), requires a different result. In *Texas Medical Association,* this Court stated that "the Commission has the ongoing statutory duty to review and revise the fee guidelines to ensure they are in compliance with the statutory factors," *see id.* at 350 (citing Tex. Lab.Code Ann. § 413.012 (West 2006)), but this Court did not consider whether that "ongoing duty" was mandatory or directory. *See id.* Nor did this Court consider the appropriate consequence for noncompliance with this "ongoing duty." Thus, our opinion in *Texas Medical Association* does not answer the question before us today-namely, whether this Court may invalidate an agency rule for noncompliance with a statutory directive when the legislature is silent.

## 2. "Unusually Costly" and "Unusually Extensive"

[21] Within their challenge to the trial court's interpretation of Rule 134.401, the carriers argue that the trial court erred in its determination that the terms "unusually costly" and "unusually extensive" are "so vague and uncertain that their use in determining whether the [Stop–Loss Exception] applies would be arbitrary." The carriers assert that such industry terms are knowable, calculable, and determinable and provide reasonably clear guidance to those parties affected by the rule.[11] We agree.

[11]     The record demonstrates that MDROs, carriers, and hospitals understand and are familiar with these terms because they have been previously utilized and applied in other cases since the 1997 guideline was promulgated.

This Court has previously held that where an "idea embodied in a phrase is reasonably clear, a court should find it acceptable as a standard of measurement." *Texas Bldg. Owners & Managers Ass'n v. Public Util. Comm'n,* 110 S.W.3d 524, 535 (Tex.App.-Austin 2003, pet. denied). The supreme court has also recognized that a broad standard encompassing a multitude of factors will pass constitutional scrutiny if it is no more extensive than the public interest demands. *See Jordan v. State Bd. of Ins.,* 160 Tex. 506, 334 S.W.2d 278, 280 (1960); *Housing Auth. v. Higginbotham,* 135 Tex. 158, 143 S.W.2d 79, 87 (1940). Examples of standards upheld by Texas courts include "not worthy of public confidence," "unjust, fair, inequitable, misleading, deceptive," and "just and reasonable." *See Texas Bldg. Owners & Managers Ass'n,* 110 S.W.3d at 535 (citing cases).

We have held that Rule 134.401 requires a provider to demonstrate that the services it has provided are "unusually costly" and "unusually extensive" in order to be reimbursed under the stop-loss methodology. The phrases "unusually costly" and "unusually extensive" are no more vague or uncertain than other standards previously upheld by Texas courts. *See id.* (discussing standards and citing cases). They are no more vague or uncertain than other standards in the labor code requiring **\*554** fee guidelines to be "fair and reasonable," "ensure quality medical care," and "achieve effective medical cost control." *See* Tex. Lab.Code Ann. § 413.011(d). What is unusually costly and unusually extensive in any particular fee dispute remains a fact-intensive inquiry best left to the Division's determination on a case-by-case basis. *See Texas Bldg. Owners & Managers Ass'n,* 110 S.W.3d at 536 (holding that what is "reasonable" and "nondiscriminatory" is fact-intensive inquiry best left to discretion of Public Utility Commission).

No party disputes that the labor code delegates authority to the Division to establish medical fee guidelines, resolve medical fee disputes, and "adjudicate the payment given the relevant statutory provisions and commissioner rules." *Id.* §§ 413.011(d) (establish fee guidelines), .031(c) (adjudicate payment due). The scope of this authority includes the discretion to establish appropriate standards for reimbursement and to determine whether those standards have been met. *Id.* §§ 413.011(d), .031(c); *see also Texas Bldg. Owners & Managers Ass'n,* 110 S.W.3d at 535–36 (commission's authority to require payment of "reasonable" and "nondiscriminatory" compensation includes power to determine what is reasonable and nondiscriminatory when dispute arises). To the extent the parties are dissatisfied with the Division's determination, the labor code provides for review by SOAH and appeal to the courts. *See* Tex. Lab.Code Ann. § 413.031(k).[12]

[12] *See also* note 4 *supra* (explaining that between 2005 and 2007 the legislature provided for direct appeal to the courts without allowing an administrative hearing at SOAH).

[22] [23] [24] There is no constitutional requirement that a statute or rule must define all of the terms used. *See Rooms with a View, Inc. v. Private Nat'l Mortgage Ass'n, Inc.,* 7 S.W.3d 840, 845 (Tex.App.-Austin 1999, pet. denied); *Garay v. State,* 940 S.W.2d 211, 219 (Tex.App.-Houston [1st Dist.] 1997, pet. ref'd). Recognizing the myriad of factual situations that may arise and allowing administrative agencies sufficient flexibility when drafting their rules, courts require no more than a reasonable degree of certainty defining what is required or prohibited. *See Pennington v. Singleton,* 606 S.W.2d 682, 689 (Tex.1980). Courts will invalidate an economic regulation "only if it commands compliance in terms so vague and indefinite as really to be no rule or standard at all ... or if it is substantially incomprehensible." *Ford Motor Co. v. Texas Dep't of Transp.,* 264 F.3d 493, 507 (5th Cir.2001) (internal quotation omitted); *see also Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 498, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982) ("Economic regulation is subject to a less strict vagueness test."). Applying these principles to Rule 134.401, we conclude that the phrases "unusually costly" and "unusually extensive" are sufficiently definite to provide guidance to the MDROs and ALJs who review and determine medical fee disputes on a case-by-case basis. *See Hoffman Estates,* 455 U.S. at 498, 102 S.Ct. 1186; *Commission for Lawyer Discipline v. Benton,* 980 S.W.2d 425, 437 (Tex.1998). Therefore, we sustain the carriers' challenge and reverse the trial court's declaration to the contrary.

### 3. 2005 Staff Report

[25] The carriers also challenge the trial court's determination that the 2005 Staff Report was an invalid and voidable rule. In its second declaration, the trial court held that the 2005 Staff Report was an administrative rule as defined in section

2001.003(6) of the government code, and that it was invalid and voidable because it **\*555** was not adopted in compliance with government code sections 2001.0225 through 2001.034. *See* Tex. Gov't Code Ann. §§ 2001.003, .0225–.034 (West 2000) (defining "rule" and establishing rulemaking procedures). In its third declaration, the trial court invalidated the 2005 Staff Report because it found that the Division's use of the phrases "unusually costly" and "unusually extensive" in determining whether the Stop–Loss Exception applies would be arbitrary. The carriers urge this Court to reverse the trial court's declarations.

We agree with the carriers that the 2005 Staff Report is not an invalid and voidable rule. The APA defines a rule as "a state agency statement of general applicability that ... implements, interprets, or prescribes law or policy; or ... describes the procedure or practice requirements of a state agency." Tex. Gov't Code Ann. § 2001.003(6)(A). The APA definition of a rule includes "the amendment or repeal of a prior rule," but it does not include "a statement regarding only the internal management or organization of a state agency and not affecting private rights or procedures." *Id.* § 2001.003(6)(B)-(C).

As a preliminary matter, we conclude that the 2005 Staff Report was not a statement by a state agency. The 2005 Staff Report was a one-page document prepared by the director of the Medical Review Division within the Division that was intended to address an internal agency matter—namely, the inconsistent application of Rule 134.401. The 2005 Staff Report was presented to the Division at the January 2005 open meeting, but the Division simply thanked the director for the report and took no official action. The 2005 Staff Report recognized that the Division's MDROs had a history of inconsistently applying Rule 134.401, and proposed a correction to that internal inconsistency based on the language of Rule 134.401. For this reason, we conclude that the 2005 Staff Report was not a statement of the agency within the meaning of the APA.

[26] Even if we recognized the 2005 Staff Report as an agency statement, it is well-established that not every administrative pronouncement is a rule within the meaning of the APA. *See Texas Educ. Agency v. Leeper,* 893 S.W.2d 432, 443 (Tex.1994); *Brinkley v. Texas Lottery Comm'n,* 986 S.W.2d 764, 769 (Tex.App.-Austin 1999, no pet.). "This observation refers to the fact that administrative agencies routinely issue letters, guidelines, and reports, and occasionally file briefs in court proceedings, any of which might contain statements that intrinsically implement, interpret, or prescribe law, policy, or procedure or practice requirements." *Brinkley,* 986 S.W.2d at 769. If such statements were rules, an agency could not carry out its legislative functions: "How, under such a theory, could an agency practically express its views to an informal conference or advisory committee, or state its reasons for denying a petition to adopt a rule or file a brief in a court or agency proceeding?" *Id.*

[27] The supreme court in *El Paso Hospital District v. Texas Health and Human Services Commission,* 247 S.W.3d 709 (Tex.2008), analyzed whether an agency's interpretation of its own rule was also a rule.[13] In that case, the HHSC had interpreted its rule to impose a February 28th cutoff date when calculating Medicaid reimbursement rates. Under the rule's definition of "base year," the HHSC was required to use " '[a] 12–consecutive–month period of claims data,' to calculate the [h]ospitals' rates." *See id.* at 714 (quoting **\*556** 1 Tex. Admin. Code § 355.8063(b)(5)). The supreme court concluded that the February 28th cutoff was contrary to the rule's definition of base year because it excluded several claims from the calculation of the hospitals' rates and thus amended the plain language of the rule. *Id.* Because the HHSC had not followed APA rulemaking procedures to promulgate the February 28th cutoff, the supreme court also held that it was invalid and enjoined the HHSC from using the February 28th cutoff to calculate the hospitals' reimbursement rates. *Id.* at 715 (citing Tex. Gov't Code Ann. § 2001.035 (West 2000)).

---

[13]   It is undisputed that the Division has authority to interpret its own rules.

---

Unlike the HHSC's interpretation in *El Paso Hospital District,* the 2005 Staff Report does not contradict Rule 134.401. Moreover, assuming the 2005 Staff Report is an agency statement, it is a statement regarding the agency's internal management that does not affect private rights. *See* Tex. Gov't Code Ann. § 2001.003(6)(C). The 2005 Staff Report is a statement regarding internal management because it is designed to correct MDROs' inconsistent application of the Stop–Loss Exception. It also allowed the agency to function effectively and produced clarity of direction in a highly technical area. The 2005 Staff Report did not affect private rights because it did not change or amend Rule 134.401; it simply mandated internal consistency when applying the rule.

We also reject the hospitals' argument that the 2005 Staff Report was a "new" interpretation of Rule 134.401. The record before us demonstrates that MDROs in the Division, as well as SOAH ALJs, had issued conflicting opinions interpreting and applying the Stop–Loss Exception in Rule 134.401 before the 2005 Staff Report was issued. Some MDROs and ALJs interpreted and applied the Stop–Loss Exception in the same manner as the 2005 Staff Report, and some did not. Because there were prior opinions and decisions interpreting and applying the Stop–Loss Exception in the same manner as the 2005 Staff Report, that report cannot, by definition, be a "new" interpretation of Rule 134.401.

For these reasons, we conclude that the 2005 Staff Report was not a rule within the meaning of the APA and, therefore, was not subject to APA rulemaking procedures. We sustain the carriers' challenge and reverse the trial court's declaration that the 2005 Staff Report was an invalidly adopted rule.

### 4. Reimbursement for Implantables, Orthotics, and Prosthetics

[28] The carriers also challenge the trial court's declaration that Rule 134.401 does not allow a carrier to audit a provider's charges for implantables, orthotics, and prosthetics to cost plus 10% when determining whether the $40,000 stop-loss threshold has been met. For the following reasons we overrule the carriers' challenge and sustain the trial court's judgment.

Rule 134.401 specifically carves out reimbursement for implantables, orthotics, and prosthetics. *See* Rule 134.401(b)(2)(B) (general information regarding additional reimbursements), (c)(4) ("Additional Reimbursements"). When medically necessary, implantables, orthotics, and prosthetics are reimbursed as "Additional Reimbursements" under the rule.[14] *Id.* § 134.401(c)(4)(A). As provided in the rule, implantables, orthotics, and prosthetics shall be reimbursed at the cost to the hospital plus 10%. *Id.* Rule 134.401 also **\*557** provides that "[a]ll charges are subject to audit as described in the Commission rules." *Id.* § 134.401(b)(2)(C). Rule 134.401 provides that when *audited* charges exceed the $40,000 stop-loss threshold, the entire admission shall be reimbursed using the 75% stop-loss reimbursement factor. *Id.* § 134.401(c)(6)(A)(iii).

[14]  Also included in the category of "Additional Reimbursements" are magnetic resonance imaging (MRIs), computerized axial tomography (CAT scans), hyperbaric oxygen, blood, air ambulance, and pharmaceuticals. Rule 134.401(c)(4)(B)-(C).

Reading these provisions together, we conclude that the charges for implantables, orthotics, and prosthetics must be audited before those charges can be used to determine whether the $40,000 stop-loss threshold has been met. The question then becomes audited to what? The carriers argue that these costs should be reduced, or audited, to cost plus 10% as specified in section 134.401(c)(4)(A). We do not believe this is what the Commission intended. Consider the following example: if the cost for implantables in a given admission was $40,000, under the carriers' interpretation, this cost would be audited to cost plus 10%, or $44,000, for purposes of determining whether the Stop–Loss Exception applied. Assuming that the admission involved unusually costly and unusually extensive services and because $44,000 is greater than $40,000, the Stop–Loss Exception would apply. Therefore, the entire admission would be reimbursed using the following formula:

Audited Charges x 75% SLRF[15] = WCRA[16]

[15]  SLRF means "Stop–Loss Reimbursement Factor." *See* Rule 134.401(c)(6)(A).

[16]  WCRA means "Workers' Compensation Reimbursement Amount." *See id.*

*See* Rule 134.401(c)(6)(B). Applying this formula to the example, the hospital would be reimbursed only $33,000, or $7,000 less than its cost, for the implantables. Under this example, the hospital, or other provider, would incur a loss.

Because providers would incur losses under the carriers' proposed construction of the rule, that interpretation would be contrary to the statutory requirement that fee guidelines be "fair and reasonable." *See* Tex. Lab.Code Ann. § 413.011(d). We cannot construe the rule in a manner that is inconsistent with the statute. *See, e.g., CenterPoint Energy, Inc. v. Public Util. Comm'n,* 143 S.W.3d 81, 85 (Tex.2004) (observing that rule is invalid if it violates statutory provision); *Texas Workers' Comp. Comm'n v. Patient Advocates,* 136 S.W.3d 643, 657–58 (Tex.2004) (upholding rule as consistent with statute); *National Plan Adm'rs, Inc.,* 235 S.W.3d at 701 (courts should not construe statute in manner that leads to absurd results); *C & H Nationwide,* 903 S.W.2d at 322 n. 5 (same).

For these reasons, we conclude there was no error in the trial court's declaration that the costs for implantables, orthotics, and prosthetics should not be reduced to cost plus 10% when determining whether the $40,000 stop-loss threshold has been met. This is consistent with the plain language of the rule and section 413.011 of the labor code. It is likewise consistent with the trial court's judgment that a carrier is authorized to audit all hospital charges in accordance with applicable Division retrospective review rules, which we affirm because no party has challenged that declaration on appeal.

## CONCLUSION

Having considered all of the parties' issues, we affirm the trial court's judgment that carriers may audit a provider's charges as permitted by the Division's rules and that a carrier may not reduce the charges for implantables, orthotics, and prosthetics to cost plus 10% when determining whether the Stop–Loss Exception applies. We reverse the trial **\*558** court's judgment that the Stop–Loss Exception applies to any admission in which audited charges exceed $40,000, and we render judgment that, to establish eligibility for reimbursement under the Stop–Loss methodology, a provider must demonstrate that audited charges exceed $40,000 and that the services provided were unusually costly and unusually extensive so as to allow application of the exception. We also reverse the trial court's judgment that the 2005 Staff Report is an invalid rule and that the phrases "unusually costly" and "unusually extensive" are so vague and uncertain that their use by the Division in determining whether the Stop–Loss Exception applies would be arbitrary.

**All Citations**

275 S.W.3d 538

---

447 S.W.3d 520
Court of Appeals of Texas,
Austin.

The Texas State Board of Pharmacy, and in their official capacities only, Gay Dodson, Executive Director; and Jeanne D. Waggener, President of the Board, Appellants

v.

Tiana Jean Witcher, Appellee

NO. 03–12–00560–CV | Filed: October 31, 2014

**Synopsis**
**Background:** Pharmacist filed suit for judicial review of Board of Pharmacy's order indefinitely suspending her pharmacist license. The District Court, Travis County, 345th Judicial District, Tim Sulak, P.J., reversed and remanded. Board appealed.

**Holdings:** The Court of Appeals, J. Woodfin Jones, C.J., held that:

[1] reciprocal-sanctions policy was a "rule" within meaning of Administrative Procedure Act (APA), and

[2] issue was not novel or one with which Board was unfamiliar, making imposed adjudicative reciprocal sanctions policy invalid.

Affirmed; motion for rehearing overruled.

Melissa Goodwin, J., dissented and filed opinion.

West Headnotes (13)

[1]      **Health**
         Order, Judgment, or Remedy

         Board of Pharmacy applied reciprocal-sanctions policy to pharmacist, enforcing suspension of her state license concurrent with suspension of her out-of-state license, without regard to her individual circumstances and in attempt to promote consistent sanctions generally applicable to all pharmacists licensed in other states, and therefore policy was "rule" within meaning of Administrative Procedure Act (APA), rather than statement regarding only internal management or organization of Board, not affecting private rights or procedures; sanctions were imposed on pharmacist despite Board's adoption of ALJ's findings that

mitigating factors outweighed aggravating factors considered in assessing appropriate disciplinary penalty, and sanctions were, according to testimony from Board member, "Board's policy" and "standard sanction" in such circumstances. Tex. Gov't Code Ann. § 2001.003(6)(c); 22 Tex. Admin. Code §§ 281.60(c), 281.62.

1 Cases that cite this headnote

[2]     **Administrative Law and Procedure**
        🔑Validity

Rule that is not properly promulgated under mandatory Administrative Procedure Act (APA) procedures is invalid. Tex. Gov't Code Ann. § 2001.174(2).

Cases that cite this headnote

[3]     **Administrative Law and Procedure**
        🔑Reversal

Agency decision based on invalid rule must be reversed and remanded to agency if substantial rights of appellant have been prejudiced thereby. Tex. Gov't Code Ann. § 2001.174(2).

Cases that cite this headnote

[4]     **Administrative Law and Procedure**
        🔑Discretion of Administrative Agency
        **Administrative Law and Procedure**
        🔑Arbitrary, unreasonable or capricious action; illegality

An agency's decision is arbitrary or results from an abuse of discretion if the agency weighs only relevant factors that the legislature directs it to consider but still reaches a completely unreasonable result.

Cases that cite this headnote

**[5]**   **Administrative Law and Procedure**
&#x2014;Stare decisis; estoppel to change decision

Although agency is not bound to follow its decisions in contested cases in same way that court is bound by precedent, agency is required by courts to explain its reasoning when it appears to reviewing court that agency has departed from its earlier administrative policy or there exists apparent inconsistency in agency determinations.

Cases that cite this headnote

**[6]**   **Health**
&#x2014;Order, Judgment, or Remedy

Case wherein Board of Pharmacy imposed adjudicative reciprocal-sanctions policy to suspend pharmacist's license whose out-of-state license had been suspended was not novel issue with which Board was unfamiliar, and thus it did not qualify as circumstance wherein adjudicative rulemaking was appropriate, making Board's reciprocal-sanctions policy invalid; Board adjudicated policy in prior case wherein it referenced existence of other cases involving reciprocal sanctions, and Board member testified that imposing reciprocal sanctions was "Board's policy" and their "standard sanction" under such circumstances. Tex. Gov't Code Ann. § 2001.035(a).

Cases that cite this headnote

**[7]**   **Administrative Law and Procedure**
&#x2014;Notice and comment, necessity

Ad hoc rulemaking is a narrow exception to the Administrative Procedure Act's (APA) mandate that agency rules be adopted through notice-and-comment rulemaking procedures.

Tex. Gov't Code Ann. § 2001.174(2).

1 Cases that cite this headnote

[8]   **Administrative Law and Procedure**
      Duty to make

Unless mandated by statute, the choice by an agency to proceed by general rule or by ad hoc adjudication is one that lies primarily in the informed discretion of the agency.

Cases that cite this headnote

[9]   **Administrative Law and Procedure**
      Duty to make
      **Administrative Law and Procedure**
      Notice and comment, necessity

When an agency seeks to adopt rules of general applicability, there is a presumption favoring the fairness and public participation that accompany formal rulemaking under the Administrative Procedure Act (APA) because allowing an agency to amend its rules through administrative adjudication undercuts the APA. Tex. Gov't Code Ann. § 2001.174(2).

2 Cases that cite this headnote

[10]  **Administrative Law and Procedure**
      Duty to make

In exceptional cases, an agency may choose to formulate and enforce a general requirement through a decision in a particular case, but that may be done only when using the rulemaking procedure would frustrate the effective accomplishment of the agency's functions. Tex. Gov't Code Ann. § 2001.174(2).

Cases that cite this headnote

[11]      **Health**
          Review

Board of Pharmacy waived appellate review of any error in trial court's order concerning the scope of remand following invalidation of Board's reciprocal-discipline policy as an invalid rule not promulgated in accordance with Administrative Procedure Act (APA), where Board did not challenge the trial court's order with respect to the scope of remand. Tex. Gov't Code Ann. § 2001.174(2).

Cases that cite this headnote

[12]      **States**
          What are suits against state or state officers

Subject to the limited "ultra vires" exception, sovereign immunity protects state officers sued in their official capacities to the same extent that it protects their employers.

Cases that cite this headnote

[13]      **Health**
          Pharmacists

Members of Board of Pharmacy who were sued in their official capacity did not have sovereign immunity from pharmacist's action challenging Board's reciprocal-sanctions policy as an invalid rule not adopted in accordance with Administrative Procedure Act (APA), since APA waived Board's immunity from suit. Tex. Gov't Code Ann. §§ 2001.171, 2001.174(2).

Cases that cite this headnote

FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL   *522 DISTRICT, NO. D–1–GN–12–000026, HONORABLE TIM SULAK, JUDGE PRESIDING

**Attorneys and Law Firms**

Dan Lype, Andre D'Souza, Louis Leichter, for Tiana Jean Witcher.

Kristofer S. Monson, for The Texas State Board of Pharmacy, Gay Dodson and Jeanne D. Waggener.
Before Chief Justice Jones, Justices Goodwin and Field

## ON MOTION FOR REHEARING

### *OPINION*

J. Woodfin Jones, Chief Justice

We withdraw our opinion and judgment dated May 3, 2013, and substitute the following in its place. The appellants' motion for rehearing is overruled.

After a contested-case hearing, the Texas State Board of Pharmacy ("the Board") indefinitely suspended Tiana Jean Witcher's pharmacist license. Witcher filed a suit for judicial review of the Board's order. *See* Tex. Gov't Code § 2001.176. The trial court reversed the Board's order and remanded the cause to the Board, concluding that the indefinite suspension of Witcher's license was arbitrary and capricious and also was based on an invalid rule. *See id.* § 2001.174(2). We will affirm the trial court's judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

The facts of this case are largely undisputed. Witcher received her Texas pharmacist license in 1987 and her North Carolina pharmacist license in 1992 via reciprocity. In November 2007, her husband died in a car accident two weeks after they were married. In October 2008, near the anniversary of his death, Witcher became so intoxicated during her personal time that she had to be treated for alcohol poisoning. On the advice of a colleague, Witcher self-referred to the North Carolina Pharmacist Recovery Network (NCPRN), a program that aids impaired pharmacists, to address alcohol-abuse issues in her personal life. She voluntarily entered into a monitoring contract with NCPRN in January 2009.

Witcher subsequently came under scrutiny by the North Carolina licensing authority when she failed to comply with some of the terms of her voluntary monitoring agreement with the NCPRN. Due to the compliance issues, the North Carolina licensing authority suspended Witcher's pharmacist license in April 2010 based on concerns that she was unfit to practice pharmacy. In suspending Witcher's license, the North Carolina licensing authority found that she had "[i]ndulged in the use of drugs to an extent that renders the pharmacist unfit to practice pharmacy" and "[d]eveloped a physical or mental disability that render[ed her] unfit to practice pharmacy with reasonable skill, competence and safety to the public." *See* N.C. Gen.Stat. Ann. § 90–85.38(a)(3), (5). Under the North Carolina suspension order, Witcher is ineligible to petition for reinstatement of her license until the NCPRN advocates for its reinstatement, a condition presumably directed to ensuring her fitness to practice pharmacy.[1] The North Carolina order further specifies that only the NCPRN may monitor Witcher's recovery.

---

[1]   The North Carolina suspension order notes that becoming eligible to petition for reinstatement does not guarantee that such petition will be granted. Thus, even

> if Witcher satisfies the precondition to applying for reinstatement, her license would remain suspended indefinitely under the North Carolina suspension order.

***523** After Witcher's North Carolina license was suspended, she returned to Texas to live with her father because she lacked means to earn a living in North Carolina, had lost her house in foreclosure, and had no family or support system in North Carolina. Upon returning to Texas, she voluntarily enrolled in the Texas Pharmacist Recovery Network (TxPRN), became successfully employed as a pharmacist, and participated in therapy. Witcher averred that she did not abuse alcohol after her October 2008 hospitalization, did not abuse alcohol on the job, and sought assistance from NCPRN and TxPRN on her own initiative. While in Texas, Witcher has exhibited no signs of alcohol impairment in the workplace or elsewhere.

Based on the active suspension of Witcher's license in North Carolina, however, the Board instituted disciplinary proceedings to suspend Witcher's Texas license until the suspension of her North Carolina license has been lifted. *See* Tex. Occ.Code § 565.001(a)(16) (authorizing disciplinary action against licensed pharmacist disciplined by another state). Along with the disciplinary complaint, the Board's staff filed a motion for summary disposition, asserting that, as a matter of law, (1) Witcher was subject to discipline under section 565.001(a)(16) of the Texas Pharmacy Act (TPA), which authorizes the Board to discipline a license holder who has "been disciplined by the regulatory board of another state for conduct substantially equivalent to conduct described under this subsection"; (2) the violations found by the North Carolina licensing authority were, as a matter of law, substantially equivalent to conduct prohibited in TPA sections 565.001(a)(4) and (a)(7); and (3) the appropriate disciplinary sanction was "a period of suspension in Texas to run concurrently with the North Carolina suspension." *See id.* §§ 565.001(a)(4) (pharmacist may be disciplined upon "developing an incapacity that prevents the applicant or license holder from practicing pharmacy with reasonable skill, competence, and safety to the public"), (a)(7) (pharmacist may be disciplined for "us[ing] drugs in an intemperate manner that, in the board's opinion, could endanger a patient's life"), (a)(16) (pharmacist may be disciplined based on disciplinary action in another state for conduct that would violate the TPA); 565.051 (discipline for violation of TPA includes revocation, suspension, probated suspension, and licensing restrictions).

Witcher admitted that she was subject to being disciplined by the Board based on the North Carolina disciplinary action. However, because she had not abused alcohol since October 2008 and it was undisputed that she was presently fit to practice pharmacy, she advocated for a five-year probated suspension in keeping with Board precedent in disciplinary proceedings involving impaired pharmacists who had engaged in significantly more egregious conduct but who had demonstrated current fitness to practice to the Board's satisfaction.

The administrative law judge (ALJ) who presided over the disciplinary proceedings granted partial summary disposition as to Witcher's violation of the TPA but denied summary disposition regarding the appropriate sanction to be imposed.[2] *See* **\*524** 1 Tex. Admin. Code § 155.505 (2014) (State Office of Admin. Hearings, Summary Disposition) (authorizing ALJ to issue decision without evidentiary hearing if no genuine issue of material fact and party is entitled to decision as matter of law). After an evidentiary hearing directed solely to the appropriate sanction, the ALJ recommended a five-year probated suspension, finding among other things that (1) Witcher voluntarily entered into a participation agreement with TxPRN, (2) she had complied with all terms and conditions of her TxPRN participation agreement, (3) she had been sober since October 22, 2008, which was prior to her self-referral to NCPRN, and was not working when she was impaired due to alcohol use, (4) she "can safely practice pharmacy in Texas," (5) the mitigating factors in her case outweighed the aggravating factors, (6) it was "not feasible for [Witcher] to participate in the NCPRN program as a precondition to having the suspension of her North Carolina license lifted, and it is not financially viable for her to return to North Carolina," and (7) the North Carolina licensing authority would not accept Witcher's participation in the TxPRN program as a substitute for the requirement that she participate in the NCPRN program. The ALJ further found that, in relocating to Texas, Witcher was "not seeking to evade compliance with the reinstatement provisions of the North Carolina order, but only to avoid the considerable financial hurdles she would face to achieve that compliance."

---

2      In granting partial summary disposition, the ALJ concluded from the following undisputed facts that Witcher was subject to disciplinary action by the Board in accordance with section 565.001(a)(16) of the TPA:

1. Tiana J. Witcher (Respondent) holds pharmacist license No. 30135 issued by the Texas State Board of Pharmacy (Board) on October 21, 1987.

2. On or about April 20, 2010, the North Carolina Board of Pharmacy (NCBP) entered a Final Order against the North Carolina license No. 11664 held by [Witcher]. That order made the following Findings of Fact:

a) On or about January 29, 2009, [Witcher] voluntarily entered a substance abuse program administered by North Carolina Pharmacist Recovery Network (NCPRN). At that time Respondent entered into a contract governing the terms of her participation in the program (Contract).

b) Between approximately March 2009 and November 2009, Respondent violated the terms of the Contract in various ways, including but not limited to:

i. By failing to call in to determine if she should be drug tested on or about March 14, 2009, April 15, 2009, and April 17, 2009;

ii. By submitting dilute urine samples on or about June 9, 2009, July 27, 2009, September 8, 2009, October 21, 2009, and November 24, 2009;

iii. By violating the Contract's limitations on her employment, specifically by working the third shift at the North Carolina Baptist Hospital Pharmacy in or about April 2009, without approval from NCPRN, and after NCPRN had denied her request for such approval; and

iv. By failing to participate in the required sessions of continuing care in July 2009.

3. The April 10, 2010, Order placed [Witcher's] license on an indefinite suspension with the requirement that she may not petition for reinstatement unless she provides the NCBP with written notice from NCPRN that NCPRN will advocate for [her] reinstatement.

4. [Witcher] had been disciplined by a regulatory board of another state for conduct substantially equivalent for which the Board may discipline a licensee.

The Board adopted all of the ALJ's recommended findings of fact and conclusions of law without modification. However, in keeping with the Board's unwritten policy that a pharmacist with an active suspension in another state cannot practice pharmacy in Texas, the Board rejected the ALJ's recommended sanction and instead suspended Witcher's Texas license until her North Carolina license has been reinstated. The Board also required Witcher to submit to simultaneous monitoring by the TxPRN, even though the terms of both the NCPRN and TxPRN agreements require Witcher to be physically present to participate in or complete several of the **\*525** tasks, including meeting attendance and drug and alcohol screenings.

After exhausting her administrative remedies, Witcher filed a suit for judicial review in the district court of Travis County. *See* Gov't Code § 2001.176. Witcher alleged, and the district court ultimately found, that (1) an enforced suspension of Witcher's license is arbitrary and capricious in light of the facts found by the Board and its conclusions of law, (2) the Board used an unwritten policy ("reciprocal-sanctions policy") to impose an enforced suspension on Witcher's license, and (3) the

use of the reciprocal-sanctions policy was arbitrary and capricious, resulted from improper ad hoc rulemaking, and violated the formal rulemaking requirements in the Administrative Procedure Act (APA) and the TPA. *See id.* § 2001.174(2) (specifying when trial court must reverse and remand in suit for judicial review); *see also id.* §§ 2001.021–.041 (governing agency rulemaking); Tex. Occ.Code §§ 554.051–.057 (prescribing Board's rulemaking authority). The trial court did not disturb any of the Board's findings of fact and conclusions of law (which were unchallenged), but the court reversed the portion of the final order imposing an indefinite enforced suspension of Witcher's license. The court ordered the cause remanded to the Board to determine an appropriate sanction consistent with the court's findings but limited the proceedings on remand to the established record and the Board's affirmed fact findings and conclusions of law. *See* Gov't Code § 2001.174(2) (governing judicial review of agency decisions).

On appeal, the Board contends that the reciprocal sanction imposed in Witcher's case was not arbitrary and capricious because the Board has the exclusive authority to impose penalties and the sanction imposed was (1) within the range of sanctions authorized in the TPA, (2) consistent with statutory provisions that automatically deny licensing to new applicants who are subject to an active suspension in another state, and (3) consistent with the Board's policy, practice, and precedent of imposing reciprocal sanctions on Texas licensees who have been disciplined by other states.

**DISCUSSION**

In addition to having the authority to discipline a pharmacist for acts violating Texas laws and federal law applicable in Texas, the Board may also discipline pharmacists who have been disciplined by pharmacy regulatory boards in other states if the pharmacist was disciplined for conduct that would violate the TPA. *See* Occ.Code § 565.001(a)(16). If a pharmacist is found to have committed violations in another state that are substantially equivalent to Texas violations, the Board has available to it the same disciplinary options in regard to limiting a pharmacist's practice as it would have for a violation committed in Texas. *See id.* § 565.051. Those options include revocation, enforced suspension, probated suspension, and license restrictions. *See id.* Although the Board may consider an ALJ's recommendation regarding the sanction to be imposed, the Board retains discretion to determine the appropriate sanction. 22 Tex. Admin. Code § 281.60(b) (2014) (Tex. State Bd. of Pharmacy, General Guidance); *cf. Sears v. Texas State Bd. of Dental Exam'rs,* 759 S.W.2d 748, 751 (Tex.App.–Austin 1988, no writ) ("The agency is charged by law with discretion to fix the penalty when it determines that the statute has been violated.").

In selecting the appropriate sanction, the Board has formally promulgated rules setting forth guidelines to be considered in assessing sanctions for violations of the TPA. Those guidelines specify that "[t]he **\*526** ultimate purpose of disciplinary sanctions is to protect and inform the public, deter future violations, offer opportunities for rehabilitation, if appropriate, punish violators, and deter others from violations." 22 Tex. Admin. Code § 281.60(c). The guidelines are further "intended to promote consistent sanctions for similar violations." *Id.* Included in the analytical framework guiding disciplinary matters is section 281.62, a rule that prescribes several aggravating and mitigating factors that the Board may consider in assessing the appropriate disciplinary penalty.[3] Although **\*527** the Board adopted the ALJ's finding that the mitigating factors in Witcher's case outweighed the aggravating factors, it nonetheless imposed an indefinite enforced suspension of Witcher's license coterminous with the suspension of her North Carolina license.

---

[3]  Rule 281.62 provides:
>    The following factors may be considered in determining the disciplinary sanctions imposed by the board if the factors are applicable to the factual situation alleged....
>    (1) Aggravation. The following may be considered as aggravating factors so as to merit more severe or more restrictive action by the board:
>      (A) patient harm and the severity of patient harm;
>      (B) economic harm to any individual, entity, or the environment, and the severity of such harm;

(C) increased potential for harm to the public;

(D) attempted concealment of the conduct which serves as a basis for disciplinary action under the Act;

(E) premeditated conduct which serves as a basis for disciplinary action under the Act;

(F) intentional conduct which serves as a basis for disciplinary action under the Act;

(G) motive for conduct which serves as a basis for disciplinary action under the Act;

(H) prior conduct of a similar or related nature;

(I) disciplinary actions taken by any regulatory agency of the federal government or any state;

(J) prior written warnings or written admonishments from any government agency or official regarding statutes or regulations pertaining to the conduct which serves as a basis for disciplinary action under the Act;

(K) violation of a board order;

(L) failure to implement remedial measures to correct or mitigate harm from the conduct which serves as a basis for disciplinary action under the Act;

(M) lack of rehabilitative potential or likelihood for future conduct of a similar nature;

(N) relevant circumstances increasing the seriousness of the conduct which serves as a basis for disciplinary action under the Act; and

(O) circumstances indicating intoxication due to ingestion of alcohol and/or drugs.

(2) Extenuation and Mitigation. The following may be considered as extenuating and mitigating factors so as to merit less severe or less restrictive action by the board:

(A) absence of potential harm to the public;

(B) self-reported and voluntary admissions of the conduct which serves as a basis for disciplinary action under the Act;

(C) absence of premeditation to commit the conduct which serves as a basis for disciplinary action under the Act;

(D) absence of intent to commit the conduct which serves as a basis for disciplinary action under the Act;

(E) absence of prior conduct of a similar or related nature;

(F) absence of disciplinary actions taken by any regulatory agency of the federal government or any state;

(G) implementation of remedial measures to correct or mitigate harm from the conduct which serves as a basis for disciplinary action under the Act;

(H) rehabilitative potential;

(I) prior community service and present value to the community;

(J) relevant circumstances reducing the seriousness of the conduct which serves as a basis for disciplinary action under the Act;

(K) relevant circumstances lessening

responsibility for the conduct which serves as a basis for disciplinary action under the Act; and
(L) treatment and/or monitoring of an impairment.

22 Tex. Admin. Code § 281.62 (2014) (Tex. State Bd. of Pharmacy, Aggravating and Mitigating Factors).

[1] [2] [3]It is undisputed that, under the TPA, the Board had the authority to discipline Witcher and to impose an enforced suspension of her license. The overarching issue in this appeal, however, is whether the particular sanction imposed—enforced suspension of Witcher's license concurrently with the suspension of her North Carolina license—resulted from the improper application of a "rule" as that term is defined in the APA. *See* Tex. Gov't Code § 2001.003(6) (defining "rule" for purposes of APA). A rule that is not properly promulgated under mandatory APA procedures is invalid, *see El Paso Hosp. Dist. v. Texas Health & Human Servs. Comm'n,* 247 S.W.3d 709, 714 (Tex.2008), and an agency decision based on an invalid rule must be reversed and remanded to the agency if substantial rights of the appellant have been prejudiced thereby, *see* Gov't Code § 2001.174(2) (specifying when trial court must reverse and remand agency decision). Because the Board's action in this case undeniably affected Witcher's substantial rights, we focus our analysis on whether the Board applied an improperly promulgated "rule" within the meaning of the APA.

The Board does not dispute that, in the present case, it employed what it characterized as a "non-binding" policy, practice, or precedent of imposing reciprocal sanctions on Texas licensees who have been disciplined by licensing authorities of other states if the conduct would have been sanctionable if committed in Texas. It is further undisputed that the Board did not adopt this policy, practice, or precedent in accordance with the APA's formal rulemaking procedures. The Board contends, however, that no matter how the reciprocal-sanctions policy is characterized, it was not required to comply with the APA's rulemaking procedures because the policy is not a "rule" within the meaning of the APA but rather is a "statement regarding only the internal management or organization of a state agency and not affecting private rights or procedures." *See* Gov't Code § 2001.003(6)(c) (excluding such statement from APA's definition of "rule"). The Board asserts that it has the authority to develop internal practices intended to promote consistency in the assessment of administrative penalties and that the reciprocal-sanctions policy furthers that goal. Alternatively, the Board asserts that it was entitled to adopt the policy as an ad hoc rule because the Board did not have sufficient experience with the issue of suspended pharmacists to develop a "hard and fast rule." *See City of El Paso v. Public Util. Comm'n of Tex.,* 883 S.W.2d 179, 188–89 (Tex.1994) (observing that agency rule may be adopted outside formal rulemaking procedures in limited circumstances including novel situations in which agency is inexperienced).

Witcher contends, however, that the policy falls squarely within the APA's definition of a rule, was not properly promulgated under the APA, and does not qualify for any recognized exception to the requirement of formal rulemaking. *See, e.g., id.* (citing *SEC v. Chenery Corp.,* 332 U.S. 194, 202–03, 67 S.Ct. 1760, 91 L.Ed. 1995 (1947), as recognizing that agency has discretion to proceed on ad hoc or "case-by- **\*528** case" basis when issue is novel to agency or so specialized and varying as to be impossible of capture within any general rule); *see also Southwestern Bell Tel. Co. v. Public Util. Comm'n of Tex.,* 745 S.W.2d 918, 926 (Tex.App.–Austin 1988, writ denied) (recognizing ad hoc rulemaking can be appropriate to flesh out new statute or rule). Witcher also asserts that, absent the application of a rule, the Board's chosen sanction is arbitrary and capricious because, among other things, there is no rational relationship between the facts found by the Board and the sanction imposed. *See City of El Paso,* 883 S.W.2d at 184 (agency decision is arbitrary if agency fails to consider statutorily required factor, considers irrelevant factor, or weighs only relevant factors but reaches unreasonable result). Stated another way, Witcher contends that absent the application of a valid rule mandating a reciprocal sanction, such a sanction is unreasonable considering both her individual circumstances and prior Board precedent involving pharmacists who engaged in significantly more egregious substance-abuse conduct but who received probated five-year sentences upon establishing fitness to practice, as she has in this case. *See* Agreed Board Order # G–09–025 (May 5, 2010) (pharmacist who stole drugs from pharmacy, abused legal and illegal drugs, and violated terms of monitoring agreement with TxPRN given one-year active suspension followed by five-year probated suspension if fitness to practice established by end of active suspension); Agreed Board Order # G–10–020 (June 7, 2011) (involving similar facts and sanctions); Agreed Board Order # B–08–038–A (Aug. 11, 2010) (pharmacist who stole controlled substances given limited active suspension followed by five-year probated suspension if fitness to practice established by end of active suspension).

The APA defines a "rule" as follows:

"Rule":

(A) means a state agency statement of general applicability that:

i. implements, interprets, or prescribes law or policy; or

ii. describes the procedure or practice requirements of a state agency;

(B) includes the amendment or repeal of a prior rule; and

(C) does not include a statement regarding only the internal management or organization of a state agency and not affecting private rights or procedures.

Gov't Code § 2001.003(6). This Court has held that, to constitute a "rule" under this definition, "an agency statement interpreting law must bind the agency *or otherwise represent its authoritative position in matters that impact personal rights.*" *Texas Dep't of Transp. v. Sunset Transp., Inc.,* 357 S.W.3d 691, 703 (Tex.App.–Austin 2011, no pet.) (emphasis added); *see Texas Dep't of Pub. Safety v. Salazar,* 304 S.W.3d 896, 905 (Tex.App.–Austin 2009, no pet.) ("Agency statements that 'have no effect on private persons' are not considered rules.") (quoting *Brinkley v. Texas Lottery Comm'n,* 986 S.W.2d 764, 770 (Tex.App.–Austin 1999, no pet.)); *Combs v. Entertainment Publ'ns Inc.,* 292 S.W.3d 712, 722 (Tex.App.–Austin 2009, no pet.) (emphasizing that legal interpretation in Comptroller's letters would bind agency employees and "unambiguously express[ed] an intent to apply this interpretation ... in all future cases" involving private parties in similar circumstances); *Texas Alcoholic Beverage Comm'n v. Amusement & Music Operators of Tex. Inc.,* 997 S.W.2d 651, 658 (Tex.App.–Austin 1999, pet. dism'd w.o.j.) (agency memoranda to its law-enforcement agents held to constitute "rules" on that record where there was evidence that agents "*not only intend to enforce, but* **\*529** *have enforced administrative sanctions* " in accordance with memoranda (emphasis added)); *see also Brinkley,* 986 S.W.2d at 770 (observing that agency advisory opinion regarding applicable law would have no legal effect "absent a statute that so provides *or some attempt by the agency to enforce its statement against a private person* " (emphasis added)). "Although the distinction between a 'rule' and an agency statement that concerns only 'internal management or organization ... and not affecting private rights' may sometimes be elusive, the core concept is that the agency statement must in itself have a binding effect on private parties." *Slay v. Texas Comm'n on Envtl. Quality,* 351 S.W.3d 532, 546 (Tex.App.–Austin 2011, pet. denied). In that regard, a distinction exists between nonbinding evaluative guidelines that take into consideration case-specific circumstances—which have been held not to be a rule—and policies that dictate specified results without regard to individual circumstances, which have been held to be a rule. *Compare id.* at 538–39, 548 (agency's guidelines used to evaluate environmental violations for purposes of recommending penalty based on individual circumstances was not "rule" under APA), *with El Paso Hosp. Dist.,* 247 S.W.3d at 714 (by establishing cut-off date for accepting data to determine hospitals' Medicaid reimbursement rate, agency established "rule" within meaning of APA) *and Entertainment Publ'ns,* 292 S.W.3d at 721("[T]he Comptroller's statements in the March and April 2008 letters that the Comptroller will uniformly regard brochure-fundraising firms as the sellers and nonprofit entities as the sellers' agents, without regard to the individual factors considered under the Comptroller's previous guidelines, are 'generally applicable' statements for purposes of the APA.").

The Board's disciplinary order in this case, including the findings of fact and conclusions of law, leave little doubt that the Board's reciprocal-sanctions policy is a statement implementing, interpreting, or prescribing the agency's policy that affects private rights and has implications beyond the parties to the underlying proceeding. It is, therefore, a rule within the meaning of the APA. *See El Paso Hosp. Dist.,* 247 S.W.3d at 714 (stating that "general applicability" under APA references agency statements that affect interests of public at large such that they cannot be given effect of law without public input); *see also CenterPoint Energy Entex v. Railroad Comm'n of Tex.,* 213 S.W.3d 364, 369 (Tex.App.–Austin 2006, no pet.) ("Ad hoc rulemaking occurs when the agency makes a determination that has implications beyond the instant parties....").

In the final agency order in Witcher's disciplinary proceeding, the Board explained its reciprocal-sanctions policy in the following terms of general applicability:

A concurrent suspension is the appropriate disciplinary sanction because the Board can not [sic] allow pharmacists to work in Texas who have had their practice ability taken away in another state. The

integrity of all states' licensing systems is compromised if pharmacists are allowed to jump from state to state in order to avoid disciplinary action. The Board has a duty to respect the public acts of another state board. This promotes uniformity and consistency in regulation among the states.

As articulated, the Board's reciprocal-sanctions policy applies not just to Witcher but to all pharmacists licensed in more than one state. The order essentially states that the Board is *duty-bound* to impose reciprocal disciplinary action without regard to any other factor that might be **\*530** considered in individual circumstances.[4]

[4]    The dissent makes much of the fact that "the Board's representative" (i.e., a staff member) argued to the Board that it was not *required* to suspend Witcher. But in an administrative hearing, the agency's staff is simply like any other party in the proceeding, and statements by a staff member are not deemed to be statements of the agency board or commission. Here, as in every contested case, the Board spoke through its order.

[4]The general applicability of the Board's policy is underscored by the passage that followed its articulation, which further demonstrates that the reciprocal-sanctions policy was applied without regard to the specific circumstances in Witcher's case:

> Although the ALJ's recommendation [of a five-year probated sentence with monitoring] may satisfy concerns the Board would have regarding [Witcher's] impairment, it would not address the fact that [Witcher] is barred from practicing pharmacy by a regulatory board of another state for conduct substantially equivalent to conduct described under the Texas Pharmacy Act.

Moreover, contrary to the stated rationale for the reciprocal-sanctions policy, the Board adopted the ALJ's finding that Witcher was "not seeking to evade compliance with the reinstatement provisions of the North Carolina order, but only to avoid the considerable financial hurdles she would face to achieve that compliance." Significantly, although the Board found that requiring Witcher to participate in the NCPRN program as a precondition to having the suspension of her North Carolina license lifted is not reasonably possible given her current circumstances, it nonetheless ordered her to do just that.[5] These findings and conclusions support the construction of the Board's policy as a rule that applies irrespective of the circumstances in an individual case.

[5]    The Board adopted the ALJ's finding that it would not be "feasible" for Witcher to comply with the NCPRN precondition to reinstatement. "Feasible" is defined to mean "capable of being done ... possible of realization," "capable of being managed, utilized or dealt with successfully," and "reasonable, likely." *Webster's Third New Int'l Dictionary: Unabridged* 831 (2002). "An agency's decision is arbitrary or results from an abuse of discretion if the agency ... weighs only relevant factors that the legislature directs it to consider but still reaches a completely unreasonable result." *City of El Paso v. Public Util. Comm'n of Tex.,* 883 S.W.2d 179, 184 (Tex.1994). Thus, even if we were to agree with the Board that its policy is not a rule under the APA, the imposition of a requirement that the Board itself found to be virtually impossible to satisfy would suggest that the Board's decision is arbitrary and capricious. If the Board applied a properly promulgated rule dictating such a consequence, however, it would be more difficult to conclude that the sanction lacked a rational basis. *Cf. Pierce v. Texas Racing Comm'n,* 212

> S.W.3d 745, 753–54 (Tex.App.–Austin 2006, pet. denied) (agency did not abuse its discretion in applying zero-tolerance policy when racehorse tested positive for banned substance and unchallenged "guidelines" mandated loss of purse for type of violation involved).

The general applicability of the reciprocal-sanctions policy and its impact on the interests of the public at large is further evident from the evidence and testimony admitted at the hearing before the ALJ. At the evidentiary hearing, Carol Fisher, the Board's Director of Enforcement, testified that reciprocal discipline is the "Board's policy" and the "standard sanction." As the source of the policy, Fisher cited the case of *In re Nealy,* in which the Board had previously articulated its reciprocal-sanctions policy in the same terms of general applicability in a particularly egregious case in which a pharmacist who received his Texas license via reciprocity with Louisiana had a long history of violating the pharmacy laws of both states. *See* **\*531** *Texas State Bd. of Pharmacy v. Nealy,* Board Order # N–03–005, SOAH Docket No. 515–04–6488 (2005). After nearly 15 years of suspensions, revocations, reinstatements, and continuing violations, the Board suspended Nealy's license concurrently with an active suspension of his Louisiana license, and stated:

> In previous cases with similar facts, the Board has typically imposed disciplinary action mirroring the action by another state board of pharmacy. The policy the Board considers in taking such action is to prevent licensees from escaping disciplinary action in one state by coming to Texas. If another state board of pharmacy has prohibited a pharmacist from practicing, so long as there is no evidence that a pharmacist has not been afforded due process in the other state, *the Board believes it is sound policy for the pharmacist to be prevented from practicing in Texas until the pharmacist resolves the restrictions on his license in the other state.* Otherwise a pharmacist would suffer no negative consequences from violations of the law in another state. Other pharmacists with licenses in Texas and in another state might assume that similar violations would not merit serious consideration by the Board.

*Id.* (emphasis added). Although the factual circumstances and extensive disciplinary history in *Nealy* would have justified the imposition of a reciprocal sanction without regard to the enunciated policy, the Board made a point of articulating the policy itself as the basis for imposing a reciprocal sanction. As the Board's staff noted in its written closing argument in Witcher's case: "It is clear from the order [in *Nealy* ] that [the Board] based the selection of the sanction on the licensee's disciplinary status in the other state and not upon his prior disciplinary history with [the Board]."

Despite the stark disparity in individual circumstances between Witcher's case and the facts in *Nealy,* Fisher testified that she did not expect that the Board would do anything differently from what it had done in *Nealy* because the fact of an active suspension of Witcher's North Carolina license was dispositive of the appropriate sanction. Fisher repeatedly testified to the effect that individual circumstances do not matter. In this regard, the reciprocal-sanctions policy is analogous to agency policies that this Court in *Combs v. Entertainment Publications, Inc.,* 292 S.W.3d 712 (Tex.App.–Austin 2009, no pet.), and the supreme court in *El Paso Hospital District v. Texas Health & Human Services Commission,* 247 S.W.3d 709 (Tex.2008), found to be rules under the APA.

In *Entertainment Publications,* a brochure-fundraising firm that contracted with tax-exempt schools to sell merchandise and food products to raise money for student groups challenged an agency policy that would require it to collect and remit tax on its sale of those goods to the schools. *Entertainment Publ'ns,* 292 S.W.3d at 715. Historically, the brochure-fundraising firm had structured its transactions with its customers to take advantage of the exemption to avoid collecting sales taxes on its initial sale of goods to those customers. *Id.* at 716. The tax-exempt customers, in turn, could use a different provision of the tax code to avoid collecting sales tax on the items when sold to the ultimate consumer, but only if the tax-exempt customer was considered to be the "seller" of the merchandise. *Id.* To determine who was the seller in such transactions, the Comptroller had historically applied several criteria to analyze the actual substance of the relevant transaction. That policy had been reflected in an earlier letter ruling, which a representative of the Comptroller's office testified accurately stated the Comptroller's policy **\*532** as to brochure fundraising at the time it was issued. However, the Comptroller subsequently issued two letters in which the policy was changed from the factor-based approach to a bright-line rule that the fundraising firm would always be considered the "seller."

Like the Board in the present case, the Comptroller in *Entertainment Publications* argued that the letters were merely advisory opinions, not binding instructions, concerning her future enforcement of the sales tax. This Court disagreed, holding:

> There is no question in this case that the [Comptroller's] March and April 2008 letters are statements implementing, interpreting, or prescribing law or policy. As the Comptroller's witness testified, these letters communicated the Comptroller's intention to apply section 151.024 in all cases involving brochure fundraising firms, thereby interpreting the tax code to mean that such firms are, for purposes of collecting and remitting sales tax, always the "sellers" of the taxable items.

*Id.* at 721. The Court further concluded that the policy was "generally applicable" within the meaning of the APA because

> the Comptroller's statements in the March and April 2008 letters that the Comptroller will uniformly regard brochure-fundraising firms as the sellers and nonprofit entities as the sellers' agents, without regard to the individual factors considered under the Comptroller's previous guidelines, are "generally applicable" statements for purposes of the APA. These interpretations apply not only to [the appellee] and the tax-exempt groups with which it conducts business, but to all brochure-fundraising firms engaging in business across the state.

*Id.* at 721–22.

As in *Entertainment Publications,* the present case involves a policy that establishes a bright-line rule that is applicable without regard to individual circumstances that could be considered under section 281.62 of the Board's rules. In addition, both the terms of the final order and the testimony by the Board's Enforcement Director during the disciplinary proceeding reveal the Board's intent to apply the policy not just to Witcher but also prescriptively to others.

In *El Paso Hospital District,* the Texas Supreme Court considered whether the Health & Human Services Commission's (HHSC) data-collection method for calculating prospective Medicaid inpatient service rates was an agency rule as defined by the APA. 247 S.W.3d at 711. In determining the reimbursement rate, HHSC employed a policy of accepting data from claims paid only through a specified date in the year following the base year. *Id.* at 713. Claims for all patients admitted during the base year, but not paid by the cut-off date, were not included in determining the prospective reimbursement rates. *Id.* This policy resulted in the exclusion of data for services actually performed in the base year if the claims were not paid before the cut-off date. *Id.* The supreme court rejected HHSC's argument that the cut-off date was not a rule itself but rather an interpretation of its own base-year rule. *Id.* at 714. The court concluded that the cut-off rule fell squarely within the APA's definition of a rule because (1) it implemented HHSC's policy and described its data-collection procedure and (2) it applied to all hospitals receiving reimbursement for inpatient Medicaid services. *Id.*

The court observed that HHSC's rules provided that it would use a base year, defined as "[a] 12–consecutive–month period of claims data," to calculate the Hospitals' rates and that the effect of the cut-off **\*533** date was to modify the base-year rule by controlling the data HHSC would use from that base year. *Id.* at 714 (quoting 1 Tex. Admin. Code § 355.8063(b)(5)). The court also determined that the cut-off date did not concern the agency's internal management or organization but rather affected the Hospitals' private rights. *Id.* at 714–15. Consequently, the court said, the Hospitals were "entitled to have their prospective reimbursement rates determined according to the formula set out in HHSC's rules." *Id.* Because the cut-off date was a rule that had not been properly promulgated, it was found to be invalid. *Id.*

In the present case, the reciprocal-sanctions policy the Board cited in its final order is analogous to the cut-off date in *El Paso Hospital District* in that it establishes one of the aggravating factors in section 281.62 of the Board's rules—specifically, subsection (1)(I) pertaining to disciplinary actions taken by any state—as an outcome-determinative factor. Although use of the factors in section 281.62 is discretionary, the elevation of one of those factors to case-dispositive status either constitutes a modification of that rule or the establishment of a new rule.

The Board argues that the reciprocal-sanctions policy is like the evaluative penalty guidelines this Court concluded did not constitute a rule in *Slay v. Texas Commission on Environmental Quality,* 351 S.W.3d 532, 548 (Tex.App.–Austin 2011, pet.

denied). That case—unlike the present case, *Entertainment Publications,* and *El Paso Hospital District*—involved guidelines that required evaluation of case-specific factors in formulating a recommendation for an appropriate sanction. *See id.* at 537–42. Although the guidelines considered in *Slay* were intended to achieve a level of consistency when similar circumstances were present, they did not require a specific result in all cases. There was no per se penalty dictated by the guidelines; rather, the agency's staff was required to use a formalized analytical structure to evaluate the case, but the structure did not direct a particular outcome. *Id.* at 546–48. That is the opposite of the circumstances in the present case.

Considering the foregoing, we conclude that construing the Board's policy as a "rule" is consistent with the supreme court's instruction that we consider the intent of the agency, the prescriptive nature of the policy, and the context in which the agency statement was made. *Cf. Entertainment Publ'ns,* 292 S.W.3d at 722 (citing *Texas Educ. Agency v. Leeper,* 893 S.W.2d 432, 443 (Tex.1994)). The Board has unambiguously expressed its intent to apply the reciprocal-sanctions policy to all Texas pharmacists licensed to practice in other states, regardless of whether the particular circumstances of each case might result in a different sanction if the aggravating and mitigating factors in agency rule 281.62 were considered. *Cf.* 22 Tex. Admin. Code § 281.62 (2014) (Tex. State Bd. of Pharmacy, Aggravating and Mitigating Factors) (listing factors that "may be considered in determining the disciplinary sanctions imposed by the board if the factors are applicable to the factual situation alleged"); *cf. also Entertainment Publ'ns,* 292 S.W.3d at 722 (construing Comptroller's letters that changed policy from "seller versus agent-for-seller" analysis to bright-line standard). Without doubt, the Board's policy "represent[s] its authoritative position in matters that impact personal rights."[6] *See Sunset Transp., Inc.,* 357 S.W.3d at 703.

---

[6]  After issuing its final order in Witcher's case, the Board, using notice-and-comment rulemaking procedures, formally promulgated a rule requiring the imposition of reciprocal sanctions when a Texas licensee has been disciplined by the regulatory board of another state:

§ 281.67. Sanctions for Out–of–State Disciplinary Actions

(a) When determining the appropriate sanction for a disciplinary action taken by a regulatory board of another state under § 565.001(a)(16), § 565.002(a)(13), or § 568.003(a)(13), the board has determined that the following shall be applicable for all types of licensees and registrants for such licenses and registrations issued by the board.

(1) If the other state's disciplinary action resulted in the license or registration being restricted, suspended, revoked, or surrendered, the appropriate sanction shall be the same as the sanction imposed by the other state, such that the licensee or registrant has the same restriction against practice in Texas.

(2) If the license or registration is subject to any other type of disciplinary sanctions, the appropriate sanction shall be equivalent to or less than that imposed by the other state unless contrary to board policy.

(b) The sanctions imposed by this section can be used in conjunction with other types of disciplinary actions, including administrative penalties, as outlined in this chapter.

(c) When a licensee or registrant has additional violations of the Texas Pharmacy Act, the board shall consider imposing additional more severe types of disciplinary sanctions, as deemed necessary.

22 Tex. Admin. Code § 281.67 (2014) (Texas State Bd. of Pharmacy, Sanctions for Out–of–State Disciplinary Actions). In adopting that rule, the

Board stated that the addition of section 281.67 "*clarifies* the sanctions for disciplinary actions taken by a regulatory board of another state." 37 Tex. Reg. 4046 (June 1, 2012) (emphasis added) (adopting new section 281.67 of Board's rules); 37 Tex. Reg. 2145 (Mar. 30, 2012) (emphasis added) (proposing new section 281.67). This statement of the formal rule as a "clarification" might be construed to further support the prescriptive nature and general applicability of the reciprocal-sanctions policy prior to its formal adoption as a rule. But even if it is not, it at least demonstrates that the policy was capable of being captured in a rule, thus rendering one of the recognized exceptions to the APA's formal rulemaking procedures inapplicable. *See City of El Paso,* 883 S.W.2d at 188–89 (observing that agency rule may be adopted outside formal rulemaking procedures in limited circumstances including when issue is so specialized and varying as to be impossible of capture within general rule).

[5] **\*534** Furthermore, having previously articulated the reciprocal-sanctions policy in *Nealy* and as it is rearticulated in Witcher's case, the Board is not entirely free to disregard it in future cases. Although an " 'agency is not bound to follow its decisions in contested cases in the same way that a court is bound by precedent.' ... [,] an agency is required by courts to 'explain its reasoning when it "appears to the reviewing court that an agency has departed from its earlier administrative policy or there exists an apparent inconsistency in agency determinations." ' " *Austin Chevrolet, Inc. v. Motor Vehicle Bd.,* 212 S.W.3d 425, 438 (Tex.App.–Austin 2006, pet. denied) (quoting *Flores v. Employees Retirement Sys. of Tex.,* 74 S.W.3d 532, 533–34 (Tex.App.–Austin 2002, pet. denied)).[7]

7    In light of the facts the Board adopted in Witcher's case and the Board's acknowledgment that the underlying rationale of the policy is not strictly applicable to Witcher's individual circumstances, it is difficult to conceive of a scenario in which the Board would not apply the policy. At oral argument, the only scenario the Board's counsel could hypothesize was one for which no discipline would be authorized under the TPA in the first instance—that is, counsel suggested that the Board would not impose reciprocal discipline if a pharmacist's license was suspended in another state for something absurd, like wearing a red t-shirt. However, such conduct would not be sanctionable under the TPA, and accordingly the reciprocal-sanctions policy would not be implicated. *See* Tex. Occ.Code § 565.001 (providing grounds for disciplining Texas licensee).

[6]The foregoing analysis leads us to conclude that the Board's informally announced reciprocal-sanctions policy constitutes an agency "rule" as that term is **\*535** defined in the APA. It is well established that a rule that is not adopted in accordance with the APA's rulemaking procedures is typically invalid. *El Paso Hosp. Dist.,* 247 S.W.3d at 715 (citing Gov't Code § 2001.035(a)). In exceptional cases, however, an agency may choose to formulate and enforce a general requirement through a decision in a particular case. *Rodriguez v. Service Lloyds Ins. Co.,* 997 S.W.2d 248, 255 (Tex.1999). Adjudicative rulemaking has been recognized as appropriate in limited circumstances in which an agency is confronted with (1) an issue of first impression, (2) a new or amended statutory scheme or administrative rules, or (3) an issue that cannot be adequately captured within the bounds of a general rule because the problem is so specialized and varying in nature. None of those circumstances is present in this case.[8] Accordingly, the rule embodied in the reciprocal-sanctions policy is invalid and should not have been

applied in Witcher's case. The inclusion of general language in the final order that the sanction imposed "best reflects the Board's determination of the seriousness of the violation and is the best sanction to deter future violations" neither negates the rule's obvious application in Witcher's case nor suggests an alternative basis for the Board's decision. The trial court did not err in reversing the Board's order and remanding the cause to the Board for reconsideration of the appropriate sanction under properly promulgated rules.

[8]     We are not persuaded by the Board's assertion that Witcher's case presented a novel issue with which the Board was unfamiliar. The case of *In re Nealy,* which references the existence of other cases involving reciprocal sanctions, refutes such a claim, as does Fisher's testimony.

### ON MOTION FOR REHEARING

In its initial appellate briefing, the Board's principal arguments were that (1) the Board's order did not contain or adopt a "rule" at all, and (2) if it did, the rule fell within one of the narrow circumstances in which ad hoc rulemaking is permitted. The Board has now filed a motion for rehearing raising wholly new issues and arguments. Although we conclude that the motion for rehearing does not require that we alter the substance of our original opinion, we add this supplemental opinion to address some of the new arguments raised in the motion.

It is undisputed that, at all relevant times, there was no statute or regulation that mandated the imposition of an identical reciprocal sanction for a Texas licensee whose out-of-state pharmacist's license had been suspended or revoked by another state. Rather, the Board's formally adopted regulations provided a number of aggravating and mitigating factors to be considered in determining the appropriate disciplinary sanction in an individual disciplinary proceeding. *See* 22 Tex. Admin. Code § 281.62 (providing evaluative factors in cases involving non-criminal conduct). The disciplinary action taken by another jurisdiction was but one of those factors. *Id.* § 281.62(1)(I). The central issue in this case is whether the Board improperly engaged in ad hoc rulemaking (also referred to as adjudicative rulemaking) when it applied a general policy that requires, as a standard sanction, the imposition of a reciprocal sanction without regard to any other factor identified in the applicable regulation and without regard to whether the rationale underlying the policy is actually implicated by the affected pharmacist's individual circumstances.

An ad hoc rule is a general statement of law or policy that is made in the context of a contested case and the impact of which **\*536** will extend to persons beyond those who are parties to the proceeding at hand.

> [T]he Texas Supreme Court and the Austin Court of Appeals have both recognized that an agency may formulate a rule for the first time within a contested case proceeding. Such act of rulemaking has been labeled ad hoc adjudication or ad hoc rulemaking or case by case rulemaking.
>
> ... [A]n ad hoc "rule" is not a mere finding of fact or interpretation of a statutory term but it is an agency formulating policy subject to its delegated rule making power that sets forth a standard that is binding on the parties before the agency.

2 Ronald L. Beal, *Texas Administrative Practice and Procedure* § 10.1 at 10–2 to 10–3 (Supp. 6/2009) (footnotes omitted).

> While ad hoc rulemaking is an exercise of legislative power, the rules are developed by the "common law" method [i.e., within a contested case] that then imposes the rules by stare decisis and precedent. While the particular contested case order which adopted an ad hoc rule is only directly applicable to those to whom it has been applied, the agency will be required to apply it to future parties with substantially similar conditions.

1 Beal, *supra* § 2.4 at 2–58 (Supp. 6/2010).

The present case presents a quintessential example of ad hoc rulemaking. Pursuant to the APA's notice-and-comment rulemaking procedures, the Board had formally adopted a rule setting forth 15 aggravating factors and 12 mitigating factors that could be considered in determining the appropriate sanction to be assessed against a pharmacist who had violated Board rules. *See* 22 Tex. Admin. Code § 281.62. Nonetheless, in this case the Board's contested-case order stated that, as a matter of policy, one of the aggravating factors listed in Rule 281.62(1) would be dispositive in all cases in which that factor was present, regardless of the presence or absence of any of the other 26 enumerated factors. *Id.* at 281.62(1)(I). This statement was announced as a matter of general policy. This is the essence of an ad hoc rule. *See* 1 Beal, *supra* at § 2.4 (Supp. 6/2010); Ron Beal, *Ad Hoc Rulemaking in Texas: The Scope of Judicial Review,* 42 Baylor L.Rev. 459, 461–67 (1990); Ron Beal, *Ad Hoc Rulemaking: Texas Style,* 41 Baylor L.Rev. 101, 102–07 (1989); *see also* Ron Beal, *The APA and Rulemaking: Lack of Uniformity within a Uniform System,* 56 Baylor L.Rev. 1, 13–18 (2004).

The main thrust of the Board's motion for rehearing is that the Board (and, by extension, any administrative agency) has virtually unrestricted discretion to engage in ad hoc rulemaking. In advancing this position, which was not previously made to this Court, the Board relies largely on two arguments, which were likewise not previously made to this Court. First, the Board asserts that certain statements in *Rodriguez v. Service Lloyds Ins. Co.,* 997 S.W.2d 248 (Tex.1999), in which the Texas Supreme Court recognized severe limitations on an agency's authority to engage in ad hoc rulemaking, are mere "dictum" that can safely be ignored. Second, the Board asserts that, in any event, the holding in *Rodriguez* was undercut if not overturned—sub silentio—by the supreme court's later opinion in *Railroad Commission of Tex. v. WBD Oil & Gas Co.,* 104 S.W.3d 69 (Tex.2003). We disagree on both counts.

### *Rodriguez v. Service Lloyds Ins. Co.*

The supreme court in *Rodriguez* emphasized the importance of requiring agencies to adhere to the notice-and-comment rulemaking procedures mandated by the APA: **\*537** "A presumption favors adopting rules of general applicability through the formal [notice-and-comment] rulemaking procedures as opposed to administrative adjudication. Allowing an agency to create broad amendments to its rules through administrative adjudication rather than through its rulemaking authority undercuts the Administrative Procedure Act (APA)." 997 S.W.2d at 255. The court held that agencies could utilize ad hoc rulemaking *only in narrow circumstances:*

> **In exceptional cases,** an agency may choose to formulate and enforce a general requirement through a decision in a particular case. An agency may do this when using the [notice-and-comment] rulemaking procedure would frustrate the effective accomplishment of the agency's functions. Adjudicative rulemaking may be appropriate, for example, **when the agency is construing a new rule** or when a dispute deals with a problem that requires ad hoc resolution because **the issue cannot be captured within the bounds of a general rule.** The agency's discretionary choice to rely on adjudication is subject to judicial review and revision.

*Id.* (citations omitted) (emphases added). In recognizing stringent limitations on an agency's power to use ad hoc rulemaking, the *Rodriguez* court did not make new law and did not go out on a jurisprudential limb.[9] Rather, the court upheld *the plain language of the APA* as prescribing the method and manner by which a state agency can adopt generally applicable statements of law, policy, procedure, or practice. *See* Tex. Gov't Code §§ 2001.0225–.034 (governing agency rulemaking); *cf. generally Texas Dep't of Protective & Regulatory Servs. v. Mega Child Care, Inc.,* 145 S.W.3d 170, 173, 199 (Tex.2004) (holding that APA's plain language controls in absence of express conflict with agency's enabling statute or unless clear evidence exists of contrary legislative intent). An improperly adopted rule is voidable. Tex. Gov't Code § 2001.035(a).

---

[9]     *See, e.g., SEC v. Chenery Corp.,* 332 U.S. 194, 202–03, 67 S.Ct. 1760, 91 L.Ed. 1995 (1947) (observing that agencies are less justified in resorting to ad hoc procedures in lieu of promulgating general rules, but

recognizing that, to avoid "stultify[ing] the administrative process," ad hoc decision making would be warranted in appropriate circumstances including reasonably unforseeable situations, inexperience with particular problems, or inability to capture problem within bounds of general rule); *Railroad Comm'n of Tex. v. Lone Star Gas Co.,* 844 S.W.2d 679, 689 (Tex.1992) (noting that agency has "informed discretion" in making decision to proceed via rulemaking or ad hoc adjudication but stating that *rulemaking should be utilized* except " '[when] there is a danger that its use would frustrate the effective accomplishment of the agency's function'"); *Amarillo Indep. Sch. Dist. v. Meno,* 854 S.W.2d 950, 958 (Tex.App.–Austin 1993, writ denied) ("exceptional cases" may arise in which "agency may justifiably choose, in its discretion to formulate and enforce a general requirement [ad hoc]" rather than by formal rulemaking, including construing new rule or statute or matter incapable of articulation as general rule); 1 Frank E. Cooper, *State Administrative Law* 177–85 (1965) (observing that legislature delegates rulemaking power to agency in expectation that it will ordinarily employ that power to formulate and adopt requirements of general applicability).

In its motion for rehearing in the present case, the Board attempts to dismiss these holdings in *Rodriguez* as dictum. They are not. In *Rodriguez,* the Texas Workers' Compensation Commission had formally adopted a rule requiring that an initial impairment rating be disputed by the claimant within 90 days after the rating was assigned. 997 S.W.2d at 252. Over the years, however, the Commission had purported to create ad hoc exceptions to the 90–day deadline. *Id.* at 254–55. The claimant in *Rodriguez* sought to take advantage of those exceptions. The supreme **\*538** court rejected the agency's ad hoc exceptions as improper, holding that the formally adopted rule would control:

> Here, we see no reason to overturn the presumption favoring the fairness and public participation that accompany formal rulemaking under the APA. The 90–day Rule certainly is not new. In addition, the Commission could have easily formulated exceptions in the language of a general rule. In fact, the Commission appeals panels formulated their exceptions in the language of a general rule....

*Id.* at 255 (citations omitted).

[7]Thus, the *Rodriguez* opinion not only *announced* the standard by which courts should determine the validity of ad hoc rules, it specifically *applied* that standard in evaluating—and rejecting—the Commission's ad hoc exceptions. Far from being peripheral to the court's holding, the *Rodriguez* opinion's references to the exceptional circumstances needed to make ad hoc rulemaking permissible ("construing a new rule" or addressing an "issue [that] cannot be captured within the bounds of a general rule") were central to the court's decision. Accordingly, the relevant statements in *Rodriguez* were not dictum. *See* Bryan A. Garner, *A Dictionary of Modern Legal Usage* 274 (2nd ed.1995) (quoting Judge Posner's definition of "dictum" as "a statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding ...." contained in *Sarnoff v. American Home Prods. Corp.,* 798 F.2d 1075, 1084 (7th Cir.1986)). We therefore continue to be bound by the holdings in *Rodriguez,* which can only be read as affirming that ad hoc rulemaking is a narrow exception to the APA's mandate that agency rules be adopted through notice-and-comment rulemaking procedures.

*Railroad Commission of Texas v. WBD Oil & Gas Co.*

The second major argument raised in the Board's motion for rehearing is that the supreme court's holding in *Rodriguez* described above was undercut by the court's later opinion in *Railroad Commission of Tex. v. WBD Oil & Gas Co.,* 104 S.W.3d 69 (Tex.2003). Even a casual reading of *WBD,* however, shows that it is inapplicable to the present case. The sole issue in *WBD* was whether field rules adopted by the Railroad Commission after a trial-type proceeding (which the supreme court held to be a contested case) could be challenged under section 2001.038 of the APA or instead had to be challenged through contested-case procedures. *See id.* at 74. Section 2001.038 provides that "[t]he validity or applicability of a rule ... may be determined in an action for declaratory judgment if it is alleged that the rule or its threatened application interferes with or impairs, or threatens to interfere with or impair, a legal right or privilege of the plaintiff." Tex. Gov't Code § 2001.038(a). The court held that the field rules at issue could not be challenged under section 2001.038 but had to be challenged through the procedure for challenging a contested-case order:

> Thus, as we read the APA, judicial review of orders adopting field rules should be the same as in other contested case decisions....

> Accordingly, we conclude that Commission field rules adopted in a contested case like those involved here cannot be challenged in a declaratory judgment action under section 2001.038 of the APA.

*WBD,* 104 S.W.3d at 79. Nowhere in the supreme court's *WBD* opinion is ad hoc rulemaking mentioned. Nowhere in the opinion is *Rodriguez* cited, much less discussed **\*539** or overruled. In short, ad hoc rulemaking was never an issue in *WBD.*

The procedural posture of the present case, on the other hand, is radically different. Here, Witcher **did** use contested-case procedures to challenge the Board's ad hoc rule. She timely filed a motion for rehearing with the Board, complaining of the ad hoc reciprocal-sanction rule. When that was overruled, she timely filed a suit for judicial review, again complaining of the ad hoc rule. *See* Tex. Gov't Code §§ 2001.171, .174–76. The trial court agreed, ruling that "the Board's use of an unwritten policy to impose an enforced suspension of Ms. Witcher's license is 1) arbitrary and capricious, 2) improper ad-hoc rulemaking, and 3) a violation of the APA and Pharmacy Act's rulemaking requirements." Thus, as stated above, the dispositive issues in this appeal are (1) whether the Board's contested-case order applied an ad hoc "rule," and (2) if it did, whether the circumstances fall within one of the narrow exceptions in which ad hoc rulemaking is permitted. *WBD* does not control these questions.

Nonetheless, the Board appears to contend in its motion for rehearing that *WBD* stands for the proposition that (1) agencies generally have unqualified discretion to adopt rules either by notice-and-comment rulemaking or by ad hoc adjudication and (2) an agency statement that "implements, interprets, or prescribes law or policy" adopted ad hoc in an adjudicative proceeding can never be a statement of general applicability as required to meet the APA's definition of a "rule." *See* Tex. Gov't Code § 2001.003(6) (defining "rule" for purposes of APA). Neither of these broad propositions is supported by the applicable statutory schemes or the relevant jurisprudential environment.

We will not revisit the second proposition because our original opinion adequately explains our conclusion that the reciprocal-sanctions policy meets the APA's definition of a rule and we discern nothing in *WBD* that alters that conclusion.[10] Our discussion of the first proposition **\*540** proceeds from our conclusion that the reciprocal-sanctions policy is a rule that was not promulgated under the APA's mandatory rulemaking procedures before being applied to dictate the sanction imposed in Witcher's case.

[10]    We reiterate our initial observations that the Board's disciplinary order included affirmative statements of general applicability that were prospective in operation and based on general policy considerations rather than Witcher's individual circumstances. *Cf. Combs v. Entertainment Publ'ns Inc.,* 292 S.W.3d 712, 724 & n. 8 (Tex.App.–Austin 2009, no pet.) (agency not precluded from making individual determination, on case-by-case basis, but pronouncement of policy applicable to all similarly situated businesses without regard to individual circumstances constituted "rule" under APA). The evidence established that the Board

considers a reciprocal sanction to be the "standard sanction." Moreover, and perhaps most importantly, the indefinite-suspension sanction the Board imposed against Witcher's Texas license is so at odds with the Board's fact findings as to be inexplicable without the application of an outcome-determinative factor not found in the enabling statute or governing regulations. Without resort to such a rule, the sanction imposed is not supported by basic underlying fact findings and the Board's own precedent. Further, in addition to espousing a general policy to justify the selection of a standard sanction in reciprocal disciplinary scenarios, the Board's decision only sets forth justifications or explanations that contradict its fact findings. The Board's motion for rehearing presents no reason for us to reconsider our prior holding that the reciprocal-sanctions policy meets the APA's definition of a "rule."

> We do not read *WBD* as holding that contested-case proceedings can never give rise to a statement that meets the APA's general applicability standard. In that case, the supreme court concluded that the field rules emanating from a contested-case proceeding were not statements of general applicability *because they affected only individual interests in a specific field and had no impact on other oil and gas fields in the state. See WBD,* 104 S.W.3d at 79. That is not the situation presented here; the policy the Board articulated and applied in this case has statewide ramifications that extend far beyond the specific party to the contested-case proceeding.

In a nutshell, (1) the APA contains a statutory mandate governing agency adoption of rules of general applicability; (2) the Board's enabling statute, the TPA, contains no language that limits the APA's reach or expands the Board's rulemaking authority; and (3) to the extent the Board arguably has discretion to use its limited statutory adjudicatory authority to adopt ad hoc rules of general applicability, the facts of this case do not support the exercise (through any recognized or proffered exception to APA rulemaking) of any such discretion in contravention of the APA's plain language and the presumption favoring APA rulemaking.

[8]As a general proposition, "[u]nless mandated by statute, the choice by an agency to proceed by general rule or by ad hoc adjudication is one that lies primarily in the informed discretion of the agency." *State Bd. of Ins. v. Deffebach,* 631 S.W.2d 794, 799 (Tex.App.–Austin 1982, writ ref'd n.r.e.) (citing *SEC v. Chenery Corp.,* 332 U.S. 194, 67 S.Ct. 1760, 91 L.Ed. 1995 (1947)). The APA is a statute that mandates the procedures by which agencies are permitted to adopt rules, and in *Mega Child Care,* the Texas Supreme Court affirmed the unremarkable proposition that the APA must be applied according to its plain language absent an express conflict with an agency's enabling statute. 145 S.W.3d at 199 ("[I]n the absence of express statutory language [in the agency's enabling statute] prohibiting judicial review, a legislative intent to prohibit judicial review [otherwise afforded under the APA] must be established by specific legislative history or other reliable evidence of intent."). There is nothing in the TPA that support's the conclusion that the TPA's general grant of rulemaking authority or limited grant of adjudicatory authority categorically trumps the APA's mandate that agencies are to adopt rules of general applicability via notice-and-comment rulemaking.

With regard to rulemaking, the TPA states:

  (a) The board shall adopt rules consistent with this subtitle for the administration and enforcement of this subtitle.

  (b) If the board determines it necessary to protect the health and welfare of the citizens of this state, the board may make a

rule concerning the operation of a licensed pharmacy located in this state applicable to a pharmacy licensed by the board that is located in another state.

(c) The board shall adopt rules regarding records to be maintained by a pharmacist performing a specific act under a written protocol.

(d) The board by rule shall specify minimum standards for professional responsibility in the conduct of a pharmacy.

Tex. Occ.Code § 554.051. Thus, the TPA authorizes the Board to adopt rules but is silent with regard to the method or methods by which the Board may do so. The APA, on the other hand, is not silent about how agencies are required to adopt rules. *See* Tex. Gov't Code §§ 2001.0225–.036. Nevertheless, relying on the presumption that agencies have some discretion to select the method for adopting rules in the absence of a statutory prohibition, the Board now argues that the absence of an *express prohibition against* adjudicative rulemaking is all that is required to supersede the APA's plain directive. Such a position, however, is contrary to bedrock principles of statutory construction, which eschew reliance on extrinsic construction **\*541** aids that alter a statute's plain meaning. *See Shook v. Walden,* 304 S.W.3d 910, 917 (Tex.App.–Austin 2010, no pet.) (courts may resort to rules of construction or extrinsic aids only when statutory text is ambiguous); *cf. generally Mega Child Care,* 145 S.W.3d at 173 (holding that plain language of APA provides independent right to judicial review when agency's enabling statute neither specifically authorizes nor specifically prohibits judicial review).

In the present case, the TPA does not contain any language that limits the APA's mandate that agencies use notice-and-comment procedures to adopt rules, including making them available for public inspection and comment. *See* Tex. Gov't Code §§ 2001.004–.005, .0225–.034. Nor is there any other evidence of clear legislative intent to override or limit the APA's scope or to expand the Board's rulemaking authority.[11] Applying the APA as written, that statute provides the procedures required for the Board to adopt rules or regulations of general applicability. Although narrow exceptions have been recognized where necessary to allow the agency to accomplish its functions, the Board has cited none that would apply under the facts of this case, as we previously discussed and further explain here.

[11]     To the contrary, when the TPA was enacted in 1981, the statute expressly required the Board to adopt rules in accordance with the APA. *See* Act of May 28, 1981, 67th Leg., R.S., ch. 255, § 16(a), 1981 Tex. Gen. Laws 638, 645 ("The rules shall be adopted, amended, or repealed in accordance with the Administrative Procedure Act."). During a nonsubstantive codification in 1999, the foregoing language referring to compliance with the APA was removed. *See* Act of May 28, 1999, 76th Leg., R.S., ch. 388, § 1, 1999 Tex. Gen. Laws 1431, 1949 (current version at Tex. Occ.Code § 554.051). But according to a "Revisor's Note" to the revised statute, the sentence requiring adoption of rules under the APA was deleted as "unnecessary" because the APA, by its express terms, applies to all agencies: "The revised law omits as unnecessary the portion of [the prior statute] that requires rules to be adopted, amended, or repealed in accordance with the Administrative Procedure Act. Chapter 2001, Government Code, requires each agency to follow that law in adopting rules." *Id.* (Revisor's Note). Notwithstanding this explanation, the Board asserts that the deletion of the reference to the APA means that, under the TPA, the Board has complete discretion to adopt rules in individual adjudications without regard to the APA. We disagree.

    Although a revisor's note cannot vary the plain language of a statute, the ability to proceed via "adjudicative rulemaking" is not included anywhere in the TPA. Therefore, the discretion to forgo

compliance with APA rulemaking procedures could exist only by resorting to an extra-textual presumption that would create a conflict with the APA's plain language. Harmonizing the TPA and APA to avoid such a conflict—and consistent with the legislature's intent in adopting both statutes—the APA must be construed to govern the Board's rulemaking activities in the absence of an express provision in the TPA to the contrary or clear evidence of legislative intent to restrict the APA's scope and applicability vis-á-vis the Board. *Cf. Texas Dep't of Protective & Regulatory Servs. v. Mega Child Care, Inc.,* 145 S.W.3d 170, 199 (Tex.2004) ("In the absence of express statutory language prohibiting judicial review, a legislative intent to prohibit judicial review [despite independent right provided by the APA] must be established by specific legislative history or other reliable evidence of intent."); *cf. also Texas Indus. Energy Consumers v. CenterPoint Energy Hous. Elec. LLC,* 324 S.W.3d 95, 107 (Tex.2010) (resort to "specific-controls-over-general maxim" is unnecessary because maxim only applies if overlapping statutes cannot be reconciled and court was able to construe two provisions to harmonize rather than conflict).

[9]To the extent the Board has "discretion" to adopt, repeal, or modify rules in an adjudicative proceeding by virtue of its statutory authority to adjudicate disciplinary actions, the case law cannot be read to support the unfettered discretion alluded to in the Board's motion for rehearing. **\*542** Rather, the principle of "informed discretion" has long been tempered by "[a] presumption [that] favors adopting rules of general applicability through the [APA's] formal rulemaking procedures as opposed to administrative adjudication." *Rodriguez,* 997 S.W.2d at 255; *see Railroad Comm'n of Tex. v. Lone Star Gas Co.,* 844 S.W.2d 679, 688–689 (Tex.1992); *cf. City of El Paso v. Public Util. Comm'n of Tex.,* 883 S.W.2d 179, 189 n. 21 (Tex.1994) (observing that agency "discretion to proceed on a 'case-by-case basis is not absolute" and that agency is "bound to follow the [APA's] formal rulemaking procedures" when circumstances supporting ad hoc adjudication are not present). Thus, when an agency seeks to adopt rules of general applicability, there is a "presumption favoring the fairness and public participation that accompany formal rulemaking under the APA" because "[a]llowing an agency to [amend] its rules through administrative adjudication ... undercuts the APA."[12] *Rodriguez,* 997 S.W.2d at 255.

12    Although the Board attempts to distinguish *Rodriguez* on the basis that its holding is limited to *amendments* of rules made on an ad hoc basis, it is axiomatic that amending a rule is substantively, legally, and effectively indistinguishable from adopting a new rule or repealing an old one.

[10]In "exceptional cases," an agency "may choose to formulate and enforce a general requirement through a decision in a particular case," but that may be done only when "using the rulemaking procedure would frustrate the effective accomplishment of the agency's functions." *Id.* (citing *Lone Star Gas Co.,* 844 S.W.2d at 689, and *Amarillo Indep. Sch. Dist. v. Meno,* 854 S.W.2d 950, 958 (Tex.App.–Austin 1993, writ denied)). Courts have recognized that ad hoc rulemaking "may be" appropriate, for example, when the agency is presented with a novel issue; when a dispute deals with a problem that is too technical, complex, or varied to be captured within the bounds of a general rule; or to fill in the interstices of a new statute or rule. *See, e.g., Rodriguez,* 997 S.W.2d at 255; *City of El Paso,* 883 S.W.2d at 188–89 & n. 21 (citing *Chenery,* 332 U.S. at 202–03, 67 S.Ct. 1760, and *Southwestern Bell Tel. Co. v. Public Util. Comm'n of Tex.,* 745 S.W.2d 918, 926–27

(Tex.App.–Austin 1988, writ denied)); *see also* Beal, *supra,* 56 Baylor L.Rev. at 16 ("[N]otice and comment rulemaking procedures must be utilized unless a bona fide exception exists."). As stated in our original opinion, none of these circumstances applies to the reciprocal-sanctions policy at issue here. Even on rehearing, the Board has offered no exceptional circumstances to support adopting the reciprocal-sanctions policy on an ad hoc basis.

The Board asserts that the reciprocal-sanctions policy was not newly adopted in Witcher's case, or even in *Nealy,* but instead was adopted in contested cases 30 years ago (or over the course of the past 30 years) to address the issue at a time when it was "novel." That proposition, however, is not supported by the plethora of Board decisions submitted for the first time in its motion for rehearing, nor by the history of the statutes governing pharmacist licensing. Until *Nealy* and the order in the present case, there is no indication that the results were governed by a prospective policy of general applicability rather than the significantly more egregious and entirely distinguishable factual and procedural circumstances presented in those cases. Moreover, this is not an issue that was unfamiliar to the legislature or the Board when the TPA was enacted. Indeed, suspension, revocation, cancellation, or restriction of an out-of-state license **\*543** has been a basis for disciplining a Texas licensee since the TPA's inception.[13] The reciprocal-sanctions policy simply does not address any novelty in the regulation of pharmacists that had not already been contemplated by the legislature in enacting the TPA.

[13] *See generally* Acts 1973, 63d Leg., R.S., ch. 286, § 1, 1973 Tex. Gen. Laws 677, 678. (authorizing Board to issue Texas pharmacy license by reciprocity on applicant's satisfaction of certain conditions) (repealed); Act of May 28, 1981, 67th Leg., R.S., ch. 255, §§ 22(a)(5), 26(a)(15), 1981 Tex. Gen. Laws 638, 652, 54 (current versions at Tex. Occ.Code §§ 558.101, 565.001(a)(16), 565.051) (prohibiting Board from issuing Texas pharmacy license by reciprocity if applicant had license granted by another state "suspended, revoked, canceled or otherwise restricted for any reason" and authorizing a range of disciplinary actions against Texas licensee or applicant whose "license to practice pharmacy issued by another state [was] canceled, revoked, or suspended for conduct substantially equivalent" to conduct that would subject pharmacist to discipline under TPA); Act of May 28, 1987, 70th Leg., R.S. ch. 262, §§ 3, 5, 1987 Tex. Gen. Laws 1584, 1585 (current versions at Tex. Occ.Code § 558.051(a)(F), 559.005(a)) (amending TPA to prohibit initial licensing by examination if pharmacist had license issued by another state "suspended, revoked, canceled, surrendered, or otherwise restricted for any reason" and prohibiting Texas licensee from obtaining new license upon same circumstances if Texas license lapsed without renewal for two or more years).

Even if the issue had been "novel" at an earlier time, there are several other reasons why the Board would have abused its discretion in continuing to apply an ad hoc rule, including that any novelty or exigencies that might have previously warranted a deviation from the APA's procedures or the need for continued reliance on an ad hoc rule should have been temporary and lasted only so long as reasonably necessary to allow the Board an opportunity to comply with the APA in adopting the rule.[14] *See City of El Paso,* 883 S.W.2d at 188–89 & n. 21; *cf.* Tex. Gov't Code § 2001.034 (agency may enact "emergency rule without prior notice or hearing" upon finding "imminent peril to public health, safety, or welfare" but such rule may be used *only temporarily* pending adoption following APA's notice-and-comment rulemaking procedures). The availability of the APA rulemaking process and the amenability of the subject matter to promulgation as a formal rule support the presumption favoring the fairness and public participation that accompany notice-and-comment rulemaking under the APA.[15]

[14] Over the years, the Board has promulgated rules

governing disciplinary sanctions on several occasions but failed to formally adopt the reciprocal-sanctions rule until June 2012, *after* its decision in Witcher's case. *See* 22 Tex. Admin. Code § 281.67 (Texas State Bd. of Pharmacy, Sanctions for Out–of–State Disciplinary Actions). The Board's regulatory history reveals that, in March 2000, it promulgated a rule expressly setting forth aggravating and mitigating factors as guidelines for determining the appropriate sanction in disciplinary actions under section 565.001 of the TPA, but the Board apparently was not moved at that time to include its "long-standing" reciprocal-sanctions policy in the new rule. *See* 25 Tex. Reg. 2574 (Mar. 24, 2000) (former 22 Tex. Admin. Code § 281.57). Nor was it moved to do so when the rule was amended in 2005 and later repealed and replaced in 2006, both of which occurred after the Board's decision in *In re Nealy*, Bd. Order # N–03–005 (May 10, 2005). *See* 30 Tex. Reg. 7874 (Nov. 25, 2005) (former 22 Tex. Admin. Code § 281.57); 22 Tex. Admin Code § 281.62 (current version). Instead, "disciplinary actions taken by any regulatory agency of the federal government or any state" was included in the sanctions guidelines as *one factor among many* that could be considered.

15    The inadvisability of allowing the Board to freely adopt, amend, or repeal its rules in disciplinary proceedings is further demonstrated by the TPA's confidentiality provisions, which preclude the Board from publicly disclosing the contents of an order disciplining an impaired pharmacist. *See* Tex. Occ.Code §§ 564.002 ("All records and proceedings of the board, an authorized agent of the board, or a pharmaceutical organization committee relating to the administration of this chapter (governing Texas's program to aid impaired pharmacists and pharmacy students) are confidential and are not considered public information...."), .003 ("The board may disclose that the license of a pharmacist who is the subject of [a confidential] order ... is suspended, revoked, canceled, restricted, or retired ... [but] may not disclose the nature of the impairment or other information that resulted in the board's action."). Because the Board's orders are not uniformly made available for public inspection, using the disciplinary adjudicative process to announce new, amended, or repealed rules of general applicability would hinder the goals of openness and public participation reflected in the APA's provisions. *See*, *e.g.,* Tex. Gov't Code § 2001.004 (requiring agencies to make available for public inspection "all rules and other written statements of policy or interpretations that are prepared, adopted, or used by the agency in discharging its functions"); *see also Rodriguez v. Service Lloyds Ins. Co.,* 997 S.W.2d 248, 255–56 (Tex.1999) ("[I]nformally amending this rule through a contested case hearing or an appeals panel decision results in the 'issuance of private opinion that

will never be known by anyone except those few persons who take the time to research the files of an agency.' " (quoting Ron Beal, *Ad Hoc Rulemaking: Texas Style,* 41 Baylor L.Rev. 101, 120 (1989))).

**\*544** In sum, the Board's motion for rehearing does not persuade us that *WBD* requires a different outcome in this case. Nor does it persuade us that the Board appropriately adopted the reciprocal-sanctions policy as a rule of general applicability without complying with the APA.

### The Board's Other Arguments in its Motion for Rehearing

The Board also complains that we are required to uphold the Board's decision if there is a rational basis underlying the reciprocal-sanction policy and if there is some evidence that it is applicable under the facts of Witcher's case. However, an agency's legislative rule is binding on all concerned, including the judicial department, only if the rule is (1) reasonable, (2) within the power delegated to the agency, and (3) *the product of proper procedure. General Elec. Credit Corp. v. Smail,* 584 S.W.2d 690, 694 (Tex.1979) (citing and quoting K. Davis, Administrative Law Treatise § 5.03 (1958 ed. and Supps.)); *Sharp v. Cox Tex. Publ'ns, Inc.,* 943 S.W.2d 206, 209 (Tex.App.–Austin 1997, no writ). "When an agency promulgates a rule without complying with proper rule-making procedures, the rule is invalid." *El Paso Hosp. Dist. v. Texas Health & Human Servs. Comm'n,* 247 S.W.3d 709, 715 (Tex.2008). Having concluded that the rule here is not the product of proper procedure, it lacks the force of law without regard to its reasonableness vel non.

[11]The Board also complains that the trial court erred in limiting the scope of remand to a determination of an appropriate sanction based on the established record and the affirmed fact findings and conclusions of law, which were not challenged below or on appeal. The Board contends that the *only* remedy for applying an improperly promulgated rule is remand for entirely new proceedings affording Witcher notice of the rules of decision to be applied, including the reciprocal-sanctions policy. *Cf. Texas State Bd. of Pharmacy v. Seely,* 764 S.W.2d 806, 814 (Tex.App.–Austin 1988, writ denied) ("Assum[ing], *without deciding,* that the Board [of Pharmacy] possessed authority to promulgate official policy as to what that norm or standard [of conduct] should be; that it promulgated a valid policy consistent with the statutory provisions committed to the Board's administration; and that it permissibly promulgated and applied that policy retroactively in the course **\*545** of adjudicating Seely's case, rather than formulating and promulgating that policy under the rulemaking provisions of [the predecessor to the APA] to be applied prospectively"—*all such assumptions being necessary to valid license-revocation order*—due process required, at minimum, that Board give pharmacist prior notice of legal criteria Board would apply to his conduct); *Madden v. Texas Bd. of Chiropractic Exam'rs,* 663 S.W.2d 622, 626–27 (Tex.App.–Austin 1983, writ ref'd n.r.e.) (chiropractic board "arguably" had discretion to announce and apply new definition in ad hoc adjudicative proceeding rather than by promulgation of general rule through exercise of its rulemaking power, but, at minimum, due process required prior notice of legal criteria and hearing relative to issues that would actually control result). In the present appeal, the Board did not challenge the trial court's order with respect to the scope of remand. Accordingly, if there is any error in that regard, it has been waived. *See Secure Comm, Inc. v. Anderson,* 31 S.W.3d 428, 430–31 (Tex.App.–Austin 2000, no pet.) (holding that appellant waives right to complain of ruling to which no error was assigned).

[12] [13]Finally, the Board summarily asserts that sovereign immunity bars Witcher's claims against the individual appellants who were sued in their official capacity.[16] Subject to the limited "ultra vires" exception, sovereign immunity protects state officers sued in their official capacities to the same extent that it protects their employers. *See, e.g., University of Tex. Med. Branch at Galveston v. Hohman,* 6 S.W.3d 767, 776 (Tex.App.–Houston [1st Dist.] 1999, pet. dism'd w.o.j.) ("[T]o the extent [the nurse] was acting in her official capacity, she enjoys the same governmental immunity as UTMB on [the plaintiff's] claims under the Nurse Reporting Act."). The Texas Supreme Court has explained the derivative nature of a state official's immunity as follows:

When a state official files a plea to the jurisdiction, the official is invoking the sovereign immunity from suit *held by the government itself.* It is fundamental that a suit against a state official is merely "another way of pleading an action against the entity of which [the official] is an agent." A suit against a state official in his official capacity "is not a suit against the

official personally, for the real party in interest is the entity." Such a suit actually seeks to impose liability against the governmental unit rather than on the individual specifically named and "is, in all respects other than name, ... a suit against the entity."

*Texas A & M Univ. Sys. v. Koseoglu,* 233 S.W.3d 835, 844 (Tex.2007) (internal citations omitted) (emphasis added); *see also, e.g., De Mino v. Sheridan,* 176 S.W.3d 359, 365 (Tex.App.–Houston [1st Dist.] 2004, no pet.). ("It is a well-established and generally accepted principle of law that suit against a government employee in his official capacity is, in all respects, a suit against the governmental unit."). It is undisputed in this case that the Board's immunity from suit is waived by section **\*546** 2001.171 of the APA.[17] Because the Board is not immune from suit, neither are the individual appellants who were sued in their official capacities.

[16]  Although courts occasionally use the terms "sovereign immunity" and "governmental immunity" interchangeably, they are distinct concepts. *Wichita Falls State Hosp. v. Taylor,* 106 S.W.3d 692, 694 n. 3 (Tex.2003). The Board generally asserts that its board members and executive director enjoy "immunity" from suit in their official capacities. We construe this as a claim of "sovereign immunity," which refers to the state's immunity from suit and liability and extends not only to the state but also to various divisions of state government, including agencies, boards, hospitals, and universities. *Id.*

[17]  *See* Tex. Gov't Code § 2001.171 (authorizing an aggrieved person to file suit for judicial review of agency's final decision in contested case); *Mega Child Care,* 145 S.W.3d at 198 (recognizing APA's limited waiver of sovereign immunity for suits for judicial review).

We overrule the Board's motion for rehearing.

## CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

Dissenting Opinion by Justice Goodwin

## DISSENTING OPINION

Melissa Goodwin, Justice
I withdraw my dissenting opinion dated May 3, 2013, and substitute the following in its place.

The only issue in this appeal is the sanction imposed against appellee Tiana Jean Witcher by the Texas State Board of Pharmacy. The Board's sanction against Witcher—suspending her Texas pharmacy license—was within the statutory range

of punishment and consistent with past precedent and expressed policy concerns. Nonetheless, the majority concludes that the Board imposed the sanction based upon an invalid rule—a binding "reciprocal-sanctions policy." Because the record supports that the Board did not have a binding policy and that it properly considered the facts and circumstances of this case, I respectfully dissent.

Section 2001.003(6) of the Government Code defines a rule to mean a "state agency statement of general applicability." Tex. Gov't Code § 2001.003(6). As the majority recognizes, for an agency statement to be a rule, it must "bind the agency or otherwise represent its authoritative position in matters that impact personal rights." *Texas Dep't of Transp. v. Sunset Transp., Inc.,* 357 S.W.3d 691, 703 (Tex.App.–Austin 2011, no pet.); *see Slay v. Texas Comm'n on Envtl. Quality,* 351 S.W.3d 532, 546 (Tex.App.–Austin 2011, pet. denied) (noting that "core concept [of rule] is that the agency statement must in itself have a binding effect on private parties").

The majority concludes that the Board's "unwritten policy that a pharmacist with an active suspension in another state cannot practice pharmacy in Texas" was an invalid rule. The majority focuses on testimony by the Board's director of enforcement at the contested case hearing and the Board's statements in its order concerning policy reasons for imposing a reciprocal sanction against Witcher. At the hearing, the director relied upon a prior order in which the Board imposed a reciprocal sanction of suspension based upon the disciplinary action by another state's board of pharmacy. *See In re Nealy,* Bd. Order # N–03–005, SOAH Docket No. 515–04–6488 (2005). In *Nealy,* the Board noted that, "[i]n previous cases with similar facts, the Board has typically imposed disciplinary action mirroring the action by another state board of pharmacy." But the fact that the Board has "typically imposed" a mirror sanction when faced with disciplinary action by another state board does not foreclose the Board from imposing a different sanction within its discretion depending on the facts and circumstances of a particular case. *See Slay,* 351 S.W.3d at 546.

In the context of an agency's written policy "setting forth an elaborate methodology for applying statutory criteria" to determine administrative penalties, this **\*547** Court has explained the difference between a non-binding guideline and a rule. *Id.* at 538. In that case, we concluded that the district court did not err in determining that the "Penalty Policy" at issue was not a rule. *Id.* at 548. We explained: "[W]hat ultimately matters is that the district court also had evidence to the effect that the [agency] commissioners were not *bound* to follow the Penalty Policy's methodology when exercising their legislatively conferred discretion to impose penalties." *Id.* at 546 (emphasis in original); *see also Texas Educ. Agency v. Leeper,* 893 S.W.2d 432, 443 (Tex.1994) ("Not every statement by an administrative agency is a rule."); *Texas Mut. Ins. Co. v. Vista Cmty. Med. Ctr., LLP,* 275 S.W.3d 538, 555 (Tex.App.–Austin 2008, pet. denied) (noting it is "well-established that not every administrative pronouncement is a rule"); *Brinkley v. Texas Lottery Comm'n,* 986 S.W.2d 764, 769 (Tex.App.–Austin 1999, no pet.) (observing that agencies routinely issue documents such as guidelines "which might contain statements that intrinsically implement, interpret, or prescribe law, policy, or procedure or practice requirements" that are not rules).

Here, the district court had evidence that the Board was not bound to impose a sanction of suspension. The Board's own conduct demonstrated that it was not bound to apply a reciprocal sanction but that it did so within its discretion and consistent with prior decisions addressing similar facts. *See* Tex. Occ.Code § 565.051(1) (board "may" "suspend the person's license"); 22 Tex. Admin. Code § 281.60 (2012) (Texas State Bd. of Pharmacy, General Guidance)[1]; *Pierce v. Texas Racing Comm'n,* 212 S.W.3d 745, 754, 757 (Tex.App.–Austin 2006, pet. denied) (noting that "[p]olicy considerations ... are the reason that the Commission is granted discretion over what penalties should be imposed for racing violations" and upholding penalty that "followed its guidelines" and "decade of precedent"); *see also Austin Chevrolet, Inc. v. Motor Vehicle Bd.,* 212 S.W.3d 425, 438 (Tex.App.–Austin 2006, pet. denied) (noting that "a licensing authority acts arbitrarily and unlawfully if it treats similarly situated applicants differently without an articulated justification"). The sole purpose of the contested case hearing was to determine the appropriate sanction. It was undisputed that Witcher's license was suspended in North Carolina, and she did not challenge the process or procedure in North Carolina that resulted in the suspension. If the board was "*duty-bound* " to suspend Witcher's license because her North Carolina license was suspended, as the majority suggests, why have the hearing? Why admit evidence at the hearing concerning the facts and circumstances of Witcher's particular case?

---

[1] Section 281.60 states in relevant part:

(a) This subchapter is promulgated to:

(1) promote *consistency* and guidance in the exercise of the sound discretion by the agency in licensure and disciplinary matters; ...

> (b) Board's role. The board shall render the final decision in a contested case and has the responsibility to assess sanctions against licensees who are found to have violated the Act.... *Asanction should be consistent with sanctions imposed in other similar cases* and should reflect the board's determination of the seriousness of the violation and the sanction required to deter future violations. A determination of the appropriate sanction is reserved to the board....
>
> 22 Tex. Admin. Code § 281.60 (2012) (Texas State Bd. of Pharmacy, General Guidance) (emphasis added).

The Board's conclusions of law recognized that it did not have a binding policy that dictated the sanction of suspension against Witcher. The Board concluded **\*548** that it "[did] not have a written policy or rule requiring that a pharmacist be prevented from practicing in Texas until the pharmacist resolves restrictions on her license in another state." Similarly, at the open meeting where the Administrative Law Judge's proposal for decision was considered, the Board's representative stated:

> There is not a policy that requires you to suspend when somebody is suspended in another state. However, suspension is an option. And so what you have to do is look at the facts—the findings of fact in this case and decide based upon everything that the Judge found, based upon her impairment, based on her management of that impairment, based upon her status in North Carolina what of your disciplinary options do you think is the appropriate option. And I've given you the arguments why I believe that it should be suspension and why we should look at what the other state did. But, no, there's not a policy that requires you to suspend and that's not what I'm asserting; but there is no need to have a policy on the flip side. It's not required that you have a policy that says what you do in these situations.

In contrast to the majority's conclusion that the Board's "reciprocal-sanctions policy" was a "bright-line rule that is applicable without regard to individual circumstances," the Board's representative made clear to the Board that the appropriate sanction for Witcher was within the Board's discretion—not a foregone conclusion—and then argued for suspension based upon policy reasons.[2] *See Fay–Ray Corp. v. Texas Alcoholic Beverage Comm'n,* 959 S.W.2d 362, 369 (Tex.App.–Austin 1998, no pet.) (upholding revocation of permit and noting that "an agency has broad discretion in determining which sanction best serves the statutory policies committed to the agency's oversight"); *Sears v. Texas State Bd. of Dental Exam'rs,* 759 S.W.2d 748, 751 (Tex.App.–Austin 1988, no writ) ("[T]he choice of penalty is vested in the agency, not in the courts.").

[2]    For example, had there been evidence that Witcher was not afforded due process in the North Carolina proceeding, the Board, considering the facts and circumstances of Witcher's case, might have imposed a different sanction within its discretion. *See In re Nealy,* Order # N–03–005, SOAH Docket No. 515–04–6488 (2005) (recognizing that evidence of "whether a pharmacist has not been afforded due process in the other state" relevant to policy determination in context of appropriate sanction based on sanction imposed by another state board of pharmacy).

Further, unlike the agency statements that were found to be rules in the cases cited by the majority, the agency statements at issue here were made during contested case hearings in the context of determining the appropriate sanction against an individual. *Compare El Paso Hosp. Dist. v. Texas Health & Human Servs. Comm'n,* 247 S.W.3d 709, 711–12 (Tex.2008)

(concluding that agency's "data-collection method for calculating prospective Medicaid inpatient service rates" was rule in suit for declaratory relief); *Combs v. Entertainment Publ'ns, Inc.,* 292 S.W.3d 712, 715 (Tex.App.–Austin 2009, no pet.) (concluding legal interpretations in letters sent by Comptroller were rules in suit for declaratory and injunctive relief), *with Railroad Comm'n of Tex. v. WBD Oil & Gas Co.,* 104 S.W.3d 69, 70, 79 (Tex.2003) (concluding that "field rules" were not rules of "general applicability" and noting that APA definition of rule "does not reference statements made in determining individual rights").

Because I would conclude that the Board did not act based upon an invalid rule and that it considered the facts and **\*549** circumstances of Witcher's case and then acted well within its discretion to impose the sanction of license suspension, I would affirm the order of the Board and reverse the trial court's judgment.[3]

[3]    I also disagree with the majority's suggestion that, even if the Board's decision was not based upon an invalid rule, that its decision would be arbitrary and capricious. According to her own testimony, Witcher had no plans to return to North Carolina to practice pharmacy in North Carolina, or otherwise clear the North Carolina suspension because of lack of financial resources. I question whether a licensing board would be acting arbitrarily or capriciously by refusing to excuse compliance with another state's unchallenged sanction based upon the licensee's lack of financial resources.

As to the majority's supplemental opinion, I would not address issues and arguments raised by the Board for the first time in its motion for rehearing, except as to the individual appellants' assertion of immunity from suit. *See Wells Fargo Bank, N.A. v. Leath,* 425 S.W.3d 525, 540 (Tex.App.–Dallas 2014, pet. filed) (supp. op. on reh'g) (concluding issue raised for first time on rehearing not before the court and declining to address it); *AVCO Corp. v. Interstate Sw., Ltd.,* 251 S.W.3d 632, 676 (Tex.App.–Houston [14th Dist.] 2008, pet. denied) (supp. op. on reh'g) (same); *see also OAIC Commercial Assets, L.L.C. v. Stonegate Vill., L.P.,* 234 S.W.3d 726, 747 (Tex.App.–Dallas 2007, pet. denied) (op. on reh'g) ("A motion for rehearing does not afford a party an opportunity to raise new issues after the case has been briefed, argued, and decided on other grounds, unless the error is fundamental.").

**All Citations**

447 S.W.3d 520

---

**End of Document**                                      © 2015 Thomson Reuters. No claim to original U.S. Government Works.

417 S.W.3d 494
Court of Appeals of Texas,
Austin.
TRINITY SETTLEMENT SERVICES, LLC, Appellant
v.
The TEXAS STATE SECURITIES BOARD and John Morgan, in his Official Capacity as Commissioner of the
Texas State Securities Board[1], Appellees.

[1] The notice of appeal and prior filings in the district court reference the TSSB's former commissioner, Denise Voigt Crawford, who has since retired. Accordingly, the TSSB's current commissioner, John Morgan, has been substituted. *See* Tex.R.App. P. 7.2(a).

No. 03–10–00639–CV. | Aug. 1, 2013. | Rehearing Overruled Oct. 2, 2013.

**Synopsis**
**Background:** Viatical settlement company sued Texas State Securities Board (TSSB) to obtain declaratory judgment that TSSB acted without statutory authority in prior enforcement action against another viatical settlement company, and that certain investments plaintiff proposed to sell were not "securities" as defined by Texas Securities Act (TSA). The 53rd Judicial District Court, Travis County, Lora Livingston, J., granted TSSB's plea to the jurisdiction. Plaintiff appealed.

**Holdings:** The Court of Appeals, David Puryear, J., held that:

[1] TSSB's statements in prior action did not constitute rule under Administrative Procedure Act (APA) subject to challenge through declaratory judgment action;

[2] in seeking declaration that TSSB acted without statutory authority, plaintiff sought impermissible advisory opinion; and

[3] plaintiff's requested declaration of its rights and status was not ripe for review.

Affirmed.

West Headnotes (29)

[1]     **Securities Regulation**
⌖Securities requiring registration or qualification in general

Courts must analyze specific facts surrounding investment transaction to determine whether it falls within the definition of "security" under Texas Securities Act (TSA).

Ann.Texas Civ.St. art. 581–4(A).

Cases that cite this headnote

[2] **Securities Regulation**
🔑Investment contracts

Test for whether an investment constitutes investment contract, and thus a security under Texas Securities Act (TSA), is whether the scheme involves investment of money in common enterprise with profits to come solely from efforts of others. Vernon's Ann.Texas Civ.St. art. 581–4(A).

Cases that cite this headnote

[3] **Securities Regulation**
🔑Investment contracts

In determining whether profits anticipated from investment by investors result solely from efforts of others so that investment is an investment contract, and thus a security under Texas Securities Act (TSA), test for whether profits from enterprise in which investment was made come solely from efforts of others is whether efforts made by those other than investor are undeniably significant ones, those essential managerial efforts which affect failing or success of the enterprise. Vernon's Ann.Texas Civ.St. art. 581–4(A).

Cases that cite this headnote

[4] **Securities Regulation**
🔑Investment contracts

Particular business structure and managerial efforts of viatical-settlement provider are critical in determining whether provider is selling securities subject to regulation under Texas Securities Act (TSA).

Civ.St. art. 581–4(A).

Cases that cite this headnote

[5] **Courts**
🔑 Jurisdiction of Cause of Action

Subject-matter jurisdiction is essential to the authority of a court to decide a case.

Cases that cite this headnote

[6] **Pleading**
🔑 Plea to the Jurisdiction

Plea to the jurisdiction challenges trial court's authority to determine subject matter of specific cause of action.

Cases that cite this headnote

[7] **Appeal and Error**
🔑 Extent of Review Dependent on Nature of Decision Appealed from

When Court of Appeals considers trial court's order on plea to the jurisdiction, Court looks to plaintiff's petition to determine whether facts pled affirmatively demonstrate that jurisdiction exists.

Cases that cite this headnote

[8] **Pleading**
🔑 Presumptions and Burden of Proof

In plea to the jurisdiction, burden is on plaintiff to affirmatively demonstrate trial court's jurisdiction.

Cases that cite this headnote

**[9]**      **Appeal and Error**
            🗝Pleading

In determining whether plaintiff, in plea to the jurisdiction has met burden to affirmatively demonstrate trial court's jurisdiction, Court of Appeals construes plaintiff's pleadings liberally, taking all factual assertions as true, and looks to plaintiff's intent.

Cases that cite this headnote

**[10]**     **Pleading**
            🗝Scope of inquiry and matters considered in general

Court deciding plea to the jurisdiction is not required to look solely to pleadings, but may consider evidence and must do so when necessary to resolve jurisdictional issues raised.

Cases that cite this headnote

**[11]**     **States**
            🗝Declaratory judgment

Section of Administrative Procedure Act (APA) that allows party to bring declaratory-judgment action against agency rule is legislative grant of subject-matter jurisdiction, such that valid claims raised pursuant to its provisions are not barred by sovereign immunity. V.T.C.A., Government Code § 2001.038.

Cases that cite this headnote

**[12]**     **Declaratory Judgment**
            🗝Officers and official acts in general

If party raises valid agency rule challenge for declaratory judgment under Administrative Procedure Act (APA), trial court's subject-matter jurisdiction is established, but challenged agency action constituting a rule under APA must exist for claimant to successfully invoke trial court's subject-matter jurisdiction under statute allowing party to bring declaratory judgment action. V.T.C.A., Government Code § 2001.038.

Cases that cite this headnote

[13] **Declaratory Judgment**
Officers and official acts in general
**States**
Declaratory judgment

If there is not an agency rule within meaning of Administrative Procedure Act (APA) being challenged by declaratory-judgment, claimant cannot seek declaratory relief, and sovereign immunity bars the cause of action.

Cases that cite this headnote

[14] **Declaratory Judgment**
State officers and boards

Texas State Securities Board's (TSSB) statement in action against viatical settlement company that sale of viatical settlements, as investments, were securities subject to Texas Securities Act (TSA), did not constitute a rule within meaning of Administrative Procedure Act (APA), and thus statement was not subject to challenge under APA through declaratory-judgment action; TSSB's statement was not generally applicable, but rather it specifically described business model and investment transactions of company, and it was made in seeking adjudication only of company's individual rights based on specific investments it sold. V.T.C.A., Government Code §§ 2001.003(6), 2001.038.

Cases that cite this headnote

**[15]** **Administrative Law and Procedure**
 Nature and Scope

Not every administrative pronouncement is a rule within the meaning Administrative Procedure Act (APA). V.T.C.A., Government Code § 2001.003(6).

Cases that cite this headnote

**[16]** **Administrative Law and Procedure**
 Nature and Scope

In order to be considered statement of general applicability under Administrative Procedure Act (APA), such that statement would be a rule within meaning of APA, agency pronouncements must affect interest of the public at large such that they cannot be given effect of law without public input. V.T.C.A., Government Code § 2001.003(6).

Cases that cite this headnote

**[17]** **Administrative Law and Procedure**
 Nature and Scope

Agency statements that have no legal effect on private persons are not considered rules under Administrative Procedure Act (APA). V.T.C.A., Government Code § 2001.003(6).

Cases that cite this headnote

**[18]** **Declaratory Judgment**
 Jurisdiction not enlarged

Uniform Declaratory Judgments Act (UDJA)

does not enlarge trial court's jurisdiction; rather, declaratory-judgment action under UDJA is merely a procedural device for deciding matters already within trial court's subject-matter jurisdiction. V.T.C.A., Civil Practice & Remedies Code § 37.001 et seq.

Cases that cite this headnote

[19]     **Action**
⚷Moot, hypothetical or abstract questions
**Action**
⚷Persons entitled to sue

Subject matter jurisdiction requires that party bringing suit must have standing, that there be live controversy between parties, and the case must be justiciable.

Cases that cite this headnote

[20]     **Declaratory Judgment**
⚷Termination or settlement of controversy
**Declaratory Judgment**
⚷Necessity

To invoke subject-matter jurisdiction of court, declaratory judgment action requires a justiciable controversy as to rights and status of parties actually before court for adjudication, and declaration sought must actually resolve the controversy.

2 Cases that cite this headnote

[21]     **Declaratory Judgment**
⚷Moot, abstract or hypothetical questions

"Justiciable controversy," as prerequisite for declaratory judgment, is one in which real and substantial controversy exists involving genuine conflict of tangible interest and not merely a theoretical dispute.

1 Cases that cite this headnote

[22]     **Declaratory Judgment**
🔑Moot, abstract or hypothetical questions

Jurisdiction under Uniform Declaratory Judgments Act (UDJA) primarily depends on nature of the controversy, whether controversy is merely hypothetical or rises to justiciable level. V.T.C.A., Civil Practice & Remedies Code § 37.001 et seq.

Cases that cite this headnote

[23]     **Declaratory Judgment**
🔑State officers and boards

Viatical settlement company, in seeking declaration that Texas State Securities Board (TSSB) acted without statutory authority in prior action by alleging that viatical settlement investments were securities under Texas Securities Act (TSA), did not allege justiciable controversy, as required for declaratory judgment, and thus company sought impermissible advisory opinion from trial court; opinion would not bind parties before court, nor would it resolve whether company was subject to requirements of TSA. V.T.C.A., Civil Practice & Remedies Code § 37.001 et seq.; Vernon's Ann.Texas Civ.St. art. 581–4(A).

Cases that cite this headnote

[24]     **Declaratory Judgment**
🔑Moot, abstract or hypothetical questions
**Declaratory Judgment**
🔑Future or contingent questions

Declaratory-judgment action does not give court jurisdiction to pass upon hypothetical or contingent situations, or to determine questions not then essential to the decision of actual controversy, although such actions may in the

future require adjudication.

2 Cases that cite this headnote

[25]     **Action**
         Moot, hypothetical or abstract questions

Ripeness implicates subject-matter jurisdiction and asks whether, at the time lawsuit is filed, facts have developed sufficiently so that injury has occurred or is likely to occur, rather than being contingent or remote.

Cases that cite this headnote

[26]     **Action**
         Moot, hypothetical or abstract questions

Case is not ripe when its resolution depends on contingent or hypothetical facts, or upon events that have not yet come to pass.

1 Cases that cite this headnote

[27]     **Declaratory Judgment**
         Nature and elements in general

Justiciable controversy, as required for declaratory judgment, does not necessarily equate with a fully ripened cause of action; rather, action for declaratory judgment will lie when fact situation manifests presence of ripening seeds of a controversy, such that claims of several parties are present and indicative of threatened litigation in immediate future which seems unavoidable, even though differences between parties as to their legal rights have not reached state of actual controversy. V.T.C.A., Civil Practice & Remedies Code § 37.001 et seq.

Cases that cite this headnote

[28] **Action**
Moot, hypothetical or abstract questions

In determining whether a cause is ripe for judicial consideration, courts look to whether facts have sufficiently developed to show that injury has occurred, or is likely to occur.

1 Cases that cite this headnote

[29] **Declaratory Judgment**
Professions, businesses or occupations
**Declaratory Judgment**
State officers and boards

Viatical settlement company's requested declaration of its rights and status under Texas Securities Act (TSA) was not ripe for review so as to invoke jurisdiction under Uniform Declaratory Judgments Act (UDJA); company's requested declaration was based on hypothetical facts, and whether company was under imminent threat of enforcement action under TSA was speculative. V.T.C.A., Civil Practice & Remedies Code § 37.001 et seq.; Vernon's Ann.Texas Civ.St. art. 581–4(A).

Cases that cite this headnote

**Attorneys and Law Firms**

**\*497** Hector De Leon, Benjamin S. De Leon, Thomas P. Washburn, George B. Ward, De Leon & Washburn, P.C., Austin, TX, for Appellant.

Lesli Gattis Ginn, Assistant Attorney General, Financial Litigation, Tax, and Charitable Trusts Division, Austin, TX, for Appellee.

Before Justices PURYEAR, PEMBERTON, and ROSE.

*OPINION*

DAVID PURYEAR, Judge.

This is an appeal from a grant of a plea to the jurisdiction stemming from a dispute regarding the Texas State Securities Board's regulation of the sale of viatical settlements. Appellant Trinity Settlement **\*498** Services, LLC (Trinity), an entity proposing to engage in the sale of viatical settlements, sued appellees the Texas State Securities Board (TSSB) and John Morgan, in his official capacity as Commissioner of the TSSB, to obtain a declaratory judgment (1) that the TSSB and Morgan acted without statutory authority in an enforcement action against another viatical-settlement provider, Retirement Value, LLC (RV) and (2) that certain investments Trinity itself proposes to sell, denominated "specified percentages of participations in the proceeds of life insurance policies," are not "securities" as defined by the Texas Securities Act (TSA). We affirm the trial court's order granting the plea to the jurisdiction, concluding Trinity failed to invoke the jurisdiction of the trial court under either (1) the Administrative Procedure Act (APA) section 2001.038 because it failed to challenge a rule of the TSSB, as defined by the APA, or (2) the Uniform Declaratory Judgments Act (UDJA) because it failed to plead a justiciable controversy.

## BACKGROUND

### A. Viatical Settlements

A "viatical settlement" is a transaction in which an insured sells the benefits of his or her life insurance policy to a third party in return for a lump-sum cash payment equal to a percentage of the policy's value. *See Black's Law Dictionary* 1497 (9th ed. 2009); *Securities & Exch. Comm'n. v. Mutual Benefits Corp.,* 408 F.3d 737, 738 (11th Cir.2005). The purchaser of the viatical settlement realizes a profit if, when the insured dies, the policy benefits paid are greater than the purchasing price, adjusted for time value. *Mutual Benefits Corp.,* 408 F.3d at 738. Viatical-settlement providers—like Trinity—purchase policies from individual insureds and then typically sell fractionalized interests in these policies to investors. *Id.*

[1] Viatical settlements may be subject to the requirements of the TSA if they constitute "securities" as defined by the Act. Tex.Rev.Civ. Stat. art. 581–4(A). The TSA's definition of "security" includes, in relevant part, "any ... note ... or other evidence of indebtedness ... or any ... investment contract" but excludes "any insurance policy ... or any contract or agreement in relation to and in consequence of any such policy or contract, issued by an insurance company subject to the supervision or control of the Texas Department of Insurance when the form of such policy or contract has been duly filed with the Department." *Id.* "The term 'security' has been defined broadly and encompasses unusual financial instruments as well as those commonly considered securities." *Caldwell v. State,* 95 S.W.3d 563, 566 (Tex.App.-Houston [1st Dist.] 2002, pet. ref'd); *see also Tcherepnin v. Knight,* 389 U.S. 332, 338, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967) (noting term "security" should be viewed as embodying a flexible rather than static principle). Courts must analyze the specific facts surrounding an investment transaction to determine whether it falls within the definition of "security." *See, e.g., Caldwell,* 95 S.W.3d at 566; *King Commodity Co. of Tex., Inc. v. State,* 508 S.W.2d 439, 442 (Tex.Civ.App.-Dallas 1974, no writ).

Whether a particular viatical settlement falls within the definition of a "security" may turn on a number of factors, including whether the investment may be characterized as a note, evidence of indebtedness, or investment contract and whether the investment is excluded from the definition of security because it is a contract or agreement in relation to and in consequence of a life insurance policy. *See, e.g.,* **\*499** *Griffitts v. Life Partners, Inc.,* No. 10–01–00271–CV, 2004 WL 1178418, at \*1 (Tex.App.-Waco May 26, 2004, no pet.) (mem. op.); *see also* Tex.Rev.Civ. Stat. art. 581–4(A). Even if a viatical settlement falls within the definition of a security, there are several exemptions from the TSA's registration requirements—including exemptions for private offerings and sales to accredited investors. *See* Tex.Rev.Civ. Stat. art. 581–5 (Exempt Transactions); 7 Tex. Admin. Code § 139.19 (2013) (TSSB, Accredited Investor Exemption).

[2] [3] Litigation involving the regulation of viatical settlements as securities, however, has largely turned on whether the investment at issue satisfied the requirements of an "investment contract." *See, e.g., Mutual Benefits Corp.,* 408 F.3d at 743; *Griffitts,* 2004 WL 1178418, at \*1–2; *see also* Michele Meyer McCarthy, Annotation, *State Regulation of Viatical Life Insurance Programs, Viatical Settlements, and Viatical Investments,* 28 A.L.R.6th 281 (2007). "The test" for whether an investment constitutes an investment contract "is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others." *Searsy v. Commercial Trading Corp.,* 560 S.W.2d 637, 640

(Tex.1977). The test, in turn, for whether profits "come solely from the efforts of others" is "whether the efforts made by those other than the investor are undeniably significant ones, those essential managerial efforts which affect the failing or success of the enterprise." *Id.* at 641.

[4] In the context of viatical settlements, courts have found that whether a particular viatical settlement is an investment contract largely depends on whether the managerial efforts of a viatical-settlement provider affected the failure or success of the enterprise or whether the profitability of the enterprise is determined by the mortality of the insureds rather than the managerial efforts of the provider. *Compare Securities & Ex. Comm'n. v. Life Partners, Inc.,* 87 F.3d 536, 542–548 (D.C.Cir.1996); *Griffitts,* 2004 WL 1178418, at \*2, *with Mutual Benefits Corp.,* 408 F.3d at 743–745. Thus, the particular business structure and managerial efforts of a viatical-settlement provider are critical in determining whether the provider is selling securities subject to regulation under the TSA. Determining who is buying the investments may also be critical, as sales to some investors may be exempt from the TSA's registration requirements. *See* Tex.Rev.Civ. Stat. art. 581–5; 7 Tex. Admin. Code § 139.19.

### B. RV Lawsuit

On May 5, 2010, the State of Texas, through the Office of the Attorney General and at the request of the TSSB, filed suit against RV—a viatical—settlement provider-alleging several causes of action including the sale of unregistered securities in violation of the TSA. The Plaintiff's Original Verified Petition, verified by the Deputy Securities Commissioner, alleges that RV "offered for sale and sold investments in the death benefits of life insurance policies" as part of its "Re–Sale Life Insurance Policy Program." After providing a detailed recitation of the specific facts giving rise to the investment transactions in the Re–Sale Life Insurance Policy Program, the Petition alleges:

> The investments in the Re–Sale Life Insurance Policy Program are securities in the form of "investment contracts".... An application of [the definition of investment contract] to the investments in the Re–Sale Life Insurance Policy Program demonstrates that these investments are "investment contracts," and these instruments are therefore securities.

**\*500** The Petition then asserts several causes of action against RV, including offering and selling unregistered securities in violation of the TSA.

### C. Trinity's Lawsuit

The present suit arises from Trinity—an entity not associated with RV—seeking a declaration under both the UDJA and APA that the TSSB and Morgan acted without authority in the RV suit in alleging that the investments in the Re–Sale Life Insurance Policy Program were securities subject to the TSA's requirements. With regard to its interest in the RV suit, Trinity alleges only that it "proposed to engage in the sale of specified percentages of participations in the proceeds of life insurance policies," and that "as a result of the TSSB's allegations that the investments in the Re–Sale Life Insurance Policy Program are securities in the form of investment contracts, ... Trinity has been forced to cease its own anticipated business operations and refuse any business from participants seeking to purchase a specified percentage in the proceeds of life insurance policies." Trinity additionally seeks a declaration that the sale of specified percentages of participations in the proceeds of life insurance policies does not constitute a security under the TSA, and consequently, Trinity is not required to register with the TSSB.

The appellees filed a plea to the jurisdiction alleging the trial court did not have subject-matter jurisdiction because Trinity's claims were not ripe for adjudication, sought an advisory opinion, and were barred by sovereign immunity. Trinity responded by contending the TSSB was engaging in improper ad-hoc rule-making against RV and other viatical-settlement providers. As evidence, Trinity attached a hearing transcript from an enforcement action brought by the TSSB against another viatical-settlement provider, AGAP Life Offering, LLC (AGAP). The trial court granted the plea to the jurisdiction and issued the following conclusions of law: (1) Trinity's claims are not ripe for adjudication and its suit seeks an impermissible advisory opinion, (2) Trinity's UDJA claims against the TSSB are barred by sovereign immunity, (3) Trinity's UDJA claims against the Commissioner in his official capacity fail because Trinity did not allege an ultra vires action, and (4) the APA does not confer jurisdiction under section 2001.038 because Trinity did not challenge a TSSB rule.

## STANDARD OF REVIEW

[5] [6] Subject-matter jurisdiction is essential to the authority of a court to decide a case. *Rusk State Hosp. v. Black,* 392 S.W.3d 88, 94 (Tex.2012). A plea to the jurisdiction challenges the trial court's authority to determine the subject matter of a specific cause of action. *Heckman v. Williamson Cnty.,* 369 S.W.3d 137, 149 (Tex.2012). The purpose of a plea "is not to force the plaintiff to preview their case on the merits but to establish a reason why the merits of the plaintiffs' claims should never be reached." *Bland Indep. Sch. Dist. v. Blue,* 34 S.W.3d 547, 554 (Tex.2000). Because subject-matter jurisdiction presents a question of law, we review the district court's decision de novo. *Graber v. Fuqua,* 279 S.W.3d 608, 631 (Tex.2009).

[7] [8] [9] [10] When we consider a trial court's order on a plea to the jurisdiction, we look to the "plaintiff's petition to determine whether the facts pled affirmatively demonstrate that jurisdiction exists." *State v. Holland,* 221 S.W.3d 639, 642 (Tex.2007). The burden is on the plaintiff to affirmatively demonstrate the trial court's jurisdiction. *Heckman,* 369 S.W.3d at 137. In determining whether the plaintiff has met this burden, we construe the plaintiff's **\*501** pleadings liberally, taking all factual assertions as true, and look to the plaintiff's intent. *Id.* "A court deciding a plea to the jurisdiction is not required to look solely to the pleadings but may consider evidence and must do so when necessary to resolve the jurisdictional issues raised." *Bland Indep. Sch. Dist.,* 34 S.W.3d at 555. Here, Trinity submitted as evidence the State's petition filed on behalf of the TSSB in the RV suit and a transcript from the TSSB's enforcement hearing against AGAP.

## DISCUSSION

### A. Subject–Matter Jurisdiction under the APA

[11] [12] [13] In its first issue on appeal, Trinity argues that the trial court had jurisdiction over its claims against the TSSB under section 2001.038 of the APA. *See* Tex. Gov't Code § 2001.038. The APA allows a party to bring a declaratory-judgment action against an agency to challenge the validity or applicability of an agency rule if it is alleged that the rule or its threatened application interferes with or impairs a legal right or privilege of the plaintiff. *Id.;* *see Texas Dep't of Transp. v. Sunset Transp. Inc.,* 357 S.W.3d 691, 700 (Tex.App.-Austin 2011, no pet.). Section 2001.038 of the APA is considered a legislative grant of subject-matter jurisdiction, such that valid claims raised pursuant to its provisions are not barred by sovereign immunity. *See Combs v. Entertainment Publ'ns., Inc.,* 292 S.W.3d 712, 720 (Tex.App.-Austin 2009, no pet.); *Texas Dep't of Pub. Safety v. Salazar,* 304 S.W.3d 896, 903 (Tex.App.-Austin 2009, no pet.). If a party raises a valid rule challenge under the APA, the trial court's subject-matter jurisdiction is established. *See Combs,* 292 S.W.3d at 720. But a challenged agency action constituting a "rule"—as defined by the APA—must exist for a claimant to successfully invoke the trial court's subject-matter jurisdiction under section 2001.038. *See Slay v. Texas Comm'n. on Envtl. Quality,* 351 S.W.3d 532, 545 (Tex.App.-Austin 2011, pet. denied). If there is not a "rule" as defined by the APA, the claimant cannot seek declaratory relief under section 2001.038, and sovereign immunity bars the cause of action. *Id.*

[14] In this appeal, Trinity does not challenge an agency rule adopted by the TSSB through the formal rule-making procedures set forth in the APA. *See* Tex. Gov't Code § 2001.023–.034. Rather, Trinity argues that the TSSB's "publicly-announced interpretation of the TSA" in the RV suit is an ad hoc rule subject to challenge under the APA. "Ad hoc rulemaking occurs when the agency makes a determination that has implications beyond the instant parties but prefers not to make a formal rule because the agency may not have had sufficient experience with a particular problem to support making a rule or because the problem is so specialized and varying in nature as to be impossible of capture within the boundaries of a general rule." *CenterPoint Energy Entex v. Railroad Comm'n. of Tex.,* 213 S.W.3d 364, 369 (Tex.App.-Austin 2006, pet. dismissed). The TSSB, however, argues that statements made in its pleadings in the RV suit are not "rules" within the meaning of the APA, and therefore not subject to a challenge under section 2001.038. We agree with the TSSB.

[15] To invoke the trial court's jurisdiction under the APA, Trinity had the burden of establishing that the TSSB's "publicly-announced interpretation of the TSA" in the RV suit was a "rule" as defined by the APA. *See* Tex. Gov't Code §

2001.038; *see also Slay,* 351 S.W.3d at 544–45. The APA defines a "rule" as a "state agency statement of general applicability" **\*502** that "implements, interprets, or prescribes law or policy" or "describes the procedure or practice requirements of a state agency" but "does not include a statement regarding only the internal management or organization of a state agency and not affecting private rights or procedures." Tex. Gov't Code § 2001.003(6). But "[n]ot every administrative pronouncement is a rule within the meaning of the APA." *Salazar,* 304 S.W.3d at 906; *see Texas Educ. Agency v. Leeper,* 893 S.W.2d 432, 443 (Tex.1994). "This observation refers to the fact that administrative agencies routinely issue letters, guidelines, and reports, and occasionally file briefs in court proceedings, any of which might contain statements that intrinsically implement, interpret, or prescribe law, policy or procedure or practice requirements," but not all such statements are "rules" within the meaning of the APA. *Brinkley v. Texas Lottery Comm'n.,* 986 S.W.2d 764, 769 (Tex.App.-Austin 1999, no pet.) (also noting that an agency could not practically file a brief in court "if bound to express their views as to law, policy, and procedural requirements through contested-case decisions or formal rules exclusively").

[16] [17] In order to be considered a statement of "general applicability" under the APA, agency pronouncements must "affect the interest of the public at large such that they cannot be given the effect of law without public input." *El Paso Hosp. Dist. v. Texas Health & Human Servs. Comm'n.,* 247 S.W.3d 709, 714 (Tex.2008). Agency statements that "have no legal effect on private persons" are not considered rules. *Brinkley,* 986 S.W.2d at 770. When an agency adjudicates individual rights of parties through trial-type proceedings, the Texas Supreme Court has held that "statements made in determining individual rights, even if the number of individuals is large and they can be described as falling within a defined class" are not statements of general applicability. *Railroad Comm'n. v. WBD Oil & Gas Co.,* 104 S.W.3d 69, 79 (Tex.2003) (concluding field rules adopted through contested-case hearings "are not rules of general applicability which must not be made without public comment but are an adjudication of the individual interests principally affected"); *see also Combs,* 292 S.W.3d at 721 n. 4 (observing that field rules at issue in *WBD Oil* were "promulgated through trial-type proceedings ... that adjudicated the individual rights of the parties and could not, therefore, be challenged as generally applicable rules in a declaratory-judgment action under section 2001.038").

We conclude the TSSB's statements in the RV suit were limited solely to an adjudication of RV's individual rights under the TSA and are not statements of general applicability. *See WBD Oil & Gas Co.,* 104 S.W.3d at 79. The TSSB's petition in the RV suit specifically describes the business model and investment transactions of RV's Re–Sale Life Insurance Policy Program, analyzes the definition of "security" under the TSA, and concludes that the specific investments sold by RV were "securities" subject to regulation by the TSSB. But this statement applies only to RV and is based on the specific transactions involved in the Re–Sale Life Insurance Policy Program.

Further, the TSSB did not express an intention in the RV suit to apply this interpretation of the TSA in all future cases involving the sale of viatical settlements, regardless of whether the particular factual circumstances of a transaction might result in a different treatment. *Compare Combs,* 292 S.W.3d at 722 (emphasizing legal interpretation in Comptroller's letter constituted a rule because it would bind agency employees and "unambiguously express[ed] **\*503** an intent to apply this interpretation ... in all future cases involving brochure-fundraising firms, regardless of whether the particular circumstances of each transaction might have resulted in a different tax treatment"); *El Paso Hosp. Dist.,* 247 S.W.3d at 714 (concluding HHSC's cutoff date for submitting paid claims to determine Medicaid reimbursement rates was a "statement of general applicability because it applies to all hospitals"); *see also Texas State Bd. of Pharmacy v. Witcher,* No. 03–12–00560–CV, 2013 WL 1876467, at \*8 (Tex.App.-Austin May 3, 2013, no pet. h.) (motion for rehearing pending) (majority opinion concluding agency's reciprocal-sanctions policy met APA's definition of a "rule" because it was generally applicable to all pharmacists licensed in more than one state without regard to individual circumstances and Board intended "to apply the policy not just to Witcher but also prescriptively to others"). Rather, the TSSB's statements were made in seeking an adjudication only of RV's individual rights based on the specific investments they sold under their Re–Sale Life Insurance Policy Program and are not statements of generally applicability. *See WBD Oil & Gas Co.,* 104 S.W.3d at 79.

Further, the transcript from the TSSB's enforcement hearing against AGAP—another viatical-settlement provider—does not demonstrate that the TSSB has adopted an unwritten rule or policy of regulating all viatical settlements as securities without regard to individual circumstances. *See CenterPoint Energy,* 213 S.W.3d at 369 ("If the decision made during a ratemaking proceeding reflects a policy choice that has not been committed to a formal rule, it can be considered an ad hoc rulemaking."); *Witcher,* 2013 WL 1876467, at \*8 (majority opinion concluding "a policy that establishes a bright-line rule that is applicable without regard to individual circumstances" met definition of "rule" under APA). Rather, the TSSB's representative at the hearing repeatedly testified that not all viatical settlements are securities, and under Texas law, the TSSB must analyze the specific facts of an investment transaction and apply such facts to the TSA's definition of "security" to determine whether an

investment is a security subject to the TSSB's regulation. He further testified in great detail as to the specific facts of AGAP's investments—which differed from Trinity's—and applied these facts to the TSA's definition of security to conclude that AGAP's investments were securities subject to regulation. Because AGAP and RV had different factual circumstances, TSSB's legal theories and analysis in the two cases differed and neither case established a policy of regulating all viatical settlements without regard to individual circumstances.

Accordingly, we cannot conclude that Trinity has established that the TSSB's statements in the RV suit constituted a "rule" invoking the trial court's jurisdiction under the APA. We overrule Trinity's first issue on appeal.

### B. Subject–Matter Jurisdiction under the UDJA

Having concluded that Trinity failed to invoke the jurisdiction of the trial court under the APA, we next consider whether the trial court had jurisdiction under the UDJA. *See* Tex. Civ. Prac. & Rem.Code § 37.001–.011 (provisions of UDJA). Trinity sought two declarations under the UDJA: (1) a declaration that the appellees acted without statutory authority in the RV suit and (2) a declaration of its own rights and status under the TSA. Sovereign immunity bars both of Trinity's UDJA claims against the TSSB. *See Texas Dep't. of Transp. v. Sefzik,* 355 S.W.3d 618, 621 (Tex.2011) ("[T]he UDJA does not **\*504** waive the state's sovereign immunity when the plaintiff seeks a declaration of his or her rights under a statute."); *City of El Paso v. Heinrich,* 284 S.W.3d 366, 372–73 (Tex.2009) (suits seeking to restrain official conduct that is ultra vires of an agency's statutory or constitutional powers "cannot be brought against the state, which retains immunity, but must be brought against the state actors in their official capacity" because "acts of officials which are not lawfully authorized are not acts of the state"). With regard to Trinity's remaining claims against Morgan, we conclude Trinity failed to plead a justiciable controversy. For Trinity's first claim seeking a declaration that Morgan acted without statutory authority in the RV suit, we conclude Trinity is seeking an impermissible advisory opinion that will not resolve any controversy between the parties actually before the court. For Trinity's second claim seeking a declaration of its own rights and status under the TSA, we conclude that any controversy between the TSSB and Trinity at this time is based upon hypothetical facts that have not yet matured to a ripe controversy sufficient to confer jurisdiction on the trial court.[2]

[2]      Because we conclude Trinity failed to plead a justiciable controversy, we do not reach the issue of whether they raised valid ultra vires claims. *See Texas Dep't of Pub. Safety v. Salazar,* 304 S.W.3d 896, 906 (Tex.App.-Austin 2009, no pet.) ("While private parties may seek declaratory relief in connection with an alleged ultra vires act, a declaratory judgment requires a justiciable controversy as to the rights and status of parties actually before the court for adjudication.").

#### *Declaration that Morgan Acted Without Statutory Authority in the RV Suit*

**[18] [19] [20] [21] [22]** The UDJA is a remedial statute designed "to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations." Tex. Civ. Prac. & Rem.Code § 37.002(b). It provides in relevant part: "A person ... whose rights, status, or other legal relations are affected by a statute ... may have determined any question of construction or validity arising under the ... statute ... and obtain a declaration of rights, status, or legal relations thereunder." *Id.* § 37.004(a). The UDJA, however, does not enlarge a trial court's jurisdiction; rather, a declaratory-judgment action is merely a procedural device for deciding matters already within a trial court's subject-matter jurisdiction. *Heinrich,* 284 S.W.3d at 370. "Subject matter jurisdiction requires that the party bringing the suit must have standing, that there be a live controversy between the parties, and the case must be justiciable." *Tex. Dep't. of Banking v. Mount Olivet Cemetery Ass'n.,* 27 S.W.3d 276, 282 (Tex.App.-Austin 2000, pet. denied). Accordingly, to invoke the subject-matter jurisdiction of the court, a declaratory judgment action "requires a justiciable controversy as to the rights and status of the parties actually before the court for adjudication, and the declaration sought must actually resolve the controversy." *Brooks v. Northglen Ass'n.,* 141

S.W.3d 158, 163–64 (Tex.2004). A justiciable controversy is one in which a real and substantial controversy exists involving a genuine conflict of tangible interest and not merely a theoretical dispute. *Texas Dep't. of Pub. Safety v. Moore,* 985 S.W.2d 149, 154 (Tex.App.-Austin 1998, no pet.). Jurisdiction under the UDJA therefore "primarily depends on the nature of the controversy; whether the controversy is merely hypothetical or rises to the justiciable level." *Id.* at 154.

[23] We conclude Trinity is seeking an impermissible advisory opinion as the declaration it seeks—that the TSSB acted without statutory authority in the RV **\*505** suit—would not bind the parties to the current litigation nor provide specific relief to Trinity. *See Brinkley,* 986 S.W.2d at 767 ("The distinctive feature of an advisory opinion is that it decides an abstract question of law without binding the parties."). Rather, Trinity is seeking a declaration of the rights and status of RV—a party who is not before the court and cannot invoke the jurisdiction of the trial court. *See Brooks,* 141 S.W.3d at 163–64 (concluding trial court does not have jurisdiction to declare rights and status of parties who are not before the court). To invoke the jurisdiction of the trial court, Trinity must allege a justiciable controversy "as to the rights and status of parties actually before the court for adjudication" that will be resolved by the declaration sought. *Id.* Further, a declaration that the TSSB acted without statutory authority in the RV suit would not resolve whether Trinity is subject to the requirements of the TSA. Rather, Trinity's right to proceed with its proposed sale of viatical settlements would remain speculative because it is a fact-based determination. *See* Tex. Civ. Prac. & Rem.Code § 37.008 (allowing trial court to refuse to render declaratory judgment if it would not end controversy or uncertainty giving rise to proceeding). Accordingly, we conclude Trinity seeks an impermissible advisory opinion that would not bind the parties before the court and failed to invoke the jurisdiction of the trial court under the UDJA.

### Declaration of Trinity's Rights and Status under the TSA

[24] Trinity additionally seeks a declaration "that the sale of specified percentages of participations in the proceeds of life insurance policies does not constitute a security" under the TSA and that "Trinity is consequently not required to register with the TSSB its participations as securities." In this claim, Trinity is not challenging a specific agency action nor the validity of an agency rule. *See City of Waco v. Texas Nat'l. Res. Conservation Comm'n.,* 83 S.W.3d 169, 178 (Tex.App.-Austin 2002, pet. denied). Rather, Trinity seeks a declaration to clarify its own rights and status under the TSA. The UDJA grants any litigant whose rights are affected by a statute the opportunity to obtain a declaration of those rights under the statute. Tex. Civ. Prac. & Rem.Code § 37.004; *see also Texas Mun. Power Agency v. Public Util. Comm'n.,* 100 S.W.3d 510, 515 (Tex.App.-Austin 2003, pet denied). A declaratory-judgment action does not, however, give a court "jurisdiction to pass upon hypothetical or contingent situations, or to determine questions not then essential to the decision of an actual controversy, although such actions may in the future require adjudication." *Bexar Metro. Water Dist. v. City of Bulverde,* 234 S.W.3d 126, 130–31 (Tex.App.-Austin 2007, no pet.). After careful review of the record, we conclude any controversy between the TSSB and Trinity at this time is based upon hypothetical facts that have not yet matured to a ripe controversy sufficient to confer jurisdiction on the trial court. While the TSSB raises several challenges to the trial court's jurisdiction, the ripeness issue is dispositive. *See Waco Indep. Sch. Dist. v. Gibson,* 22 S.W.3d 849, 851 (Tex.2000).

[25] [26] [27] Ripeness implicates subject-matter jurisdiction and asks whether—at the time a lawsuit is filed—the facts have developed sufficiently so that an injury has occurred or is likely to occur, rather than being contingent or remote. *Rea v. State,* 297 S.W.3d 379, 383 (Tex.App.-Austin 2009, no pet.). A case is not ripe when its resolution depends on contingent or hypothetical facts, or upon events that have not yet come to pass. **\*506** *Patterson v. Planned Parenthood of Houston,* 971 S.W.2d 439, 442 (Tex.1998). A justiciable controversy, however, does not necessarily equate with a fully ripened cause of action. *Moore,* 985 S.W.2d at 153–54. Rather, an action for declaratory judgment will "lie when the fact situation manifests the presence of ripening seeds of a controversy," such that "the claims of several parties are present and indicative of threatened litigation in the immediate future which seems unavoidable, even though the differences between the parties as to their legal rights have not reached the state of an actual controversy." *Id.; see Save our Springs Alliance v. City of Austin,* 149 S.W.3d 674, 683 (Tex.App.-Austin 2004, no pet.) The constitutional prohibition against issuing advisory opinions also has a pragmatic, prudential aspect that aims to conserve "judicial time and resources for real and current controversies, rather than abstract, hypothetical, or remote disputes." *Patterson,* 971 S.W.2d at 443 (quoting *Mayhew v. Town of Sunnyvale,* 964 S.W.2d 922, 928 (Tex.1998)). In the administrative-law context, moreover, avoiding premature litigation over administrative determinations prevents courts from "entangling themselves in abstract disagreements over administrative policies" while simultaneously allowing the agency to perform its functions unimpeded. *Id.*

[28] [29] In determining whether a cause is ripe for judicial consideration, we look to whether the facts have sufficiently developed to show that an injury has occurred, or is likely to occur. *City of Waco,* 83 S.W.3d at 175. When a business—like Trinity—files a "pre-enforcement" suit seeking a declaration of its rights prior to an agency enforcement action, we have concluded the controversy is ripe for review only if "an enforcement action is imminent or sufficiently likely." *Atmos Energy Corp. v. Abbott,* 127 S.W.3d 852, 856 (Tex.App.-Austin 2004, no pet.); *see also Rea,* 297 S.W.3d at 383 ("To establish that a claim is ripe based on an injury that is *likely* to occur, the plaintiff must demonstrate that the injury is imminent, direct, and immediate, and not merely remote, conjectural, or hypothetical."). In this case, the pleadings and evidence indicate the TSSB has taken no action against Trinity.[3] Although the TSSB has brought an enforcement action against other viatical settlement providers, we cannot conclude that an enforcement action against Trinity is also imminent or sufficiently likely to occur at this time.

[3] Trinity pleads the TSSB sent its manager, Michael McDermott, correspondence in connection with the RV suit "alleging Mr. McDermott may have offered for sale and/or sold investments on behalf of RV." According to Trinity's pleadings, the TSSB letter was sent to Mr. McDermott because of his potential connection with the RV suit and not because of any action by Trinity or action by McDermott on Trinity's behalf.

Rather, whether the TSSB will bring an enforcement action against Trinity depends on many factual contingencies that have not yet come to pass and are not before the court, including whether Trinity chooses to begin selling viatical settlements, how Trinity ultimately structures its investments, the managerial efforts Trinity exerts in such sales, what type of investors purchase the viatical settlements, and whether the TSSB elects to bring an enforcement action against Trinity based on these future actions. Trinity's claim does not pose a pure question of law but instead asks the trial court to engage in a fact-based determination based upon contingent, hypothetical facts. *See Beacon Nat'l. Ins. Co. v. Montemayor,* 86 S.W.3d 260, 268 (Tex.App.-Austin 2002, no pet.) (concluding appellant's premature attempt to arrest the administrative process before the agency had taken an adverse action against it was not ripe when claim did not **\*507** present pure question of law but required the determination of several factual matters that had not sufficiently developed); *see also Atmos,* 127 S.W.3d at 858 (concluding "issues raised by appellants were not fit for judicial review because whether appellants are subject to the Ceiling Price Statute is dependent on many facts not before the trial court"); *see also Patterson,* 971 S.W.2d at 443 ("Litigation based upon hypothetical possibility rather than concrete fact is apt to be poor litigation.").

Further, we cannot conclude that the TSSB's enforcement actions against other viatical-settlement providers demonstrates that an enforcement action against Trinity is also imminent at this time. Whether a particular viatical settlement is subject to the TSA is a fact-based determination contingent upon a number of factors, including whether the profitability of the enterprise is determined by the death of the insureds or the essential managerial efforts of the provider. *See Life Partners, Inc.,* 87 F.3d at 542–48; *Mutual Benefits Corp.,* 408 F.3d at 743–45; *Griffitts,* 2004 WL 1178418, at \*2. Trinity pleaded that it "proposed to engage in the sale of viatical settlements" but did not plead that its investments or business would be structured identically to RV's or any other viatical-settlement provider the TSSB has previously instituted enforcement proceedings against.[4] Because Trinity's specific factual circumstances may differ from other viatical-settlement providers, we cannot conclude that an enforcement action against Trinity is imminent or sufficiently likely at this time. Accordingly, we conclude that Trinity's requested declaration of its rights and status under the TSA is not ripe for review and failed to invoke the trial court's jurisdiction under the UDJA because it is based on hypothetical facts. We further conclude that whether the TSSB will bring a future action is too speculative to support Trinity's contention that they are under an imminent threat of enforcement. *See Atmos,* 127 S.W.3d at 858.

[4] In its appellate brief, Trinity states that it did not intend to "suggest that Trinity's entire business model or systems and processes were going to be identical to those of RV."

## CONCLUSION

Having determined Trinity's petition did not invoke the trial court's jurisdiction, we affirm the trial court's grant of the plea to the jurisdiction.[5]

[5]    The Texas Supreme Court has instructed us that if a claimant's pleadings omit sufficient facts to affirmatively demonstrate the trial court's jurisdiction but do not affirmatively demonstrate incurable defects in jurisdiction, the issue is one of "pleading sufficiency, and the plaintiffs should be afforded the opportunity to amend." *Texas Dep't of Parks & Wildlife v. Miranda,* 133 S.W.3d 217, 226–27 (Tex.2004). This is not such a case. Rather, we conclude the pleadings "affirmatively negate the existence of jurisdiction" and the "plea to the jurisdiction may be granted without allowing the plaintiffs an opportunity to amend." *Id.*

**All Citations**

417 S.W.3d 494, Blue Sky L. Rep. P 75,042

---

    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

22 TAC § 174.4
Tex. Admin. Code tit. 22, § 174.4
TEXAS ADMINISTRATIVE CODE
TITLE 22. EXAMINING BOARDS
PART 9. TEXAS MEDICAL BOARD
CHAPTER 174. TELEMEDICINE

Effective:TAX

§ 174.4. Use of the Internet in Medical Practice

(a) Evaluation of the Patient. Physicians who utilize the Internet must ensure a proper physician-patient relationship is established that at a minimum includes:

(1) establishing that the person requesting the treatment is in fact who the person claims to be;

(2) establishing a diagnosis through the use of acceptable medical practices such as patient history, mental status examination, physical examination, and appropriate diagnostic and laboratory testing to establish diagnoses and identify underlying conditions and/or contra-indications to treatment recommended/provided;

(3) discussing with the patient the diagnosis and the evidence for it, the risks and benefits of various treatment options; and

(4) ensuring the availability of the physician or coverage of the patient for appropriate follow-up care.

(b) Treatment. Treatment and consultation recommendations made in an online setting, including issuing a prescription via electronic means, will be held to the same standards of appropriate practice as those in traditional (face-to-face) settings. An online or telephonic evaluation by questionnaire does not constitute an acceptable standard of care.

(c) State Licensure. Physicians who treat and prescribe through the Internet are practicing medicine and must possess appropriate licensure in all jurisdictions where patients reside.

(d) Electronic Communications.

(1) Written policies and procedures must be maintained when using electronic mail for physician-patient communications. Policies must be evaluated periodically for currency. Such policies and procedures must address:

(A) privacy to assure confidentiality and integrity of patient-identifiable information;

(B) health care personnel, in addition to the physician, who will process messages;

(C) hours of operation and availability;

(D) types of transactions that will be permitted electronically;

(E) required patient information to be included in the communication, such as patient name, identification number and type of transaction;

(F) archival and retrieval; and

(G) quality oversight mechanisms.

(2) All patient-physician e-mail, as well as other patient-related electronic communications, must be stored and filed in the patient's medical record.

(3) Patients must be informed of alternative forms of communication for urgent matters.

(e) Medical Records.

(1) Medical records must include copies of all patient-related electronic communications, including patient-physician e-mail, prescriptions, laboratory and test results, evaluations and consultations, records of past care and instructions.

(2) Notice of privacy practices related to the use of e-mail must be filed in the medical record.

(f) Disclosure. Physician medical practice sites must clearly disclose:

(1) ownership of the website;

(2) specific services provided;

(3) office address and contact information;

(4) licensure and qualifications of physician(s) and associated health care providers;

(5) fees for online consultation and services and how payment is to be made;

(6) financial interest in any information, products, or services;

(7) appropriate uses and limitations of the site, including providing health advice and emergency health situations;

(8) uses and response times for e-mails, electronic messages, and other communications transmitted via the site;

(9) to whom patient health information may be disclosed and for what purpose;

(10) rights of patients with respect to patient health information; and

(11) information collected and any passive tracking mechanisms utilized.

(g) Accountability. Medical practice sites must provide patients with a clear mechanism to:

(1) access, supplement, and amend patient-provided personal health information;

(2) provide feedback regarding the site and the quality of information and services; and

(3) register complaints, including information regarding filing a complaint with the Texas State Board of Medical Examiners as provided for in Chapter 178 of this title (relating to Complaints).

(h) Advertising/Promotion of Goods or Products. Advertising or promotion of goods or products from which the physician receives direct remuneration or incentives is prohibited.

**Source:** The provisions of this § 174.4 adopted to be effective July 4, 2004, 29 TexReg 6088.

Current through December 31, 2009
Copr. (c) 2009. All rights reserved.

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Texas Administrative Code
  Title 22. Examining Boards
    Part 9. Texas Medical Board
      Chapter 174. Telemedicine

22 TAC § 174.8

Tex. Admin. Code tit. 22, § 174.8

§ 174.8. Evaluation and Treatment of the Patient

Currentness

(a) Evaluation of the Patient. Distant site providers who utilize telemedicine medical services must ensure that a defined physician-patient relationship is established which at a minimum includes:

> (1) establishing that the person requesting the treatment is in fact who the person claims to be;

> (2) establishing a diagnosis through the use of acceptable medical practices, including documenting and performing patient history, mental status examination, and physical examination that must be performed as part of a face-to-face or in-person evaluation as defined in § 174.2(3) and (4) of this title (relating to Definitions). The requirement for a face-to-face or in-person evaluation does not apply to mental health services, except in cases of behavioral emergencies, as defined by 25 TAC § 415.253 (relating to Definitions), and appropriate diagnostic and laboratory testing to establish diagnoses, as well as identify underlying conditions or contra-indications, or both, to treatment recommended or provided;

> (3) discussing with the patient the diagnosis and the evidence for it, the risks and benefits of various treatment options; and

> (4) ensuring the availability of the distant site provider or coverage of the patient for appropriate follow-up care.

(b) Treatment. Treatment and consultation recommendations made in an online setting, including issuing a prescription via electronic means, will be held to the same standards of acceptable medical practices as those in traditional in-person clinical settings.

(c) An online questionnaire or questions and answers exchanged through email, electronic text, or chat or telephonic evaluation of or consultation with a patient are inadequate to establish a defined physician-patient relationship.

**Credits**
**Source:** The provisions of this § 174.8 adopted to be effective October 17, 2010, 35 TexReg 9085; amended to be effective June 4, 2015, 40 TexReg 3148.

Current through 40 Tex.Reg. No. 4262, dated June 26, 2015, as effective on or before June 30, 2015

22 TAC § 174.8, 22 TX ADC § 174.8

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Texas Administrative Code
  Title 22. Examining Boards
    Part 9. Texas Medical Board
      Chapter 190. Disciplinary Guidelines
        Subchapter B. Violation Guidelines

22 TAC § 190.8

Tex. Admin. Code tit. 22, § 190.8

§ 190.8. Violation Guidelines

Currentness

<Teladoc, Inc. v. Texas Medical Bd.,--- F.Supp.3d ----, 2015 WL 4103658 (W.D.Tex.,2015.) enjoined this section from taking effect, providing that "Defendants are enjoined from taking any action to implement, enact and enforce New Rule 190.8 from taking effect pending final resolution of the claims brought by Plaintiffs in their Complaint.">

When substantiated by credible evidence, the following acts, practices, and conduct are considered to be violations of the Act. The following shall not be considered an exhaustive or exclusive listing.

(1) Practice Inconsistent with Public Health and Welfare. Failure to practice in an acceptable professional manner consistent with public health and welfare within the meaning of the Act includes, but is not limited to:

(A) failure to treat a patient according to the generally accepted standard of care;

(B) negligence in performing medical services;

(C) failure to use proper diligence in one's professional practice;

(D) failure to safeguard against potential complications;

(E) improper utilization review;

(F) failure to timely respond in person when on-call or when requested by emergency room or hospital staff;

(G) failure to disclose reasonably foreseeable side effects of a procedure or treatment;

(H) failure to disclose reasonable alternative treatments to a proposed procedure or treatment;

(I) failure to obtain informed consent from the patient or other person authorized by law to consent to treatment on the patient's behalf before performing tests, treatments, procedures, or autopsies as required under Chapter 49 of the Code of Criminal Procedure;

(J) termination of patient care without providing reasonable notice to the patient;

(K) prescription or administration of a drug in a manner that is not in compliance with Chapter 200 of this title (relating to Standards for Physicians Practicing Complementary and Alternative Medicine) or, that is either not approved by the Food and Drug Administration (FDA) for use in human beings or does not meet standards for off-label use, unless an exemption has otherwise been obtained from the FDA;

(L) prescription of any dangerous drug or controlled substance without first establishing a defined physician-patient relationship.

(i) A defined physician-patient relationship must include, at a minimum:

(I) establishing that the person requesting the medication is in fact who the person claims to be;

(II) establishing a diagnosis through the use of acceptable medical practices, which includes documenting and performing:

(-a-) patient history;

(-b-) mental status examination;

(-c-) physical examination that must be performed by either a face-to-face visit or in-person evaluation as defined in §174.2(3) and (4) of this title (relating to Definitions). The requirement for a face-to-face or in-person evaluation does not apply to mental health services, except in cases of behavioral emergencies, as defined by 25 TAC §415.253 (relating to Definitions); and

(-d-) appropriate diagnostic and laboratory testing.

(III) An online questionnaire or questions and answers exchanged through email, electronic text, or chat or telephonic evaluation of or consultation with a patient are inadequate to establish a defined physician-patient relationship;

(IV) discussing with the patient the diagnosis and the evidence for it, the risks and benefits of various treatment options; and

(V) ensuring the availability of the licensee or coverage of the patient for appropriate follow-up care.

(ii) A proper professional relationship is also considered to exist between a patient certified as having a terminal illness and who is enrolled in a hospice program, or another similar formal program which meets the requirements of subclauses (I) through (IV) of this clause, and the physician supporting the program. To have a terminal condition for the purposes of this rule, the patient must be certified as having a terminal illness under the requirements of 40 TAC §97.403 (relating to Standards Specific to Agencies Licensed to Provide Hospice Service) and 42 CFR 418.22.

(iii) Notwithstanding the provisions of this subparagraph, establishing a professional relationship is not required for:

(I) a physician to prescribe medications for sexually transmitted diseases for partners of the physician's established patient, if the physician determines that the patient may have been infected with a sexually transmitted disease; or

(II) a physician to prescribe dangerous drugs and/or vaccines for a patient's close contacts if the physician diagnoses the patient with one or more of the following infectious diseases listed in items (-a-)-(-g-) of this subclause. For the purpose of this clause, a "close contact" is defined as: any person who provided care for the patient while the patient was symptomatic; or a member of the patient's household. The physician must document the treatment provided to the patient's close contact(s) in the patient's medical record. Such documentation at a minimum must include the close contact's name, drug prescribed, and the date that the prescription was provided.

(-a-) Chicken Pox;

(-b-) Influenza;

(-c-) Invasive Haemophilus influenzae Type B;

(-d-) Meningococcal disease;

(-e-) Pertussis;

(-f-) Scabies; or

(-g-) Shingles.

(M) inappropriate prescription of dangerous drugs or controlled substances to oneself, family members, or others in which there is a close personal relationship that would include the following:

(i) prescribing or administering dangerous drugs or controlled substances without taking an adequate history, performing a proper physical examination, and creating and maintaining adequate records; and

(ii) prescribing controlled substances in the absence of immediate need. "Immediate need" shall be considered no more than 72 hours.

(N) providing on-call back-up by a person who is not licensed to practice medicine in this state or who does not have adequate training and experience.

(O) delegating the performance of nerve conduction studies to a person who is not licensed as a physician or physical therapist without:

(i) first selecting the appropriate nerve conductions to be performed;

(ii) ensuring that the person performing the study is adequately trained;

(iii) being onsite during the performance of the study; and

(iv) being immediately available to provide the person with assistance and direction.

(2) Unprofessional and Dishonorable Conduct. Unprofessional and dishonorable conduct that is likely to deceive, defraud, or injure the public within the meaning of the Act includes, but is not limited to:

(A) violating a board order;

(B) failing to comply with a board subpoena or request for information or action;

(C) providing false information to the board;

(D) failing to cooperate with board staff;

(E) engaging in sexual contact with a patient;

(F) engaging in sexually inappropriate behavior or comments directed towards a patient;

(G) becoming financially or personally involved with a patient in an inappropriate manner;

(H) referring a patient to a facility, laboratory, or pharmacy without disclosing the existence of the licensee's ownership interest in the entity to the patient;

(I) using false, misleading, or deceptive advertising;

(J) providing medically unnecessary services to a patient or submitting a billing statement to a patient or a third party payer that the licensee knew or should have known was improper. "Improper" means the billing statement is false, fraudulent, misrepresents services provided, or otherwise does not meet professional standards;

(K) behaving in an abusive or assaultive manner towards a patient or the patient's family or representatives that interferes with patient care or could be reasonably expected to adversely impact the quality of care rendered to a patient;

(L) failing to timely respond to communications from a patient;

(M) failing to complete the required amounts of CME;

(N) failing to maintain the confidentiality of a patient;

(O) failing to report suspected abuse of a patient by a third party, when the report of that abuse is required by law;

(P) behaving in a disruptive manner toward licensees, hospital personnel, other medical personnel, patients, family members or others that interferes with patient care or could be reasonably expected to adversely impact the quality of care rendered to a patient;

(Q) entering into any agreement whereby a licensee, peer review committee, hospital, medical staff, or medical society is restricted in providing information to the board; and

(R) commission of the following violations of federal and state laws whether or not there is a complaint, indictment, or conviction:

    (i) any felony;

    (ii) any offense in which assault or battery, or the attempt of either is an essential element;

    (iii) any criminal violation of the Medical Practice Act or other statutes regulating or pertaining to the practice of medicine;

    (iv) any criminal violation of statutes regulating other professions in the healing arts that the licensee is licensed in;

(v) any misdemeanor involving moral turpitude as defined by paragraph (6) of this section;

(vi) bribery or corrupt influence;

(vii) burglary;

(viii) child molestation;

(ix) kidnapping or false imprisonment;

(x) obstruction of governmental operations;

(xi) public indecency; and

(xii) substance abuse or substance diversion.

(S) contacting or attempting to contact a complainant, witness, medical peer review committee member, or professional review body as defined under §160.001 of the Act regarding statements used in an active investigation by the board for purposes of intimidation. It is not a violation for a licensee under investigation to have contact with a complainant, witness, medical peer review committee member, or professional review body if the contact is in the normal course of business and unrelated to the investigation.

(T) failing to timely submit complete forms for purposes of registration as set out in §166.1 of this title (relating to Physician Registration) when it is the intent of the licensee to maintain licensure with the board as indicated through submission of an application and fees prior to one year after a permit expires.

(3) Disciplinary actions by another state board. A voluntary surrender of a license in lieu of disciplinary action or while an investigation or disciplinary action is pending constitutes disciplinary action within the meaning of the Act. The voluntary surrender shall be considered to be based on acts that are alleged in a complaint or stated in the order of voluntary surrender, whether or not the licensee has denied the facts involved.

(4) Disciplinary actions by peer groups. A voluntary relinquishment of privileges or a failure to renew privileges with a hospital, medical staff, or medical association or society while investigation or a disciplinary action is pending or is on appeal constitutes disciplinary action that is appropriate and reasonably supported by evidence submitted to the board, within the meaning of §164.051(a)(7) the Act.

(5) Repeated or recurring meritorious health care liability claims. It shall be presumed that a claim is "meritorious," within the meaning of §164.051(a)(8) of the Act, if there is a finding by a judge or jury that a licensee was negligent in the care of a patient or if there is a settlement of a claim without the filing of a lawsuit or a settlement of a lawsuit against the licensee in the amount

of $50,000 or more. Claims are "repeated or recurring," within the meaning of §164.051(a)(8) of the Act, if there are three or more claims in any five-year period. The date of the claim shall be the date the licensee or licensee's medical liability insurer is first notified of the claim, as reported to the board pursuant to §160.052 of the Act or otherwise.

(6) Discipline based on Criminal Conviction. The board is authorized by the following separate statutes to take disciplinary action against a licensee based on a criminal conviction:

(A) Felonies.

(i) Section 164.051(a)(2)(B) of the Medical Practice Act, §204.303(a)(2) of the Physician Assistant Act, and §203.351(a)(7) of the Acupuncture Act, (collectively, the "Licensing Acts") authorize the board to take disciplinary action based on a conviction, deferred adjudication, community supervision, or deferred disposition for any felony.

(ii) Chapter 53, Texas Occupations Code authorizes the board to revoke or suspend a license on the grounds that a person has been convicted of a felony that directly relates to the duties and responsibilities of the licensed occupation.

(iii) Because the provisions of the Licensing Acts may be based on either conviction or a form of deferred adjudication, the board determines that the requirements of the Act are stricter than the requirements of Chapter 53 and, therefore, the board is not required to comply with Chapter 53, pursuant to §153.0045 of the Act.

(iv) Upon the initial conviction for any felony, the board shall suspend a physician's license, in accordance with §164.057(a)(1)(A), of the Act.

(v) Upon final conviction for any felony, the board shall revoke a physician's license, in accordance with §164.057(b) of the Act.

(B) Misdemeanors.

(i) Section 164.051(a)(2)(B) of the Act authorizes the board to take disciplinary action based on a conviction, deferred adjudication, community supervision, or deferred disposition for any misdemeanor involving moral turpitude.

(ii) Chapter 53, Texas Occupations Code authorizes the board to revoke or suspend a license on the grounds that a person has been convicted of a misdemeanor that directly relates to the duties and responsibilities of the licensed occupation.

(iii) For a misdemeanor involving moral turpitude, the provisions of §164.051(a)(2) of the Medical Practice Act and §205.351(a)(7) of the Acupuncture Act, may be based on either conviction or a form of deferred adjudication, and therefore the board determines that the requirements of these licensing acts are stricter than the requirements of Chapter 53 and the board is not required to comply with Chapter 53, pursuant to §153.0045 of the Act.

(iv) The Medical Practice Act and the Acupuncture Act do not authorize disciplinary action based on conviction for a misdemeanor that does not involve moral turpitude. The Physician Assistant Act does not authorize disciplinary action based on conviction for a misdemeanor. Therefore these licensing acts are not stricter than the requirements of Chapter 53 in those situations. In such situations, the conviction will be considered to directly relate to the practice of medicine if the act:

(I) arose out of the practice of medicine, as defined by the Act;

(II) arose out of the practice location of the physician;

(III) involves a patient or former patient;

(IV) involves any other health professional with whom the physician has or has had a professional relationship;

(V) involves the prescribing, sale, distribution, or use of any dangerous drug or controlled substance; or

(VI) involves the billing for or any financial arrangement regarding any medical service;

(v) Misdemeanors involving moral turpitude. Misdemeanors involving moral turpitude, within the meaning of the Act, are those that involve dishonesty, fraud, deceit, misrepresentation, deliberate violence, or that reflect adversely on a licensee's honesty, trustworthiness, or fitness to practice under the scope of the person's license.

(C) In accordance with §164.058 of the Act, the board shall suspend the license of a licensee serving a prison term in a state or federal penitentiary during the term of the incarceration regardless of the offense.

(7) Violations of the Health and Safety Code. In accordance with §164.055 of the Act, the Board shall take appropriate disciplinary action against a physician who violates §170.002 or Chapter 171, Texas Health and Safety Code.

(8) For purposes of §164.051(a)(4)(C) of the Texas Occupations Code, any use of a substance listed in Schedule I, as established by the Commissioner of the Department of State Health Services under Chapter 481, or as established under the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. §801 et seq.) constitutes excessive use of such substance.

**Credits**
**Source:** The provisions of this §190.8 adopted to be effective November 30, 2003, 28 TexReg 10496; amended to be effective July 4, 2004, 29 TexReg 6092; amended to be effective January 25, 2006, 31 TexReg 396; amended to be effective July 3, 2007, 32 TexReg 3994; amended to be effective June 24, 2009, 34 TexReg 4124; amended to be effective October 3, 2010, 35 TexReg 8754; amended to be effective June 28, 2011, 36 TexReg 3921; amended to be effective December 18, 2011, 36 TexReg 8378; amended to be effective July 4, 2012, 37 TexReg 4929; amended to be effective December 23, 2012, 37 TexReg 9774; amended to be effective August 3, 2014, 39 TexReg 5750; amended to be effective December 7, 2014, 39 TexReg 9345; amended to be effective June 3, 2015, 40 TexReg 3159.

Current through 40 Tex.Reg. No. 4262, dated June 26, 2015, as effective on or before June 30, 2015

22 TAC § 190.8, 22 TX ADC § 190.8

**End of Document**                                   © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Government Code (Refs & Annos)
    Title 2. Judicial Branch (Refs & Annos)
      Subtitle A. Courts
        Chapter 22. Appellate Courts
          Subchapter A. Supreme Court

V.T.C.A., Government Code § 22.001

§ 22.001. Jurisdiction

Effective: September 1, 2003
Currentness

(a) The supreme court has appellate jurisdiction, except in criminal law matters, coextensive with the limits of the state and extending to all questions of law arising in the following cases when they have been brought to the courts of appeals from appealable judgment of the trial courts:

(1) a case in which the justices of a court of appeals disagree on a question of law material to the decision;

(2) a case in which one of the courts of appeals holds differently from a prior decision of another court of appeals or of the supreme court on a question of law material to a decision of the case;

(3) a case involving the construction or validity of a statute necessary to a determination of the case;

(4) a case involving state revenue;

(5) a case in which the railroad commission is a party; and

(6) any other case in which it appears that an error of law has been committed by the court of appeals, and that error is of such importance to the jurisprudence of the state that, in the opinion of the supreme court, it requires correction, but excluding those cases in which the jurisdiction of the court of appeals is made final by statute.

(b) A case over which the court has jurisdiction under Subsection (a) may be carried to the supreme court either by writ of error or by certificate from the court of appeals, but the court of appeals may certify a question of law arising in any of those cases at any time it chooses, either before or after the decision of the case in that court.

(c) An appeal may be taken directly to the supreme court from an order of a trial court granting or denying an interlocutory or permanent injunction on the ground of the constitutionality of a statute of this state. It is the duty of the supreme court to prescribe the necessary rules of procedure to be followed in perfecting the appeal.

(d) The supreme court has the power, on affidavit or otherwise, as the court may determine, to ascertain the matters of fact that are necessary to the proper exercise of its jurisdiction.

(e) For purposes of Subsection (a)(2), one court holds differently from another when there is inconsistency in their respective decisions that should be clarified to remove unnecessary uncertainty in the law and unfairness to litigants.

**Credits**

Acts 1985, 69th Leg., ch. 480, § 1, eff. Sept. 1, 1985. Amended by Acts 1987, 70th Leg., ch. 1106, § 1, eff. June 20, 1987; Acts 2003, 78th Leg., ch. 204, § 1.04, eff. Sept. 1, 2003.

Notes of Decisions (280)

V. T. C. A., Government Code § 22.001, TX GOVT § 22.001
Current through Chapters effective immediately through Chapter 46 of the 2015 Regular Session of the 84th Legislature

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Government Code (Refs & Annos)
    Title 10. General Government (Refs & Annos)
      Subtitle A. Administrative Procedure and Practice
        Chapter 2001. Administrative Procedure (Refs & Annos)
          Subchapter A. General Provisions (Refs & Annos)

V.T.C.A., Government Code § 2001.003

§ 2001.003. Definitions

Effective: September 1, 2005
Currentness

In this chapter:

(1) "Contested case" means a proceeding, including a ratemaking or licensing proceeding, in which the legal rights, duties, or privileges of a party are to be determined by a state agency after an opportunity for adjudicative hearing.

(2) "License" includes the whole or a part of a state agency permit, certificate, approval, registration, or similar form of permission required by law.

(3) "Licensing" includes a state agency process relating to the granting, denial, renewal, revocation, suspension, annulment, withdrawal, or amendment of a license.

(4) "Party" means a person or state agency named or admitted as a party.

(5) "Person" means an individual, partnership, corporation, association, governmental subdivision, or public or private organization that is not a state agency.

(6) "Rule":

   (A) means a state agency statement of general applicability that:

      (i) implements, interprets, or prescribes law or policy; or

      (ii) describes the procedure or practice requirements of a state agency;

   (B) includes the amendment or repeal of a prior rule; and

(C) does not include a statement regarding only the internal management or organization of a state agency and not affecting private rights or procedures.

(7) "State agency" means a state officer, board, commission, or department with statewide jurisdiction that makes rules or determines contested cases. The term includes the State Office of Administrative Hearings for the purpose of determining contested cases. The term does not include:

(A) a state agency wholly financed by federal money;

(B) the legislature;

(C) the courts;

(D) the Texas Department of Insurance, as regards proceedings and activities under Title 5, Labor Code, [1] of the department, the commissioner of insurance, or the commissioner of workers' compensation; or

(E) an institution of higher education.

**Credits**

Added by Acts 1993, 73rd Leg., ch. 268, § 1, eff. Sept. 1, 1993. Amended by Acts 2005, 79th Leg., ch. 265, § 6.007, eff. Sept. 1, 2005.

**Editors' Notes**

**REVISOR'S NOTE**

**2008 Main Volume**

The source law states that "contested case" means a certain type of proceeding, "including but not restricted to" a ratemaking or licensing proceeding. The revised law omits the words "but not restricted to" because under Sections 311.005 of this code (Code Construction Act) and 312.011 of this code, "including" is a term of enlargement and not of limitation, and use of the term does not create a presumption that components not expressed are excluded.

Footnotes

1    V.T.C.A., Labor Code § 401.001 et seq.

V. T. C. A., Government Code § 2001.003, TX GOVT § 2001.003

Current through Chapters effective immediately through Chapter 46 of the 2015 Regular Session of the 84th Legislature

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Government Code (Refs & Annos)
    Title 10. General Government (Refs & Annos)
      Subtitle A. Administrative Procedure and Practice
        Chapter 2001. Administrative Procedure (Refs & Annos)
          Subchapter B. Rulemaking

V.T.C.A., Government Code § 2001.035

§ 2001.035. Substantial Compliance Requirement; Time Limit on Procedural Challenge

Currentness

(a) A rule is voidable unless a state agency adopts it in substantial compliance with Sections 2001.0225 through 2001.034.

(b) A person must initiate a proceeding to contest a rule on the ground of noncompliance with the procedural requirements of Sections 2001.0225 through 2001.034 not later than the second anniversary of the effective date of the rule.

(c) A state agency substantially complies with the requirements of Section 2001.033 if the agency's reasoned justification demonstrates in a relatively clear and logical fashion that the rule is a reasonable means to a legitimate objective.

(d) A mere technical defect that does not result in prejudice to a person's rights or privileges is not grounds for invalidation of a rule.

**Credits**
Added by Acts 1993, 73rd Leg., ch. 268, § 1, eff. Sept. 1, 1993. Amended by Acts 1999, 76th Leg., ch. 558, § 3, eff. Sept. 1, 1999.

**Editors' Notes**

**REVISOR'S NOTE**

**2008 Main Volume**

(1) The revised law substitutes "January 1, 1976," for the source law reference to a rule "hereafter" adopted because the provision became effective on that date.

(2) The source law refers to adoption of a rule "in substantial compliance with this section." The revised law substitutes "Sections 2001.023-2001.034" for "this section" because Section 5 of the source law is revised as Sections 2001.023-2001.034 of this chapter.

V. T. C. A., Government Code § 2001.035, TX GOVT § 2001.035
Current through Chapters effective immediately through Chapter 46 of the 2015 Regular Session of the 84th Legislature

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Government Code (Refs & Annos)
    Title 10. General Government (Refs & Annos)
      Subtitle A. Administrative Procedure and Practice
        Chapter 2001. Administrative Procedure (Refs & Annos)
          Subchapter B. Rulemaking

V.T.C.A., Government Code § 2001.038

§ 2001.038. Declaratory Judgment

Currentness

(a) The validity or applicability of a rule, including an emergency rule adopted under Section 2001.034, may be determined in an action for declaratory judgment if it is alleged that the rule or its threatened application interferes with or impairs, or threatens to interfere with or impair, a legal right or privilege of the plaintiff.

(b) The action may be brought only in a Travis County district court.

(c) The state agency must be made a party to the action.

(d) A court may render a declaratory judgment without regard to whether the plaintiff requested the state agency to rule on the validity or applicability of the rule in question.

(e) An action brought under this section may not be used to delay or stay a hearing in which a suspension, revocation, or cancellation of a license by a state agency is at issue before the agency after notice of the hearing has been given.

(f) A Travis County district court in which an action is brought under this section, on its own motion or the motion of any party, may request transfer of the action to the Court of Appeals for the Third Court of Appeals District if the district court finds that the public interest requires a prompt, authoritative determination of the validity or applicability of the rule in question and the case would ordinarily be appealed. After filing of the district court's request with the court of appeals, transfer of the action may be granted by the court of appeals if it agrees with the findings of the district court concerning the application of the statutory standards to the action. On entry of an order by the court of appeals granting transfer, the action is transferred to the court of appeals for decision, and the validity or applicability of the rule in question is subject to judicial review by the court of appeals. The administrative record and the district court record shall be filed by the district clerk with the clerk of the court of appeals. The court of appeals may direct the district court to conduct any necessary evidentiary hearings in connection with the action.

**Credits**
Added by Acts 1993, 73rd Leg., ch. 268, § 1, eff. Sept. 1, 1993. Amended by Acts 1999, 76th Leg., ch. 894, § 1, eff. Sept. 1, 1999.

V. T. C. A., Government Code § 2001.038, TX GOVT § 2001.038
Current through Chapters effective immediately through Chapter 46 of the 2015 Regular Session of the 84th Legislature

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Board of Medical Examiners to adopt rules and bylaws as necessary to: govern its own proceedings; perform its duties; regulate the practice of medicine in this state; and enforce this subtitle.

The following are affected by the proposed repeals: Article 21.53F of the Insurance Code; Government Code §531.0217(i) and Texas Occupations Code Annotated, §153.004.

§174.1. *Purpose.*
§174.2. *Definitions.*
§174.3. *Qualifications for Special Purpose License for Practice of Medicine Across State Lines.*
§174.4. *Limits on Special Purpose License to Practice Medicine Across State Lines.*
§174.5. *Denial of Application for Special Purpose License to Practice Medicine Across State Lines.*
§174.6. *Revocation and Limitation of Special Purpose License.*
§174.7. *Cooperation.*
§174.8. *Appearances.*
§174.9. *Patient Medical Records.*
§174.10. *Informed Consent.*
§174.11. *Address Changes.*
§174.12. *Delegation and Supervision.*
§174.13. *Exemptions.*
§174.14. *Temporary Suspension of Special Purpose License.*
§174.15. *Fees and Failure To Submit Fees.*
§174.16. *Registration Requirements.*
§174.17. *Use of the Internet in Medical Practice.*
This agency hereby certifies that the proposal has been reviewed by legal counsel and found to be within the agency's legal authority to adopt.

Filed with the Office of the Secretary of State on April 12, 2004.

TRD-200402445
Donald W. Patrick, MD, JD
Executive Director
Texas State Board of Medical Examiners
Earliest possible date of adoption: May 23, 2004
For further information, please call: (512) 305-7016

♦　　　♦　　　♦

## 22 TAC §§174.1 - 174.5

The new sections are proposed under the authority of the Occupations Code Annotated, §153.001, which provides the Texas State Board of Medical Examiners to adopt rules and bylaws as necessary to: govern its own proceedings; perform its duties; regulate the practice of medicine in this state; and enforce this subtitle.

The following are affected by the proposed new rules: Article 21.53F of the Insurance Code; Government Code §531.0217(i) and Texas Occupations Code Annotated, §153.004.

§174.1. *Purpose.*
This chapter is promulgated to establish standards for the use of the Internet and provision of telemedicine medical services by physicians who are licensed to practice medicine in this State.

§174.2. *Definitions.*
The following words and terms, when used in this chapter shall have the following meanings unless the context indicates otherwise.

(1) Medical practice site--A patient-specific Internet site, access to which is limited to licensed physicians, associated medical personnel and patients. It is an interactive site and thus qualifies as a practice location. It requires a defined physician-patient relationship.

(2) Medium--Any mechanism of information transfer including electronic means.

(3) Person--An individual unless otherwise expressly made applicable to a partnership, association, or corporation.

(4) Physician-patient e-mail--A computer-based communication between physician (or their medical personnel) and patients within a professional relationship in which the physician has taken on an explicit measure of responsibility for the patient's care.

(5) Telemedicine medical service--A health care service initiated by a physician or provided by a health professional acting under physician delegation and supervision, for purposes of assessment by a health professional, diagnosis or consultation by a physician, treatment, or the transfer of medical data, that requires the use of advanced telecommunications other than by telephone or facsimile as described in §57.042 of the Utilities Code.

§174.3. *Telemedicine Medical Services.*

(a) All physicians that use telemedicine medical services in their practices shall adopt protocols to prevent fraud and abuse through the use of telemedicine medical services. These standards must be consistent with those established by the Telecommunications Infrastructure Fund Board and Health and Human Services Commission pursuant to §531.02161 of the Government Code.

(b) In order to establish that a physician has made a good faith effort in the physician's practice to prevent fraud and abuse through the use of telemedicine medical services, the physician must implement written protocols that address the following:

(1) authentication and authorization of users;

(2) authentication of the origin of information;

(3) the prevention of unauthorized access to the system or information;

(4) system security, including the integrity of information that is collected, program integrity, and system integrity;

(5) maintenance of documentation about system and information usage;

(6) information storage, maintenance, and transmission; and

(7) synchronization and verification of patient profile data.

§174.4. *Use of the Internet in Medical Practice.*

(a) Evaluation of the Patient. Physicians who utilize the Internet must ensure a proper physician-patient relationship is established that at a minimum includes:

(1) establishing that the person requesting the treatment is in fact who the person claims to be;

(2) establishing a diagnosis through the use of acceptable medical practices  such as patient history, mental status examination, physical examination, and appropriate diagnostic and laboratory testing to establish diagnoses and identify underlying conditions and/or contraindications to treatment recommended/provided;

(3) discussing with the patient the diagnosis and the evidence for it, the risks and benefits of various treatment options; and

(4) ensuring the availability of the physician or coverage of the patient for appropriate follow-up care.

(b) Treatment. Treatment and consultation recommendations made in an online setting, including issuing a prescription via electronic means, will be held to the same standards of appropriate practice

as those in traditional (face-to-face) settings. An online or telephonic evaluation by questionnaire does not constitute an acceptable standard of care.

(c) State Licensure. Physicians who treat and prescribe through the Internet are practicing medicine and must possess appropriate licensure in all jurisdictions where patients reside.

(d) Electronic Communications.

(1) Written policies and procedures must be maintained when using electronic mail for physician-patient communications. Policies must be evaluated periodically for currency. Such policies and procedures must address:

(A) privacy to assure confidentiality and integrity of patient-identifiable information;

(B) health care personnel, in addition to the physician, who will process messages;

(C) hours of operation and availability;

(D) types of transactions that will be permitted electronically;

(E) required patient information to be included in the communication, such as patient name, identification number and type of transaction;

(F) archival and retrieval; and

(G) quality oversight mechanisms.

(2) All patient-physician e-mail, as well as other patient-related electronic communications, must be stored and filed in the patient's medical record.

(3) Patients must be informed of alternative forms of communication for urgent matters.

(e) Medical Records.

(1) Medical records must include copies of all patient-related electronic communications, including patient-physician e-mail, prescriptions, laboratory and test results, evaluations and consultations, records of past care and instructions.

(2) Notice of privacy practices related to the use of e-mail must be filed in the medical record.

(f) Disclosure. Physician medical practice sites must clearly disclose:

(1) ownership of the website;

(2) specific services provided;

(3) office address and contact information;

(4) licensure and qualifications of physician(s) and associated health care providers;

(5) fees for online consultation and services and how payment is to be made;

(6) financial interest in any information, products, or services;

(7) appropriate uses and limitations of the site, including providing health advice and emergency health situations;

(8) uses and response times for e-mails, electronic messages, and other communications transmitted via the site;

(9) to whom patient health information may be disclosed and for what purpose;

(10) rights of patients with respect to patient health information; and

(11) information collected and any passive tracking mechanisms utilized.

(g) Accountability. Medical practice sites must provide patients with a clear mechanism to:

(1) access, supplement, and amend patient-provided personal health information;

(2) provide feedback regarding the site and the quality of information and services; and

(3) register complaints, including information regarding filing a complaint with the Texas State Board of Medical Examiners as provided for in Chapter 178 of this title (relating to Complaints).

(h) Advertising/Promotion of Goods or Products. Advertising or promotion of goods or products from which the physician receives direct remuneration or incentives is prohibited.

*§174.5. Notice of Privacy Practices.*

(a) Physicians that communicate with patients by e-mail or other electronic means other than telephone or facsimile must make a good faith effort to notify patients in writing of the physicians' privacy practices.

(b) The notice of privacy practices shall include language that is consistent with federal standards under 45 CFR Parts 160 and 164 relating to privacy of individually identifiable health information.

This agency hereby certifies that the proposal has been reviewed by legal counsel and found to be within the agency's legal authority to adopt.

Filed with the Office of the Secretary of State on April 12, 2004.

TRD-200402446
Donald W. Patrick, MD, JD
Executive Director
Texas State Board of Medical Examiners
Earliest possible date of adoption: May 23, 2004
For further information, please call: (512) 305-7016

♦     ♦     ♦

# CHAPTER 177. CERTIFICATION OF NON-PROFIT HEALTH ORGANIZATIONS

The Texas State Board of Medical Examiners proposes amendments to §§177.1 - 177.8, the repeal of §§177.9 - 177.16 and new §§177.9 - 177.13, concerning Certification of Non-Profit Health Organizations. The amendments, repeals and new rules are necessary for general cleanup of the chapter.

Elsewhere in this issue of the *Texas Register*, the Texas State Board of Medical Examiners proposes the rule review of Chapter 177.

Michele Shackelford, General Counsel, Texas State Board of Medical Examiners, has determined that for the first five-year period the rules are in effect there will be no fiscal implications to state or local government as a result of enforcing the rules as proposed.

Ms. Shackelford also has determined that for each year of the first five years the rules as proposed are in effect the public benefit anticipated as a result of enforcing the sections will be to make reference to other sections of the rules rather than to repeat the

William H. Kuntz, Jr.
Executive Director
Texas Department of Licensing and Regulation
Effective date: June 28, 2004
Proposal publication date: January 30, 2004
For further information, please call: (512) 463-7348

♦ ♦ ♦

# TITLE 19. EDUCATION

## PART 7.  STATE BOARD FOR EDUCATOR CERTIFICATION

### CHAPTER 233.  CATEGORIES OF CLASSROOM TEACHING CERTIFICATES

#### 19 TAC §§233.4, 233.9 - 233.12

The State Board for Educator Certification adopts amendments to §233.4, relating to the mathematics and science certificates for teaching in grades 4-8 and 8-12 and new §233.9, relating to the supplemental certificate for teaching gifted and talented students in the same grade levels and in the same content areas of the holder's base certificate; §233.10, relating to the certificates for teaching fine arts in all levels, from early childhood programs through grade 12; §233.11, relating to certificates for teaching health in all levels, from early childhood programs through grade 12; and §233.12, relating to certificates for teaching career and technology education in grades 6-12 and in grades 8-12.

The rules were published in the February 27, 2004, issue of the *Texas Register* (29 TexReg 1811) and are adopted without changes.

The State Board for Educator Certification received no objections to the adoption of new certificates which will remain valid for holders but which will no longer be issued after September 1, 2005.

No public comments were received in response to the notice of proposed rules as published in the above-referenced issue of the *Texas Register.*

The amendments and new sections are adopted under the statutory authority of the following sections of the Education Code: §21.031(a), which vests SBEC with the authority to regulate and oversee all aspects of the certification, continuing education, and standards of conduct of public school educators; §21.041(b)(1), Education Code, which requires SBEC to propose rules that provide for the regulation of educators and the general administration of Chapter 21, Subchapter B, in a manner consistent with that subchapter; §21.041(b)(2), which requires SBEC to specify the classes of certificates to be issued; §21.041(b)(3), which requires SBEC to specify the period for which each class of educator certificate is valid; §21.041(b)(4), which requires SBEC to specify the requirements for the issuance and renewal of an educator certificate; and §21.042, which requires SBEC to submit proposed rules to the State Board of Education for review prior to adoption.

No other statutes, articles, or codes are affected by the adopted amendments and new sections.

This agency hereby certifies that the adoption has been reviewed by legal counsel and found to be a valid exercise of the agency's legal authority.

Filed with the Office of the Secretary of State on June 8, 2004.

TRD-200403723
Ron Kettler, Ph.D.
Interim Executive Director
State Board for Educator Certification
Effective date: June 28, 2004
Proposal publication date: February 27, 2004
For further information, please call: (512) 936-8239

♦ ♦ ♦

# TITLE 22. EXAMINING BOARDS

## PART 9.  TEXAS STATE BOARD OF MEDICAL EXAMINERS

### CHAPTER 163.  LICENSURE

#### 22 TAC §163.14

The Texas State Board of Medical Examiners adopts new §163.14, concerning Licensure to Practice Medicine Across State Lines, without changes to the proposed text as published in the April 23, 2004, issue of the *Texas Register* (29 TexReg 3894) and will not be republished.

The new rule is created in order to implement requirements for practicing medicine across state lines.

No comments were received regarding adoption of the rule.

The new section is adopted under the authority of the Occupations Code Annotated, §153.001, which provides the Texas State Board of Medical Examiners to adopt rules and bylaws as necessary to: govern its own proceedings; perform its duties; regulate the practice of medicine in this state; and enforce this subtitle.

This agency hereby certifies that the adoption has been reviewed by legal counsel and found to be a valid exercise of the agency's legal authority.

Filed with the Office of the Secretary of State on June 14, 2004.

TRD-200403861
Donald W. Patrick, MD, JD
Executive Director
Texas State Board of Medical Examiners
Effective date: July 4, 2004
Proposal publication date: April 23, 2004
For further information, please call: (512) 305-7016

♦ ♦ ♦

### CHAPTER 174.  TELEMEDICINE

The Texas State Board of Medical Examiners adopts the repeal of §§174.1 - 174.17 and new §§174.1 - 174.5, concerning Telemedicine, without changes to the proposed text as published in the April 23, 2004, issue of the *Texas Register* (29 TexReg 3895) and will not be republished.

The new rules relate to standards for provision of telemedicine medical services and use of the Internet in transmission of information.

No comments were received regarding adoption of the rules.

#### 22 TAC §§174.1 - 174.17

The repeals are adopted under the authority of the Occupations Code Annotated, §153.001, which provides the Texas State Board of Medical Examiners to adopt rules and bylaws as necessary to: govern its own proceedings; perform its duties; regulate the practice of medicine in this state; and enforce this subtitle.

This agency hereby certifies that the adoption has been reviewed by legal counsel and found to be a valid exercise of the agency's legal authority.

Filed with the Office of the Secretary of State on June 14, 2004.

TRD-200403862
Donald W. Patrick, MD, JD
Executive Director
Texas State Board of Medical Examiners
Effective date: July 4, 2004
Proposal publication date: April 23, 2004
For further information, please call: (512) 305-7016

♦          ♦          ♦

## 22 TAC §§174.1 - 174.5

The new sections are adopted under the authority of the Occupations Code Annotated, §153.001. which provides the Texas State Board of Medical Examiners to adopt rules and bylaws as necessary to: govern its own proceedings; perform its duties; regulate the practice of medicine in this state; and enforce this subtitle.

This agency hereby certifies that the adoption has been reviewed by legal counsel and found to be a valid exercise of the agency's legal authority.

Filed with the Office of the Secretary of State on June 14, 2004.

TRD-200403863
Donald W. Patrick, MD, JD
Executive Director
Texas State Board of Medical Examiners
Effective date: July 4, 2004
Proposal publication date: April 23, 2004
For further information, please call: (512) 305-7010

♦          ♦          ♦

## CHAPTER 177. CERTIFICATION OF NON-PROFIT HEALTH ORGANIZATIONS

The Texas State Board of Medical Examiners adopts amendments to §§177.1 - 177.3, 177.5-177.8, the repeal of §§177.9 - 177.16 and new §§177.9 - 177.13, concerning Certification of Non-Profit Health Organizations, without changes to the proposed text as published in the April 23, 2004, issue of the *Texas Register* (29 TexReg 3898) and will not be republished. The Texas State Board of Medical Examiners also adopts an amendment to §177.4 with changes to the proposed text as published in the April 23, 2004, issue of the *Texas Register* (29 TexReg 3898). The text of the rule will be republished. There is a minor change in paragraph (2)(F). The words at the end of the sentence "unless the physician is terminated" have been removed.

The amendments, repeals and new rules are necessary for general cleanup of the chapter.

Elsewhere in this issue of the *Texas Register*, the Texas State Board of Medical Examiners adopts the rule review of Chapter 177.

No comments were received regarding adoption of the rules.

## 22 TAC §§177.1 - 177.8

The amendments are adopted under the authority of the Occupations Code Annotated, §153.001, which provides the Texas State Board of Medical Examiners to adopt rules and bylaws as necessary to: govern its own proceedings; perform its duties; regulate the practice of medicine in this state; and enforce this subtitle.

*§177.4. Applications for Certification as a 162.001(b) Health Organization.*

A health organization seeking certification under §162.001(b) of the Act shall submit an application to the board, to the attention of the Non-Profits department, on a form approved by the board. The application shall include:

(1) Initial Identification Statement. A statement signed and verified by the chief executive officer:

(A) indicating the name and mailing address of the health organization;

(B) indicating the names and mailing addresses of all members or that there are no members;

(C) indicating the names and mailing addresses of all officers; and

(D) indicating the names and mailing addresses of all directors.

(2) Initial Document Statement. A statement signed and verified by the chief executive officer attaching a copy of the current certificate of incorporation of the health organization and attaching a copy of the current by-laws of the health organization including provisions that:

(A) the health organization is organized for any or all of the following purposes:

(i) the carrying out of scientific research and research projects in the public interest in the fields of medical sciences, medical economics, public health, sociology, or related areas;

(ii) the supporting of medical education in medical schools through grants and scholarships;

(iii) the improving and developing of the abilities of individuals and institutions studying, teaching, and practicing medicine;

(iv) the delivery of health care to the public;

(v) the engaging in the instruction of the general public in the area of medical science, public health, and hygiene and related instruction useful to the individual and beneficial to the community.

(B) the physician(s) organizing and incorporating the health organization shall select the initial board of directors consistent with the mission, goals, and purposes of the health organization;

(C) the by-laws of the health organization shall be interpreted in a manner that reserves to the health organization through its retained physicians the sole authority to engage in the practice of medicine and reserves to the health organization through its board of

requires the use of advanced telecommunications other than by telephone or facsimile as described in §57.042 of the Utilities Code.]

[(6) Telepresenter--a remote site provider, as defined in 1 TAC §354.1430, who is not a physician, registered nurse, advanced practice nurse or physician assistant, unless such physician, registered nurse, advanced practice nurse or physician assistant is a qualified mental health professional as defined in §531.02175(a) of the Government Code.]

§174.3. Telemedicine Medical Services.

(a) All physicians that use telemedicine medical services in their practices shall adopt protocols to prevent fraud and abuse through the use of telemedicine medical services. These standards must be consistent with those established by the [Telecommunications Infrastructure Fund Board and] Health and Human Services Commission pursuant to §531.02161 of the Government Code.

(b) (No change.)

§174.5. Notice to Patients [of Privacy Practices].

(a) Privacy Practices.

(1) [(a)] Physicians that communicate with patients by electronic communications [e-mail or other electronic means] other than telephone or facsimile must provide patients with written notification of the physicians' privacy practices prior to evaluation or treatment. In addition, a good faith effort must be made to obtain the patient's written acknowledgement, including by e-mail, of the notice. [make a good faith effort to notify patients in writing of the physicians' privacy practices.]

(2) [(b)] The notice of privacy practices shall include language that is consistent with federal standards under 45 CFR Parts 160 and 164 relating to privacy of individually identifiable health information.

(b) Limitations of Telemedicine. Physicians who use telemedicine medical services must, prior to providing services, give their patients notice regarding telemedicine medical services, including the risks and benefits of being treated via telemedicine, how to receive follow-up care or assistance in the event of an adverse reaction to the treatment or in the event of an inability to communicate as a result of a technological or equipment failure. A signed and dated notice, including an electronic acknowledgement, by the patient establishes a presumption of notice.

(c) Necessity of In-Person Evaluation. When, for whatever reason, the telemedicine modality in use for a particular patient encounter is unable to provide all pertinent clinical information that a health care provider exercising ordinary skill and care would deem reasonably necessary for the practice of medicine at an acceptable level of safety and quality in the context of that particular medical encounter, then the distant site provider must make this known to the patient prior to the conclusion of the live telemedicine encounter and advise and counsel the patient prior to the conclusion of the live telemedicine encounter regarding the need for the patient to obtain an additional in-person medical evaluation reasonably able to meet the patient's needs.

(d) Complaints to the Board. Physicians that use telemedicine medical services must provide notice of how patients may file a complaint with the Board on the physician's website or with informed consent materials provided to patients prior to rendering telemedicine medical services. Written content and method of the notice must be consistent with §178.3 of this title (relating to Complaint Procedure Notification).

§174.6. Telemedicine Medical Services Provided at an Established Medical Site.

(a) Telemedicine medical services provided at a an established medical site may be used for all patient visits, including initial evaluations to establish a proper physician-patient relationship between a distant site provider and a patient.

(b) For new conditions, a patient site presenter must be reasonably available onsite at the established medical site to assist with the provision of care. It is at the discretion of the distant site physician if a patient site presenter is necessary for follow-up evaluation or treatment of a previously diagnosed condition.

(1) A distant site provider may delegate tasks and activities to a patient site presenter during a patient encounter.

(2) A distant site provider delegating tasks to a patient site presenter shall ensure that the patient site presenter to whom delegation is made is properly supervised.

(c) If the only services provided are related to mental health, a patient site presenter is not required except in cases where the patient may be a danger to themselves or others

§174.7. Telemedicine Medical Services Provided at Sites other than Established Medical Sites.

(a) A distant site provider who provides telemedicine medical services at a site other than an established medical site for a patient's previously diagnosed condition must either:

(1) see the patient one time in a face-to-face visit before providing telemedicine medical care; or

(2) see the patient without an initial face-to-face visit, provided the patient has received an in-person evaluation by another physician who has referred the patient for additional care and the referral is documented in the medical record.

(b) Patient site presenters are not required for pre-existing conditions previously diagnosed by a physician through a face-to-face visit.

(c) All patients must be seen by a physician for an in-person evaluation at least once a year.

(d) Telemedicine medical services may not be used to treat chronic pain with scheduled drugs at sites other than medical practice sites.

(e) A distant site provider may treat an established patient's new symptoms that are unrelated to a patient's preexisting condition provided the patient is requested to be seen in a face-to-face visit by a physician within 72 hours. A distant site provider may not provide continuing telemedicine medical services for these new symptoms to a patient who is not seen within 72 hours. If a patient's symptoms are resolved within 72 hours such that continuing treatment for the acute symptoms is not necessary then a follow-up face-to-face visit is not required.

§174.8. Evaluation and Treatment of the Patient.

(a) Evaluation of the Patient. Distant site providers who utilize telemedicine medical services must ensure a proper physician-patient relationship is established that at a minimum includes:

(1) establishing that the person requesting the treatment is in fact who the person claims to be;

(2) establishing a diagnosis through the use of acceptable medical practices including patient history, mental status examination, physical examination (unless not warranted by the patient's mental condition), and appropriate diagnostic and laboratory testing to establish diagnoses as well as identify underlying conditions or contra-indications, or both, to treatment recommended or provided;

(3) discussing with the patient the diagnosis and the evidence for it, the risks and benefits of various treatment options; and

(4) ensuring the availability of the distant site provider or coverage of the patient for appropriate follow-up care.

(b) Treatment. Treatment and consultation recommendations made in an online setting, including issuing a prescription via electronic means, will be held to the same standards of appropriate practice as those in traditional in-person clinical settings. An online or telephonic evaluation solely by questionnaire does not constitute an acceptable standard of care.

§174.9. *Technology and Security Requirements.*

(a) At a minimum, advanced communication technology must be used for all patient evaluation and treatment conducted via telemedicine.

(b) Adequate security measures must be implemented to ensure that all patient communications, recordings and records remain confidential.

(c) Electronic Communications.

(1) Written policies and procedures must be maintained when using electronic mail for physician-patient communications. Policies must be evaluated periodically for currency. Such policies and procedures must address:

(A) privacy to assure confidentiality and integrity of patient-identifiable information;

(B) health care personnel, in addition to the physician, who will process messages;

(C) hours of operation and availability;

(D) types of transactions that will be permitted electronically;

(E) required patient information to be included in the communication, such as patient name, identification number and type of transaction;

(F) archival and retrieval; and

(G) quality oversight mechanisms.

(2) All relevant patient-physician e-mail, as well as other patient-related electronic communications, must be stored and filed in the patient's medical record.

(3) Patients must be informed of alternative forms of communication for urgent matters.

§174.10. *Medical Records for Telemedicine Medical Services.*

(a) Medical records must be maintained for all telemedicine medical services. Both the distant site provider and the patient site presenter must maintain the records created at each site unless the distant site provider maintains the records in an electronic health record format.

(b) Distant site providers must obtain an adequate and complete medical history for the patient prior to providing treatment and must document this in the medical record.

(c) Medical records must include copies of all relevant patient-related electronic communications, including relevant patient-physician e-mail, prescriptions, laboratory and test results, evaluations and consultations, records of past care and instructions. If possible, telemedicine encounters that are recorded electronically should also be included in the medical record.

§174.11. *On-call Services.*

Physicians, who are of the same specialty and provide reciprocal services, may provide on-call telemedicine medical services for each other's current patients.

§174.12. *State Licensure.*

Physicians who treat and prescribe through advanced communications technology are practicing medicine and must possess appropriate licensure in all jurisdictions where their patients presently reside. An out-of-state physician may provide episodic consultations without a Texas medical license, as provided in Texas Occupations Code, §151.056 and §172.12(f) of this title (relating to Out-of-State Telemedicine License-Exemptions).

This agency hereby certifies that the proposal has been reviewed by legal counsel and found to be within the agency's legal authority to adopt.

Filed with the Office of the Secretary of State on April 19, 2010.

TRD-201001895
Mari Robinson, J.D.
Executive Director
Texas Medical Board
Earliest possible date of adoption: May 30, 2010
For further information, please call: (512) 305-7016

♦ ♦ ♦

## 22 TAC §174.4, §174.6

*(Editor's note: The text of the following sections proposed for repeal will not be published. The sections may be examined in the offices of the Texas Medical Board or in the Texas Register office, Room 245, James Earl Rudder Building, 1019 Brazos Street, Austin, Texas.)*

The repeals are proposed under the authority of the Texas Occupations Code Annotated, §153.001, which provides authority for the Board to adopt rules and bylaws as necessary to: govern its own proceedings; perform its duties; regulate the practice of medicine in this state; enforce this subtitle; and establish rules related to licensure.

The repeals are also authorized by §157.001, Texas Occupations Code.

No other statutes, articles or codes are affected by this proposal.

§174.4. *Use of the Internet in Medical Practice.*

§174.6. *Delegation to and Supervision of Telepresenters.*

This agency hereby certifies that the proposal has been reviewed by legal counsel and found to be within the agency's legal authority to adopt.

Filed with the Office of the Secretary of State on April 19, 2010.

TRD-201001896
Mari Robinson, J.D.
Executive Director
Texas Medical Board
Earliest possible date of adoption: May 30, 2010
For further information, please call: (512) 305-7016

♦ ♦ ♦

# PART 18. TEXAS STATE BOARD OF PODIATRIC MEDICAL EXAMINERS

The amendments are adopted under Texas Occupations Code, Chapter 51 and Chapter 1151, which authorize the Texas Commission of Licensing and Regulation, the Department's governing body, to adopt rules as necessary to implement these chapters and any other law establishing a program regulated by the Department.

The statutory provisions affected by the adoption are those set forth in Texas Occupations Code, Chapters 51 and 1151. No other statutes, articles, or codes are affected by the adoption.

*§94.100. Code of Ethics.*

Registrants must:

(1) be guided by the principle that property taxation should be fair and uniform, and apply all laws, rules, methods, and procedures, in a uniform manner, to all taxpayers;

(2) not accept or solicit any gift, favor, or service that might reasonably tend to influence the registrant in the discharge of official duties, with the following exceptions:

(A) the benefit is used solely to defray the expenses that accrue in the performance of duties or activities in connection with the office which are nonreimbursable by the state or political subdivision;

(B) a political contribution as defined by Title 15 of the Election Code; or

(C) an item with a value of less than $50, excluding cash or a negotiable instrument;

(3) not use information received in connection with the duties of an appraiser, assessor, or collector for their own purposes, unless such information can be known by ordinary means to any ordinary citizen;

(4) not engage in an official act that is dishonest, misleading, fraudulent, deceptive, or in violation of law;

(5) not conduct their professional duties in a manner that could reasonably be expected to create the appearance of impropriety;

(6) not accept an appraisal, assessment, or collection related assignment that can reasonably be construed as being in conflict with the registrant's responsibility to their jurisdiction, employer, or client, or in which the registrant has an unrevealed personal interest or bias; and

(7) not accept an assignment or responsibility in which the registrant has a personal interest without full disclosure of that interest.

This agency hereby certifies that the adoption has been reviewed by legal counsel and found to be a valid exercise of the agency's legal authority.

Filed with the Office of the Secretary of State on September 24, 2010.

TRD-201005557
William H. Kuntz, Jr.
Executive Director
Texas Department of Licensing and Regulation
Effective date: October 15, 2010
Proposal publication date: May 28, 2010
For further information, please call: (512) 463-7348

♦　　　♦　　　♦

# TITLE 22. EXAMINING BOARDS

# PART 9. TEXAS MEDICAL BOARD

## CHAPTER 174. TELEMEDICINE

The Texas Medical Board (Board) adopts amendments to §§174.1 - 174.3 and 174.5, the repeal of §174.4 and §174.6 and new §§174.6 - 174.12, concerning Telemedicine. The amendments to §§174.1, 174.3 and 174.5 and the repeal of §174.4 and §174.6 and new §174.10 and §174.12 are adopted without changes to the proposed text as published in the April 30, 2010, issue of the *Texas Register* (35 TexReg 3390) and will not be republished. New §174.6 and §174.8 are adopted with minor changes to the proposed text as published in the April 30, 2010, issue of the *Texas Register* (35 TexReg 3390). The text of the rule will be republished. The amendment to §174.2 and new §174.9 and §174.11 are adopted without changes to the proposed text as published in the July 16, 2010, issue of the *Texas Register* (35 TexReg 6175) and will not be republished. New §174.7 is adopted with a minor change to the proposal as published in the July 16, 2010, issue of the *Texas Register* (35 TexReg 6175). The text of the rule will be republished.

The amendments to §174.1, concerning Purpose, adds statutory authority for the chapter and exempts out-of-state telemedicine license holders, federally qualified health centers, and health insurance help lines from the chapter. The Board has determined that the changes are necessary to have the rules applied to only certain telemedicine providers.

The amendments to §174.2, concerning Definitions, define distant site provider, established medical site, face-to-face visit, patient site location, patient site presenter; amend the definitions for physician-patient e-mail, telemedicine medical services; and deletes the definition for telepresenter. The Board has determined that it is necessary to establish uniform definitions for those who practice telemedicine in Texas.

The amendments to §174.3, concerning Telemedicine Medical Services, deletes reference to the Telecommunications Infrastructure Fund Board (TIFB). The Board has determined that references to the TIFB must be eliminated since it no longer exists.

The repeal of §174.4, concerning Use of the Internet in Medical Practice, is moved to Chapter 164 as new §164.6. The Board has determined that this section is more appropriately placed in Chapter 164, which relates to advertising.

The amendments to §174.5, concerning Notice of Privacy Practices, provides that physicians that communicate electronically with patients and provide telemedicine medical services, must provide notice to patients of privacy practices, limitations of telemedicine, when in-person evaluations are necessary, and how to file complaints with the Board. The Board has determined that it is necessary to ensure that patients are given appropriate notice to make informed decisions about their care and their rights as consumers. The amendment also changes the name from "Notice of Privacy Practices" to "Notice to Patients".

The repeal and replacement of §174.6, concerning Delegation to and Supervision of Telepresenters, repeals §174.6 and adds new language for new §174.6, concerning Telemedicine Medical Services Provided at an Established Medical Site. The Board has determined that the new language is necessary to establish standards for the provision of telemedicine medical services at established medical sites.

New §174.7, concerning Telemedicine Medical Services Provided at Sites other than an Established Medical Site, establishes under what conditions a distant site provider may provide telemedicine medical services at sites other than an established medical site, such as a patient's home.

New §174.8, concerning Evaluation and Treatment of the Patient, establishes standards for physicians that use telemedicine medical services for the evaluation and treatment of patients.

New §174.9, concerning Technology and Security Requirements, establishes requirements relating to technology and security regarding the provision of telemedicine medical services and physician-patient communications through email. The Board has determined that the new rule will protect confidential electronic communications between physicians and their patients and that electronic medical records are appropriately safeguarded.

New §174.10, concerning Medical Records for Telemedicine Medical Services, establishes the requirements for the maintenance of medical records for telemedicine medical services and what documents are considered part of the medical records. The Board has determined that the changes ensure that medical records are appropriately maintained for patients who receive telemedicine medical services.

New §174.11, concerning On-call Services, establishes that physicians in the same specialty who provide reciprocal services may provide on-call telemedicine medical services for each other's patients. The Board has determined that changes allow for the use of telemedicine medical services through on-call services when a patient's distant site provider is not available.

New §174.12, concerning State Licensure, provides that persons who treat and prescribe through advanced communications technology are engaged in the practice of medicine and must have appropriate licensure unless otherwise exempt. The Board has determined that the changes ensure that those who reside outside of Texas and provide medical services to Texas residents are appropriately licensed.

Sections 174.2, 174.7, 174.9 and 174.11 were previously published for proposal in the April 30, 2010, issue of the *Texas Register*, however these sections were withdrawn and re-proposed in the July 16, 2010, issue of the *Texas Register*. These sections were withdrawn and re-published with changes based on comments received from the April 30, 2010 proposal. The Board received and reviewed comments at the June and August meetings. Some entities made comments twice (repeating their comments) and the relevant sections (§§174.2, 174.7, 174.9 and 174.11) were withdrawn and republished with changes in July. The comments were again reviewed at the August meeting and no further changes were made to the rules, therefore the rules are adopted without changes at this time. A summary of the comments follows.

The Board sought stakeholder input through Stakeholder Groups, which made comments on the suggested changes to the rules at a meeting, held on March 9, 2010. The comments were incorporated into the proposed rules.

The Board received support for the rules without change from the Texas Department of Insurance, the University of Texas Medical Branch at Galveston, Texas e-Health Alliance and Texas Organization of Rural and Community Hospitals.

Comments:

No comments were received regarding §§174.1, 174.3, 174.4, 174.6, 174.10 and 174.12.

§174.2

The Board received comments regarding §174.2 from the Texas Medical Association and Health and Human Services Commission.

COMMENT ONE: Texas Medical Association

The commenter asked the following questions and made the following suggestions:

(1): Paragraph (1) should be clarified to indicate that a distant site provider also includes physician assistants or advanced practice nurses who are supervised by and delegated authority from a licensed Texas physician in accordance with *Title 3 Texas Occupations Code, Chapter 157*. Otherwise, this provision could be misinterpreted to mean that the usual delegation requirements do not apply to Telemedicine.

(2): Although paragraph (2) states that an established medical site requires a defined physician-patient relationship, it is unclear as to when exactly the creation of a physician-patient relationship must occur. Does the relationship need to be established before the patient arrives at an established medical site for the first time, or can it take place during the initial visit?

(3): Paragraphs (3) and (4) are very similar in definition. Listing examples under each definition may assist in minimizing confusion.

(4): The definition of "patient-site presenter" in paragraph (7)(A) should be amended by adding another subdivision that would permit either the licensed health care individual or a person delegated and supervised by the distant site physician to be the patient site presenter. The commenter states that the provisions of *Section 157.001, Occupations Code* would permit such delegation and supervision, and contends that this ability to delegate and supervise is extremely important to assure access in the rural areas where health care providers are few and far between.

(5): In paragraph (7)(B), there should be an additional sentence stating that all delegation tasks and activities must be done in accordance with the provisions of Chapter 157 of the Occupations Code. This should be done in order to put physicians on notice that compliance with the statute is not limited to solely PAs and APNs.

The Board agrees with comment (1) and amended the language to include PAs and APNs in the definition of distant site provider. Section 174.6(a) addresses comment (2) as it provides that a telemedicine encounter at an established medical site may be used for an initial evaluation and therefore the rules already provide that the relationship does not need to precede the patient's visit to the site. The Board agrees in part with comment (3) and will develop a link on its website for frequently asked questions, including examples for these definitions. The Board disagrees with comment (4) and has determined that patient site presenters must be licensed or certified in a health-related field to ensure patient safety. In addition, this rule is consistent with regulations established by the Health and Human Services Commission as it relates to Medicaid reimbursement requirements for telemedicine services. The Board disagrees with comment (5) and does not believe additional language is necessary as Chapter 157 applies to all delegated acts and additional notice is not required.

COMMENT TWO: Health and Human Services Commission

The commenter recommends adding the word "private" to the last sentence in paragraph (2) so that it would read "a patient's private home is not considered an established medical site." He states that otherwise, the definition excludes a residential facility or other institutional setting where a patient resides. The commenter also recommended substituting "in real time" for "contemporaneously" in paragraph (10). Several grammatical suggestions were also made. The Board agreed with these comments, and changes were made to the section.

§174.5

The Board received comments regarding §174.5 from the Texas Medical Association and Teladoc Medical Services.

COMMENT ONE: Texas Medical Association

The commenter contends that this section of the rule is inconsistent with federal HIPAA privacy requirements. She states that as written, this section would require physicians who are not otherwise subject to the "notice and acknowledgment" requirements of HIPAA to be subject to those provisions, even though telemedicine services are not covered by HIPAA. She notes that even HIPAA provides an exemption from those requirements for medical practices with 10 or fewer full time employees, and that to impose these requirements upon all physicians would have an adverse impact upon both small practices and those in rural areas. She suggests that if the agency seeks to keep this Section of the Rule, it should retain only a "notice" requirement, and delete any references to "written acknowledgment".

The Board disagrees with this comment. After review of the federal HIPAA notice and privacy requirements, the Board has determined that the rules are not in violation with HIPAA. The following was obtained from the HHS Office of Civil Rights' website that supports the Board's position and therefore the Board has adopted the proposed language without amendment:

*"The HIPAA Privacy Rule is intended to be flexible enough to address the various types of relationships that covered health care providers may have with the individuals they treat, including those treatment situations that are not face-to-face ... For service provided electronically, the notice must be sent electronically automatically and contemporaneously in response to the individual's first request for service. In this situation, an electronic return receipt or other return transmission from the individual is considered a valid written acknowledgment of the notice."*

COMMENT TWO: Teladoc Medical Services

The commenter objects to the references in subsections (b) and (c) that advise the patient to seek additional follow-up care. He states that the language is overly restrictive and that the telemedicine physician can provide appropriate follow-up care.

The Board disagrees with this comment. Stakeholder input led to the inclusion of this language so that patients would be able to give proper informed consent when seeking medical care through the use of telemedicine services.

§174.7

The Board received comments regarding §174.7 from Texas Hospital Association, OptumHealth (national care management organization that provides health care via telemedicine), AmericanWell (technology partner of OptumHealth), Rural Caucus of the Texas Legislature, the Texas Conservative Coalition, Texas Conservative Coalition Research Institute, Texas Medical Association, Teladoc Medical Services, Texas Health and Human Services Commission, Texas Association of Business, Texas Public Policy Foundation, and State Representative Jim Jackson.

COMMENT NO. 1

Texas Hospital Association commented that they have some concern about the proposed language that would require an established patient with new symptoms to be seen in person within 72 hours or at an established medical site. They recommend that the Texas Medical Board, with input from telemedicine experts, health care facilities and professionals, monitor this provision closely on an ongoing basis with regard to its impact on resources and access to health care, particularly in underserved areas, and be prepared to respond to those concerns if necessary by considering a future rule change.

The Board disagrees with this comment in part. The 72-hour provision in subsection (e) pertains only to patients being treated at home with new conditions unrelated to the preexisting conditions they are being treated for via telemedicine. IF the patient's symptoms resolve within 72 hours, then an in-person visit is not required. Because this provision only pertains to patients receiving treatment at home, or somewhere besides an established medicine site, there would likely be no patient site presenter available to confer with the distant site provider to determine whether the patient needs an in-person visit. In addition, Chapter 111 of the Texas Occupations Code pertaining to telemedicine and telehealth services authorizes the Board to adopt rules to ensure that patients receiving care via telemedicine receive appropriate, quality care and to "require a face-to-face consultation between a patient and physician providing a telemedicine medical service within a certain number of days following an initial telemedicine medical service only if the physician has never seen the patient". The adopted rules are in keeping with the intent of the current statute. For these reasons, the Board does not believe that any changes should be made to this proposed rule as published. The Board has adopted the amendments to this section as published, without changes, but plans to work with stakeholders in the future to monitor how the rules will affect patient care.

COMMENT NO. 2

OptumHealth commented that the rules should focus "on the roles and responsibilities of health professionals providing care, rather than distinguishing based upon how healthcare information is transmitted." OptumHealth also raised concerns that the rules "do not clearly define what is and what is not permitted through various modes of information transmission" and that rules should provide a "flexible regulatory framework that both recognizes the rapidly changing information infrastructure and protects patients and care providers."

The Board disagrees with this comment. The Board has set out requirements for when face-to-face visits are necessary and when the use of advanced communication technology may be used, in part based on where the patient is being treated (established medical site v. site other than an established medical site) and the condition being treated (preexisting condition v. new condition unrelated to previously diagnosed condition). For these reasons, the Board does not believe that any changes should be made to this proposed rule as published. The Board has adopted the amendments to this section as published, without changes.

COMMENT NO. 3

## CHAPTER 176. HEALTH CARE LIABILITY LAWSUITS AND SETTLEMENTS

### 22 TAC §176.1

The Texas Medical Board (Board) proposes an amendment to §176.1, concerning Definitions.

The amendment to §176.1 corrects the spelling of the term "x-ray" located in paragraph (6).

Scott Freshour, General Counsel for the Board, has determined that for each year of the first five years the section as proposed is in effect the public benefit anticipated as a result of enforcing this proposal will be to have correctly spelled medical terms contained in the Board rules.

Mr. Freshour has also determined that for the first five-year period the section is in effect there will be no fiscal implication to state or local government as a result of enforcing the section as proposed. There will be no effect to individuals required to comply with the rule as proposed. There will be no effect on small or micro businesses.

Comments on the proposal may be submitted to Rita Chapin, P.O. Box 2018, Austin, Texas 78768-2018 or e-mail comments to: rules.development@tmb.state.tx.us. A public hearing will be held at a later date.

The amendment is proposed under the authority of the Texas Occupations Code Annotated, §153.001, which provides authority for the Board to adopt rules and bylaws as necessary to: govern its own proceedings; perform its duties; regulate the practice of medicine in this state; enforce this subtitle; and establish rules related to licensure.

No other statutes, articles or codes are affected by this proposal.

*§176.1. Definitions.*
For the purposes of this chapter:

(1) "Health care liability claim" means a cause of action against a licensee for treatment, lack of treatment, or other claimed departure from accepted standards of medical or health care or safety that proximately results in injury to or death of a patient, whether the patient's claim or cause of action sounds in tort or contract. This definition is consistent with Texas Civil Practices and Remedies Code §74.001(a)(13) (relating to medical liability).

(2) "Complaint" means a petition or complaint filed as a lawsuit on a health care liability claim.

(3) "Settlement" means:

(A) a payment made by or on behalf of a licensee on a health care liability claim on which no lawsuit has been filed;

(B) an agreement to settle a lawsuit on a health care liability claim for a specified amount to be paid by or on behalf of a licensee;

(C) a dismissal or non-suit of a lawsuit on a health care liability claim with no payment; and

(D) a final judgment in a lawsuit on a health care liability claim entered by the trial court.

(4) "Insurer" means any entity that provides health care liability coverage to a licensee and is not limited to insurance companies that are regulated by the Texas Department of Insurance.

(5) "Nonadmitted insurer" means an insurance company that is not admitted to do business in Texas, does business on a sur-

plus lines basis, and is not otherwise subject to regulation by the Texas Department of Insurance.

(6) "Physician" means any person licensed to practice medicine in this state, including interns, residents, physicians acting as supervising physicians, on-call physicians, consulting physicians, and physicians who administer, read, or interpret laboratory tests, x-rays [ex-rays], and other diagnostic studies.

The agency certifies that legal counsel has reviewed the proposal and found it to be within the state agency's legal authority to adopt.

Filed with the Office of the Secretary of State on February 23, 2015.

TRD-201500619
Mari Robinson, J.D.
Executive Director
Texas Medical Board
Earliest possible date of adoption: April 5, 2015
For further information, please call: (512) 305-7016



## CHAPTER 190. DISCIPLINARY GUIDELINES
## SUBCHAPTER B. VIOLATION GUIDELINES

### 22 TAC §190.8

The Texas Medical Board (Board) proposes amendments to §190.8, concerning Violation Guidelines.

The amendment adds language to paragraph (1)(L) in order to clarify a "defined physician-patient relationship" and the requirements for establishing same before prescribing drugs. The amendment clearly defines the minimum elements that are required to establish a defined physician-patient relationship. The elements include a physical examination that must be performed either by a face-to-face visit or an in-person evaluation, as those terms are defined under existing board rules.

The amendments to §190.8 further add new paragraph (8), relating to Texas Occupations Code §164.051(a)(4)(C)'s authority for the board to take disciplinary action based upon a licensee's inability to practice medicine with reasonable skill and safety to patients because of excessive use of drugs, narcotics, chemicals, or another substance. The amendment adds language stating that for the purposes of §164.051(a)(4)(C) of the Texas Occupations Code, any use of a substance listed in Schedule I, as established by the Commissioner of the Department of State Health Services under Chapter 481 of the Texas Health and Safety Code, or as established under the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. §801 et seq., constitutes excessive use of such substance.

Scott Freshour, General Counsel for the Board, has determined that for each year of the first five years the section as proposed is in effect the public benefit anticipated as a result of enforcing the proposal will be to insure patient safety by setting forth specific parameters and requirements for a practitioner to establish a defined physician-patient relationship prior to prescribing drugs. The amendment to §190.8(1)(L) will protect patient health and safety by requiring the use of acceptable medical practices that comply with state law and medical board rules, while still providing ample access to medical treatment. An additional public benefit anticipated will be to clarify requirements for prescribing

drugs that are consistent with the board's existing rules related to acceptable medical practices, requirements for medical record documentation of patient evaluations and examinations, and requirements for the practice of telemedicine. The public benefit will also provide clarity as to the definition of excessive use of narcotics, chemicals, or another substance by a physician that would impair a physician's ability to practice with reasonable skill and safety to patients and that would authorize the board to take disciplinary action based upon such impairment, thereby better enabling the board to protect the public.

Mr. Freshour has also determined that for the first five-year period the section is in effect there will be no fiscal implication to state or local government as a result of enforcing the section as proposed. There will be no effect to individuals required to comply with the rule as proposed. There will be no effect on small or micro businesses.

Comments on the proposal may be submitted to Rita Chapin, P.O. Box 2018, Austin, Texas 78768-2018 or e-mail comments to: rules.development@tmb.state.tx.us. A public hearing will be held at a later date.

The amendment is proposed under the authority of the Texas Occupations Code Annotated, §153.001, which provides authority for the Board to adopt rules and bylaws as necessary to: govern its own proceedings; perform its duties; regulate the practice of medicine in this state; enforce this subtitle; and establish rules related to licensure. The amendments are also proposed under the authority of the Texas Occupations Code Annotated, §164.051(a)(4)(C).

No other statutes, articles or codes are affected by this proposal.

*§190.8.  Violation Guidelines.*

When substantiated by credible evidence, the following acts, practices, and conduct are considered to be violations of the Act. The following shall not be considered an exhaustive or exclusive listing.

(1)    Practice Inconsistent with Public Health and Welfare. Failure to practice in an acceptable professional manner consistent with public health and welfare within the meaning of the Act includes, but is not limited to:

(A) - (K)    (No change.)

(L)    prescription of any dangerous drug or controlled substance without first establishing a defined physician-patient [proper professional] relationship [with the patient].

(i)    A defined physician-patient [proper] relationship must include, at a minimum [requires]:

(I)    establishing that the person requesting the medication is in fact who the person claims to be;

(II)    establishing a diagnosis through the use of acceptable medical practices, which includes documenting and performing: [such as]

(-a-)    patient history;[,]
(-b-)    mental status examination;[,]
(-c-)    physical examination that must be performed by either a face-to-face visit or in-person evaluation as defined in §174.2(3) and (4) of this title (relating to Definitions). The requirement for a face-to-face or in-person evaluation does not apply to mental health services, except in cases of behavioral emergencies, as defined by 25 TAC §415.253 (relating to Definitions);[,] and
(-d-)    appropriate diagnostic and laboratory testing.

(III)    An online questionnaire or questions and answers exchanged through email, electronic text, or chat or telephonic evaluation of or consultation with a patient are inadequate to establish a defined physician-patient relationship [by questionnaire is inadequate];

(IV)    [(III)] discussing with the patient the diagnosis and the evidence for it, the risks and benefits of various treatment options; and

(V)    [(IV)] ensuring the availability of the licensee or coverage of the patient for appropriate follow-up care.

(ii) - (iii)    (No change.)

(M) - (O)    (No change.)

(2) - (7)    (No change.)

(8)    For purposes of §164.051(a)(4)(C) of the Texas Occupations Code, any use of a substance listed in Schedule I, as established by the Commissioner of the Department of State Health Services under Chapter 481, or as established under the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. §801 et seq.) constitutes excessive use of such substance.

The agency certifies that legal counsel has reviewed the proposal and found it to be within the state agency's legal authority to adopt.

Filed with the Office of the Secretary of State on February 23, 2015.

TRD-201500621
Mari Robinson, J.D.
Executive Director
Texas Medical Board
Earliest possible date of adoption: April 5, 2015
For further information, please call: (512) 305-7016

♦ ♦ ♦

# TITLE 43.  TRANSPORTATION

# PART 10.    TEXAS DEPARTMENT OF MOTOR VEHICLES

## CHAPTER 206.    MANAGEMENT

The Texas Department of Motor Vehicles (department) proposes amendments to Chapter 206, Subchapter A, §206.1, Texas Motor Vehicle Board; §206.2, Texas Department of Motor Vehicles; Subchapter B, §206.22, Public Access to Board Meetings; §206.23, Public Hearings; Subchapter E, §206.92, Definitions; §206.93, Advisory Committee Operations and Procedures; Subchapter F, §206.111, Restrictions on Assignment of Vehicles; and Subchapter G, §206.131, Digital Certificates. The department also proposes the repeals of Subchapter B, §206.21, Board Meetings; Subchapter D, §§206.61 - 206.73, relating to Procedures in Contested Cases; and Subchapter E, §206.91, Scope and Purpose.

EXPLANATION OF PROPOSED AMENDMENTS AND REPEALS

The department conducted a review of its rules in compliance with Government Code, §2001.039. Notice of the department's plan to review was published in the April 18, 2014, issue of the *Texas Register* (39 TexReg 3261).



# Texas Medical Board

MAILING ADDRESS: P.O. BOX 2018 • AUSTIN TX 78768-2018
PHONE: (512) 305-7010

June 16, 2011

**VIA LONE STAR OVERNIGHT DELIVERY**
Mr. Paul Squire, Esq.
General Counsel
Teledoc
100 Spring Valley, Ste 600
Dallas, Texas 75244

Dear Mr. Squire:

Several recent representations by Teledoc regarding its internet program have come to the attention of the Texas Medical Board ("Board"). These representations cause concern on the part of the Board for its licensed Texas physicians. Physicians who choose to participate in the internet program you advertise should be able to expect that your company has taken all steps necessary to ensure that the service or product offered by you in Texas meets all Texas legal standards and requirements. Further, physicians should be able to have assurances from your company that they will not be jeopardizing their respective licenses should they choose to participate. The Board does not believe that physicians in Texas can rely on your representations as to compliance with Texas Board rules should they opt to participate in your program.

As you may recall, the Board, after extensive public input and numerous stakeholder meetings, several of which Teledoc participated in, adopted new telemedicine rules last year. As you will also recall, of all the stakeholders, only Teledoc and Optimum opposed the final rules as adopted, maintaining throughout the rulemaking process that "face-to-face" examinations were not necessary to establish a physician/patient relationship. Board Rule 190.8(1)(L) provides:

Prescription of any dangerous drug or controlled substance without first establishing a proper professional relationship with the patient.

> (i) A proper relationship, at a minimum requires:
> (I) Establishing that the person requesting the medication is in fact who the person claims to be;
> (II) Establishing a diagnosis through the use of acceptable medical practices such a patient history, mental status examination, physician examination, and laboratory testing. An online or telephone evaluation by questionnaire is inadequate;
> . . . .



EXHIBIT
tabbies®
A

The Board both initially and throughout the process specifically rejected the position that a "face- to- face" examination was not required to establish a physician/patient relationship and crafted the Board rules to allow for situations in which that required "face-to-face" examination

Mr. Paul Squire, Esq.
June 16, 2011
Page No. 2

could be accomplished through the use of the internet. Further refinements were provided for after that initial physician patient relationship was established. However, the fundamental language of Board Rule 190.8(1)(L) was never changed.

Teledoc's advertising material has multiple statements indicating that its process can be conducted over the telephone without any prior establishment of a physician/patient relationship via a "face-to-face" examination. Such statements include:

- **"Teledoc ....provides Aetna's Texas insured members access to Texas licensed physicians who treat minor non-emergent medical conditions via remote telephone consultations when the member's primary care physician is not available."**

- **"Specialize in talking with patients and diagnosing problems over the phone."**

- **"In compliance with the Texas Medical Board's rules, do not consult with individuals via email, algorithm or online chat, nor are consultations based solely on an online or telephone consult questionnaire."** The Board notes that the only thing the physician will be looking at is the patient's medical records maintained by Aetna. There will be no "face-to-face" examination by the Teledoc physician.

- **"You should be aware that Teledoc was actively involved in the comments to such Rules."** The Board notes that as Teledoc described its practices before the Board members sitting on the rulemaking committee, Teledoc was told it was then violating Board rules and if it continued in that vein it would continue to be in violation of Board rules.

- **"Moreover, the Texas Medical Board, when adopting the Telemedicine Rules last year, intentionally deleted phone consults from the definition of "telemedicine medical services" before the rules were finally adopted in August 2010. You should note that Teledoc does not provide video consultations here in Texas that would meet the definition of telemedicine medical services under the TMB's rules. Finally, the access which Teledoc provides to Aenta's members complies with the TMB's prior guidance ensuring that the standard of care is met in Teledoc's physicians' consultations."** Teledoc does correctly note that phone consults were deleted from the rule as adopted because such consults were directly in opposition to the position of the Board that "face-to-face" consults were the only appropriate manner in which to establish a physician/patient relationship. Such deletion was not the result of the Board's decision that telephone consultations would be appropriate. The Board notes that Teledoc was in violation of the Board's rules then and is in violation of the rules now, in that its program does not provide for a prior physician/patient relationship to be established with the "face- to-face" examination aspect.

- "... diagnose routine, non-emergency medical problems, recommend treatment, and can even call in a prescription to your pharmacy of choice, when necessary:"

These statements are but a few of the statements made by Teledoc, that if followed by licensed Texas physicians, will lead to disciplinary action against the participating doctors in the program.

Such knowing and deliberate misrepresentation is unconscionable given the active participation of Teledoc in the discussions and rulemaking procedures leading up to the adoption of the telemedicine rules in Board Rule 174 this last year. Teledoc has been told by Board members, the Executive Director and myself, as General Counsel, that the structure proposed by Teledoc is contrary to the Board's rules and that opinion has not changed due to the adoption of Board Rule 174. The adoption of that rule did not in any manner amend, modify, or delete the requirements of Board Rule 190.8(1)(L).

Accordingly, the Board is hereby notifying you that any representation that you make regarding Teledoc's program being in conformance with the Board's rules will be directly and firmly refuted by the Board. By copy hereof, the Board is sending this correspondence to the Texas Medical Association.

The Board will take all legal steps as are necessary should it see continued advertisements containing the material referenced above.

Sincerely,

Nancy Leshikar, J.D.
General Counsel

cc: **VIA LONE STAR OVERNIGHT DELIVERY**
Rocky Wilcox, JD
Vice President and General Counsel
Texas Medical Association
401 West 15th Street
Austin, Texas 78701

LICENSE NO. E-7013

| IN THE MATTER OF | § | BEFORE THE |
| THE COMPLAINT AGAINST | § § § | TEXAS STATE BOARD |
| DAVID LYMAN BRYSON, M.D. | § § | OF MEDICAL EXAMINERS |

**FINAL ORDER**

During open meeting at Austin, Texas, the Texas State Board of Medical Examiners finds that after proper and timely notice was given, the above-styled case was heard by an Administrative Law Judge of the Texas State Office of Administrative Hearings ("SOAH") who made and filed a proposal for decision containing the Administrative Law Judge's proposed findings of fact and conclusions of law. The proposal for decision was properly served on all parties and all parties were given an opportunity to file exceptions and replies as part of the record herein.

The Texas State Board of Medical Examiners, after review and due consideration of the proposal for decision, and exceptions and replies filed, if any, adopts the following proposed findings of fact and conclusions of law of the Administrative Law Judge ("ALJ"). All proposed findings of fact and conclusions of law not specifically adopted herein are hereby denied.

**FINDINGS OF FACT**

1. David L. Bryson, M.D., holds Texas Medical License E-7013.

2. The Texas State Board of Medical Examiners (Board) issued License E-7013 to Dr. Bryson on December 8, 1976.

3. Dr. Bryson's license has been temporarily suspended by the Board since January 22, 2001. At all other times relevant to this case, Dr. Bryson's license was in full force and effect.

4. In January 1999, Dr. Bryson entered into a business and financial relationship with Mr. William Stallknecht and the Pill Box Pharmacy, of San Antonio, Texas. Mr. William Stallknecht is a licensed Texas pharmacist.

5.    Dr. Bryson's business and financial relationship with Mr. Stallknecht and the Pill Box Pharmacy (Pill Box) continued until March 1, 2001.

6.    During 1999, Dr. Bryson consulted with over 10,000 patients through either internet questionnaires or telephone conversations. As the year progressed, Dr. Bryson consulted with fewer patients by internet questionnaire and consulted with more patients by telephone. Dr. Bryson prescribed only unscheduled drugs based on the internet questionnaire. He also prescribed scheduled drugs and controlled substances based on the telephone conversations.

7.    After December 24, 1999, Dr. Bryson ceased consulting with any patients solely through internet questionnaires. After that date, he conducted all of his consultations by telephone.

8.    From January 2000 through March 1, 2001, Dr. Bryson consulted with over 10,000 patients through telephone conversations. Dr. Bryson prescribed scheduled drugs and controlled substances to these patients based on the telephone conversations.

9.    Between January 1999 and March 1, 2001, more than 50% of the prescriptions written by Dr. Bryson were for the pain medication hydrocodone.

10.    Between January 1999 and March 1, 2001, more than 25% of the prescriptions written by Dr. Bryson were for anti-anxiety drugs, such as Xanax and Valium.

11.    Between January 1999 and March 1, 2001, Dr. Bryson had no medical office or other facilities to examine patients.

12.    Between January 1999 and March 1, 2001, Dr. Bryson never saw his patients or performed physical examinations, nor did he order urinalyses, CBCs, blood chemistries, X-rays, CT scans, MRIs, or any other type of diagnostic testing for any of the more than 20,000 patients that he consulted with by telephone or internet questionnaire.

13.    Between January 1999 and March 1, 2001, Dr. Bryson did not consult with the treating physicians for any of his 20,000 patients.

14.     Between January 1999 and March 1, 2001, Dr. Bryson failed to establish a proper medical diagnosis on his patients by not obtaining complete medical histories, not performing mental status exams, not performing physical examinations, and not ordering appropriate diagnostic testing.

15.     Between January 1999 and March 1, 2001, Dr. Bryson prescribed scheduled substances and dangerous drugs without establishing a proper physician / patient relationship.

16.     Between January 1999 and March 1, 2001, Dr. Bryson ordered three refills for approximately 90% of the prescriptions he issued.

17.     Between January 1999 and March 1, 2001, Dr. Bryson never requested or obtained any of his patients' relevant medical records directly from their prior or current treating physicians.

18.     Between January 1999 and March 1, 2001, Dr. Bryson never provided a report or a medical or clinical record to any of his patients' then current or subsequent treating physicians.

19.     Between January 1999 and March 1, 2001, Dr. Bryson prescribed dangerous drugs or controlled substances for pain without conducting any physical examinations of patients that included an assessment and consideration of the pain, physical and psychological function, history of substance abuse, coexisting diseases and conditions, or the presence of a recognized medical indication for the use of a dangerous drug or controlled substance.

20.     Between January 1999 and March 1, 2001, Dr. Bryson failed to make any arrangements for clinical follow-up or assessment of treatment for any of his patients.

21.     Between January 1999 and March 1, 2001, Dr. Bryson received two or three calls per month from patient family members stating that the patient was abusing drugs.

22.     Between January 1999 and March 1, 2001, Dr. Bryson failed to exercise sound medical judgment in treating pain and related symptoms with scheduled drugs and controlled substances.

23.     Between January 1999 and March 1, 2001, Dr. Bryson prescribed scheduled drugs and controlled substances in a manner that created a substantial risk of harm to his patients.

24. Between January 1999 and March 1, 2001, Dr. Bryson prescribed scheduled drugs and controlled substances in a manner inconsistent with public health and welfare.

25. Dr. Bryson's prescription of Tussionex (with hydrocodone) to patient JA on November 4, 1999, caused harm to JA in that it supported JA's addiction to pain medications.

26. During 1999, an $85.00 physician consultation fee was charged to each patient who received a prescription from Dr. Bryson. For internet-questionnaire patients, Dr. Bryson received $25.00 of the consultation fee and the Pill Box Pharmacy received $60.00 of the fee. For telephone consultation patients, Dr. Bryson received $35.00 and the Pill Box Pharmacy received $50.00.

27. Between January 2000 and March 1, 2001, a $100.00 physician consultation fee was charged to each telephone-consultation patient who received a prescription from Dr. Bryson. Dr. Bryson received $50.00 of the consultation fee and the Pill Box Pharmacy received $50.00 of the fee. After January 1, 2000, Dr. Bryson consulted with all patients by telephone.

28. All patients paid their fees by credit card to the Pill Box Pharmacy, which then paid Dr. Bryson his share.

29. If Dr. Bryson did not write a prescription for a patient, the patient did not pay the consultation fee and Dr. Bryson received no compensation.

30. Dr. Bryson's patient records lacked adequate information to document a diagnosis or to formulate a treatment plan for the following patients: JB, LB, VB, RC, DF, EH, PH, WH, CK, and DL.

31. Dr. Bryson's medical practice between January 1999 and March 1, 2001, was unprofessional and likely deceived, defrauded, and injured the public.

32. Dr. Bryson's continuation in the practice of medicine creates a danger or threat to the general public.

## CONCLUSIONS OF LAW

1.    The Board of Medical Examiners (Board) has jurisdiction over this matter pursuant to TEX. OCC. CODE ANN. §164.151.

2.    The State Office of Administrative Hearings has jurisdiction to conduct the administrative hearing in this matter and to issue a proposal for decision pursuant to TEX. OCC. CODE ANN. § 164.007 and TEX. GOV'T CODE ANN., Ch. 2003.

3.    Notice of hearing was provided as required by the Administrative Procedure Act, TEX. GOV'T CODE ANN.§ 2001.051 and 2001.052.

4.    The hearing was conducted according to the requirements of the Administrative Procedure Act, the Rules of the State Office of Administrative Hearings, and the rules of the Texas State Board of Medical Examiners.

5.    Based on Findings of Fact No. 30, Dr. Bryson violated 22 TEX. ADMIN. CODE (TAC)§ 165.1 by failing to maintain adequate medical records.

6.    Based on Findings of Fact Nos. 6-24, Dr. Bryson violated TEX. OCC. CODE § 164.051(a)(6) by failing to practice medicine in an acceptable manner consistent with the public health and welfare.

7.    Based on Findings of Fact Nos. 6-24, Dr. Bryson violated TEX. OCC. CODE § 164.051(a)(1) and 164.052(a)(5) by engaging in unprofessional conduct that is likely to deceive or defraud the public or injure the public.

8.    Based on Findings of Fact Nos. 6-24, Dr. Bryson violated TEX. OCC. CODE § 164.053(a)(6) by prescribing dangerous drugs and controlled substances in a manner inconsistent with the public health and welfare.

9.    Based on Findings of Fact Nos. 6-24, Dr. Bryson violated the BME Internet Prescribing Policy by prescribing dangerous drugs and controlled substances without establishing a proper physician-patient relationship.

10.    Based on Findings of Fact Nos. 6-24, Dr. Bryson violated 22 TAC § 170.3 by failing to follow Board guidelines for treatment of intractable pain.

11.    Based on Conclusions of Law Nos. 5-10, the Texas State Board of Medical Examiners should revoke Dr. Bryson's medical license No. E-7013.

## ORDER

Based on the above Findings of Fact and Conclusions of Law, the Board ORDERS that Respondent's Texas license is hereby REVOKED. Respondent shall immediately cease the practice of medicine in the state of Texas.

In accordance with TEX. OCC. CODE ANN § 2001.177 and 22 TEX. ADMIN. CODE § 187.39(C), should Respondent appeal this Final Order, the Respondent shall be responsible for payment of all costs of preparation of the original or certified copy of the record of the agency proceedings.

**SIGNED AND ENTERED** by the presiding officer of the Texas State Board of Medical Examiners on this __16__ day of August, 2002.

Lee S. Anderson, M.D., President
Texas State Board of Medical Examiners